# EXHIBIT 28

# ∎FOLEY

**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W.
SUITE 600
WASHINGTON, D.C.  20007-5109
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.295.4791
emorabito@foley.com

June 8, 2020

**CONFIDENTIAL**

<u>**Via E-Mail**</u>

Thomas J. McKee, Jr., Esq.
mckeet@gtlaw.com
Greenberg Traurig LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA 22102

       Re:    ***In re: LeClairRyan PLLC (the "Debtor")***

              **Demand that ULX Partners LLC ("ULXP") and UnitedLex Corporation ("UnitedLex") Return No Less Than $66,047,082.20 Received by ULXP in Preferential and Fraudulent Transfers and Pay Treble Damages as a Result of their Civil Conspiracy**

Dear Mr. McKee:

       As you are aware, this Firm represents Ms. Lynn L. Tavenner in her capacity as the Chapter 7 Trustee of the Debtor (the "Trustee") in the above referenced bankruptcy case, which is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.  We write to demand that ULXP and UnitedLex return no less than **$66,047,082.20**, which includes amounts received by ULXP in preferential and fraudulent transfers in an amount not less than $16,511,770.55 and treble damages, as a result of their conspiracy to hinder, delay and defraud creditors of the Debtor.  In addition to this amount, the Trustee demands all reasonable attorneys' fees and costs incurred in bringing claims against ULXP and UnitedLex, in an amount to be determined.[1]

---

[1] Because her investigation is ongoing, the Trustee reserves her right to increase this amount based on additional causes of action, not asserted herein.

| | | | | |
|---|---|---|---|---|
| BOSTON | JACKSONVILLE | MILWAUKEE | SAN DIEGO | TALLAHASSEE |
| BRUSSELS | LOS ANGELES | NEW YORK | SAN FRANCISCO | TAMPA |
| CHICAGO | MADISON | ORLANDO | SHANGHAI | TOKYO |
| DETROIT | MIAMI | SACRAMENTO | SILICON VALLEY | WASHINGTON, D.C. |



FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 2

### A.    SUMMARY OF RELEVANT FACTS

This Demand is a result of the Trustee's reasonable due diligence showing that ULXP, due to its pervasive operational control over the Debtor, is an insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code. Additionally, UnitedLex (1) operated ULXP as its alter ego and (2) formed and operated ULXP as a device to skirt the clear public policy prohibition against non-lawyers having an ownership interest in and sharing in the profits of law firms. Therefore, the prerequisites for piercing UnitedLex's corporate veil have been satisfied and United Lex is responsible for all amounts ULXP is obligated to return to the Debtor. Moreover, because UnitedLex and ULXP engaged in a conspiracy under Virginia's common law, UnitedLex and ULXP are also liable for treble damages pursuant to Virginia Code § 18.2-500.

The Trustee's investigation is ongoing. This Demand, therefore, presents a summary of certain facts and information presently known. The Trustee reserves the right to assert additional facts and causes of action at any time.

### 1.    From its Formation, ULXP Was Controlled by UnitedLex

ULXP was formed in April 2018 as a joint venture between UnitedLex and the Debtor. ULXP was publicly described as the creation of "a strategic business platform designed to empower a 'constellation' of law firms" by serving as a central source from which member law firms accessed dedicated tools, resources, and capital.[2] Referring to ULXP, Daniel Reed, UnitedLex's Chairman, told the American Lawyer that "if we don't reach 10,000 employees in the next five years, then I'm not doing something right. Some people would view that as heretical, but it's not."[3]

However, the first—and as it turns out, the only—firm in the constellation was the Debtor. Further, despite the lofty goals advertised as its purpose, the effect of the joint venture – indeed, its disguised purpose – was to facilitate the assumption of financial and operational control by UnitedLex over the Debtor.

---

[2] *UnitedLex and LeClairRyan Achieve a "Tour de Force" with the Launch of ULX Partners*, BUSINESSWIRE (June 13, 2018), https://www.businesswire.com/news/home/20180613005287/en/UnitedLex-LeClairRyan-Achieve-"Tour-de-Force"-Launch.

[3] Dan Packel, *UnitedLex's Deal With LeClairRyan Was a Failure. Is it Also a Sign of Things to Come?* THE AMERICAN LAWYER (Sept. 6, 2019, 10:11 a.m.), https://www.law.com/americanlawyer/2019/09/06/unitedlexs-deal-with-leclairryan-was-a-failure-is-it-also-a-sign-of-things-to-come/?slreturn=20200505114390.



**FOLEY & LARDNER LLP**

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 3

Moreover, the foundational documents for ULXP made clear that UnitedLex was in control of the joint venture and therefore the Debtor. Pursuant to ULXP's Amended and Restated Limited Liability Company Agreement (the "ULXP LLC Agreement"), "[t]he business and affairs of the company shall be managed, operated and controlled by or under the direction of the managing member," which was UnitedLex Manager LLC, a special purpose 100% owned subsidiary of UnitedLex. Daniel Reed, the CEO of UnitedLex, was the managing member of UnitedLex Manager LLC, thus completing the chain of control over ULXP by United Lex.

The ULXP LLC Agreement further stated that "the managing member shall have and is hereby granted, the full and complete power, authority and direction for, on behalf of the name of the company, to take such action as it may and in its sole direction deemed necessary or advisable to carry out any and all objections and purposes of the company, subject only to the terms of this agreement." UnitedLex excised its control over ULXP vigorously. As a practical matter, there was no separation between those two entities, and UnitedLex operated and controlled ULXP as its alter ego.

### a.    UnitedLex and ULXP took significant control over virtually every aspect of the Debtor

For its part, the Debtor had been incurring substantial setbacks for a number of years prior to entering into the ULXP venture. Among other things, the firm had repeatedly missed its budgetary goals beginning in 2011; profitable practice groups defected; other individual attorneys were fired; most shareholders lost some or all of the "at-risk" portion of their compensation; and many shareholders had their compensation reduced by six figures while the firm overpaid other attorneys. These issues reflected that the Debtor had been insolvent for some time as it entered into discussions to form the joint venture. Thus, as UnitedLex and the Debtor began their discussions in 2017, the Debtor was insolvent, and had been for a significant time, and therefore in desperate need of a lifeline.

As the negotiations unfolded, the Debtor's financial weakness and perilous path forward became apparent. Taking full advantage of its superior bargaining position, UnitedLex structured the formation of the governing and formation documents to bestow unprecedented control of ULXP—which was 99% owned by UnitedLex—over the Debtor. The extent of this control is illustrated by the Master Services Agreement (the "MSA"), which was entered into between the Debtor and ULXP on or about April 4, 2018, a true and correct copy of which is attached as Exhibit A.



**FOLEY & LARDNER LLP**

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 4

Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of the Debtor. The breadth of these responsibilities is best illustrated by the addendum to the MSA which listed those "responsibilities" to include such essential functions as "Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security".   The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions in the MSA, which state that ULXP would, among other things:

- "Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients."

- "Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the successful implementation of the Services, and (c) accomplish the goals of this Agreement."

-  "Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities."

- "Manage all market-facing communications and marketing collateral, including Law Firm's website."

- "Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients."

- "Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level."

-  "Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives."

- "Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work."

-  "Manage employee relations issues and performance management issues at Law Firm and the Provider."



FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 5

- "Identify, develop and propose compensation for Law Firm non-Members based on market data."

- "Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees."

- "Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm."

- "Manage and ensure the efficient functioning of Law Firm and Provider offices."

- "Track and manage efficient Law Firm time entry compliance."

- "Track and manage WIP, write downs and write-offs."

- "Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables."

(Ex. A, Addendum 1, § III)

These were not mere "Middle Management" delegations. Indeed, the effect of the assumption by ULXP of these sweeping responsibilities over the business of the Debtor is graphically illustrated in the below PowerPoint slide prepared by Peter Krakaur, a UnitedLex Vice President, illustrating that ULXP and the Debtor functioned as one entity:



FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 6



(Exhibit B.)

      Because of the pervasive breadth of these essential services, once the ULXP transaction was consummated, the Debtor was no longer able to function without ULXP or UnitedLex. Indeed, through its control of <u>every function</u> necessary to the Debtor's operations as a law firm (except for providing legal advice), ULXP exerted control over almost all of the operations of the Debtor. As Peter Krakaur unequivocally stated in August 2018, "<u>ULXP is now the owner of the business of law</u>."[4]

      That very same communication shows that UnitedLex and ULXP regarded themselves as part of the ownership process and regarded its position as driving the debtor to decisions that ULXP wanted implemented. (See Exhibit C.) Mr. Krakauer wrote, "[w]e all know law firms do not operate as a business. ULXP is designed to change that. Given the nature of the relationship, the agreements, <u>and the practical aspects of us running the law firm</u>, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan." (See Ex. C (emphasis added).) Indeed, by discussing the effects of "us running the law firm," that "we" needed to consider certain actions and that "we" needed to

---

[4] Ex. C (emphasis added). Krakaur made this statement in the notes to a calendar invitation to an August 10, 2018 invitation sent to among others, Daniel Reed, UnitedLex's Chief Executive Officer and Nicholas Hinton, its Chief Financial Officer.



Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 7

communicate actions, Mr. Krakauer – as a UnitedLex Vice President— did not even attempt to hide that ULXP was simply the alter ego of UnitedLex and that UnitedLex was calling all the shots.  (See Ex. C.)

The ways in which ULXP exerted control, all for the benefit of United Lex, were far from subtle.  For example, in a March 15, 2019 email from Mr. Hinton, Chief Financial Officer of United Lex and also a member of ULXP's Oversight Board, to the Debtor, relayed that "[t]he 250K [overdue to ULXP] continues to build the amount due to ULX as we also have payroll next week. Please revisit the cash, your holdbacks and your priorities. . . . Like I said before, we are not the bank. The top priority has to be paying ULXP—we are the vendor that can shut down operations." (Emphasis added). (Exhibit D.)

Clearly, ULXP controlled the Debtor with an iron fist.

2.      **ULXP Was an Insider of the Debtor and is Thus Liable for $16,511,770.55 to The Trustee**

The inescapable conclusion – based on, among other things, the facts described above and the linking of the Debtor's profits to ULXP's compensation – is that ULXP is an insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.

Among other things, ULXP (1) was an affiliate of the Debtor as an entity that operated the business or substantially all of the property of the Debtor under an operating agreement; and (2) was a managing agent of the Debtor, as it exerted operational control over the Debtor, had the ability to make personnel decisions, had the authority to incur or pay obligations, and had access to financial and other information essential to the Debtor's operation. ULXP is also a non-statutory insider because, among other things, ULXP (1) had a close relationship with the Debtor; (2) exercised extensive influence over the Debtor; and (3) engaged in transactions that were not arms-length.

As a result, ULXP is liable to the Debtor for all payments during the one year period before the Petition Date because they are a preference pursuant to section 547(b) of the Bankruptcy Code.  The facts will show that the Debtor transferred no less than $16,511,770.55 to its insider ULXP during this time.  Consequently, the transfers are preferential and may be avoided under § 547(b) of the Bankruptcy Code and, pursuant to § 550(a) of the Bankruptcy Code, may be recovered from ULXP as the initial transferees.



**FOLEY & LARDNER LLP**

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 8

### 3.      Fraudulent Transfers to ULXP in the Amount of $16,511,770.55 Must Be Returned to the Trustee

From July 30, 2018 through July 31, 2019, the Debtor transferred amounts to its insider ULXP that totaled $16,511,770.55 (the "Fraudulent Transfers"). (*See* Exhibit E.)  These transfers were made with the actual intent to delay, hinder, or defraud creditors during a time period where the Debtor was insolvent and thus must be returned to the estate.

Prior to entering into the MSA, the Debtor had been incurring substantial setbacks for years. Among other events, budgetary goals were repeatedly missed since 2011, shareholders defected or were fired, many had their compensation reduced, and others were overpaid.  Indeed, at the time the MSA was signed, creditors were owed a substantial sum of money, a fact that ULXP knew or should have known. Yet, in an attempt to artificially extend its lifespan, the Debtor entered into the ULXP relationship and ceded to ULXP the power to prioritize payment of the Debtor's expenses.  This action resulted in the payment by the Debtor to its insider ULXP of no less than $16,511,770.55.  Because the Debtor made these transfers with the intent to delay, hinder, or defraud creditors during a time period where it was insolvent, the Trustee may recover the Transfers from ULXP under §§ 544(b) and 548(a)(1)(A) of the Bankruptcy Code and Virginia Code § 55.1-400.

### 4.      Debtor's Purported Secured Claim Must Be Recharacterized as Equity

ULXP has filed a secured claim based on an Outstanding Deferred Loan Promissory Note in the principal amount of $8,000,000 (the "ULXP Note") and an accompanying Security Agreement (the "ULXP Security Agreement").  However, the facts show that UnitedLex and ULXP acted in concert with the Debtor's management to attempt to treat this "loan" as equity. This secured claim will of course be disallowed if the Preferential Transfers are not returned to the Trustee as demanded. In all events, you are hereby put on notice that the secured claim is properly reclassified as one based on an equity investment.

The Deferred Loan Promissory Note documents were backdated to December 20, 2018, but were actually prepared over several weeks before being executed on April 4, 2019.  By the ULXP Note, the Debtor agreed to pay ULXP the principal amount of $8,000,000 for alleged deferred fees owed by the Debtor to ULXP under the MSA.  Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023. (Exhibit F, §§ 1 and 3.) The result of the ULXP Note and the ULXP Security Agreement—and clearly its purpose—was



Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 9

to elevate ULXP's priority over other unsecured creditors. Indeed, the debt that formed the center of that loan consisted of prior advances made by ULXP to the Debtor.

Yet, at the same time that ULXP was maneuvering to increase its priority over unsecured creditors, it was working in concert with the Debtor to convince Virginia Commercial Finance ("VCF")—the bank that had a senior lien on the assets of the Debtor—that the $8,000,000 loan should be treated as an equity transaction. That the Note and Security Agreement transaction was in reality a disguised equity infusion is evidenced in part that the Debtor was undercapitalized, indeed insolvent, at the time Note and Security Agreement and from the overall nature of the relationship between ULXP and the Debtor.

But indirect evidence is not necessary here as the Debtor, along with ULXP and UnitedLex, were all aware that the transaction was in the nature of an equity infusion, not a loan. On January 22, 2019, Chris Lange, an attorney with the Debtor, sent revisions to the ULXP Loan to UnitedLex and ULXP's outside counsel, and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender …would see as being equity like in that it is being paid from the return on our equity investment in ULX Partners." (Exhibit G.) This effort proved successful, as on January 31, the lender informed the Debtor that it approved the leverage ratio calculation so that the $8M will be treated as equity, saying "[t]he [ULXP] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in." (Exhibit H.)

Consequently, the Debtor's purported security interest must be re-characterized as equity.

**5.      UnitedLex Is Responsible for All Funds That ULXP Is Obligated to Return to the Trustee**

The structure of the ULXP joint venture, together with UnitedLex's complete ownership, operational and financial control of ULXP, demonstrates that ULXP was merely a device or sham used by UnitedLex to disguise wrongs, obscure fraud, and possibly conceal crimes that were occurring. As such, ULXP's corporate veil should be pierced to enable recovery against UnitedLex for all amounts owed by ULXP to the Debtor's bankruptcy estate.

UnitedLex owned 99% of, had complete operational and financial control over, and treated ULXP as its alter ego. Additionally, the unity between those two entities was so extensive that any reasonable notion of separateness had ceased. UnitedLex also organized and operated



**FOLEY**
FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 10

ULXP in a manner that flouted the public policy proscription against non-lawyers having an equity interest in, and sharing in the profits of, a law firm. Consequently, ULXP was a device or sham used by UnitedLex to disguise wrongs, obscure fraud or conceal crime. As such, ULXP's corporate veil should be pierced to enable recovery against UnitedLex for all amounts owed by ULXP to the Debtor's bankruptcy estate. The Trustee hereby demands payment thereof.

### 6.     UnitedLex and ULXP are Liable for Civil Conspiracy

The actions of UnitedLex and ULXP, some of which are previewed in this Demand Letter, are also evidence of civil conspiracy in violation of Virginia law. More specifically and as discussed in greater detail above, UnitedLex and ULXP worked in concert to affect the fraudulent transfers described above for the willful and malicious purpose of injuring the Debtor's business. Moreover, the Trustee is investigating additional civil conspiracy claims that involve, among others, United Lex, ULP, certain members of the Debtor's management, and other entities and individuals who may have worked in concert to also effect the fraudulent transfers described above. Such actions were for the purpose of hindering, delaying, and defrauding the Debtor's creditors. UnitedLex and ULXP are therefore liable for civil conspiracy under Virginia's common law and for treble damages pursuant to section § 18.2-500, Virginia Code.

### B.     DEMAND

In sum, the Trustee demands ULXP and UnitedLex return no less than **$66,047,082.20**, based on the $16,511,770.55 received by ULXP in preferential and/or fraudulent transfers and treble damages of this amount. Moreover, the Trustee demands her attorneys' fees and costs, in an amount to be determined. In addition, the Trustee reserves the right to assert additional facts, causes of action, and/or additional damages at any time.

*          *          *          *          *



**FOLEY**
FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 11

Please be advised that under the Procedures Order, UnitedLex and ULXP have fourteen (14) days from the date of this letter to elect to proceed to the Mediation Process provided for in Section 3 of the Procedures Order.  The election must be made by written request to the Trustee's counsel, Paula S. Beran (pberan@tb-lawfirm.com) and the undersigned, as the Trustee's Special Litigation Counsel (emorabito@foley.com).  If UnitedLex and ULXP make a Pre-Complaint Mediation Election, the Trustee will not file a complaint against them until after the filing of the Mediator's Report. Absent the timely Pre-Complaint Mediation Election and/or a consummated settlement within thirty (30) days of the date of this letter, the Trustee will proceed to file a complaint against UnitedLex and ULXP.

Sincerely,

FOLEY & LARDNER LLP

Erika L. Morabito