## <u>Exhibit A</u>
**Part 1 of 2**

**Corrected Complaint**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>　　　**LeClairRyan PLLC,**<br><br>　　　　　**Debtor** | **Case No.: 19-34574-KRH**<br><br>**Chapter 7** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>　　　　**Plaintiff,**<br><br>vs.<br><br>**ULX PARTNERS, LLC and UNITEDLEX CORPORATION,**<br><br>　　　**Defendants.** | **Adv. Pro. No.: _____** |

## COMPLAINT

Plaintiff, Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "Chapter 7 Trustee" or, the "Trustee") of the bankruptcy estate (the "Estate") of LeClairRyan, PLLC ("LeClairRyan" or the "Debtor"), by her undersigned counsel, states the following in support of this Adversary Complaint against Defendants ULX Partners, LLC ("ULXP") and UnitedLex Corporation ("UnitedLex") (collectively, the "ULX Entities" or "Defendants"):

―――――――――――――――――
Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 600
Washington, DC 20007-5109
Telephone: (202) 672-5300
Telecopy: (202) 672-5399
emorabito@foley.com
bnelson@foley.com
*Special Counsel to Lynn L. Tavenner, Esq., the Chapter 7 Trustee of the Estate of LeClairRyan PLLC*

## NATURE OF THE CASE

1.      This case arises from the business failure of Richmond-based law firm
LeClairRyan.  On or about the fall of 2017, the struggling law firm began negotiating a potential
joint venture with a legal services provider, UnitedLex, which was intended to resolve the firm's
financial problems with an infusion of much needed liquidity.  In the end, however, rather than
resolving the Debtor's financial issues, the actions or inactions of the ULX Entities only served to
plunge LeClairRyan further into insolvency.  In fact, the Defendants, along with certain of the
Debtor's directors, officers, and agents (the "LCR Officers and Directors"), prioritized their own
desires for financial gain and prolonged the Debtor's lifespan, enabling the Defendants and others
to improperly and unfairly extract millions of dollars from the Estate, to the detriment of
LeClairRyan's creditors.

2.      As more fully set forth below, the structure of the ULXP joint venture, and the way
in which it operated in practice, bestowed insider status on the ULX Entities vis-à-vis the Debtor.
This resulted in, among other things, the creation of voidable liens and recoverable preferential
transfers in an amount not less than $17,425,405.50.

3.      Irrespective of insider status, the ULX Entities are liable for not less than
$19,357,282.51 in damages for fraudulent transfers.

4.      Moreover, the conspiracy between the ULX Entities and the LCR Officers and
Directors caused damages in an amount of not less than $42,759,900, including but not limited to
damages relating and/or arising out of (i) keeping the Debtor operating instead of winding down
the insolvent law firm; (ii) the Debtor's conversion from a professional corporation to a
professional limited liability corporation, a condition precedent to forming the joint venture with
UnitedLex; (iii) the Debtor's liquidation of a retirement plan; and/or, (iv) the increase in trade
payables and account receivables.

5.      Finally, the Defendants' actions also caused damages and harm to the Estate, in an amount of not less than $1,069,51.00 through their misappropriation of funds tendered by clients for specific expenses, which were used by the ULX Entities for improper purposes.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

7.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Chapter 11 Cases (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).

8.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a).

9.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

10.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and (8) to, among other things, determine the validity, priority, or extent of a lien or other interest in property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential and fraudulent obligations and transfers.

11.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

12.     On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3

13.     On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1]  As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Estate.

14.     The Debtor was a law firm run, at different times, by a board of directors and/or managers.

15.     The Debtor was organized under the laws of the Commonwealth of Virginia.

16.     Defendant UnitedLex is a Delaware corporation with its principal place of business in Overland Park, Kansas.

17.     In September 2018, UnitedLex became a portfolio investment of CVC Capital Partners ("CVC"), a private equity and investment advisory firm.

18.     Defendant ULXP is a Delaware limited liability company.

19.     ULXP was created in 2018 as a joint venture between the Debtor and UnitedLex, and was 99% owned by UnitedLex.

20.     ULXP was also fully controlled and managed by a special purpose entity wholly owned and controlled by UnitedLex.

## STATEMENT OF FACTS

### A.     LeClairRyan's Dire Financial Status Prior to 2017.

21.     LeClairRyan was founded in 1988 by Dennis Ryan and Gary D. LeClair ("LeClair").  It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia.  But LeClairRyan rapidly expanded – ultimately opening offices or acquiring firms across the United States.

---

[1] *See* Appointment of Interim Trustee Lynn L. Tavenner, Dkt. No. 175.

4850-3004-5648.2

22.     Fundamental issues of financial mismanagement plagued the firm for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

23.     Beginning at least in 2014, LeClairRyan consistently missed its budget and its revenue fell short of projections.

24.     By at least the end of 2014, the Debtor was insolvent, or within the zone of insolvency, failing to generate sufficient revenue to pay its debts as they became due.

25.     In 2017, searching for a lifeline, the Debtor turned to a potential joint venture with a third-party, the legal services provider UnitedLex, as a way to address the Debtor's financial difficulties.

**B.      UnitedLex and LeClairRyan Enter Into a Joint Venture.**

26.     Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments.  These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support.  These non-legal services also include legal support services, like patent mining, document management, and electronic discovery.

27.     Upon information and belief, in approximately 2017 UnitedLex sought to move beyond merely being a vendor providing legal services to become more of a partner to a "constellation" of law firms.

28.     The joint venture between UnitedLex and LeClairRyan was intended to be the foundation of this proposed "constellation" structure in the United States.

5

29.     UnitedLex advertised when the joint venture was announced, through ULXP, UnitedLex and LeClairRyan sought to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."[2]

30.     Under this model, ULXP would provide its constellation law firms with "market-leading technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics."[3]

31.     UnitedLex also advertised that the joint venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength."[4]

**C.     Initial Negotiations Regarding the ULXP Venture.**

32.     Negotiations between UnitedLex and LeClairRyan regarding the ULXP venture began on or about October 2017.

33.     Under the initial terms of the deal, including in a proposal presented to the Board of Directors of LeClairRyan (the "LCR Board") on December 29, 2017 (the "December 29 Proposal"), UnitedLex would control ULXP, but members of the LeClairRyan leadership team would hold senior leadership positions at ULXP.[5]

---

[2] *See Business Wire, "UnitedLex and LeClairRyan Achieve a 'Tour de Force' with the Launch of ULX Partners"* (June 13, 2018), *available at* https://www.businesswire.com/news/home/20180613005287/en/UnitedLex-LeClairRyan-Achieve-%E2%80%9CTour-de-Force%E2%80%9D-Launch.

[3] *Id.*

[4] *Id.*

[5] A true and correct copy of the December 29 Proposal is attached as Exhibit 1.

34.     Under the terms of the December 29 Proposal, LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the Debtor to provide an array of services to the firm. LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.[6]

35.     Under the terms of the December 29 Proposal, LeClairRyan was to receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.[7]

36.     Under the terms of the December 29 Proposal, LeClairRyan would also receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."[8]

37.     Upon information and belief, at the time of the December 29 Proposal, the parties were also considering an additional $13 million dollar loan to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

38.     The December 29 Proposal also included terms creating other financial incentives for the Debtor's individual shareholders, including an immediate full redemption of their shares in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving equity interests in UnitedLex through either annual or performance-based interests options.

---

[6] *Id*. at 1.

[7] *Id.*

[8] *Id.* at 2.

39.     Despite the fact that CVC's investment in UnitedLex was not formalized and would not be announced to the public until September 2018, CVC was an active participant in negotiating the deal from the start and, ultimately, was a critical driver of the final terms of the deal.

40.     Upon information and belief, behind closed doors, as the transaction was being negotiated, CVC was represented as being UnitedLex's "bankers" and CVC employees participated in multiple in-person meetings and discussions with the Debtor, UnitedLex, and others, regarding the structure of the transaction and relevant deal terms.

41.     For instance, on or about November 22, 2017, UnitedLex CEO Dan Reed ("Reed") told LeClair in an email that "the lead bankers from CVC will be flying to NYC next week to review a range of details re: our vision/future" and inviting him to join.[9]  Jennifer Weiss from Greenberg Traurig was also in attendance in this NYC meeting.

42.     Yet, when the deal was announced to the public, CVC's role was entirely omitted, such as when Reed touted the fact UnitedLex was "venture-backed by JP Morgan."[10]

43.     As described further in Paragraphs 94 to 109, below, UnitedLex ultimately required that LeClairRyan take several actions as conditions precedent to entering into the ULXP transaction.  Among these conditions, ULXP required LeClairRyan to convert from a professional corporation (PC) to a professional limited liability corporation (PLLC).

**D.     The Deal Changes Upon UnitedLex Learning of LeClairRyan's Financial Position.**

44.     During the winter and spring of 2018, the parties engaged in due diligence for the joint venture.

---

[9] A true and correct copy of the November 22, 2017 email from Reed to LeClair is attached as Exhibit 2.

[10] UnitedLex Partners: What exactly is it?  Legal IT Insider (Aug. 8, 2018) https://legaltechnology.com/unitedlex-ulx-partners-what-exactly-is-it/.

45.     Even though CVC was not a party to the transaction — its investment in UnitedLex would only be made public several months after ULXP was announced — CVC was, however, given access to confidential due diligence information related to the transaction.

46.     There was concern at the time from UnitedLex's counsel that CVC was receiving more information than UnitedLex.  For example, in a February 18, 2018 email, Reed noted that "[Greenberg] want[s] me to ensure that our board has the same level of information as has been provided to CVC to avoid any claim of unequal information. . . ."[11]

47.     On or about January 2018, UnitedLex hired a third-party, Doug Benson ("Benson") of $SB_2$ Consultants ("$SB_2$"), to conduct due diligence and assess the Debtor's finances.

48.     Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report").[12]

49.     The Benson Report gave United Lex insight into the poor and troubling condition of LeClairRyan's finances.

50.     In a March 21, 2018 email from Reed to LeClairRyan's then-CEO Erik Gustafson ("Gustafson") and LeClair (the "March 21-22 Reed Email Chain"), Reed described the findings contained in the Benson Report, explaining that "[Benson's] findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity. [Benson] goes as far as to **raise a question of going concern** given current obligations and being at the limit of its credit line and partner stability."[13]  (emphasis added).

---

[11] A true and correct copy of the February 18, 2018 email from Reed is attached as Exhibit 3.

[12] A true and correct copy of the Benson Report is attached as Exhibit 4.

[13] A true and correct copy of the March 21-22 Reed Email Chain is attached as Exhibit 5, at 3.

51.     In the March 21-22 Reed Email Chain, Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path…we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."[14]

52.     In response to the March 21-22 Reed Email Chain, Gustafson provided a detailed rebuttal to the issues identified in the draft Benson Report and the concerns noted in the March 21-22 Reed Email Chain.  Gustafson claimed that LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."[15]

53.     As of March 22, 2018, UnitedLex knew, or should have known, that LeClairRyan was insolvent or in the zone of insolvency.

54.     For instance, replying to Gustafson's response to the March 21-22 Reed Email Chain, Reed stated, in relevant part:

> [t]he real challenge is liquidity for [LeClairRyan]. I was not expecting that [UnitedLex] would make the capital return, takeover the debt (which does not help [LeClairRyan] in terms of new liquidity) AND *then have to infuse material cash to ensure the firm can survive*. Doug's take away from [Dwight Jones] is that every day begins with a review of cash and serious concerns over the current situation.  *Doug [Benson] has not come across a firm that is in [LeClairRyan]'s current cash position, and has expressed serious concern with its status as a going concern*…I also did not fully realize until seeing [the Benson Report] that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs.  Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our 'deal infusion,' how much is needed to operate the firm *without being in the perpetual red zone.*[16]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 1.

(emphasis added).

**E.      UnitedLex and LeClairRyan Seek Legal Opinions to Support the Joint Venture.**

55.      LeClairRyan received legal advice with respect to the planned joint venture from Hinshaw & Culbertson LLP ("Hinshaw").

56.      Upon information and belief, UnitedLex also received legal advice with respect to the planned joint venture from Hinshaw.

57.      Hinshaw's role advising the parties was described in a March 19, 2018 executive summary of the contemplated transaction prepared for LeClairRyan's members (the "Project ULX Executive Summary").[17]

58.      The Hinshaw Summary states that LeClairRyan "individually engaged" Hinshaw to provide "an ethics opinion for the benefit of [LeClairRyan] confirming that the overall proposed transaction and deal structure are legal and ethical."[18]

59.      The Hinshaw Summary also states that UnitedLex "separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion."[19]

60.      UnitedLex had previously received a legal opinion from Hinshaw dated July 25, 2017 (the "July 2017 ULX Opinion"), regarding a similar joint venture transaction with another law firm.[20]

61.      The July 2017 ULX Opinion cautioned that UnitedLex could not "**under any circumstances have an ownership interest in [the law firm], or exercise any management or**

---

[17] A true and correct copy of the March 19, 2018 Project ULX Executive Summary is attached as Exhibit 6.

[18] *Id.* at 9.

[19] *Id.*

[20] A true and correct copy of the July 25, 2017 ULX Opinion is attached as Exhibit 7.

**control over [the law firm], or over the provision of legal services by [the law firm]"** (emphasis in original).[21]

62.     The July 2017 ULX Opinion was referenced in term sheets prepared on or about October 2017, which began to sketch out the proposed transaction between UnitedLex and LeClairRyan.

63.     These early term sheets relied on the July 2017 ULX Opinion, among others, to claim that the deal under discussion was "[f]ully compliant with [the] Rules of Professional Conduct."[22]

64.     Following discussions between Hinshaw, LeClairRyan's then-General Counsel, Lori Thompson ("Thompson"), and others, Hinshaw provided the Debtor with an initial opinion letter on March 27, 2018.[23]

65.     A revised version of the opinion letter was provided to Thompson the following day (the "March 28, 2018 Opinion Letter").[24]

66.     The March 28, 2018 Opinion Letter was provided to the LCR Board in advance of its vote to approve entering into the ULXP transaction.

67.     However, the March 28, 2018 Opinion Letter was premised upon facts relevant to earlier versions of the deal terms and not the terms actually under negotiation at the time it was issued.

---

[21] *Id.* at 6.

[22] A true and correct copy of the October 10, 2017 Draft Summary of Terms is attached as Exhibit 8.

[23] A true and correct copy of the March 27, 2018 initial opinion from Hinshaw is attached as Exhibit 9.

[24] A true and correct copy of the March 28, 2018 Opinion Letter is attached as Exhibit 10.

68.     For example, the March 28, 2018 Opinion Letter included references to "ULFS" –

United Law Firm Solutions – which was the name the parties had used for the joint venture during

negotiations in or around the Fall of 2017.[25]

69.     Notably, the March 28, 2018 Opinion Letter did not include any discussion

affirmatively stating that UnitedLex would not have an "ownership interest in" LeClairRyan or

that UnitedLex would not "exercise any management or control" over LeClairRyan.

70.     The March 28, 2018 Opinion Letter was never updated, not even after the structure

and operation of the joint venture were revised prior to the effective date of the agreements creating

ULXP, nor after aspects of the agreements creating ULXP were amended in or around the end of

2018.

71.     Upon information and belief, LCR Officers and Directors made false and/or

misleading statements to Hinshaw regarding the nature of the ULXP transaction.

72.     Upon information and belief, UnitedLex made false and/or misleading statements

to Hinshaw regarding the nature of the ULXP transaction.

**F.     Despite Knowing of LeClairRyan's Insolvency, the Debtor and UnitedLex Move
Forward to Create the Joint Venture.**

73.     Despite expressing serious reservations once they learned the true extent of

LeClairRyan's insolvency, CVC and UnitedLex pushed forward with the ULXP venture.

74.     Once the Debtor's financial situation was known, UnitedLex restructured the

proposed transaction between ULXP and LeClairRyan (the "Proposed Transaction") to reduce the

immediate financial benefits to the Debtor and bestow more control over the Debtor's operations

to ULXP, to the detriment of the Debtor's creditors.

---

[25] *Id.* at 2.

75.     First, CVC and UnitedLex immediately took the additional loans of up to $33 million off the table due to serious concerns about LeClairRyan's liquidity and earning potential.

76.     Thus, UnitedLex gave no new money to LeClairRyan as a part of the transaction.

77.     Second, the Debtor's equity interest in the venture was reduced, ultimately to merely 1%.

78.     Third, the Debtor and ULXP entered into an expansive Master Services Agreement (the "MSA") on or about April 4, 2018.[26]

79.     Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of the Debtor.[27]

80.     The breadth of these responsibilities is best illustrated by a section of the MSA entitled "Provider & Law Firm Responsibilities," which listed the contemplated responsibilities of ULXP in regards to several essential functions, including "Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security."

81.     The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions of ULXP's responsibilities under the MSA, which stated that ULXP would, among other things:

a.      "Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients."

b.      "Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the

---

[26] A true and correct copy of the April 29, 2018 MSA is attached as Exhibit 11.

[27] *Id.* at 1-2.

successful implementation of the Services, and (c) accomplish the goals of this Agreement."

c.  "Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities."

d.  "Manage all market-facing communications and marketing collateral, including Law Firm's website."

e.  "Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients."

f.  "Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level."

g.  "Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives."

h.  "Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work."

i.  "Manage employee relations issues and performance management issues at Law Firm and the Provider."

j.  "Identify, develop and propose compensation for Law Firm non-Members based on market data."

k.  "Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees."

l.  "Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm."

m.  "Manage and ensure the efficient functioning of Law Firm and Provider offices."

n.  "Track and manage efficient Law Firm time entry compliance."

o.  "Track and manage [work-in-progress], write downs and write-offs."

p.  "Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables."

4850-3004-5648.2

82.     Once the ULXP transaction was consummated, the Debtor was no longer able to function on its own without the support of the ULX Entities.

83.     The MSA also provided for fees to ULXP to be calculated under a combination of factors, including what the MSA described as "Invoice Fees" related to "Operations Services" and "Production Services."[28]

84.     The Operations Services Fees related to ULXP's provision of the different back office and other non-legal services that LeClairRyan transitioned to it.[29]

85.     The Production Services Fees were established through "*a calculation that is based on member distributable income and accrued revenue*," which are fees from the Debtor's legal services.[30]

86.     Thus, pursuant to the Production Services Fees, ULXP *was to be compensated based on net profits of the law firm from its provision of legal services*.

87.     Upon information and belief, ULXP was sharing in fees from LeClairRyan's legal practice, which is prohibited by the Virginia State Bar Rules of Professional Conduct (the "Rules of Professional Conduct").

88.     The MSA included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of the Law Firm."[31]

89.     Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"):  (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member

---

[28] *See* MSA, *supra* n. 26, at 10-12.

[29] *Id*.

[30] *Id*.

[31] *Id.*

and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018); (2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of Class B Common Interest (effective April 4, 2018  and including the Operating Agreement as Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4, 2018); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement") between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

90.     Together, the JV Agreements granted the ULX Entities unprecedented control over the operation of the Debtor law firm.

91.     The Defendants used the JV Agreements to influence and control LeClairRyan's decision-making and require LeClairRyan to pay them ahead of other creditors.

92.     The Defendants also used the JV Agreements to influence and control LeClairRyan's decision-making, including requiring LeClairRyan to inappropriately misuse funds tendered by clients for specific costs and expenses.

93.     At the time the JV Agreements were executed, the LCR Board knew, or should have known, that LeClairRyan was insolvent or in the zone of insolvency.

**G.     As a Condition of the Joint Venture, LeClairRyan Converted from a Professional Corporation to a Professional Liability Corporation and Liquidated its Deferred Compensation and Supplemental Retirement Plans.**

94.     As a condition precedent to entering into the ULXP transaction, ULXP required LeClair Ryan to convert its corporate form from a PC to a PLLC.

95.     LeClairRyan converted from a PC to a PLLC as of March 31, 2018 (the "Conversion").

96.     The PLLC flow-through structure allowed for a single level of taxation on any capital gains that would have resulted from the shareholders' equity in ULXP.

4850-3004-5648.2

97.     The effects of the Conversion were described in a March 22, 2018 email from Gustafson to Reed, which explained that one consequence of the Conversion was that the firm was able to "materially reduce [its] monthly cash burn [in 2018] by another $450k per month" (the "March 22, 2018 Gustafson Email").[32]

98.     In the March 22, 2018 Gustafson Email, Gustafson explained that the Conversion also allowed the firm to "pay about $30 million in partner draws on a tax deferred basis" which "create[d] a significant retention incentive through 2023, especially for [LeClairRyan's] biggest producers, because early departure can trigger a recapture tax event."[33]

99.     As the firm had previously explained to its shareholders in materials provided in advance of a February 24, 2018 meeting to approve the Conversion, "[r]etention of Partners via the equity incentive [was] a **key requirement for ULX**."[34] (emphasis added.)  The "conversion to an LLC to avoid double tax" was seen as "evidence [of] the value [LeClairRyan] place[d] in that incentive."[35]

100.     Certain accounting-related aspects of the Conversion are currently the subject of an IRS audit.

101.     The IRS filed a proof of claim in the bankruptcy (Claim No. 252), which, among other things, asserts a priority claim in the estimated amount of $4,759,175.17, based on the tax returns prepared in conjunction with the transaction and the accounting methods used therein.

---

[32] *See* Exhibit 5, *supra* n. 13.

[33] *Id.* at 2.

[34] A true and correct copy of the Conversion to LLC Net Cash Benefits Summary, an attachment to a February 24, 2018 email to Shareholders, is attached as Exhibit 12.

[35] *Id*. at 3.

102.    In addition, in connection with the ULXP transaction then-under negotiation, the LCR Board voted to terminate the firm's Deferred Compensation and Supplemental Retirement plans effective as of December 29, 2017.

103.    The effect of this termination was that the plan balances, totaling an amount not less than $12 million, became eligible to be transferred to shareholders beginning on or about December 29, 2018.

104.    Although these payments would have ordinarily been taxable to the shareholders receiving payments from the terminated plans, the tax savings realized from LeClairRyan's conversion from a PC to PLLC were passed through to the individual shareholders, who were able to use those net operating losses to offset the taxes that would have been owed on the distributions.

105.    LeClairRyan recognized this benefit in a January 13, 2018 draft summary of the Conversion prepared for its shareholders, which noted that "[t]hose distributions ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."[36]

106.    The termination and subsequent payments from the Deferred Compensation and Supplemental Retirement plans diverted funds from the Debtor's creditors.

107.    At or around the time of the transaction, the LCR Board and the LCR Officers and Directors breached their fiduciary duties of care and loyalty by, among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients

---

[36] A true and correct copy of the January 13, 2018 Project 100 Summary is attached as Exhibit 13.

for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

108. The ULX Entities aided and abetted the LCR Board's breach of its fiduciary duties of care and loyalty and conspired with the LCR Officers and Directors to breach the duties owed to the Debtor and its shareholders, clients, and creditors

109. As a result of their breaches of fiduciary duties of care and loyalty, including their decision to enter into the ULXP transaction, instead of winding down the insolvent law firm, the LCR Officers and Directors caused significant damages to the Estate in an amount not less than $42,759,900.

**H.    ULXP Controls LeClairRyan Through the Joint Venture.**

110. Following the execution of the MSA and JV Agreements, the ULX Entities worked as managing agents for the Debtor.

111. The ULX Entities were in charge of key functions, such as accounting, marketing, conflict management, and business development.

112. The ULX Entities accessed the Debtor's financial and other confidential information essential to the operation of the Debtor.

113. Upon information and belief, the ULX Entities also incurred expenses on the Debtor's behalf.

114. The ULX Entities also made personnel decisions regarding the Debtor's personnel.

115. ULXP Employees were the directors of the following key operations at LeClairRyan: Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development.

116.    ULXP Employees regularly held themselves out to the public to be employees and decision-makers of LeClairRyan.

117.    For instance, in February 2019, Josh Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as the "Chief Operating Officer" of LeClairRyan, as well as an employee authorized to enter into business transactions on behalf of UnitedLex and ULXP.[37]

118.    In an August 8, 2018 email to Reed and UnitedLex CFO Nicholas Hinton ("Hinton"), along with certain ULXP directors, Peter Krakaur, then the UnitedLex Vice President, Legal Business Solutions ("Krakaur"), illustrated the operation of ULXP and UnitedLex.[38]  A PowerPoint attached to the email illustrated the service arrangement employed at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and LeClairRyan fully into UnitedLex's systems and processes.

119.    The diagram, reproduced below, shows a slow movement to full integration and dominance by UnitedLex – despite noted "potential issues" that would result from such a course of action.[39]



---

[37] A true and correct copy of the February 18, 2019 email from Rosenfeld to Proxios is attached as Exhibit 14.

[38] A true and correct copy of the August 8, 2018 email from Krakaur to Reed and Hinton is attached as Exhibit 15.

[39] A true and correct copy of the PowerPoint, which was attached to the August 8, 2018 email from Krakaur to Reed and Hinton, is attached as Exhibit 16.

4850-3004-5648.2

120.    In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan]. We are slowly and necessarily integrating UXP (*sic*) operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm. Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes. The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.[40]

121.    As Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now ***the owner of the business of law***."[41] (emphasis added).

122.    Explaining further, Krakaur wrote, "[w]e all know law firms do not operate as a business.  ULXP is designed to change that.  Given the nature of the relationship, the agreements, ***and the practical aspects of us running the law firm***, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."[42]

123.    The Debtor's financial condition forced the ULX Entities to reluctantly accept an arrangement where the Debtor would ultimately receive between $10 to $12 million in cash flow float, through the ULX Entities' provision of services as well as by taking over payment of vendor fees, while receiving limited to no payments from LeClairRyan (the "Cash Flow Float").

**I.    The ULX Entities and CVC Grow Concerned Over LeClairRyan's Ability to Repay ULXP.**

124.    ULX Entities and CVC were concerned about LeClairRyan's ability to repay the investments and the Cash Flow Float being provided to the firm.

---

[40] *Id.* at 2-3.

[41] A true and correct copy of the August 10, 2018 email from Krakaur is attached as Exhibit 17.

[42] *Id.*

125.    One reason that the ULX Entities and CVC were concerned was because CVC would be drawing its funding lines to extend the credit to LeClairRyan.

126.    On or about July 2018, CVC contemplated capping the Cash Flow Float at $8.5 million and thought about seeking a commitment from LeClairRyan that any incremental amounts would be subject to different payment terms.[43]

127.    CVC, in particular, had been concerned about LeClairRyan's finances and, during the negotiations had been focused on the growth of the float amounts and sought to include terms in the agreements to protect their investment, including proposing a term saying that payments to ULXP would have priority over distributions to LeClairRyan's members.  However, these terms were ultimately not included.

128.    The Cash Flow Float, however, was premised on (1) increased profitability by LeClairRyan and (2) the ULX Entities systems further optimizing that profitability by allowing attorneys to focus on the practice of law.

129.    Yet, because of LeClairRyan's continued and sustained financial problems, the ULX Entities knew or should have known that LeClairRyan did not have sufficient funds to pay its obligations as they came due – including making payments on the Cash Flow Float provided by the ULX Entities.

**J.      The ULX Entities Sought to Elevate ULXP's Priority Over Other Unsecured Creditors through an $8 Million Dollar Promissory Note.**

130.    By the end of 2018, the Debtor was continuing to experience shareholder defections and declining revenue.

---

[43] A true and correct copy of the July 2, 2018 email from Mohit Goyal is attached as Exhibit 18.

131.    By the end of 2018, the Debtor owed the ULX Entities fees totaling more than $12 million.

132.    In April 2019, a year after entering in the joint venture and five months before the Debtor would file for bankruptcy protection, ULXP and the Debtor entered into an Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "ULXP Note")[44] and an accompanying Security Agreement (the "ULXP Security Agreement").[45]

133.    Both documents were signed on April 4, 2019 but backdated to December 20, 2018.

134.    Under the terms of the ULXP Note, the Debtor agreed to pay ULXP the principal amount of $8 million for alleged fees owed by the Debtor to ULXP under the MSA.

135.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.[46]

136.    The debt that formed the center of the purported loan consisted entirely of *prior advances* made by the ULX Entities to the Debtor.

137.    The result of the ULXP Note was to elevate ULXP's priority over other unsecured creditors.

138.    The Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

139.    That the ULXP Note was, in reality, an equity infusion is evidenced in part by the fact that the Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

---

[44] A true and correct copy of the ULXP Note is attached as Exhibit 19.

[45] A true and correct copy of the ULXP Security Agreement is attached as Exhibit 20.

[46] *See* ULXP Note, *supra* n. 44 at §§ 1, 3.

140.    Despite the premise of a loan, on January 22, 2019, Christopher Lange ("Lange"), a LeClairRyan attorney and the former Corporate Secretary, sent revisions to the ULXP Note to the ULX Entities' outside counsel, and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender [VCF] …would see as being equity like in that it is being paid from the return on our equity investment in [ULXP]."[47]

141.    This effort proved successful.  On January 31, VCF informed the Debtor that it approved the leverage ratio calculation so that the $8 million would be treated as equity, saying "[t]he [UnitedLex] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in."[48]

142.    United Lex knew or should have known that the ULXP Note was treated as equity by VCF.

143.    ULXP knew or should have known that the ULXP Note was treated as equity by VCF.

144.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the ULX Entities were providing equity and investing into the Debtor.

145.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the Debtor was not sufficiently capitalized to pay back the ULXP Note.

146.    LeClairRyan never made a single payment under the ULXP Note.

---

[47] A true and correct copy of the January 22, 2019 email from Lange is attached as Exhibit 21.

[48] A true and correct copy of the January 31, 2019 email from VCF attached as Exhibit 22.

4850-3004-5648.2

**K.**     **The Defendants Take Further Control of the Debtor, Prioritizing Payments to ULXP Over All Others and Encouraging the Debtor to Misappropriate Funds Tendered by the Debtor's Clients for Specific Expenses.**

147.     In or around January 2019, the ULX Entities began to convene regular meetings with LeClairRyan's CFO, Dwight Jones ("Jones"), and other LCR Board members to discuss cash flow.

148.     Upon information and belief, in these meetings, Jones would meet with Hinton and the UnitedLex Controller to discuss 13-week cash flow forecasts and to address the payment installments for the ULX Entities.

149.     Hinton insisted that Jones prepare these 13-week cash flow forecasts, which showed weekly cash receipts and potential cash disbursements.   This type of cash flow forecast is most often used in situations where a company enters financial distress in order to provide visibility into the company's short-term options

150.      In connection with these meetings and discussions, Hinton also decided which of the firm's key vendors needed to be paid.

151.     These regular meetings became avenues for the ULX Entities to exert their control and ensure that their invoices were paid ahead of other creditors.

152.    As demonstrated by the chart below, between November 2018 and the Petition Date, payables due and owing from the Debtor to ULXP decreased by approximately 30.7%, while the Debtor's payables due and owing to all other creditors increased by approximately 181%:



**Comparison of Payable to ULXP to Other Accounts Payable**
*($ in millions)*

[1]  Excludes interest on $8,000,000 debt recharacterization.
[2]  Includes the following balance sheet line items: Accounts Payable, Credit Card and Accrued Expenses.

153.    The ULX Entities continued to demand weekly payments, with the Debtor's stated payment amounts needing to be at least $2 million a month.

154.    The ULX Entities would demand these payments, regardless of what other higher priority vendor payments were outstanding.

155.    Through these meetings, it was clear that the ULX Entities made the decisions about who was to be paid and when.

27

156.    For example, in an email dated February 21, 2019, Jones explained that the Debtor would not be issuing a weekly payment to ULXP due to the need to handle outstanding payables for client reimbursements.[49]

157.    In response, Hinton sent an email to Gustafson asking him if this was LeClairRyan's position and noting that "[UnitedLex] is not the lowest priority vendor.  We are not LCR's bank."[50]

158.    Based on pressure exerted by the ULX Entities, the Debtor improperly prioritized payments to ULXP, to the detriment of other creditors and clients.

159.    Upon information and belief, there were also instances in which the Debtor did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Entities.

160.    Upon information and belief, in certain of these instances, individual attorneys had to pay for client fees out of pocket to avoid missing client deadlines.

161.    Upon information and belief, in other instances, the Debtor would not pay vendors who were handling aspects of clients' cases, even though the client had tendered funds to LeClairRyan for the purpose of paying those vendors.

162.    The ULX Entities encouraged LeClairRyan to commingle funds tendered by clients for specific expenses with operational funds that were used for other payments.

163.    The ULX Entities pushed back against efforts by the Debtor to cease, or limit, the practice of commingling client and operational funds as the firm approached bankruptcy.

164.    Indeed, Bruce Matson ("Matson"), the Debtor's former Chief Legal Officer, had previously raised this issue to the Debtor's senior leadership by 2016. Matson explained that funds

---

[49] A true and correct copy of the February 21, 2019 email from Jones is attached as Exhibit 23.

[50] *Id.*

tendered by clients, even those related directly to a client disbursement, were not being used for their earmarked purpose and were being intermingled and used to fund the Debtor's operations.

165.    Matson even expressed that the mismanagement of funds tendered by clients was "tantamount to misusing (intentionally) client trust funds."[51]

166.    Hinton was told by LCR Officers and Directors that these funds should not be used for any other purpose other than the purpose that the client intended.

167.    Despite this warning, in an April 10, 2019 email discussing this issue, Hinton told Jones, the then-Chief Financial Officer, to use the funds given to LeClairRyan by clients for expenses for its creditors,  instead of "restrict[ing] the liquidity of the firm by creating artificial restricted cash pools."[52]

168.    This mishandling of these funds, related mismanagement of client affairs, and neglect of other important financial obligations in order to prioritize payments to ULXP was a further violation of fiduciary duties owed by the LCR Officers and Directors, including to its clients and creditors.

## L.    The Novellus Law Group, the Ultimate Demise of ULXP, and the Final Act Pushing LeClair Ryan into Bankruptcy.

169.    On or about early 2019, the Debtor's financial condition worsened.

170.    At that time, the Debtor and the ULX Entities embarked on an initiative known as "Project Modern."

171.    Project Modern was a last-ditch effort to keep the Debtor from filing bankruptcy whereby the ULX Entities sought to take even greater control of the Debtor.

---

[51] A true and correct copy of the May 2, 2016 email from Matson to Gustafson is attached as Exhibit 24.

[52] A true and correct copy of the April 10, 2019 email from Hinton is attached as Exhibit 25.

172.     Project Modern morphed into the idea of creating a new law firm called the Novellus Law Group ("NLG").

173.     Presented to the Debtor's members on or around May 2019, the NLG concept involved forming a new partnership with UnitedLex in which certain of the Debtor's members would move back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.  UnitedLex would be compensated by utilizing a legal and management fee structure and retaining an $8 million dollar investment.

174.     NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that retained LeClairRyan's profitable members while leaving certain debt and other liabilities, including but not limited to real estate leases and technology costs, with LeClairRyan, which would have been wound down.

175.     Under the proposal, the debts owed by LeClairRyan to UnitedLex would be assumed by the newly-formed NLG.

176.     Other debt, including but not limited to debt to former shareholders and landlords, would not have been assumed by NLG.

177.     To incentivize them to join NLG, certain of the Debtor's members were promised equity in UnitedLex, which still hoped to grow by duplicating the failed ULXP business model with other law firms.

178.     In NLG offer letters, a select, group of the Debtor's members were offered base compensation, bonus potential, long term incentive compensation, benefits and payroll taxes –a package allegedly superior to that of the traditional law firm model.

179. Yet, any new entity formed from the Debtor would still have to still grapple with the Debtor's liquidity issues.

180. Upon information and belief, these liquidity concerns were assuaged by the fact UnitedLex and CVC would provide financial backing to NLG.

181. By exploring this proposed transaction, which would have improperly prioritized certain creditors at the expense of others, the LCR Officers and Directors breached the fiduciary duty of care and loyalty.

182. Exploring this proposed transaction damaged the Estate by further deepening the insolvency of the Debtor.

183. On or about June 20, 2019, in connection with efforts to enact the NLG plan, Hinton and Reed began negotiating directly with the Debtor's lender, VCF, to provide more financing for NLG.

184. Upon information and belief, Hinton and Reed sought financial backing from VCF because both CVC and the UnitedLex Entities did not want to invest further money in LeClairRyan.

185. VCF eventually refused to provide the level of funding Hinton and Reed were seeking.

186. At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of ULXP. This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

187. The Debtor's members voted on July 29, 2019 to formally wind-down LeClairRyan.

31

188.     On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**M.     Payments Made to ULXP by the Debtor.**

189.     Upon information and belief, during the relationship between the ULX Entities and

LeClairRyan, LeClairRyan transferred not less than $19,357,282.51 to ULXP between August 1,

2018 and the Petition Date (the "Avoidable Transfers").  The Avoidable Transfers are listed on the

attached Exhibit 26.

190.     Upon information and belief, of that amount, not less than $17,425,405.50 of the

transfers occurred within one year of the petition date (the "Preferential Transfers").  The

Preferential Transfers are listed on the attached Exhibit 27.

## COUNT I

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code
Against ULXP and UnitedLex)**

191.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by references as if set forth in their entirety.

192.     The Avoidable Transfers, as detailed on Exhibit 26, were transfers of interests in

the Debtor's property.

193.     The Avoidable Transfers were made with actual intent of the Debtor to hinder,

delay, or defraud any entity to which the Debtor was or became, on or after the date that such

transfers were made or such obligation was incurred, indebted.

194.     The Defendants were not good faith transferees, and therefore are not entitled to

offset rights under section 548(c) and applicable non-bankruptcy law.

195.     Each Avoidable Transfer was accompanied by at least three badges of fraud

indicating the fraudulent nature of such transfer, including but not limited to the following: (i) the

transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the Avoidable Transfers.

196.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

197.    As a result of the Avoidable Transfers, creditors of the Debtor sustained significant damages.

198.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

199.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

200.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not less than $19,357,282.51, plus her reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

201.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

## COUNT II

### (Avoidance of Fraudulent Transfers Under Section 548(A)(1)(B) of the Bankruptcy Code Against ULXP And UnitedLex)

202.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by references as if set forth in their entirety.

203.    The Avoidable Transfers were transfers of interest in the Debtor's property.

204.    The Debtor did not receive reasonably equivalent value in exchange for the Avoidable Transfers.

205.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

206.    The Avoidable Transfers were made while the Debtor were insolvent, or became insolvent as a result of the Avoidable Transfers.

207.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

208.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

209.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of 11 U.S.C. § 502.

210.    The Avoidable Transfers are avoidable transfers pursuant to Bankruptcy Code Section 548(a)(1)(B).

211.    The Debtor received less than a reasonably equivalent value in exchange for the Avoidable Transfers.

212.    The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

213.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

214.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

215.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

216.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT III

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the
Bankruptcy Code and Applicable State Law Against ULXP and UnitedLex)**

217.    The allegations in the preceding paragraphs are re-alleged and incorporated herein
by reference as if set forth in their entirety.

218.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of
an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

219.    The Avoidable Transfers were transfers of interest in the Debtor's property to the
Defendants.  The Trustee reserves the right to seek the avoidance and recovery of any and all
additional transfers that she later discovers.

220.    At all relevant times, the Debtor had at least one creditor with claims that arose
before or within a reasonable time after the Petition was filed.

221.    The Defendants entered into each Avoidable Transfer with the actual intent to
delay, hinder, or defraud the creditors of LeClairRyan.

222.    The primary purpose of the Avoidable Transfers was to take cash from
LeClairRyan for the benefit of the Defendants without those assets being made available to
LeClairRyan's other creditors.

223.     Each Avoidable Transfer was accompanied by at least three badges of fraud
indicating the true fraudulent nature of such transfer, including but not limited to the following: (i)
the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over
the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were
being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the
Avoidable Transfers.

224.    The Avoidable Transfers were made to or for the benefit of the Defendants.

225.    The Avoidable Transfers were made within the six (6) years before the Petition

Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy

Code.

226.    The Trustee reserves the right to seek the avoidance and recovery of any and all

additional avoidable transfers that she later discovers.

227.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

228.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not

less than $19,425,405.51, plus her reasonable attorneys' fees and costs, and all other relief the

Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT IV

### (Avoidance of Preferences Under Section 547(b) of the Bankruptcy Code Against ULXP and UnitedLex)

229.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

230.    Between the Petition Date and one year before the Petition Date, the Debtor made

transfers (the "Preferential Transfers") to or for the benefit of the Defendants, as set forth on

Exhibit 27.

231.    The Preferential Transfers were for or on account of an antecedent debt owed by

the Debtor before the Preferential Transfers were made.

232.    The Defendants are statutory insiders for the Debtor, within the meaning of Section

101(31)(F) of the Bankruptcy Code.

233.    The Defendants are also non-statutory insiders of the Debtor.

234.    The Defendants were managing agents of the Debtor, as they accessed the Debtor's

financial and other information essential to the operation of the Debtor, incurred expenses on the

Debtor's behalf, made personnel decisions, and were in charge of key functions, such as accounting, marketing, conflict management, and business development.

235.    The Debtor was insolvent at all times within one year of the Petition Date.

236.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544 or 548 of the Bankruptcy Code, such portion is plead here, in the alternative, as a Preferential Transfer.

237.    The Preferential Transfers enabled the Defendants, as creditors, to receive more than they would have received had the transfer not been made and the creditor received payment of such debt under Chapter 7.

238.    The Preferential Transfers are avoidable as preferences under Section 547 of the Bankruptcy Code.

239.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

240.    The Preferential Transfers are recoverable from United Lex as an alter ego of ULXP.

241.    The Trustee is entitled to the full amount of the Preferential Transfers, totaling not less than $17,425,405.50, plus her reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

## <u>COUNT V</u>

### (Avoidance of Lien and Recovery of Avoided Transactions Under Sections 550(a) of the Bankruptcy Code Against ULXP)

242.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

4850-3004-5648.2

243.    To the extent that any transaction is avoided under Bankruptcy Sections 544, 547, and/or 548, pursuant to section 544(b) of the Bankruptcy Code, ULXP's claims and liens against the Debtor are avoidable.

244.    Pursuant to section 551 of the Bankruptcy Code, ULXP's claims and liens that are avoidable herein shall be preserved for the benefit of the Debtor's Estate.

245.    The Claims consist of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

246.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.

247.    Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.

248.    ULXP was granted liens securing the commitments pursuant to the ULXP Note.

249.    During all relevant times, ULXP was both a statutory and non-statutory insider.

250.    The grant of the security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to the benefit of insider ULXP (the "ULXP Note Transfer").

251.    The Debtor made such a transfer for or on account of an antecedent debt owed by the Debtor to ULXP before the ULXP Note Transfer was made.

252.    At the time the Debtor made the ULXP Note Transfer, the liabilities of LeClairRyan exceeded the fair value of its assets and it was insolvent.

253.    LeClairRyan made the ULXP Note Transfer within the one-year period before the Petition Date.

254.    The ULXP Note Transfer enabled ULXP to receive more than they would receive if the transfer had not been made.

255.    Based on the foregoing, the ULXP Note Transfer is avoidable pursuant to 11 U.S.C. § 547.

## COUNT VI

### (Avoidance of Fraudulent Transfer Under Section 544(b) and Section 550 of the Bankruptcy Code and Applicable State Law Against ULXP)

256.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

257.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

258.    The ULXP Note Transfer was a transfer of interest in the Debtor's property to ULXP.

259.    At all relevant times, the Debtor had at least one creditor with claims that arose before or within a reasonable time after the Petition was filed.

260.    The Debtor entered into the ULXP Note Transfer with the actual intent to delay, hinder, or defraud the creditors of LeClairRyan.

261.    The ULXP Note Transfer was made to or for the benefit of ULXP.

262.    The ULXP Note Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the ULXP Note Transfer was made to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the  ULXP Note Transfer was made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the ULXP Note Transfer.

263.    The ULXP Note Transfer was made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

264.    The ULXP Note Transfer should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) or (B), and 550 and applicable state fraudulent transfer law.

## COUNT VII

### (Disallowance of Claims under 11 U.S.C. § 502(d)) Against ULXP and UnitedLex)

265.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

266.    As alleged above, the Defendants were the recipients of the Avoidable Transfers and the Preferential Transfers which are avoidable pursuant to Section 547 of the Bankruptcy Code, and which are recoverable pursuant to Section 550 of the Bankruptcy Code.

267.    Despite a demand, ULXP has not returned the Avoidable Transfers to the Trustee.[53]

268.    Pursuant to Section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property is recoverable under Section 550(a) of the Bankruptcy Code.

269.    Because the Defendants have not paid or returned the Avoidable Transfers to the Trustee, ULXP's Claims or any claims which ULXP or UnitedLex purport to assert must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

270.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the Defendants' claims against the Debtor's Estate are disallowed.

---

[53] A true and correct copy of the demand letter sent June 8, 2020 is attached as Exhibit 28.

4850-3004-5648.2

## COUNT VIII

### (Re-Characterization of Debt as Equity Against ULXP)

271.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

272.    ULXP has filed a claim that asserts a right to payments allegedly owed by the Debtor (Proof of Claim Nos. 174) (the "Secured Claim").

273.    The Secured Claim consists of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

274.    The Secured Claims were equitable contributions to the Debtor where the Debtor was undercapitalized, and the Defendants' $8 million dollar loan consisted of prior advances made by the Defendants to the Debtor.

275.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.

276.    The Debtor made no payments on the $8 million-dollar ULXP Note.

277.    As a result of the Defendants' equitable contribution, the Court should recharacterize as equity ULXP's Proof of Claim No. 174 in its entirety pursuant to this Court's equitable powers.

## COUNT IX

### (Aiding and Abetting Breach of Fiduciary Duty Against UnitedLex, ULXP)

278.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

279.    From at least until or around 2017 and until or around 2019, the Defendants aided and abetted the breaches of fiduciary duty of due care and loyalty by one or more of the LCR

Board and the LCR Officers, who owed such fiduciary duties to the Debtor and/or its shareholders, clients, and creditors at all relevant times.

280.    The Defendants did so knowingly, or having reason to know, the nature of the injury to the Debtor and Debtor's creditors brought about by such assistance.

281.    The Defendants substantially assisted one or more of the LCR Officers and Directors knowingly, or having reason to know, the nature of the injury to the Debtor and the Debtor's creditors brought about by such assistance.

282.    The Defendants directly benefited from aiding and abetting such breaches of fiduciary duty and self-dealing by reaping financial rewards to which they were not entitled.

283.    As a direct and proximate result of aiding and abetting breaches of fiduciary duty and self-dealing, the Debtor and its creditors sustained significant damages, including but not limited to damages resulting in the deepening insolvency of the Debtor.

284.    As a result of the Defendants' aiding and abetting of the aforementioned breaches by one or more of the LCR Officers and Directors, the Trustee is entitled to recover the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than $42,759,900.

## COUNT X

### (Statutory Conspiracy Against UnitedLex, ULXP pursuant to Virginia Code § 18.2-499, et seq.)

285.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

286.    From at least until in or around 2017 to until or around 2019, the Defendants and one or more of the LCR Officers and Directors acted in concert, agreed, associated, mutually

undertook, or combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused injury and damage to the Debtor and creditors of the Debtor.

287.    The Defendants violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to the LCR Officers and Directors for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

288.    The Defendants conspired to breach the fiduciary duties the LCR Officers and Directors owed to the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

289.    The unlawful acts include, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

290.    The Defendants wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

291.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one of more of the LCR Officers and Directors, the Debtor and its creditors suffered significant damages, including but not limited to damages related to the Debtor's deepening insolvency.

292.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act (the "VBCA").

4850-3004-5648.2

293.     The Debtor suffered injury from extending the life of the Debtor, life dissipation of assets, and increased insolvency.   As such, the Debtor's creditors lost assets that would have otherwise been available to satisfy their claims.

294.     As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

295.     The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code.

## COUNT XI

### (Common Law Conspiracy against UnitedLex, ULXP)

296.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

297.     From at least until on or around 2017 to until or around August 2019, the Defendants and one or more of the LCR Director and Officers acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

298.     The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties the LCR Board and the LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for

specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

299.    The Defendants and one or more of the LCR Officers and Directors intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

300.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one or more of the LCR Officers and Directors, the Debtor and their creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

301.    As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

## COUNT XII

### (Conversion Against UnitedLex, ULXP)

302.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

303.    Rather than utilizing monies that had been tendered by the Debtor's clients for specific expense (the "Expense Transfers"), the Debtors instead turned said monies over to the Defendants.

304.    The Expense Transfers were wrongfully paid to the Defendants.

305.    The Trustee is entitled to immediate possession of the Expense Transfers.

306.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $1,069,510.00.

## COUNT XIII

### (Unjust Enrichment Against UnitedLex, ULXP)

307.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

308.    By accepting funds that were taken inappropriately, at least in part, from funds tendered by the Debtor's clients for specific expenses, UnitedLex and ULXP were conferred a benefit by LeClairRyan's clients.

309.    The ULX Entities knew, or should have known, that the funds received by ULXP were tendered to the Debtor by clients of LeClairRyan to be used for specific expenses.

310.    UnitedLex and ULXP accepted and retained this benefit in circumstances that render it inequitable for them to retain the benefit without paying for its value.

311.    The Trustee is entitled to damages as a result of this unjust enrichment in an amount to be proven at trial, but in an amount not less than $1,069,510.00.

## COUNT XIV

### (Alter Ego Liability Against UnitedLex)

312.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

313.    ULXP was an alter ego of UnitedLex.

314.    There existed a unity of interest and ownership between the Defendants that created no separate personalities for each entity.  ULXP is the adjunct, creature, instrumentality, device, stooge, or dummy of UnitedLex.

315.    The CEO of UnitedLex, was the sole managing member of UnitedLex Manager.

316.    The Defendants shared staff and assets through the Shared Personnel Agreement entered into between the two entities.

4850-3004-5648.2

317.   ULXP was used to justify wrongs, protect fraudulent transfers, and to conspire with the LCR Board to breach the fiduciary duties the LCR Board and LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors; or at a minimum, aided and abetted this breach.

318.   As such, UnitedLex formed and operated ULXP as a device or sham used to disguise this wrongful conduct.

319.   Consequently, all monies that ULXP is required to return to the Estate should be enforced against UnitedLex.

320.   The Trustee is entitled to recover all damages asserted in the Complaint, jointly and severally from UnitedLex and ULXP, which operated as UnitedLex's alter ego.

## **PRAYER FOR RELIEF**

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)   On Counts I and II, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the Avoidable Transfers, and directing the Defendants to pay the Trustee an amount to be determined at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

(b)   On Count III, awarding judgment to the Trustee, pursuant to Sections 544 and 550 of the Bankruptcy Code, Va. Code Sections 55-80 and 55-81, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount to be proven at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(c)   On Count IV, awarding judgment to the Trustee, pursuant to Section 547 of the Bankruptcy Code, in an amount to be proven at trial that is not less than $17,425,405.50, pursuant to Section 550(a) of the Bankruptcy Code;

(d)   On Counts V and VI, avoiding all of ULXP's liens asserted against the Debtor's Estate;

(e)     On Count VII, disallowing any claim of the Defendants pursuant to section 502(d) of the Bankruptcy Code;

(f)     On Count VIII, recharacterizing ULXP's Proof of Claim No. 174 as a claim of equity;

(g)     On Count IX, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the Defendants' aiding and abetting breaches of fiduciary duties and self-dealing in an amount to be proven at trial, but totaling not less than $42,759,900;

(h)     On Count X, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of violation of the VBCA, for three times the damages caused to the Debtor as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, in an amount to be proven at trial, but totaling not less than $128,279,700;

(i)     On Count XI, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the civil conspiracy in an amount to be proven at trial, but totaling not less than $42,759,900;

(j)     On Count XII, awarding judgment to the Trustee for damages caused to the Debtor and its creditors and clients, as a result of the Defendants acts of conversion in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(k)     On Count XIII, awarding judgment to the Trustee for turnover of money or the value thereof, which does not belong to the Defendants, in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(l)     On Count XIV, finding that ULXP was the alter ego of UnitedLex and that ULXP and United Lex are jointly and severally liable for all damages resulting from this Adversary Proceeding;

(m)     Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(n)     Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(o)     Directing the Defendants to pay forthwith all amounts awarded; and

48

(p)    Granting such other relief as the Bankruptcy Court deems just and proper.

Dated:    October 26, 2020                    Respectfully submitted,

*/s/ Erika L. Morabito*
Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 600
Washington, DC 20007-5109
(202) 672-5300 (telephone)
(202) 672-5399 (facsimile)
emorabito@foley.com
bnelson@foley.com

*Special Counsel to Lynn L. Tavenner, Chapter 7
Trustee*

49

# EXHIBIT 1

12/28/17

**Project Liberty**
**Summary**

The following is subject to ongoing adjustments to reflect tax, GAAP accounting and
financial markets considerations, as well as the ongoing business discussions among
the parties.

1. **Closing**:  Closing will occur on January 31, 2018.

2. **Conversion to PLLC**:  Between Closing and April 1, 2018, LR will convert into a
   professional limited liability company.  The term "LR" as used below will generally refer to
   this new PLLC, unless the context otherwise requires.

3. **The JV**:  After LR converts to a PLLC and prior to April 1, 2018, UL and LR will form United
   Law Firm Support, which will be a JV structured as an LLC/LTD PS (UL would be the
   general partner). Except for certain fundamental matters (e.g., approval of transactions
   between the JV and UL), UL will control the affairs of the JV.  It is anticipated that one or
   more current LR colleagues (e.g., Jen Mistal) will assume a senior management role in the
   JV.

4. **LR's Capital Contribution**:  Upon formation of the JV, LR will contribute its Strategic IP,
   Operating IP and Admin Operations (including the related fixed assets) to the JV. LR will
   secure prior to Closing a valuation by Keiter Stephens of that contribution.

5. **CPMA**:  Upon formation of the JV, LR and the JV also will enter into a 10-year Client
   Practice Management Services Agreement ("CPMA") pursuant to which (i) the JV will
   provide CPM Services to LR and (ii) LR will pay a CPM Fee to the JV.

6. **Termination of CPMA**:  The CPMA will be terminable by either party with cause (upon 30
   days notice) or, after the second anniversary, without cause (upon 180 days advance notice
   prior to each April 1 anniversary of the CPMA).  Cause will be limited to material breaches
   (e.g., failure to pay the CPM Fee).

7. **CPM Services**:  Client Practice Management Services will include business development,
   training, client solutions (e.g., knowledge management, project management), utilization
   management, operations support (e.g., pricing, budgeting, time entry, billing, collections and
   disbursements management), capital and compensation efficiency (e.g., LR no longer would
   have annual preferred dividends, stock redemption, loan interest and loan principal cash
   outflows) and other agreed-to services.

8. **LR Value Pool Interest**:  In exchange for its contribution to the JV, LR will receive an equity
   interest in the JV (the "LR Value Pool Interest"). The LR Value Pool Interest will have a
   conditional value equal to 5 times the average annual Client Practice Management Fee paid
   by LR to the JV during the period April 1, 2018 through March 31, 2023 (the "Value Pool
   Measurement Period").  LR may redeem the LR Value Pool Interest on April 30, 2023 (the
   "Value Pool Redemption Date").

9. **Taxes Upon Conversion**:  LR's 2018 taxable income related to the conversion to the new
   PLLC will be reduced to the extent of LR's NOLs. The 2018 taxable income incurred by LR
   Shareholders related to such conversion will be reduced to the extent of the PLLC's
   corresponding 2018 losses. A final tax projection will be prepared before Closing based on

1

final 2017 results. It is anticipated that the conversion will be tax neutral to LR's Shareholders and that funding for any net tax liability incurred by the C corporation will be arranged through an increase in the LR Loan discussed below.

10. **LR Loan**:  At Closing, UL will lend (the "LR Loan") to LR $20 million (the "Capital Funding") [plus up to $13 million if UL will become LR's term and working capital/landlord letter of credit lender (the "Debt Funding")].  The LR Loan will be covenant-lite.

11. **Security for LR Loan**:  The Capital Funding will be secured by a first lien on the LR Value Pool Interest and if LR terminates the CPMA without cause or UL terminates it with cause (either event, a "Black Hat CPMA Termination"), a second lien [first lien in the event the LR Loan also includes the Debt Funding] on LR's WIP and AR. [The Debt Funding will be secured by both the LR Value Pool Interest and a first lien on LR's WIP and AR].

12. **Repayment of LR Loan**:  The unpaid LR Loan principal and accrued simple interest (the "Loan Repayment Amount") will be due on the earlier of a Black Hat CPMA Termination or January 31, 2028 (the "Loan Maturity Date"). The LR Loan will bear interest at the rate paid by LR to Wells Fargo in 2017.  The LR Loan is subject to prepayment without penalty. Within 30 days after the end of each April 1 to March 31 fiscal year (see below), LR will make a minimum repayment equal to up to 10% of the then outstanding loan principal amount, to the extent of 50% of LR's free cash flow for such fiscal year, calculated after an assumed payment of a $20 million CPM Fee for such fiscal year.  LR also must prepay the LR Loan, if requested by UL, to the extent of any redemption payments to LR of its LR Value Pool Interest.

13. **Offset vs. LR Value Pool Interest**:  On the Value Pool Redemption Date, LR may offset against the LR Value Pool Interest an amount equal to the Loan Repayment Amount. In the event the CPMA is terminated and such termination is not a Black Hat CPMA Termination, in order to compensate LR for the potential disruption caused by such termination, LR may offset the Loan Repayment Amount against the LR Value Pool Interest and such offset will be deemed a payment in full of the Capital Funding portion of the LR Loan. If a Black Hat CPMA Termination has occurred, any LR Loan balance remaining after the credit against the LR Value Pool Interest will be repaid over 5 years. [If a Black Hat CPMA Termination has not occurred, any LR Loan balance attributable to the Debt Funding and remaining after the offset against the LR Value Pool Interest will be repaid over 5 years.]

14. **Return of Shareholder Capital**:  At Closing, LR will distribute to its Shareholders $20 million in return of their capital contributions [and pay up to $13 million in repayment of its bank term debt (approximately $7.3 million), bank working capital line (approximately $5 million) and other miscellaneous debt (approximately $800,000)].

15. **Future Capital Contributions**:  Capital contributions no longer will be required of promoted or lateral partners.

16. **Shareholder Participations in LR Value Pool Interest**:  On April 1, 2018, LR will allocate to its Shareholders Participations in the LR Value Pool Interest, which Participations will have value only to the extent the LR Value Pool Interest exceeds 125% (i.e., the amount required to repay the LR Loan and the estimated LR tax on the LR Value Pool Interest) of the LR Loan Repayment Amount. During the Value Pool Measurement Period, LR may grant additional Participations to its partners, including promoted and lateral partners, with such vesting terms that LR deems appropriate in the circumstances. In the event LR consummates a major law firm merger, UL and LR will cooperate in designing an appropriate Value Pool for LR and the partners in the merged firm.

17. **Fixed or Variable Participations**:  With respect to the initial grants of the Participations in the LR Value Pool Interest on April 1, 2018, Shareholders may elect to fix their Participations, in which case they will be paid in cash to the extent earned.  Alternatively, they may elect a variable Participation, in which case they will be paid based on the change in UL common stock equity value from Closing to the end of the Value Pool Measurement Period. At least 50% of the aggregate Participations must be fixed. See Appendix A for example. Any grants by LR of Participations after Closing will be fixed.

18. **Vesting of Shareholder Participations in the LR Value Pool Interest**:  The Participations will vest over 5 years with partial vesting in the event of a "white hat" departure. No vesting will occur if a "black hat" departure occurs before the end of the Value Pool Measurement Period.

19. **New Compensation Fiscal Year**:  The fiscal year end for LR for compensation purposes will be March 31, which is also UL's fiscal year end.  LR's tax and audit year end will remain December 31.

20. **Annual Equity Interests**:  On April 1 of each year beginning in 2018 and for the duration of the CPMA, LR will award approximately $6.0 million of Annual Equity Interests to Shareholders. Those interests will vest on the April 30 of the following calendar year. Upon vesting, each Shareholder can elect by May 15 to cash out his Annual Equity Interest at its original value or continue to hold it.  If the Shareholder elects to cash it out, it will be taxed at the capital gains rate.  If a Shareholder continues to hold it, he can cash out at the underlying UL equity's value on the next April 30. Cash outs may be paid in cash or registered UL stock at the option of the JV/UL.

21. **Performance Equity Interests**:  UL also may make available on an annual basis to LR (which in turn will make them available to LR partners) additional Performance Equity Interests, subject to such vesting terms as UL may determine.

22. **Valuation of Annual and Performance Interests**:  The equity value of the Annual Equity Interests and the Performance Equity Interests will be tied to the value of UL common stock on the date of grant of the equity interests. Payments of the vested awards may be made in either cash or registered UL stock at the option of the JV/UL.

23. **UL Guaranty:**  UL will stand behind the obligations of the JV to LR and with respect to the cash outs of the various Value Pool Interests.

24. **2018-2019 Shareholder Compensation**:  The compensation of LR Shareholders for April 1, 2018 through March 31, 2019 will be as budgeted by LR for that period based on the effects of Project Liberty.  The draws for January through March 2018 will be as currently budgeted.

25. **DC and SR Plan Termination**:  It is intended that LR will terminate its non-qualified deferred compensation and supplemental retirement plans prior to Closing, with the plan balances (approximately $11 million) distributed one year after termination (some balances may need to be distributed upon plan termination). Any additional NOLs flowing from such termination and distribution will be used to offset any current or future LR gains or income.

26. **Shareholder Compensation Policies**:  Beginning with the fiscal year starting April 1, 2019, Shareholders will draw at no more than 80% of their target cash compensation, with the final no less than 20% at risk amount payable on April 30 of the following year contingent upon LR achieving a 100% point value.  Shareholder compensation otherwise will be determined by LR in accordance with its Shareholder approved policies and procedures. Those policies

and procedures will reflect incentives to engage in the behaviors that will optimize the LR
Value Pool Interest.

27. **Ownership and Governance**:  LR will continue to be owned and governed by its partners.
The CPMA will not place any controls or restrictions on LR's ownership or governance. LR
will adopt policies and procedures that will take advantage of the CPM Services in order to
optimize the LR Value Pool Interest.

28. [**Additional Loan Financing**:  If UL becomes LR's lender, LR and UL may agree from time
to time to increase the LR Loan for growth or Cap Ex. Prior to the Loan Maturity Date, any
such increase will be subject to repayment on the Loan Maturity Date, unless otherwise
agreed. Presumably, the Value Pool Fees payable by LR will increase as a result of such
growth or Cap Ex, which in turn will increase the LR Value Pool Interest.]

29. [**Client Advances Loan**:  UL may take over the funding of LR's approximately $4 million of
client disbursement advances as part of its lending facility.]

30. **Services to other Law Firms**:  The JV may render services to other law firms in the UL law
firm constellation.

31. **Legal Opinions**:  Prior to Closing, UL, the JV and LR will be provided legal opinions
acceptable to them as to compliance with ethical guidelines.

**Ongoing Due Diligence**:  Upon LR's Board's positive response to this summary, LR will
complete its due diligence of UL.

Project Liberty
LR Value Pool Interest and Shareholder Participations
Example

Assumptions:

(i)   Average Annual Client Practice Management Fee during the Value Pool Measurement Period is $20,000,000.

(ii)   LR Loan is for both the $20 million Capital Funding and the $13 million Debt Funding, as well as additional growth and CapEx, resulting in a Loan Repayment Amount of $50,000,000.

(iii)   60% of the Shareholders Participations in the LR Value Pool Interest are fixed and 40% are variable.

(iv)   The value of UL's common equity doubles from the Closing through the end of the Value Pool Measurement Period.

Results:

(i)   The LR Value Pool Interest will be $100,000,000 (5 times $20 million).

(ii)   $62,500,000 (125% of $50 million) of the $100,000,000 will be paid to LR, which it in turn will use to (i) repay the LR Loan ($50 million) and (ii) cover its tax on the LR Value Pool Interest ($12.5 million).

(iii)   $37,500,000 ($100 million minus $62.5 million) of the LR Value Pool Interest is available for the Shareholders' Participations.

(iv)   The fixed 60% of the Participations is paid out in cash or registered UL equity in the amount of $22,500,000 (60% of $37.5 million).

(v)   The remaining variable 40% of the Participations is paid out in cash or registered UL equity in the amount of $30,000,000 (2 times $15 million).

# EXHIBIT 2

**To:** LeClair, Gary D [Gary.LeClair@leclairryan.com]
**From:** Daniel Reed [Daniel.Reed@unitedlex.com]
**Sent:** Wed 11/22/2017 9:07:13 AM (UTC-05:00)
**Subject:** FW: Keystone Article

Gary, the lead bankers from CVC will be flying to NYC next week to review a range of details re: our vision/future. Is there any chance you could join us on Tuesday? Jennifer Weiss from Greenberg Traurig will also be there to go into more detail on the tax structuring of our solution. If travel there is a challenge, would be great if you could at least join via Video. Please let me know what can work for you.

The below event is another interesting ripple on the legal landscape – and worth some study – what we are doing is obviously radically more robust.

Best, Dan

---

**From:** Jeff Brown
**Sent:** Tuesday, November 21, 2017 8:13 AM
**To:** Daniel Reed <Daniel.Reed@unitedlex.com>
**Subject:** Keystone Article

NOT FOR REPRINT

Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: http://www.law.com/americanlawyer/sites/americanlawyer/2017/11/16/keystone-law-set-to-become-third-uk-firm-to-float/

# U.K. Law Firm Poised to Become Third in Country to Go Public

Keystone Law hopes to raise nearly $20 million through a listing on the London Stock Exchange.

By Alex Berry | November 16, 2017



James Knight, founder and managing director at Keystone Law

Keystone Law is set to become the third firm in the U.K. to list itself on the London Stock Exchange after announcing Thursday its intention to proceed with an initial public offering.

The firm said in a statement that it planned to join London's Alternative Investment Market (AIM) later this month, with the new trading entity to be known as Keystone Law Group plc.

Keystone said shares will begin trading on Nov. 27, with the firm hoping to raise £15 million ($19.8 million) in total, based on a placing price of 160 pence per share that values Keystone at £50 million ($65.9 million).

"The entire team has worked hard to establish our position as one of the leading U.K. mid-market challenger law firms," said Keystone founder and managing director James Knight. "Our decision to list on the [LSE] will provide us with the most resilient and stable platform to support our ambitious growth plans long into the future. The U.K. legal services market is the second largest in the world and we believe the Keystone model is well placed to take advantage of this significant opportunity."

Squire Patton Boggs corporate partner Adam Hastings, who works out of London and Leeds, England, is advising Keystone on its IPO plans. The firm, which was established in 2002 and converted into a so-called alternative business structure in 2013, has its roots as a virtual law outfit, with its lawyers using technology to work remotely rather than from an expensive, central location. However, in recent years, Keystone has opened a string of offices across the U.K., including the Channel Island of Guernsey and in Sydney, Australia.

In 2014, private equity firm Root Capital injected £3.15 million into the business, with Keystone subsequently achieving annual gross revenue growth of more than 20 percent. Gross revenue in 2016-17 stood at £26 million ($34.28 million). According to Keystone's website, key clients of the firm include RSA Insurance Group plc, Siemens AG, The Royal Bank of Scotland plc and Virgin Atlantic Airways Ltd.

Keystone's decision makes it the third firm to float in London after regional mid-market British firm Gateley made its move in 2015. The latter raised £30 million when it listed, with partners taking £25 million and the firm keeping £5 million.

Earlier this summer, London-based Gordon Dadds announced its intention to join London's AIM market via a reverse takeover of marketing company Work Group.

Keystone's Knight, who will become CEO of the newly-listed company, told London-based Legal Weekthat his firm's listing had been in the works since early 2016 and is "about the future."

Going public will leave Keystone with no debt, Knight said, and lock in senior management and shareholders for up to two years, fueling the firm's strategy for future growth.

"The public market provides a solid platform for us to move forward within. We have been ambitious, and this kind of stable platform is something we believe will help us grow," Knight explained. "I think Keystone as a firm and business model is suited to this kind of market, and it will also be a good thing for how we are recognized and perceived to clients and other lawyers."

Of the nearly $20 million in capital that Keystone hopes to raise, £7.4 million (nearly $9.8 million) will be used to pay off shareholder debt relating to Root Capital's 2014 investment, a move that enabled Keystone to take on external capital. After these debts and IPO-related costs have been paid, Keystone will be debt free, and the remaining capital can be invested in itself.

"Fundamentally, the IPO doesn't represent any deviation from our existing business model," said Knight. "When you do these things you go around to the institutions and fund managers to gauge appetite and get allocations, and the offering was substantially oversubscribed. The reason why investors have been so bullish is because they see the Keystone model as the model for the future—particularly in the mid-market—and wholeheartedly believe in the concept of this very different business model."

While Knight is keen to stress that the IPO will not prompt Keystone to diverge from its current strategy, the firm intends to draw on new capital resources to expand its geographic reach, which is currently primarily focused on London and the southern part of the U.K.

The IPO will lock in all existing shareholders and management for a period of one-to-two years, depending on their roles. And while the firm's 260 lawyers will not be offered share options as part of the float, they will "in the usual way" be able to buy shares in the firm, Knight said.

"Equity in traditional law firms is fraught with politics, risks and there are great deal of strings attached," Knight added. "It stands for something very different from this, which is much more easy and transparent."

# EXHIBIT 3

**To:**       LeClair, Gary D [Gary.LeClair@leclairryan.com]
**From:**     Daniel Reed [Daniel.Reed@unitedlex.com]
**Sent:**     Sun 2/18/2018 10:14:41 PM (UTC-05:00)
**Subject:**  Jennifer / GT

Gary, I spoke with Jennifer.  She stated the agreement is largely complete, but she is waiting on clearance to release it for distribution.  There is a disclosure issue with which Greenberg is not comfortable.  They want me to ensure that our board has the same level of information as has been provided to CVC to avoid any claim of unequal information in the wake of pending securities purchases and sales.  I expect this disclosure issue to be resolved (so that both sides of all information) by Wednesday of this week.  Let's briefly discuss on Monday late morning or early afternoon based on your schedule.  Dan

**Daniel E. Reed**

Chief Executive Officer

T: 954.559.2579

100 Broadway | 22nd Floor | New York, NY 10005

dan.reed@unitedlex.com

www.unitedlex.com



# EXHIBIT 4



# Due Diligence Findings & Conclusions
## March 2018

# Findings

| | 2015 | 2016 | 2017 | YTD FEB. 2018 | Budgeted Goal 2018 |
|---|---|---|---|---|---|
| **Attorney FTE** | | | | | |
| Members | 150 | 145 | 119 | 110 | 101[1] |
| Officers | 84 | 89 | 76 | 71 | 67 |
| **Total Partner** | 234 | 234 | 195 | 181 | 167 |
| Associates | 109 | 112 | 99 | 112 | 94 |
| **Total Attorney FTE** | 343 | 346 | 294 | 293 | 261[2] |
| | | | | | |
| **Attorney Leverage** | | | | | |
| Structural (base on FTEs) | .46 | .48 | .51 | .62 | .56 |
| Applied (based on billable hours) | .43 | .52 | .56 | .68 | .63 |

[1] 3% JV value capture model assumed 105
[2] 3% JV value capture model assumed 285



**UnitedLex Law Department Consulting**    2

# Findings

| | 2015 | 2016 | 2017 | YTD FEB. 2018 | Budgeted Goal 2018 |
|---|---|---|---|---|---|
| **Annualized Billable Hours** | | | | | |
| Shareholders | 1,757 | 1,565 | 1,506 | 1,413 | 1,533 |
| Officers | 1,839 | 1,624 | 1,549 | 1,434 | 1,664 |
| Non-Partner Attorney | 1,626 | 1,712 | 1,663 | 1,547 | 1,725 |
| Associates | 1,437 | 1,470 | 1,688 | 1,590 | 1,528 |
| **All Attorney** | 1,670 | 1,545 | 1,553 | 1,451 | 1,696[1] |
| Paralegals | 1,264 | 1,244 | 1,163 | 1,296 | 1,373 |
| | | | | | |
| **Average Hourly Rate** | | | | | |
| Shareholder | $422 | $432 | $436 | $453 | $453 |
| Officers | $337 | $345 | $358 | $373 | $373 |
| Average - All Partners | $390 | $399 | $405 | $423 | $423 |
| Average - All Associates | $257 | $262 | $248 | $264 | $264 |
| Average - All Attorneys | $361 | $360 | $360 | $365 | $365 |
| Paralegals | $170 | $170 | $164 | $173 | $173 |

[1] 3% JV value capture model assumed 1,589



# Findings

| | 2015 | 2016 | 2017 | YTD FEB. 2018 | Budgeted Goal 2018 |
|---|---|---|---|---|---|
| **VOTR** | $224,103,630 | $213,938,871 | $184,427,814 | $28,124,293 | $182,408,667[1] |
| | | | | | |
| **Gross Realization Rate** (Dollars collected / Dollars standard logged) | 72% | 74% | 78% | 74% | 80% |
| | | | | | |
| **Days Outstanding** (A/R + WIP) | 133 | 124 | 99 | 63 | 72 |

[1] 3% JV value capture model assumed $163,369,008



# Findings

| | 2015 | 2016 | 2017 | YTD FEB. 2018 | Budgeted Goal 2018 |
|---|---|---|---|---|---|
| **Debt and Capital** | | | | | |
| Term Loan | $10,549,760 | $11,635,924 | $7,000,000 | $6,936,430 | |
| Credit Line | $7,500,000 | $10,000,000 | $5,600,000 | $5,632,666 | |
| Letters of Credit | $2,917,282 | $2,474,986 | $2,400,000 | $2,367,334 | |
| **Total Debt** | **$20,967,042** | **$24,110,910** | **$15,000,000** | **$14,936,430** | |
| | | | | | |
| **Total Capital** | $20,642,000 | $22,189,502 | $19,470,865 | $16,746,785 | |
| | | | | | |
| **Leverage Ratio** | | | | | |
| Total Liability | $67,006,330 | $56,622,779 | $55,339,000 | $65,255,436 | |
| Net Equity | $18,172,589 | $21,812,790 | $13,303,000 | $14,269,038 | |
| Leverage Ratio | 3.69 | 2.60 | 4.16 | 4.57 | 5.75* |
| | | | | | |
| **Operating Cash Balance** | $11,071,162 | $6,561,605 | $7,168,206 | $5,923,599 | $500,000* |

* Loan compliance requirement



# Findings

| | 2015 | 2016 | 2017 | YTD FEB. 2018 | Budgeted Goal 2018 |
|---|---|---|---|---|---|
| **Minimum Level of Excess Availability** | | | | | |
| Total Gross Availability (A/R and WIP) | - | - | $15,448,049 | $19,566,966 | |
| Term Loan Balance | - | - | $7,000,000 | $6,936,430 | |
| Revolver Balance | - | - | $5,628,862 | $8,000,000 | |
| Excess Availability | - | - | $2,819,187 | $4,630,535 | $1,500,000* |
| | | | | | |
| **Profitability** | | | | | |
| Revenue | $163,553,323 | $158,820,600 | $142,192,969 | $16,610,723 | $141,917,248[1] |
| Expenses | $107,454,441 | $110,811,388 | $100,300,892 | $14,755,191 | $104,621,200[2] |
| Profit | $56,098,882 | $48,009,212 | $41,892,077 | $1,855,532 | $37,296,048[3] |
| Number of Shareholders | 150 | 145 | 119 | 110 | 101 |
| Profit per Equity Partner | $373,993 | $331,098 | $352,034 | $17,842 | $370,111[4] |

\* Loan compliance requirement
[1] 3% JV value capture model assumed $142,706,000
[2] 3% JV value capture model assumed $109,468,000
[3] 3% JV value capture model assumed $33,238,000
[4] 3% JV value capture model assumed $316,000



# Conclusions: Interviews

**Due Diligence Interviews:** CEO, CFO, GC, Chairman of the Board, Name Partner and 5 additional shareholders

**Interview Conclusions:**

- Optimistic outlook on the deal
- Few partner departures that impact profitability, no more departures expected
- Culture
  - Shifting towards more institutional model
  - Cross office and cross client cooperation
  - Entrepreneurial with appetite for change
- Key benefits
  - Opportunity to grow network / cross marketing opportunities (especially corporate clients)
  - Increased institutional knowledge and processes
  - Additional experienced personnel with goal of improving key financial metrics including rates and efficiency
  - Capital contribution back / no capital requirements for partner
- Critical for Success
  - Firm investment in additional personnel and operational systems
  - Concise communication and playbook of action
  - Leaders living the change by example
  - Marketing and business development that can communicate value and drive change



# Conclusions: Financial Analysis

**Financial Conclusions:**

- LeClairRyan was in default on its bank loan from Wells Fargo in December 2017.

  - This was primarily caused by an 18% reduction of 26 equity partners in 2017.

  - An additional 9 partners have departed in 2018 in just the last several months.

  - December 2017 collections were below expectations resulting in partners not receiving their final 25% draw.

  - Billable hours, hourly rates, gross realization and days outstanding need improvement as compared to relative competition.

- LeClairRyan switched to Virginia Commonwealth Financial (VCF) in 2018 with higher interest rates and less restrictive loan covenants.

- Currently, the firm is maxed out on credit line and doesn't have the ability to return capital of $6.8M to recently departed partners.

  - If capital was returned, LeClairRyan would not be in compliance with its financial line at VCF.

  - If ULX were to return partner capital and pay off term loan, LeClairRyan could still be in a precarious cash position.

- Between 2015 and 2017, revenue decreased by 13% ($21.4M) while expenses only decreased by 7% ($7.2M) resulting in a profit reduction of 25% ($14.2M) contributing to liquidity and potential going concern issues.

- Given current cash position and requirements, LeClairRyan will likely require an additional cash infusion to meet its funding obligations, pay partner draws and be in compliance with the VCF loan.



# EXHIBIT 5

To: Gustafson, C. Erik[Erik.Gustafson@leclairryan.com]; LeClair, Gary D.[Gary.LeClair@leclairryan.com]

From: Daniel Reed[Daniel.Reed@unitedlex.com]

Sent: Thur 3/22/2018 3:05:35 PM (UTC-04:00)

Subject: RE: Doug Benson Draft Report

Case 20-03142-KRH   Doc   Filed 10/27/20   Entered 10/27/20 16:32:24   Desc  Ex.
(Part 1 of 1)   Page 72 of 137

Thanks Erik. The real challenge is liquidity for LR. I was not expecting that ULX would make the capital return, takeover the debt (which does not help LR in terms of new liquidity) AND then have to infuse material cash to ensure the firm can survive. Doug's take away from Dwight is that every day begins with a review of cash and serious concern over the current situation. Doug has not come across a firm that is in LR's current cash position, and has expressed serious concern with its status as a going concern. I realize you have a very different view, and I need to reconcile that with Doug. The only omission in process thus far was the preparation of a pro forma of true cash needs (on multiple levels) of LR. I also did not realize until seeing Doug's report that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs. Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our "deal infusion", how much is needed to operate the firm without being in the perpetual red zone.

When we speak at 5, I would like to confirm what edits, if any, need to be made to Doug's PPT before I send to members of my board and CVC this evening. I think it will make sense for Doug to join given the need to send out the PPT today.

Dan

**Daniel E. Reed**

Chief Executive Officer

T: 954.559.2579

100 Broadway | 22nd Floor | New York, NY 10005

dan.reed@unitedlex.com

www.unitedlex.com



---

Dan, we appreciate the opportunity to reflect on the report and to comment. We offer the following for your consideration in advance of our call.

1. Return of former partner capital: Our existing partner agreement has longstanding protections in place that put strict limitations on returning capital, even in robust times. We have the legal right to delay repaying capital for as long as necessary on numerous grounds, including if the payment would cause a loan default. Practically speaking, in the near tem, this capital is permanent capital. There is no risk that it would cause a liquidity problem.

2. Collections cycle. Cash is tight. Some of that is cyclical. We typically empty out our AR and WIP collections pipeline in December, which results in draws on our line to cover the cash flow shortfalls in January and February. We eventually turn cash positive in the March timeframe. That is what is happening this year, with collections significantly improving in March. The historical data shows that consistently since the inception of the firm, and this is consistent with the law firm industry.

3. Headcount: Cash is also tight because we have re-positioned the firm, resulting in a decrease in headcount that

we now plan to reverse. We began adding lawyers beginning last summer, and then put shareholder lateral hiring on hold in November pending the JV. An early experience and the early months of a year are when much of our attrition occurs. While we are on the sidelines now, we are confident that once we sign, our growth pipeline will allow us to rebuild our attorney headcount with accretive and culturally compatible shareholder hires.

4. Cash management:  We fully drew on our $5.6 million line at the end of February in part because we chose to maintain our cash balance level at about $6 million of cash on hand.   We expect our cash position to continue to strengthen throughout the year as in the past.  Our March 1st conversion to a PLLC from a C Corp has given us the ability to materially reduce our monthly cash burn this year by another $450K per month.  This conversion has allowed us to reduce partner draws effective tomorrow by more than 20% and allocated bonuses by 30%, because even after those reductions, net after tax take home pay will increase by about 10%.  The conversion also allows us to pay about $30 million in partner draws on a tax deferred basis.  Also, the tax deferral creates a significant retention incentive through 2023, especially for our biggest producers, because early departure can trigger a recapture tax event.

5. Leverage:  We leverage our officers (non-equity partners).  Part of our re-positioning was to increase our leverage from 1.15 in 2016 (193 non equity attorneys/150 equity partners) to 1.66 in February 2018 ( 183 non equity attorneys/110 equity partners).   We expect this trend to continue.  We believe this largely explains why PPP went up 6% in 2017 even though revenues decreased by more than expenses.  The reduced net was spread over a greater reduced number of partners.

6. Trend.  I am glad that this report was not written in early 2016 when I took over.   I was given a mandate to reposition the firm, financially and culturally.  That mostly involved fixing or transitioning poor fit practices and underperforming or over compensated partners, and to a lesser extent,  transitioning partners who posed management or cultural challenges.   We also eliminated many side deals and exceptions, reinforcing our "all for one" firm-first approach.   Our partners that have left are generally good people, but were not aligned with what needed to be done to ensure we had the right platform on which to build.  There has been an understanding that taking our medicine would be painful financially for the partners for a couple years.  It has been painful, but worth it.  Our internal sentiment is that we now are much stronger and poised to grow and increase profitability.  The JV will benefit from this repositioning, as we have already addressed many issues that would have been obstacles in the change management and EBITDA generation process.

7.  2017 Performance: we saw the fruits of our 2016 restructuring efforts with our 2017 performance, where we achieved a cash profit on lower revenues, and as Doug's data shows, significantly reduced our debt levels.

8.  VCF:  We were candid with VCF in the underwriting process and have maintained constant, open communications with it.  We moved from Wells because VCF has more flexibility to work with us and to allow us to make good long term decisions.  The re-positioning was intentional and we were open with Wells far in advance that our restructuring efforts would trigger the partner reduction covenant, but their hands were tied when it came time to set the renewal terms.  VCF became a better solution moving forward than renewing with Wells. The cost of the extra interest is well worth the flexibility to run our firm the right way.  We have a close relationship with VCF that stretches back 20 years and we are comfortable that our relationship with it will continue.

Without claiming mission accomplished or suggesting that we don't have lots of work ahead, LR could continue on its re-positioned path as a stand alone firm.   We would continue to manage our liquidity and get back on the growth path.

Our future is more secure with more upside if we proceed with the JV, and we remain committed to it.  It immediately

eliminates our bank debt and accelerates our cash generation. While we expect our cash position to continue to strengthen, the $3M advances line will clearly eliminate any lingering cash pressure. More importantly, the JV will improve our results, enable better growth and, given our starting point, generate a track record that will allow the JV to share LR's improvements with other law firms.

As far as the suggestion that we tier the capital infusion, we do not see how we could transfer our back office, undertake the requisite change management, create partner excitement and manage our VCF relationship unless we pay off the debt and address the return of partner capital. We also do not see a way to sign later than March 30 or close later than April 29. We are deep in our partner approval process, we have to turn the growth faucet back on and we need to eliminate the uncertainty and distraction, end our mounting tax accounting and outside costs and redirect productive resources away from the documentation and approval process back to production.

If after considering our comments you still have concerns, a quick and simple solution that works on your end and ours would be in order. If you believe it would be necessary, we would suggest 50% of capital be returned at closing and 50% in one year. If a partner leaves after closing, their remaining capital would be subject to return under our restrictive partner agreements. That delayed return, coupled with the potential for tax recapture on their 2018 distributions and the loss of their equity incentives, as well as the positive attributes of increasing success through our collaborative efforts all would act as incentives to stay.

We hope our comments, coupled with this suggested change, will get this over the goal line.

We look forward to talking to you later today.

Sincerely, Erik

C. Erik Gustafson
Attorney at Law

LeClairRyan
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
(703) 647-5902 Direct
(703)-684-8075 Fax
(703) 307-2270 Mobile
Erik.Gustafson@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

**From:** Daniel Reed [mailto:Daniel.Reed@unitedlex.com]
**Sent:** Wednesday, March 21, 2018 11:14 PM
**To:** Gustafson, C. Erik; LeClair, Gary D.
**Subject:** Doug Benson Draft Report
**Importance:** High

Erik and Gary, earlier this evening I received the attached draft of Doug's report he will be submitting to CVC late tomorrow or Friday; it is concerning and creates challenges for me in its current form. I had Doug walk me through it and I would like to have a call among the four of us on Thursday. Doug's findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity. Doug goes as far as to raise a question of going concern given current obligations and being at the limit of its credit line and partner stability. Quite frankly I did not realize that cash was as tight as indicated – which raises questions in my mind re: logical uses of funds over the next six months.

CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path. The numbers are challenging regardless of assertions that 90+% of the partners that have departed in recent times were "bad eggs". Before the three of us speak with members of UnitedLex's board and/or CVC, I would like to confirm the points to be made in the face of Doug's report – and what modifications, if any, should be made to the report before submission. We also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand before funding is used for any other purpose, or that there is at least some balancing of use of proceeds.

I will free up from meetings in Tysons at 1pm on Thursday. Please let me know if 1pm can work, or the next open slot, to speak

with Doug and me.

Dan

**Daniel E. Reed**

Chief Executive Officer
T: 954.559.2579
100 Broadway | 22nd Floor | New York, NY 10005
dan.reed@unitedlex.com
www.unitedlex.com



* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

# EXHIBIT 6

LECLAIRRYAN

<u>**CONFIDENTIAL**</u>

TO:        Members

FROM:    Erik Gustafson and Andy Zappia

DATE:    March 19, 2018

RE:        Project ULX Executive Summary for Members

---

Project ULX is the proposed business alliance between UnitedLex ("ULX") and LeClairRyan PLLC ("LR"), through a joint venture structure.  This alliance is designed to provide LR with a significant competitive advantage in the legal industry, providing for an enhanced opportunity for increased success for the next decade and beyond.  It provides avenues and resources for continued improvements in client service, while providing a stronger economic foundation upon which to grow the depth and breadth of our practices and the size of LR overall.

The process of designing and negotiating this alliance has been led by our CEO, Lead Manager and our Administrative Leadership, and has been supported by our corporate and tax colleagues, who have employed their drafting, insight and deal experience to this transaction.  Our Board has standalone authority to approve most aspects of this transaction, but one key deal element, namely the upfront loan LR will receive as part of the transaction, is subject to Member review and approval.  Members will also be asked to affirm their general support for the deal and its objectives.  As discussed below, the loan LR will take from ULX, or one of its affiliates, is non-recourse to our Members and no payments will be due on the loan for the first five years after closing.  The deal is structured so that the value we build as part of this business alliance will be credited against the loan amount.  Based on current projections, the value we should build in this alliance would be more than sufficient to satisfy the loan.

We believe that as part of this alliance, we will be able to increase our profitability and growth of LR.  The alliance will also allow us to present an attractive platform to both clients and potential laterals.  For lateral recruitment, the alliance will also allow us to have only a minimal paid-in capital requirement, which should aid growth.  The alliance will also give our Members an equity upside opportunity in the success of the joint venture, allowing our Members to get the type of equity benefits that many of our corporate client contacts have.  We think all these benefits will solidify growth and help us retain our talent.

The Board is in the process of reviewing all of the deal terms (separate from the loan item), and intends to give final approval to those other deal terms by March 30.  On a

MEMORANDUM

March 19, 2018
Page 2

parallel track, the Board has recommended the loan element for Member approval.  We are now coming to the Members to brief you on the overall terms of the transaction and to seek approval of the loan element, so that we can sign deal documents by the targeted signing date of March 30th.  The deal documents will not be signed unless the Members have approved the loan, and likewise the loan documents will not be executed unless the Board has approved all of the other aspects of the transaction.

If approved by the Board and Members, we intend to sign all of the deal agreements on or before March 30, 2018.  We will then continue efforts to bring the joint venture live, at which point the loan will be funded.  The goal is to bring the joint venture live by no later than May 1, 2018, but we hope to achieve that earlier, if possible.

Lastly, we have not concluded negotiations with ULX on all deal elements, but we expect any changes in deal terms as we approach agreement execution to be consistent with this summary.  If there are any material inconsistent changes, Members will be advised.

## **Who is ULX**

ULX is a non-law firm enterprise legal services provider.  ULX was founded in 2006 with a business objective to improve the performance of leading corporations, law firms, and academic institutions. Since then, more than 2,000 attorneys, engineers, and consultants across four continents have deployed varied programs that deliver business solutions resulting in risk mitigation, efficiency improvements, and cost optimization for clients. LR has a long history with ULX, including the prior transfer of our Discovery Solutions Practice to ULX, and our former partner Jeff Brown continues to serve in the management of ULX.

ULX operates in the following service areas:

- Litigation support: Litigation Support, eDiscovery, Document Review, Investigations
- Law Department Consulting: Vision and Strategy Articulation, Operational Effectiveness, Internal Resource Optimization, Outside Counsel and Vendor Management, Technology Strategy and Utilization, Operational Support and Staff Augmentation
- Intellectual Property: Patent Litigation Solution; Patent Licensing & Monetization; Prior Use, Prior Art & Invalidity Analysis; Trademark Solutions
- Digital Contracting Solutions: Policies, Templates and Playbooks, Drafting and Negotiations, Contract and Subcontract Management, Contract Enforcement, Audits, Reports and Governance
- Cybersecurity: Risk Assessment, Incident Response, Forensics, Managed Security Services

March 19, 2018
Page 3

ULX Offices:

- ☐ Overland Park, Kansas
- ☐ Atlanta, Georgia
- ☐ Austin, Texas
- ☐ Cincinnati, Ohio
- ☐ Columbus, Ohio
- ☐ Gainesville, Florida
- ☐ Lenexa, Kansas
- ☐ Miami, Florida
- ☐ New York City, New York
- ☐ Papillion, Nebraska
- ☐ Richmond, Virginia
- ☐ San Jose, California

International:

- ☐ Bangalore, India
- ☐ Gurgaon, India
- ☐ London, United Kingdom
- ☐ Sydney, Australia
- ☐ Tel Aviv, Israel
- ☐ Toronto, Canada
- ☐ Wanchai, Hong Kong
- ☐ Singapore

## **General Alliance Structure**

The alliance is structured through an entity called ULX Partners LLC, a Delaware limited liability company, co-owed by LR and ULX (the "JV").  A summary of the JV terms, as embodied in the JV Limited Liability Company Agreement (the "Operating Agreement") is provided below.  The operating relationship between the JV and LR is governed by a Master Services Agreement ("MSA"), also summarized below.  Finally, a key component of this structure is replacing our current debt facilities and repaying our current capital to Members with a single loan from ULX, or one of its affiliates, that is non-recourse to Members (the "Loan Agreement").  The Loan Agreement is likewise summarized below.  The proceeds of the loan will also close an approximately $900K funding gap in our deferred compensation plan, allowing us to pay out all vested dollars in that plan by December 31, 2018, the earliest allowed date under IRS regulations.  It is also projected that the loan and other aspects of the transaction will significantly improve our cash flow.

Under this transaction, we the Members remain the sole owners of LR, and LR remains an independent law firm.  ULX is not acquiring us.  We will continue to govern of our operations, elect our leadership, set our compensation, approval lateral or promoted Members, and will be responsible for directing and delivering excellent legal solutions

March 19, 2018
Page 4

and services to our clients.  This alliance, however, will enhance our ability to do those things, as well as create new opportunities to source and grow client relationships.

## **The MSA**

This agreement between LR and the JV generally sets forth the responsibilities and obligations the JV has to provide business support services (the "Services") to LR, LR's responsibilities and obligations to engage with the JV in the provision of those Services, and to compensate the JV for those Services.  The key provisions of the MSA are as follows:

- *Term.* Ten years, with two automatic extensions of an additional five years each, unless the MSA is terminated early in accordance with its terms (whether for Cause or for convenience), or if a party elects not to extend beyond the initial ten year term or an extension thereof.
- *Termination Assistance*.  The JV will be obligated to provide assistance to LR following any termination or expiration so that LR can transition the Services to alternative providers.
- *Invoicing*.  The MSA sets forth an invoicing model and the general expectations for the amount of EBITDA (free cash flow) the JV/ULX will garner attributable to: (i) the invoiced fees to LR for the Services, and (ii) EBITDA relating to business referred by LR to the JV/ULX for document review, IP services support, etc.  There is a termination fee if LR terminates for convenience and moves its business to another omnibus service provider.  The invoiced fees relate to the following areas of improvement that we anticipate the JV and the overall alliance with ULX will be able to achieve:
  - *Production* – Improvements to our rates, hours, billings and collections.
  - *Operations* – Optimizing platform services (finance, HR, benefits, marketing, lateral growth, etc.).
  - *Capital Efficiency* – no interest payments or repayments of principal on the loan, and repayment of current preferred and common capital obligations to Members.
  - *Growth* – accelerating our growth, expanding revenues going to the JV.
  - *Efficiency and productivity.* – we anticipate on a going forward basis changes and updates to aspects of operations, governance systems, and fiscal year that will reduce Members' non-productive time commitments and improve efficiency to achieve maximum benefit from the deal structure.  We also expect higher work flow and correspondingly higher utilization from our current timekeepers.  We will need to make some updates to our PLLC documents to address certain aspects of the transaction.  Members and all timekeepers will be expected to embrace and support these new structures to maximize the return for LR and the JV.
- *EBITDA Expectations.*  Measured in the aggregate, from both invoiced fees and business referred during each Fiscal Year (planned to be April 1 through March 31), provided that we are meeting or exceeding the mutual goals we have set out

March 19, 2018
Page 5

(roughly 3% year-over-year improvement from what we would otherwise achieve without the assistance of the JV's services and support):
- o *Years 2-5 - $15 to $20 million each year.*
- o *Years 6-10 - $20 to $30 million each year.*
- o *As discussed below, these payments go towards the calculation of the First and Subsequent Target Amounts, which will be used to retire the loan, cover taxes, and provided that the amounts exceed those thresholds, will be available as further payouts to our Members.*
- ☐ *Standard Provisions.*  Standard reciprocal provisions relating to confidentiality, indemnity, limitations of liability, arbitration of disputes, etc.

To the extent that we achieve these goals or exceed them, an increasingly large amount of profit can be distributed as Member compensation.

## MSA Operations and Going Forward Considerations

The underlying intention of this alliance is to allow us to better achieve and exceed the mutual goals established under the MSA.  In so doing, everyone benefits short term by generating more profit to be distributed to Members, and in the long term by increasing the Initial and Subsequent Target Amounts (detailed below).  Our goal is simple – improved performance.  This is not a free lunch.  To maximize benefit of this alliance, LR and our Members will need to embrace innovation, generate more work, work harder than our current pace, improve our policies and require compliance with them, and raise our game overall.  We need to eliminate time and effort devoted to things that do not move us forward.  To that end, we will re-examine our relevant policies, procedures and operations to make sure they are all aligned with achieving our financial and alliance goals.

## JV and JV Operating Agreement

Generally, the JV will house most of LR's non-attorney/patent agent staff and administrative functions as they exist now, will build additional resources for practice and management support, and will provide additional assistance in business development, pricing, legal process improvements, and technology.  The JV will be staffed by our existing team, with growth and improvements over time utilizing ULX's resources and ULX's additional experience and capabilities in collateral legal operations and client services.

Executive leadership of the JV will be provided initially by a steering board that will include our CEO, as well as Dan Reed, ULX's CEO.  There may be one or two additional advisory board members. ULX will be the managing member of the JV.  The senior day-to-day leadership within the JV will be comprised of our current Chief Administrative Officer, Jen Mistal, together with new professional executive hires, including a Chief Practice Officer and a Chief Pricing Officer.  The expense of these new positions is part of ULX's investment in the JV.  Over time, it is certain that there will be additional personnel and resources added to the JV or collaborative sharing with

March 19, 2018
Page 6

ULX personnel, particularly with respect to program and process management, pricing and business development support.

With respect to our existing colleagues who will join the JV, nothing is intended to change with respect to their roles, responsibilities, reporting structure, compensation, or where they sit.  ULX's current employee benefits are slightly different, but we hope to minimize changes there as well over time.  Our valued staff members will continue to be an integral part of supporting LR and our client services.  Their pay stubs and related benefits will come through the JV.  We would otherwise not expect any material changes, other than those that would naturally recur in our typical business cycle over time.  We have an advanced rollout plan to explain these changes and the new structure to our team members, if this transaction is approved.

As described above with respect to the invoicing provision of the MSA, prospectively LR will be invoiced for the JV's Services, including those costs and expenses for personnel and services that we will migrate to the JV.  Functionally, rather than LR paying for those services ad hoc every day as it does now, the JV will invoice LR in a lump sum of accumulated services at the end of each month, generally on a net 30 day basis for payment.  This should initially assist with short term cash flow, and more regularize our support cost and payment cycle.  The deal is structured so that LR's costs for our current staff services will remain proportional to what LR pays now, meaning we will not pay a premium back to the JV for the services from our team members who will be housed in the JV.

It is contemplated that going forward, additional law firms will sign separate master services agreements with the JV, eventually creating a constellation of law firms with contractual relationships with the JV (but not with each other).  However, the JV will initially be focused on a successful launch of the relationship with LR before approaching other firms to join the constellation.

Appendix A of JV Operating Agreement – Target Amounts and Redemptions.  A very important additional benefit for our Members that has been negotiated as part of the alliance is the creation of an Initial Target Amount ($60-$80M) and Subsequent Target Amount ($20-$30M) of value.  These Target Amounts may be higher or lower based on LR and JV performance and growth.  At 5 and 10 years, the actual Target Amounts realized, adjusted by our then outstanding loan balance and an allocation to address taxes resulting from distributions satisfying the loan payment (25% of the repayment amount), will then result in Initial and Subsequent Target Amounts distributable to LR Members.  The dates of the First and Subsequent Target Amounts are intended to be on the 5th and 10th anniversaries of launching the JV.

To the extent that the actual Target Amount is less than the then current loan balance, the loan automatically rolls over with a maturity date in 2028.  The Loan Agreement is discussed below.

March 19, 2018
Page 7

The First and Subsequent Target Amounts available for distribution, if any, will be distributed to Members based on interests (termed "Participations"). Members will be allocated initial Participations by the Board by the closing date. The Board will determinate how to allocate Participations. In general, we expect that allocations will likely be made based on a combination of certain pro rata allocations to all Members, together with allocations of Participations based on three-year performance metrics, and contributions to leadership and closing the transaction, along with a portion reserved for future allocations.

Participations will vest as of the date of allocation to a Member. If a Member leaves LR prior to the 5th and then 10th anniversary dates for redemption, the value of that Member's Participations held will be determined as of the immediately preceding anniversary date. Since the Initial and Subsequent Target Amounts are calculated on an additive basis each year, it is unlikely that the Participations will have much, if any, value until closer to the 5th anniversary date when the increasing value of the Initial Target Amount should begin to be greater than the amount of the outstanding loan and gross up to cover the allocated taxes. We are also looking at a "good leaver" mechanism where Members who leave LR for in-house positions with clients, retirement at a specified age or later, judicial positions, etc, can have a means to maintain the potential value in the Participations.

## Loan Agreement

The financing element of the transaction contemplates a loan in an amount to provide for: (i) replacing our current indebtedness, including our operating line of credit, our one remaining term loan, and our letters of credit used as lease security for some of our offices; (ii) repaying our current capital obligations to Members; (iii) covering the approximately $900K funding gap in our deferred compensation plan; (iv) addressing client cost advance and reimbursement needs; and (v) any tax liabilities incurred in connection with either our contribution to the JV at closing or the distribution to Members in year 5 following the closing. We may also use some of the loan proceeds for near term opportunities for lateral growth and office expansion. Although the exact amount of the loan is still being finalized, the Loan Agreement is materially complete regarding the terms of the loan. For those reasons, conditioned upon no material change and further conditioned on Board approval of the remaining deal documents in their final form, the Board has approved and is recommending to Members to grant authority to borrow up to $45M under the Loan Agreement. If there is a material change in any of the terms or provisions in the Loan Agreement, we will come back to the Board and Members for approval.

This loan is non-recourse to our Members. The loan is secured by a first lien on all of LR's assets, including A/R, WIP and LR's interest in the JV. With the exception of the JV interest (which does not currently exist), this is the same loan security provided for in our current debt facilities. The loan will accrue simple interest at 7% (meaning it does not compound, including annually), payable on the repayment date in 2023. This is the same current rate on our current debt facilities, but the current rate is variable and may

March 19, 2018
Page 8

increase, is due on a current basis, and compounds.  Overall, the terms of the loan as part of this transaction are more favorable than our current debt facilities.

The Loan Maturity Date is initially June 30, 2023.  Provided that the MSA has not been terminated in the interim, the loan is then repaid through the process described above with respect to the Initial Target Amount and Subsequent Target Amount.  If the First Target Amount is insufficient to satisfy the entire loan, the amount available will first reduce the amount of the indebtedness related to capital repayment, then to the amount remaining on the debt funding.  Any remaining balance will then automatically be rolled over, extending the maturity date another five years to coincide with the valuation of the 2028 Subsequent Target Amount.  If the Subsequent Target Amount is insufficient to pay any further remaining balance, the amount of the loan attributable to the capital repayment would be forgiven, and all other amounts remaining would be payable on the fifth anniversary of such date (i.e. 5 years after that date that is 10 years from closing).

The representations, warranties and covenants in the loan agreement are based on the terms in our loan from our current lender, but revised in our favor to eliminate typical lending terms related to financial and negative covenants.

## Ancillary Agreements

As part of this business alliance, LR would also enter into several additional agreements ancillary to the key agreements summarized above.  Those ancillary agreements are summarized as follows:

Shared Personnel and Services Agreement ("Support Agreement").  This is a standard intercompany support agreement between the JV and ULX that enables the JV to acquire certain services from ULX so that it can, in part, provide services to LR under the MSA.  The Support Agreement is necessary because the JV may not staff every function within the JV either initially or over time.  Rather, certain services, such as legal and risk management support and other back office operations of the JV, may be supported or provided by ULX from time to time.

Contribution Agreement.  This agreement between LR and the JV relates to LR's contribution to the JV of certain of its tangible and intangible assets.  The Contribution Agreement is necessary to: (i) migrate LR's "Platform" from LR to the JV; and (ii) demonstrate the consideration LR is delivering to the JV (either by transfer or license) in exchange for LR's interest in the JV.  Standard representations, warranties, indemnification provisions for an agreement of this nature apply.

Subscription Agreement.  Standard agreement between LR and the JV whereby LR subscribes for its Class B Membership Interest in the JV.  Standard representations and warranties apply.

March 19, 2018
Page 9

## Equity Grant Program

Another facet of this alliance is creating the ability for LR to subscribe to ULX stock annually, projected to be in an amount of 8-10% of Member compensation.  While the details of this are still being finalized, the goal is to commence the program in March 2019.  This program would generate four underlying opportunities for Members: (i) an opportunity to have access to a security with a stated minimum value that might increase in value at the date of sale; (ii) enabling the ability of our Members to receive value in a security that would be taxed at a capital gain rate; (iii) creating certainty with respect to the payment of a portion of year-end value as this would be locked in at the beginning of the year; and (iv) increasing our EBIDTA contribution, thereby increasing the Initial and Subsequent Target Amounts.

## Ethics Opinion

We have individually engaged Hinshaw & Culbertson, LLP ("Hinshaw"), our long-time outside ethics counsel, for an opinion for the benefit of LR confirming that the overall proposed transaction and deal structure are legal and ethical, as well as providing any other guidance relevant to our processes, procedures or operations going forward with respect to this alliance.  Hinshaw is currently working on the opinion letter, but has also been involved in the development of the deal structure from the outset, and we have revised and updated the deal structure based on their continuing advice.  ULX has separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion.  The final execution of deal documents and approval of the Loan Agreement are contingent upon receiving a satisfactory and final opinion letter supporting this transaction.

## PLLC Conversion Issues

It is our present intention to either pay the PLLC Conversion Tax Liability in July in full or to reach agreement with the IRS to pay that tax liability over time.  The improved cash flow from this ULX transaction will aid that effort.  In addition, as of our performance and cash flow improves, the Board will determine how and when to increase the current 55% draw percentage on the tax deferred draws to Members to a higher percentage.  If our performance warrants, the Board would like to move the draw percentage for our tax deferred draws to 62%.  Also, we are projecting that the recapture tax on a portion of the tax deferred benefit from the PLLC conversion will sunset in 2023 when we achieve the Initial Target Amount, as discussed above.  Finally, we will also be transitioning to Member payments being made twice monthly, rather than the current bi-weekly schedule.  That will likely occur in May or early June.

We hope you find this summary useful and share the Board's and Leadership Team's enthusiasm for what this alliance may mean to the Firm, our clients and colleagues joining the JV.  As noted, to the extent there are material developments, we will keep you in the loop.  We hope you can attend the upcoming Member meetings where the alliance will be discussed in greater detail.  In the meantime, please be mindful of the

March 19, 2018
Page 10

sensitive nature of the information we are sharing with you and thank you for your
attention to this important opportunity.

# EXHIBIT 7



**ATTORNEYS AT LAW**
800 Third Avenue
13th Floor
New York, NY 10022

212-471-6200
212-935-1166 (fax)
www.hinshawlaw.com

## STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

July 25, 2017

Daniel E. Reed, Esq.
Chief Executive Officer
UnitedLex Corporation
100 Broadway
22nd Floor
New York, NY 10005

*Questions on 5.4 and 1.8(f)*

Re:   **Opinion Letter**

Dear Mr. Reed:

This letter responds to the request from UnitedLex Corporation ("ULex") and Marshall Denning LLC ("MD Law Firm") for Hinshaw & Culbertson LLP ("we," "our," or "us") to opine whether ULex's plan to enter into certain business arrangements with the MD Law Firm and MD Law Firm members is consistent with the law and the New York Rules of Professional Conduct (the "Rules," or "RPCs") governing lawyers and the unauthorized practice of law. This opinion is based on the law and Rules of New York.   The RPC's discussed herein are attached as Appendix 1. [1]

This opinion rests upon the facts set forth in this opinion letter, which were provided by ULex and the MD Law Firm.   We have not taken steps to independently confirm the information provided regarding ULex's business or the MD Law Firm's practice.   Should the facts as summarized in this opinion letter prove inaccurate, such inaccuracies could change the conclusions reached herein.   We do not express an opinion on the merits of the business plans described herein.[2]   Further, this letter is intended only for ULex and its corporate affiliates and the MD Law Firm and should not be relied upon by others.

---

[1] The rules in effect in the states that you identified as possible office locations, with commentary as to whether application of any of these states' rules and laws is likely to yield a different outcome from that in New York, are set forth in Appendix 2.

[2] We also do not address whether the use of the name Marshall Denning, if challenged, would be found to be permissible in the jurisdictions in which the MD Law Firm plans to have offices.

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 2


## Summary of Facts

ULex is a Delaware corporation with its principal place of business in Overland Park, Kansas. It does business in more than 20 countries. In the United States, it is engaged in providing services to law firms and corporate legal departments in the form of "back-office" services such as, among other things, accounting, marketing, technology, human resources, and legal and nonlegal staffing. In addition, ULex provides to corporate legal departments and to law firm clients "client-facing" nonlegal services, such as contracts and transactional management, intellectual property assistance (including patent mining and monetization, technical expertise, and strategic advice), data management, discovery and cyber security, and other nonlegal litigation and transactional support (the "ULex Services"), which for the purposes of this letter we assume are "nonlegal" and do not constitute the unauthorized practice of law.

The MD Law Firm is a limited liability company organized under the laws of the State of Florida. For the purpose of this analysis, we have anticipated that it will have offices in a number of states, including New York, Delaware, the District of Columbia, Florida, Georgia, Illinois, Texas, Virginia, California, Massachusetts, and Pennsylvania. The MD Law Firm is and will be wholly owned by members of the MD Law Firm, all of whom are lawyers. Members of the MD Law Firm will receive a percentage share of the profits of the MD Law Firm as compensation.

In addition, as an incentive to join the MD Law Firm, members will receive, when joining, equity in ULex. ULex will provide this equity with the understanding that the MD Law Firm will contract with ULex as described under Business Plan 1 below. In addition, ULex hopes that MD Law Firm clients will use ULex Services as described in Business Plan 2 below, but the amount of equity or other direct or indirect compensation or benefits to MD members will not be dependent on such referrals.

ULex and the MD Law Firm will work closely to achieve efficiencies while providing first-class service to MD Law Firm clients. The cost-savings and efficiencies will be accomplished primarily in two ways:

**Business Plan 1:** ULex will provide, as it does to other law firms, "back office" services to the MD Law Firm. These will include accounting, technology, human resources, marketing and IT support. Because of its size, experience and economies of scale, ULex is in a position to provide these services more efficiently than the MD Law Firm would be able to do on its own. ULex will invoice the MD Law Firm for these services at market rates. ULex may also provide legal and nonlegal staffing to the MD Law Firm. These lawyers will work under the supervision of MD Law Firm lawyers. (The analysis of "back office" services under Business Plan 1 herein is applicable to such services under Business Plan 2 as well.)

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 3


MD Law Firm members will benefit from this arrangement in that, the MD Law Firm will have a lower "back office" services bill than it would have had without the arrangement. They will also indirectly benefit in that ULex, in which they hold equity, will make a profit on the delivery of these services.

**Business Plan 2**: In addition to the services provided under Business Plan 1, ULex will provide on a matter-by-matter basis nonlegal services to MD Law Firm clients. These services may include, but are not limited to, ULex Services. As a result, certain nonlegal services that would have been performed and invoiced by the MD Law Firm will be performed and invoiced by ULex.

ULex will not provide any legal services under either Business Plan.

MD Law Firm members will receive benefits for the nonlegal services provided by ULex in client matters because of their equity in ULex either through an increase in the value of their ULex equity and/or distributions from a profit-sharing pool based on their ownership of equity. These benefits and distributions will not be based on the referral of MD Law Firm clients to ULex.

**Questions Presented:**

1.      (a)      Under either Business Plan, may ULex have an ownership interest in the MD Law Firm, or exercise any management or control over the MD Law Firm, or over the provision of legal services by the MD Law Firm?

        (b)      What duties of supervision of ULex does the MD Law Firm have under each business plan?

2.      Under either Business Plan, may lawyers who are members of the MD Law Firm have an ownership interest in ULex?  May they serve as officers or employees of ULex?

3.      (a)      Under Business Plan 2, what services may ULex provide to clients, including but not limited to, clients of the MD Law Firm?

        (b)      Under Business Plan 2, may lawyers who are members of the MD Law Firm, in addition to their ownership interest in ULex, receive benefits or distributions (separate and apart from their equity interest) from ULex either through an increase in the value of their ULex equity or payment of a distribution from a profit-sharing pool based on their ownership of equity?

4.      (a) Under Business Plan 1 (and 2 to the extent these services are included), how should ULex charges to the MD Law Firm for support services provided to the MD Law Firm and not to

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 4

the MD Law Firm's clients be structured to avoid violating the rules against the sharing of fees with nonlawyers?

(b) Under Business Plan 2, how should ULex charges to clients either under a distinct engagement letter or through a subcontract through the MD Law Firm be structured to avoid violating the rules against the sharing of fees with nonlawyers?

5.      Under Business Plan 2, what disclosure and consent requirements need to be met whenever a third-party client is a client of both ULex and the MD Law Firm in order to avoid the unauthorized practice of law by ULex and to comply with the Rules governing conflicts of interest?

6.      Under Business Plan 2, may third-party clients who are clients of both ULex and the MD Law Firm be billed for the services provided by both entities in a single invoice issued by the MD Law Firm? Alternatively, may ULex bill the client separately?

**Summary of Opinion**

For the reasons set forth below, in our opinion:

1.      (a)      Under the prevailing Rules, and multiple ethics opinions, ULex may not have any financial interest in, or in any way control the provision of legal services by the MD Law Firm.

(b)      Under Business Plan 1, the MD Law Firm will have the duty to supervise those services provided by ULex to the MD Law Firm in order to make sure that such services conform to the requirement of the Rules. Under Business Plan 2, the MD Law Firm will have the same duty to supervise services provided by ULex to clients of ULex in a matter where they are also clients of the MD Law Firm, unless such clients unambiguously agree in advance that the services provided by ULex are to be provided independently and separately from the services provided by the MD Law Firm and that the client's in-house counsel will supervise or arrange for legal supervision of the provision of the ULex Services. If the ULex Services are being provided to a client of the MD Law Firm in a matter unrelated to the MD Law Firm's representation of that client, the MD Law Firm will have no duty of supervision. Such relationships should be documented carefully to ensure that it is clear that the MD Law Firm has no such duty in that matter.

2.      The MD Law Firm and its individual members may have a financial interest in, and control the provision of nonlegal services by ULex to MD Law Firm clients, and ULex may provide such nonlegal services to third-party clients, including but not limited to clients of the MD Law Firm, subject to strict compliance with the Rules governing the provision of nonlegal

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 5

services by lawyers and law firms, including full and complete disclosure of the arrangement is made to MD Law Firm clients and consent is obtained from such clients.

3.   (a)   ULex may provide nonlegal services as defined in the applicable rules to all of its clients, save that, with respect to clients that are also clients of the MD Law Firm, the provision of such services must be consistent with and subject to compliance with the rules governing conflicts of interest, as summarized at item 5 below.

(b)   In connection with Business Plan 2, lawyers who are members of the MD Law Firm, in addition to their ownership interest in ULex, may receive additional  benefits (separate and apart from their equity interest) from ULex either through an increase in the value of their ULex equity or payment of distributions from a profit-sharing pool based on  their ownership of equity, provided that express and explicit disclosure is made to, and consent is obtained from such clients with respect to these arrangements, as part of the disclosure and consent discussed at item 5 below.  Further, such additional benefits must be incidental to MD Law Firm members' equity ownership and not based on the referral of any clients to ULex.

4.   (a)   With respect to Business Plan 1, ULex may charge and the MD Law Firm may pay for support and "back office" services, provided that the amounts charged and paid reflect the actual cost or market value of the services provided. In order to avoid the risk that these charges and payments may be considered to violate the Rule prohibiting fee sharing with nonlawyers, ULex should not calculate the charges based on a percentage of the MD Law Firm's fees.

(b)   With respect to Business Plan 2, ULex may charge the same rates it would charge corporate legal departments or clients of other law firms.  The MD Law Firm may not charge lower fees to facilitate the charging of higher rates by ULex because this could be seen as impermissible fee sharing.

5.   With respect to all third-party clients of ULex in matters in which the MD Law Firm represents the clients, in compliance with the Rules governing the provision of nonlegal services by lawyers and law firms, and with the Rules governing conflicts of interest, full and complete disclosure must be made to such clients separately by both ULex and the MD Law Firm (i) explicitly and clearly differentiating the legal services to be provided by the MD Law Firm and the nonlegal services to be provided by ULex; and (ii) explaining in detail the ownership and other financial relationships between the MD Law Firm, its members and ULex, the risks and benefits to the client of engaging both ULex and the MD Law Firm including but not limited to the right of the client to select a different provider for the nonlegal services to be provided by ULex.

If Ulex is providing ULex Services to a third-party client that is also a client of the MD Law Firm in an unrelated matter, this disclosure is not required, provided that a member of the MD

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 6

Law Firm has not referred the business to ULex. If there has been such a referral, full disclosure is required.

6.      With respect to Business Plan 2, and subject to compliance with all of the applicable Rules, third-party clients of both the MD Law Firm and ULex may receive a single bill from the MD Law Firm for both legal services it has provided and nonlegal services provided by Ulex, provided that the charges and fees for ULex's services are designated as a disbursement on the MD Law Firm bill, and that the amount of those charges and fees are the same as would be billed by ULex to the client if ULex were to bill the client directly rather than as a disbursement to the MD Law Firm bill (i.e., without any markup).

ULex may bill the client separately, but ULex bills may not include MD Law Firm fees.

**Analysis**

1.      (a)      *Under either Business Plan, may ULex have an ownership interest in the MD Law Firm, or exercise any management or control over the MD Law Firm, or over the provision of legal services by the MD Law Firm?*

The Rules that apply to this question are RPC 5.4, prohibiting lawyers from practicing law in any arrangement where nonlawyers own (or have any ownership interest in), operate or control the law firm, and RPC 5.3, governing the duty of lawyers to supervise nonlawyers. RPC 5.4(b) explicitly and specifically prohibits lawyers from forming "a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law." RPC 5.4(d) amplifies this prohibition, making it clear that lawyers may not practice law in entities that are authorized to practice law for profit where "nonlawyers own any interest therein," or where any nonlawyer is "a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation." These specific prohibitions are underscored by the general and governing principle expressed in RPC 5.4(e) that lawyers may not practice with or in any entity where "a nonlawyer has the right to direct or control the professional judgment of a lawyer." **Accordingly, ULex may not under any circumstances have an ownership interest in the MD Law Firm, or exercise any management or control over the MD Law Firm, or over the provision of legal services by the MD Law Firm.**

        (b)      *What duties of supervision of ULex does the MD Law Firm have under each business plan?*

RPC 5.3 governs the duty of lawyers to supervise nonlawyers. Precisely because the services to be provided by ULex are nonlegal services, the MD Law Firm will have the obligation to make sure that, under Business Plan 1, back-office services provided by ULex to the MD Law Firm are ultimately supervised by the MD Law Firm, and that those services are properly performed so

STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 7

that at all times the services of ULex and the MD Law Firm in utilizing those services conform in all respects to all of the requirements of the Rules.

With respect to Business Plan 2, it will be critically important to establish in the engagement letters from each entity whether any of the services provided by ULex to MD Law Firm clients will be supervised by the MD Law Firm, or conversely, will be provided independently by ULex, and supervised by the client's in-house counsel (or some other attorney designated by the client), and not subject to supervision by the MD Law Firm. In addition to RPC 5.3 concerns, it is necessary for nonlawyer personnel to be supervised by lawyers in order to avoid the unauthorized practice of law.  Any ambiguity will be interpreted as requiring supervision and oversight of those services by the MD Law Firm. Whenever the MD Law Firm is responsible for overseeing the services provided by ULex to these clients, as to such services the MD Law Firm and its members individually will be responsible for taking all appropriate steps to make sure that those services conform in all respects to all of the requirements of the Rules. To the extent that, and whenever the services of ULex are billed to clients by the MD Law Firm (see item 6 below), all services so billed will be deemed to have been subject to the supervision of the MD Law Firm and its lawyers.

The allocation of roles and responsibilities between ULex and the MD Law Firm consistent with this opinion should be included in any Master Services Agreement between them.

2.      *Under either Business Plan, may lawyers who are members of the MD Law Firm have an ownership interest in ULex? May they serve as officers or employees of ULex?*

The Rule that applies to this question is RPC 5.7. RPC 5.7 (a) specifically and explicitly envisages that lawyers and law firms may own, control or otherwise be affiliated with a provider of nonlegal services, subject to meeting the requirements for the avoidance of confusion by clients and the requirements of RPC 5.7 (b) that the person or entity providing nonlegal services may not direct or regulate the professional judgment of lawyers or law firms that are rendering legal services to the client. RPC 5.7 (c) defines "nonlegal services" as "those services that lawyers may lawfully provide and that are not prohibited as an unauthorized practice of law when provided by a nonlawyer."

Taken together, the import of these Rules to this question is that lawyers who are members of the MD Law Firm may have an ownership interest in ULex, subject to compliance with the requirements that (i) the provision of nonlegal services by ULex to the MD Law Firm does not cause the clients of the MD Law Firm to believe that ULex is providing legal services to the client, and (ii) in providing services to the MD Law Firm, ULex does not direct or regulate the professional judgment of the MD Law Firm, or its lawyers, or compromise their duties to preserve the confidences of their clients.

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 8

Although theoretically MD Law Firm members may serve as members of the ULex executive committee or other governing body, this creates the danger of confusion that RPC 5.7 (a) is intended to address.  This is particularly the case where an MD Law Firm member who serves on the ULex executive committee is also responsible for, overseeing or working on an MD Law Firm matter in which ULex is providing ULex Services.  In addition, to avoid potential conflict claims against the MD Law Firm, MD Law Firm members (or other personnel) should not be in a position to have access to information concerning any ULex clients other than those that are clients of the MD Law Firm and then only regarding the client's matters on which the MD Law Firm is advising.  Because ULex provides services to multiple law firms, it is important that MD Law Firm members not have access to that information, which could create conflict issues.

3.      (a)    *Under Business Plan 2, what services may ULex provide to clients, including but not limited to clients of the MD Law Firm?*

As stated in response to question 2 above, and pursuant to Rule 5.7 (c), ULex may provide to all of its clients, whether or not they are also clients of the MD Law Firm, any and all services that do not constitute the unauthorized practice of law.  The ethics opinions and case law on the boundaries of what activities are permissible without violating that constraint are very extensive.  As noted above, we assume for the purposes of this letter that the ULex Services are "nonlegal" and do not constitute the unauthorized practice of law.  We recommend that ULex evaluate on an ongoing basis the nature of its services, particularly to the degree these  services include providing complete solutions, based on enhanced technological capabilities or otherwise, and seek guidance as to whether ULex may be engaged in the unauthorized practice of law.[3]

(b)    *Under Business Plan 2, may lawyers who are members of the MD Law Firm, in addition to their ownership interest in ULex, receive additional benefits or distributions (separate and apart from their equity interest) from ULex either through an increase in the value of their ULex equity or payment of a distribution from a profit-sharing pool based on* their ownership of equity?

---

[3]  RPC 5.8(a) provides in part that, under certain conditions, "a lawyer or law firm may enter into and maintain a contractual relationship with a nonlegal professional or professional service firm for the purpose of offering to the public, on a systematic and continuing basis, legal services performed by the lawyer or law firm as well as other nonlegal professional services...."  This Rule, which has no corollary in the ABA Model Rules of Professional Conduct, is limited to architects, C.P.A.'s, professional engineers, land surveyors, and certified social workers, Joint App. Div. Rule § 1205.3.  Although it is not directly applicable to this situation, the existence of the Rule suggests a willingness on the part of regulators to recognize the reality of collaborations between lawyers and non-lawyers.

Although RPC 5.8 is not applicable here because there is no agreement to provide nonlegal services, it is useful to note that the requirements of no nonlegal control of legal services and disclosure to the clients and consent are followed here.

STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 9

With respect to the provision of services by ULex to clients that are also clients of the MD Law Firm, there are additional Rules that must be considered and complied with in order to avoid conflicts of interest. These are discussed at item 5 below, but in addition to the general requirements for disclosure and consent explained there, lawyers who are  members of the MD Law Firm, in addition to their ownership interest in ULex, may receive additional  benefits or distributions  from ULex either through an increase in the value of their ULex equity or otherwise  such as through distributions from a ULex profit pool based on equity ownership, provided that the arrangements with respect to such additional income are expressly disclosed to and consented to by clients who are clients of both Ulex and the MD Law Firm.  This disclosure need not be made to clients of the MD Law Firm who are not clients of ULex.  Nevertheless, the MD Law Firm may wish to consider including this disclosure in all engagement letters to anticipate the situation in which a client becomes a client of ULex in the course of the matter.

Any such benefits and distributions must not be compensation for referrals from the members of the MD Law Firm to ULex to avoid any suggestion that such payments are improper referral fees. *See* N.Y. State Ethics Op. 845.

4.     (a) *Under Business Plan 1, how should ULex charges to the MD Law Firm for support services provided to the MD Law Firm and not to the MD Law Firm's clients be structured to avoid violating the rules against the sharing of fees with nonlawyers?*

RPC 5.4 expressly prohibits fee sharing by lawyers with nonlawyers. However, to the extent that the ULex fees reflect the actual cost or value of the services provided, and are not charged in proportion to the fees paid to the MD Law Firm by its clients on specific matters, they avoid the implication of fee sharing. But if the fees charged by ULex are calculated based upon the legal fees earned by the MD Law Firm, there arises a presumption of fee sharing. If challenged, the MD Law Firm would have the burden to refute improper fee sharing by demonstrating that the amount paid to ULex reflects the actual cost or value of the nonlegal services provided. In NY State Eth. Op. 1068, the nonlawyer provided services that the attorney could have performed, but did not need to because of the services provided by the nonlawyer. In that instance, the proportional allocation of legal fees and nonlegal fees did reflect the services rendered by the lawyer and nonlawyer respectively. The Opinion is very clear that fees charged by the nonlegal services provider must be commensurate with the actual cost or value of the nonlegal services provided.[4]  Thus, in NY State Eth. Op 855, where at least part of the nonlegal services were for

---

[4] *See, also,* N.Y. City Eth. Op. 976 (finding that a percentage fee could be permitted where it reasonably related to the value of the nonlegal services); N.Y. State Eth. Op. 1068 (August 10, 2015) (finding that a lawyer may reduce his fee by the amount a nonlawyer service provider charges to the client without sharing fees, if the nonlawyer provides substantial assistance and the compensation of the nonlawyer is commensurate with the service it provides).

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 10

referral of clients, a percentage or proportional fee to the nonlegal service provider was found to be improper.[5] With respect to the relationship between ULex and the MD Law Firm, the fees paid to ULex should be based on their actual value, and not on some proportional basis in relation to the MD Law Firm's legal fees, because, if challenged, it would be difficult, if not impossible, to justify a proportional basis to a regulator. Clearly, however the value of ULex's services are established and set, they also cannot be so high as to leave the MD Law Firm without any real profits (i.e., the profits to be paid to MD Law Firm members) from providing legal services. Any pricing arrangement that effectively removes all or most of the profit the MD Law Firm would otherwise derive from its law practice would also be susceptible to challenge as improper fee sharing.

(b) *Under Business Plan 2, how should ULex charges to clients either under a distinct engagement letter or through a subcontract through the MD Law Firm be structured to avoid violating the rules against the sharing of fees with nonlawyers?*

Rule 5.4 does not prohibit fee sharing by ULex with nonlawyers. The fees should be structured as they would be for any other ULex law firm or corporate legal department client. The MD Law Firm cannot agree to charge a lower fee for legal services in exchange for higher fees being charged for the ULex Services.

5. *Under Business Plan 2, what disclosure and consent requirements need to be met whenever a third-party client is a client of both ULex and the MD Law Firm in order to avoid the unauthorized practice of law by ULex and to comply with the Rules governing conflicts of interest?*

In addition to the Rules referred to at items 1 and 3 (a) above, the Rules that govern this question are those governing conflicts of interest, namely RPCs 1.7, 1.8 and the definitions of disclosure and consent in RPC 1.0 (j).

RPC 1.7 governs conflicts of interest generally, including personal and financial interest conflicts, and RPC 1.8 governs conflicts of interest when lawyers have an interest in the specific transaction as to which the lawyer is providing legal services. RPC 1.0 (j) defines what is meant by the requirements of disclosure and consent in the conflicts rules. Taken together, these rules require that in each and every engagement of the MD Law Firm where it is contemplated that

---

[5] Finding improper fee sharing where "[t]he attorney seeks to reduce the attorney's own fee, knowing that the amount of the reduction would be owed to the non-attorney company. Although the non-attorney company would perform some unspecified services . . . there appears to be no relation between the funds to be received by the nonlawyer company and the value of the services actually performed for the client. In essence the non-attorney company would find the clients and refer them to the lawyer, taking a fee from the tax reduction").

STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 11

ULex will provide nonlegal services to the client, express disclosure must be made to the client of the nature of the financial arrangement as between the MD Law Firm and its lawyers and ULex, and the nature of the MD Law Firm's and its lawyers' interests in ULex. As stated at item 3 (a) above, if additional compensation will be paid to or received by the MD Law Firm or its lawyers in connection with the nonlegal services to be provided by ULex, this must also be specifically disclosed to the client. In addition, the disclosure should explain the potential advantages to the client of having the specified nonlegal services be provided by ULex, as well as the risks and dangers that may arise. Further, the disclosure must make it clear that the client is free to select a different provider of the nonlegal services contemplated to be provided by ULex, and that it is possible that such services may be cheaper and preferable in other ways. The consent of the client is required to be in writing, and because of the application of RPC 1.8, the writing must be countersigned by the client. Because the disclosure and consent are fundamental to the propriety of the arrangements, the client's countersignatures should be provided either by the client's in-house counsel, or, if it does not have one, should reflect that the client has had the opportunity to seek the advice of independent counsel before countersigning the consent and has been advised to do so.[6]

6. *Under Business Plan 2, may third-party clients who are clients of both ULex and the MD Law Firm be billed for the services provided by both entities in a single invoice?*

The MD Law Firm may bill its clients for the services provided to those clients by ULex, subject to two constraints. First, as indicated at item 1 above, if those services are billed as disbursements on bills sent to clients by the MD Law Firm, the MD Law Firm and its individual partners (or equivalent) will be responsible for supervising those services and making sure that they are provided in accordance with all of the Rules that govern the conduct of lawyers. The engagement letters provided to these clients, including any separate engagement letters between the clients and ULex directly, may not in any way seek to avoid or dilute that supervisory obligation, or limit the MD Law Firm's liability for any failure of supervision.

Second, if the ULex Services are included and billed as disbursements on the MD Law Firm's bills to the clients, the MD Law Firm may not mark up the ULex bills, or make a profit in any way with respect to the services provided by ULex.[7] However, the MD Law Firm may properly

---

[6] There are certain conflicts that are not waivable, e.g., a lawyer may not act as both a lawyer and a real estate broker for a client in a real estate transaction because a broker may have an interest in having a deal close regardless of the interests of the client. N.Y. State Ethics Op.845. Although at the moment it does not appear that the ULex Services create a conflict that would not be waivable, the MD Law Firm should consider, on a case-by-case basis, whether a particular ULex Service would create such an unwaivable conflict.

[7] *See* ABA Formal Opinion 93-379 (December 6, 1993).

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

Daniel E. Reed, Esq.
UnitedLex Corporation
July 25, 2017
Page 12

charge, as part of its own fees for legal services, its ongoing supervision of the services provided by ULex.

ULex may bill the client separately for the ULex Services, provided that, if the ULex Services are performed in a matter in which the MD Law firm is acting as the client's counsel, the MD Law Firm has the duty of supervision described at 1(b) above.

Sincerely yours,

HINSHAW & CULBERTSON LLP

Anthony E. Davis

AED/jls
Attachments

cc:     Joseph F. Dearing, Esq.
        Janis M. Meyer, Esq.

# APPENDIX 1
## *EXCERPTS* FROM THE NEW YORK RULES OF PROFESSIONAL CONDUCT

## RULE 1.0: TERMINOLOGY

. . .

(j) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives.

. . .

## RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

(1) the representation will involve the lawyer in representing differing interests; or

(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

## RULE 1.8: CURRENT CLIENTS: SPECIFIC CONFLICT OF INTEREST RULES

(a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

(1) the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

. . .

## RULE 5.3: LAWYER'S RESPONSIBILITY FOR CONDUCT OF NONLAWYERS

(a) A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate. A lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter and the likelihood that ethical problems might arise in the course of working on the matter.

(b) A lawyer shall be responsible for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of these Rules if engaged in by a lawyer, if:

(1) the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

(2) the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the nonlawyer is employed or is a lawyer who has supervisory authority over the nonlawyer; and

(i) knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

(ii) in the exercise of reasonable management or supervisory authority should have known of the conduct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.

## RULE 5.4: PROFESSIONAL INDEPENDENCE OF A LAWYER

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm or another lawyer associated in the firm may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer; and

(3) a lawyer or law firm may compensate a nonlawyer employee or include a nonlawyer employee in a retirement plan based in whole or in part on a profit-sharing arrangement.

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) Unless authorized by law, a lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d) A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

## RULE 5.7: RESPONSIBILITIES REGARDING NONLEGAL SERVICES

(a) With respect to lawyers or law firms providing nonlegal services to clients or other persons:

(1) A lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services.

(2) A lawyer or law firm that provides nonlegal services to a person that are distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(3) A lawyer or law firm that is an owner, controlling party or agent of, or that is otherwise affiliated with, an entity that the lawyer or law firm knows to be providing nonlegal services to a person is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(4) For purposes of paragraphs (a)(2) and (a)(3), it will be presumed that the person receiving nonlegal services believes the services to be the subject of a client-lawyer relationship unless the lawyer or law firm has advised the person receiving the services in writing that the services are not legal services and that the protection of a client-lawyer relationship does not exist with respect to the nonlegal services, or if the interest of the lawyer or law firm in the entity providing nonlegal services is de minimis.

(b) Notwithstanding the provisions of paragraph (a), a lawyer or law firm that is an owner, controlling party, agent, or is otherwise affiliated with an entity that the lawyer or law firm knows is providing nonlegal services to a person shall not permit any nonlawyer providing such

3

services or affiliated with that entity to direct or regulate the professional judgment of the lawyer or law firm in rendering legal services to any person, or to cause the lawyer or law firm to compromise its duty under Rule 1.6(a) and Rule 1.6(c) with respect to the confidential information of a client receiving legal services.

(c) For purposes of this Rule, "nonlegal services" shall mean those services that lawyers may lawfully provide and that are not prohibited as an unauthorized practice of law when provided by a nonlawyer.

# APPENDIX 2

To the extent there are rules comparable to NY Rules 1.0 (definition of "informed consent"), 1.7, 1.8, 5.3, 5.4, and 5.7 in California, Delaware, the District of Columbia, Florida, Georgia, Massachusetts, Pennsylvania, Texas, and Virginia, they are included herein.[8]  Although the provisions of these Rules differ in language, there is no basis to conclude that the analysis in these jurisdictions would be different than that under the New York Rules.

California, Illinois, Texas and Virginia have not adopted Rule 5.7.  Nevertheless, there is no prohibition in these jurisdictions on lawyer ownership of an entity that provides nonlegal services.

## California

In Formal Op. No. 1994-141, the State Bar of California Standing Committee on Professional Responsibility & Conduct opined that it was permissible for a lawyer to render nonlegal services through an entity in which the lawyer had an ownership interest provided there was compliance with the California Rules of Professional Conduct (conflicts, disclosure, client confidentiality, non-solicitation, and the rules relating to doing business with a client.)

## Illinois

We did not locate any support for the view that the ULex/Marshall Denning relationship would not be permissible in Illinois.

## Texas

In Opinion No. 643, the Supreme Court of Texas Professionalism Committee noted that there is no *per se* prohibition in Texas on a lawyer's ownership of an entity providing non-legal services. In addressing a question as to whether it was proper for a lawyer to arrange for a debt management firm the lawyer owned to refer legal business to the lawyer, however, the committee concluded that this situation would present a conflict because the lawyer would be opining on the work the debt management company did for the client, and no amount of disclosure would be sufficient to render the conflict waivable. 2014 TX Sup. Ct. Prof. Comm. Op. 643.

We do not believe the reasoning in this opinion is applicable in the ULex/Marshall Denning relationship.  ULex is not providing services that would be subject to analysis by Marshall Denning.  It does not appear that Texas law would prohibit the arrangements proposed in either Business Plan 1 or 2.

---

[8] The Rules of Professional Conduct in California, Virginia and Texas do not contain a definition of "informed consent" or Rule 5.7.  California's rules also do not contain an equivalent of Rule 5.3.

**Virginia**

The Virginia Standing Committee on Legal Ethics concluded that it was proper for a law firm to work with a consulting firm owned by the law firm provided there was adequate disclosure. 1995 Va. Legal Ethics Op. No. 1658.  The reasoning in this opinion would apply equally to the ULex/Marshall Denning relationship.

The rules and ethics opinions are attached.  We advise that United Lex and Marshall Denning review each state's rules and ethics opinions on a periodic basis to ensure compliance.

## APPENDIX 2-EXHIBITS

### 1. California

Excerpts from California Rules of Professional Conduct

1-300, 1-310, 1-320, 3-310

California State Bar Formal Op. No.141-1995

### 2. Delaware

Excerpts from Delaware Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

### 3. District of Columbia

Excerpts from District of Columbia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

### 4. Florida

Excerpts from Florida Rules of Professional Conduct

Preamble, 1.7, 1.8, 5.3, 5.4, 5.7

### 5. Georgia

Excerpts from Georgia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

### 6. Illinois

Excerpts from Illinois Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

### 7. Massachusetts

Excerpts from Massachusetts Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**8. Pennsylvania**

Excerpts from Pennsylvania Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**9. Texas**

Rules of Professional Conduct

1.06, 1.08, 5.03, 5.04

Texas Supreme Court Professionalism Committee, Formal Op. 643-2014

**10. Virginia**

Rules of Professional Conduct

1.7, 1.8, 5.3, 5.4

Virginia Legal Ethics Ops., 1658-1995

# EXHIBIT 8

UnitedLex Confidential & Proprietary

**DRAFT 1.0**

October 10, 2017

**LeClairRyan ("LR"), UnitedLex (ULX) & Marshall Denning ("MD")**
**DRAFT Strategic Engagement**
**Summary of Terms**

1. **Key Goals for LR:** The ULX-LR strategic relationship is designed to provide LR attorneys i) a greater range and depth of services for LR clients, ii) a greater financial benefit in terms of wealth creation and security, and iii) a more competitive advantage in a legal environment that continues to evolve with increasing competition from new and old sources.

2. **Engagement Enablers:** Under the strategic relationship with ULX and MD, LR attorneys & clients gain:
   a. Elite IP, Corporate, Cyber Security, and Litigation domain and technical expertise and Six Sigma project management
   b. Broader and deeper solutions for clients
   c. Equity that has significant value (financial sponsor is JP Morgan Private Equity)
   d. Conversion of ordinary income to long-term capital gain
   e. Flexible structure that mitigates potential legal and/or business conflicts
   f. Synergies from centralized and leveraged (scaled) shared services support, including HR, IT and Finance/Accounting, using robust technology
   g. Optimal matching of resource skill level and task at the paralegal, associate and partner levels
   h. A global business development team and marketing expertise / technology
   i. Access to the ULX global list of Fortune 500 clients and related case/matter pipeline
   j. Global presence, reach and growth strategy

3. **Responsibilities of LR:**
   a. Commit to executing a mutually agreed upon operating plan including, among other things, shared services and attorney staffing optimization, as well as administrative and infrastructure rationalization
   b. Continue to support existing clients and source new clients in order to maintain and expand client engagement activity
   c. Engage in cross selling, co-marketing, horizontal referencing and vertical integration in coordination with (and in support of) ULX service offerings and business opportunities, as permitted by (and not in breach of) applicable ethical requirements and laws
   d. Determine needed ratio of transfer pricing components

4. **Legal Structure:**  LR to be merged into MD and operate, in part, under a Master Services Agreement ("MSA") with ULX pursuant to which the rights and obligations of each party will be defined. ULX will invoice, per Strategic MSA terms, for services provided.  The Strategic MSA will

UnitedLex Confidential & Proprietary

**DRAFT 1.0**

have an indefinite term with appropriate performance level requirements and an oversight board comprised of MD leadership (including one or more current LR leaders) and ULX leadership.

5. **Economic Elements:**
   a. Partner (current and former) capital accounts (preferred and common) at LR to be repaid as follows: X% of common stock within 30 days of merger closing and the balance of common and preferred stock within 12 months of merger closing.
   b. Elimination of capital contribution requirement to join firm as a stockholder/partner
   c. Current LR equity partners will retain same or better cash compensation structure as experienced pre-merger
   d. LR equity partners will receive an up-front payment ("Distribution Amount") comprised of a mix of cash and equity in ULX, as determined by the LR Leadership and subject to the approval of the MD Leadership.  The Distribution Amount is in addition to the return of all current LR capital account amounts.
       i. The Distribution Amount will equal $_____ subject to performance expectations over 4 years (performance levels will have wide collars to provide comfort that what is expected is "usual course" performance and associated fluctuations)
       ii. The Distribution Amount will be calculated based on the ability to drive efficiency gains of between 12%-15% of LR TTM revenue via:
           1. Optimization of shared services functions and infrastructure
           2. Attorney resource utilization and rationalization efficiency
           3. Equity partner allocations
       iii. Amount derived from points 5.d.ii.1&2 above will be part of a trust to be disbursed at the discretion of the MD leadership; amount derived from point 5.d.ii.3 above will be part of designated special partner accounts
   e. Opportunity to generate additional income via service expansion opportunities due to enhanced capability in areas such as cyber security, intellection property, contract management, discovery, and consulting as permitted by applicable ethical rules and law.

6. **LR Management Benefits:**
   a. Significantly reduce burden of managing shared services functions
   b. Mitigate potential business conflicts by shifting work within ULX network
   c. Eliminate free agency risk, which currently drives less optimal decisions and poor utilization management
       i. Partners motivated by equity to think long term and more strongly align with the "team"
       ii. Management empowered with new capital to drive "good to great" behavior
       iii. Materially enhance ability to recruit key talent from, or in competition with, large, global firms

2

UnitedLex Confidential & Proprietary

**DRAFT 1.0**

7. **Answers to Potential Questions**

   a. Is there any actionable basis for State Bar Association opposition?

      i. Fully compliant with Rules of Professional Conduct

      ii. Ethics opinions from:

         1. Hinshaw Culbertson

         2. Pillsbury Madison

         3. Professor Bruce Green of Fordham University Law School, where he directs the Louis Stein Center for Law and Ethics. Bruce was also past chair of the NY State Bar Association's Committee on Professional Ethics.

   b. Is partner discretion compromised?

      i. Partner maintains control of her/his core practice of law activity; support may be modified to achieve greater efficiency without compromising the result; partner must address client best interest.

      ii. The core practice of law is not affected.

   c. Is there any brand-based loss in value in shift from LR to MD?

      i. No, to the contrary, LR attorneys will have an enhanced brand/prestige experience as part of MD (what was built at LR strengthens due to unique synergy).

      ii. This engagement is about the evolution and democratization of law.

      iii. We can be creative and forward-thinking about our joined brand since we are creating a new legal services model.

      iv. We will be backed by a blue-chip banking team, unlike all other law firms.

      v. Pro bono and charitable investments will be maintained, if not increased.

      vi. Advancement of law school alliances and residency programs, along with superior training and development programs, demonstrate the parties' collective commitment to improving the legal ecosystem

8. **Timeline:** The Strategic MSA will be signed no later than _____, 2017.  Planning and execution will commence by _____, 2017 or _____ 2018.

9. **Other Material Terms and Conditions:**

   a. **Confidentiality –** all discussions to remain confidential until a mutually agreed upon date

   b. **Other**

# EXHIBIT 9

# HINSHAW

& CULBERTSON LLP

**ATTORNEYS AT LAW**

800 Third Avenue
13th Floor
New York, NY 10022

212-471-6200
212-935-1166 (fax)
www.hinshawlaw.com

## STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

March 27, 2018

Lori D. Thompson, Esq.
General Counsel
LeClairRyan PLLC
1800 Wells Fargo Tower
Drawer 1200
Roanoke, Virginia 24006

Re:   **Opinion Letter**

Dear Ms. Thompson:

This letter responds to the request from LeClairRyan PLLC ("LR") for Hinshaw & Culbertson LLP ("we," "our," or "us") to opine whether LR's plan to enter into a joint venture to be called ULX Partners, LLC ("ULX Partners" or the "Joint Venture") with ULX Manager LLC ("ULX Manager" or the "Managing Member"), a 100% owned indirect subsidiary of UnitedLex Corporation ("ULex"), is consistent with the law and the New York Rules of Professional Conduct (the "Rules," or "RPCs") governing lawyers and the unauthorized practice of law. This opinion is based on the law and Rules of the State of New York. Excerpts of certain of those Rules are attached as Appendix 1.[1]  This opinion rests upon the facts set forth in this opinion letter.  Although we have reviewed in whole or in part drafts of certain agreements documenting the Joint Venture transaction, we have relied on your interpretation and description of how LR and the Joint Venture will implement the transaction and operate after the transaction closes. Should the facts as summarized in this opinion letter prove inaccurate, such inaccuracies could change the conclusions herein.  We do not express an opinion on any tax consequences or on the merits of the business plans described herein.  Further, this letter is intended only for LR and its members and should not be relied upon by others.

---

[1]  We have reviewed comparable sections (to the extent they exist) of the Rules of Professional Conduct in California, Delaware, the District of Columbia, Florida, Georgia, Illinois, Massachusetts, Pennsylvania, Texas and Virginia, and have attached copies in Appendix 2. Although time has not permitted a detailed review, we do not believe that the analysis will be materially different in those states.  In addition, we have attached the Rules of Connecticut, Maryland, Michigan and New Jersey but have not reviewed their applicability to the proposed arrangement.  We will provide a supplemental memorandum on these jurisdictions.

---

*Building on the Barger Tradition*

301405825v7 1006289

Arizona   California   Florida   Illinois   Indiana   Massachusetts   Minnesota   Missouri   New York   Rhode Island   Wisconsin   ◆   London

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

LeClairRyan PLLC
Page 2

## Summary of Facts

LR is a professional limited liability corporation engaged in the practice of law and organized under the laws of the Commonwealth of Virginia. ULex is a Delaware corporation with its principal place of business in Overland Park, Kansas.[2]

### The Joint Venture Transaction

We understand that LR will enter into a joint venture with ULX Manager, which is a wholly owned indirect subsidiary of ULex. The Joint VentureULX Partners is a limited liability company organized under the laws of Delaware. ULX Manager will be the controlling (Class A) member of ULX Partners. LR will be [a] Class B member.

As consideration for its Class B interest in ULX Partners, LR will at closing contribute certain intellectual property (for example, but not limited to, LR human resources and other policies, LR business plans and procedures, IT procedures, and administrative procedures and tools excluding all legal intellectual property), and transfer its administrative and other support staff to ULX Partners. As consideration for its Class A interest, ULX Manager or another ULX entitywill at closing provide term loans to LR totalling $ 33 million to be used to return LR's members' capital and pay off existing debt. In addition, ULX Manager or another ULX entity will provide letters of credit to secure LR's leases and make a line of credit available to support LR's business needs.

It is contemplated that LR will transfer its paralegal staff to ULX Partners in the future.

ULX Manager and LR will each receive an equity interest in ULX Partners. It is anticipated that the value of the equity interests will increase over the life of the joint venture due to the profits ULFS will make in its provision of services to LR, and LR has the right to redeem a portion of its interest in ULFS twice, five years and 10 years after closing.

---

[2] Ulex does business in more than 20 countries. In the United States, it is engaged in providing services to law firms and corporate legal departments in the form of "back-office" services such as, among other things, accounting, marketing, technology, human resources, and legal and nonlegal staffing. In addition, ULex provides to corporate legal departments and to law firm clients "client-facing" nonlegal services, such as contracts and transactional management, intellectual property assistance (including patent mining and monetization, technical expertise, and strategic advice), data management, discovery and cyber security, and other nonlegal litigation and transactional support, which for the purposes of this letter we assume are "nonlegal" and do not constitute the unauthorized practice of law.

STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL

LeClairRyan PLLC
Page 3


### The Joint Venture Operation

LR will continue to practice law, bill clients for its services at its usual rates, and distribute profits to its members at the end of the year. No LR proceeds from fees will be shared with ULFS.

Pursuant to a Master Services Agreement between LR and ULX Partners (the "MSA"), ULX Partners will provide "back office" services to LR. These will include, without limitation, accounting, technology, human resources, marketing and IT support. In some cases, ULX Partners will receive assistance from ULex, which, as described above, is experienced in providing this support. It is anticipated that ULX Partners, with ULex's assistance, will be in a position to provide these services more efficiently than LR would be able to do on its own. ULX Partners will not provide any services directly to clients. Any paralegal services will be provided to LR, not directly to clients, and ULX Partners will bill LR for those services. LR will in turn bill clients for those services either on an hourly basis, or, if billed as a marked-up disbursement, with notice to the client of the mark-up. All "back office" services as described above will be subject to the supervision of LR as appropriate in accordance with Rule 5.3 of the Rules of Professional Conduct. In addition, to the extent client information is available to ULX Partners, LR will have the ultimate authority to require ULX Partners to maintain the confidentiality of such information, including client identities.

The MSA and other relevant agreements provide:

Notwithstanding any allocation of responsibility in this agreement, the parties acknowledge and agree that

(a) [LR] shall have full authority and the right to oversee the maintenance of confidentiality of all client information, including the identity of clients, whether in electronic or hard copy format that comes into the possession, custody or control of [ULX Partners], in accordance with its obligations under the Rules of Professional Conduct (the "Rules"), and [ULX Partners] agrees to abide by and cause all of its employees to comply with the policies and instructions of [LR] with respect to client confidentiality, including, without limitation, all steps, policies, procedures or systems that may be required from time to time to preserve appropriate levels of cyber security; and

(b) [LR] has obligations under the Rules, including, without limitation, the duty of competence, the duty of communication, duties with respect to fees and expenses, the duty of confidentiality, and the duty to avoid conflicts, and [ULX Partners] agrees to defer to [LR]'s final judgment with respect to any decisions that implicate [LR]'s obligations under the Rules.

ULX Partners will invoice LR for all services at market rates.

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

LeClairRyan PLLC
Page 4

LR may also seek assistance for certain "client-facing" nonlegal services, such as transactional management, intellectual property assistance, data management, discovery and cyber support and other nonlegal litigation and transactional support for client matters (the "ULex Services"). In those situations, LR will advise its clients that it can use ULex or another vendor to provide these services and disclose to the client that it has a business relationship with ULex. ULex will bill LR for these client support services at market rates, and LR will bill its clients in the ordinary course.

LR will supervise the performance and delivery of all ULex Services.

ULex may also provide legal and nonlegal staffing to LR. These lawyers will work under the supervision of LR lawyers.

**Opinion**

Based on the foregoing facts, and with the caveat that we cannot predict with certainty how a regulator may view a particular arrangement, we believe that there is a reasonable basis to conclude that, by entering into the Joint Venture Transaction and conducting its business as described above, LR will

1.  Not be engaged in impermissible fee-sharing within the meaning of Rule 5.4(a).

2.  Not be assisting another entity or individual in the unauthorized practice of law.

3.  Will be in compliance with its duty of supervision under Rule 5.3.

HINSHAW & CULBERTSON LLP

Anthony E. Davis

AED/jls
Attachments

cc: Janis M. Meyer

301405825v7 1006289

# APPENDIX 1
## *EXCERPTS* FROM THE NEW YORK RULES OF PROFESSIONAL CONDUCT

## RULE 1.0: TERMINOLOGY

. . .

(j) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives.

. . .

## RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

(1) the representation will involve the lawyer in representing differing interests; or

(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

## RULE 1.8: CURRENT CLIENTS: SPECIFIC CONFLICT OF INTEREST RULES

(a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

(1) the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

. . .

## RULE 5.3: LAWYER'S RESPONSIBILITY FOR CONDUCT OF NONLAWYERS

(a) A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate. A lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter and the likelihood that ethical problems might arise in the course of working on the matter.

(b) A lawyer shall be responsible for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of these Rules if engaged in by a lawyer, if:

(1) the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

(2) the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the nonlawyer is employed or is a lawyer who has supervisory authority over the nonlawyer; and

(i) knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

(ii) in the exercise of reasonable management or supervisory authority should have known of the conduct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.

## RULE 5.4: PROFESSIONAL INDEPENDENCE OF A LAWYER

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm or another lawyer associated in the firm may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer; and

(3) a lawyer or law firm may compensate a nonlawyer employee or include a nonlawyer employee in a retirement plan based in whole or in part on a profit-sharing arrangement.

301405825v7 1006289

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) Unless authorized by law, a lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d) A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

## RULE 5.7: RESPONSIBILITIES REGARDING NONLEGAL SERVICES

(a) With respect to lawyers or law firms providing nonlegal services to clients or other persons:

(1) A lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services.

(2) A lawyer or law firm that provides nonlegal services to a person that are distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(3) A lawyer or law firm that is an owner, controlling party or agent of, or that is otherwise affiliated with, an entity that the lawyer or law firm knows to be providing nonlegal services to a person is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(4) For purposes of paragraphs (a)(2) and (a)(3), it will be presumed that the person receiving nonlegal services believes the services to be the subject of a client-lawyer relationship unless the lawyer or law firm has advised the person receiving the services in writing that the services are not legal services and that the protection of a client-lawyer relationship does not exist with respect to the nonlegal services, or if the interest of the lawyer or law firm in the entity providing nonlegal services is de minimis.

(b) Notwithstanding the provisions of paragraph (a), a lawyer or law firm that is an owner, controlling party, agent, or is otherwise affiliated with an entity that the lawyer or law firm knows is providing nonlegal services to a person shall not permit any nonlawyer providing such

3

301405825v7 1006289

services or affiliated with that entity to direct or regulate the professional judgment of the lawyer or law firm in rendering legal services to any person, or to cause the lawyer or law firm to compromise its duty under Rule 1.6(a) and Rule 1.6(c) with respect to the confidential information of a client receiving legal services.

(c) For purposes of this Rule, "nonlegal services" shall mean those services that lawyers may lawfully provide and that are not prohibited as an unauthorized practice of law when provided by a nonlawyer.

4

## APPENDIX 2

To the extent there are rules comparable to NY Rules 1.0 (definition of "informed consent"), 1.7, 1.8, 5.3, 5.4, and 5.7 in California, Delaware, the District of Columbia, Florida, Georgia, Illinois, Massachusetts, Pennsylvania, Texas, and Virginia, they are included herein.[3] Although the provisions of these Rules differ in language, there is no basis to conclude that the analysis in these jurisdictions would be different than that under the New York Rules.

California, Illinois, Texas and Virginia have not adopted Rule 5.7. Nevertheless, there is no prohibition in these jurisdictions on lawyer ownership of an entity that provides nonlegal services.

### California

In Formal Op. No. 1994-141, the State Bar of California Standing Committee on Professional Responsibility & Conduct opined that it was permissible for a lawyer to render nonlegal services through an entity in which the lawyer had an ownership interest provided there was compliance with the California Rules of Professional Conduct (conflicts, disclosure, client confidentiality, non-solicitation, and the rules relating to doing business with a client.)

### Illinois

We did not locate any support for the view that the the proposed arrangement would not be permissible in Illinois.

### Texas

In Opinion No. 643, the Supreme Court of Texas Professionalism Committee noted that there is no *per se* prohibition in Texas on a lawyer's ownership of an entity providing non-legal services. In addressing a question as to whether it was proper for a lawyer to arrange for a debt management firm the lawyer owned to refer legal business to the lawyer, however, the committee concluded that this situation would present a conflict because the lawyer would be opining on the work the debt management company did for the client, and no amount of disclosure would be sufficient to render the conflict waivable. 2014 TX Sup. Ct. Prof. Comm. Op. 643.

We do not believe the reasoning in this opinion is applicable in the proposed arrangement. ULX Partners is not providing services that would be subject to analysis by LR. It does not appear that Texas law would prohibit the proposed arrangement.

---

[3] The Rules of Professional Conduct in California, Virginia and Texas do not contain a definition of "informed consent" or Rule 5.7. California's rules also do not contain an equivalent of Rule 5.3.

**Virginia**

The Virginia Standing Committee on Legal Ethics concluded that it was proper for a law firm to work with a consulting firm owned by the law firm provided there was adequate disclosure. 1995 Va. Legal Ethics Op. No. 1658.  The reasoning in this opinion would apply equally to the proposed arrangement.

The rules and ethics opinions are attached.

## APPENDIX 2-EXHIBITS

**1. California**

Excerpts from California Rules of Professional Conduct

1-300, 1-310, 1-320, 3-310

California State Bar Formal Op. No.141-1995

**2. Delaware**

Excerpts from Delaware Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**3. District of Columbia**

Excerpts from District of Columbia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**4. Florida**

Excerpts from Florida Rules of Professional Conduct

Preamble, 1.7, 1.8, 5.3, 5.4, 5.7

**5. Georgia**

Excerpts from Georgia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**6. Illinois**

Excerpts from Illinois Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**7. Massachusetts**

Excerpts from Massachusetts Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**8. Pennsylvania**

Excerpts from Pennsylvania Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**9. Texas**

Rules of Professional Conduct

1.06, 1.08, 5.03, 5.04

Texas Supreme Court Professionalism Committee, Formal Op. 643-2014

**10. Virginia**

Rules of Professional Conduct

1.7, 1.8, 5.3, 5.4

Virginia Legal Ethics Ops., 1658-1995

**11.  Conn. Rules of Prof. Conduct (excerpts)**

**12.  Maryland Rules of Prof. Conduct (excerpts)**

**13.  Michigan Rules of Prof. Conduct (excerpts)**

**14.  New Jersey Rules of Prof. Conduct (excerpts)**

# EXHIBIT 10

# HINSHAW

& CULBERTSON LLP

**ATTORNEYS AT LAW**

800 Third Avenue
13th Floor
New York, NY 10022

212-471-6200
212-935-1166 (fax)
www.hinshawlaw.com

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

March 28, 2018 - REVISED

Lori D. Thompson, Esq.
General Counsel
LeClairRyan PLLC
1800 Wells Fargo Tower
Drawer 1200
Roanoke, Virginia 24006

Re:     **Opinion Letter**

Dear Ms. Thompson:

This letter responds to the request from LeClairRyan PLLC ("LR") for Hinshaw & Culbertson LLP ("we," "our," or "us") to opine whether LR's plan to enter into a joint venture to be called ULX Partners, LLC ("ULX Partners" or the "Joint Venture") with ULX Manager LLC ("ULX Manager" or the "Managing Member"), a 100% owned indirect subsidiary of UnitedLex Corporation ("ULex"), is consistent with the law and the New York Rules of Professional Conduct (the "Rules," or "RPCs") governing lawyers and the unauthorized practice of law. This opinion is based on the law and Rules of the State of New York. Excerpts of certain of those Rules are attached as Appendix 1.[1] This opinion rests upon the facts set forth in this opinion letter. Although we have reviewed in whole or in part drafts of certain agreements documenting the Joint Venture transaction, we have relied on your interpretation and description of how LR and the Joint Venture will implement the transaction and operate after the transaction closes. Should the facts as summarized in this opinion letter prove inaccurate, such inaccuracies could change the conclusions herein. We do not express an opinion on any tax consequences or on the merits of the business plans described herein. Further, this letter is intended only for LR and its members and should not be relied upon by others.

---

[1] We have reviewed comparable sections (to the extent they exist) of the Rules of Professional Conduct in California, Delaware, the District of Columbia, Florida, Georgia, Illinois, Massachusetts, Pennsylvania, Rhode Island, Texas and Virginia, and have attached copies in Appendix 2. Although time has not permitted a detailed review, we do not believe that the analysis will be materially different in those states. In addition, we have attached the Rules of Connecticut, Maryland, Michigan and New Jersey but have not reviewed their applicability to the proposed arrangement. We will provide a supplemental memorandum on these jurisdictions.

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

LeClairRyan PLLC
Page 2


**Summary of Facts**

LR is a professional limited liability corporation engaged in the practice of law and organized under the laws of the Commonwealth of Virginia. ULex is a Delaware corporation with its principal place of business in Overland Park, Kansas.[2]

**The Joint Venture Transaction**

We understand that LR will enter into a joint venture with ULX Manager, which is a wholly owned indirect subsidiary of ULex. The Joint VentureULX Partners is a limited liability company organized under the laws of Delaware. ULX Manager will be the controlling (Class A) member of ULX Partners. LR will be [a] Class B member.

As consideration for its Class B interest in ULX Partners, LR will at closing contribute certain intellectual property (for example, but not limited to, LR human resources and other policies, LR business plans and procedures, IT procedures, and administrative procedures and tools excluding all legal intellectual property), and transfer its administrative and other support staff to ULX Partners. As consideration for its Class A interest, ULX Manager or another ULX entitywill at closing provide term loans to LR totalling $ 33 million to be used to return LR's members' capital and pay off existing debt. In addition, ULX Manager or another ULX entity will provide letters of credit to secure LR's leases and make a line of credit available to support LR's business needs.

It is contemplated that LR will transfer its paralegal staff to ULX Partners in the future.

ULX Manager and LR will each receive an equity interest in ULX Partners. It is anticipated that the value of the equity interests will increase over the life of the joint venture due to the profits ULFS will make in its provision of services to LR, and LR has the right to redeem a portion of its interest in ULFS twice, five years and 10 years after closing.

---

[2] Ulex does business in more than 20 countries. In the United States, it is engaged in providing services to law firms and corporate legal departments in the form of "back-office" services such as, among other things, accounting, marketing, technology, human resources, and legal and nonlegal staffing. In addition, ULex provides to corporate legal departments and to law firm clients "client-facing" nonlegal services, such as contracts and transactional management, intellectual property assistance (including patent mining and monetization, technical expertise, and strategic advice), data management, discovery and cyber security, and other nonlegal litigation and transactional support, which for the purposes of this letter we assume are "nonlegal" and do not constitute the unauthorized practice of law.

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

LeClairRyan PLLC
Page 3


### The Joint Venture Operation

LR will continue to practice law, bill clients for its services at its usual rates, and distribute profits to its members at the end of the year. No LR proceeds from fees will be shared with ULFS.

Pursuant to a Master Services Agreement between LR and ULX Partners (the "MSA"), ULX Partners will provide "back office" services to LR. These will include, without limitation, accounting, technology, human resources, marketing and IT support. In some cases, ULX Partners will receive assistance from ULex, which, as described above, is experienced in providing this support. It is anticipated that ULX Partners, with ULex's assistance, will be in a position to provide these services more efficiently than LR would be able to do on its own. ULX Partners will not provide any services directly to clients. Any paralegal services will be provided to LR, not directly to clients, and ULX Partners will bill LR for those services. LR will in turn bill clients for those services either on an hourly basis, or, if billed as a marked-up disbursement, with notice to the client of the mark-up. All "back office" services as described above will be subject to the supervision of LR as appropriate in accordance with Rule 5.3 of the Rules of Professional Conduct. In addition, to the extent client information is available to ULX Partners, LR will have the ultimate authority to require ULX Partners to maintain the confidentiality of such information, including client identities.

The MSA and other relevant agreements provide:

Notwithstanding any allocation of responsibility in this agreement, the parties acknowledge and agree that

(a) [LR] shall have full authority and the right to oversee the maintenance of confidentiality of all client information, including the identity of clients, whether in electronic or hard copy format that comes into the possession, custody or control of [ULX Partners], in accordance with its obligations under the Rules of Professional Conduct (the "Rules"), and [ULX Partners] agrees to abide by and cause all of its employees to comply with the policies and instructions of [LR] with respect to client confidentiality, including, without limitation, all steps, policies, procedures or systems that may be required from time to time to preserve appropriate levels of cyber security; and

(b) [LR] has obligations under the Rules, including, without limitation, the duty of competence, the duty of communication, duties with respect to fees and expenses, the duty of confidentiality, and the duty to avoid conflicts, and [ULX Partners] agrees to defer to [LR]'s final judgment with respect to any decisions that implicate [LR]'s obligations under the Rules.

ULX Partners will invoice LR for all services at market rates.

**STRICTLY CONFIDENTIAL AND ATTORNEY-CLIENT PRIVILEGED MATERIAL**

LeClairRyan PLLC
Page 4


LR may also seek assistance for certain "client-facing" nonlegal services, such as transactional management, intellectual property assistance, data management, discovery and cyber support and other nonlegal litigation and transactional support for client matters (the "ULex Services"). In those situations, LR will advise its clients that it can use ULex or another vendor to provide these services and disclose to the client that it has a business relationship with ULex. ULex will bill LR for these client support services at market rates, and LR will bill its clients in the ordinary course.

LR will supervise the performance and delivery of all ULex Services.

ULex may also provide legal and nonlegal staffing to LR. These lawyers will work under the supervision of LR lawyers.

**Opinion**

Based on the foregoing facts, and with the caveat that we cannot predict with certainty how a regulator may view a particular arrangement, we believe that there is a reasonable basis to conclude that, by entering into the Joint Venture Transaction and conducting its business as described above, LR will

1. Not be engaged in impermissible fee-sharing within the meaning of Rule 5.4(a).

2. Not be assisting another entity or individual in the unauthorized practice of law.

3. Will be in compliance with its duty of supervision under Rule 5.3.

HINSHAW & CULBERTSON LLP

Anthony E. Davis

AED/jls
Attachments

cc: Janis M. Meyer

## APPENDIX 1
## *EXCERPTS* FROM THE NEW YORK RULES OF PROFESSIONAL CONDUCT

### RULE 1.0: TERMINOLOGY

. . .

(j) "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives.

. . .

### RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either:

(1) the representation will involve the lawyer in representing differing interests; or

(2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

### RULE 1.8: CURRENT CLIENTS: SPECIFIC CONFLICT OF INTEREST RULES

(a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:

(1) the transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) the client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

(3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

. . .

## RULE 5.3: LAWYER'S RESPONSIBILITY FOR CONDUCT OF NONLAWYERS

(a) A law firm shall ensure that the work of nonlawyers who work for the firm is adequately supervised, as appropriate. A lawyer with direct supervisory authority over a nonlawyer shall adequately supervise the work of the nonlawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter and the likelihood that ethical problems might arise in the course of working on the matter.

(b) A lawyer shall be responsible for conduct of a nonlawyer employed or retained by or associated with the lawyer that would be a violation of these Rules if engaged in by a lawyer, if:

(1) the lawyer orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it; or

(2) the lawyer is a partner in a law firm or is a lawyer who individually or together with other lawyers possesses comparable managerial responsibility in a law firm in which the nonlawyer is employed or is a lawyer who has supervisory authority over the nonlawyer; and

(i) knows of such conduct at a time when it could be prevented or its consequences avoided or mitigated but fails to take reasonable remedial action; or

(ii) in the exercise of reasonable management or supervisory authority should have known of the conduct so that reasonable remedial action could have been taken at a time when the consequences of the conduct could have been avoided or mitigated.

## RULE 5.4: PROFESSIONAL INDEPENDENCE OF A LAWYER

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm or another lawyer associated in the firm may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that portion of the total compensation that fairly represents the services rendered by the deceased lawyer; and

(3) a lawyer or law firm may compensate a nonlawyer employee or include a nonlawyer employee in a retirement plan based in whole or in part on a profit-sharing arrangement.

301405825v7 1006289

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) Unless authorized by law, a lawyer shall not permit a person who recommends, employs or pays the lawyer to render legal service for another to direct or regulate the lawyer's professional judgment in rendering such legal services or to cause the lawyer to compromise the lawyer's duty to maintain the confidential information of the client under Rule 1.6.

(d) A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a member, corporate director or officer thereof or occupies a position of similar responsibility in any form of association other than a corporation; or

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

## RULE 5.7: RESPONSIBILITIES REGARDING NONLEGAL SERVICES

(a) With respect to lawyers or law firms providing nonlegal services to clients or other persons:

(1) A lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services.

(2) A lawyer or law firm that provides nonlegal services to a person that are distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(3) A lawyer or law firm that is an owner, controlling party or agent of, or that is otherwise affiliated with, an entity that the lawyer or law firm knows to be providing nonlegal services to a person is subject to these Rules with respect to the nonlegal services if the person receiving the services could reasonably believe that the nonlegal services are the subject of a client-lawyer relationship.

(4) For purposes of paragraphs (a)(2) and (a)(3), it will be presumed that the person receiving nonlegal services believes the services to be the subject of a client-lawyer relationship unless the lawyer or law firm has advised the person receiving the services in writing that the services are not legal services and that the protection of a client-lawyer relationship does not exist with respect to the nonlegal services, or if the interest of the lawyer or law firm in the entity providing nonlegal services is de minimis.

(b) Notwithstanding the provisions of paragraph (a), a lawyer or law firm that is an owner, controlling party, agent, or is otherwise affiliated with an entity that the lawyer or law firm knows is providing nonlegal services to a person shall not permit any nonlawyer providing such

301405825v7 1006289

services or affiliated with that entity to direct or regulate the professional judgment of the lawyer or law firm in rendering legal services to any person, or to cause the lawyer or law firm to compromise its duty under Rule 1.6(a) and Rule 1.6(c) with respect to the confidential information of a client receiving legal services.

(c) For purposes of this Rule, "nonlegal services" shall mean those services that lawyers may lawfully provide and that are not prohibited as an unauthorized practice of law when provided by a nonlawyer.

301405825v7 1006289

## APPENDIX 2

To the extent there are rules comparable to NY Rules 1.0 (definition of "informed consent"), 1.7, 1.8, 5.3, 5.4, and 5.7 in California, Delaware, the District of Columbia, Florida, Georgia, Illinois, Massachusetts, Pennsylvania, Texas, and Virginia, they are included herein.[3]  Although the provisions of these Rules differ in language, there is no basis to conclude that the analysis in these jurisdictions would be different than that under the New York Rules.

California, Illinois, Texas and Virginia have not adopted Rule 5.7.  Nevertheless, there is no prohibition in these jurisdictions on lawyer ownership of an entity that provides nonlegal services.

### California

In Formal Op. No. 1994-141, the State Bar of California Standing Committee on Professional Responsibility & Conduct opined that it was permissible for a lawyer to render nonlegal services through an entity in which the lawyer had an ownership interest provided there was compliance with the California Rules of Professional Conduct (conflicts, disclosure, client confidentiality, non-solicitation, and the rules relating to doing business with a client.)

### Illinois

We did not locate any support for the view that the the proposed arrangement would not be permissible in Illinois.

### Texas

In Opinion No. 643, the Supreme Court of Texas Professionalism Committee noted that there is no *per se* prohibition in Texas on a lawyer's ownership of an entity providing non-legal services. In addressing a question as to whether it was proper for a lawyer to arrange for a debt management firm the lawyer owned to refer legal business to the lawyer, however, the committee concluded that this situation would present a conflict because the lawyer would be opining on the work the debt management company did for the client, and no amount of disclosure would be sufficient to render the conflict waivable.  2014 TX Sup. Ct. Prof. Comm. Op. 643.

We do not believe the reasoning in this opinion is applicable in the proposed arrangement.  ULX Partners is not providing services that would be subject to analysis by LR.  It does not appear that Texas law would prohibit the proposed arrangement.

---

[3] The Rules of Professional Conduct in California, Virginia and Texas do not contain a definition of "informed consent" or Rule 5.7.  California's rules also do not contain an equivalent of Rule 5.3.

**Virginia**

The Virginia Standing Committee on Legal Ethics concluded that it was proper for a law firm to work with a consulting firm owned by the law firm provided there was adequate disclosure. 1995 Va. Legal Ethics Op. No. 1658.  The reasoning in this opinion would apply equally to the proposed arrangement.

The rules and ethics opinions are attached.

2

## APPENDIX 2-EXHIBITS

**1. California**

Excerpts from California Rules of Professional Conduct

1-300, 1-310, 1-320, 3-310

California State Bar Formal Op. No.141-1995

**2. Delaware**

Excerpts from Delaware Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**3. District of Columbia**

Excerpts from District of Columbia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**4. Florida**

Excerpts from Florida Rules of Professional Conduct

Preamble, 1.7, 1.8, 5.3, 5.4, 5.7

**5. Georgia**

Excerpts from Georgia Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**6. Illinois**

Excerpts from Illinois Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**7. Massachusetts**

Excerpts from Massachusetts Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**8. Pennsylvania**

Excerpts from Pennsylvania Rules of Professional Conduct

1.0, 1.7, 1.8, 5.3, 5.4, 5.7

**9. Texas**

Rules of Professional Conduct

1.06, 1.08, 5.03, 5.04

Texas Supreme Court Professionalism Committee, Formal Op. 643-2014

**10. Virginia**

Rules of Professional Conduct

1.7, 1.8, 5.3, 5.4

Virginia Legal Ethics Ops., 1658-1995

**11.  Conn. Rules of Prof. Conduct (excerpts)**

**12.  Maryland Rules of Prof. Conduct (excerpts)**

**13.  Michigan Rules of Prof. Conduct (excerpts)**

**14.  New Jersey Rules of Prof. Conduct (excerpts)**

**15.  Rhode Island Rules of Prof. Conduct (excerpts)**