## Exhibit A
### Part 2 of 2

### Corrected Complaint

# EXHIBIT 11

## MASTER SERVICES AGREEMENT

This Master Services Agreement ("**Agreement**") is entered into as of April 4, 2018 (the "**Execution Date**") and shall be effective on April 29, 2018 or such other date as the Parties agree (the "**Effective Date**"), by and between ULX Partners LLC, a Delaware limited liability company ("**Provider**"), having a principal place of business at 4405 Cox Road, Suite 200, Glen Allen, Virginia 23060 and LeClairRyan PLLC, a Virginia professional limited liability company ("**Law Firm**"), having a principal place of business at 919 East Main Street, Twenty-Fourth Floor, Richmond, VA 23219 (each a "**Party**" and together, the "**Parties**"). The Parties agree as follows.

### RECITALS

A.  WHEREAS, on the Execution Date, the Parties have entered into a number of agreements to give effect to "Project Liberty", including the Provider's Limited Liability Company Agreement (to which the Law Firm is a Class B Member) dated April 4, 2018 (the "**LLC Agreement**"), a Subscription Agreement whereby the Law Firm subscribed for its Class B Common Interest in the Provider, a Contribution Agreement (the "**Contribution Agreement**") whereby the Law Firm will contribute the LR Contribution (as defined in the Contribution Agreement) to the Provider in exchange for its Class B Common Interest in the Provider, a Shared Personnel and Services Agreement dated April 4, 2018, whereby UnitedLex Corporation agrees to provide certain personnel and support services to the Provider so that Provider can fulfill its obligations to the Law Firm (the "**Shared Personnel Agreement**") under this Master Services Agreement, whereby the Provider shall provide certain business services to the Law Firm in exchange for the fees, as set forth in this Agreement;

B.  WHEREAS, the Parties have agreed that each of the agreements described in the preceding Recital and/or the transactions contemplated thereby shall, subject to the satisfaction of the Closing Condition (as defined in the Contribution Agreement), become effective on the Effective Date;

C.  WHEREAS, Provider is not a law firm and does not provide legal service or advice;

D.  WHEREAS, Law Firm is a law firm in the business of providing legal services or advice to its clients; and

E.  WHEREAS, Provider shall provide business support services, as described in this Agreement, to Law Firm.

### TERMS

In consideration of the mutual covenants and agreements hereinafter set forth and subject to the satisfaction of the Closing Condition (as set forth in the Contribution Agreement), the Parties agree as follows:

1.  **Scope of Services.** Provider shall provide business support services to Law Firm as described in the attached Addendum 1 – Provider & Law Firm Responsibilities (collectively, the "**Services**"), which the Parties shall amend from time to time.  Over time and from time to time following the

Effective Date and prior to March 31, 2020, the Parties shall work together in good faith to develop Service Level Agreements ("**SLAs**") covering the Services described in Addendum 1. As appropriate, the SLAs may establish (i) mutually agreed to Provider and Law Firm performance measures and targets, as well as "satisfactory," "needs improvement" and "unsatisfactory" performance ranges, and (ii) mutually agreed to fee adjustments for sustained performance below the "satisfactory" range.

2.  **Provider Obligations**. Provider shall appoint an individual to serve as a primary contact with respect to this Agreement (the "**Provider Contact**"). Provider personnel shall be suitably skilled, experienced and qualified to perform the Services. Any deliverables or work product provided by Provider to Law Firm hereunder shall conform to the specifications described herein, in Addendum 1 or the SLAs adopted upon the mutual agreement of the Parties from time to time. The Parties acknowledge that resources provided to Law Firm may be subject to compliance with reasonable policies, including information technology usage, security, privacy, as provided by Law Firm to such resources in writing from time to time. Except as otherwise provided by Section 25 (Subcontracting) and the Shared Personnel Agreement, any personnel resources provided to Law Firm under this Agreement shall be considered by the Law Firm to be employees of Provider, and Law Firm shall have no responsibility for providing compensation to such resources. The Parties acknowledge and agree that the scope of Services and the manner in which they are delivered shall evolve over time. The Services the Provider is providing to the Law Firm are business process in nature and the Parties agree that the Provider shall have no control or supervision over how the Law Firm provides legal services to its clients.

3.  **Law Firm Obligations**.

    a.  General. Law Firm shall cooperate with Provider in all matters relating to the Services and shall appoint an individual to serve as a primary contact with respect to this Agreement (the "**Law Firm Contact**"). Such cooperation includes, but is not limited to, good faith commercially reasonable efforts to respond as reasonably necessary to any Provider request for Law Firm's direction, decisions or information to enable Provider to carry out the Services in a timely manner and in accordance with the terms of this Agreement, Addendum 1 or any applicable SLA.

    b.  Professional Services and Supervision. Law Firm shall have complete control of and responsibility for (i) providing professional legal services to clients in compliance with relevant ethical standards, laws and regulations applying to the legal profession, (ii) ensuring that each attorney associated with Law Firm is appropriately licensed by the relevant state bar, and (iii) providing adequate supervision to such attorneys and other staff providing legal services to the Law Firm's clients.

    c.  Employment of Law Firm Attorneys. Law Firm shall maintain complete control of and responsibility for the final hiring decision, compensation, supervision, evaluation and termination of its attorney employees. Law Firm shall be responsible for the payment of such attorney employees' salaries and wages, payroll taxes, benefits and all other taxes

2

and charges now or hereafter applicable to them.  With respect to attorneys, Law Firm shall only employ and contract with licensed attorneys meeting applicable credentialing guidelines established by Law Firm and relevant authorities.

    d.  <u>Professional Insurance Eligibility</u>. Law Firm shall obtain and retain professional liability insurance with industry-appropriate levels of coverage and shall, within applicable standards set by the profession, assure that its attorney employees are insurable and practicing law in accordance with Law Firm's policies and on-going risk management procedures.

**4.  Representations and Warranties**. Each Party represents and warrants to the other Party that:

    a.  It is duly organized, validly existing and in good standing as a corporation or other entity as represented herein under the laws and regulations of its jurisdiction of incorporation, organization or chartering;

    b.  It has the full right, power and authority to enter into this Agreement, to grant the rights and licenses granted hereunder and to perform its obligations hereunder;

    c.  The execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action of the Party; and

    d.  When executed and delivered by such Party, this Agreement will constitute the legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms.

**5.  Term**.

    a.  <u>Initial Term</u>.  Unless earlier terminated or extended as provided herein, the initial Term of this Agreement will commence as of the Effective Date and will continue until March 31, 2028, subject to automatic extension and the termination rights granted in this Agreement (the "**Initial Term**").

    b.  <u>Automatic Extensions</u>. Upon expiration of the Initial Term, this Agreement shall automatically extend for up to two (2) additional periods of five (5) years each (each an "**Extension Period**") on the same rates, fees and terms and conditions in effect at the end of the preceding Initial Term or Extension Period (or upon the rates, fees and terms and conditions as may be mutually agreed) unless either Party provides written notice to the other at least one-year prior to the expiration of the Initial Term or such Extension Period. If either Party provides notice that it elects not to extend this Agreement, then this Agreement will expire at the close of the Initial Term or the then-current Extension Period, as applicable.  The Initial Term, any Extension Period(s), and any Termination Assistance Period will collectively be referred to as (the "**Term**").

6. **Termination**.

    a.   <u>Termination for Convenience</u>. Either Law Firm or Provider may, at its option, terminate this Agreement, without cause, upon thirty (30) days' written notice to the other ("**Termination for Convenience**").

    b.   <u>Termination by Law Firm for Cause</u>.

        i.   In the event of a Provider Material Default (defined below) and Provider does not cure such Provider Material Default within thirty (30) days after receipt of written notice from Law Firm, then Law Firm, by giving notice to Provider, may terminate this Agreement, as of the termination date specified in the notice. Notwithstanding the foregoing, if such Provider Material Default is not capable of cure, Law Firm may terminate this Agreement immediately upon written notice to Provider. "**Provider Material Default**" means (x) an act or multiple contemporaneous acts of fraud, gross negligence or malfeasance by the Provider, and/or (y) a breach or multiple contemporaneous breaches of this Agreement by the Provider, including sustained "unsatisfactory" performance under one or more SLAs, provided such acts or breaches directly result in and are the proximate cause of the annual Aggregate Net Contribution (defined below) for a given Fiscal Year being fifteen percent (15%) or more less than the annual Aggregate Net Contribution would have been for such Fiscal Year absent such acts or breaches or defaults. Notwithstanding the forgoing, if Provider disputes the existence of a Provider Material Default, the existence or non-existence of a Provider Material Default shall ultimately be determined by an Arbitration panel in accordance with Section 31 (Governing Law and Dispute Resolution).

        ii.   If Provider, the Class A Member of the Provider or UnitedLex Corporation breaches their respective obligations under the LLC Agreement (including, without limitation, UnitedLex Corporation's guaranty obligations under Section 5.03 of the LLC Agreement) and such breach remains uncured for a period of thirty (30) days, then the Law Firm may, by giving notice to Provider, terminate this Agreement, as of the termination date specified in the notice.

    c.   <u>Termination by Provider for Cause</u>.

        i.   Provider may terminate this Agreement if Law Firm fails to pay when due properly invoiced, undisputed fees that in the aggregate exceed two (2) months of fees and fails to cure any such breach within thirty (30) days after receiving notice from Provider of the failure to make payment of such fees.

        ii.   In the event of a Law Firm Material Default (defined below) and Law Firm does not cure such Law Firm Material Default within thirty (30) days after receipt of written notice from Provider, then Provider, by giving notice to Law Firm, may

terminate this Agreement, as of the termination date specified in the notice. Notwithstanding the foregoing, if such Law Firm Material Default is not capable of cure, Provider may terminate this Agreement immediately upon written notice to Law Firm. **"Law Firm Material Default"** means (x) an act or multiple contemporaneous acts of fraud, gross negligence or malfeasance by the Law Firm, and/or (y) a breach or multiple contemporaneous breaches of this Agreement by the Law Firm, including sustained "unsatisfactory" performance under one or more SLAs, provided such acts or breaches directly result in and are the proximate cause of the annual Aggregate Net Contribution for a given Fiscal Year being fifteen percent (15%) or more less than the annual Aggregate Net Contribution would have been for such Fiscal Year absent such acts or breaches or defaults. Notwithstanding the forgoing, if Law Firm disputes the existence of a Law Firm Material Default, the existence or non-existence of a Law Firm Material Default shall ultimately be determined by an Arbitration panel in accordance with Section 31 (Governing Law and Dispute Resolution).

    iii.  If the Law Firm breaches its obligations under the LLC Agreement and such breach remains uncured for a period of thirty (30) days, then the Provider may, by giving notice to Law Firm, terminate this Agreement, as of the termination date specified in the notice.

d.    <u>Termination for Insolvency or Financial Deterioration</u>. Either Party may terminate this Agreement at any time if the other Party (which other Party, in the case of termination by Law Firm, includes the Provider, the Managing Member of the Provider or UnitedLex Corporation): (a) files a petition in bankruptcy; (b) has an involuntary petition in bankruptcy filed against it which is not challenged within ten (10) days and dismissed within thirty (30) days; (c) makes a general assignment for the benefit of creditors; or (d) has a receiver appointed for its assets; then the other Party may, upon notice to the first Party, terminate this Agreement as of the termination date specified in the notice.

e.    <u>Termination for Violation of Ethical or Professional Rule</u>.  Either Party may terminate this Agreement at any time if (i) a professional regulatory body of a state bar or a court of competent jurisdiction makes a final determination that a term or provision of this Agreement violates an ethical opinion or professional rule of conduct, and (ii) following such determination, the Parties have attempted, in good faith, to reform the Agreement in accordance with Section 22 (Reformation), and (iii) following such attempt to reform the Agreement, either the Law Firm or the Provider reasonably determines, in good faith, that such term or provision cannot be modified in accordance with Section 22 (Reformation) in a manner that effects the original intent of the Parties, then either Party may, by giving notice to the other, terminate this Agreement, as of the termination date specified in the notice without regard to any cure period.

f.    <u>Termination Assistance</u>. If this Agreement terminates or expires, for any reason, then Provider shall, during the Termination Assistance Period (defined below), perform those

services, activities and responsibilities required to successfully transition the Services from Provider to Law Firm or third party providers designated by Law Firm, without unreasonable interruption, delay or degradation in quality. Such services, activities and responsibilities, include: (a) continuing to perform the terminated (or expired) Services and any services required upon termination (or expiration) under this Agreement; (b) upon request, implementing and performing a written exit plan for the transition of the Services to Law Firm or alternative third party providers designated by Law Firm; (c) providing a parallel operation, data migration and testing process until the successful completion of the transition to Law Firm or third party providers designated by Law Firm; (d) cooperating with Law Firm and any third party providers designated by Law Firm in order to facilitate the transfer of the Services to Law Firm or such other third party providers; and (e) performing any other services requested by Law Firm or otherwise required to transition the provision of the terminated (or expired) Services to Law Firm or another supplier without interruption to or any degradation in the quality of the Services (the services in clauses (a) through (e), the "**Termination Assistance Services**"). The Termination Assistance Services shall be considered "Services" and shall be provided in accordance with this Agreement.   The fees for Termination Assistance Services shall be the same rates, fees and terms and conditions in effect at the time of termination or expiration.  Law Firm may at any time notify Provider of the Termination Assistance Services to be provided and the time period during which such services shall be provided which shall not exceed one-year (the "**Termination Assistance Period**"). Without limiting the foregoing, Law Firm may request that Termination Assistance Services be provided (a) up to one-year prior to the expiration or termination, and (b) with respect to all or part of the Services and without regard to whether the termination resulted from the Provider terminating the Agreement for Cause or the exercise by Law Firm of its right to Terminate for Convenience.  During a Termination Assistance Period, the Termination Assistance Services shall be of the same degree of accuracy, quality, completeness, timeliness, responsiveness, efficiency and scope as the Services provided prior to termination or expiration. In the process of evaluating whether to undertake or allow termination, expiration or automatic extension of this Agreement, Law Firm may consider third party proposals to perform services similar to the Services following termination or expiration of this Agreement.  Upon request by Law Firm, Provider shall provide to Law Firm such information regarding performance of the Services as may be reasonably necessary or helpful to a third party in preparing an informed, non-qualified proposal to provide such services.

g.   License of Provider Intellectual Property.  Provider hereby grants to Law Firm a non-exclusive, royalty-free, worldwide, non-transferable and non-assignable right and license after expiration of the Term to use any proprietary Provider Intellectual Property (including related documentations) for the purpose of enabling Law Firm or its designee to carry out the services that replace the Services after such Services have been terminated or expire.  Provider shall deliver to Law Firm a copy of the Provider Intellectual Property (including related documentations) in respect of such Services, in both source and object code form.  With respect to software that is proprietary to Provider

and not commercially available, Provider shall, if requested by Law Firm, license such proprietary software to Law Firm (with right of sublicense to a replacement provider for use on behalf of Law Firm) pursuant to the terms of this Section 6 and at a reasonable additional charge which reflects pricing for commercially available substitutes.

h.  Hiring of Service Delivery Organization.  As of the date a determination is made that there shall be an expiration or termination of this Agreement, with respect to the then-current employees, contractors and other personnel of the Provider and its agents who provide the Services to Law Firm (each, an **"Affected Service Delivery Organization Member"**), Provider shall (a) not terminate, reassign or otherwise remove from the Provider any Affected Service Delivery Organization Member until Law Firm has requested Provider cease performing the Services, and (b) upon Law Firm's request, prior to any termination, reassignment or other removal of an Affected Service Delivery Organization Member, and to the extent not prohibited by applicable Laws, (i) provide Law Firm with the name of each Affected Service Delivery Organization Member's position and such Affected Service Delivery Organization Member's description of job responsibilities, in accordance with Provider's standard employment policies, (ii) provide Law Firm and its designees full access to such Affected Service Delivery Organization Member, and (iii) allow Law Firm and its designees to meet with and extend offers of employment to such Affected Service Delivery Organization Member without interference from Provider or Provider agents (including interference through counter-offers).  Provider shall waive any restrictions that may prevent any Affected Service Delivery Organization Member from being hired by Law Firm or its designees pursuant to this Section 6.  Additionally, Provider shall not make any other material change to the terms or conditions of its employment of the Affected Service Delivery Organization other than such changes that are made in accordance with Provider's normal personnel practices and cycles.

7.  **Confidential Information**. The Parties acknowledge that it will be necessary for them to disclose or make available to each other information and materials that are confidential, privileged or proprietary or contain valuable trade secrets relating to their respective businesses (collectively the "Confidential Information"). Confidential Information shall mean information that a reasonable person would consider confidential given its nature or the circumstances surrounding its disclosure. It shall expressly include, but not be limited to information concerning Law Firm's clients, Law Firm Content and Law Firm Data. **"Law Firm Content"** means all Law Firm Data, information or content (including, e-mails, documents, files and records), in any form, as well as any Law Firm Data, that is (i) loaded into the applications and/or the technology platform or otherwise made available to Provider by or on behalf of Law Firm and/or any authorized users (including any content or information sent to Law Firm via the technology platform by Law Firm's clients or other third parties); or (ii) generated by the applications and/or the technology platform based on such information, Law Firm Data or content.  **"Law Firm Data"** means all data and information, including the Law Firm Intellectual Property and Personal Data that is (x) submitted to Provider or its agents by or on behalf of Law Firm, (y) obtained, developed or produced by Provider or its agents for Law Firm in connection with this Agreement or (z) Law

7

Firm Intellectual Property and Personal Data to which Provider or its agents have access in connection with the provision of the Services. **"Personal Data"** means any information (a) that, either individually or when combined with other information, can be used to identify a specific individual or derive information specific to a particular individual, and any information or data related to the current, past or potential employees or clients of Law Firm, (b) covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and (c) covered, now or in the future, by privacy laws, including information that is identifiable to or identifies an individual.

   a.  Non-Disclosure. Each of the Parties agrees: (a) to use commercially reasonable efforts to protect the Confidential Information of the other Party from unauthorized use or disclosure and to use at least the same degree of care with regard thereto as it uses to protect its own Confidential Information of a like nature; and (b) not to disclose or otherwise permit access to the Confidential Information of the other Party to any third party without such other Party's prior, written consent and then only to the extent reasonably required to accomplish the intent of this Agreement.

   b.  Compelled Disclosure. In the event that either Party or any of its directors, officers, partners, or employees is required by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar process to disclose any of the Confidential Information of the other Party, such compelled Party or any such person may disclose only that portion of the Confidential Information of the other Party that such Party or such person is legally required to disclose. If legally permitted, a Party shall first provide notice to the other Party of any such process requiring such disclosure upon receipt thereof in order to provide the other Party with the opportunity to petition the court or administrative body to prevent such disclosure.

   c.  Exceptions. Information will not be considered to be Confidential Information if it: (a) is already, or otherwise becomes, publicly known by third parties other than as a result of an act or omission of the receiving Party; (b) is lawfully received, after disclosure hereunder, from a third party having the right to disseminate the information to the receiving Party and without restriction on disclosure; (c) is furnished to others by the disclosing Party without restriction on disclosure; or (d) can be shown by the receiving Party to have been independently developed by such Party without use of or reference to the Confidential Information of the disclosing Party.

   d.  Injunctive Relief. The Parties agree that any breach by a Party or any of its directors, officers, partners, employees, agents, or representatives of any provisions of this Section 7 may cause immediate and irreparable injury to the other Party and that, in the event of such breach, the injured Party will be entitled to seek injunctive relief as well as any other legal or equitable remedy available.

   e.  Return of Confidential Information. Promptly upon the written request of the disclosing Party or upon termination of this Agreement, the receiving Party will, at the disclosing

8

Party's option, return to the disclosing Party or destroy all copies of the disclosing Party's Confidential Information (including, in the case of Law Firm, Law Firm Content and Law Firm Data). Each Party may, however, maintain a copy of any Confidential Information necessary to support its work under this Agreement for reference and archival purposes, in accordance with applicable Law or the professional standards applicable to either Party; provided, that Provider may not maintain a copy of any Law Firm Content beyond the normal retention policies involved in the backup, disaster recovery or other data management procedures put in place for Law Firm's benefit prior to termination.

f.   <u>Segregation of Provider Employees with Critical Law Firm Content</u>.  Consistent with the standards set forth in Section 7(h), following the Effective Date, and in any event, prior to another law firm becoming a member of the Provider, the Parties shall adopt an Addendum to this Agreement setting forth screening procedures relating to employees of the Provider who have access to highly sensitive Law Firm Content that relates to Law Firm's clients.

g.   <u>Data Security</u>.  Provider acknowledges that Law Firm and its attorneys are subject to legal and ethical standards concerning data protection and information security, which may include state bar and legal ethics standards, requirements applicable to "business associates" under HIPAA, requirements applicable to Providers under the Gramm-Leach-Bliley Act, and state, federal and non-U.S. Laws of general application.  Promptly following the Effective Date, the Parties shall adopt an Addendum to this Agreement setting forth commercially reasonable data security and data privacy practices and procedures to ensure proper handling of Law Firm Content, Law Firm Data and Personal Data by the Provider.

h.   <u>Acknowledgement of Law Firm's Ethical Obligations Relating to Confidential Information</u>.  Notwithstanding any allocation of responsibility relating to Confidential Information set forth in this Agreement, the Parties acknowledge and agree that (i) Law Firm has an ethical obligation to ensure its clients' information remain confidential and shall have the ultimate responsibility for the maintenance of confidentiality of all client information, including the identity of clients, whether in electronic or hard copy format that comes into the possession, custody or control of Provider, in accordance with its obligations under the Rules of Professional Conduct (the "**Rules**"), and Provider agrees to abide by and cause all of its employees to comply with commercially reasonable best practices with respect to maintaining Law Firm's client confidentiality, including, without limitation, all steps that may be required from time to time to preserve appropriate levels of cyber security; and (ii) Law Firm has obligations under the Rules, including, without limitation, the duty of competence, the duty of communication, duties with respect to fees and expenses, the duty of confidentiality, the duty to avoid conflicts, and the duty to supervise.

8. **Fees; Expenses; Invoices.**

    a. <u>General</u>.

        i. The fees for Provider's Services will be charged on the terms and at the rates specified in the attached Addendum 2 - Invoicing.  As more fully described in Addendum 2 - Invoicing, the Provider shall provide a monthly invoice to Law Firm for fees associated with Production Services and Operations Services (collectively, the "**Invoiced Fees**").

    b. Provider shall be solely responsible for its expenses unless the Parties otherwise specifically agree to a change in the applicable Operations Services fee.  The Parties acknowledge that certain portions of the Provider's expenses may be taken into account in determining the Invoice Net Contribution (as further described in Section 8(d) below).

        i. Following the Execution Date, the Parties shall adopt processes to ensure that invoices received from third-parties are appropriately delivered to, and are the responsibility of, the proper Party (e.g., client expenses are the responsibility of the Law Firm and expenses for services that support the Provider are the responsibility of the Provider).

        ii. "**Fiscal Year**" means each one-year period measured from April 1 to the following March 31.

    c. <u>Referral EBITDA</u>.  Separate and apart from the Invoiced Fees, the Provider shall track the EBITDA attributable to any revenues derived from projects, clients or customers referred by the Law Firm to the Provider, UnitedLex Corporation, or any affiliates of UnitedLex Corporation (collectively, "**Provider Affiliates**") in a given Fiscal Year, whether such EBITDA resides on the Provider's or Provider Affiliates' financial statements and results of operations (the EBITDA attributable to such referral revenue, the "**Referral EBITDA**").

    d. <u>Expectations</u>. As set forth below, the Parties have established the mutual expectations with respect to the aggregate amount of (i) the Provider's net contribution attributable to the Invoiced Fees for a given Fiscal Year (the "**Invoice Net Contribution**"), <u>plus</u> (ii) the Referral EBITDA for the same Fiscal Year (together, the "**Aggregate Net Contribution**"), set forth below. For the purposes of determining Invoice Net Contribution and Referral EBITDA, the Parties shall follow the Guidelines for Determining EBITDA and Net Contributions set forth in Schedule 8 attached hereto.

        i. <u>Initial Period Expectation</u>. For each of Fiscal Years two (2) through five (5) following the Effective Date (with Fiscal Year two being the period beginning April 1, 2019 and ending March 31, 2020), the Parties expect that the Aggregate Net Contribution for each such Fiscal Year will be between $15 million and $20 million (the "**Initial Period Expectation**").  Absent a Provider Material Default or a Law Firm Material Default, failure to achieve the Initial Period Expectation will not be deemed a breach of the Agreement.  In the event the Aggregate Net Contribution exceeds the Initial Period Expectation, the Provider will not be

required to return to the Law Firm any Invoiced Fees paid or make any payment for any Referral EBITDA achieved.

ii. <u>Subsequent Period Expectation</u>. For each of (x) Fiscal Years six (6) through ten (10) following the Effective Date (with Fiscal Year six being the period beginning April 1, 2023 and ending March 31, 2024), (y) Fiscal Years eleven (11) through fifteen (15), if the Agreement remains effective through the first Extension Period, and (z) Fiscal Years sixteen (16) through twenty (20), if the Agreement remains effective through the second Extension Period, the Parties expect that the Aggregate Net Contribution for each such Fiscal Year will be between $20 million and $30 million (the "**Subsequent Period Expectation**"). Absent a Provider Material Default or a Law Firm Material Default, failure to achieve the Subsequent Period Expectation will not be deemed a breach of the Agreement. In the event the Aggregate Net Contribution exceeds the Subsequent Period Expectation, the Provider will not be required to return to the Law Firm any Invoiced Fees paid or make any payment for any Referral EBITDA achieved.

e. The Provider Contact and Law Firm Contact shall meet periodically to review the financial performance of the Parties resulting from this Agreement, including reviewing the calculation of Invoiced Fees and the generation of Invoice Net Contribution and Referral EBITDA. On or before April 30 of each calendar year, the Provider shall prepare and deliver to the Law Firm Contact its calculation of the actual Invoice Net Contribution and Referral EBITDA for the preceding Fiscal Year. Such certification shall set forth in reasonable detail the Provider's calculation of Invoice Net Contribution and Referral EBITDA (the "**EBITDA Certification**"). If the Law Firm Contact objects in any way to the Provider's calculation of Invoice Net Contribution or Referral EBITDA, then the Law Firm Contact shall notify Provider in writing of such objection within thirty (30) calendar days following their receipt of the EBITDA Certification. If, for any reason, Law Firm Contact fails to give Provider notice of any such objection within such 30-day period, then the Provider's calculation of the Invoice Net Contribution and Referral EBITDA shall be deemed correct. If, however, Law Firm Contact notifies Provider of such an objection within such 30-day period, then Law Firm Contact and Provider shall, for a period of time not to exceed 30 calendar days (unless otherwise agreed in writing by the Parties) after the date upon which the Provider receives the Law Firm Contact's objection notice (such period of time being hereinafter referred to as the "**Resolution Period**"), work together diligently and in good faith to resolve any and all such objections. If, at or before the end of the Resolution Period, Law Firm Contact and Provider resolve their disputes regarding the calculation of the Invoice Net Contribution and Referral EBITDA, then the calculation of such amounts as so agreed shall be deemed to be the actual Invoice Net Contribution and Referral EBITDA for that Fiscal Year. If, at the end of the Resolution Period, Law Firm Contact and Provider have not resolved their disputes regarding the calculation of the Invoice Net Contribution and Referral EBITDA, then such disputes shall, within thirty (30) calendar

days after the expiration of the Resolution Period, be submitted to arbitration pursuant to Section 31 (Governing Law and Dispute Resolution) for final determination.

f.  <u>Termination Fee</u>.  In the event (i) Law Firm terminates the Agreement for Convenience in accordance with Section 6(a), (ii) Provider terminates this Agreement for cause in accordance with Section 6(c), or (iii) Law Firm elects not to extend this Agreement pursuant to Section 5(b), then Law Firm shall pay the Termination Fee to the Provider on the termination date.  The **"Termination Fee"** in event of items (i) and (ii) of the preceding sentence shall be an amount equal to eight times (8x) the Aggregate Net Contribution for the Fiscal Year or portion thereof immediately preceding the date of notice of termination and in the event of item (iii) of the preceding sentence shall be an amount equal to four times (4x) the Aggregate Net Contribution for the last Fiscal Year of the Term.  In the event that (X) either (i) Law Firm terminates this Agreement for convenience in accordance with Section 6(a) after the First Redemption Date (as defined in Annex A to the LLC Agreement) or (ii) Law Firm elects not to renew at the end of the Initial Term of this Agreement, and (Y) the Aggregate Net Contribution for Fiscal Years two (2) through five (5) cumulatively exceeded $84 million, then the Termination Fee payable hereunder shall further be reduced by an amount equal to the excess, if any, of such Aggregate Net Contribution over the First Redemption Amount (as defined in Annex A to the LLC Agreement) received by the Law Firm on the First Redemption Date.

9.  **Taxes**. Law Firm shall be responsible for paying any applicable sales, use, excise, value added, withholding, or similar taxes, duties, or assessments imposed upon the Services rendered or products provided hereunder by any federal, state, local, or foreign government authority, exclusive of any taxes based upon Provider's income or payroll.

10. **Payment**. Except as set forth in Addendum 2 – Invoicing or the Parties otherwise mutually agree in writing to another schedule, Law Firm will pay invoices as follows:

a.  <u>Invoice Issuance</u>. Two monthly invoices, one for Operations Services and one for Production Services, shall be produced each month and shall be paid in U.S. dollars.

b.  <u>Interest</u>. All undisputed and unpaid invoice amounts shall accrue interest following their due date, until paid, at the lesser of 1.5% per month or the maximum interest rate permitted under applicable law.

c.  <u>Operations Services</u>. The monthly invoice for Operations Services shall be delivered by the Provider at the end of each month and the undisputed invoice amount shall be paid by the Law Firm upon receipt.

d.  <u>Production Services</u>. The monthly invoice for Production Services shall generally be delivered by the Provider on the 15th day of the month for all professional services rendered for the previous month and undisputed invoice amounts shall be due and payable by the Law Firm within fifteen (15) calendar days after the invoice date.

e. <u>Disputes</u>. Law Firm shall submit written notice of reasonably disputed invoice amounts within ten (10) calendar days of the invoice date. Upon receipt of such notice, Provider shall conduct a reasonable investigation into the disputed invoice amounts. The Parties shall attempt to informally resolve disputed invoice amounts in good faith.

    i. In the event of a dispute relating to operations invoices, Provider will provide a credit to Law Firm on the next month's invoice for all operations amounts that the parties agree reflects the costs of operations pursuant to the dispute resolution process.

    ii. Nothing in this Section shall diminish Law Firm's responsibility to pay undisputed invoice amounts in accordance with the terms stated herein. Without prejudice to any other right or remedy it may have, Law Firm reserves the right to set off at any time any amount owing to it by Provider against any amount payable by Law Firm to Provider.

11. **Audits.** Upon reasonable notice from one Party (the "**Requesting Party**") to the other (the "**Notified Party**"), the Notified Party will (and for clarity, will use their good faith efforts to ensure, to the extent that it is able, that its agents) provide the Requesting Party and its agents (the "**Auditors**") with reasonable access at reasonable times to locations and to the Notified Party for the purpose of performing audits or inspections of the Notified Party's and its agents' to review performance of Notified Party's obligations under this Agreement. If any audit by a Requesting Party results in Notified Party being notified that Notified Party or its agents are not in compliance with this Agreement or any law or regulatory requirement, Notified Party shall, and shall cause its agents to, promptly take actions to comply with this Agreement or such law or regulatory requirement.   The exercise by either Party of the audit rights provided in this Section 11 shall not limit or restrict the discovery rights of such Party or the admissibility of any of the audit results in connection with a legal proceeding.

12. **Intellectual Property and Deliverables.** Subject, in all respects, to the terms and conditions set forth in the Contribution Agreement, Law Firm is, and shall be, the sole and exclusive owner of all right, title and interest in and to deliverables provided hereunder, including all Intellectual Property Rights therein. Provider agrees, and will cause its personnel to agree, that with respect to any deliverables that may qualify as "work made for hire" as defined in 17 U.S.C. §101, such deliverables are hereby deemed a "work made for hire" for Law Firm. To the extent that any of the deliverables do not constitute a "work made for hire," Provider hereby irrevocably assigns, and shall cause its personnel to irrevocably assign to Law Firm, in each case without additional consideration, all right, title and interest throughout the world in and to the deliverables, including all Intellectual Property Rights therein. Provider shall cause its personnel to irrevocably waive, to the extent permitted by applicable law, any and all claims such personnel may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of droit moral with respect to the deliverables. "**Intellectual Property Rights**" means all (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names and domain names, together with all of the goodwill associated therewith, (c) copyrights and copyrightable works (including computer programs), and rights in data and

13

databases, (d) trade secrets, know-how and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all applications for, and renewals or extensions of, such rights, and all similar or equivalent rights or forms of protection in any part of the world. Nothing in this Section 12 shall be deemed to modify the Provider's rights to Law Firm Intellectual Property set forth in the Contribution Agreement. In the event there is a conflict between the terms of this Section 12 and the Contribution Agreement, the terms of the Contribution Agreement shall govern.

13. **Provider Intellectual Property**. Provider and its licensors are, and shall remain, the sole and exclusive owners of all right, title and interest in and to the Pre-Existing Materials, including all Intellectual Property Rights therein. Provider hereby grants Law Firm a limited, irrevocable, perpetual, fully paid-up, royalty-free, non-transferable, non-sublicenseable, worldwide license to use, perform, display, execute, reproduce, distribute, transmit, modify (including to create derivative works), import, make, have made, sell, offer to sell and otherwise exploit any Pre-Existing Materials to the extent incorporated in, combined with or otherwise necessary for the use of the deliverables for any and all purposes/solely to the extent reasonably required in connection with Law Firm's receipt or use of the Services and deliverables. All other rights in and to the Pre-Existing Materials are expressly reserved by Provider. "**Pre-Existing Materials**" means documents, data, know-how, methodologies, software and other materials, including computer programs, reports and specifications, provided by or used by Provider in connection with performing the Services, in each case developed or acquired by the Provider prior to the Effective Date.

14. **Law Firm Materials**. Except as otherwise provided in the Contribution Agreement, Law Firm and its licensors are, and shall remain, the sole and exclusive owner of all right, title and interest in and to the Law Firm Materials, including all Intellectual Property Rights therein. Except as otherwise provided in the Contribution Agreement, Provider shall have no right or license to use any Law Firm Materials except solely during the term of this Agreement to the extent necessary to provide the Services to Law Firm. Except as otherwise provided in the Contribution Agreement, all other rights in and to the Law Firm Materials are expressly reserved by Law Firm. "**Law Firm Materials**" means any documents, data, know-how, methodologies, software and other materials provided to Provider by Law Firm. Nothing in this Section 14 shall be deemed to modify the Provider's rights to Law Firm Intellectual Property set forth in the Contribution Agreement. In the event there is a conflict between the terms of this Section 14 and the Contribution Agreement, the terms of the Contribution Agreement shall govern.

15. **Non-Infringement Warranty**. To the extent performance by either Party under this Agreement involves the provision of deliverables or work product to the other, each Party warrants that such deliverables or work product shall not infringe any intellectual property right, including but not limited to, patent, copyright or trademark, of any third party arising under the law of the United States. However, this excludes any infringement or claim, litigation or other proceedings to the extent arising out of Law Firm's use of such deliverables or work product in combination with any materials not supplied or specified by Provider, if the infringement would have been avoided

by the use of the deliverables or work product not so combined or any modification or changes made to such deliverables or work product by a party other than Provider.

16. **Law Firm Monies**. Provider may, from time to time, as necessary in its provision of the Services, hold money on Law Firm's behalf. Such money will be held in trust in Law Firm's bank account which is segregated from Provider's own funds (the "**Trust Account**"). While Provider will take reasonable steps to satisfy itself as to the financial standing of the bank into which such money is paid, Law Firm agrees that Provider shall not be liable to Law Firm for any losses incurred (including loss of the funds held on Law Firm's behalf) in the event that such bank becomes insolvent or is otherwise unable to release the funds held or comply with payment instructions properly given on the due date or at all. Provider warrants that it shall take all commercially reasonable measures, including due diligence, in its selection of banks at which it shall maintain Trust Accounts. Funds held in Trust Accounts shall not attract interest. Trust Accounts shall be operated, and all funds dealt with, in accordance with the applicable law governing such accounts.

17. **Disclaimer**. NEITHER PARTY SHALL HAVE ANY LIABILITY WHATSOEVER FOR CONSEQUENTIAL, INDIRECT, EXEMPLARY, INCIDENTAL, OR PUNITIVE DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, LOST BUSINESS, REVENUE, OR PROFITS), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

18. **Limitation of Liability**. EXCEPT AS OTHERWISE PROVIDED IN SECTION 8(e) WITH RESPECT TO THE TERMINATION FEE, EACH PARTY'S LIABILITY UNDER THIS AGREEMENT FOR ANY REASON AND UPON ANY CAUSE OF ACTION, WHETHER SOUNDING IN TORT, CONTRACT, OR ANY OTHER LEGAL THEORY, SHALL BE LIMITED IN THE AGGREGATE TO THE TOTAL OF SUCH INVOICED FEES PAID BY LAW FIRM TO JOINT VENTURE UNDER THIS AGREEMENT DURING THE THREE (3) MONTH PERIOD PRECEDING THE EVENT UPON WHICH LIABILITY IS PREDICATED. THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE OR EXTEND THIS LIMIT. THIS PROVISION DOES NOT LIMIT EITHER PARTY'S LIABILITY FOR ANY LIABILITY WHICH MAY NOT BE EXCLUDED OR LIMITED BY APPLICABLE LAW.

19. **Indemnity.** See Addendum 3 - Indemnification.

20. **Insurance.** Promptly following the Effective Date, the Parties shall adopt an addendum (Addendum 4 – Insurance) to this Agreement setting forth commercially reasonable insurance coverages and terms for the Provider and the Law Firm.

21. **Service Levels**. In the event the Provider offers services substantially similar to the Services provided hereunder to another law firm at service levels superior to the service level the Law Firm receives those same Services hereunder, then the Services shall be provided to the Law Firm at that same superior service level offered to the third party.

**22. Reformation.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, or if a professional regulatory body of a state bar determines that a term or provision of this Agreement violates an ethical opinion or rule of professional conduct, such invalidity, illegality, unenforceability or violation shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, unenforceable or violates an ethical rule or opinion, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**23. Complete Agreement.** This Agreement is the complete and exclusive statement of the Agreement of the Parties with respect to the subject matter hereof and supersedes and merges all prior proposals, understandings, and agreements, whether oral or written, between the Parties with respect to the subject matter hereof. This Agreement may not be modified except by a written instrument executed by authorized representatives of the Parties. The pre-printed terms and conditions of any purchase order or other ordering document issued by Law Firm in connection with this Agreement shall not be binding on Provider and shall not be deemed to modify this Agreement.

**24. No Waiver.** No failure to exercise, and no delay in exercising, on the part of either Party, any right, power or privilege hereunder will operate as a waiver thereof, nor will any Party's exercise of any right, power or privilege hereunder preclude further exercise of the same right or the exercise of any other right hereunder.

**25. Subcontracting.** Provider shall obtain Law Firm's prior written consent before subcontracting any of the Services described hereunder.

**26. No Assignment.** Neither Party shall assign this Agreement, in whole or part, unless authorized in writing by the other Party. The consent of a Party to any assignment of this Agreement will not constitute such Party's consent to further assignment. This Agreement will be binding on the Parties and their respective successors and permitted assigns. Any assignment in contravention of this Section 26 will be void. A change of control, merger or sale of all or substantially all assets of a Party or a Provider Affiliate that controls the Provider shall constitute an assignment pursuant to this Section 26; provided, however, an initial public offering of UnitedLex Corporation shall not be deemed a change of control for the purposes of this Section 26.

**27. Records.** Provider shall maintain complete and accurate records relating to the provision of Services under this Agreement. During the term of this Agreement and for a period of time measured consistently with the Law Firm's then-current record retention procedures, upon Law Firm's written request provided with reasonable advance notice, Provider shall allow Law Firm or Law Firm's representative to inspect such records.

28. **Enforceability**. If any part of this Agreement shall be adjudged by any court of competent jurisdiction to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired thereby and shall be enforced to the maximum extent permitted by applicable law. If any remedy set forth in this Agreement is determined to have failed of its essential purpose, then all other provisions of this Agreement, including the limitations of liability and exclusion of damages, shall remain in full force and effect.

29. **Force Majeure**. Either Party shall be excused from performance and shall not be liable for any delay in whole or in part, caused by the occurrence of any contingency beyond the reasonable control of either the excused Party or its subcontractors or suppliers. These contingencies include, but are not limited to, war, sabotage, insurrection, riot or other act of civil disobedience, act of public enemy, failure or delay in transportation, act of any government or any agency or subdivision thereof affecting the terms hereof, accident, fire, explosion, flood, severe weather or other act of God, or shortage of labor or fuel or raw materials.

30. **Notice**. All notices and/or notifications required hereunder shall be directed to the following:

In the case of Provider:

Jennifer Mistal
ULX Partners LLC
4405 Cox Road, Suite 200
Glen Allen, Virginia 23060

With a copy to:

Philip W. Goodin, Esq.
Senior Vice President-Global Litigation Services
UnitedLex Corporation
6130 Sprint Parkway, Suite 300
Overland Park, Kansas, 66211

In the case of Law Firm:

C. Erik Gustafson
Chief Executive Officer
LeClairRyan PLLC
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314

With a copy to:

Lori D. Thompson, Esq.
General Counsel
LeClairRyan PLLC

1800 Wells Fargo Tower, Drawer 1200
Roanoke, Virginia 24018

Any notice required or permitted hereunder to the Parties hereto will be deemed to have been duly given only if in writing to the address of the receiving Party as set forth on the initial page hereof or such other address as may be specified by such Party in a notice delivered to the other Party in accordance with this Section 30 and delivered by: (i) certified U.S. mail, return receipt requested, postage prepaid; (ii) nationally recognized overnight courier, delivery charges prepaid; or (iii) by hand delivery with signed receipt. Any notice shall be deemed delivered: (a) on the fifth (5th) business day following deposit of such notice with the U.S. Postal Service if notice is given in accordance with (i), above; (b) on the second (2nd) business day following deposit of such notice with the courier if notice is given in accordance with (ii), above; or (c) on the date of actual delivery if notice is given in accordance with (iii), above.

31. **Governing Law and Dispute Resolution**. The interpretation and construction of this Agreement, and all matters relating to this Agreement, will be governed by the laws of the State of Delaware, in the United States of America, without giving effect to any conflict of law provisions thereof. Unless prohibited by applicable law, the Parties agree that any dispute, controversy, claim or cause of action arising out of, relating to, or in connection with this Agreement, and the interpretation of, validity, construction, performance, breach and/or termination thereof, shall be resolved by mandatory, confidential, final and binding arbitration. Unless the Parties are able to agree on a single arbitrator, three (3) arbitrators (individually, an "**Arbitrator,**" and collectively, the "**Arbitrators**") shall be chosen in the following manner:  (i) the Party initiating arbitration shall name one Arbitrator in its written notice of arbitration to the other Party; (ii) within ten (10) days thereafter, the other Party shall by written notice to the initiating Party and the first Arbitrator, name a second Arbitrator; and (iii) within ten (10) days thereafter, the two Arbitrators so named shall select a third Arbitrator. If any Arbitrator is not selected within the time periods specified, the vacancy or vacancies shall be filled pursuant to the rules of the American Arbitration Association (AAA) or any other mutually agreed upon arbitration service.  The Arbitrators appointed shall be knowledgeable in the areas of the law to be adjudicated in the arbitration.  The decision in writing of at least two (2) of the Arbitrators shall be final and binding on the Parties. The Arbitrators shall have authority to only preside over and hear claims that are legally cognizable claims under the law which is the same as in a court of law.  The Arbitrators shall have the authority to award any Party all forms of relief that are otherwise available to all Parties under applicable law, including for example, damages, reasonable attorney's fees and costs of the arbitration.  Any arbitration award may be entered or docketed as a judgment in a court having competent jurisdiction. The Parties agree that the arbitration itself shall take place in Washington, D.C. even though such Party may be located or reside elsewhere.  The Arbitrators shall apply the substantive law of the State of Delaware for all claims, without reference or deference to rules of conflicts of law.  The parties also agree and each Party consents to personal jurisdiction of the federal courts located in Washington, D.C. for any proceeding that may be required under this Agreement. Either Party my apply to any state or federal court for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as it deems necessary, without breaching this Agreement to arbitrate or waiving that Party's duty or right to arbitrate. The costs of the arbitration shall be borne equally by the Parties, absent an award of

18

such costs by the Arbitrators in the arbitration award. Each Party shall be responsible for its own incidental costs such as hearing transcripts, deposition transcripts, copies, attorney's fees, etc., absent an award of these costs by the Arbitrators in the arbitration award as provided under applicable law. Notwithstanding the choice of law provision of this Agreement, the provisions of this Section 31 shall be interpreted and enforced under the Federal Arbitration Act, 9 U.S.C. §1 et seq. (FAA), regardless of where a Party may be located. Each Party acknowledges and agrees that the transactions under the Agreement involve interstate commerce and that the FAA is controlling. The Parties have read and understand the foregoing provisions regarding arbitration. Each Party understands that by signing this Agreement, each Party agrees to waive its right to sue the other Party in a court of law for any claim, controversy, cause of action or dispute arising under this Agreement. By entering into this Agreement, each Party agrees that if either Party files a lawsuit in court, then the Parties agree that the court shall dismiss or stay the lawsuit and require the Parties to arbitrate. Each Party to this Agreement irrevocably waives their right to a trial by jury of any cause or action, counterclaim or cross-complaint in any action or other proceeding arising out of, or in any way connected with, this Agreement or any portion thereof, whether based upon contract, statute, tort, or any other theory of liability. Each Party further agrees that the dispute resolution provisions set forth in this Section 31 is the appropriate means to resolve any dispute relating to (i) any dispute arising over termination of this Agreement, or (ii) the Provider's determination of Invoice Net Contribution and Referral EBITDA. The Parties warrant and represent that they have had the opportunity to consult with counsel regarding the meaning and effect of this waiver of the right to a trial by jury.

[SIGNATURE PAGES FOLLOW]

32. **No Third-Party Benefit**. The provisions of this Agreement are for the sole benefit of the Parties hereto. This Agreement confers no rights, benefits, or claims upon any person or entity not a party hereto.

**ULX Partners, LLC**
By:  ULX Manager LLC, its Managing Member

By:    UnitedLex Corporation, its Managing Member

By: _____

Name:  Daniel E. Reed
Title:    Chief Executive Officer
Date:

**LeClairRyan PLLC**

By: _____

Name: C Leic GUSTAFSN
Title:   CEO
Date:

20

# EXHIBIT 12

**Conversion to LLC**
**Net Cash Benefits**
**Summary**

The Firm has the opportunity to take advantage of its net operating loss (NOL), allowances for uncollectable WIP/AR, and the lower corporate tax rates under the new tax law to convert from a C Corp to a LLC in a manner that minimizes the tax liability from the conversion to an amount of approximately $4.3M.  In the conversion, LR's WIP/AR will be taxed.  As a result, when that WIP/AR is turned into cash in the LLC, it will be tax deferred to our partners.  This creates an opportunity to pay about $31.5M to members of the LLC (current shareholders) on a tax deferred basis without 2018 tax liability.  There is a recapture period where some (but not all) of this tax benefit could be recaptured if someone leaves the Firm, but we currently expect that the recapture period will sunset in 2023 if we close Project ULX and, even with a recapture event, a cash benefit will remain.  The LLC conversion will allow the Firm to get higher regular salary take home pay to its Partners.  The LLC conversion is a standalone item, but it also contributes to and provides further benefits if we close on Project ULX

**Key Assumptions**

1.  The hypothetical Shareholder:

    o  has a $500k/$400k/$300k Full Payment Amount and a $350k/$280k/$210k Regular Salary (70%);
    o  receives only Regular Salary and has no other taxable income;
    o  has an $80k basis in $100k of common stock;
    o  has a $70k basis in $70k of preferred stock; and
    o  has a 38%/34%/30% effective federal and state tax rate.

2.  The Firm will convert from a C Corp to an LLC on March 1, 2018. The conversion will be treated as a taxable liquidation for tax purposes, which will result in a 2018 corporate tax on the conversion of about $4.3 million. The tax will be due and payable on July 15, 2018.  The Firm will pay the tax either on a monthly installment basis through no later than July 2019 or will secure alternative funding to pay the tax in full on its due date.

3.  The conversion will be cash neutral to the Firm. The $4.3 million estimated 2018 corporate tax on the conversion will be funded out of reducing the current 70% draw to a lower draw percentage, anticipated to be between 55% and 62%, which will be applicable 2018 points allocations.  Any 2017 bonus awards payable in 2018 will be paid in an amount at least equal to the equivalent after-tax amount each recipient would have received if no conversion to a LLC.  As detailed below, an LLC draw percentage between 55% and 62% will result in higher 2018 after tax take home pay because of the tax deferral.

4.  It is anticipated that the draw will commence at 55%, but the goal is to raise it to 62% during 2018 if Firm performance warrants.

5.  The LLC conversion will not involve taking on any new debt, other than any decision the Firm might make to finance any part of the estimated $4.3M tax liability payable July 15, 2018.

6.  The Firm currently plans to distribute to the Partners on December 31, 2018 the approximately $12 million of SR and DC Plan balances.

7.  If the Firm closes Project ULX, the Firm will change its fiscal year for budgeting and compensation purposes to April 1 through March 31. Current points allocations will not be changed as part of the LLC conversion or adjusted as to partners generally in connection with the potential change in fiscal and compensation year.

8. The Firm estimates that it will collect by March 2019 the aggregate amount of its conversion-date WIP and AR (i.e., about $45 million of WIP and AR less about $13 million of allowances for uncollectability).

9. Health insurance costs will be neutral to the Partners. The Firm share of those costs will be added to Partner K-1s and then offset by an equivalent deduction.

**Results**

**<u>LLC Conversion</u>**:

1. The LLC conversion will allow the Firm to take advantage of the recent federal Tax Cuts & Jobs Act, including a reduced tax on the Firm's WIP and AR (21% instead of 34%).  It will also allow the Firm to monetize in 2018 its current $8 million NOL, as well as the $12 million of additional NOLs created by the accrual and distribution of the SR and DC Plan balances in December 2018. As a result, about $31.5 million of distributions can be paid to the Partners post-conversion in 2018 and early 2019 as draw on a tax-deferred basis for federal and state tax purposes. The $31.5 million deferral approximates the sum of the current $29 million of annualized 70% Partner draws (Regular Salary) and the $1.7 million in 2017 bonuses payable to Partners in 2018.

2. The hypothetical Partner will have about a $5,000 capital gain on the conversion and the basis in his/her LLC Capital Account (which will include original basis in each Partner's common and preferred stock), will increase by approximately $5,000.

3. Instead of a C Corp Regular Salary of $350k/$280k/$210k, the hypothetical Partner will have an annualized LLC draw of about $275k/$220k/165k at a 55% draw and of $308k/$246k/$185k at a 62% draw.  The savings from these lower draw amounts are planned to be used by the Firm to fund payment of the $4.3M 2018 corporate tax on the conversion.

4. After the reduction in draw to between 55% to 62%, the hypothetical Partner's bi-weekly take home cash will be about $10,500/$8,400/$6,300 at the 55% draw and $11,800/$9,400/$7,100 at the 62% draw. This is compared to C Corp after-withholdings bi-weekly take home cash of about $8,300/$7,000/$5,700 (at a 70% draw rate).  The hypothetical Partner's LLC take home cash draw exceeds C Corp take home cash draw at both a 55% draw and a 62% draw.

5. The total net cash benefit to the hypothetical Partner after the payment of the tax on the $5,000 capital gain on conversion is the same at the 55% and 62% draw and is estimated at $105k/$80k/$55k, the only difference being a potentially longer time frame to get the full benefit under the 55% draw.  The net cash benefit to all Partners in the aggregate will be about $9 million.

6. If the hypothetical Partner departs in 2019 or later, under the tax laws a portion of the benefit will be payable as a recapture tax, which is estimated to be about $70k/$46k/$25k at either the 55% draw or the 62% draw (amounts will vary somewhat based on timing at the different draw levels).  This leaves an estimated net cash benefit of $35k/$34k/$30k at either draw level.  There is no penalty or interest on the recapture.

7. Regarding items (2) through (6) above, see attached charts for estimates at 55% draw and 62% draw for ease of reference.

8. While SR and DC plan distributions will remain taxable, assuming those funds are distributed on December 31, 2018 as planned, Partners will receive permanent benefits from lower marginal tax rates (22-24% vs 35-37%) on much of their SR and DC Plan distributions. This benefit will be about $600k on the $12 million-plus of aggregate SR and DC Plan distributions. This benefit is permanent and not subject to recapture.

9. Once payments to Partners exceed the $31.5 million deferral, additional draw amounts generally will be taxed as self-employment income at regular rates.

2

<u>Follow the LLC conversion with Project ULX</u>:

1. Except as provided in the next two sentences, the LLC conversion items (1) to (9) above remain unchanged. First, if a Partner departs after 2023 and assuming the $35 million loan from ULX will be deemed repaid out of the Firm's capital gain on its JV equity (which restores basis by that amount), there will be no recapture.   Second, the first payments to the Partners out of the JV equity interests in 2023 are planned to be used to reimburse Partners for their shares of the $4.3 million 2018 corporate tax liability.
2. Capital repayments in 2018 as part of Project ULX will not be subject to tax.  However, if a Partner departs the Firm in 2018 and a recapture event is triggered as discussed above, tax may be due attributable to the recapture.
3. Operating in LLC form will avoid double tax on any gain on the JV/ULX equity. The LLC flow-through structure will allow for one level of tax at the capital gains tax rate on the JV/ULX equity, whereas the C Corp structure would result in a double tax.  Retention of Partners via the equity incentive is a key requirement for ULX.  Our conversion to an LLC to avoid double tax will evidence the value LR places in that incentive.

**Conclusions**

1. The LLC conversion makes sense as a stand alone initiative.  It will generate an estimated $9 million initial benefit to our Partners.
2. The LLC conversion will enable Project ULX and Project ULX will enhance the benefits of the LLC conversion.  It also will make the initial benefits permanent for Partners who stay with the Firm through 2023, as well as avoiding double tax on the ULX/JV equity earned by Firm Partners.  It will also create significant retention incentives.

## ESTIMATED BI-WEEKLY PAYCHECK SHAREHOLDER EXAMPLES AT 55% DRAW

| | | | |
|---|---|---|---|
| Full Payment Amount at $100 point | 500K | 400K | 300K |
| Assumed Tax Rate | 38% | 34% | 30% |
| C Corp 70% Draw (Regular Salary) | 350K | 280K | 210K |
| C Corp Take Home Pay on Bi-weekly Draw | 8,300 | 7,000 | 5,700 |
| LLC Draw at 55% | 275K | 220K | 165K |
| LLC Bi-weekly Draw Take Home Pay | 10,500 | 8,400 | 6,300 |
| Net Cash benefit in LLC Draw | 105K | 80K | 55K |
| Tax Recapture if Departure During Recapture Period | 70K | 46K | 25K |
| Benefit After Recapture in the event of Departure | 35K | 34K | 30K |

**ESTIMATED BI-WEEKLY PAYCHECK SHAREHOLDER EXAMPLES AT 62% DRAW**

| | 500K | 400K | 300K |
|---|---|---|---|
| Full Payment Amount at $100 point | 500K | 400K | 300K |
| Assumed Tax Rate | 38% | 34% | 30% |
| C Corp 70% Draw (Regular Salary) | 350K | 280K | 210K |
| C Corp Take Home Pay on Bi-weekly Draw | 8,300 | 7,000 | 5,700 |
| LLC Draw at 62% | 308K | 246K | 185K |
| LLC Bi-weekly Draw Take Home Pay | 11,800 | 9,400 | 7,100 |
| Net Cash benefit in LLC Draw | 105K | 80K | 55K |
| Tax Recapture if Departure During Recapture Period | 70K | 46K | 25K |
| Benefit After Recapture in the event of Departure | 35K | 34K | 30K |

# EXHIBIT 13

1/13/18

**Project 100**
**Summary**

**The following is subject to ongoing tax and financial analysis.**

1. **Tax Objective**:  The recently enacted changes in the federal tax laws have created an opportunity for LR to achieve significant tax savings (currently estimated at $5 million) by converting from a C corporation to a professional limited liability company.  Those tax savings can be used to offset Partner taxes on their (i) future capital gains, (ii) normal compensation from the Firm and (iii) receipt of deferred compensation and supplemental retirement plan balances. The savings flow primarily from (i) the accelerated use of LR's nearly $10 million of accumulated NOLs and (ii) the tax rate arbitrage from recognizing income at the [25%] C corporation effective federal tax rate upon conversion on LR's approximate $[40] million of outstanding WIP and AR and then avoiding income at the individual Partner [30%] effective rate after conversion as that WIP and AR is collected.

2. **Fiscal Objective**:  LR's leadership believes it is in the best interests of the Firm to change its fiscal year for compensation purposes from December 31 to March 31. Among the benefits of this change are conducting (i) the annual budget, promotion and compensation exercises in the less hectic first quarter instead of the fourth quarter and (ii) the year-end collections push in March instead of during the holidays.

3. **Conversion to PLLC**:  On February 28, 2018, LR will convert into a Delaware professional limited liability company pursuant to a statutory merger.

4. **LR Tax Upon Conversion**:  LR will be taxed on the value of its WIP and AR upon the conversion.  That tax will be reduced to the extent of LR's accumulated NOLs through the date of conversion (including any losses incurred in early 2018). It is estimated that the LR tax upon the conversion will be $[9] million.

5. **LR Partner Long Term Capital Loss Upon Conversion**:  It is estimated that LR Partners will incur an approximately $[10] million long term capital loss upon the conversion. That loss can be used to offset their 2018 and later capital gains and can be carried forward indefinitely. If Project Liberty closes, the losses can be used to offset any long term gains on their LR stock redemptions or a Partner's share of any gains on LR's JV Interest. The loss is estimated to be worth approximately $[2] million to LR's partners.

6. **PLLC Taxes**:  Because LR's WIP and AR will be taxed upon conversion, they will not be taxed as collected. That means that as the PLLC collects that $[40] million in WIP and AR, it will be able to use the approximate $[12] million of tax savings to (i) pay the $[9] million tax upon the conversion and (ii) effectively increase Partner net after tax compensation by $[3] million.

1

7. **New Compensation Fiscal Year**:  The fiscal year end for compensation purposes will be March 31.  LR's tax and audit year end will remain December 31.

8. **2018-2019 Partner Compensation**:  The compensation of LR Partners for April 1, 2018 through March 31, 2019 will be as budgeted by LR for that period based on the effects of Project 100 and if it occurs, Project Liberty. It is anticipated that even if Project Liberty does not close, the budget for this new fiscal year will show a materially higher likelihood of achieving a 100% point value.  The draws for January through March 2018 will be as currently budgeted.  The net after tax guaranteed payments (fdraws) for April 1, 2018 through March 31, 2019 will be slightly higher than the currently budgeted draws.

9. **DC and SR Plan Termination**:  In anticipation of Project 100, LR terminated its non-qualified deferred compensation and supplemental retirement plans on December 29, 2017, with the plan balances (approximately $11 million) to be distributed one year after termination.  Those distributions ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax.

10. **Composite State Return**:  Going forward, LR will file at its expense a composite state tax return for its Partners.

# EXHIBIT 14

To: Josh Rosenfeld[josh.rosenfeld@ULXpartners.com]
From: Frank Butler[fbutler@proxios.com]
Sent: Mon 2/18/2019 10:57:03 AM (UTC-05:00)
Subject: RE: LeClairRyan & UnitedLex

Case 20-03142-KRH   Doc 2-2   Filed 10/27/20   Entered 10/27/20 16:32:24   Desc Ex.
A (Part 2 of 2)   Page 33 of 104

Josh:

We are happy to discuss this with you when we meet.  Is there anything else you would like on the agenda, or would you like to concentrate on this issue alone?  If you have other items, let me know, and I'll prepare an agenda with the additional items as I previously promised.

Thanks so much, and looking forward to meeting soon.

**Frank**

## Frank Butler | CEO

**fbutler@proxios.com**
**Phone | 804-342-1202**
**Mobile | 804-677-3344**
**LinkedIn | https://www.linkedin.com/in/frank-butler-0683851**

**OFFICE   | 701 East Byrd Street | Richmond, VA 23219**
**MAILING   | P.O. Box 85055 | Richmond, VA 23285**
**SHIPPING | Federal Reserve Bank of Richmond | 2050 Magnolia Street | Richmond, VA 23223**

## PROXIOS

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

**From:** Josh Rosenfeld <josh.rosenfeld@ULXpartners.com>
**Sent:** Wednesday, February 13, 2019 6:16 PM
**To:** Frank Butler <fbutler@proxios.com>
**Cc:** Peter Krakaur <peter.krakaur@unitedlex.com>; Susan Lenox <susan.lenox@ULXpartners.com>
**Subject:** RE: LeClairRyan & UnitedLex

Frank,

We are all looking forward to our meeting.

With regard to the invoice-related issues, while Patrick and Susan did speak as you suggested below, I want to make sure you understand that we continue to dispute the February invoice with regard to the "Over/Under Usage Adjustment" charge of $22,628.03, the "Amount Exceeding 4% Monthly Reduction Threshold" penalty of $8,416.09, the 683 "Authorized User" count on which the February invoice is based, among other charges.

We hope to resolve these with you when we meet in person on the 27th.

Best regards,

Josh
**Josh Rosenfeld**
**Chief Operating Officer**

LeCLAIR**RYAN**
(415) 861-9367 Direct
Josh.Rosenfeld@leclairryan.com
https://www.leclairryan.com
LeClairRyan, LLP is a Delaware Limited Liability Partnership

Please consider the environment before printing this email.

**From:** Frank Butler [mailto:fbutler@proxios.com]
**Sent:** Monday, February 11, 2019 4:31 PM
**To:** Josh Rosenfeld
**Subject:** RE: LeClairRyan & UnitedLex

Josh:

Now that we have the meeting scheduled for the 27th, I'll prepare an agenda using your letter as a guide.  I'll send it over as soon as I have a draft ready for your review.  Once I receive your comments and/or edits, I'll prepare a finalized version for your approval.   Using the approved version, I'll line up the staff on our end best able to address the agenda topics and schedule them for the meeting on the 27th.  More to come on this.

In the meantime, I have asked Patrick Butler to work with Susan Lenox on the invoice-related question which you mentioned in your letter.  My hope is that Susan and Patrick can resolve this before we meet.

Lastly, I thought I would ask if you like to join me for lunch, dinner or breakfast, if that works best for you, either before or after our meeting on the 27th.  I would be happy to learn more about UnitedLex, ULX Partners, your relationship with LeClairRyan and the mutual goals and objectives you share.  Similarly, I'd like to share a bit about Proxios, etc., and answer any questions you might have about us and our relationship with the firm.  Let me know if you'd be open to this.

Look forward to meeting soon.

Frank

**Frank Butler** | **CEO**
fbutler@proxios.com
**Phone | 804-342-1202**
**Mobile | 804-677-3344**
**701 EAST BYRD STREET | 17TH FLOOR | RICHMOND, VA | 23219**

   

This email may contain confidential and privileged material for the sole use of the intended recipient. Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

**From:** Josh Rosenfeld [mailto:josh.rosenfeld@ULXpartners.com]
**Sent:** Thursday, February 07, 2019 6:39 PM
**To:** Frank Butler <fbutler@proxios.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>
**Subject:** LeClairRyan & UnitedLex

Mimecast Attachment Protection has deemed this file to be safe, but always exercise caution when opening files.

Dear Frank,

Attached is a copy of a letter that I mailed to you earlier today.

As explained in the letter, I look forward to meeting with you soon to discuss the relationship between Proxios, LeClairRyan, UnitedLex and ULX Partners as well as making appropriate adjustments to the February invoice and future invoices.

Best regards,

Josh

Josh Rosenfeld

Chief Operating Officer

ULX Partners

415.861.9367

# EXHIBIT 15

To: Nicholas Hinton[nicholas.hinton@unitedlex.com]
Cc: Rosenfeld, Josh[Josh.Rosenfeld@leclairryan.com]; Daniel Reed[Daniel.Reed@unitedlex.com]; Mistal, Jennifer[Jennifer.Mistal@leclairryan.com]

Case 20-03142-KRH   Doc 232   Filed 10/27/20   Entered 10/27/20 16:32:24   Desc  Ex.
A (Part 2 of 2)   Page 37 of 104

**From:** Peter Krakaur[peter.krakaur@unitedlex.com]
**Sent:** Wed 8/8/2018 1:09:55 PM (UTC-04:00)
**Subject:** FW: LeClairRyan weekly Financial Report
LR Financial Briefing weekly 8-3-2017.pptx
MSA Addendum 1--April 6.pdf
2018Aug08_ULXP_NickH.pptx

Nick,

Thank you for your time today. I'm excited to have you on board.

I do not want to inundate you with content. For now, I provide:

    a.  the slides that contain the org chart you requested. I also include some high level slides that we did not have time to review today that suggest how we might think about shifting ULXP service delivery.  (2018Aug08_ULXP_Nick)
    b.  MSA Addendum 1, outlining the obligations of ULXP and LR. Section III(L) covers the "Finance" obligations. Other sections cover pricing, FP&A and additional financial-related elements that Josh is coordinating under the "Client & Practice Services" area of ULXP.
    c.  The 8/3/17 LR Financial briefing. We created a basic LR financial overview that is shared weekly with the ULXP advisory board. We have a more detailed set of KPIs we intend to share regularly internally. As we discussed, we need greater internal collaboration to get Brian Haynes and others access to the data so they can help us track and report regularly our KPIs.

I look forward to working with you.

Let us know when you want to schedule time with me, Josh, Jen (and likely Brian) to drill into the specific near- and long-term action items.

Peter

**Peter Krakaur**

Vice President, Legal Business Solutions
M: 1-415-710-7325
E:  peter.krakaur@unitedlex.com
www.unitedlex.com

---

**From:** Haynes, Brian A. [mailto:Brian.Haynes@leclairryan.com]
**Sent:** Wednesday, August 8, 2018 8:47 AM
**To:** Jones, Dwight <Dwight.Jones@leclairryan.com>; Daniel Reed <Daniel.Reed@unitedlex.com>; Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Mistal, Jennifer <Jennifer.Mistal@leclairryan.com>; Peter Krakaur <peter.krakaur@unitedlex.com>; Rosenfeld, Josh <Josh.Rosenfeld@leclairryan.com>; Zappia, Andrew P. <Andrew.Zappia@leclairryan.com>; Doug Benson (dbenson@sb2consultants.com) (dbenson@sb2consultants.com) <dbenson@sb2consultants.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>
**Subject:** RE: LeClairRyan weekly Financial Report

All,

I had June's invoice incorrectly listed on the report, the attached has the corrected amounts.

Thanks,

Brian

**Brian A. Haynes**
**Director, Financial Planning & Analysis**
LeCLAIR**RYAN**
4405 Cox Road, Suite 200
Glen Allen, Virginia 23060
(804) 783-7542 Direct
(804) 783-7552 Fax
(804) 658-9298 Mobile
Brian.Haynes@leclairryan.com
https://www.leclairryan.com
*** *Please note our new address listed above. Our telephone and fax numbers remain the same.* ***

Please consider the environment before printing this email.

---

**From:** Jones, Dwight
**Sent:** Wednesday, August 08, 2018 11:16 AM
**To:** Haynes, Brian A.; Daniel Reed (Daniel.Reed@unitedlex.com); Gustafson, C. Erik; Mistal, Jennifer; Peter Krakaur (peter.krakaur@unitedlex.com); Rosenfeld, Josh; Zappia, Andrew P.; Doug Benson (dbenson@sb2consultants.com) (dbenson@sb2consultants.com); Lange, Christopher J.
**Subject:** RE: LeClairRyan weekly Financial Report

Brian,

Check what you have listed for the ULXP invoices.  I have different amounts…particularly the June Invoice.

**Dwight Jones**
**Chief Financial Officer**
LeCLAIR**RYAN**
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

---

**From:** Haynes, Brian A.
**Sent:** Monday, August 06, 2018 6:17 PM
**To:** Daniel Reed (Daniel.Reed@unitedlex.com); Gustafson, C. Erik; Mistal, Jennifer; Peter Krakaur (peter.krakaur@unitedlex.com); Rosenfeld, Josh; Zappia, Andrew P.; Doug Benson (dbenson@sb2consultants.com) (dbenson@sb2consultants.com); Lange, Christopher J.; Jones, Dwight
**Subject:** LeClairRyan weekly Financial Report

All,

Please see attached.

The attached is intended to be distributed weekly to report on a month to date basis LeClairRyan's collection performance, attorney headcount, ageing AP balances and operating cash. Also listed is the past and future operational invoice amounts with a forecasted ULXP cash balance. The budgeted amounts for collections and headcount are based on the 133m baseline budget.

For this weeks report, I listed July's month end performance for collections and attorney headcount.

Please let me know if you have any questions.

Thanks,

Brian

**Brian A. Haynes**
**Director, Financial Planning & Analysis**

LECLAIRRYAN
4405 Cox Road, Suite 200
Glen Allen, Virginia 23060
(804) 783-7542 Direct
(804) 783-7552 Fax
(804) 658-9298 Mobile
Brian.Haynes@leclairryan.com
https://www.leclairryan.com

**** Please note our new address listed above. Our telephone and fax numbers remain the same. ****

Please consider the environment before printing this email.

* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

# EXHIBIT 16

# joint venture
## structure



**LeClairRyan**

| Board of Directors | CEO | Dept. Leaders |
| Legal Dept.:GC & AGCs | JV Liaison/ Vendor Mgmt. | Tax, Trust Accts, Controller |

Shareholders

Officers

**Partnership Track**

Senior Counsel

Counsel

**Oversight Board**

**Members**

| Dan Reed | Doug Benson | Erik Gustafson |
| Peter Krakaur | | Chris Lange |

**ULX Partners Leadership**

Jennifer Mistal        Josh Rosenfeld

**UnitedLex**

| LBS | Digital Contracting |
| Litigation Services | Intellectual Property |
| Cyber Risk | Financial Advisory |

Operations        HR

Finance        IT

Marketing

**ULX Partners**

**Business & Operations Services**

| Human Resources | Talent Development |
| Support Operations | Risk Management |
| Finance | Marketing & Comms |
| Technology, Data & Security | Procurement & PMO |

**Client & Practice Services**

| Client Relations & Business Development | Value Pricing & Legal Project Management |
| Knowledge Mgmt & Process Innovation | Conflict & Engagement Mgmt. |
| | Paralegals |
| | Counsel & Other Timekeepers |

**Firm 2**        **Firm 3**

**Page 1**

Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of LR. We are slowly and necessarily integrating UXP operations (including finance) with ULX. That said, we still need to service LR as a law firm. Over time, we will shift ULXP (and LR) towards ULX systems and processes. The art is doing it in a way that pulls LR partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.





# EXHIBIT 17

| | |
|---|---|
| **Organizer:** | Peter Krakaur[peter.krakaur@unitedlex.com] |
| **From:** | Peter Krakaur[peter.krakaur@unitedlex.com] |
| **Attendees:** | Nicholas Hinton; Daniel Reed; Mistal, Jennifer; Rosenfeld, Josh; Doug Benson (dbenson@sb2consultants.com) |
| **Location:** | 1-415-697-1276 |
| **Importance:** | High |
| **Subject:** | Monday's Liquidity Discussion |
| **Start Time:** | Fri 8/10/2018 5:30:00 PM (UTC-04:00) |
| **End Time:** | Fri 8/10/2018 6:00:00 PM (UTC-04:00) |
| **Required Attendees:** | Nicholas Hinton; Daniel Reed; Mistal, Jennifer; Rosenfeld, Josh; Doug Benson (dbenson@sb2consultants.com) |

[if this time does not work due to Nick's travel, we should regroup over the weekend.]

Nick,

I agree wholeheartedly with the focus on liquidity and the issues we need to tackle. I propose this time to regroup to consider how we frame the message.

In many respects the action items you describe are fully on ULXP, not LR to drive. The framework you suggest is a very good one for us to propose a plan on what we will do, agree on collective responsibilities, and lay out how we will drive LR to follow the plan.

I suggest this from the perspective of what we architected (ULXP is now the owner of the business of law) combined with our partnership with the people who practice law. We all know law firms do not operate as a business. ULXP is designed to change that. Given the nature of the relationship, the agreements, and the practical aspects of us running the law firm, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan. Pushing areas in ways that are not aligned directly with the partnership model we architected and the current firm makeup could lead to further instability in partnership ranks.

All that said, the Monday meeting is critical to change dramatically LR behavior (Erik, Dwight, Board and members) in very specific areas to make it clear to Erik what THEY need to change and do:

- Realistic and honest budgets
- Realistic and honest discussions of liquidity
- Full ULXP ownership of collections
- Greater ULXP ownership of cash and LR finances (removed from Dwight)

There may be other specific asks we should include in our forceful message. Regardless, I think it needs to be frame in terms of what we own and will drive.

Peter

# EXHIBIT 18

**To:** Peter Krakaur[peter.krakaur@unitedlex.com]; Doug Benson (dbenson@sb2consultants.com)[dbenson@sb2consultants.com]
**Cc:** Aamir Zeb[azeb@cvc.com]
**From:** Mohit Goyal[mgoyal@cvc.com]
**Sent:** Mon 7/2/2018 9:13:02 AM (UTC-04:00)
**Subject:** LCR Follow-on Queries

Hi Peter, Doug,

Thanks for your time last week – we found the discussion to be quite helpful. We have some broader queries (listed below) that we thought could be handled separately as these are more of clarification in nature. Can we do the call between the four of us tomorrow at 9pm IST?

1. **Worst case scenario:** As discussed over the call, could you please share a worst case scenario for FY19 (in the monthly P&L format that you had shared earlier) so that we can work on the covenants for overall financing that we need to raise for new project execution
2. **Interest cost:** From notes you shared, there was a line saying "The latter covers at least our interest payments relating to the float of operations costs". Could you clarify whether the interest cost relating to float ($8.5m @ 8 p.a. = $0.68m) would be charged back to LCR?  We will be drawing our funding lines to extend this credit to LCR
3. **Provider Operational Expense:** We need to understand the context in which this has been included (does this only cover the interest cost on the float?)
4. **Operational Services EBITDA:** Our understanding was that Operational Services would be a pass-through cost and EBITDA would be generated in the business through Production services revenue. However, there seems to be an Operational Services EBITDA budgeted for FY19. Could  you help us understand the concept better?
5. **Invoicing mechanism**: We think it maybe helpful to keep the 'Production Services' and 'Operational Services' as two separate invoices from process standpoint e.g. in the current process, if there is a dispute on the Production Services invoice then the entire invoice may remain outstanding.  Also, cash flow availability can be a potential reason for "Production Invoice" payout but not for "Operational Services" component
6. **$8.5m float cap:** We think its important that we make this commitment (verbally or in writing) that any incremental cost won't enjoy the same payment terms.  While it is handled through exception, those items are always hard to execute.  We don't have any budget or cash flow availability to extend more receivable financing to LCR
7. **Contingency**: There is a reference to exclude 'contingency' cases in the MSA. Can you clarify whether only the existing contingency cases or all cases (including new contingency cases) have been excluded

Apart from these, we wanted some clarification inputs on the items below:

1. **Contract status**: We want to spend 5-10 mins with you to understand the current status of contract(# of employees on-boarded? Capex done so far? Invoice raised for May/Jun? Actual Operational Services cost vs. budgeted costs? Cost savings/revenue maximization opportunity identified thus far?)
2. **Expenses build up**: Could we go through the expense line items to better understand what costs are being captured within the JV and if there are any costs that is outside of it for Ulex.
3. **Business Trajectory**: Could you share the estimates for May and June P&L (in the monthly P&L format in which the budget was prepared – we can simplify the format over call)

Best,
Mohit

---

This message and any attachment(s) are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system and do not disclose its contents to any third parties.

Any views or opinions expressed by an individual within this email are the views and opinions of that individual unless expressed to be otherwise and do not necessarily reflect the views or opinions of any member of the CVC network. No member of the CVC network accepts liability arising in any way from relying upon such views or opinions.

CVC Advisers Limited is a limited company registered at Companies House in England and Wales (registered number 04726084) having its registered office at 111 Strand, London WC2R 0AG.

CVC Advisers Limited is authorised and regulated by the Financial Conduct Authority (FCA firm reference number 229350).

For further information about the CVC network please visit www.cvc.com.

# EXHIBIT 19

EXECUTION COPY

## OUTSTANDING DEFERRED LOAN PROMISSORY NOTE

**$8,000,000.00**                                                                    **December 20, 2018**

LeClairRyan PLLC, a Virginia professional limited liability company ("**Borrower**"), is party to a Master Services Agreement dated as of April 4, 2018 ("**MSA**") with ULX Partners, LLC, a Delaware limited liability company ("**Lender**") pursuant to which Lender provides business support services to Borrower and Borrower is obligated to pay Invoiced Fees (as defined in the MSA. Although Borrower has not paid all Invoiced Fees when due, Lender has continued to provide services and is willing to accept this secured note (the "**Note**") in respect of $8,000,000 of such deferred Invoiced Fees. Accordingly, the undersigned Borrower hereby promises to pay to the order of Lender the principal sum of **EIGHT MILLION DOLLARS ($8,000,000.00)** plus interest thereon as set forth below on the Maturity Date, as defined below, payable in accordance with the terms set forth below at 100 Broadway, New York, New York 10005 or at such other place as the Lender by written notice may specify. The Borrower's obligations hereunder shall be secured pursuant to the Security Agreement (defined below and attached hereto as Exhibit A) by a second priority lien on the collateral described in the Security Agreement. Lender's rights under the Security Agreement shall be subordinate to the rights of ABL Alliance, LLLP, a Virginia limited liability limited partnership ("**ABLA**"), as set forth in the Intercreditor Agreement (defined below and attached hereto as Exhibit B).

1.    **Definitions.** As used in this Note, the following terms shall have the following meanings:

**Bankruptcy Default**: any Event of Default described in clauses (i), (ii), (iii) or (iv) of Section 5.1(b) or in Section 5.1(c).

**Default Rate**: the Interest Rate in effect plus ten percent (10%) per annum.

**Dollars**: lawful currency of the United States.

**Governmental Body**: any foreign, federal, state, municipal or other government, or any department, commission, board, bureau, agency, public authority or instrumentality thereof or any court or arbitrator.

**Intercreditor Agreement**: the Intercreditor Agreement among the Borrower, Lender and ABLA, the Borrower's primary lender that has a first lien on the Collateral as defined in the Loan and Security Agreement between the Borrower and ABLA dated as of December 29, 2017, as the same may be amended from time to time (the "**First Lien Credit Agreement**").

**Interest Rate**: simple interest (non-compounding) at a rate of ten percent (10%) per annum.

**Loan Documents**: this Note, the Security Agreement, the Intercreditor Agreement, Uniform Commercial Code financing statements made by Borrower in favor of Lender, and all other documents and instruments now or hereafter executed and

delivered by Borrower to Lender relating specifically to this Note, all as may be amended, modified, supplemented or restated from time to time.

**Maturity Date**:  the Maturity Date shall be June 30, 2023, provided, however, that if on or before ten days prior to the Maturity Date Borrower in its capacity as a Class B Member of Lender shall not have received aggregate distribution and redemption payments pursuant to Lender's Amended and Restated Limited Liability Company Agreement equal to or exceeding the amounts due under this Note, then Borrower by written notice to Lender may extend the Maturity Date to June 30, 2028, which date as so extended shall be the Maturity Date.

**Maximum Rate**: the highest rate of interest and other charges which may be charged by Lender or which Borrower legally may contract to pay under applicable law.

**Obligations**:  the Principal Balance and any accrued and unpaid interest thereon as well as any fees or other costs or expenses due or to become due under this Note.

**Principal Balance**:  the unpaid principal balance of this Note outstanding from time to time.

**Security Agreement**: the Security Agreement entered into between Borrower and Lender whereby Borrower grants Lender a second priority lien and security interest in the collateral described therein, as the same may be amended, modified, supplemented or restated from time to time.

2.      **Interest Rate; Maximum Rate.**

2.1     **Interest Rate.**  The Principal Balance shall bear interest at a rate per annum equal to the Interest Rate so long as no Event of Default exists and is continuing and the Principal Balance together with the aggregate amount of accrued and unpaid interest thereon shall bear interest at a rate per annum equal to the Default Rate so long as any Event of Default exists and is continuing.  Interest shall be computed on the basis of a year consisting of 360 days and charged for the actual number of days during the period for which interest is being charged.

2.2     **Maximum Rate.**  Lender and Borrower intend this Note to comply in all respects with all provisions of law and not to violate, in any way, any legal limitations on interest and other charges.  Accordingly, if, for any reason, Borrower is required to pay, or has paid, interest on the Principal Balance or other charges at a rate in excess of the Maximum Rate, then the interest and other charges payable hereunder shall be deemed to be reduced, automatically and immediately, to the Maximum Rate, the interest and other charges payable hereunder shall be computed and paid at the Maximum Rate and the portion of all prior payments of interest or other charges in excess of the Maximum Rate shall be deemed to have been payments in reduction of the Principal Balance.

3.    **Payments.**

3.1    **Interest.** Interest shall accrue and be payable on the Maturity Date.

3.2    **Principal.** The Principal Balance together with all accrued and unpaid interest thereon, shall be payable in full on the Maturity Date.

3.3    **Application of Payments.** All payments shall be applied first, to the accrued and unpaid interest on the Principal Balance and then to the Principal Balance, except that if any Event of Default exists and is continuing payments may be applied in such manner as Lender determines.

3.4    **Expenses.** Borrower promises to pay to Lender all of Lender's out-of-pocket costs and expenses in connection with the loan evidenced by this Note, including Lender's reasonable attorneys' fees and expenses incurred in connection with collection.

4.    **Prepayments.** Borrower may prepay the Principal Balance of this Note in whole or in part at any time without premium or penalty.

5.    **Default Acceleration and Remedies.**

5.1    **Events of Default.** The occurrence of any of the following shall constitute an Event of Default hereunder:

(a)    if Borrower shall fail to pay all or any portion of the amount due on the Maturity Date;

(b)    if Borrower shall (i) file, or consent, by answer or otherwise, to the filing against it or him of a petition for relief or reorganization or arrangement or any other petition in bankruptcy or insolvency under the laws of any jurisdiction, (ii) make an assignment for the benefit of creditors, (iii) consent to the appointment of a custodian, receiver, trustee or other officer with similar powers for it or him, or for any substantial part of its or his property or (iv) be adjudicated insolvent;

(c)    if any Governmental Body of competent jurisdiction shall enter an order appointing, without consent of Borrower, a custodian, receiver, trustee or other officer with similar powers with respect to Borrower, or with respect to any substantial part of its property, or if an order for relief relating to Borrower shall be entered in any case or proceeding for liquidation or reorganization or otherwise to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of Borrower, or if any petition for any such relief shall be filed against Borrower and such order or petition shall not be dismissed or stayed within 60 days;

(d)    If Borrower shall violate any covenant set forth in the Loan Documents or, without Lender's express written consent, incur secured

indebtedness in excess of the amounts permitted as of the date hereof under the First Lien Credit Agreement; or

(e)     if the MSA shall have been terminated by the Borrower with or without Cause.

5.2     **Acceleration.** Upon the occurrence of:

(a)     any Bankruptcy Default, all of the Obligations at that time outstanding automatically shall mature and become due, and

(b)     any other Event of Default, Lender, at any time, at its option, upon written notice to Borrower and without further notice or demand, may declare all of the Obligations, including, without limitation, the Principal Balance and all accrued and unpaid interest thereon, due and payable, whereupon such Obligations immediately shall mature and become due and payable,

all without presentment, protest or notice (other than the declaration referred to in clause (b) above), all of which hereby are waived.

5.3     **Remedies.** Upon the occurrence of any Event of Default, Lender, at its option, may enforce or cause to be enforced any of the rights or remedies accorded to Lender (i) under this Note, the Security Agreement and any of the other Loan Documents and (ii) at equity or law, by virtue of statute or otherwise. The acceptance by Lender of any payment(s) after any default hereunder shall not operate to extend the time of payment of any amount(s) then remaining unpaid hereunder or constitute a waiver of any of the rights of Lender hereunder.

6.     **Miscellaneous.**

6.1     **Waivers.** Borrower hereby waives presentment for payment, protest and demand and notice of protest, demand, dishonor, nonpayment, intent to accelerate and acceleration of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time before, at or after maturity, without in any way affecting the liability of Borrower hereunder or any guarantor hereof.

6.2     **Modifications.** This Note may only be amended by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

6.3     **Successors and Assigns.** This Note shall be binding upon Borrower and upon Borrower's successors and assigns, and shall inure to the benefit Lender and its successors and assigns.

6.4     **Severability.** In the event that any provision hereof shall be deemed to be invalid by reason of the operation of any law, or by reason of the interpretation placed thereon by any court or any governmental body, this Note shall be construed as not containing such provision and the invalidity of such provision shall not affect the validity

- 4 -

of any other provisions hereof, and any and all other provisions hereof which otherwise are lawful and valid shall remain in full force and effect.

     **6.5**    **Time of the Essence.**  Time for the performance of the Obligations under this Note, the Security Agreement and the other Loan Documents is of the essence.

     **6.6**    **Security.**  This Note is entitled to the benefit of certain collateral security, all as more fully set forth in the Security Agreement.  The rights and remedies of Lender are set forth herein and in the other Loan Documents, which are incorporated herein by this reference.  Pursuant to the Security Agreement and Intercreditor Agreement, the second priority lien granted under the Security Agreement shall be subordinated to all of the Borrower's obligations to ABLA and subject to the terms of the Intercreditor Agreement.

     **6.7**    **Costs of Collection.**  If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, Borrower promises and agrees to pay all costs of collection, including all court costs and reasonable attorneys' fees based upon customary hourly rates and not a percentage of the indebtedness outstanding.

    **7.**    **GOVERNING LAW.  This Note shall be construed in accordance with and governed by the laws and decisions of the Commonwealth of Virginia, without giving effect to any conflict of law provisions thereof.**

**[Signature Page Follows]**

IN WITNESS WHEREOF, this Note has been executed and delivered by Borrower by
its duly authorized officer on the date first set forth above.

LECLAIRRYAN PLLC,
a Virginia professional limited liability company

By: _C E L_

Name:  C. Erik Gustafson
Title:  Chief Executive Officer

- 6 -

Exhibit A

Security Agreement

(See Attached)

Exhibit B

**Intercreditor Agreement**

(See Attached)

# EXHIBIT 20

## SECURITY AGREEMENT

This Security Agreement ("Security Agreement") is made effective this 2nd day of April, 2019 among LECLAIRRYAN PLLC, a Virginia professional limited liability company (the "Company") in favor of ULX PARTNERS, LLC, a Delaware limited liability company (the "Secured Party").

## RECITALS

A.    The Company has issued an Outstanding Deferred Loan Promissory Note dated December 20, 2018 in favor of Secured Party in the original principal amount of $8,000,000.00 (the "ULXP Note").

B.    The Company has agreed to grant Secured Party a second priority lien on certain of its assets as security for the amounts owed under the ULXP Note.

## COVENANTS

NOW THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged the Secured Party and the Companies hereby agree as follows:

**I.    DEFINITIONS.**

**1.1 Collateral.**

(i)    All personal property and assets of the Company, wherever located and whether now owned by the Company or hereafter acquired, including: (a) all Goods, Equipment, Fixtures and Inventory; (b) all General Intangibles; (c) all Accounts; (d) all Chattel Paper; (e) all Instruments and Documents and any other instrument or intangible representing payment for goods or services; (f) all Investment Property; (g) all Commercial Tort Claims; (h) all Letter-of-Credit Rights; (i) all Deposit Accounts and funds on deposit therein, including but not limited to any funds otherwise on deposit with or under the control of Secured Party or its agents or correspondents; and (j) all post office boxes; and (k) all parts, replacements, substitutions, profits, products, Accessions and cash and non-cash Proceeds and Supporting Obligations of any of the foregoing (including, but not limited to, insurance proceeds) in any form and wherever located.  Collateral shall include all written or electronically recorded books and records relating to any such Collateral and other rights relating thereto.

(ii)    Any replacements or additions to the items described in (i), from the proceeds of any sale described in Section 2.2 below or any other source.

(iii)    All proceeds (cash and non-cash) and products of the foregoing.

1.2 **Obligations.** This Security Agreement secures the following (collectively, the "Obligations");

(i) all of the Company's obligations under the ULXP Note;

(ii) all amounts owed under any modifications, renewals, extensions or substitutions of any of the foregoing obligations; and

(iii) all Default Costs, as defined in Paragraph VIII of this Security Agreement.

1.3 **UCC Definitions.** Any term used in Virginia's Uniform Commercial Code (the "UCC") and not otherwise defined in this Security Agreement has the meaning given to the term in the UCC.

## II. GRANT AND RELEASE OF SECURITY INTEREST

2.1 **Grant.** The Company hereby grants a security interest in the Collateral to Secured Party to secure the payment and performance of the Obligations. The security interest created hereby shall be a second priority security interest and Secured Party hereby subordinates such security interest to any liens in favor of ABL Alliance, LLLP, a Virginia limited liability limited partnership (referred to herein as "ABLA") the Company's current secured lender. In connection with the foregoing, Secured Party, the Company and ABLA have entered into that certain Intercreditor Agreement of even date herewith (the "Intercreditor Agreement"). In addition, Secured Party hereby agrees that the security interest created hereby shall be subordinate to any liens in favor of any lender that succeeds ABLA as the Company's senior, secured lender on the same terms and conditions as set forth in the Intercreditor Agreement. Secured Party further agrees to execute a new intercreditor agreement with the Company and any such successor secured lender to confirm such subordination.

2.2 **Release.** Secured Party hereby agrees that upon payment of the Obligations in full, the Company is hereby authorized and directed to file such termination statements and any other documents reasonably required to evidence and confirm the release of the security interest created by this Security Agreement. In addition, in the event of the sale of any of the Collateral by the Company in the ordinary course of business, Secured Party hereby agrees that (i) Secured Party in its capacity as Secured Party in payment of Obligations shall not be entitled to receive any of the proceeds from such sale, and (ii) the Company is hereby authorized and directed to file such releases and partial terminations as reasonably required to evidence and confirm the release of the security interest created by this Security Agreement with respect to the Collateral being sold. In furtherance of the foregoing, Secured Party hereby (x) agrees to take any and all actions as may be reasonably requested by the Company to effectuate the agreements of Secured Party under this Section 2.2, and (y) appoints the Company as Secured Party's attorney-in-fact with full authority in the place and stead of Secured Party, and in the name of Secured Party, to take any action or to execute any instrument reasonably required to accomplish the purpose of this Section 2.2, such appointment constituting a power coupled with an interest and being irrevocable so long as any of the obligations remain outstanding.

2

### III.  PERFECTION OF SECURITY INTERESTS.

The Company authorizes Secured Party to file any financing statement (a "Financing Statement") describing the Collateral in any location deemed necessary and appropriate by Secured Party.

### IV.  COVENANTS AND RIGHTS CONCERNING THE COLLATERAL.

**4.1    Inspection.**  Secured Party may inspect any Collateral at any time upon reasonable notice, as long as such inspection does not unreasonably interfere with the operations of the Company's business.

**4.2    Limitations on Obligations Concerning Maintenance of Collateral.**

(i)    **Risk of Loss**.  The Company has the risk of loss of the Collateral.

(ii)    **No Collection Obligation**.  Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

**4.3    Conduct of Business.**  The Company shall (i) comply with all laws, statutes and regulations pertaining to its use and ownership of its personal and real property (the "Property") and the conduct of its business; (ii) care for and maintain all of its property in good condition, free of misuse, abuse, waste and deterioration, reasonable wear and tear excepted; (iii) observe and perform promptly all contracts or agreements to which it is a party or by which any of its Property is bound; (iv) carry on its business in the ordinary course, and (v) continue to conduct its business at its current locations.

**4.4    Additional Liens.**  The Company shall not grant any additional liens on the Collateral without Secured Party's prior written consent, except for any liens in favor of any successor, senior lender to ABLA.

### V.  THE COMPANY'S REPRESENTATIONS AND WARRANTIES.

The Company represents and warrants to Secured Party:

**5.1    Title to and transfer of Collateral.**  It has rights in or the power to transfer the Collateral and its title to the Collateral is free of all adverse claims, liens, security interests and restrictions on transfer or pledge except (i) for any liens in favor of ABLA, and (ii) as created by this Security Agreement.

**5.2    Location of Collateral.**  All Collateral shall be located at a place of business where the Borrower is currently conducting business.

3

**5.3**     **Location and Name.**  The Company's:

    (i)     chief executive office and place of business is located at 919 East Main Street, 24th Floor, Richmond, VA 23219; and

    (ii)     its exact legal name is as set forth in the first paragraph of this Security Agreement.

**5.4**     **Company's Status.**  The Company is a professional limited liability company duly organized and in good standing in the Commonwealth of Virginia and has all requisite power to own, lease and operate its Property and business and to carry on its business as now conducted and as proposed to be conducted.

**5.5**     **Enforceability of Rights in Collateral.**  The Company's rights to the Collateral are genuine and enforceable under law and are not subject to any defense, offset, counterclaim or contingency whatsoever.

## VI.    COMPANY COVENANTS.

**6.1**     **Location Change.**  Until the Obligations are paid in full, the Company agrees that it will not change the location of any of its places of business without providing Secured Party with 30 days' prior written notice.

**6.2**     **Financial Statements.**  The Company shall provide Secured Party with copies of its consolidated and audited annual financial statements so long as any of the Obligations remain outstanding.

## VII.    EVENTS OF DEFAULT.

The occurrence of any of the following shall, at the option of Secured Party, be an "Event of Default:"

**7.1**     Any default, or event of default, or breach of representations warranties or covenants by the Company under this Agreement or the Obligations;

**7.2**     Attachment, execution, levy or the issuance of a charging order on any of the Collateral; and

**7.3**     The Company voluntarily or involuntarily becoming subject to any proceeding under (a) the U.S. Bankruptcy Code or (b) any similar remedy under state statutory or common law.

**7.4**     Any default by the Company under its agreements with ABLA or any successor secured lender.

## VIII.  DEFAULT COSTS.

8.1     Should an Event of Default occur, the Company will pay to Secured Party all costs incurred by the Secured Party for the purpose of enforcing its rights hereunder, including:

(i)     costs of foreclosure;

(ii)    costs of obtaining money damages; and

(iii)   a reasonable fee for the service of attorneys employed by Secured Party for any purpose related to this Security Agreement or the Obligations, including without limitation consultation, negotiation, drafting documents, sending notices or instituting, prosecuting or defending litigation or arbitration.

## IX.   REMEDIES UPON DEFAULT.

9.1     **General.**  Upon any Event of Default and subject to the Intercreditor Agreement, Secured Party may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce or satisfy any of Obligations then owing, whether by acceleration or otherwise.

9.2.    **Concurrent Remedies.**   Upon any Event of Default and subject to the Intercreditor Agreement, Secured Party shall have the right to pursue any of the following remedies separately, successively or concurrently:

(i)     File suit and obtain judgment and, in conjunction with any action, Secured Party may seek any ancillary remedies provided by law or at equity, including levy of attachment and garnishment.

(ii)    Take possession of any Collateral if not already in its possession without demand and without legal process.  Upon Secured Party's demand, the Companies will assemble and make the Collateral available to Secured Party as it directs.  Each Company grants to Secured Party the right, for this purpose, to enter into or on any premises where Collateral may be located.

(iii)   Without taking possession, sell, lease or otherwise dispose of the Collateral at public or private sale in accordance with the UCC.

9.3     **Subordination Agreement.**  Notwithstanding anything set forth in this Security Agreement to the contrary, Secured Party's rights and remedies upon an Event of Default shall in all cases to subject to the terms and conditions of the Intercreditor Agreement, or any replacement inter-creditor agreement.

## X.   FORECLOSURE PROCEDURES.

10.1   **No Waiver**.  No delay or omission by Secured Party to exercise any right or remedy accruing upon any Event of Default shall (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature.

10.2   **Notices**.  Secured Party shall give the Company such notice of any private or public sale as may be required by the UCC.

10.3   **Condition of Collateral**.  Secured Party has no obligation to repair, clean-up or otherwise prepare the Collateral for sale.

10.4   **No Obligation to Pursue Others.**  Secured Party has no obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and Secured Party may release, modify or waive any collateral provided by any other person to secure any of the Obligations, all without affecting Secured Party's rights against the Company.

10.5   **Compliance With Other Laws**.  Secured Party may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.6   **Warranties**.  Secured Party may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like.  This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

10.7   **Sales on Credit**.  If Secured Party sells any of the Collateral upon credit, the Company will be credited only with payments actually made by the purchaser, received by Secured Party and applied to the indebtedness of the purchaser.  In the event the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and the Company shall be credited with the proceeds of the sale as and when received, less expenses.

10.8   **Purchases by Secured Party**.  In the event Secured Party purchases any of the Collateral being sold, Secured Party may pay for the Collateral by crediting the payment against the Obligations.

10.9   **Intercreditor Agreement**.  Secured Party's rights under this Article X are subject to the terms and conditions of the Intercreditor Agreement, and any replacement inter-creditor agreement.

## XI.   MISCELLANEOUS.

**11.1   Assignment**.

    **(i)**   **Binds Assignees**.  This Security Agreement shall bind and shall inure to the benefit of the successors and assigns of Secured Party, and shall bind all heirs, personal representatives, executors, administrators, successors and permitted assigns of the Company.

    **(ii)**   **No Assignments**.  Neither party may assign its rights and interests under this Security Agreement without the prior written consent of the other party, which may be withheld by such party in its sole discretion.

**11.2   Severability**.  Should any provision of this Security Agreement be found to be void, invalid or unenforceable by a court or panel of arbitrators of competent jurisdiction, that finding shall only affect the provisions found to be void, invalid or unenforceable and shall not affect the remaining provisions of this Security Agreement.

**11.3   Notices**.  Any notices required by this Security Agreement shall be deemed to be delivered when a record has been (a) deposited in any United States postal box if postage is prepaid, and the notice properly addressed to the intended recipient, (b) received by telecopy, (c) received through the Internet, and (d) when personally delivered. The Company's address for notice purposes shall be 919 East Main Street, 24th Floor, Richmond, Virginia 23219.  Secured Party's address for notice purposes shall be 100 Broadway, New York, NY 10005.  Any party may change its notice address by providing notice to the other party in accordance with the foregoing.

**11.4   Headings**.  Section headings used in this Security Agreement are for convenience only.  They are not a part of this Security Agreement and shall not be used in construing it.

**11.5   Governing Law**.  This Security Agreement is being executed and delivered and is intended to be performed in the Commonwealth of Virginia and shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia.

**11.6   Secured Party Appointed Attorney-In-Fact.**  The Company hereby appoints Secured Party as the Company's attorney-in-fact with full authority in the place and stead of the Company and in the name of the Company or otherwise, from time to time, after an Event of Default, in Secured Party's sole and absolute discretion, to take any action and to execute any instrument which Secured Party may deem necessary or advisable to accomplish the purposes of this Security Agreement. Such appointment constitutes a power coupled with an interest and is irrevocable as long as any of the Obligations remain outstanding.

7

**11.7    Integration and Modifications**.

    (i)    This Security Agreement is the entire agreement of the Company and Secured Party concerning its subject matter, subject to the provisions of the Subordination Agreement or any replacement subordination agreement.

    (ii)    Any modification to this Security Agreement must be made in writing and signed by the party adversely affected.

**11.8    Waiver**.  Any party to this Security Agreement may waive the enforcement of any provision to the extent the provision is for its benefit.

**11.9    Further Assurances**.  The Company agrees to execute any further documents, and to take any further actions, reasonably requested by Secured Party to evidence or perfect the security interest granted herein or to effectuate the rights granted to Secured Party herein.

**11.10  Counterparts.**  This Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together will constitute but a single instrument.

[Signature page follows]

WITNESS the following signatures:

COMPANY:

LECLAIRRYAN PLLC

By: _____

Name: _____

Title: _____


SECURED PARTY:

ULX PARTNERS, LLC

By: _____

Name:   Nicholas Hinton

Title:    Chief Financial Officer

9

# EXHIBIT 21

To:    'weissj@gtlaw.com'[weissj@gtlaw.com]; Rosenfeld, Josh[Josh.Rosenfeld@leclairryan.com]
Cc:    peter.krakaur@unitedlex.com[peter.krakaur@unitedlex.com];
       nicholas.hinton@unitedlex.com[nicholas.hinton@unitedlex.com]; eric.kelly@unitedlex.com]; Hopewell, Dwight
       F.[Dwight.Hopewell@leclairryan.com]
**From:**   Lange, Christopher J.[/O=LECLAIRRYAN/OU=LECLAIRRYANRICHMOND/CN=RECIPIENTS/CN=CLANGE]
**Sent:**   Tue 1/22/2019 9:56:04 PM (UTC-05:00)
**Subject:**   RE: ULX Partners LeClairRyan Draft Promissory Note
ULX Partners LeClairRyan Promissory Note.DOC
COMPARE ULX Partners LeClairRyan Promissory Note 3 v 1.PDF


Jennifer,

Thanks for taking the lead on drafting the note.  Enclosed please find our revised draft.  Per our conversation, I went through the note and struck the bracketed items that didn't apply and tailored it to our situation.  Clean and marked drafts attached.

In thinking through these changes, we wanted to present a note that our lender (VCF) would see as being equity like in that it is being paid from the return on our equity investment in ULX Partners as opposed to from LR operating cash.  That will help with our Leverage Ratio covenant and perhaps avoid a big mark-up with subordination provisions, etc.  Happy to discuss my drafting choices over a call.

We have an in person meeting with VCF coming up on Monday to discuss our 2019 forecast and this note and we would like to get this draft in their hands by Thursday afternoon or Friday morning if we could.   If you could take a look at the revised draft and let us know whether you have any material comments, that would help us get a draft in their hands before the weekend and lay the groundwork for Monday's meeting.  Again, happy to discuss.

PETER – Given our meeting with VCF on Monday,  can we look for alternate dates/times for our ULX Partners catch up call?  We need to use that time  to prep for  that meeting.

Many thanks, Chris


**Christopher J. Lange**
**Attorney at Law**
LeClair**Ryan**
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4094 Direct
(804) 783-7689 Fax
(804) 248-8701 Mobile
Christopher.Lange@leclairryan.com
https://www.leclairryan.com

Blog   |  LinkedIn   |  Twitter    |  BIO

Please consider the environment before printing this email.

---

**From:** weissj@gtlaw.com [mailto:weissj@gtlaw.com]
**Sent:** Friday, January 11, 2019 12:23 AM
**To:** Lange, Christopher J.; Rosenfeld, Josh
**Cc:** peter.krakaur@unitedlex.com; nicholas.hinton@unitedlex.com; eric.kelly@unitedlex.com
**Subject:** ULX Partners LeClairRyan Draft Promissory Note

All – please find a draft of a fairly simple promissory note memorializing the "Outstanding Deferred Loan", which remains subject to the review and comment of the ULX team in all respects.


Best, Jennifer

**Jennifer Weiss**
Shareholder
Greenberg Traurig, LLP | One International Place | Suite 2000 | Boston, MA 02110
Tel 617.310.6005 | Fax 617.279.8415 | Cell 617.429.4400
weissj@gtlaw.com  | www.gtlaw.com



ALBANY   ·   AMSTERDAM   ·   ATLANTA   ·   AUSTIN   ·   BOSTON   ·   BERLIN*   ·   CHICAGO   ·   DALLAS   ·   DELAWARE   ·   DENVER   ·   FORT LAUDERDALE   ·   HOUSTON   ·   LAS VEGAS   ·   LONDON*   ·   LOS ANGELES   ·   MEXICO CITY*   ·   MIAMI   ·   NEW JERSEY   ·   NEW YORK   ·   NORTHERN VIRGINIA   ·   ORANGE COUNTY   ·   ORLANDO   ·   PALM BEACH COUNTY   ·   PHILADELPHIA   ·   PHOENIX   ·   SACRAMENTO   ·   SAN FRANCISCO   ·   SEOUL*   ·   SHANGHAI   ·   SILICON VALLEY   ·   TALLAHASSEE   ·   TAMPA   ·   TEL AVIV*   ·   TOKYO*   ·   WARSAW*   ·   WASHINGTON, D.C.   ·   WESTCHESTER COUNTY

*BERLIN: GREENBERG TRAURIG'S BERLIN OFFICE IS OPERATED BY GREENBERG TRAURIG GERMANY, AN AFFILIATE OF GREENBERG TRAURIG, P.A. AND GREENBERG TRAURIG, LLP.; LONDON: OPERATES AS A SEPARATE UK REGISTERED LEGAL ENTITY; MEXICO CITY: OPERATES AS GREENBERG TRAURIG, S.C.; SEOUL: OPERATED BY GREENBERG TRAURIG LLP FOREIGN LEGAL CONSULTANT OFFICE; TEL AVIV: A BRANCH OF GREENBERG TRAURIG, P.A., FLORIDA, USA; GREENBERG TRAURIG TOKYO LAW OFFICES ARE OPERATED BY GT TOKYO HORITSU JIMUSHO, AN AFFILIATE OF GREENBERG TRAURIG, P.A. AND GREENBERG TRAURIG, LLP; WARSAW: OPERATES AS GREENBERG TRAURIG GRZESIAK SP.K.
**STRATEGIC ALLIANCE WITH AN INDEPENDENT LAW FIRM**
MILAN · ROME

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information.

# EXHIBIT 22

| To: | Jones, Dwight[Dwight.Jones@leclairryan.com] |
| Cc: | DeFazio, Brian A.[Brian.DeFazio@leclairryan.com] |
| From: | Luke Swygard[lswygard@vcfnow.com] |
| Sent: | Thur 1/31/2019 1:18:59 PM (UTC-05:00) |
| Subject: | RE: VCF December Compliance |

Case 20-01192-KRH   Doc 232   Filed 10/27/20   Entered 10/27/20 16:32:24   Desc   Ex.
A (Part 2 of 2)   Page 71 of 104

Dwight and Brian,

This email serves as communication affirming the leverage ratio calculation as you have laid it out below.  The ULX Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in.

Please let me know if you have any questions.

Please provide an executed copy of the Promissory Note once available.

Thank you,

Luke

From: Jones, Dwight <Dwight.Jones@leclairryan.com>
Sent: Friday, January 25, 2019 12:36 PM
To: Luke Swygard <lswygard@vcfnow.com>
Cc: DeFazio, Brian A. <Brian.DeFazio@leclairryan.com>
Subject: RE: VCF December Compliance

Luke,

I have to leave for some other meetings, however call my mobile to walk through this info.  I will also try to call while I'm driving.

**Dwight Jones**
**Chief Financial Officer**
LeCLAIR**RYAN**
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com
Please consider the environment before printing this email.

From: Jones, Dwight
Sent: Friday, January 25, 2019 10:01 AM
To: Luke Swygard (lswygard@vcfnow.com)
Cc: DeFazio, Brian A.
Subject: VCF December Compliance

Luke,

Wanted to provide you with some info prior to our call at 11am today.

Attached is a draft of the ULX Outstanding Deferred Loan Promissory Note and updated draft of Annex A from the Operating Agreement.  This will convert $8M of the ULXP Accounts Payable to a deferred loan/equity investment.  Note the date of execution is December 20th, which would be reflected in our December financials.  Per our discussion, based on the terms, this reflects an equity investment and given that, I would propose that we reflect it as such in the Leverage Ratio calculation.  Without the adjustment the Leverage Ratio would be 13.30, however adjusting for the ULX equity investment, by reducing Liabilities by $8M and increasing Net Equity by $8M, this would result in a Leverage Ratio of 3.96.  See below and attached.  Also, we can have further discussion regarding the $7.3M adjustment to the AR & WIP Allowance.

Talk to you at 11am.

| | | The Leverage Ratio as of: | 12/31/2018 | | is: | 13.30 | to 1 | | In Default |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Maximum | | 5.75 | to 1 | | |
| | | | | | | | | | |
| | | total equity: | $ | (4,714,172) | | | total liabilities | $ | 56,579,459 |
| | | | | | | | | | |
| | Less: | | | | | | | | |
| | | deferred assets: | $ | 249,620 | | | | | |
| | | other assets: | $ | - | | | | | |
| | | SH loans receivable: | $ | 92,374 | | | | | |
| | | intangible assets: | $ | 167,142 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | Add Back: | | | | | | | | |
| | | Stock Subscription Payable: | $ | 5,890,000 | | | | | |
| | | Preferred Stock Subscription Payable: | $ | 3,587,350 | | | | | |
| | | | | | | | | | |
| | | Net Equity | $ | 4,254,042 | | | | | |

| ADJUSTED FOR $8M ULX EQUITY INVESTMENT | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | The Leverage Ratio as of: | 12/31/2018 | | is: | 3.96 | to 1 | | In Compliance |
| | | | Maximum | | 5.75 | to 1 | | |
| | | | | | | | | |
| | total equity: | $ (4,714,172) | | | | total liabilities | $56,579,459 | |
| | | | | | | ULX Equity Investment | $ (8,000,000) | |
| | Less: | | | | | Adjusted total | $48,579,459 | |
| | deferred assets: | $ | 249,620 | | | | | |
| | other assets: | $ | - | | | | | |
| | SH loans receivable: | $ | 92,374 | | | | | |
| | intangible assets: | $ | 167,142 | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | Add Back: | | | | | | | |
| | Stock Subscription Payable: | $ | 5,890,000 | | | | | |
| | Preferred Stock Subscription Payable: | $ | 3,587,350 | | | | | |
| | ULX Equity Investment | $ | 8,000,000 | | | | | |
| | Net Equity | $12,254,042 | | | | | | |

**Dwight Jones**
**Chief Financial Officer**

LeCLAIRRYAN
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct

(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

# EXHIBIT 23

**To:**         Jones, Dwight[Dwight.Jones@leclairryan.com]
**Cc:**         Gustafson, C. Erik[Erik.Gustafson@leclairryan.com]; Lange, Christopher J.[Christopher.Lange@leclairryan.com]; Rosenfeld, Josh[Josh.Rosenfeld@leclairryan.com]
**From:**      Nicholas Hinton[nicholas.hinton@unitedlex.com]
**Sent:**      Thur 2/21/2019 3:17:41 PM (UTC-05:00)
**Subject:**   RE: ULXP Invoice Payment

## Eric – is this your position. ULX is now the lowest prioritized vendor. We are not LCR's bank. Nick

**Nicholas Hinton**
Chief Financial Officer
**UnitedLex**
100 Broadway, New York, New York, 10005
M +1 813 508 1604

---

**From:** Jones, Dwight <Dwight.Jones@leclairryan.com>
**Sent:** Thursday, February 21, 2019 2:38 PM
**To:** Nicholas Hinton <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>; Rosenfeld, Josh <Josh.Rosenfeld@leclairryan.com>
**Subject:** RE: ULXP Invoice Payment

Nick,

Our collections this week have continued to be slow.  We have only collected $1.1M this week and $4.3M for February.  After the rest of payroll is transferred today to ADP today, I estimate our Operating Cash to be approximately $2.2M or lower, depending on today collections.  In addition, we sill have outstanding February Rents along with Healthcare.  Also, I have been instructed by our CEO and General Counsel that the outstanding payables for client reimbursements have to be reduced and prioritized ahead of all Opex except Payroll, Healthcare, Liability Insurance, and VCF Debt Service.  The outstanding payable for client reimbursements is currently at $2.3M.  I have shared a plan with Erik and Lori that gets us back in compliance with our outstanding client reimbursed expenses by end of April or mid-May.  This shortfall in February Collections has created very strained cashflow and I will have to delay the remaining payment of $164,539 against the January invoice.  I will continue to keep you updated and will resolve this remaining payment as soon as possible.

If you want to discuss the nature of the client reimbursed expenses or where we currently stand on cashflow, let me know and I will schedule time for us.

**Dwight Jones**
**Chief Financial Officer**
LeClairRyan
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

---

**From:** Jones, Dwight
**Sent:** Wednesday, February 13, 2019 9:58 AM

**To:** 'Nicholas Hinton' <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>
**Subject:** RE: ULXP Invoice Payment

Nick,

The slowness in Collections have continued.  Monday collections, once again was much lower than expected.  Through yesterday we have only collected $2.5M and we still have to pay rents and other critical items.  That has brought us down to below the $3M Operating Cash threshold.  I will plan to send over $164,539 later today, which is 50% of the remaining $329,077 owed for the January invoice.  Given the way collections have been trickling in, I will have to begin to conserve cash for next weeks payroll.

I will keep you updated as the week progresses.

**Dwight Jones**
**Chief Financial Officer**
LeCLAIRRYAN
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

---

**From:** Nicholas Hinton [mailto:nicholas.hinton@unitedlex.com]
**Sent:** Friday, February 08, 2019 7:10 PM
**To:** Jones, Dwight
**Cc:** Gustafson, C. Erik; Lange, Christopher J.
**Subject:** RE: ULXP Invoice Payment

Our emails crossed.  Thank you for the payment.

I look forward to receiving the remaining balance early next week

Nick

**Nicholas Hinton**
Chief Financial Officer
**UnitedLex**
100 Broadway, New York, New York, 10005
M +1 813 508 1604

---

**From:** Jones, Dwight <Dwight.Jones@leclairryan.com>
**Sent:** Friday, February 8, 2019 5:47 PM
**To:** Nicholas Hinton <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>
**Subject:** ULXP Invoice Payment

Nick,

Following up today as promised.  I approved a wire to ULX for $329,077 today.  This is 50% of the remaining $658.154 owed on the

January invoice.  This week's collections were only $1.3M and will leave us with approximately $3M in operating cash with critical items still outstanding (Rents, Anthem, Proxios, etc).  I will assess after Monday's collections to determine if we are in a position to send the remaining $329,077 to close out the January invoice.

Thanks and have a good weekend.

**Dwight Jones**
**Chief Financial Officer**
LeClair**Ryan**
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.
* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

# EXHIBIT 24

To: Gustafson, C. Erik[Erik.Gustafson@leclairryan.com]
From: Matson, Bruce H.[/O=LECLAIRRYAN/OU=LECLAIRRYANRICHMOND/CN=RECIPIENTS/CN=BMATSON]
Sent: Mon 5/2/2016 4:47:45 PM (UTC-04:00)
Subject: RE: Confidential Communication

Filed 10/27/20    Entered 10/27/20 16:32:24    Desc    Ex.
A (Part 2 of 2)    Page 79 of 104

Thanks.

I was getting ready to write you in this when my mother died.

I continue to be concerned that we are underestimating the severity of this situation. Dwight is a trooper in dealing with unpleasant calls but has he done an analysis showing how vendors like GLC are expecting more and there is less and less flex - moreover, do we have a plan regarding paid client items?

We now know that we have about $3mm of obligations for funds previously received from clients for particular purposes where we did not use the funds for those purposes. This appears to be tantamount to misusing (intentionally) client trust funds.

We need a stated plan - a direction from you or me to Dwight - that we must (1) stop the practice immediately and (2) develop a specific, disciplined process to get the $3mm paid off for good within a reasonable period of time. I do not know what that is, but it has to be less than a year.

Hence, my concerns as to whether Dwight has done analysis with such assumptions. Hence, my concern that we will hit a wall. Hence, my suggestion that we may have to go to the Bank for a bridge loan. We cannot, in my opinion, just continue handling AP (especially the client advances AP) the way we have just hoping cash flow will get better. (If cash flow IS projected to increase that's fine, but I think we are at risk as a Firm and as fiduciaries absent a plan supported by analysis.

I'm sorry to burden you further, but this is looking similar to the LandAmerica conduct I criticized so highly in litigation. I am happy to discuss further.

I would also like to get a moment to discuss with you the Peter Mares situation, the dangerous cuts into the muscle of the Platform, and, of course, the Preferred dividends, the SLCs, etc.

Sent with Good (www.good.com)

---

**From:** Gustafson, C. Erik
**Sent:** Monday, May 02, 2016 3:30:29 PM
**To:** Matson, Bruce H.
**Subject:** Confidential Communication

FYI

C. Erik Gustafson, Esq.
LeClairRyan
(703) 307-2270

---

**From:** Mistal, Jennifer
**Sent:** Monday, May 02, 2016 3:04:34 PM
**To:** Jones, Dwight; Gustafson, C. Erik
**Subject:** FW: GLC Outstanding Invoices

Dwight,

Let me know what we can do.  I think we need to make some kind of good faith effort since these folks are actual onsite personnel.

Thanks!

J

**Jennifer Mistal**
**Chief Human Resources Officer**
LeClairRyan
4405 Cox Road, Suite 200
Glen Allen, Virginia 23060
(804) 783-7587 Direct
(804) 783-7687 Fax
(804) 301-9644 Mobile
Jennifer.Mistal@leclairryan.com
https://www.leclairryan.com
*** Please note our new address listed above. Our telephone and fax numbers remain the same. ***

Please consider the environment before printing this email.

---

**From:** Gerard Chambers [mailto:gcham@GLCBS.com]
**Sent:** Monday, May 02, 2016 2:21 PM
**To:** Smith, Shellie D.; Mistal, Jennifer
**Cc:** John Hayes; Andrew Chambers; Michael Hayes; John Falco; Lori Gothard; msmith@in-house-attorney.com; John Solomon
**Subject:** GLC Outstanding Invoices

Hi Shellie and Jenn,

I write to you both in part because of the seriousness of the situation and also in hopes of enlisting as much help as we can to reconcile the situation regarding the outstanding LeClairRyan invoices.

I had a conversation with Dwight Jones on Friday, and as per Shellie's direction, regarding this issue and he indicated two things. One is that no payment was imminent and that he was "hopeful" of getting some payment to GLC by the end of the week of 5/2. While we discussed $50 - $100K, there was no definitive amount set and this is just a fraction of the $500K owed. In deference to Dwight he did say that it was his intention to get current by the end of May and this would be great. If this does work out to be the case and we can get on to the regular ACH schedule then this note is mute.

The reality is that the LeClairRyan invoices to GLC are not being paid in a timely fashion, in accordance with our contract and as per the ACH process which LeClairRyan agreed. As you also know, GLC provides labor only to LeClairRyan and we are paying our staff at LeClairRyan without the appropriate reimbursement. LeClairRyan negotiated a very strict contract with GLC to hold us to very high standards of operational performance. LeClairRyan in addition, assigned significant financial penalties to our bill should GLC not meet these expectations. GLC has and will continue to meet and exceed these expectations but considers it fair and part of our desire to build a strong and lasting relationship, to expect at least the same from LeClairRyan with respect to payment of our invoices.

However, if GLC continues to provide uninterrupted service to LeClairRyan and we do not see movement toward getting current we need to establish a positive working plan of action. I write to you both in hopes that we can determine the best road forward.

Please give me a call when you are available. I welcome the opportunity to discuss the next steps.

Sincerely,

Gerry

Gerard J. Chambers
Chairman, CEO
GLC Business Services
C: 585-704-4011

Consider It Done.

# EXHIBIT 25

| | |
|---|---|
| **To:** | Jones, Dwight[Dwight.Jones@leclairryan.com]; Gary Quinn[gary_quinn@unitedlex.com]; Gustafson, C. Erik[Erik.Gustafson@leclairryan.com]; Rosenfeld, Josh[Josh.Rosenfeld@leclairryan.com]; Thompson, Lori D.[Lori.Thompson@leclairryan.com]; Lange, Christopher J.[Christopher.Lange@leclairryan.com]; Acee, Elizabeth K.[Elizabeth.Acee@leclairryan.com]; Bowerman, Deke[Deke.Bowerman@leclairryan.com]; DeFazio, Brian A.[Brian.DeFazio@leclairryan.com] |
| **From:** | Nicholas Hinton[nicholas.hinton@unitedlex.com] |
| **Sent:** | Wed 4/10/2019 5:31:02 PM (UTC-04:00) |
| **Subject:** | RE: LR Cash & Payment Update - April 10th |

Thank you for the comments.  Regarding the last comment you should treat the $626k as the cash supporting the in trust monies, and not restrict the liquidity of the firm by creating artificial restricted cash pools.

Nick

**Nicholas Hinton**
Chief Financial Officer
**UnitedLex**
100 Broadway, New York, New York, 10005
M +1 813 508 1604

---

**From:** Jones, Dwight <Dwight.Jones@leclairryan.com>
**Sent:** Wednesday, April 10, 2019 3:40 PM
**To:** Gary Quinn <gary_quinn@unitedlex.com>; Nicholas Hinton <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Rosenfeld, Josh <Josh.Rosenfeld@leclairryan.com>; Thompson, Lori D. <Lori.Thompson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>; Acee, Elizabeth K. <Elizabeth.Acee@leclairryan.com>; Bowerman, Deke <Deke.Bowerman@leclairryan.com>; DeFazio, Brian A. <Brian.DeFazio@leclairryan.com>
**Subject:** RE: LR Cash & Payment Update - April 10th

Gary,

Comments to your questions......

• Collections had a great start for Monday and Tuesday, however today started very slow, but that is expected for Wednesdays.  It would be great to exceed the collections forecast this week.

• I understand your point about not paying landlords interest and late fees.  Given prior payment history, our landlords have not been willing to forgo interest and late fees.  In fact, the majority of them begin with calls and/or demand letters to me and Lori when the rent is one day past due.  We can discuss further tomorrow if needed.

• As discussed in prior meetings, the protocol is that any money received from clients for the reimbursement of expenses, the money is transferred from the HSBC Operating Account to the HSBC Money Market account the following day.  Then each Monday, the AP Manager pays down the Client Expense AP in the amount collected the previous week, the Operating Account is then reimbursed from the HSBC Money Market account.  Therefore, you will see the HSBC Money Market account grow until Client Expense AP payments are made.  Other than required immediate payments, I have not given the AP Manager authorization to make those payments yet this week.  This protocol has been made clear by our General Counsel and that these funds can not be used for operating expenses.  Unless agreed differently with our General Counsel, this

Case 20-03142-KRH   Doc 2-2   Filed 10/27/20   Entered 10/27/20 16:32:24   Desc Ex.
A (Part 2 of 2)   Page 84 of 104

protocol will be continued and the money in the HSBC Money Market account should not be considered available funds for operating expenses.

• Execution of the DACA agreement that will allow release of the $626K in the WF MM account is still with VCF for finalization to be completed with the ULX note, security agreement, and an amendment to our LSA to reflect a number of items that I can update you separately.  Based on a recent call with VCF, I now expect at the earliest that the documents will not be completed until next week.


If you need any additional context or info, feel free to give me a call to discuss.


**Dwight Jones**
**Chief Financial Officer**
LeCLAIR**R**YAN
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

**From:** Gary Quinn <gary.quinn@unitedlex.com>
**Sent:** Wednesday, April 10, 2019 2:36 PM
**To:** Jones, Dwight <Dwight.Jones@leclairryan.com>; Nicholas Hinton <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Rosenfeld, Josh <Josh.Rosenfeld@leclairryan.com>; Thompson, Lori D. <Lori.Thompson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>; Acee, Elizabeth K. <Elizabeth.Acee@leclairryan.com>; Bowerman, Deke <Deke.Bowerman@leclairryan.com>; DeFazio, Brian A. <Brian.DeFazio@leclairryan.com>
**Subject:** RE: LR Cash & Payment Update - April 10th

Thanks Dwight –

Solid collections for the first two days  - the firm should be able to exceed that weekly goal with three more days of receipts to come.

A question as to why the firm would necessarily pay interest / penalties for the occupancy? I would push them hard on LR policy not to pay – if that is the firm policy. Don't they also have deposits they can dip into?

The money market accounts have grown as well and now represent $1.3M as of yesterday, in addition to the $2.9M quoted as operating cash. How is the firm doing on the release of funds/paperwork from the bank?

Thanks,

Gary

**From:** Jones, Dwight <Dwight.Jones@leclairryan.com>
**Sent:** Wednesday, April 10, 2019 2:24 PM
**To:** Nicholas Hinton <nicholas.hinton@unitedlex.com>
**Cc:** Gustafson, C. Erik <Erik.Gustafson@leclairryan.com>; Rosenfeld, Josh <Josh.Rosenfeld@leclairryan.com>; Thompson, Lori D. <Lori.Thompson@leclairryan.com>; Lange, Christopher J. <Christopher.Lange@leclairryan.com>; Acee, Elizabeth K. <Elizabeth.Acee@leclairryan.com>; Bowerman, Deke <Deke.Bowerman@leclairryan.com>; Gary Quinn <gary.quinn@unitedlex.com>; DeFazio, Brian A. <Brian.DeFazio@leclairryan.com>
**Subject:** LR Cash & Payment Update - April 10th

Nick & Gary,

Wanted to give you an update on were we stand with cash, collections, and payment updates prior to the weekly meeting scheduled for tomorrow.

I will authorize Tisa to make rent payments in the amount of $872K (See the list below).  These are for March rents with the exception of two offices.  The amounts are now higher than previously communicated as they now include interest and late fees from our landlords.  For context, we have started to receive default/demand letters and we need to address payment before it escalates.  The 13WK Forecast reflected making rent payments of $1.2M last week, however were delayed to this week until last weeks payroll was funded, therefore we will be making some payments this week.

As of today we have Operating Cash of $2.9M and after we make the aforementioned rent payments, the Operating Cash will be approximately $2.0M.  Also, note that we will have to fund payroll next week and the first VCF Curtailment payment of $319K is due on April 15th.  Further, through yesterday we have collections of $1,438K against the 13WK forecast of $1,960K.

We can discuss further on the call tomorrow, however feel free to give me a call with any questions.

| Office | Amount | Period |
|---|---|---|
| Suntrust | 97,569.45 | March |
| Norfolk | 31,669.87 | March |
| Alexandria Sub | 14,609.76 | March |
| DC | 49,853.97 | March |
| Matrix One | 199,841.85 | March |
| Dearborn | 11,314.40 | March |
| Los Angeles | 49,918.98 | March |
| San Francisco | 57,820.24 | March |
| New Haven | 47,444.58 | March |
| Hartford | 21,229.38 | March |
| New York | 90,307.33 | March |
| Roanoke | 51,418.71 | March |
| Annapolis | 27,909.90 | March |
| Sacramento | 22,709.13 | March |
| Williamsburg | 22,666.66 | April |
| Houston | 75,615.50 | April |
|  | 871,899.71 |  |

**Dwight Jones**
**Chief Financial Officer**
LeClairRyan
919 East Main Street, Twenty-Fourth Floor
Richmond, Virginia 23219
(804) 343-4091 Direct
(804) 783-2294 Fax
(703) 217-6726 Mobile
Dwight.Jones@leclairryan.com
https://www.leclairryan.com

Please consider the environment before printing this email.

* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.
* This e-mail may contain confidential or privileged information. If you are not the intended recipient, please notify the sender

immediately by return e-mail with a copy to emailadministrator@leclairryan.com and delete this e-mail and all copies and attachments.

# EXHIBIT 26

| Check #/AR-AP Swap Invoice # | Payment Type | Check / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 305749 | Check | 7/30/2018 | 8/1/2018 | $    250,000.00 |
| 306336 | Check | 8/23/2018 | 8/23/2018 | 500,000.00 |
| 306494 | Check | 8/30/2018 | 8/30/2018 | 500,000.00 |
| 838849 | AR-AP Swap | 6/27/2018 | 8/31/2018 | 147,637.99 |
| 843694 | AR-AP Swap | 7/27/2018 | 8/31/2018 | (27,632.01) |
| 843701 | AR-AP Swap | 7/27/2018 | 8/31/2018 | 318,651.67 |
| 848326 | AR-AP Swap | 8/30/2018 | 8/31/2018 | 243,219.35 |
| 9142018 | Check | 9/14/2018 | 9/14/2018 | 500,000.00 |
| 307052 | Check | 9/24/2018 | 9/24/2018 | 500,000.00 |
| 307193 | Check | 9/27/2018 | 9/27/2018 | 1,000,000.00 |
| 849579 | AR-AP Swap | 9/6/2018 | 9/28/2018 | 97,840.21 |
| 852644 | AR-AP Swap | 9/25/2018 | 9/28/2018 | 84,773.59 |
| 852865 | AR-AP Swap | 9/28/2018 | 9/28/2018 | 19,383.19 |
| 844450 | AR-AP Swap | 8/6/2018 | 9/28/2018 | 9,372.50 |
| 848478 | AR-AP Swap | 9/4/2018 | 9/28/2018 | 1,220.00 |
| 850140 | AR-AP Swap | 9/7/2018 | 9/28/2018 | 7,392.50 |
| 307424 | Check | 10/5/2018 | 10/4/2018 | 500,000.00 |
| 307633 | Check | 10/12/2018 | 10/12/2018 | 500,000.00 |
| 307960 | Check | 10/22/2018 | 10/17/2018 | 500,000.00 |
| 308103 | Check | 10/26/2018 | 10/25/2018 | 500,000.00 |
| 857251 | AR-AP Swap | 10/31/2018 | 10/30/2018 | 35,085.76 |
| 857167 | AR-AP Swap | 10/26/2018 | 10/30/2018 | 263,323.59 |
| 853411 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 1,363.00 |
| 855168 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 9,834.50 |
| 308243 | Check | 11/2/2018 | 11/2/2018 | 500,000.00 |
| 308413 | Check | 11/12/2018 | 11/9/2018 | 500,000.00 |
| 308615 | Check | 11/20/2018 | 11/20/2018 | 500,000.00 |
| 861158 | AR-AP Swap | 11/27/2018 | 11/30/2018 | 168,271.74 |
| 861439 | AR-AP Swap | 11/29/2018 | 11/30/2018 | 30,069.35 |
| 858669 | AR-AP Swap | 11/13/2018 | 11/30/2018 | 3,315.54 |
| 859089 | AR-AP Swap | 11/8/2018 | 11/30/2018 | 3,360.00 |
| 309622 | Check | 12/18/2018 | 12/18/2018 | 1,000,000.00 |
| 309716 | Check | 12/28/2018 | 12/28/2018 | 250,000.00 |
| 309742 | Check | 12/31/2018 | 12/31/2018 | 750,000.00 |
| 865375 | AR-AP Swap | 12/19/2018 | 12/31/2018 | 30,929.11 |
| 865520 | AR-AP Swap | 12/28/2018 | 12/31/2018 | 5,129.35 |
| 866298 | AR-AP Swap | 12/31/2018 | 12/31/2018 | 5,509.55 |
| 862884 | AR-AP Swap | 12/5/2018 | 12/31/2018 | 2,187.50 |
| 863910 | AR-AP Swap | 12/7/2018 | 12/31/2018 | 434.50 |
| 309916 | Check | 1/8/2019 | 1/8/2019 | 250,000.00 |
| 310051 | Check | 1/14/2019 | 1/11/2019 | 750,000.00 |
| 310493 | Check | 1/30/2019 | 1/30/2019 | 658,154.00 |
| 869687 | AR-AP Swap | 1/28/2019 | 1/31/2019 | 34,506.35 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 3,273.37 |
| 867677 | AR-AP Swap | 1/9/2019 | 1/31/2019 | 4,590.00 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 2,100.00 |
| 1656 | Check | 2/8/2019 | 2/8/2019 | 329,077.55 |

| Check #/AR-AP Swap Invoice # | Payment Type | Check / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 1757 | Check | 2/13/2019 | 2/13/2019 | 164,539.00 |
| 2571 | Check | 2/27/2019 | 2/27/2019 | 500,000.00 |
| 873497 | AR-AP Swap | 2/22/2019 | 2/28/2019 | 27,434.08 |
| 871186 | AR-AP Swap | 2/8/2019 | 2/28/2019 | 10,577.13 |
| 2916 | Check | 3/8/2019 | 3/8/2019 | 250,000.00 |
| 3053 | Check | 3/15/2019 | 3/15/2019 | 250,000.00 |
| 3370 | Check | 3/20/2019 | 3/20/2019 | 500,000.00 |
| 3222019 | Check | 3/22/2019 | 3/22/2019 | 500,000.00 |
| 876425 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 18,243.73 |
| 875655 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 1,235.40 |
| 876743 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 32,879.42 |
| 3636 | Check | 3/31/2019 | 4/1/2019 | 400,000.00 |
| 4009 | Check | 4/5/2019 | 4/5/2019 | 400,000.00 |
| 4115 | Check | 4/11/2019 | 4/11/2019 | 500,000.00 |
| 4230 | Check | 4/17/2019 | 4/17/2019 | 350,000.00 |
| 42519A | Check | 4/25/2019 | 4/25/2019 | 400,000.00 |
| 4948 | Check | 5/2/2019 | 5/2/2019 | 200,000.00 |
| 4999 | Check | 5/3/2019 | 5/3/2019 | 200,000.00 |
| 5210 | Check | 5/10/2019 | 5/10/2019 | 100,000.00 |
| 5450 | Check | 5/21/2019 | 5/21/2019 | 400,000.00 |
| 5937 | Check | 5/30/2019 | 5/30/2019 | 300,000.00 |
| 5965 | Check | 5/31/2019 | 5/31/2019 | 150,000.00 |
| 6006 | Check | 6/4/2019 | 6/4/2019 | 200,000.00 |
| 6081 | Check | 6/7/2019 | 6/7/2019 | 200,000.00 |
| 6313 | Check | 6/18/2019 | 6/19/2019 | 200,000.00 |
| 6314 | Check | 6/19/2019 | 6/19/2019 | 50,000.00 |
| 6682 | Check | 6/28/2019 | 6/28/2019 | 320,000.00 |
| 7404 | Check | 7/25/2019 | 7/25/2019 | 170,000.00 |
| 7332 | Check | 7/25/2019 | 7/25/2019 | 150,000.00 |
| 7791 | Check | 7/31/2019 | 7/31/2019 | 170,000.00 |
|  |  |  |  | $  19,357,282.51 |

# EXHIBIT 27

| Check #/AR-AP Swap Invoice # | Payment Type | Check / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 9142018 | Check | 9/14/2018 | 9/14/2018 | $ 500,000.00 |
| 307052 | Check | 9/24/2018 | 9/24/2018 | 500,000.00 |
| 307193 | Check | 9/27/2018 | 9/27/2018 | 1,000,000.00 |
| 849579 | AR-AP Swap | 9/6/2018 | 9/28/2018 | 97,840.21 |
| 852644 | AR-AP Swap | 9/25/2018 | 9/28/2018 | 84,773.59 |
| 852865 | AR-AP Swap | 9/28/2018 | 9/28/2018 | 19,383.19 |
| 844450 | AR-AP Swap | 8/6/2018 | 9/28/2018 | 9,372.50 |
| 848478 | AR-AP Swap | 9/4/2018 | 9/28/2018 | 1,220.00 |
| 850140 | AR-AP Swap | 9/7/2018 | 9/28/2018 | 7,392.50 |
| 307424 | Check | 10/5/2018 | 10/4/2018 | 500,000.00 |
| 307633 | Check | 10/12/2018 | 10/12/2018 | 500,000.00 |
| 307960 | Check | 10/22/2018 | 10/17/2018 | 500,000.00 |
| 308103 | Check | 10/26/2018 | 10/25/2018 | 500,000.00 |
| 857251 | AR-AP Swap | 10/31/2018 | 10/30/2018 | 35,085.76 |
| 857167 | AR-AP Swap | 10/26/2018 | 10/30/2018 | 263,323.59 |
| 853411 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 1,363.00 |
| 855168 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 9,834.50 |
| 308243 | Check | 11/2/2018 | 11/2/2018 | 500,000.00 |
| 308413 | Check | 11/12/2018 | 11/9/2018 | 500,000.00 |
| 308615 | Check | 11/20/2018 | 11/20/2018 | 500,000.00 |
| 861158 | AR-AP Swap | 11/27/2018 | 11/30/2018 | 168,271.74 |
| 861439 | AR-AP Swap | 11/29/2018 | 11/30/2018 | 30,069.35 |
| 858669 | AR-AP Swap | 11/13/2018 | 11/30/2018 | 3,315.54 |
| 859089 | AR-AP Swap | 11/8/2018 | 11/30/2018 | 3,360.00 |
| 309622 | Check | 12/18/2018 | 12/18/2018 | 1,000,000.00 |
| 309716 | Check | 12/28/2018 | 12/28/2018 | 250,000.00 |
| 309742 | Check | 12/31/2018 | 12/31/2018 | 750,000.00 |
| 865375 | AR-AP Swap | 12/19/2018 | 12/31/2018 | 30,929.11 |
| 865520 | AR-AP Swap | 12/28/2018 | 12/31/2018 | 5,129.35 |
| 866298 | AR-AP Swap | 12/31/2018 | 12/31/2018 | 5,509.55 |
| 862884 | AR-AP Swap | 12/5/2018 | 12/31/2018 | 2,187.50 |
| 863910 | AR-AP Swap | 12/7/2018 | 12/31/2018 | 434.50 |
| 309916 | Check | 1/8/2019 | 1/8/2019 | 250,000.00 |
| 310051 | Check | 1/14/2019 | 1/11/2019 | 750,000.00 |
| 310493 | Check | 1/30/2019 | 1/30/2019 | 658,154.00 |
| 869687 | AR-AP Swap | 1/28/2019 | 1/31/2019 | 34,506.35 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 3,273.37 |
| 867677 | AR-AP Swap | 1/9/2019 | 1/31/2019 | 4,590.00 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 2,100.00 |
| 1656 | Check | 2/8/2019 | 2/8/2019 | 329,077.55 |
| 1757 | Check | 2/13/2019 | 2/13/2019 | 164,539.00 |
| 2571 | Check | 2/27/2019 | 2/27/2019 | 500,000.00 |
| 873497 | AR-AP Swap | 2/22/2019 | 2/28/2019 | 27,434.08 |
| 871186 | AR-AP Swap | 2/8/2019 | 2/28/2019 | 10,577.13 |
| 2916 | Check | 3/8/2019 | 3/8/2019 | 250,000.00 |
| 3053 | Check | 3/15/2019 | 3/15/2019 | 250,000.00 |
| 3370 | Check | 3/20/2019 | 3/20/2019 | 500,000.00 |

| Check #/AR-AP Swap Invoice # | Payment Type | Check / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 3222019 | Check | 3/22/2019 | 3/22/2019 | 500,000.00 |
| 876425 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 18,243.73 |
| 875655 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 1,235.40 |
| 876743 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 32,879.42 |
| 3636 | Check | 3/31/2019 | 4/1/2019 | 400,000.00 |
| 4009 | Check | 4/5/2019 | 4/5/2019 | 400,000.00 |
| 4115 | Check | 4/11/2019 | 4/11/2019 | 500,000.00 |
| 4230 | Check | 4/17/2019 | 4/17/2019 | 350,000.00 |
| 42519A | Check | 4/25/2019 | 4/25/2019 | 400,000.00 |
| 4948 | Check | 5/2/2019 | 5/2/2019 | 200,000.00 |
| 4999 | Check | 5/3/2019 | 5/3/2019 | 200,000.00 |
| 5210 | Check | 5/10/2019 | 5/10/2019 | 100,000.00 |
| 5450 | Check | 5/21/2019 | 5/21/2019 | 400,000.00 |
| 5937 | Check | 5/30/2019 | 5/30/2019 | 300,000.00 |
| 5965 | Check | 5/31/2019 | 5/31/2019 | 150,000.00 |
| 6006 | Check | 6/4/2019 | 6/4/2019 | 200,000.00 |
| 6081 | Check | 6/7/2019 | 6/7/2019 | 200,000.00 |
| 6313 | Check | 6/18/2019 | 6/19/2019 | 200,000.00 |
| 6314 | Check | 6/19/2019 | 6/19/2019 | 50,000.00 |
| 6682 | Check | 6/28/2019 | 6/28/2019 | 320,000.00 |
| 7404 | Check | 7/25/2019 | 7/25/2019 | 170,000.00 |
| 7332 | Check | 7/25/2019 | 7/25/2019 | 150,000.00 |
| 7791 | Check | 7/31/2019 | 7/31/2019 | 170,000.00 |

$  17,425,405.51

# EXHIBIT 28

**█FOLEY**

FOLEY & LARDNER LLP

ATTORNEYS AT LAW

WASHINGTON HARBOUR
3000 K STREET, N.W.
SUITE 600
WASHINGTON, D.C.  20007-5109
202.672.5300 TEL
202.672.5399 FAX
WWW.FOLEY.COM

WRITER'S DIRECT LINE
202.295.4791
emorabito@foley.com

June 8, 2020

**CONFIDENTIAL**

**Via E-Mail**

Thomas J. McKee, Jr., Esq.
mckeet@gtlaw.com
Greenberg Traurig LLP
1750 Tysons Boulevard
Suite 1000
McLean, VA 22102

Re:     *In re: LeClairRyan PLLC (the "Debtor")*

        **Demand that ULX Partners LLC ("ULXP") and UnitedLex Corporation ("UnitedLex") Return No Less Than $66,047,082.20 Received by ULXP in Preferential and Fraudulent Transfers and Pay Treble Damages as a Result of their Civil Conspiracy**

Dear Mr. McKee:

        As you are aware, this Firm represents Ms. Lynn L. Tavenner in her capacity as the Chapter 7 Trustee of the Debtor (the "Trustee") in the above referenced bankruptcy case, which is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.  We write to demand that ULXP and UnitedLex return no less than **$66,047,082.20**, which includes amounts received by ULXP in preferential and fraudulent transfers in an amount not less than $16,511,770.55 and treble damages, as a result of their conspiracy to hinder, delay and defraud creditors of the Debtor.  In addition to this amount, the Trustee demands all reasonable attorneys' fees and costs incurred in bringing claims against ULXP and UnitedLex, in an amount to be determined.[1]

---

[1] Because her investigation is ongoing, the Trustee reserves her right to increase this amount based on additional causes of action, not asserted herein.

BOSTON          JACKSONVILLE    MILWAUKEE       SAN DIEGO       TALLAHASSEE
BRUSSELS        LOS ANGELES     NEW YORK        SAN FRANCISCO   TAMPA
CHICAGO         MADISON         ORLANDO         SHANGHAI        TOKYO
DETROIT         MIAMI           SACRAMENTO      SILICON VALLEY  WASHINGTON, D.C.



**FOLEY**

FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 2

## A.    SUMMARY OF RELEVANT FACTS

This Demand is a result of the Trustee's reasonable due diligence showing that ULXP, due to its pervasive operational control over the Debtor, is an insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.  Additionally, UnitedLex (1) operated ULXP as its alter ego and (2) formed and operated ULXP as a device to skirt the clear public policy prohibition against non-lawyers having an ownership interest in and sharing in the profits of law firms.  Therefore, the prerequisites for piercing UnitedLex's corporate veil have been satisfied and United Lex is responsible for all amounts ULXP is obligated to return to the Debtor.  Moreover, because UnitedLex and ULXP engaged in a conspiracy under Virginia's common law, UnitedLex and ULXP are also liable for treble damages pursuant to Virginia Code § 18.2-500.

The Trustee's investigation is ongoing.  This Demand, therefore, presents a summary of certain facts and information presently known. The Trustee reserves the right to assert additional facts and causes of action at any time.

### 1.    From its Formation, ULXP Was Controlled by UnitedLex

ULXP was formed in April 2018 as a joint venture between UnitedLex and the Debtor.  ULXP was publicly described as the creation of "a strategic business platform designed to empower a 'constellation' of law firms" by serving as a central source from which member law firms accessed dedicated tools, resources, and capital.[2] Referring to ULXP, Daniel Reed, UnitedLex's Chairman, told the American Lawyer that "if we don't reach 10,000 employees in the next five years, then I'm not doing something right. Some people would view that as heretical, but it's not."[3]

However, the first—and as it turns out, the only—firm in the constellation was the Debtor.  Further, despite the lofty goals advertised as its purpose, the effect of the joint venture – indeed, its disguised purpose – was to facilitate the assumption of financial and operational control by UnitedLex over the Debtor.

---

[2] *UnitedLex and LeClairRyan Achieve a "Tour de Force" with the Launch of ULX Partners*, BUSINESSWIRE (June 13, 2018), https://www.businesswire.com/news/home/20180613005287/en/UnitedLex-LeClairRyan-Achieve-"Tour-de-Force"-Launch.

[3] Dan Packel, *UnitedLex's Deal With LeClairRyan Was a Failure. Is it Also a Sign of Things to Come?* THE AMERICAN LAWYER (Sept. 6, 2019, 10:11 a.m.), https://www.law.com/americanlawyer/2019/09/06/unitedlexs-deal-with-leclairryan-was-a-failure-is-it-also-a-sign-of-things-to-come/?slreturn=20200505114390.



**FOLEY & LARDNER LLP**

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 3

Moreover, the foundational documents for ULXP made clear that UnitedLex was in control of the joint venture and therefore the Debtor.  Pursuant to ULXP's Amended and Restated Limited Liability Company Agreement (the "ULXP LLC Agreement"), "[t]he business and affairs of the company shall be managed, operated and controlled by or under the direction of the managing member," which was UnitedLex Manager LLC, a special purpose 100% owned subsidiary of UnitedLex.  Daniel Reed, the CEO of UnitedLex, was the managing member of UnitedLex Manager LLC, thus completing the chain of control over ULXP by United Lex.

The ULXP LLC Agreement further stated that "the managing member shall have and is hereby granted, the full and complete power, authority and direction for, on behalf of the name of the company, to take such action as it may and in its sole direction deemed necessary or advisable to carry out any and all objections and purposes of the company, subject only to the terms of this agreement."  UnitedLex excised its control over ULXP vigorously.  As a practical matter, there was no separation between those two entities, and UnitedLex operated and controlled ULXP as its alter ego.

### a.      *UnitedLex and ULXP took significant control over virtually every aspect of the Debtor*

For its part, the Debtor had been incurring substantial setbacks for a number of years prior to entering into the ULXP venture. Among other things, the firm had repeatedly missed its budgetary goals beginning in 2011; profitable practice groups defected; other individual attorneys were fired; most shareholders lost some or all of the "at-risk" portion of their compensation; and many shareholders had their compensation reduced by six figures while the firm overpaid other attorneys.  These issues reflected that the Debtor had been insolvent for some time as it entered into discussions to form the joint venture.  Thus, as UnitedLex and the Debtor began their discussions in 2017, the Debtor was insolvent, and had been for a significant time, and therefore in desperate need of a lifeline.

As the negotiations unfolded, the Debtor's financial weakness and perilous path forward became apparent.  Taking full advantage of its superior bargaining position, UnitedLex structured the formation of the governing and formation documents to bestow unprecedented control of ULXP—which was 99% owned by UnitedLex—over the Debtor.  The extent of this control is illustrated by the Master Services Agreement (the "MSA"), which was entered into between the Debtor and ULXP on or about April 4, 2018, a true and correct copy of which is attached as Exhibit A.


FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 4

Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of the Debtor. The breadth of these responsibilities is best illustrated by the addendum to the MSA which listed those "responsibilities" to include such essential functions as "Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security".   The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions in the MSA, which state that ULXP would, among other things:

- "Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients."

- "Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the successful implementation of the Services, and (c) accomplish the goals of this Agreement."

- "Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities."

- "Manage all market-facing communications and marketing collateral, including Law Firm's website."

- "Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients."

- "Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level."

- "Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives."

- "Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work."

- "Manage employee relations issues and performance management issues at Law Firm and the Provider."

# FOLEY

FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 5

- "Identify, develop and propose compensation for Law Firm non-Members based on market data."

- "Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees."

- "Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm."

- "Manage and ensure the efficient functioning of Law Firm and Provider offices."

- "Track and manage efficient Law Firm time entry compliance."

- "Track and manage WIP, write downs and write-offs."

- "Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables."

(Ex. A, Addendum 1, § III)

These were not mere "Middle Management" delegations.  Indeed, the effect of the assumption by ULXP of these sweeping responsibilities over the business of the Debtor is graphically illustrated in the below PowerPoint slide prepared by Peter Krakaur, a UnitedLex Vice President, illustrating that ULXP and the Debtor functioned as one entity:

# FOLEY
FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 6



Page 2

(Exhibit B.)

Because of the pervasive breadth of these essential services, once the ULXP transaction was consummated, the Debtor was no longer able to function without ULXP or UnitedLex.  Indeed, through its control of <u>every function</u> necessary to the Debtor's operations as a law firm (except for providing legal advice), ULXP exerted control over almost all of the operations of the Debtor.  As Peter Krakaur unequivocally stated in August 2018, "<u>ULXP is now the owner of the business of law</u>."[4]

That very same communication shows that UnitedLex and ULXP regarded themselves as part of the ownership process and regarded its position as driving the debtor to decisions that ULXP wanted implemented. (See Exhibit C.)  Mr. Krakauer wrote, "[w]e all know law firms do not operate as a business. ULXP is designed to change that.  Given the nature of the relationship, the agreements, <u>and the practical aspects of us running the law firm</u>, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan." (See Ex. C (emphasis added).)  Indeed, by discussing the effects of "us running the law firm," that "we" needed to consider certain actions and that "we" needed to

---

[4] Ex. C (emphasis added).  Krakaur made this statement in the notes to a calendar invitation to an August 10, 2018 invitation sent to among others, Daniel Reed, UnitedLex's Chief Executive Officer and Nicholas Hinton, its Chief Financial Officer.

**▪▪FOLEY**

FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 7

communicate actions, Mr. Krakauer – as a UnitedLex Vice President— did not even attempt to hide that ULXP was simply the alter ego of UnitedLex and that UnitedLex was calling all the shots.  (See Ex. C.)

The ways in which ULXP exerted control, all for the benefit of United Lex, were far from subtle.  For example, in a March 15, 2019 email from Mr. Hinton, Chief Financial Officer of United Lex and also a member of ULXP's Oversight Board, to the Debtor, relayed that "[t]he 250K [overdue to ULXP] continues to build the amount due to ULX as we also have payroll next week. Please revisit the cash, your holdbacks and your priorities. . . . Like I said before, we are not the bank. The top priority has to be paying ULXP—we are the vendor that can shut down operations." (Emphasis added). (Exhibit D.)

Clearly, ULXP controlled the Debtor with an iron fist.

## 2.  ULXP Was an Insider of the Debtor and is Thus Liable for $16,511,770.55 to The Trustee

The inescapable conclusion – based on, among other things, the facts described above and the linking of the Debtor's profits to ULXP's compensation – is that ULXP is an insider of the Debtor within the meaning of § 101(31) of the Bankruptcy Code.

Among other things, ULXP (1) was an affiliate of the Debtor as an entity that operated the business or substantially all of the property of the Debtor under an operating agreement; and (2) was a managing agent of the Debtor, as it exerted operational control over the Debtor, had the ability to make personnel decisions, had the authority to incur or pay obligations, and had access to financial and other information essential to the Debtor's operation. ULXP is also a non-statutory insider because, among other things, ULXP (1) had a close relationship with the Debtor; (2) exercised extensive influence over the Debtor; and (3) engaged in transactions that were not arms-length.

As a result, ULXP is liable to the Debtor for all payments during the one year period before the Petition Date because they are a preference pursuant to section 547(b) of the Bankruptcy Code.  The facts will show that the Debtor transferred no less than $16,511,770.55 to its insider ULXP during this time.  Consequently, the transfers are preferential and may be avoided under § 547(b) of the Bankruptcy Code and, pursuant to § 550(a) of the Bankruptcy Code, may be recovered from ULXP as the initial transferees.


FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 8

**3.      Fraudulent Transfers to ULXP in the Amount of $16,511,770.55 Must Be
Returned to the Trustee**

From July 30, 2018 through July 31, 2019, the Debtor transferred amounts to its
insider ULXP that totaled $16,511,770.55 (the "Fraudulent Transfers"). (*See* Exhibit E.)  These
transfers were made with the actual intent to delay, hinder, or defraud creditors during a time
period where the Debtor was insolvent and thus must be returned to the estate.

Prior to entering into the MSA, the Debtor had been incurring substantial setbacks
for years. Among other events, budgetary goals were repeatedly missed since 2011, shareholders
defected or were fired, many had their compensation reduced, and others were overpaid.  Indeed,
at the time the MSA was signed, creditors were owed a substantial sum of money, a fact that ULXP
knew or should have known. Yet, in an attempt to artificially extend its lifespan, the Debtor entered
into the ULXP relationship and ceded to ULXP the power to prioritize payment of the Debtor's
expenses.  This action resulted in the payment by the Debtor to its insider ULXP of no less than
$16,511,770.55.  Because the Debtor made these transfers with the intent to delay, hinder, or
defraud creditors during a time period where it was insolvent, the Trustee may recover the
Transfers from ULXP under §§ 544(b) and 548(a)(1)(A) of the Bankruptcy Code and Virginia
Code § 55.1-400.

**4.      Debtor's Purported Secured Claim Must Be Recharacterized as Equity**

ULXP has filed a secured claim based on an Outstanding Deferred Loan
Promissory Note in the principal amount of $8,000,000 (the "ULXP Note") and an accompanying
Security Agreement (the "ULXP Security Agreement").  However, the facts show that UnitedLex
and ULXP acted in concert with the Debtor's management to attempt to treat this "loan" as equity.
This secured claim will of course be disallowed if the Preferential Transfers are not returned to the
Trustee as demanded. In all events, you are hereby put on notice that the secured claim is properly
reclassified as one based on an equity investment.

The Deferred Loan Promissory Note documents were backdated to December 20,
2018, but were actually prepared over several weeks before being executed on April 4, 2019.  By
the ULXP Note, the Debtor agreed to pay ULXP the principal amount of $8,000,000 for alleged
deferred fees owed by the Debtor to ULXP under the MSA.  Under the terms of the ULXP Note,
no payments were to be made until its maturity date on June 30, 2023. (Exhibit F, §§ 1 and 3.)
The result of the ULXP Note and the ULXP Security Agreement—and clearly its purpose—was

**FOLEY**

FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 9

to elevate ULXP's priority over other unsecured creditors. Indeed, the debt that formed the center of that loan consisted of prior advances made by ULXP to the Debtor.

Yet, at the same time that ULXP was maneuvering to increase its priority over unsecured creditors, it was working in concert with the Debtor to convince Virginia Commercial Finance ("VCF")—the bank that had a senior lien on the assets of the Debtor—that the $8,000,000 loan should be treated as an equity transaction. That the Note and Security Agreement transaction was in reality a disguised equity infusion is evidenced in part that the Debtor was undercapitalized, indeed insolvent, at the time Note and Security Agreement and from the overall nature of the relationship between ULXP and the Debtor.

But indirect evidence is not necessary here as the Debtor, along with ULXP and UnitedLex, were all aware that the transaction was in the nature of an equity infusion, not a loan. On January 22, 2019, Chris Lange, an attorney with the Debtor, sent revisions to the ULXP Loan to UnitedLex and ULXP's outside counsel, and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender …would see as being equity like in that it is being paid from the return on our equity investment in ULX Partners." (Exhibit G.) This effort proved successful, as on January 31, the lender informed the Debtor that it approved the leverage ratio calculation so that the $8M will be treated as equity, saying "[t]he [ULXP] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in." (Exhibit H.)

Consequently, the Debtor's purported security interest must be re-characterized as equity.

5.     **UnitedLex Is Responsible for All Funds That ULXP Is Obligated to Return to the Trustee**

The structure of the ULXP joint venture, together with UnitedLex's complete ownership, operational and financial control of ULXP, demonstrates that ULXP was merely a device or sham used by UnitedLex to disguise wrongs, obscure fraud, and possibly conceal crimes that were occurring. As such, ULXP's corporate veil should be pierced to enable recovery against UnitedLex for all amounts owed by ULXP to the Debtor's bankruptcy estate.

UnitedLex owned 99% of, had complete operational and financial control over, and treated ULXP as its alter ego. Additionally, the unity between those two entities was so extensive that any reasonable notion of separateness had ceased. UnitedLex also organized and operated



FOLEY & LARDNER LLP

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 10

ULXP in a manner that flouted the public policy proscription against non-lawyers having an equity interest in, and sharing in the profits of, a law firm. Consequently, ULXP was a device or sham used by UnitedLex to disguise wrongs, obscure fraud or conceal crime. As such, ULXP's corporate veil should be pierced to enable recovery against UnitedLex for all amounts owed by ULXP to the Debtor's bankruptcy estate. The Trustee hereby demands payment thereof.

**6.      UnitedLex and ULXP are Liable for Civil Conspiracy**

The actions of UnitedLex and ULXP, some of which are previewed in this Demand Letter, are also evidence of civil conspiracy in violation of Virginia law. More specifically and as discussed in greater detail above, UnitedLex and ULXP worked in concert to affect the fraudulent transfers described above for the willful and malicious purpose of injuring the Debtor's business. Moreover, the Trustee is investigating additional civil conspiracy claims that involve, among others, United Lex, ULP, certain members of the Debtor's management, and other entities and individuals who may have worked in concert to also effect the fraudulent transfers described above. Such actions were for the purpose of hindering, delaying, and defrauding the Debtor's creditors. UnitedLex and ULXP are therefore liable for civil conspiracy under Virginia's common law and for treble damages pursuant to section § 18.2-500, Virginia Code.

**B.      DEMAND**

In sum, the Trustee demands ULXP and UnitedLex return no less than **$66,047,082.20**, based on the $16,511,770.55 received by ULXP in preferential and/or fraudulent transfers and treble damages of this amount. Moreover, the Trustee demands her attorneys' fees and costs, in an amount to be determined. In addition, the Trustee reserves the right to assert additional facts, causes of action, and/or additional damages at any time.

\*      \*      \*      \*      \*



**FOLEY & LARDNER LLP**

Thomas J. McKee, Jr., Esq.
June 8, 2020
Page 11

Please be advised that under the Procedures Order, UnitedLex and ULXP have fourteen (14) days from the date of this letter to elect to proceed to the Mediation Process provided for in Section 3 of the Procedures Order.  The election must be made by written request to the Trustee's counsel, Paula S. Beran (pberan@tb-lawfirm.com) and the undersigned, as the Trustee's Special Litigation Counsel (emorabito@foley.com).  If UnitedLex and ULXP make a Pre-Complaint Mediation Election, the Trustee will not file a complaint against them until after the filing of the Mediator's Report. Absent the timely Pre-Complaint Mediation Election and/or a consummated settlement within thirty (30) days of the date of this letter, the Trustee will proceed to file a complaint against UnitedLex and ULXP.

Sincerely,

FOLEY & LARDNER LLP

Erika L. Morabito

Enclosures