## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re:<br><br>    **LeClairRyan PLLC,**<br><br>Debtor | **Case No.: 19-34574-KRH**<br><br>**Chapter 7** |
| **Lynn L. Tavenner, as Chapter 7 Trustee,**<br><br>Plaintiff,<br><br>vs.<br><br>**ULX PARTNERS, LLC and UNITEDLEX CORPORATION,**<br><br>Defendants. | **Adv. Pro. No.:** _____ |

## COMPLAINT

Plaintiff, Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "Chapter 7 Trustee" or, the "Trustee") of the bankruptcy estate (the "Estate") of LeClairRyan, PLLC ("LeClairRyan" or the "Debtor"), by her undersigned counsel, states the following in support of this Adversary Complaint against Defendants ULX Partners, LLC ("ULXP") and UnitedLex Corporation ("UnitedLex") (collectively, the "ULX Entities" or "Defendants"):

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 600
Washington, DC 20007-5109
Telephone: (202) 672-5300
Telecopy: (202) 672-5399
emorabito@foley.com
bnelson@foley.com
*Special Counsel to Lynn L. Tavenner, Esq., the Chapter 7 Trustee of the Estate of LeClairRyan PLLC*

4850-3004-5648.2

## NATURE OF THE CASE

1.      This case arises from the business failure of Richmond-based law firm LeClairRyan.  On or about the fall of 2017, the struggling law firm began negotiating a potential joint venture with a legal services provider, UnitedLex, which was intended to resolve the firm's financial problems with an infusion of much needed liquidity.  In the end, however, rather than resolving the Debtor's financial issues, the actions or inactions of the ULX Entities only served to plunge LeClairRyan further into insolvency.  In fact, the Defendants, along with certain of the Debtor's directors, officers, and agents (the "LCR Officers and Directors"), prioritized their own desires for financial gain and prolonged the Debtor's lifespan, enabling the Defendants and others to improperly and unfairly extract millions of dollars from the Estate, to the detriment of LeClairRyan's creditors.

2.      As more fully set forth below, the structure of the ULXP joint venture, and the way in which it operated in practice, bestowed insider status on the ULX Entities vis-à-vis the Debtor. This resulted in, among other things, the creation of voidable liens and recoverable preferential transfers in an amount not less than $17,425,405.50.

3.      Irrespective of insider status, the ULX Entities are liable for not less than $19,357,282.51 in damages for fraudulent transfers.

4.      Moreover, the conspiracy between the ULX Entities and the LCR Officers and Directors caused damages in an amount of not less than $42,759,900, including but not limited to damages relating and/or arising out of (i) keeping the Debtor operating instead of winding down the insolvent law firm; (ii) the Debtor's conversion from a professional corporation to a professional limited liability corporation, a condition precedent to forming the joint venture with UnitedLex; (iii) the Debtor's liquidation of a retirement plan; and/or, (iv) the increase in trade payables and account receivables.

5.      Finally, the Defendants' actions also caused damages and harm to the Estate, in an amount of not less than $1,069,51.00 through their misappropriation of funds tendered by clients for specific expenses, which were used by the ULX Entities for improper purposes.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

7.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Chapter 11 Cases (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).

8.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a).

9.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

10.      This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and (8) to, among other things, determine the validity, priority, or extent of a lien or other interest in property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential and fraudulent obligations and transfers.

11.      Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

12.      On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4850-3004-5648.2

13.     On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1]  As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Estate.

14.     The Debtor was a law firm run, at different times, by a board of directors and/or managers.

15.     The Debtor was organized under the laws of the Commonwealth of Virginia.

16.     Defendant UnitedLex is a Delaware corporation with its principal place of business in Overland Park, Kansas.

17.     In September 2018, UnitedLex became a portfolio investment of CVC Capital Partners ("CVC"), a private equity and investment advisory firm.

18.     Defendant ULXP is a Delaware limited liability company.

19.     ULXP was created in 2018 as a joint venture between the Debtor and UnitedLex, and was 99% owned by UnitedLex.

20.     ULXP was also fully controlled and managed by a special purpose entity wholly owned and controlled by UnitedLex.

## STATEMENT OF FACTS

### A.     LeClairRyan's Dire Financial Status Prior to 2017.

21.     LeClairRyan was founded in 1988 by Dennis Ryan and Gary D. LeClair ("LeClair").  It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia.  But LeClairRyan rapidly expanded – ultimately opening offices or acquiring firms across the United States.

---

[1] *See* Appointment of Interim Trustee Lynn L. Tavenner, Dkt. No. 175.

4850-3004-5648.2

22.     Fundamental issues of financial mismanagement plagued the firm for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

23.     Beginning at least in 2014, LeClairRyan consistently missed its budget and its revenue fell short of projections.

24.     By at least the end of 2014, the Debtor was insolvent, or within the zone of insolvency, failing to generate sufficient revenue to pay its debts as they became due.

25.     In 2017, searching for a lifeline, the Debtor turned to a potential joint venture with a third-party, the legal services provider UnitedLex, as a way to address the Debtor's financial difficulties.

**B.      UnitedLex and LeClairRyan Enter Into a Joint Venture.**

26.     Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments.  These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support.  These non-legal services also include legal support services, like patent mining, document management, and electronic discovery.

27.     Upon information and belief, in approximately 2017 UnitedLex sought to move beyond merely being a vendor providing legal services to become more of a partner to a "constellation" of law firms.

28.     The joint venture between UnitedLex and LeClairRyan was intended to be the foundation of this proposed "constellation" structure in the United States.

4850-3004-5648.2

29.     UnitedLex advertised when the joint venture was announced, through ULXP, UnitedLex and LeClairRyan sought to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."[2]

30.     Under this model, ULXP would provide its constellation law firms with "market-leading technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics."[3]

31.     UnitedLex also advertised that the joint venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength."[4]

**C.    Initial Negotiations Regarding the ULXP Venture.**

32.     Negotiations between UnitedLex and LeClairRyan regarding the ULXP venture began on or about October 2017.

33.     Under the initial terms of the deal, including in a proposal presented to the Board of Directors of LeClairRyan (the "LCR Board") on December 29, 2017 (the "December 29 Proposal"), UnitedLex would control ULXP, but members of the LeClairRyan leadership team would hold senior leadership positions at ULXP.[5]

---

[2] *See Business Wire, "UnitedLex and LeClairRyan Achieve a 'Tour de Force' with the Launch of ULX Partners"* (June 13, 2018), *available at* https://www.businesswire.com/news/home/20180613005287/en/UnitedLex-LeClairRyan-Achieve-%E2%80%9CTour-de-Force%E2%80%9D-Launch.

[3] *Id.*

[4] *Id.*

[5] A true and correct copy of the December 29 Proposal is attached as Exhibit 1.

34.     Under the terms of the December 29 Proposal, LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the Debtor to provide an array of services to the firm. LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.[6]

35.     Under the terms of the December 29 Proposal, LeClairRyan was to receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.[7]

36.     Under the terms of the December 29 Proposal, LeClairRyan would also receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."[8]

37.     Upon information and belief, at the time of the December 29 Proposal, the parties were also considering an additional $13 million dollar loan to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

38.     The December 29 Proposal also included terms creating other financial incentives for the Debtor's individual shareholders, including an immediate full redemption of their shares in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving equity interests in UnitedLex through either annual or performance-based interests options.

---

[6] *Id*. at 1.

[7] *Id.*

[8] *Id.* at 2.

39.     Despite the fact that CVC's investment in UnitedLex was not formalized and would not be announced to the public until September 2018, CVC was an active participant in negotiating the deal from the start and, ultimately, was a critical driver of the final terms of the deal.

40.     Upon information and belief, behind closed doors, as the transaction was being negotiated, CVC was represented as being UnitedLex's "bankers" and CVC employees participated in multiple in-person meetings and discussions with the Debtor, UnitedLex, and others, regarding the structure of the transaction and relevant deal terms.

41.     For instance, on or about November 22, 2017, UnitedLex CEO Dan Reed ("Reed") told LeClair in an email that "the lead bankers from CVC will be flying to NYC next week to review a range of details re: our vision/future" and inviting him to join.[9]  Jennifer Weiss from Greenberg Traurig was also in attendance in this NYC meeting.

42.     Yet, when the deal was announced to the public, CVC's role was entirely omitted, such as when Reed touted the fact UnitedLex was "venture-backed by JP Morgan."[10]

43.     As described further in Paragraphs 94 to 109, below, UnitedLex ultimately required that LeClairRyan take several actions as conditions precedent to entering into the ULXP transaction.  Among these conditions, ULXP required LeClairRyan to convert from a professional corporation (PC) to a professional limited liability corporation (PLLC).

**D.**     **The Deal Changes Upon UnitedLex Learning of LeClairRyan's Financial Position.**

44.     During the winter and spring of 2018, the parties engaged in due diligence for the joint venture.

---

[9] A true and correct copy of the November 22, 2017 email from Reed to LeClair is attached as Exhibit 2.

[10] UnitedLex Partners: What exactly is it?  Legal IT Insider (Aug. 8, 2018) https://legaltechnology.com/unitedlex-ulx-partners-what-exactly-is-it/.

45.    Even though CVC was not a party to the transaction — its investment in UnitedLex would only be made public several months after ULXP was announced — CVC was, however, given access to confidential due diligence information related to the transaction.

46.    There was concern at the time from UnitedLex's counsel that CVC was receiving more information than UnitedLex.  For example, in a February 18, 2018 email, Reed noted that "[Greenberg] want[s] me to ensure that our board has the same level of information as has been provided to CVC to avoid any claim of unequal information. . . ."[11]

47.    On or about January 2018, UnitedLex hired a third-party, Doug Benson ("Benson") of $SB_2$ Consultants ("$SB_2$"), to conduct due diligence and assess the Debtor's finances.

48.    Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report").[12]

49.    The Benson Report gave United Lex insight into the poor and troubling condition of LeClairRyan's finances.

50.    In a March 21, 2018 email from Reed to LeClairRyan's then-CEO Erik Gustafson ("Gustafson") and LeClair (the "March 21-22 Reed Email Chain"), Reed described the findings contained in the Benson Report, explaining that "[Benson's] findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity. [Benson] goes as far as to *raise a question of going concern* given current obligations and being at the limit of its credit line and partner stability."[13]  (emphasis added).

---

[11] A true and correct copy of the February 18, 2018 email from Reed is attached as Exhibit 3.

[12] A true and correct copy of the Benson Report is attached as Exhibit 4.

[13] A true and correct copy of the March 21-22 Reed Email Chain is attached as Exhibit 5, at 3.

4850-3004-5648.2

51.    In the March 21-22 Reed Email Chain, Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path…we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."[14]

52.    In response to the March 21-22 Reed Email Chain, Gustafson provided a detailed rebuttal to the issues identified in the draft Benson Report and the concerns noted in the March 21-22 Reed Email Chain.  Gustafson claimed that LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."[15]

53.    As of March 22, 2018, UnitedLex knew, or should have known, that LeClairRyan was insolvent or in the zone of insolvency.

54.    For instance, replying to Gustafson's response to the March 21-22 Reed Email Chain, Reed stated, in relevant part:

> [t]he real challenge is liquidity for [LeClairRyan]. I was not expecting that [UnitedLex] would make the capital return, takeover the debt (which does not help [LeClairRyan] in terms of new liquidity) AND *then have to infuse material cash to ensure the firm can survive*. Doug's take away from [Dwight Jones] is that every day begins with a review of cash and serious concerns over the current situation.  ***Doug [Benson] has not come across a firm that is in [LeClairRyan]'s current cash position, and has expressed serious concern with its status as a going concern***…I also did not fully realize until seeing [the Benson Report] that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs.  Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our 'deal infusion,' how much is needed to operate the firm *without being in the perpetual red zone.*[16]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 1.

4850-3004-5648.2

(emphasis added).

**E.**    **UnitedLex and LeClairRyan Seek Legal Opinions to Support the Joint Venture.**

55.    LeClairRyan received legal advice with respect to the planned joint venture from Hinshaw & Culbertson LLP ("Hinshaw").

56.    Upon information and belief, UnitedLex also received legal advice with respect to the planned joint venture from Hinshaw.

57.    Hinshaw's role advising the parties was described in a March 19, 2018 executive summary of the contemplated transaction prepared for LeClairRyan's members (the "Project ULX Executive Summary").[17]

58.    The Hinshaw Summary states that LeClairRyan "individually engaged" Hinshaw to provide "an ethics opinion for the benefit of [LeClairRyan] confirming that the overall proposed transaction and deal structure are legal and ethical."[18]

59.    The Hinshaw Summary also states that UnitedLex "separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion."[19]

60.    UnitedLex had previously received a legal opinion from Hinshaw dated July 25, 2017 (the "July 2017 ULX Opinion"), regarding a similar joint venture transaction with another law firm.[20]

61.    The July 2017 ULX Opinion cautioned that UnitedLex could not "**under any circumstances have an ownership interest in [the law firm], or exercise any management or**

---

[17] A true and correct copy of the March 19, 2018 Project ULX Executive Summary is attached as Exhibit 6.

[18] *Id.* at 9.

[19] *Id.*

[20] A true and correct copy of the July 25, 2017 ULX Opinion is attached as Exhibit 7.

4850-3004-5648.2

**control over [the law firm], or over the provision of legal services by [the law firm]"** (emphasis in original).[21]

62.    The July 2017 ULX Opinion was referenced in term sheets prepared on or about October 2017, which began to sketch out the proposed transaction between UnitedLex and LeClairRyan.

63.    These early term sheets relied on the July 2017 ULX Opinion, among others, to claim that the deal under discussion was "[f]ully compliant with [the] Rules of Professional Conduct."[22]

64.    Following discussions between Hinshaw, LeClairRyan's then-General Counsel, Lori Thompson ("Thompson"), and others, Hinshaw provided the Debtor with an initial opinion letter on March 27, 2018.[23]

65.    A revised version of the opinion letter was provided to Thompson the following day (the "March 28, 2018 Opinion Letter").[24]

66.    The March 28, 2018 Opinion Letter was provided to the LCR Board in advance of its vote to approve entering into the ULXP transaction.

67.    However, the March 28, 2018 Opinion Letter was premised upon facts relevant to earlier versions of the deal terms and not the terms actually under negotiation at the time it was issued.

---

[21] *Id.* at 6.

[22] A true and correct copy of the October 10, 2017 Draft Summary of Terms is attached as Exhibit 8.

[23] A true and correct copy of the March 27, 2018 initial opinion from Hinshaw is attached as Exhibit 9.

[24] A true and correct copy of the March 28, 2018 Opinion Letter is attached as Exhibit 10.

4850-3004-5648.2

68.     For example, the March 28, 2018 Opinion Letter included references to "ULFS" –
United Law Firm Solutions – which was the name the parties had used for the joint venture during
negotiations in or around the Fall of 2017.[25]

69.     Notably, the March 28, 2018 Opinion Letter did not include any discussion
affirmatively stating that UnitedLex would not have an "ownership interest in" LeClairRyan or
that UnitedLex would not "exercise any management or control" over LeClairRyan.

70.     The March 28, 2018 Opinion Letter was never updated, not even after the structure
and operation of the joint venture were revised prior to the effective date of the agreements creating
ULXP, nor after aspects of the agreements creating ULXP were amended in or around the end of
2018.

71.     Upon information and belief, LCR Officers and Directors made false and/or
misleading statements to Hinshaw regarding the nature of the ULXP transaction.

72.     Upon information and belief, UnitedLex made false and/or misleading statements
to Hinshaw regarding the nature of the ULXP transaction.

**F.     Despite Knowing of LeClairRyan's Insolvency, the Debtor and UnitedLex Move
Forward to Create the Joint Venture.**

73.     Despite expressing serious reservations once they learned the true extent of
LeClairRyan's insolvency, CVC and UnitedLex pushed forward with the ULXP venture.

74.     Once the Debtor's financial situation was known, UnitedLex restructured the
proposed transaction between ULXP and LeClairRyan (the "Proposed Transaction") to reduce the
immediate financial benefits to the Debtor and bestow more control over the Debtor's operations
to ULXP, to the detriment of the Debtor's creditors.

---

[25] *Id.* at 2.

75.    First, CVC and UnitedLex immediately took the additional loans of up to $33 million off the table due to serious concerns about LeClairRyan's liquidity and earning potential.

76.    Thus, UnitedLex gave no new money to LeClairRyan as a part of the transaction.

77.    Second, the Debtor's equity interest in the venture was reduced, ultimately to merely 1%.

78.    Third, the Debtor and ULXP entered into an expansive Master Services Agreement (the "MSA") on or about April 4, 2018.[26]

79.    Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of the Debtor.[27]

80.    The breadth of these responsibilities is best illustrated by a section of the MSA entitled "Provider & Law Firm Responsibilities," which listed the contemplated responsibilities of ULXP in regards to several essential functions, including "Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security."

81.    The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions of ULXP's responsibilities under the MSA, which stated that ULXP would, among other things:

a.    "Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients."

b.    "Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the

---

[26] A true and correct copy of the April 29, 2018 MSA is attached as Exhibit 11.

[27] *Id.* at 1-2.

successful implementation of the Services, and (c) accomplish the goals of this Agreement."

c.  "Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities."

d.  "Manage all market-facing communications and marketing collateral, including Law Firm's website."

e.  "Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients."

f.  "Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level."

g.  "Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives."

h.  "Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work."

i.  "Manage employee relations issues and performance management issues at Law Firm and the Provider."

j.  "Identify, develop and propose compensation for Law Firm non-Members based on market data."

k.  "Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees."

l.  "Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm."

m.  "Manage and ensure the efficient functioning of Law Firm and Provider offices."

n.  "Track and manage efficient Law Firm time entry compliance."

o.  "Track and manage [work-in-progress], write downs and write-offs."

p.  "Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables."

4850-3004-5648.2

82.    Once the ULXP transaction was consummated, the Debtor was no longer able to function on its own without the support of the ULX Entities.

83.    The MSA also provided for fees to ULXP to be calculated under a combination of factors, including what the MSA described as "Invoice Fees" related to "Operations Services" and "Production Services."[28]

84.    The Operations Services Fees related to ULXP's provision of the different back office and other non-legal services that LeClairRyan transitioned to it.[29]

85.    The Production Services Fees were established through "*a calculation that is based on member distributable income and accrued revenue*," which are fees from the Debtor's legal services.[30]

86.    Thus, pursuant to the Production Services Fees, ULXP *was to be compensated based on net profits of the law firm from its provision of legal services*.

87.    Upon information and belief, ULXP was sharing in fees from LeClairRyan's legal practice, which is prohibited by the Virginia State Bar Rules of Professional Conduct (the "Rules of Professional Conduct").

88.    The MSA included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of the Law Firm."[31]

89.    Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"): (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member

---

[28] *See* MSA, *supra* n. 26, at 10-12.

[29] *Id*.

[30] *Id*.

[31] *Id.*

and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018); (2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of Class B Common Interest (effective April 4, 2018  and including the Operating Agreement as Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4, 2018); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement") between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

90.    Together, the JV Agreements granted the ULX Entities unprecedented control over the operation of the Debtor law firm.

91.    The Defendants used the JV Agreements to influence and control LeClairRyan's decision-making and require LeClairRyan to pay them ahead of other creditors.

92.    The Defendants also used the JV Agreements to influence and control LeClairRyan's decision-making, including requiring LeClairRyan to inappropriately misuse funds tendered by clients for specific costs and expenses.

93.    At the time the JV Agreements were executed, the LCR Board knew, or should have known, that LeClairRyan was insolvent or in the zone of insolvency.

**G.    As a Condition of the Joint Venture, LeClairRyan Converted from a Professional Corporation to a Professional Liability Corporation and Liquidated its Deferred Compensation and Supplemental Retirement Plans.**

94.    As a condition precedent to entering into the ULXP transaction, ULXP required LeClair Ryan to convert its corporate form from a PC to a PLLC.

95.    LeClairRyan converted from a PC to a PLLC as of March 31, 2018 (the "Conversion").

96.    The PLLC flow-through structure allowed for a single level of taxation on any capital gains that would have resulted from the shareholders' equity in ULXP.

97.     The effects of the Conversion were described in a March 22, 2018 email from Gustafson to Reed, which explained that one consequence of the Conversion was that the firm was able to "materially reduce [its] monthly cash burn [in 2018] by another $450k per month" (the "March 22, 2018 Gustafson Email").[32]

98.     In the March 22, 2018 Gustafson Email, Gustafson explained that the Conversion also allowed the firm to "pay about $30 million in partner draws on a tax deferred basis" which "create[d] a significant retention incentive through 2023, especially for [LeClairRyan's] biggest producers, because early departure can trigger a recapture tax event."[33]

99.     As the firm had previously explained to its shareholders in materials provided in advance of a February 24, 2018 meeting to approve the Conversion, "[r]etention of Partners via the equity incentive [was] a **key requirement for ULX**."[34] (emphasis added.)  The "conversion to an LLC to avoid double tax" was seen as "evidence [of] the value [LeClairRyan] place[d] in that incentive."[35]

100.    Certain accounting-related aspects of the Conversion are currently the subject of an IRS audit.

101.    The IRS filed a proof of claim in the bankruptcy (Claim No. 252), which, among other things, asserts a priority claim in the estimated amount of $4,759,175.17, based on the tax returns prepared in conjunction with the transaction and the accounting methods used therein.

---

[32] *See* Exhibit 5, *supra* n. 13.

[33] *Id.* at 2.

[34] A true and correct copy of the Conversion to LLC Net Cash Benefits Summary, an attachment to a February 24, 2018 email to Shareholders, is attached as Exhibit 12.

[35] *Id*. at 3.

102.    In addition, in connection with the ULXP transaction then-under negotiation, the LCR Board voted to terminate the firm's Deferred Compensation and Supplemental Retirement plans effective as of December 29, 2017.

103.    The effect of this termination was that the plan balances, totaling an amount not less than $12 million, became eligible to be transferred to shareholders beginning on or about December 29, 2018.

104.    Although these payments would have ordinarily been taxable to the shareholders receiving payments from the terminated plans, the tax savings realized from LeClairRyan's conversion from a PC to PLLC were passed through to the individual shareholders, who were able to use those net operating losses to offset the taxes that would have been owed on the distributions.

105.    LeClairRyan recognized this benefit in a January 13, 2018 draft summary of the Conversion prepared for its shareholders, which noted that "[t]hose distributions ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."[36]

106.    The termination and subsequent payments from the Deferred Compensation and Supplemental Retirement plans diverted funds from the Debtor's creditors.

107.    At or around the time of the transaction, the LCR Board and the LCR Officers and Directors breached their fiduciary duties of care and loyalty by, among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients

---

[36] A true and correct copy of the January 13, 2018 Project 100 Summary is attached as Exhibit 13.

4850-3004-5648.2

for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

108.    The ULX Entities aided and abetted the LCR Board's breach of its fiduciary duties of care and loyalty and conspired with the LCR Officers and Directors to breach the duties owed to the Debtor and its shareholders, clients, and creditors

109.    As a result of their breaches of fiduciary duties of care and loyalty, including their decision to enter into the ULXP transaction, instead of winding down the insolvent law firm, the LCR Officers and Directors caused significant damages to the Estate in an amount not less than $42,759,900.

**H.    ULXP Controls LeClairRyan Through the Joint Venture.**

110.    Following the execution of the MSA and JV Agreements, the ULX Entities worked as managing agents for the Debtor.

111.    The ULX Entities were in charge of key functions, such as accounting, marketing, conflict management, and business development.

112.    The ULX Entities accessed the Debtor's financial and other confidential information essential to the operation of the Debtor.

113.    Upon information and belief, the ULX Entities also incurred expenses on the Debtor's behalf.

114.    The ULX Entities also made personnel decisions regarding the Debtor's personnel.

115.    ULXP Employees were the directors of the following key operations at LeClairRyan: Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development.

116.    ULXP Employees regularly held themselves out to the public to be employees and decision-makers of LeClairRyan.

117.    For instance, in February 2019, Josh Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as the "Chief Operating Officer" of LeClairRyan, as well as an employee authorized to enter into business transactions on behalf of UnitedLex and ULXP.[37]

118.    In an August 8, 2018 email to Reed and UnitedLex CFO Nicholas Hinton ("Hinton"), along with certain ULXP directors, Peter Krakaur, then the UnitedLex Vice President, Legal Business Solutions ("Krakaur"), illustrated the operation of ULXP and UnitedLex.[38]  A PowerPoint attached to the email illustrated the service arrangement employed at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and LeClairRyan fully into UnitedLex's systems and processes.

119.    The diagram, reproduced below, shows a slow movement to full integration and dominance by UnitedLex – despite noted "potential issues" that would result from such a course of action.[39]



---

[37] A true and correct copy of the February 18, 2019 email from Rosenfeld to Proxios is attached as Exhibit 14.

[38] A true and correct copy of the August 8, 2018 email from Krakaur to Reed and Hinton is attached as Exhibit 15.

[39] A true and correct copy of the PowerPoint, which was attached to the August 8, 2018 email from Krakaur to Reed and Hinton, is attached as Exhibit 16.

120.   In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan]. We are slowly and necessarily integrating UXP (*sic*) operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm. Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes. The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.[40]

121.   As Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now ***the owner of the business of law***."[41] (emphasis added).

122.   Explaining further, Krakaur wrote, "[w]e all know law firms do not operate as a business.  ULXP is designed to change that.  Given the nature of the relationship, the agreements, ***and the practical aspects of us running the law firm***, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."[42]

123.   The Debtor's financial condition forced the ULX Entities to reluctantly accept an arrangement where the Debtor would ultimately receive between $10 to $12 million in cash flow float, through the ULX Entities' provision of services as well as by taking over payment of vendor fees, while receiving limited to no payments from LeClairRyan (the "Cash Flow Float").

**I.    The ULX Entities and CVC Grow Concerned Over LeClairRyan's Ability to Repay ULXP.**

124.   ULX Entities and CVC were concerned about LeClairRyan's ability to repay the investments and the Cash Flow Float being provided to the firm.

---

[40] *Id.* at 2-3.

[41] A true and correct copy of the August 10, 2018 email from Krakaur is attached as Exhibit 17.

[42] *Id.*

4850-3004-5648.2

125.    One reason that the ULX Entities and CVC were concerned was because CVC would be drawing its funding lines to extend the credit to LeClairRyan.

126.    On or about July 2018, CVC contemplated capping the Cash Flow Float at $8.5 million and thought about seeking a commitment from LeClairRyan that any incremental amounts would be subject to different payment terms.[43]

127.    CVC, in particular, had been concerned about LeClairRyan's finances and, during the negotiations had been focused on the growth of the float amounts and sought to include terms in the agreements to protect their investment, including proposing a term saying that payments to ULXP would have priority over distributions to LeClairRyan's members.  However, these terms were ultimately not included.

128.    The Cash Flow Float, however, was premised on (1) increased profitability by LeClairRyan and (2) the ULX Entities systems further optimizing that profitability by allowing attorneys to focus on the practice of law.

129.    Yet, because of LeClairRyan's continued and sustained financial problems, the ULX Entities knew or should have known that LeClairRyan did not have sufficient funds to pay its obligations as they came due – including making payments on the Cash Flow Float provided by the ULX Entities.

**J.      The ULX Entities Sought to Elevate ULXP's Priority Over Other Unsecured Creditors through an $8 Million Dollar Promissory Note.**

130.    By the end of 2018, the Debtor was continuing to experience shareholder defections and declining revenue.

---

[43] A true and correct copy of the July 2, 2018 email from Mohit Goyal is attached as Exhibit 18.

4850-3004-5648.2

131.    By the end of 2018, the Debtor owed the ULX Entities fees totaling more than $12 million.

132.    In April 2019, a year after entering in the joint venture and five months before the Debtor would file for bankruptcy protection, ULXP and the Debtor entered into an Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "ULXP Note")[44] and an accompanying Security Agreement (the "ULXP Security Agreement").[45]

133.    Both documents were signed on April 4, 2019 but backdated to December 20, 2018.

134.    Under the terms of the ULXP Note, the Debtor agreed to pay ULXP the principal amount of $8 million for alleged fees owed by the Debtor to ULXP under the MSA.

135.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.[46]

136.    The debt that formed the center of the purported loan consisted entirely of *prior advances* made by the ULX Entities to the Debtor.

137.    The result of the ULXP Note was to elevate ULXP's priority over other unsecured creditors.

138.    The Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

139.    That the ULXP Note was, in reality, an equity infusion is evidenced in part by the fact that the Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

---

[44] A true and correct copy of the ULXP Note is attached as Exhibit 19.

[45] A true and correct copy of the ULXP Security Agreement is attached as Exhibit 20.

[46] *See* ULXP Note, *supra* n. 44 at §§ 1, 3.

140.    Despite the premise of a loan, on January 22, 2019, Christopher Lange ("Lange"), a LeClairRyan attorney and the former Corporate Secretary, sent revisions to the ULXP Note to the ULX Entities' outside counsel, and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender [VCF] …would see as being equity like in that it is being paid from the return on our equity investment in [ULXP]."[47]

141.    This effort proved successful.   On January 31, VCF informed the Debtor that it approved the leverage ratio calculation so that the $8 million would be treated as equity, saying "[t]he [UnitedLex] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in."[48]

142.    United Lex knew or should have known that the ULXP Note was treated as equity by VCF.

143.    ULXP knew or should have known that the ULXP Note was treated as equity by VCF.

144.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the ULX Entities were providing equity and investing into the Debtor.

145.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the Debtor was not sufficiently capitalized to pay back the ULXP Note.

146.    LeClairRyan never made a single payment under the ULXP Note.

---

[47] A true and correct copy of the January 22, 2019 email from Lange is attached as Exhibit 21.

[48] A true and correct copy of the January 31, 2019 email from VCF attached as Exhibit 22.

**K.    The Defendants Take Further Control of the Debtor, Prioritizing Payments to ULXP Over All Others and Encouraging the Debtor to Misappropriate Funds Tendered by the Debtor's Clients for Specific Expenses.**

147.    In or around January 2019, the ULX Entities began to convene regular meetings with LeClairRyan's CFO, Dwight Jones ("Jones"), and other LCR Board members to discuss cash flow.

148.    Upon information and belief, in these meetings, Jones would meet with Hinton and the UnitedLex Controller to discuss 13-week cash flow forecasts and to address the payment installments for the ULX Entities.

149.    Hinton insisted that Jones prepare these 13-week cash flow forecasts, which showed weekly cash receipts and potential cash disbursements.    This type of cash flow forecast is most often used in situations where a company enters financial distress in order to provide visibility into the company's short-term options

150.     In connection with these meetings and discussions, Hinton also decided which of the firm's key vendors needed to be paid.

151.    These regular meetings became avenues for the ULX Entities to exert their control and ensure that their invoices were paid ahead of other creditors.

26

152.    As demonstrated by the chart below, between November 2018 and the Petition Date, payables due and owing from the Debtor to ULXP decreased by approximately 30.7%, while the Debtor's payables due and owing to all other creditors increased by approximately 181%:



**Comparison of Payable to ULXP to Other Accounts Payable**
*($ in millions)*

[1]  Excludes interest on $8,000,000 debt recharacterization.
[2]  Includes the following balance sheet line items: Accounts Payable, Credit Card and Accrued Expenses.

153.    The ULX Entities continued to demand weekly payments, with the Debtor's stated payment amounts needing to be at least $2 million a month.

154.    The ULX Entities would demand these payments, regardless of what other higher priority vendor payments were outstanding.

155.    Through these meetings, it was clear that the ULX Entities made the decisions about who was to be paid and when.

4850-3004-5648.2

156.    For example, in an email dated February 21, 2019, Jones explained that the Debtor would not be issuing a weekly payment to ULXP due to the need to handle outstanding payables for client reimbursements.[49]

157.    In response, Hinton sent an email to Gustafson asking him if this was LeClairRyan's position and noting that "[UnitedLex] is not the lowest priority vendor.  We are not LCR's bank."[50]

158.    Based on pressure exerted by the ULX Entities, the Debtor improperly prioritized payments to ULXP, to the detriment of other creditors and clients.

159.    Upon information and belief, there were also instances in which the Debtor did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Entities.

160.    Upon information and belief, in certain of these instances, individual attorneys had to pay for client fees out of pocket to avoid missing client deadlines.

161.    Upon information and belief, in other instances, the Debtor would not pay vendors who were handling aspects of clients' cases, even though the client had tendered funds to LeClairRyan for the purpose of paying those vendors.

162.    The ULX Entities encouraged LeClairRyan to commingle funds tendered by clients for specific expenses with operational funds that were used for other payments.

163.    The ULX Entities pushed back against efforts by the Debtor to cease, or limit, the practice of commingling client and operational funds as the firm approached bankruptcy.

164.    Indeed, Bruce Matson ("Matson"), the Debtor's former Chief Legal Officer, had previously raised this issue to the Debtor's senior leadership by 2016. Matson explained that funds

---

[49] A true and correct copy of the February 21, 2019 email from Jones is attached as Exhibit 23.

[50] *Id.*

tendered by clients, even those related directly to a client disbursement, were not being used for their earmarked purpose and were being intermingled and used to fund the Debtor's operations.

165.   Matson even expressed that the mismanagement of funds tendered by clients was "tantamount to misusing (intentionally) client trust funds."[51]

166.   Hinton was told by LCR Officers and Directors that these funds should not be used for any other purpose other than the purpose that the client intended.

167.   Despite this warning, in an April 10, 2019 email discussing this issue, Hinton told Jones, the then-Chief Financial Officer, to use the funds given to LeClairRyan by clients for expenses for its creditors, instead of "restrict[ing] the liquidity of the firm by creating artificial restricted cash pools."[52]

168.   This mishandling of these funds, related mismanagement of client affairs, and neglect of other important financial obligations in order to prioritize payments to ULXP was a further violation of fiduciary duties owed by the LCR Officers and Directors, including to its clients and creditors.

## L.   The Novellus Law Group, the Ultimate Demise of ULXP, and the Final Act Pushing LeClair Ryan into Bankruptcy.

169.   On or about early 2019, the Debtor's financial condition worsened.

170.   At that time, the Debtor and the ULX Entities embarked on an initiative known as "Project Modern."

171.   Project Modern was a last-ditch effort to keep the Debtor from filing bankruptcy whereby the ULX Entities sought to take even greater control of the Debtor.

---

[51] A true and correct copy of the May 2, 2016 email from Matson to Gustafson is attached as Exhibit 24.

[52] A true and correct copy of the April 10, 2019 email from Hinton is attached as Exhibit 25.

4850-3004-5648.2

172.    Project Modern morphed into the idea of creating a new law firm called the Novellus Law Group ("NLG").

173.    Presented to the Debtor's members on or around May 2019, the NLG concept involved forming a new partnership with UnitedLex in which certain of the Debtor's members would move back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.  UnitedLex would be compensated by utilizing a legal and management fee structure and retaining an $8 million dollar investment.

174.    NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that retained LeClairRyan's profitable members while leaving certain debt and other liabilities, including but not limited to real estate leases and technology costs, with LeClairRyan, which would have been wound down.

175.    Under the proposal, the debts owed by LeClairRyan to UnitedLex would be assumed by the newly-formed NLG.

176.    Other debt, including but not limited to debt to former shareholders and landlords, would not have been assumed by NLG.

177.    To incentivize them to join NLG, certain of the Debtor's members were promised equity in UnitedLex, which still hoped to grow by duplicating the failed ULXP business model with other law firms.

178.    In NLG offer letters, a select, group of the Debtor's members were offered base compensation, bonus potential, long term incentive compensation, benefits and payroll taxes –a package allegedly superior to that of the traditional law firm model.

4850-3004-5648.2

179. Yet, any new entity formed from the Debtor would still have to still grapple with the Debtor's liquidity issues.

180. Upon information and belief, these liquidity concerns were assuaged by the fact UnitedLex and CVC would provide financial backing to NLG.

181. By exploring this proposed transaction, which would have improperly prioritized certain creditors at the expense of others, the LCR Officers and Directors breached the fiduciary duty of care and loyalty.

182. Exploring this proposed transaction damaged the Estate by further deepening the insolvency of the Debtor.

183. On or about June 20, 2019, in connection with efforts to enact the NLG plan, Hinton and Reed began negotiating directly with the Debtor's lender, VCF, to provide more financing for NLG.

184. Upon information and belief, Hinton and Reed sought financial backing from VCF because both CVC and the UnitedLex Entities did not want to invest further money in LeClairRyan.

185. VCF eventually refused to provide the level of funding Hinton and Reed were seeking.

186. At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of ULXP.  This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

187. The Debtor's members voted on July 29, 2019 to formally wind-down LeClairRyan.

188.    On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**M.**    **Payments Made to ULXP by the Debtor.**

189.    Upon information and belief, during the relationship between the ULX Entities and

LeClairRyan, LeClairRyan transferred not less than $19,357,282.51 to ULXP between August 1,

2018 and the Petition Date (the "Avoidable Transfers"). The Avoidable Transfers are listed on the

attached Exhibit 26.

190.    Upon information and belief, of that amount, not less than $17,425,405.50 of the

transfers occurred within one year of the petition date (the "Preferential Transfers"). The

Preferential Transfers are listed on the attached Exhibit 27.

**COUNT I**

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code
Against ULXP and UnitedLex)**

191.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by references as if set forth in their entirety.

192.    The Avoidable Transfers, as detailed on Exhibit 26, were transfers of interests in

the Debtor's property.

193.    The Avoidable Transfers were made with actual intent of the Debtor to hinder,

delay, or defraud any entity to which the Debtor was or became, on or after the date that such

transfers were made or such obligation was incurred, indebted.

194.    The Defendants were not good faith transferees, and therefore are not entitled to

offset rights under section 548(c) and applicable non-bankruptcy law.

195.    Each Avoidable Transfer was accompanied by at least three badges of fraud

indicating the fraudulent nature of such transfer, including but not limited to the following: (i) the

transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the

Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were

being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the

Avoidable Transfers.

196.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

197.    As a result of the Avoidable Transfers, creditors of the Debtor sustained significant

damages.

198.    The Avoidable Transfers are avoidable as fraudulent transfers under Section

548(a)(1)(A) of the Bankruptcy Code.

199.    The Trustee reserves the right to seek the avoidance and recovery of any and all

additional avoidable transfers that she later discovers.

200.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not

less than $19,357,282.51, plus her reasonable attorneys' fees and costs, and all other relief the

Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

201.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

## COUNT II

**(Avoidance of Fraudulent Transfers Under Section 548(A)(1)(B) of the Bankruptcy Code
Against ULXP And UnitedLex)**

202.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by references as if set forth in their entirety.

203.    The Avoidable Transfers were transfers of interest in the Debtor's property.

204.    The Debtor did not receive reasonably equivalent value in exchange for the

Avoidable Transfers.

205.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

33

206.    The Avoidable Transfers were made while the Debtor were insolvent, or became insolvent as a result of the Avoidable Transfers.

207.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

208.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

209.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of 11 U.S.C. § 502.

210.    The Avoidable Transfers are avoidable transfers pursuant to Bankruptcy Code Section 548(a)(1)(B).

211.    The Debtor received less than a reasonably equivalent value in exchange for the Avoidable Transfers.

212.    The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

213.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

214.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

215.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

216.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

4850-3004-5648.2

## COUNT III

**(Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and Applicable State Law Against ULXP and UnitedLex)**

217.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

218.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

219.    The Avoidable Transfers were transfers of interest in the Debtor's property to the Defendants.  The Trustee reserves the right to seek the avoidance and recovery of any and all additional transfers that she later discovers.

220.    At all relevant times, the Debtor had at least one creditor with claims that arose before or within a reasonable time after the Petition was filed.

221.    The Defendants entered into each Avoidable Transfer with the actual intent to delay, hinder, or defraud the creditors of LeClairRyan.

222.    The primary purpose of the Avoidable Transfers was to take cash from LeClairRyan for the benefit of the Defendants without those assets being made available to LeClairRyan's other creditors.

223.     Each Avoidable Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the Avoidable Transfers.

224.    The Avoidable Transfers were made to or for the benefit of the Defendants.

4850-3004-5648.2

225.    The Avoidable Transfers were made within the six (6) years before the Petition

Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy

Code.

226.    The Trustee reserves the right to seek the avoidance and recovery of any and all

additional avoidable transfers that she later discovers.

227.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

228.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not

less than $19,425,405.51, plus her reasonable attorneys' fees and costs, and all other relief the

Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## <u>COUNT IV</u>

### (Avoidance of Preferences Under Section 547(b) of the Bankruptcy Code Against ULXP and UnitedLex)

229.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

230.    Between the Petition Date and one year before the Petition Date, the Debtor made

transfers (the "Preferential Transfers") to or for the benefit of the Defendants, as set forth on

Exhibit 27.

231.    The Preferential Transfers were for or on account of an antecedent debt owed by

the Debtor before the Preferential Transfers were made.

232.    The Defendants are statutory insiders for the Debtor, within the meaning of Section

101(31)(F) of the Bankruptcy Code.

233.    The Defendants are also non-statutory insiders of the Debtor.

234.    The Defendants were managing agents of the Debtor, as they accessed the Debtor's

financial and other information essential to the operation of the Debtor, incurred expenses on the

4850-3004-5648.2

Debtor's behalf, made personnel decisions, and were in charge of key functions, such as accounting, marketing, conflict management, and business development.

235.    The Debtor was insolvent at all times within one year of the Petition Date.

236.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544 or 548 of the Bankruptcy Code, such portion is plead here, in the alternative, as a Preferential Transfer.

237.    The Preferential Transfers enabled the Defendants, as creditors, to receive more than they would have received had the transfer not been made and the creditor received payment of such debt under Chapter 7.

238.    The Preferential Transfers are avoidable as preferences under Section 547 of the Bankruptcy Code.

239.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

240.    The Preferential Transfers are recoverable from United Lex as an alter ego of ULXP.

241.    The Trustee is entitled to the full amount of the Preferential Transfers, totaling not less than $17,425,405.50, plus her reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

## COUNT V

### (Avoidance of Lien and Recovery of Avoided Transactions Under Sections 550(a) of the Bankruptcy Code Against ULXP)

242.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

243.    To the extent that any transaction is avoided under Bankruptcy Sections 544, 547, and/or 548, pursuant to section 544(b) of the Bankruptcy Code, ULXP's claims and liens against the Debtor are avoidable.

244.    Pursuant to section 551 of the Bankruptcy Code, ULXP's claims and liens that are avoidable herein shall be preserved for the benefit of the Debtor's Estate.

245.    The Claims consist of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

246.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.

247.    Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.

248.    ULXP was granted liens securing the commitments pursuant to the ULXP Note.

249.    During all relevant times, ULXP was both a statutory and non-statutory insider.

250.    The grant of the security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to the benefit of insider ULXP (the "ULXP Note Transfer").

251.    The Debtor made such a transfer for or on account of an antecedent debt owed by the Debtor to ULXP before the ULXP Note Transfer was made.

252.    At the time the Debtor made the ULXP Note Transfer, the liabilities of LeClairRyan exceeded the fair value of its assets and it was insolvent.

253.    LeClairRyan made the ULXP Note Transfer within the one-year period before the Petition Date.

254.    The ULXP Note Transfer enabled ULXP to receive more than they would receive if the transfer had not been made.

255.    Based on the foregoing, the ULXP Note Transfer is avoidable pursuant to 11 U.S.C. § 547.

## COUNT VI

### (Avoidance of Fraudulent Transfer Under Section 544(b) and Section 550 of the Bankruptcy Code and Applicable State Law Against ULXP)

256.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

257.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

258.    The ULXP Note Transfer was a transfer of interest in the Debtor's property to ULXP.

259.    At all relevant times, the Debtor had at least one creditor with claims that arose before or within a reasonable time after the Petition was filed.

260.    The Debtor entered into the ULXP Note Transfer with the actual intent to delay, hinder, or defraud the creditors of LeClairRyan.

261.    The ULXP Note Transfer was made to or for the benefit of ULXP.

262.    The ULXP Note Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the ULXP Note Transfer was made to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the  ULXP Note Transfer was made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the ULXP Note Transfer.

4850-3004-5648.2

263.   The ULXP Note Transfer was made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

264.   The ULXP Note Transfer should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) or (B), and 550 and applicable state fraudulent transfer law.

## COUNT VII

**(Disallowance of Claims under 11 U.S.C. § 502(d)) Against ULXP and UnitedLex)**

265.   The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

266.   As alleged above, the Defendants were the recipients of the Avoidable Transfers and the Preferential Transfers which are avoidable pursuant to Section 547 of the Bankruptcy Code, and which are recoverable pursuant to Section 550 of the Bankruptcy Code.

267.   Despite a demand, ULXP has not returned the Avoidable Transfers to the Trustee.[53]

268.   Pursuant to Section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property is recoverable under Section 550(a) of the Bankruptcy Code.

269.   Because the Defendants have not paid or returned the Avoidable Transfers to the Trustee, ULXP's Claims or any claims which ULXP or UnitedLex purport to assert must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

270.   The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the Defendants' claims against the Debtor's Estate are disallowed.

---

[53] A true and correct copy of the demand letter sent June 8, 2020 is attached as Exhibit 28.

4850-3004-5648.2

## COUNT VIII

**(Re-Characterization of Debt as Equity Against ULXP)**

271.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

272.    ULXP has filed a claim that asserts a right to payments allegedly owed by the Debtor (Proof of Claim Nos. 174) (the "Secured Claim").

273.    The Secured Claim consists of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

274.    The Secured Claims were equitable contributions to the Debtor where the Debtor was undercapitalized, and the Defendants' $8 million dollar loan consisted of prior advances made by the Defendants to the Debtor.

275.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.

276.    The Debtor made no payments on the $8 million-dollar ULXP Note.

277.    As a result of the Defendants' equitable contribution, the Court should recharacterize as equity ULXP's Proof of Claim No. 174 in its entirety pursuant to this Court's equitable powers.

## COUNT IX

**(Aiding and Abetting Breach of Fiduciary Duty Against UnitedLex, ULXP)**

278.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

279.    From at least until or around 2017 and until or around 2019, the Defendants aided and abetted the breaches of fiduciary duty of due care and loyalty by one or more of the LCR

4850-3004-5648.2

Board and the LCR Officers, who owed such fiduciary duties to the Debtor and/or its shareholders, clients, and creditors at all relevant times.

280.    The Defendants did so knowingly, or having reason to know, the nature of the injury to the Debtor and Debtor's creditors brought about by such assistance.

281.    The Defendants substantially assisted one or more of the LCR Officers and Directors knowingly, or having reason to know, the nature of the injury to the Debtor and the Debtor's creditors brought about by such assistance.

282.    The Defendants directly benefited from aiding and abetting such breaches of fiduciary duty and self-dealing by reaping financial rewards to which they were not entitled.

283.    As a direct and proximate result of aiding and abetting breaches of fiduciary duty and self-dealing, the Debtor and its creditors sustained significant damages, including but not limited to damages resulting in the deepening insolvency of the Debtor.

284.    As a result of the Defendants' aiding and abetting of the aforementioned breaches by one or more of the LCR Officers and Directors, the Trustee is entitled to recover the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than $42,759,900.

## COUNT X

**(Statutory Conspiracy Against UnitedLex, ULXP pursuant to
Virginia Code § 18.2-499, et seq.)**

285.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

286.    From at least until in or around 2017 to until or around 2019, the Defendants and one or more of the LCR Officers and Directors acted in concert, agreed, associated, mutually

undertook, or combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused injury and damage to the Debtor and creditors of the Debtor.

287.    The Defendants violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to the LCR Officers and Directors for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

288.    The Defendants conspired to breach the fiduciary duties the LCR Officers and Directors owed to the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

289.    The unlawful acts include, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

290.    The Defendants wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

291.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one of more of the LCR Officers and Directors, the Debtor and its creditors suffered significant damages, including but not limited to damages related to the Debtor's deepening insolvency.

292.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act (the "VBCA").

4850-3004-5648.2

293.    The Debtor suffered injury from extending the life of the Debtor, life dissipation of assets, and increased insolvency.  As such, the Debtor's creditors lost assets that would have otherwise been available to satisfy their claims.

294.    As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

295.    The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code.

## COUNT XI

### (Common Law Conspiracy against UnitedLex, ULXP)

296.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

297.    From at least until on or around 2017 to until or around August 2019, the Defendants and one or more of the LCR Director and Officers acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

298.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties the LCR Board and the LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for

specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

299.    The Defendants and one or more of the LCR Officers and Directors intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

300.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one or more of the LCR Officers and Directors, the Debtor and their creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

301.    As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

## COUNT XII

### (Conversion Against UnitedLex, ULXP)

302.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

303.    Rather than utilizing monies that had been tendered by the Debtor's clients for specific expense (the "Expense Transfers"), the Debtors instead turned said monies over to the Defendants.

304.    The Expense Transfers were wrongfully paid to the Defendants.

305.    The Trustee is entitled to immediate possession of the Expense Transfers.

306.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $1,069,510.00.

## COUNT XIII

### (Unjust Enrichment Against UnitedLex, ULXP)

307. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

308. By accepting funds that were taken inappropriately, at least in part, from funds tendered by the Debtor's clients for specific expenses, UnitedLex and ULXP were conferred a benefit by LeClairRyan's clients.

309. The ULX Entities knew, or should have known, that the funds received by ULXP were tendered to the Debtor by clients of LeClairRyan to be used for specific expenses.

310. UnitedLex and ULXP accepted and retained this benefit in circumstances that render it inequitable for them to retain the benefit without paying for its value.

311. The Trustee is entitled to damages as a result of this unjust enrichment in an amount to be proven at trial, but in an amount not less than $1,069,510.00.

## COUNT XIV

### (Alter Ego Liability Against UnitedLex)

312. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

313. ULXP was an alter ego of UnitedLex.

314. There existed a unity of interest and ownership between the Defendants that created no separate personalities for each entity.  ULXP is the adjunct, creature, instrumentality, device, stooge, or dummy of UnitedLex.

315. The CEO of UnitedLex, was the sole managing member of UnitedLex Manager.

316. The Defendants shared staff and assets through the Shared Personnel Agreement entered into between the two entities.

46

4850-3004-5648.2

317.    ULXP was used to justify wrongs, protect fraudulent transfers, and to conspire with the LCR Board to breach the fiduciary duties the LCR Board and LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors; or at a minimum, aided and abetted this breach.

318.    As such, UnitedLex formed and operated ULXP as a device or sham used to disguise this wrongful conduct.

319.    Consequently, all monies that ULXP is required to return to the Estate should be enforced against UnitedLex.

320.    The Trustee is entitled to recover all damages asserted in the Complaint, jointly and severally from UnitedLex and ULXP, which operated as UnitedLex's alter ego.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)    On Counts I and II, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the Avoidable Transfers, and directing the Defendants to pay the Trustee an amount to be determined at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

(b)    On Count III, awarding judgment to the Trustee, pursuant to Sections 544 and 550 of the Bankruptcy Code, Va. Code Sections 55-80 and 55-81, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount to be proven at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(c)    On Count IV, awarding judgment to the Trustee, pursuant to Section 547 of the Bankruptcy Code, in an amount to be proven at trial that is not less than $17,425,405.50, pursuant to Section 550(a) of the Bankruptcy Code;

(d)    On Counts V and VI, avoiding all of ULXP's liens asserted against the Debtor's Estate;

(e)     On Count VII, disallowing any claim of the Defendants pursuant to section 502(d) of the Bankruptcy Code;

(f)     On Count VIII, recharacterizing ULXP's Proof of Claim No. 174 as a claim of equity;

(g)     On Count IX, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the Defendants' aiding and abetting breaches of fiduciary duties and self-dealing in an amount to be proven at trial, but totaling not less than $42,759,900;

(h)     On Count X, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of violation of the VBCA, for three times the damages caused to the Debtor as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, in an amount to be proven at trial, but totaling not less than $128,279,700;

(i)     On Count XI, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the civil conspiracy in an amount to be proven at trial, but totaling not less than $42,759,900;

(j)     On Count XII, awarding judgment to the Trustee for damages caused to the Debtor and its creditors and clients, as a result of the Defendants acts of conversion in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(k)     On Count XIII, awarding judgment to the Trustee for turnover of money or the value thereof, which does not belong to the Defendants, in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(l)     On Count XIV, finding that ULXP was the alter ego of UnitedLex and that ULXP and United Lex are jointly and severally liable for all damages resulting from this Adversary Proceeding;

(m)     Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(n)     Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(o)     Directing the Defendants to pay forthwith all amounts awarded; and

(p)      Granting such other relief as the Bankruptcy Court deems just and proper.


Dated:    October 26, 2020                    Respectfully submitted,


                                             */s/ Erika L. Morabito*
                                             Erika L. Morabito (VSB No. 44369)
                                             Brittany J. Nelson (VSB No. 81734)
                                             FOLEY & LARDNER LLP
                                             3000 K Street, NW, Suite 600
                                             Washington, DC 20007-5109
                                             (202) 672-5300 (telephone)
                                             (202) 672-5399 (facsimile)
                                             emorabito@foley.com
                                             bnelson@foley.com

                                             *Special Counsel to Lynn L. Tavenner, Chapter 7
                                             Trustee*

4850-3004-5648.2