## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| In re: | **Case No.: 19-34574-KRH** |
|     **LeClairRyan PLLC,** | **Chapter 7** |
|         Debtor | |
| **Lynn L. Tavenner, as Chapter 7 Trustee,** | |
|         Plaintiff, | |
| vs. | **Adv. Pro. No.: 20-03142-KRH** |
| **ULX PARTNERS, LLC and UNITEDLEX CORPORATION,** | |
|         Defendants. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS'
## MOTION TO WITHDRAW THE REFERENCE

Plaintiff Lynn L. Tavenner, solely in her capacity as Chapter 7 Trustee ("**Plaintiff**" or "**Trustee**") for LeClairRyan, PLLC ("**LeClairRyan**" or the "**Debtor**"), respectfully submits this opposition to the Motion to Withdraw the Reference (the "**Motion**" or "**Mot.**") filed by Defendants ULX Partners, LLC ("**ULXP**") and UnitedLex Corporation ("**UnitedLex**" and, together with ULXP, the "**Defendants**"), and states as follows:

## I.    INTRODUCTION

The Defendants cannot meet their burden of establishing why the reference to the Bankruptcy Court should be withdrawn.  Consequently, their Motion should be denied.

- *First*, each of the Trustee's claims are "core" claims under the Bankruptcy Code, for which the Bankruptcy Court has the authority to issue a final judgment.  Many of the claims are specifically listed as "core" under 28 U.S.C. § 157(b)(2) because

they consist of rights derived under the Bankruptcy Code,[1] such as avoidance powers and disallowance of claims.  The Trustee's state law claims against the Defendants are also "core" because they are inextricably intertwined, factually and legally, with both (a) the resolution of ULXP's proofs of claim, and (b) the adjudication of the Trustee's core claims.  Under well-established law in this District and elsewhere, the Trustee's state law claims are therefore "core" as well.

- *Second*, contrary to their unwarranted assumptions, the Defendants have no right to a jury trial on any of the Trustee's claims.  Many of the Trustee's claims are equitable in nature for which the Defendants have no right to a jury trial.  Moreover, because ULXP filed proofs of claim, and the resolution of the Trustee's claims are intertwined with those proofs of claim, all of the Trustee's claims are deemed equitable in nature for which there is no right to a jury trial.[2]

- *Third*, because the Bankruptcy Court has great familiarity with the Debtor's chapter 7 case and the background underlying the Complaint, and also has incontrovertible expertise as to the Bankruptcy Code-based claims at the heart of the Trustee's Complaint, the interests of efficiency, judicial economy and uniform administration of this bankruptcy case all favor denial of the Motion.

- *Fourth*, the Defendants seek to use the Motion as an "escape hatch" from the Bankruptcy Court, which is disfavored under the law.

- *Fifth and finally*, the Motion is premature because the Bankruptcy Court should first decide if Defendants have a right to a jury trial and if the claims at issue are "core" before this Court hears a Motion to Withdraw the Reference.  In addition, the Defendants have a motion to dismiss pending and have not yet even demanded a jury on any claims.  At a minimum, this Court should defer any ruling on the Motion and allow the Bankruptcy Court to supervise discovery and manage pretrial proceedings in this case, which is a normal practice in addressing motions to withdraw the reference.

For these reasons and those set forth below, the Defendants' Motion should be denied.

## II.    **FACTUAL AND PROCEDURAL BACKGROUND**

1.    The Trustee's Complaint against the Defendants (the "**Complaint**") arises from the

failure and ultimate bankruptcy of LeClairRyan, a Richmond-based law firm.  The Motion barely

---

[1] References to the "Bankruptcy Code" herein , are to Title 11 of the United States Code, 11 U.S.C. §§ *et seq*.

[2] The Trustee does not concede that these Defendants (or any future defendants) would have a jury trial right on these or other claims, regardless of whether or not they filed a proof of claim, as that is an analysis that is done on a case-by-case basis. Here, as to these claims, that analysis is not needed, as ULXP clearly waived its jury trial right by submitting proofs of claim.

2

discusses the factual allegations in the Complaint and gives short shrift to the nature of the

Trustee's claims.  Accordingly, a summary of certain key facts, as alleged in the Complaint, are

set forth below.[3]

### A.    LeClairRyan's Financial Problems Spanned Many Years

2.    LeClairRyan grew from a two-partner law firm in 1988 to a national firm with

offices across the United States.  Despite this rapid growth, LeClairRyan had significant financial

issues for many years caused by, among other things, over-compensation of certain attorneys,

declining revenues, which fell short of projections and budgets by millions of dollars, and improper

and erroneous accounting for certain income and expense items.  (¶¶21-22)[4]

### B.    LeClairRyan Entered Into An Unorthodox Venture With UnitedLex

3.    Facing these dire circumstances, in 2017, LeClairRyan turned to a potential venture

with Defendant UnitedLex, a legal services provider, as a way out of its financial distress.

UnitedLex provides non-legal services to law firms and legal departments, including (a) "back-

office" services such as accounting, marketing, technology, and human resources support, and (b)

legal support services, such as patent mining, document management, and electronic discovery.

(¶¶25-26)

4.    At that time, UnitedLex sought to move beyond merely being a vendor providing

support services to becoming more of a partner to a "constellation" of law firms.  UnitedLex

believed that the venture between UnitedLex and LeClairRyan – which became Defendant ULXP

– would become the foundation of this proposed "constellation" structure.  (¶¶27-28)  Under this

new so-called "model," ULXP would provide its constellation law firms with "market-leading

---

[3] A copy of the Complaint (excluding exhibits) is attached hereto as **Exhibit A**.  A copy of the Complaint (including exhibits) is available at Adv. Pro. No. 20-03142 (Bankr. E.D. Va.), Dkt. No. 4.

[4] Paragraph citations are to the Complaint.

technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics." UnitedLex also bragged that its venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength." (¶¶30-31)  Under the initial deal terms circulated between UnitedLex and LeClairRyan, UnitedLex would have controlled ULXP, but senior members of LeClairRyan would also have held senior leadership positions at ULXP.  In addition, LeClairRyan was expected to receive, among other things, a material equity interest in ULXP as well as up to $33 million in loans to assist LeClairRyan's liquidity.  (¶¶33-37)

  C.  **LeClairRyan's Financial Woes Led UnitedLex To Revamp The Deal In A Way That Limited LeClairRyan's Financial Benefits And Maximized UnitedLex's Control**

  5.  In January 2018, UnitedLex hired a consultant to analyze LeClairRyan's financial situation.  The consultant's report painted a dire picture of LeClairRyan's finances.  The report raised serious questions regarding whether LeClairRyan could continue as a going concern given its current obligations, lack of access to credit and partner instability.  (¶¶47-50, 54)

  6.  Upon learning of LeClairRyan's precarious financial situation, UnitedLex restructured the proposed transaction between ULXP and LeClairRyan in two principal ways. First, UnitedLex reduced the financial benefits that LeClairRyan would receive under the deal. UnitedLex took the additional loans of up to $33 million to LeClairRyan off the table.  UnitedLex therefore provided no new money to LeClairRyan as part of the transaction.   In addition, LeClairRyan's equity interest in ULXP was reduced, ultimately to only 1%.  UnitedLex owned the other 99% of ULXP. (¶¶19, 74-77)

7.      Second, pursuant to an April 4, 2018 Master Services Agreement between ULXP and LeClairRyan (the "**MSA**"), ULXP assumed overwhelming control over LeClairRyan, including core law firm functions such as "Legal Operations & Administration, "Client Relations & Business Development," and "Conflicts & Engagement Management."[5]  ULXP took over control of LeClairRyan despite a 2017 legal opinion that it received from Hinshaw & Culbertson LLP opining that UnitedLex could not "under any circumstances have an ownership interest in [the law firm], or exercise any management or control over [the law firm], or over the provision of legal services by [the law firm]."  (¶¶61, 79-81)

8.      The MSA also provided that ULXP would earn fees for both "Operations Services" and "Production Services."  The Operations Services fees related to ULXP's provision of back-office, non-legal services.  The Production Services fees, however, compensated ULXP based on the net profits of LeClairRyan in its provision of legal services.  ULXP (and thus UnitedLex) thus shared in legal fee profits despite the prohibition on this practice by the Virginia State Bar Rules of Professional Conduct.  (¶¶83-86)

**D.      The Defendants Exercise Their Control To Dominate LeClairRyan And Improve Their Position**

9.      After the execution of the MSA and separate other agreements, the Defendants exercised substantial control over LeClairRyan.  They were in charge of key functions such as accounting, marketing, conflict management and business development.  They also made personnel decisions on LeClairRyan's employees and held themselves out to the public as employees and decision-makers of LeClairRyan.

---

[5] The staggering breadth of LeClairRyan's ceding of control to ULXP under the MSA is set forth in ¶ 81 of the Complaint.

10.    The Defendants' assumption of control was part of their ongoing plan to take over LeClairRyan.  In August 2018, Peter Krakaur, UnitedLex's Vice President of Business Solutions, stated in a presentation that "[o]ver time, we will shift ULXP and (and LeClairRyan) towards [UnitedLex] systems and processes.  The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen."   Mr. Krakaur also opined that "ULXP is now the ***owner of the business of law***" and characterized ULXP as "running the law firm."  (¶¶118-122) (emphasis added).

11.    The Defendants' control over LeClairRyan allowed them to strategically improve their financial position at the expense of LeClairRyan's creditors.   By the end of 2018, LeClairRyan was continuing to experience shareholder defections and declining revenue.  At the same time, LeClairRyan owed the Defendants more than $12 million in fees.  (¶¶130-31)

12.     In April 2019, only five months before LeClairRyan's bankruptcy case, the Defendants converted their outstanding claim for alleged fees owed by LeClairRyan into a secured note held by ULXP.  On April 4, 2019, ULXP and LeClairRyan entered into an Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "**ULXP Note**") and an accompanying Security Agreement (the "**ULXP Security Agreement**").  The parties purported to back date the documents to December 20, 2018.  (¶¶132-34)

13.    By purporting to obtain a "secured claim" against the Debtors under the ULXP Note and Security Agreement, the Defendants attempted to leapfrog in priority over the Debtors' unsecured creditors.  In reality, the ULXP Note was an equity infusion.  (¶¶137-44)

14.    Moreover, the Defendants also improved their positions significantly by controlling and manipulating the debts that LeClairRyan would, and would not, pay.  The Defendants routinely

demanded weekly payments from LeClairRyan and ensured that their invoices would be paid ahead of other creditors.  Indeed, between November 2018 and LeClairRyan's bankruptcy in September 2019, the payables that LeClairRyan owed to ULXP **decreased** by approximately 30.7%, while LeClairRyan's payables owed to all other creditors **increased** by approximately 181%.  (¶¶150-55)

15.    The Defendants also encouraged LeClairRyan to commingle and mishandle funds tendered by clients for specific expenses, and instead to use such funds to prioritize operational expenses, including payments to ULXP.  (¶¶161-68)

### E.    LeClairRyan Spirals Into Bankruptcy

16.    In early 2019, LeClairRyan's financial condition worsened.  In the late Spring and Summer of 2019, the Defendants engaged in various last-ditch efforts to avoid LeClairRyan filing bankruptcy, including exerting even more control over the firm and orchestrating a spin-off that would create a new entity while leaving the debts and problems behind with the old LeClairRyan shell.  (¶¶169-82)  Those efforts failed.  Accordingly, on September 3, 2019 (the "**Petition Date**"), LeClairRyan filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  (¶¶183-88)

### F.    LeClairRyan's Bankruptcy Case

17.    Although filed as a chapter 11 case, there was no hope that LeClairRyan could be restructured in any form.  As such, on September 12, 2019, the Office of the United States Trustee filed a motion to convert the Debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code (the "**Conversion Motion**").  (Main Case,[6] Dkt. No. 61).  That same day, attorneys from

---

[6] Citations to the "Main Case" are to the Debtor's chapter 7 case, Case No. 19-34574.  Otherwise, Dkt. No. references are to the underlying adversary proceeding.

Greenberg Traurig, LLP filed joint appearances on behalf of both ULXP and UnitedLex. (Main Case, Dkt. Nos. 62-64).

18.    On October 4, 2019, the Bankruptcy Court granted the Conversion Motion, converting the Debtor's case to chapter 7. (Main Case, Dkt. No. 140). Also on October 4, 2019, the Trustee was appointed as the chapter 7 trustee of the Debtor's bankruptcy estate (the "**Estate**"). (Main Case, Dkt. No. 175).

19.    Upon her appointment, among other things, the Trustee conferred with former management and counsel for the Debtor and also reviewed various pleadings filed by the Debtor. The Trustee ascertained from pleadings, as confirmed by further due diligence, the Debtor's disclosure of the purported second-priority lien of ULXP and further statements that:

> LeClairRyan holds a portion of the ownership interests in ULXP and has certain control rights in ULXP such that, together with the other facts and circumstances concerning the relationship between LeClairRyan and ULXP, LeClairRyan believes that ULXP may be an insider of the Debtor under Bankruptcy Code section 101(31). **The Debtor believes that any security interest transferred to ULXP may be an avoidable transfer to an insider pursuant to section 547(b) of the Bankruptcy Code or, alternatively, an avoidable transfer pursuant to section 548(a)(1)(B).**

Debtor's Cash Collateral Motion at ¶ 12, Main Case, Dkt. No. 13.[7]

20.    On the same day as her appointment, the Trustee also obtained approval to continue the Debtor's operations for limited wind-down purposes, including, but not limited to, the collection of outstanding accounts receivable. The Trustee utilized, as members of her wind-down team, individuals who had provided services to LeClairRyan before the bankruptcy filing, which individuals included Defendants' personnel. In connection with her wind-down operations, she

---

[7] In addition, the Trustee reviewed the Declaration of Lori D. Thompson, Esq. in Support of Chapter 11 Petition and First Day Motions (Main Case, Dkt. No. 3), wherein Ms. Thompson stated under penalty of perjury that it was the Debtor's belief that any security interest transferred to ULXP may be an avoidable transfer to an insider pursuant to section 547(b) of the Bankruptcy Code or, alternatively, an avoidable transfer pursuant to section 548(a)(1)(B).

filed the *Trustee's Motion for Use of Cash Collateral and Grant of Adequate Protection Related Thereto and Memorandum in Support Thereof* (the "**Cash Collateral Motion**") (Main Case, Dkt. No. 143). The relief requested in the Cash Collateral Motion was granted pursuant to numerous orders of the Bankruptcy Court (collectively, the "**Cash Collateral Orders**") (Main Case, Dkt. Nos. 151, 191, 255, 309, 339, 387, 453, 550, and 617). Each of these Cash Collateral Orders allowed the Trustee to use cash on hand, subject to an agreed budget with the first-lien lender, and also provided a replacement lien to ULXP, *but only to the extent that its purported liens "are not subsequently avoided."* With full knowledge of such language, ULXP, as a putative secured lender, did not responded until a year after the Trustee's wind-down operations began.

21. On October 2, 2020, the Trustee filed *Trustee's Supplemental Motion for Use of Cash Collateral and Grant of Adequate Protection Related Thereto, If Appropriate, and Memorandum in Support Thereof* (the "**Supplemental Cash Collateral Motion**") (Main Case, Dkt. No. 645), wherein the Trustee, after having conducted her own due diligence upon the declarations of the Debtor and statements at Court hearings, submitted that, among other things, ULXP is a "statutory" insider of the Debtor as "managing agent," having, among other things, (a) exerted operational control over the Debtor, (b) had the ability to make personnel decisions, (c) had the authority to incur or pay obligations, and (d) had access to financial and other information essential to the Debtor's operations. Furthermore, the Trustee contended, among other things, that ULXP is also a "non-statutory" insider for similar reasons.

22. Thereafter, on October 16, 2020, ULXP filed an objection to the Supplemental Cash Collateral Motion (Main Case, Dkt. No. 658), asserting that it possessed a secured claim of over $8 million for amounts allegedly due and owing. ULXP argued that, absent more "adequate

protection" for its alleged secured position, the Trustee should not have been able to use cash collateral over which it asserted a lien.  (*See id.* at 2, 11-17).

24.     On October 29 and 30, 2020, the Bankruptcy Court held a hearing on the Supplemental Cash Collateral Motion.  (*See* Transcript of Oct. 30, 2020 Hearing, Main Case, Dkt. No. 689).  At that hearing, the Court heard extensive testimony (direct and cross examination) from the Trustee and lengthy arguments on, among other things, (a) the history of LeClairRyan, (b) LeClairRyan's relationship with the Defendants, (c) the Trustee's allegations of wrongdoing that ultimately formed the basis of the Complaint, (d) the validity and value of ULXP's purported secured claim; and (e) ULXP's justifications for their actions and alleged secured claim.  The Court overruled ULXP's objection, found that ULXP had "failed to establish that it had a claim that was entitled to protection," and authorized the Trustee's continued use of cash collateral pursuant to the Court's tenth interim order authorizing use of cash collateral.  (Main Case, Dkt. No. 688).

G.     **The Proofs Of Claim And Additional Participation In The Bankruptcy**

24.     On December 12 and 13, 2019, ULXP filed two proofs of claim against the Debtor's estate (together, the "**Proofs of Claim**"):[8]

- An alleged secured claim secured in the amount of $8,563,288 arising out of the ULXP Note.  ULXP alleges that this claim is secured by a "[s]econd lien on substantially all assets of Debtor."  (Main Case, Claim No. 174-1).

- An alleged unsecured claim in the amount of $3,952,025 arising out of unpaid invoices for services provided to the Debtor in 2019.  (Main Case, Claim No. 175-2).

---

[8] Of the Defendants, only ULXP filed proofs of claim against the Estate.  Notwithstanding, in light of the Trustee's allegations in the Complaint that the Defendants are alter egos of each other, the Trustee submits that the Defendants are one and the same, and therefore, the Proofs of Claim are also, in effect, those of UnitedLex.

25.     Moreover, throughout the bankruptcy operations and including after the Trustee's appointment, the Defendants provided certain back-office, non-legal services to the Estate as the Trustee administered the Estate and undertook her duties.  The Trustee's efforts included the collection of accounts receivable, client file transfers, and the investigation of potential causes of action.  Although the individuals providing such services to the Estate were initially ULXP personnel, the Defendants transitioned the relationship entirely to UnitedLex, which provided services to the Estate into April 2020.  To be clear, UnitedLex provided personnel to assist in the chapter 7 wind-down operations and was compensated for those individuals' services.  *See, e.g.*, Main Case, Dkt. No. 540.

## H.     The Trustee's Complaint Against The Defendants

26.     On October 26, 2020, after unsuccessful mediation attempts in accordance with Court-ordered procedures, the Trustee filed her Complaint against the Defendants.  The Complaint alleges the following claims:

(a)     Fraudulent Transfer Claims.   Counts I and II assert actual and constructive fraudulent transfer claims against the Defendants under § 548(a) of the Bankruptcy Code to avoid and recover in excess of $19.3 million in transfers that LeClairRyan made to ULXP between August 1, 2018 and the Petition Date.  Counts III and VI assert actual and constructive fraudulent transfer claims to recover the same transfers under § 544(b) of the Bankruptcy Code and applicable state law.  In each of these Counts, the Trustee may recover such transfers from UnitedLex as an alter ego of ULXP.

(b)     Preference Claim.  Count IV asserts preference claims against the Defendants under § 547 of the Bankruptcy Code to avoid and recover in excess of $17.4 million in transfers that

LeClairRyan made to ULXP in the year before the Petition Date.  Just as with the fraudulent transfer claims, the Trustee may recover such transfers from UnitedLex as an alter ego of ULXP.

(c)    <u>Avoidance of Liens and Disallowance of Claims</u>.  Counts V and VII seek to recover transfers, avoid liens and disallow claims under §§ 550(a), 551 and 502(d) of the Bankruptcy Code due to the Defendants' receipt of the fraudulent and preferential transfers discussed above.

(d)    <u>Recharacterization of Debt as Equity</u>.  Count VIII seeks to recharacterize the Secured Claim as an equity infusion to LeClairRyan instead of an alleged "secured debt."

(e)    <u>Aiding and Abetting Breaches of Fiduciary Duty</u>.  Count IX of the Complaint seeks damages from each Defendant in an amount in excess of $42 million for aiding and abetting breaches of fiduciary duty by officers and directors of LeClairRyan by, among other things, (i) entering into the venture to grant the Defendants' control over LeClairRyan, (ii) facilitating fraudulent and preferential transfers to ULXP, (iii) misappropriating funds tendered to the Debtor by its clients for specific expenses, and (iv) at the direction of the Defendants, converting LeClairRyan's corporate form that facilitated avoidable transfers to LeClairRyan's shareholders while it was insolvent.

(f)    <u>Conspiracy Claims</u>.  Counts X and XI of the Complaint assert statutory and common law conspiracy claims, respectively, under Virginia law against the Defendants for, among other things, conspiring with LeClairRyan's officers and directors to engage in unlawful, illegal and oppressive actions that damaged the Debtor and its creditors.

(g)    <u>Conversion</u>.  Count XII asserts a conversion claim under Virginia law against the Defendants for wrongfully receiving at least $1.06 million in transfers from LeClairRyan that were tendered to it by its clients for specific expenses.

(h)    <u>Unjust Enrichment</u>.  Count XIII asserts an unjust enrichment claim under Virginia

Law against the Defendants for receiving the over $1.06 million in client fund transfers discussed

in Count XII.

(i)    <u>Alter Ego</u>.  Count XIV asserts that ULXP is the alter ego of UnitedLex due to,

among other things, (1) the unity of interest and ownership between the Defendants that created

no separate personalities for each entity, and (2) that ULXP is the adjunct, create, instrumentality,

device, stooge or dummy of UnitedLex.

27.    On January 11, 2021, the Defendants moved to dismiss many of the Counts in the

Complaint.  (Dkt. Nos. 17 & 18).  The Trustee's response to the Defendants' motion is due on

February 12, 2021.

## III.    **ARGUMENT**

### A.    **Defendants Cannot Meet The Standard For Withdrawal Of The Reference**

Pursuant to 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any

case or proceeding referred under this section, on its own motion or on timely motion of any party,

for cause shown."  28 U.S.C. § 157(d).  Section 157(d) does not define what constitutes "cause"

for withdrawal of the reference.  Courts, however, have determined that certain specific factors

should be considered when evaluating whether to withdraw the reference: (1) whether the claim is

core or non-core; (2) whether withdrawal would promote efficient use of judicial resources; (3)

whether withdrawal would impose delay or costs on the parties; (4) whether withdrawal would

promote uniformity of bankruptcy administration; (5) what will prevent forum shopping; and (6)

whether a jury demand has been made.  *See In re El-Atari*, No. 1:11CV1090 (LMB/IDD), 2011

WL 5828013, at *5 (E.D. Va. Nov. 18, 2011) (denying motion to withdraw reference because

weighing of six factors did not justify withdrawal) (citation omitted))).  Discretionary withdrawal

is "determined on a case-by-case basis by weighing all the factors presented in a particular case.

*Corliss Moore & Assocs., LLC v. Credit Control Servs.*, 497 B.R. 219, 223 (E.D. Va. 2013)

(quotation marks omitted).  Although the "appropriateness of withdrawal" is left to the sound

discretion of the district court, "courts have cautioned that this discretion should be afforded

judicious and restrained use" to prevent permissive withdrawal from becoming "just another

litigation tactic" to escape bankruptcy court.  *Peoples Bank, NA v. Johnson (In re Johnson)*, Civil

No. 3:17-mc-180, 2018 U.S. Dist. LEXIS 72873, at *6 (S.D. W. Va. May 1, 2018) (quotation and

citation omitted).

Defendants, as the parties seeking withdrawal of the reference, have the burden of proving

that this Court should grant their Motion.  *See Tavenner v. Sigler*, Civil Action No. 3:17cv502,

2018 U.S. Dist. LEXIS 51893, at *10 (E.D. Va. Mar. 27, 2018).  That burden is a high one.  *See*

*In re Post-Confirmation Comm. of Samaritan Alliance, LLC*, No. 5:10-CV-067-KKC, Adv. No.

09-05252, 2010 WL 1610495, at *2 (E.D. Ky. Apr. 20, 2010) (stating that withdrawing the

reference is generally disfavored); *In re EPD Inv. Co. LLC*, No. ADV 2:12-AP-02424-ER, 2013

WL 5352953, at *5 (C.D. Cal. Sept. 24, 2013) (permissive withdrawal of the bankruptcy reference

is allowed only in a limited number of circumstances); *Sweet v. Brailsford*, No. CV-19-05831-

PHX-MTL, 2020 U.S. Dist. LEXIS 55959, at *20 (D. Ariz. Mar. 30, 2020) ("Litigants seeking

withdrawal of the reference face a high burden.") (quotation omitted); *In re Federated Dep't*

*Stores, Inc.*, 189 B.R. 142, 144 (S.D. Ohio 1995) (requiring "clear demonstration of 'cause'" and

"extraordinary circumstances" to withdraw the reference); *In re Washington Mfg. Co.*, 133 B.R.

113, 116 (M.D. Tenn. 1991) (concluding that the "cause" standard is high, requiring compelling

reasons); *Holland v. LTV Steel Co.*, 288 B.R. 770, 772-73 (N.D. Ohio 2002) (finding withdrawal

of the reference "is not intended to be an 'escape hatch' from bankruptcy court into district court,"

and therefore, "courts prefer to grant such relief only in a limited class of proceedings" and denying

motion). In this case, the Defendants cannot meet their burden and seek withdrawal precisely as

an "escape hatch" from the Bankruptcy Court, exactly what the law forbids.

Accordingly, while the Defendants are correct that this Court has discretion as to whether

to grant a motion for permissive withdrawal of the reference (Mot. at ¶ 15), here, a proper exercise

of that discretion can lead only to the denial of Defendants' Motion because: (1) the Trustee's

claims against Defendants are each core proceedings; (2) principles of judicial economy,

efficiency, and the uniform administration of the bankruptcy laws favor keeping the case with the

Bankruptcy Court; (3) the Defendants' attempt to engage in forum shopping is disfavored; (4) the

Defendants have no right to a jury trial; and (5) the Motion should be denied as premature and

speculative.

**B.      The Trustee Asserts "Core" Claims Against The Defendants**

**1.      Standard For Determining Whether A Proceeding Is "Core"**

The "most important factor" in determining whether to withdraw the reference to the

bankruptcy court is whether the case involves a core or non-core proceeding. *See, e.g.*, *In re*

*Albertson*, 535 B.R. 662, 667 (Bankr. S.D. W. Va. 2015); *In re Iridium Operating, LLC*, 285 B.R.

822, 834 (S.D.N.Y. 2002). A proceeding is core "if it invokes a substantive right provided by title

11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."

*In re U.S. Airways Group, Inc.*, 296 B.R. 673, 681 (E.D. Va. 2003) (citation omitted).Bankruptcy

Courts can enter final orders with respect to "core" proceedings. *See* 28 U.S.C. § 157(b)(1); *MDC*

*Innovations, LLC v. Hall*, 726 F. App'x. 168, 170 (4th Cir. 2018). A non-exhaustive list of core

proceedings is set forth in 28 U.S.C. § 157(b)(2). *See MDC Innovations*, 726 F. App'x. at 171.

As discussed below, each of the Trustee's claims qualifies as a core proceeding.

In *Stern v. Marshall*, 564 U.S. 462 (2011), the Supreme Court held that a state law counterclaim asserted by the debtor against a creditor – even if "core" under the text of 28 U.S.C. § 157(b)(2)(C) – could not be deemed core as a constitutional manner because the counterclaim was *not* intertwined with the resolution of the defendant's proof of claim filed against the debtor's estate. *Id.* at 498-99. Numerous post-*Stern* decisions in this District and elsewhere, however, have held that a state law cause of action against a defendant will be deemed "core" if the cause of action "would necessarily be resolved in the claims allowance process." *See, e.g.*, *Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436, 448 (E.D. Va. 2019) (citing *Stern*, 564 U.S. at 499); *see also, e.g., Moses v. CashCall, Inc.*, 781 F.3d 63, 70 (4th Cir. 2015) (holding state law contract claim was "constitutionally core, because the validity of the [contract] would 'necessarily be resolved' in adjudicating [creditor's] proof of claim and [debtor's] objections thereto"); *Robinson v. Sterne Agee Grp., Inc.*, No. 3:15CV382-JAG-3, 2015 WL 5179002, at *3 (E.D. Va. Sept. 4, 2015) (holding "Trustee's counterclaims [seeking, *inter alia*, declaration of successor liability] do not qualify as *Stern* claims because the counterclaims would necessarily be resolved in the claims allowance process"). "A bankruptcy estate's state-law counterclaim against a creditor 'would necessarily be resolved in the claims allowance process' when it shares *common questions of fact and law* with the creditor's claim(s) and when it 'seek[s] to directly reduce or recoup the amount claimed.'" *Allied Title Lending, LLC*, 420 F. Supp. 3d at 448 (quoting *TP, Inc. v. Bank of Am., N.A. (In re TP, Inc.)*, 479 B.R. 373, 385 (Bankr. E.D.N.C. 2012)) (emphasis added). *See, e.g., id.* at 449-450 (debtor's state law claim that contract violated Virginia's usury and consumer finance statutes "constitutes a constitutionally core claim, because resolution of [the claim] … will resolve the validity of the [contract], directly reducing the amount of [creditor's] Claims" for money owed under the contract).

In addition, state law claims that are intertwined factually and legally with core claims asserted by a plaintiff – such as fraudulent transfer claims – are also deemed to be core proceedings over which the Bankruptcy Court may enter final judgments. *See, e.g.*, *In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 306 (5th Cir. 2013) (affirming bankruptcy court's authority to enter final judgment on party's state law contract claim where the claim is "inextricably intertwined with the interpretation of a right created by federal bankruptcy law, the interpretation of [which] [would be] in fact determinative of [party's] claim"); *Schmidt v. Sosa (In re Lopez)*, No. 16-70134, 2019 WL 3987748, at *2 (Bankr. S.D. Tex. Aug. 22, 2019) ("To the extent that non-core claims are involved [state law tort and contract claims], this court finds that resolution of such claims are inextricably intertwined with resolution of the core claims regarding fraudulent conveyances. As such, this Court may enter final orders and judgments.") (collecting cases employing the "inextricably intertwined approach"); *CDX Liquidating Trust v. Venrock Assoc.*, No. 04C7236, 2005 WL 3953895, at *2 (N.D. Ill. Aug. 10, 2005) (holding that where non-core state law claims were inextricably intertwined with core claims, all of the claims should be treated as core).

For example, in *Seven County Services, Inc. v. NextGen Healthcare Information Systems, Inc.*, No. 3:14-cv-330-s, 2014 WL 3941789 (W.D. Ky. Aug. 12, 2014), the Court denied a motion to withdraw the reference as to a debtor's adversary proceeding for fraudulent transfer, breach of contract and fraud because the defendant had filed a proof of claim in the bankruptcy and therefore had "consented to the Bankruptcy Court's jurisdiction" as to otherwise non-core claims that arose from the same operative facts. As the Court explained:

> In support of its motion, NextGen urges that judicial economy would be served and its right to jury trial preserved by withdrawal of the reference. This court finds this contention to be without merit in light of NextGen's voluntary submission to the jurisdiction of the bankruptcy court and the corresponding loss of its jury trial right. The AP raises fraudulent conveyance claims which are core claims under 28 U.S.C. § 157(b)(2). The additional claims alleging various permutations of fraud and

breach of contract, while traditionally non-core, arise from the same operative facts as the core claims over which the bankruptcy court has jurisdiction and the Proof of Claim NextGen itself filed. Despite its attempt to un-ring the bell, NextGen has consented to bankruptcy court jurisdiction and has no ground to procure withdrawal of the reference by this court. The motion for withdrawal of the reference will therefore be denied.

*Id.* at *2 (internal citations omitted).

## 2.    The Trustee's Claims Are Each Core Proceedings

### a.    Avoidance Claims

The Trustee's claims to avoid and recover preferential and fraudulent transfers (Counts I-VI)[9] are core proceedings. *First*, they are listed as "core" proceedings under 28 U.S.C. §§ 157(b)(2)(F) and (H). *See* 28 U.S.C. § 157(b)(2)(F) (core proceedings include "proceedings to determine, avoid, or recover preferences"); *id.* at § 157(b)(2)(H) (core proceedings also include "proceedings to determine, avoid, or recover fraudulent conveyances"); *see also Hudgins v. Shah (In re Sys. Eng'g & Energy Mgmt. Assocs.)*, 252 B.R. 635, 650 (Bankr. E.D. Va. 2000) (holding that it "requires little analytical exertion" to conclude that fraudulent transfer claims are "core" proceedings, given the statutory definition).

*Second*, ULXP filed Proofs of Claim against the Debtor's estate. Even after *Stern*, there is no doubt that preference claims against a creditor that files a proof of claim against a debtor's estate are core proceedings. *See, e.g., Stern*, 564 U.S. at 497 ("[A] preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because *then* the ensuing preference action by the trustee become[s] integral to the restructuring of the debtor-creditor relationship.") (quoting *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990)); *Burns v. Dennis (In re Southeastern Materials, Inc.)*, 467 B.R. 337, 352 (Bankr. M.D.N.C. 2012) (holding that "the

---

[9] Count V – seeking relief under §§ 550 and 551 of the Bankruptcy Code – is derivative of the avoidance Counts.

conclusion is inescapable: if a defendant in a preference action has filed a proof of claim, then the

matter is a core proceeding, and the bankruptcy court may enter a final order").

   Similarly, fraudulent transfer claims against a creditor that filed a proof of claim are also

core proceedings. *See, e.g.*, *Robinson v. Sterne Agee Group, Inc.*, Civil No. 3:15cv382-JAG-3,

2015 WL 5179002, at **2-3 & n.3 (E.D. Va. Sep. 4, 2015) (denying motion to withdraw reference

regarding Trustee's fraudulent transfer claims where defendant filed a proof of claim); *Burns*, 467

B.R. at 351 (holding that after *Stern*, "even without consent, a bankruptcy court can enter a final

judgment in a fraudulent transfer action under either Section 548 or 544 so long as the defendant

has also filed a claim against the estate, making the fraudulent transfer action part of the process

of allowance and disallowance of claims"). While true in any case, that is particularly so where,

as here, the debtor's estate seeks to avoid a creditor's claim as a fraudulent transfer. *See In re*

*Global Technovations, Inc.,* 694 F.3d 705, 722 (6th Cir. 2012).

   *Third*, numerous courts have held that, even after *Stern*, avoidance action claims are "core

proceedings" in spite of the fact that the defendant did *not* file a proof of claim. *See, e.g.*, *Kirschner*

*v. Agoglia (In re Refco, Inc.)*, 461 B.R 181, 192 (Bankr. S.D.N.Y. 2011) (holding that even where

a defendant does not file a proof of claim, "Article III of the Constitution does not prohibit the

bankruptcy courts' determination of fraudulent transfer claims under 11 U.S.C. §§ 544 and 548 by

final judgment"); *Zazzali v. Swenson (In re DBSI, Inc.)*, 466 B.R. 664, 665 (Bankr. D. Del. 2012)

(adopting the analysis in *Refco* in ruling that a fraudulent transfer claim under § 544(b) is a core

proceeding); *Pantazelos v. Benjamin (In re Pantazelos)*, 543 B.R. 864, 873 (Bankr. N.D. Ill. 2016)

("No language in *Stern* precludes jurisdiction in this case to hear or determine a preference suit

even when a Defendant fails to file a proof of claim."); *Andrews v. RBL, L.L.C. (In re Vista Bella)*,

Case No. 11-00149-MAM-7, 2012 Bankr. LEXIS 4014, at *9 (Bankr. S.D. Ala. Aug. 30, 2012

(holding that *Stern* only implicated § 157(b)(2)(C) and, therefore, fraudulent transfer claims are core matters even without a proof of claim) (collecting cases); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 36, 61 (1989) (explaining that Congress designated all fraudulent conveyance actions as "core" proceedings under § 157(b)); *but see Burns*, 467 B.R. at 364-65 (holding that after *Stern*, a bankruptcy court cannot enter a final order on a fraudulent transfer claim, while noting the "well- reasoned opinions that have reached the opposite conclusion").

In ruling that fraudulent transfer claims are "core" even absent the defendant filing a proof of claim, the Court in *Refco* reasoned that:

> Unlike the state law tortious interference claim in *Stern*, the Trustee's fraudulent transfer claim here "flow[s] from a federal statutory scheme," and is "completely dependent upon adjudication of a claim created by federal law." (citing *Stern*). That is, not only is the Trustee's fraudulent transfer cause of action expressly provided by the Bankruptcy Code, 11 U.S.C. § 544, but also Congress placed that section, as well as the other statutory avoidance powers under 11 U.S.C. §§ 547, 548, 549 and 553, within a unique statutory framework, such as the safe harbor of 11 U.S.C. § 546(e), the recovery and preservation provisions of 11 U.S.C. §§ 550 and 551 and the "pay or face claim disallowance" rule of 11 U.S.C. § 502(d). In addition, the adjudication of fraudulent transfer claims in a bankruptcy context is a "particularized area of the law," (quoting *Stern*) because of the place such litigation often takes in the overall case and the familiarity of bankruptcy courts not only with the Bankruptcy Code's fraudulent transfer scheme but also with how such cases are developed, paid for, litigated and resolved in the multi-party bankruptcy context, which differs significantly from the two-party state law setting. Thus several sections of the Bankruptcy Code as well as case law govern the trustee or debtor in possession's unique role in investigating, funding, commencing, litigating and settling fraudulent transfer claims for the benefit of the estate, other parties' limited standing to do so in the trustee's place, and, ultimately, the power of the bankruptcy judge to manage the process in the context of the overall bankruptcy case, for example, where such litigation may be best resolved by the negotiation and confirmation of a chapter 11 plan. . . .
>
> In addition, the pursuit of avoidance claims has been "a core aspect of the administration of bankrupt estates since the 18th century. . . ." (quoting *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 369-70 (2006)).

*Refco*, 461 B.R. at 187.

Under this authority, the Trustee's avoidance claims against UnitedLex are core proceedings, as well.[10]

### b.  Disallowance Or Recharacterization Of Claims

Counts VII and VIII of the Complaint seek to disallow the Defendants' claims or to recharacterize them as equity infusions. These claims are indisputably core proceedings. *See* 28 U.S.C. § 157(b)(2)(B) (core proceedings include "allowance or disallowance of claims against the estate. . . .").

### c.  The Trustee's Alter Ego Claim

Count XIV asserts an alter ego claim against UnitedLex. Courts in this District have consistently held that alter ego claims are core matters. *See, e.g., Shaia v. Malone*, No. 3:17CV114, 2017 WL 4203544, at *5 (E.D. Va. Sept. 21, 2017) (holding Virginia state law alter ego/veil piercing claim to be core); *Huennekens v. The Gilcom Corporation of Virginia (In re SunSport, Inc.)*, 260 B.R. 88 (Bankr. E.D. Va. 2000) (same); *Smith v. Richels (In re Richels)*, 163 B.R. 760, 764 (Bankr. E.D. VA. 1994) (same); *Levy v. Runnells* (*In re Landbank Equity Corp.),* 83 B.R. 362 (Bankr. E.D. Va. 1987) (same); *but see In re Sys. Eng'g & Energy Mgmt. Assocs., Inc.*, 252 B.R. 635, 649 (Bankr. E.D. Va. 2000) (holding that alter ego claims against shareholders of an alter ego were too removed from the bankruptcy and thus not core claims). A ruling that the Trustee's alter ego claim against UnitedLex is core is consistent with the close, inter-related relationships between LeClairRyan, ULXP, and UnitedLex. UnitedLex was LeClairRyan's venture partner in creating ULXP and controlled LeClairRyan to set all of the circumstances underlying the Complaint into

---

[10] In addition, as stated below, alter ego claims are "core" claims, and the Trustee seeks to recover from UnitedLex on the avoidance claims as an alter ego of ULXP. The avoidance claims against UnitedLex are core on that basis as well.

motion.  Its relationship with ULXP – and LeClairRyan – thus is at the center of the bankruptcy and the Trustee's other "core" claims in her Complaint.

**d.      The Trustee's Other State Law Claims**

The Trustee's state law claims for aiding and abetting a fiduciary duty, conspiracy, conversion and unjust enrichment are core proceedings for two reasons.  *First*, the Trustee's state law claims "would necessarily be resolved in the claims allowance process" because they share "*common questions of fact and law*" with the Proofs of Claim and "seek to directly reduce or recoup the amount claimed."  *Allied Title Lending, LLC*, 420 F. Supp. 3d at 448.

In each of her state law claims, the Trustee challenges, among other things, (a) the legality of the Defendants' relationship with LeClairRyan and, therefore, the Defendants' claims, (b) the Defendants' control over LeClairRyan, (c) the Defendants' use of control to improve their own position in order to obtain alleged "secured" claims and the receipt of avoidable transfers, and (d) the misappropriation of funds tendered by clients for specific expenses to pay the Defendants. (*See* ¶¶107, 279, 288, 298, 303-05, 308-10).   These factual and legal issues underlying the Trustee's state law claims are also central to the legality, validity, allowance, priority and amount of the Proofs of Claim.  For example, if the Defendants conspired with LeClairRyan's officers and directors to, among other things, (i) violate Virginia law in paying client trust funds to the Defendants, and (ii) ensure that the Defendants would receive inappropriate transfers and alleged secured claims, the Proofs of Claim will be disallowed or avoided.  The overlap between the claim allowance process and the Trustee's state law claims makes them core even under *Stern*.

*Second*, the Trustee's state law claims are core because they are intertwined, factually and legally, with the Trustee's core claims.  The Trustee's actual and constructive fraudulent transfer claims – which are core – address the same conduct (e.g., illegal transfers, defrauding creditors by

22

favoring the Defendants, misappropriation of client funds) that are alleged in the Trustee's state law claims.  So does the Trustee's preferential transfer claim.  Indeed, a key element of the Trustee's preferential transfer claim is that the Defendants are "insiders," which overlaps with the allegations of control and domination contained in the Trustee's state law claims.  (*See* ¶¶232-34, 107, 279-82, 287-88, 297-99); *see also* 11 U.S.C. § 547(b)(4)(b) (requiring a defendant to be an "insider" to obtain a one-year look-back period for a preference claim); *id*. at § 101(31) (definition of "insider").[11]

Each of the Trustee's claims therefore are core proceedings on which the Bankruptcy Court may enter a final judgment.  Accordingly, this Court should deny the Motion.

### C.    The Interests Of Judicial Economy, Efficiency And Uniform Administration Of Bankruptcy Law Support Denial of Defendants' Motion

The second, third, and fourth factors – judicial economy, efficiency of resources, and uniform administration of bankruptcy law, respectively – also weigh heavily against withdrawing the reference.  Judge Huennekens, an experienced bankruptcy judge, has presided over the Debtor's bankruptcy case for over 16 months.  During that time, the Bankruptcy Court has familiarized itself with the Debtors' business operations, relationship with the Defendants, the nature of its assets and liabilities, and the potential claims on behalf of the estate.  And significantly, the Court has already heard detailed arguments – via the Supplemental Cash Collateral Motion – on the operative facts and certain of the legal issues at stake in the Trustee's

---

[11] As stated in subsection (c) above, an alter ego claim is "core" without intertwinement.  The Trustee also notes that an alter ego claim against UnitedLex is also "core" because it also is intertwined with the Trustee's core claims, as well as ULXP's Proofs of Claim.  *See, e.g., Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.),* 597 B.R. 235, 244 (Bankr. D. Del. 2019) (holding that alter ego claims were core because "they arise under the same events as the 544 (fraudulent transfer) Claims and are intimately connected to them.  Allegations of alter-ego, unjust enrichment, and conspiracy are part of the same story as the core fraudulent transfer claims").  UnitedLex's dominance of ULXP – and LeClairRyan – is central to the Trustee's state law claims and the validity, priority and amount of the Proofs of Claim.

Complaint against the Defendants.    Moreover, the Court has held monthly, hour-long status hearings on the Trustee's investigation into LeClairRyan and the nature of the causes of action that the Trustee expects to pursue in the Debtor's bankruptcy case.

In short, the Bankruptcy Court is well up the learning curve on the issues at stake in this case.  "Given the Bankruptcy Court's "understanding of the underlying bankruptcy case" and its "familiar[ity] with the parties and the facts," keeping this adversary proceeding in the bankruptcy court "will promote judicial economy." *Albertson*, 535 B.R. at 668–69.  Indeed, as the Court recognized in the *Enron* matter, a bankruptcy court's familiarity with the bankruptcy can outweigh a district court's greater familiarity with certain state law claims:

> [A]ny greater experience in trying cases that may hypothetically be ascribed to the District Court as an institution is more than outweighed by the specific expertise that Judge Gonzalez has acquired with respect to the Enron matter by his seven years of presiding over the Enron bankruptcy.  This greater familiarity with the underlying facts of the case will undoubtedly enable the Bankruptcy Judge to expedite the proceedings in a way that would be impossible for a Court that would have to spend an enormous amount of time getting up to speed on matters already well known to Judge Gonzalez.

*In re Enron Creditors Recovery Corp.*, 410 B.R. 374, 385 (S.D.N.Y. 2008).

It is also important to recognize that the Complaint is not the only adversary proceeding in the Debtor's bankruptcy case.    The Court has entered two procedures orders to streamline adversary complaints brought in this case, including a procedure order that governs this adversary proceeding.  *See* Main Case, Dkt. Nos. 385, 386, 533. Pursuant to these orders, he Trustee has already filed more than 70 adversary proceedings to recover avoidable preferential and fraudulent transfers in the Bankruptcy Court, and, as it has advised the Court, expects to file many additional such proceedings.  In addition, the Trustee has asserted, via demands pursuant to the Court's procedure order (Dkt. No. 533) claims against LeClairRyan's officers and directors for, among other things, breach of fiduciary duty, and also expects to file such claims in the Bankruptcy Court.

In light of the other proceedings at issue in the Debtor's case, the Bankruptcy Court is "well-suited" to determine how the Trustee's claim in this case "interact with their ongoing bankruptcy case," and to ensure the parties receive consistent answers to common questions of bankruptcy law in the various proceedings. *Lattea v. Vanderbilt Mortg. & Fin., Inc.*, No. 3:19-0375, 2020 U.S. Dist. LEXIS 2916, at *13 (S.D. W. Va. Jan. 8, 2020); *see also Dwyer v. First Nat'l Bank* (*In re O'Brien*), 414 B.R. 92, 102 (S.D. W. Va. 2009) ("Permitting the bankruptcy court to resolve the outstanding bankruptcy law questions in this proceeding promotes the uniformity of bankruptcy law."); *Albertson*, 535 B.R. at 668 (holding second factor "weighs heavily against withdrawal of the reference" because "[t]he bankruptcy court—having experience and expertise in bankruptcy law—is well suited to handle matters such as preferential transfers").

Furthermore, requiring the Trustee "to litigate related matters in separate courts will only lead to greater expenditures," undermining efficient use of the Debtor's limited resources. *Lattea*, 2020 U.S. Dist. LEXIS 2916, at *14.  Conversely, the choice of forum for pretrial proceedings will have no effect on efficient use of Defendants' resources, as the Defendants will only be litigating in one forum in any event. *See O'Brien*, 414 B.R. at 102-03 (holding choice of forum for pre-trial matters would have "no significant effect" on efficient use of the parties' resources).  Allowing the Bankruptcy Court to continue handling this adversary proceeding raising avoidable transfer, insolvency and malfeasance issues that predominate in many other cases asserted by the Trustee would plainly foster the most efficient use of the parties' resources.

Finally, the Defendants argue that the efficiency and judicial economy factors "both strongly favor" withdrawal because "the Bankruptcy Court is not authorized to enter final judgments on purely non-core proceedings."  (Mot. at ¶ 27).  According to the Defendants, "if the reference is not withdrawn, the parties will likely be forced to litigate the non-core claims twice."

(*Id.* at ¶ 28). As explained above, these assertions are simply wrong, as each of the Trustee's claims are deemed core proceedings under the circumstances of this case.

The Defendants also assert that they "are entitled to a jury trial on many of the claims asserted against them," thereby supporting withdrawal of the reference. (*Id.* at ¶ 25). As discussed in Section E below, this is also wrong. Moreover, even if the Defendants possess jury trial rights on certain claims (and they do not), withdrawal of the reference at this stage is not necessary to promote judicial economy. Indeed, as discussed in Section F below, if the Defendants possess jury trial rights on any claims that proceed to trial, the District Court can consider whether to withdraw the reference at that time, leaving all pretrial proceedings in the Bankruptcy Court.

### D.  The Defendants Are Engaging In Forum Shopping

The next factor at issue is forum shopping. Withdrawal of the reference "is not intended to be an 'escape hatch' from bankruptcy court into district court," which results in courts being reluctant to grant such relief. *See Holland v. LTV Steel Co.*, 288 B.R. 770, 772-73 (N.D. Ohio 2002).

Here, after remaining silent during the course of nine cash collateral hearings held in the span of a year (and being fully apprised of the allegations of the voidability of the purported lien), the Defendants first raised an objection to the Trustee's use of cash collateral by virtue of the purported lien. This late and misguided objection was unsuccessful. The Bankruptcy Court rejected the Defendants' arguments with regard to the validity of the secured claim. Moreover, Judge Huennekens declined to accept the Defendants' suggestions to modify his prior mediation procedures and also indicated a desire to move forward forthwith with trial (by even entering the pre-trial order before a response to the Complaint was filed). *See* Dkt. No. 9 (Pre-Trial Order). Recognizing the Bankruptcy Court's prior rulings as well as the depth of historical knowledge

already gained by the Court in these proceedings (that may not be helpful to the Defendants'

positions), it is not surprising that the Defendants desire to find another forum.  As such, the forum

shopping factor certainly weighs in favor of the Trustee.

**E.    The Defendants Do Not Have The Right To A Jury Trial On Any Of The Trustee's Claims**

The Defendants allege that they "are entitled to a jury trial on many of the claims that the

Trustee asserts against them. . ." without asserting which claims and on what basis they claim a

jury trial right.  (Mot. at ¶ 32).  The Defendants, however, do not have the right to a jury trial on

any of the Trustee's claims.

**1.    Fraudulent Transfer And Alter Ego Claims**

ULXP does not have a right to a jury trial on the Trustee's fraudulent transfer claims

(Counts I-IV and VI).  ULXP filed Proofs of Claim against the Debtor.  As the Fourth Circuit has

long recognized:

> If a subsequent action alleging preferential transfers is filed against the creditor
> [who has filed a proof of claim against the bankruptcy estate], that action becomes
> part of the claims-allowance process, 'integral to the restructuring of the debtor-
> creditor relationship through the bankruptcy court's *equity jurisdiction*,' and the
> creditor is not entitled to a jury trial.

*Official Committee of Unsecured Creditors v. Schwartzman (In re Stansbury Poplar Place, Inc.)*,

13 F.3d 122, 125–26 (4th Cir. 1993) (quoting *Langenkamp*, 498 U.S. at 44) (emphasis in original).

Several post-*Stern* decisions in this Circuit have held that a defendant waives its right to a

jury trial on a fraudulent transfer claim by filing a proof of claim in the debtor's bankruptcy case.

*See, e.g., Robinson*, 2015 WL 5179002, at *3 n.3 (holding that movant who "submitted a proof of

claim asserting its rights in Bankruptcy Court … waived its right to have its claims heard by an

Article III court by submitting to the equitable jurisdiction of the Bankruptcy Court"); *Albertson*,

535 B.R. at 670 ("[A] party submitting a proof of claim against a bankruptcy estate subjects itself

to the equitable power of the bankruptcy court.  Thus, if the trustee files a preference action against

the party, that party does not have a right to a jury trial."); *Mason v. Ivey*, 498 B.R. 540, 549

(M.D.N.C. 2013) ("The filing of a proof of claim has historically transformed a matter ordinarily

legal in nature (to which the Seventh Amendment may provide a right to a jury trial) to one

equitable in nature, that is, the allowance or disallowance of a claim.").

Even though it did not file a proof of claim, UnitedLex also does not have a jury trial right

on the Trustee's fraudulent transfer claims because the Trustee asserts such claims against

UnitedLex as an alter ego.  (*See* ¶¶201, 215, 227).  Under Virginia law, "piercing the corporate

veil is an equitable claim that can only be ruled upon by the Court."  *Horne v. Eco-Logic Const.*,

85 Va. Cir. 106 (Va. Cir. Ct. 2012).  "It is firmly established that the Seventh Amendment right to

trial by jury attaches to civil actions that are legal, not equitable, in nature."  *Fowler v. Land Mgmt.*

*Groupe, Inc.*, 978 F.2d 158, 163 (4th Cir. 1992) (citing *Granfinanciera,* 492 U.S. at 42).  For the

same reasons, UnitedLex does not have a jury trial right on the Trustee's alter ego claim – Count

XIV – either.

## 2.    Preference Claim

Because it filed a proof of claim, ULXP also does not have a jury trial right on the Trustee's

preference claim (Count IV).  In *Langenkamp*, the Supreme Court explained:

> In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate
> the creditor triggers the process of allowance and disallowance of claims, thereby
> subjecting himself to the bankruptcy court's equitable power. If the creditor is met,
> in turn, with a preference action from the trustee, that action becomes part of the
> claims-allowance process which is triable only in equity. In other words, the
> creditor's claim and the ensuing preference action by the trustee become integral to
> the restructuring of the debtor-creditor relationship through the bankruptcy court's
> *equity jurisdiction*. As such, there is no Seventh Amendment right to a jury trial.

*Langenkamp*, 498 U.S. at 44–45 (internal quotation marks and citations omitted); *see also*

*Granfinanciera*, 492 U.S. at 58 ("[A]lthough petitioner might be entitled to a jury trial on the issue

of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, . . . when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity.") (citations omitted); *In re Enron Corp.*, 319 B.R. 122, 125 (Bankr. S.D. Tex. 2004) ("When the trustee files an avoidance action under Chapter 5 against a creditor who has filed a proof of claim, the trustee seeks to effect the claims allowance process.  The trustee therefore has no right to a jury trial of an avoidance claim when the defendant has filed a proof of claim.").

Just as with the Trustee's fraudulent transfer claims, UnitedLex also does not have a jury trial right on the Trustee's preference claim because the Trustee asserts such claim against UnitedLex as an alter ego.  (*See* ¶240).

### 3.    Disallowance Or Recharacterization Claims

As noted above, Counts VII and VIII of the Complaint – which seek to disallow the Defendants' claims or to recharacterize them as equity infusions – are indisputably core proceedings.  *See* 28 U.S.C. § 157(b)(2)(B).  The Defendants do not, and cannot, contend that they have a right to a jury trial on these claims.  *See In re Tamojira, Inc.*, No. 94-34438-DOT, 1998 WL 103142, at *3 (Bankr. E.D. Va. Jan. 28, 1998) ("Because the allowance of a claim under the Bankruptcy Code is part of a proceeding that is essentially equitable rather than legal in nature, the Seventh Amendment right to a jury trial 'in suits at common law' simply does not apply."); *Fairchild Dornier GmbH v. Official Committee of Unsecured Creditors (In re Dornier Aviation (N. Am.) Inc.*, 453 F.3d 225, 231 (4th Cir. 2006) (holding that "recharacterization is well within the broad powers afforded a bankruptcy court in § 105(a)" and explaining that "implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or

equity[,] … [and thus] the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme.").

### 4.    Aiding And Abetting A Breach Of Fiduciary Duty, Conspiracy And Conversion Claims

The Defendants also do not have a right to a jury trial on the Trustee's aiding and abetting a breach of fiduciary duty, conspiracy or conversion claims (Counts IX-XII).  The Seventh Amendment right to a jury trial right applies only "in suits at common law."  *Tull v. United States*, 481 U.S. 412, 417 (1987); *Granfinanciera*, 492 U.S. at 41.  Courts determine whether the right exists by considering two elements – "the nature of the action and of the remedy sought."  *Tull*, 481 U.S. at 417.  As to the nature of the action, courts compare the action with "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity."  *Id.*; *Granfinanciera*, 492 U.S. at 42.

As to the remedy, courts examine "the remedy sought and determine whether it is legal or equitable in nature."  *Tull*, 481 U.S. at 417-18; *Granfinanciera*, 492 U.S. at 42.  In *Granfinanciera*, the defendant had not filed a proof of claim, and so the Supreme Court did not consider what consequence a defendant's filing of a proof of claim in a bankruptcy case has on its right to a jury trial.  In *Langenkamp*, however, the Supreme Court the following year squarely addressed the significance that the filing of a proof of claim has regarding the right to a jury trial under the Bankruptcy Code.  There, the Supreme Court held that by filing proofs of claim, creditors invoke the bankruptcy court's equitable jurisdiction over the allowance and disallowance of claims and the right to participate in the distribution of the estate, and "[a]s such, there is no Seventh Amendment right to a jury trial."  *Langenkamp*, 498 U.S. at 44; *see also Katchen v. Landy*, 382 U.S. 323, 336 (1966) (explaining that by filing a proof of claim, the creditor "converts" what otherwise may have been a legal claim pursued by the trustee into an equitable one).

Where, as here, a debtor's claims against a creditor are factually and legally intertwined with the creditor's claims against the debtor, the debtor's claims become part of the equitable claims allowance process and no Seventh Amendment right to trial by jury exists. *See Lu v. Grant (In re Sunshine Trading & Transp. Co., Inc.)*, 193 B.R. 752, 756 (Bankr. E.D. Va. 1995) (denying right to jury trial on state law tort claim where party's conduct in bankruptcy proceeding implicated the claims-allowance process); *see also, e.g., In re WSC, Inc.*, 286 B.R. 321, 331 (Bankr. M.D. Tenn. 2002) (denying jury trial right on state law tort claims, including conversion and civil conspiracy, where "the Debtor's causes of action arise from the same facts, involve the same contracts and measure the same conduct that form the basis for [defendant's] claim in this bankruptcy case."). "[I]f a party's action is inextricably intertwined with a statutory public right, such as the bankruptcy regulatory scheme of allowing or reordering claims, then the party does not have a Seventh Amendment right to a jury trial." *MCI WorldCom Commc'ns, Inc. v. Commc'ns Network Int., Ltd. (In re WorldCom, Inc.)*, 378 B.R. 745, 752 (Bankr. S.D.N.Y. 2007).

Cases decided after *Stern* confirm this principle. *See, e.g., Pearson Educ., Inc. v. Almgren*, 685 F.3d 691, 695 (8th Cir. 2012) (striking party's demand for jury trial on amount of legal damages, where party had submitted proof of claim in bankruptcy proceeding, because "a determination of the amount of the damages award is part of the process of allowing or disallowing the [party's] claims"); *Shubert v. Law Offices of Paul J. Winterhalter*, 531 B.R. 546, 553-54 (E.D. Pa. 2015) (defendant not entitled to jury trial on state law tort claims, including aiding and abetting breach of fiduciary duty, where defendant filed fee application in bankruptcy court and trustee's "claims for money damages in the adversary proceeding [we]re sufficiently related to her objections to the fee application to fall within the Bankruptcy Court's equitable jurisdiction").

In this case, Defendants' own admissions establish that the Trustee's state law tort and statutory claims are intertwined with the adjudication of Defendants' proofs of claim. The Defendants explicitly acknowledge that "*the facts at issue* with respect to the claims for which the Defendants have a right to a jury trial *are substantially the same* as the facts underlying those claims for which there may not be such a right…" (Mot. at 2) (emphasis added). Indeed, the Defendants have tried to use this fact to their advantage, arguing for withdrawal of the reference as to "all claims"—including the challenge to their Proofs of Claim over which there is no dispute that the bankruptcy court has authority to enter final orders—in order to "promote uniformity" and to avoid "inconsistent or conflicting rulings." (Mot. at ¶ 26). If the Trustee's state law tort and statutory claims were not, legally and factually, inextricably intertwined with the equitable claims properly finally decided before the bankruptcy court, the risk of "inconsistent or conflicting rulings" that Defendants raise would be an empty specter.

These admissions are binding on the Defendants and foreclose any argument that the Defendants are entitled to a jury trial on the Trustee's state law tort and statutory claims (or any other claim, for that matter). *See, e.g., VIA Design Architects, PC v. U.S. Dev. Co., LLC*, No. 2:13CV555, 2014 WL 5685550, at *5 (E.D. Va. Nov. 4, 2014) (citing *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470, n.6 (2013)) ("[A]n unequivocal assertion of fact made in a pleading, such as an answer or counterclaim, constitutes a 'judicial admission' that generally binds the party making such statement throughout the remainder of the proceeding.") (holding party bound by statement made in opening brief seeking affirmative relief as judicial admission).

Moreover, as discussed in Section B above with respect to core proceedings, the allegations in the Complaint also demonstrate the factual and legal overlap between the Trustee's state law claims and the adjudication of ULXP's Proofs of Claim.

Finally, as UnitedLex is liable as an alter ego of ULXP, it also does not have an independent jury trial right.[12]  A party may submit to the equitable jurisdiction of the bankruptcy court and waive its right to a jury trial even without filing a proof of claim.  *See, e.g., Sunshine Trading*, 193 B.R. at 756*; Shubert*, 531 B.R. at 553-54.  Here, as noted, UnitedLex is an alter ego of ULXP, which filed Proofs of Claim.  UnitedLex also appeared in the Debtor's bankruptcy case.  (Main Case, Dkt. Nos. 62-64).  Moreover, after the Trustee's appointment, UnitedLex worked for the Trustee in providing back office, non-legal services into early 2020, and was paid for that work. UnitedLex therefore also submitted to the equitable jurisdiction of the Bankruptcy Court.

### 5.     Unjust Enrichment Claim

The Trustee's unjust enrichment claim (Count XIII) seeks at least $1,069,510.00 in funds received by ULXP which Debtors' clients tendered to Debtor for specific client-related expenses. (¶308)  The Complaint further alleges that ULXP retained the funds and did not use them for client-related purposes, despite the fact that ULXP knew or should have known that the funds it received were to be used for specific client-related expenses.  (¶¶ 309-10.)  "As unjust enrichment is an equitable claim, there is no right to a jury trial on that claim."  *Ashmore v. Owens*, Civil Action No. 8:15-cv-02373-JMC, 2017 U.S. Dist. LEXIS 90316, at *6 (D.S.C. June 13, 2017).  In addition, as discussed above, the unjust enrichment claim is intertwined with the resolution of the Proofs of Claim, eliminating any right to a jury trial on that basis as well.

### F.     The Motion Should Be Denied As Premature And Speculative

As shown throughout this Opposition, this Court should deny the Motion because, as a matter of law, Defendants provide no legitimate justification for withdrawing the reference.

---

[12] The Defendants have not moved to dismiss the alter ego count from the Complaint.  *See* Motion to Dismiss at Dkt. Nos. 17 & 18.

However, at best, this Court should deny the Motion as premature[13] and speculative for two reasons. *First*, the issues regarding whether a jury trial exists (factor 6) or whether the claims are core or non-core (factor 1) are for the Bankruptcy Court to decide in the first instance before the issue comes before this Court. *Second*, withdrawing the reference at this early stage in the litigation is speculative and unnecessary.

1.    **The Bankruptcy Court Should Decide Jury Trial And Core/Non-Core Issues In The First Instance**

The Bankruptcy Court is the appropriate court to decide whether Defendants have any right to a jury trial on the Trustee's claims. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Nat'l Patent Dev. Corp. (In re TMG Liquidation Co.)*, No. 7:12-629-TMC, 2012 U.S. Dist. LEXIS 76749, at *10 (D.S.C. June 4, 2012) ("The bankruptcy court is to decide whether any defendant has right to a jury trial and, if a defendant is ultimately found to have such a right, that defendant may move to withdraw the reference once the case is ready for trial."); *Corzin v. Harvey (In re Commercial Maint. & Repair, Inc.)*, No. 5:06-MC-46, 2007 WL 2815211, at *3 (N.D. Ohio Sept. 26, 2007) (articulating that regardless of "core proceeding classification," bankruptcy court decides jury entitlement issues) (citations omitted); *In re Washington Mfg. Co.*, 128 B.R. 198, 200-01 (Bankr. M.D. Tenn. 1991) (holding that bankruptcy court was appropriate tribunal for determining jury trial right even if it could not preside over the jury trial itself) (citation omitted).

The Bankruptcy Court should also determine in the first instance whether a proceeding is core or non-core. *See* 28 U.S.C. § 157(b)(3) ("*The bankruptcy judge shall determine*, on the

---

[13] The Trustee recognizes that the Bankruptcy Court's pretrial order, Dkt. No. 9, required the Defendants to file the Motion when it did in order to avoid consenting to the entry of final orders by the Bankruptcy Court. This Court, however, has the authority to defer ruling on whether withdrawal of the reference is warranted – as has been the case in the numerous cases cited below – in order to allow the proceedings to play out in front of the Bankruptcy Court. As noted below, while the Trustee believes that withdrawal of the reference is not warranted at all, at a minimum, it certainly is not necessary until a trial in this matter.

judge's own motion or on timely motion of a party, *whether a proceeding is a core proceeding* under this subsection or is a proceeding that is otherwise related to a case under Title 11.") (emphasis added). Indeed, a majority of courts in this Circuit and elsewhere have held that the Bankruptcy Court is in the best position to decide whether claims are core or non-core. *See, e.g., In re Mich. Real Estate Ins. Trust*, 87 B.R. 447, 452 (E.D. Mich. 1988) ("[I]t is the bankruptcy judge's duty to determine whether or not a proceeding is a core proceeding."); *In re Kieslich*, 216 B.R. 643, 644 (D. Nev. 1998) (remanding case to bankruptcy court on the grounds that whether a proceeding is "core" is "a fact-sensitive characterization best performed by the Bankruptcy Court in the first instance"); *Minor Family Hotels, LLC v. Hotel Charlottesville, LLC (In re Minor Family Hotels, LLC)*, No. 3:10-MC-00052, 2010 U.S. Dist. LEXIS 131119, at *9 (W.D. Va. Dec. 10, 2010) ("Generally, it is the duty of the bankruptcy judge to determine whether a cause of action is a core proceeding."); *Somerset Props. Spe v. LNR Partners, Inc. (In re Somerset Props. Spe)*, Nos. 10-09210-8-SWH, 11-00053-8-SWH-AP, 2012 Bankr. LEXIS 4106, at *13 (Bankr. E.D.N.C. Sept. 6, 2012) ("[T]he bankruptcy court must decide whether the issue at hand is core or non-core."); *In re Astroline Comms. Co. Ltd. P'Ship*, 161 B.R. 874, 877-78 (Bankr. D. Conn. 1993) ("It is the bankruptcy court which in the first instance determines whether a proceeding is core or noncore."); *In re 1733 Ridge Road East, Inc.*, 125 B.R. 722, 724 (W.D.N.Y. 1991) ("The classification of a proceeding as core or non-core is in itself a core proceeding which, once decided by the bankruptcy judge, is subject only to review for clear error.").

This is particularly true in the context of a motion to withdraw the reference. *See In re East West Trade Partners Inc.*, Civil No. 1:06-cv-01812 (RBK), 2007 WL 1213393, at *3 (D.N.J. Apr. 23, 2007) (holding that §157(b)(3) *requires* the bankruptcy judge to determine whether a proceeding is core or non-core); *Central Nat'l Bank v. Kwak*, 49 B.R. 337, 340 (N.D. Ohio 1985)

35

(holding that the question of whether a proceeding is core or non-core must *first* be submitted to the bankruptcy judge under 28 U.S.C. § 157(b)(3)).

In *In re the Post-Confirmation Comm. of Samaritan Alliance, LLC*, No. 5:10-CV-067-KKC, Adv. No. 09-05252, 2010 WL 1610495, at \*1 (E.D. Ky. Apr. 20, 2010), the defendants moved to withdraw the reference pursuant to 28 U.S.C. § 157(d). Just like in this case, the defendants there argued that their motion should be granted because (1) they had an alleged Seventh Amendment right to a jury trial on certain state law claims, and (2) the bankruptcy judge could not conduct a jury trial or enter a final order on these claims because they allegedly were non-core. *See id.* The District Court denied the motion as premature. *Id.* at \*4. The Court declined to decide the core versus non-core issue in light of the statutory language of 28 U.S.C. § 157(b)(3) and the appeals process set forth in 28 U.S.C. § 158. *Id.* at \*3. The Court found that the best course of action would be to allow the Bankruptcy Court to determine whether the matters were core to the bankruptcy proceeding. *Id.* It therefore denied the motion to withdraw the reference without prejudice, and stated that it would allow the parties to seek withdrawal of the reference in the future once the bankruptcy judge rendered a decision. *Id.* at \* 4. This Court therefore should, at a minimum, deny the Motion without prejudice, and await the Bankruptcy Court's threshold determinations on these issues.

## 2. The Motion Should Be Denied As Premature And Speculative At This Early Stage In The Proceeding

Even if this Court concludes that the Trustee asserts certain non-core claims or that the Defendants have jury trial rights (and it should not), the reference should not be withdrawn at this time because judicial economy is better served by permitting the Bankruptcy Court to manage the pre-trial phase of the litigation. "[T]he mere fact that the district court must conduct a jury trial … 'does not mean that … the district court cannot delegate to the bankruptcy court the responsibility

for supervising discovery, conducting pre-trial conferences, and other matters short of the jury

selection and trial.'" *Tyler v. McLane Foodservice, Inc. (In re QSM, LLC)*, 453 B.R. 807, 810

(E.D. Va. 2011) (quoting *Stansbury Poplar Place,* 13 F.3d at 128); *see als*o *In re Appalachian*

*Fuels, LLC*, 472 B.R. 731, 747-48 (E.D. Ky. 2012).

Withdrawal of the reference is also premature where, as here, a motion to dismiss has been

filed and is pending before the bankruptcy court. *See, e.g., QSM*, 453 B.R. at 808 (denying motion

to withdraw reference as "premature" where "it is unclear whether a jury trial on this action will

be necessary, inasmuch as the summary judgment stage has not yet been reached"); *Dwyer v. First*

*National Bank (In re Dwyer),* 414 B.R. 92, 103 (S.D. W.Va. 2009) ("declining to withdraw the

reference at this time preserves the right to a jury trial because the reference may be withdrawn if

and when a jury trial becomes necessary").  Moreover, the necessity of a jury trial in this case

remains highly speculative.  Until and unless the Defendants actually demand a jury (to date, they

have not), the speculative possibility that they may do so in the future does not support cause to

withdraw the reference now.  *See, e.g.*, *In re El-Atari*, 2011 WL 5828013, at *6 (denying motion

to withdraw reference, filed prior to any other responsive pleading, where movant "has not made

a jury demand [yet] . . . [and] [t]herefore, the need for a jury trial is speculative").

The Defendants even concede the highly speculative nature of any jury trial right in this

adversary proceeding.  (*See* Mot. at ¶ 33) (acknowledging "Defendants have not yet requested a

jury trial" and that "they anticipate doing so *if ultimately required to file an answer* to the

Complaint") (emphasis added).

By postponing a ruling on withdrawal of the reference to a later date, this Court can review

the following before making a decision:  (a) which of the Trustee's claims proceed to trial, (b) if

the Defendants demand a jury trial on such claims, and (c) the Bankruptcy Court's initial

determinations on jury trial and core/non-core issues.  Moreover, there is no doubt that the

Bankruptcy Court is well suited to supervise discovery and manage pretrial proceedings in this

case, particularly in light of the already entered procedures orders and other proceedings pending

before the Bankruptcy Court that involve interrelated issues.  Accordingly, there simply is no basis

to *immediately* withdraw the reference in this case.

## IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Defendants have failed to satisfy their burden of

demonstrating that withdrawal of the reference to the Bankruptcy Court is warranted, particularly

at this stage of the case.  This Court should deny the Motion.


Dated:    January 25, 2021                     Respectfully submitted,


                                               */s/ Erika L. Morabito*
                                               Erika L. Morabito (VSB No. 44369)
                                               Brittany J. Nelson (VSB No. 81734)
                                               FOLEY & LARDNER LLP
                                               3000 K Street, NW, Suite 600
                                               Washington, DC 20007-5109
                                               Telephone: (202) 672-5300
                                               Facsimile: (202) 672-5399
                                               emorabito@foley.com
                                               bnelson@foley.com

                                               *Special Counsel to Lynn L. Tavenner, Chapter 7
                                               Trustee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 25th day of January, 2021, I served a true and correct copy of the foregoing *Plaintiff's Opposition to Defendants' Motion to Withdraw the Reference* via the Court's Electronic Case Filing System upon:

Thomas J. McKee, Jr.
Greenberg Traurig, LLP
1750 Tysons Boulevard, Suite 1000
McLean, Virginia 22102
Email: mckeet@gtlaw.com
Email: milmoeg@gtlaw.com
Email: bargerd@gtlaw.com

/s/ Erika L. Morabito
Erika L. Morabito

## **Exhibit A**

The Complaint
(without exhibits)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In re:

      **LeClairRyan PLLC,**

      **Debtor**

**Lynn L. Tavenner, as Chapter 7 Trustee,**

      **Plaintiff,**

**vs.**

**ULX PARTNERS, LLC and UNITEDLEX CORPORATION,**

      **Defendants.**

**Case No.: 19-34574-KRH**

**Chapter 7**

**Adv. Pro. No.: _____**

### COMPLAINT

Plaintiff, Lynn L. Tavenner, Trustee, and not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "Chapter 7 Trustee" or, the "Trustee") of the bankruptcy estate (the "Estate") of LeClairRyan, PLLC ("LeClairRyan" or the "Debtor"), by her undersigned counsel, states the following in support of this Adversary Complaint against Defendants ULX Partners, LLC ("ULXP") and UnitedLex Corporation ("UnitedLex") (collectively, the "ULX Entities" or "Defendants"):

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
FOLEY & LARDNER LLP
3000 K Street, NW, Suite 600
Washington, DC 20007-5109
Telephone: (202) 672-5300
Telecopy: (202) 672-5399
emorabito@foley.com
bnelson@foley.com
*Special Counsel to Lynn L. Tavenner, Esq., the Chapter 7 Trustee of the Estate of LeClairRyan PLLC*

4850-3004-5648.2

## NATURE OF THE CASE

1.      This case arises from the business failure of Richmond-based law firm LeClairRyan.  On or about the fall of 2017, the struggling law firm began negotiating a potential joint venture with a legal services provider, UnitedLex, which was intended to resolve the firm's financial problems with an infusion of much needed liquidity.  In the end, however, rather than resolving the Debtor's financial issues, the actions or inactions of the ULX Entities only served to plunge LeClairRyan further into insolvency.  In fact, the Defendants, along with certain of the Debtor's directors, officers, and agents (the "LCR Officers and Directors"), prioritized their own desires for financial gain and prolonged the Debtor's lifespan, enabling the Defendants and others to improperly and unfairly extract millions of dollars from the Estate, to the detriment of LeClairRyan's creditors.

2.      As more fully set forth below, the structure of the ULXP joint venture, and the way in which it operated in practice, bestowed insider status on the ULX Entities vis-à-vis the Debtor. This resulted in, among other things, the creation of voidable liens and recoverable preferential transfers in an amount not less than $17,425,405.50.

3.      Irrespective of insider status, the ULX Entities are liable for not less than $19,357,282.51 in damages for fraudulent transfers.

4.      Moreover, the conspiracy between the ULX Entities and the LCR Officers and Directors caused damages in an amount of not less than $42,759,900, including but not limited to damages relating and/or arising out of (i) keeping the Debtor operating instead of winding down the insolvent law firm; (ii) the Debtor's conversion from a professional corporation to a professional limited liability corporation, a condition precedent to forming the joint venture with UnitedLex; (iii) the Debtor's liquidation of a retirement plan; and/or, (iv) the increase in trade payables and account receivables.

5.      Finally, the Defendants' actions also caused damages and harm to the Estate, in an amount of not less than $1,069,51.00 through their misappropriation of funds tendered by clients for specific expenses, which were used by the ULX Entities for improper purposes.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

7.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's Chapter 11 Cases (under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).

8.      This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a).

9.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

10.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and (8) to, among other things, determine the validity, priority, or extent of a lien or other interest in property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential and fraudulent obligations and transfers.

11.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

12.     On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4850-3004-5648.2

13.     On October 4, 2019, Ms. Tavenner was appointed as the Chapter 7 Trustee for the Debtor.[1]  As Trustee, Ms. Tavenner has the sole authority to bring these claims on behalf of the Estate.

14.     The Debtor was a law firm run, at different times, by a board of directors and/or managers.

15.     The Debtor was organized under the laws of the Commonwealth of Virginia.

16.     Defendant UnitedLex is a Delaware corporation with its principal place of business in Overland Park, Kansas.

17.     In September 2018, UnitedLex became a portfolio investment of CVC Capital Partners ("CVC"), a private equity and investment advisory firm.

18.     Defendant ULXP is a Delaware limited liability company.

19.     ULXP was created in 2018 as a joint venture between the Debtor and UnitedLex, and was 99% owned by UnitedLex.

20.     ULXP was also fully controlled and managed by a special purpose entity wholly owned and controlled by UnitedLex.

## STATEMENT OF FACTS

**A.     LeClairRyan's Dire Financial Status Prior to 2017.**

21.     LeClairRyan was founded in 1988 by Dennis Ryan and Gary D. LeClair ("LeClair").  It initially operated as a regional corporate-focused law firm, headquartered in Richmond, Virginia.  But LeClairRyan rapidly expanded – ultimately opening offices or acquiring firms across the United States.

---

[1] *See* Appointment of Interim Trustee Lynn L. Tavenner, Dkt. No. 175.

4

22.     Fundamental issues of financial mismanagement plagued the firm for years, including, but not limited to, over-compensation of certain attorneys, declining revenues, which fell short of projections and budgets by millions of dollars, and improper and erroneous accounting for certain income and expense items.

23.     Beginning at least in 2014, LeClairRyan consistently missed its budget and its revenue fell short of projections.

24.     By at least the end of 2014, the Debtor was insolvent, or within the zone of insolvency, failing to generate sufficient revenue to pay its debts as they became due.

25.     In 2017, searching for a lifeline, the Debtor turned to a potential joint venture with a third-party, the legal services provider UnitedLex, as a way to address the Debtor's financial difficulties.

**B.     UnitedLex and LeClairRyan Enter Into a Joint Venture.**

26.     Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments.  These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support.  These non-legal services also include legal support services, like patent mining, document management, and electronic discovery.

27.     Upon information and belief, in approximately 2017 UnitedLex sought to move beyond merely being a vendor providing legal services to become more of a partner to a "constellation" of law firms.

28.     The joint venture between UnitedLex and LeClairRyan was intended to be the foundation of this proposed "constellation" structure in the United States.

29.     UnitedLex advertised when the joint venture was announced, through ULXP, UnitedLex and LeClairRyan sought to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."[2]

30.     Under this model, ULXP would provide its constellation law firms with "market-leading technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics."[3]

31.     UnitedLex also advertised that the joint venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength."[4]

**C.      Initial Negotiations Regarding the ULXP Venture.**

32.     Negotiations between UnitedLex and LeClairRyan regarding the ULXP venture began on or about October 2017.

33.     Under the initial terms of the deal, including in a proposal presented to the Board of Directors of LeClairRyan (the "LCR Board") on December 29, 2017 (the "December 29 Proposal"), UnitedLex would control ULXP, but members of the LeClairRyan leadership team would hold senior leadership positions at ULXP.[5]

---

[2] *See Business Wire, "UnitedLex and LeClairRyan Achieve a 'Tour de Force' with the Launch of ULX Partners"* (June 13, 2018), *available at* https://www.businesswire.com/news/home/20180613005287/en/UnitedLex-LeClairRyan-Achieve-%E2%80%9CTour-de-Force%E2%80%9D-Launch.

[3] *Id.*

[4] *Id.*

[5] A true and correct copy of the December 29 Proposal is attached as Exhibit 1.

34.     Under the terms of the December 29 Proposal, LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the Debtor to provide an array of services to the firm. LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.[6]

35.     Under the terms of the December 29 Proposal, LeClairRyan was to receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.[7]

36.     Under the terms of the December 29 Proposal, LeClairRyan would also receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."[8]

37.     Upon information and belief, at the time of the December 29 Proposal, the parties were also considering an additional $13 million dollar loan to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

38.     The December 29 Proposal also included terms creating other financial incentives for the Debtor's individual shareholders, including an immediate full redemption of their shares in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving equity interests in UnitedLex through either annual or performance-based interests options.

---

[6] *Id*. at 1.

[7] *Id.*

[8] *Id.* at 2.

39.    Despite the fact that CVC's investment in UnitedLex was not formalized and would not be announced to the public until September 2018, CVC was an active participant in negotiating the deal from the start and, ultimately, was a critical driver of the final terms of the deal.

40.    Upon information and belief, behind closed doors, as the transaction was being negotiated, CVC was represented as being UnitedLex's "bankers" and CVC employees participated in multiple in-person meetings and discussions with the Debtor, UnitedLex, and others, regarding the structure of the transaction and relevant deal terms.

41.    For instance, on or about November 22, 2017, UnitedLex CEO Dan Reed ("Reed") told LeClair in an email that "the lead bankers from CVC will be flying to NYC next week to review a range of details re: our vision/future" and inviting him to join.[9]  Jennifer Weiss from Greenberg Traurig was also in attendance in this NYC meeting.

42.    Yet, when the deal was announced to the public, CVC's role was entirely omitted, such as when Reed touted the fact UnitedLex was "venture-backed by JP Morgan."[10]

43.    As described further in Paragraphs 94 to 109, below, UnitedLex ultimately required that LeClairRyan take several actions as conditions precedent to entering into the ULXP transaction.  Among these conditions, ULXP required LeClairRyan to convert from a professional corporation (PC) to a professional limited liability corporation (PLLC).

**D.    The Deal Changes Upon UnitedLex Learning of LeClairRyan's Financial Position.**

44.    During the winter and spring of 2018, the parties engaged in due diligence for the joint venture.

---

[9] A true and correct copy of the November 22, 2017 email from Reed to LeClair is attached as Exhibit 2.

[10] UnitedLex Partners: What exactly is it?  Legal IT Insider (Aug. 8, 2018) https://legaltechnology.com/unitedlex-ulx-partners-what-exactly-is-it/.

8

45.     Even though CVC was not a party to the transaction — its investment in UnitedLex would only be made public several months after ULXP was announced — CVC was, however, given access to confidential due diligence information related to the transaction.

46.     There was concern at the time from UnitedLex's counsel that CVC was receiving more information than UnitedLex.  For example, in a February 18, 2018 email, Reed noted that "[Greenberg] want[s] me to ensure that our board has the same level of information as has been provided to CVC to avoid any claim of unequal information. . . ."[11]

47.     On or about January 2018, UnitedLex hired a third-party, Doug Benson ("Benson") of SB$_2$ Consultants ("SB$_2$"), to conduct due diligence and assess the Debtor's finances.

48.     Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report").[12]

49.     The Benson Report gave United Lex insight into the poor and troubling condition of LeClairRyan's finances.

50.     In a March 21, 2018 email from Reed to LeClairRyan's then-CEO Erik Gustafson ("Gustafson") and LeClair (the "March 21-22 Reed Email Chain"), Reed described the findings contained in the Benson Report, explaining that "[Benson's] findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity. [Benson] goes as far as to *raise a question of going concern* given current obligations and being at the limit of its credit line and partner stability."[13]  (emphasis added).

---

[11] A true and correct copy of the February 18, 2018 email from Reed is attached as Exhibit 3.

[12] A true and correct copy of the Benson Report is attached as Exhibit 4.

[13] A true and correct copy of the March 21-22 Reed Email Chain is attached as Exhibit 5, at 3.

51.     In the March 21-22 Reed Email Chain, Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path…we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."[14]

52.     In response to the March 21-22 Reed Email Chain, Gustafson provided a detailed rebuttal to the issues identified in the draft Benson Report and the concerns noted in the March 21-22 Reed Email Chain.  Gustafson claimed that LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."[15]

53.     As of March 22, 2018, UnitedLex knew, or should have known, that LeClairRyan was insolvent or in the zone of insolvency.

54.     For instance, replying to Gustafson's response to the March 21-22 Reed Email Chain, Reed stated, in relevant part:

> [t]he real challenge is liquidity for [LeClairRyan]. I was not expecting that [UnitedLex] would make the capital return, takeover the debt (which does not help [LeClairRyan] in terms of new liquidity) AND *then have to infuse material cash to ensure the firm can survive*. Doug's take away from [Dwight Jones] is that every day begins with a review of cash and serious concerns over the current situation.  *Doug [Benson] has not come across a firm that is in [LeClairRyan]'s current cash position, and has expressed serious concern with its status as a going concern*…I also did not fully realize until seeing [the Benson Report] that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs.  Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our 'deal infusion,' how much is needed to operate the firm *without being in the perpetual red zone.*[16]

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 1.

(emphasis added).

**E.    UnitedLex and LeClairRyan Seek Legal Opinions to Support the Joint Venture.**

55.    LeClairRyan received legal advice with respect to the planned joint venture from Hinshaw & Culbertson LLP ("Hinshaw").

56.    Upon information and belief, UnitedLex also received legal advice with respect to the planned joint venture from Hinshaw.

57.    Hinshaw's role advising the parties was described in a March 19, 2018 executive summary of the contemplated transaction prepared for LeClairRyan's members (the "Project ULX Executive Summary").[17]

58.    The Hinshaw Summary states that LeClairRyan "individually engaged" Hinshaw to provide "an ethics opinion for the benefit of [LeClairRyan] confirming that the overall proposed transaction and deal structure are legal and ethical."[18]

59.    The Hinshaw Summary also states that UnitedLex "separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion."[19]

60.    UnitedLex had previously received a legal opinion from Hinshaw dated July 25, 2017 (the "July 2017 ULX Opinion"), regarding a similar joint venture transaction with another law firm.[20]

61.    The July 2017 ULX Opinion cautioned that UnitedLex could not "**under any circumstances have an ownership interest in [the law firm], or exercise any management or**

---

[17] A true and correct copy of the March 19, 2018 Project ULX Executive Summary is attached as Exhibit 6.

[18] *Id.* at 9.

[19] *Id.*

[20] A true and correct copy of the July 25, 2017 ULX Opinion is attached as Exhibit 7.

4850-3004-5648.2

control over [the law firm], or over the provision of legal services by [the law firm]" (emphasis in original).[21]

62.     The July 2017 ULX Opinion was referenced in term sheets prepared on or about October 2017, which began to sketch out the proposed transaction between UnitedLex and LeClairRyan.

63.     These early term sheets relied on the July 2017 ULX Opinion, among others, to claim that the deal under discussion was "[f]ully compliant with [the] Rules of Professional Conduct."[22]

64.     Following discussions between Hinshaw, LeClairRyan's then-General Counsel, Lori Thompson ("Thompson"), and others, Hinshaw provided the Debtor with an initial opinion letter on March 27, 2018.[23]

65.     A revised version of the opinion letter was provided to Thompson the following day (the "March 28, 2018 Opinion Letter").[24]

66.     The March 28, 2018 Opinion Letter was provided to the LCR Board in advance of its vote to approve entering into the ULXP transaction.

67.     However, the March 28, 2018 Opinion Letter was premised upon facts relevant to earlier versions of the deal terms and not the terms actually under negotiation at the time it was issued.

---

[21] *Id.* at 6.

[22] A true and correct copy of the October 10, 2017 Draft Summary of Terms is attached as Exhibit 8.

[23] A true and correct copy of the March 27, 2018 initial opinion from Hinshaw is attached as Exhibit 9.

[24] A true and correct copy of the March 28, 2018 Opinion Letter is attached as Exhibit 10.

68.     For example, the March 28, 2018 Opinion Letter included references to "ULFS" –
United Law Firm Solutions – which was the name the parties had used for the joint venture during
negotiations in or around the Fall of 2017.[25]

69.     Notably, the March 28, 2018 Opinion Letter did not include any discussion
affirmatively stating that UnitedLex would not have an "ownership interest in" LeClairRyan or
that UnitedLex would not "exercise any management or control" over LeClairRyan.

70.     The March 28, 2018 Opinion Letter was never updated, not even after the structure
and operation of the joint venture were revised prior to the effective date of the agreements creating
ULXP, nor after aspects of the agreements creating ULXP were amended in or around the end of
2018.

71.     Upon information and belief, LCR Officers and Directors made false and/or
misleading statements to Hinshaw regarding the nature of the ULXP transaction.

72.     Upon information and belief, UnitedLex made false and/or misleading statements
to Hinshaw regarding the nature of the ULXP transaction.

## F.     Despite Knowing of LeClairRyan's Insolvency, the Debtor and UnitedLex Move Forward to Create the Joint Venture.

73.     Despite expressing serious reservations once they learned the true extent of
LeClairRyan's insolvency, CVC and UnitedLex pushed forward with the ULXP venture.

74.     Once the Debtor's financial situation was known, UnitedLex restructured the
proposed transaction between ULXP and LeClairRyan (the "Proposed Transaction") to reduce the
immediate financial benefits to the Debtor and bestow more control over the Debtor's operations
to ULXP, to the detriment of the Debtor's creditors.

---

[25] *Id.* at 2.

75.     First, CVC and UnitedLex immediately took the additional loans of up to $33 million off the table due to serious concerns about LeClairRyan's liquidity and earning potential.

76.     Thus, UnitedLex gave no new money to LeClairRyan as a part of the transaction.

77.     Second, the Debtor's equity interest in the venture was reduced, ultimately to merely 1%.

78.     Third, the Debtor and ULXP entered into an expansive Master Services Agreement (the "MSA") on or about April 4, 2018.[26]

79.     Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of the Debtor.[27]

80.     The breadth of these responsibilities is best illustrated by a section of the MSA entitled "Provider & Law Firm Responsibilities," which listed the contemplated responsibilities of ULXP in regards to several essential functions, including "Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security."

81.     The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions of ULXP's responsibilities under the MSA, which stated that ULXP would, among other things:

    a.    "Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients."

    b.    "Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the

---

[26] A true and correct copy of the April 29, 2018 MSA is attached as Exhibit 11.

[27] *Id.* at 1-2.

successful implementation of the Services, and (c) accomplish the goals of this Agreement."

c.    "Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities."

d.    "Manage all market-facing communications and marketing collateral, including Law Firm's website."

e.    "Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients."

f.    "Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level."

g.    "Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives."

h.    "Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work."

i.    "Manage employee relations issues and performance management issues at Law Firm and the Provider."

j.    "Identify, develop and propose compensation for Law Firm non-Members based on market data."

k.    "Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees."

l.    "Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm."

m.    "Manage and ensure the efficient functioning of Law Firm and Provider offices."

n.    "Track and manage efficient Law Firm time entry compliance."

o.    "Track and manage [work-in-progress], write downs and write-offs."

p.    "Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables."

15

82.     Once the ULXP transaction was consummated, the Debtor was no longer able to function on its own without the support of the ULX Entities.

83.     The MSA also provided for fees to ULXP to be calculated under a combination of factors, including what the MSA described as "Invoice Fees" related to "Operations Services" and "Production Services."[28]

84.     The Operations Services Fees related to ULXP's provision of the different back office and other non-legal services that LeClairRyan transitioned to it.[29]

85.     The Production Services Fees were established through "*a calculation that is based on member distributable income and accrued revenue*," which are fees from the Debtor's legal services.[30]

86.     Thus, pursuant to the Production Services Fees, ULXP *was to be compensated based on net profits of the law firm from its provision of legal services*.

87.     Upon information and belief, ULXP was sharing in fees from LeClairRyan's legal practice, which is prohibited by the Virginia State Bar Rules of Professional Conduct (the "Rules of Professional Conduct").

88.     The MSA included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of the Law Firm."[31]

89.     Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"):  (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member

---

[28] *See* MSA, *supra* n. 26, at 10-12.

[29] *Id*.

[30] *Id*.

[31] *Id*.

16

and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018);
(2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of
Class B Common Interest (effective April 4, 2018  and including the Operating Agreement as
Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4,
2018); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement")
between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

90.     Together, the JV Agreements granted the ULX Entities unprecedented control over
the operation of the Debtor law firm.

91.     The Defendants used the JV Agreements to influence and control LeClairRyan's
decision-making and require LeClairRyan to pay them ahead of other creditors.

92.     The Defendants also used the JV Agreements to influence and control
LeClairRyan's decision-making, including requiring LeClairRyan to inappropriately misuse funds
tendered by clients for specific costs and expenses.

93.     At the time the JV Agreements were executed, the LCR Board knew, or should
have known, that LeClairRyan was insolvent or in the zone of insolvency.

**G.     As a Condition of the Joint Venture, LeClairRyan Converted from a Professional
Corporation to a Professional Liability Corporation and Liquidated its Deferred
Compensation and Supplemental Retirement Plans.**

94.     As a condition precedent to entering into the ULXP transaction, ULXP required
LeClair Ryan to convert its corporate form from a PC to a PLLC.

95.     LeClairRyan converted from a PC to a PLLC as of March 31, 2018 (the
"Conversion").

96.     The PLLC flow-through structure allowed for a single level of taxation on any
capital gains that would have resulted from the shareholders' equity in ULXP.

17

97.     The effects of the Conversion were described in a March 22, 2018 email from Gustafson to Reed, which explained that one consequence of the Conversion was that the firm was able to "materially reduce [its] monthly cash burn [in 2018] by another $450k per month" (the "March 22, 2018 Gustafson Email").[32]

98.     In the March 22, 2018 Gustafson Email, Gustafson explained that the Conversion also allowed the firm to "pay about $30 million in partner draws on a tax deferred basis" which "create[d] a significant retention incentive through 2023, especially for [LeClairRyan's] biggest producers, because early departure can trigger a recapture tax event."[33]

99.     As the firm had previously explained to its shareholders in materials provided in advance of a February 24, 2018 meeting to approve the Conversion, "[r]etention of Partners via the equity incentive [was] a **key requirement for ULX**."[34] (emphasis added.)  The "conversion to an LLC to avoid double tax" was seen as "evidence [of] the value [LeClairRyan] place[d] in that incentive."[35]

100.     Certain accounting-related aspects of the Conversion are currently the subject of an IRS audit.

101.     The IRS filed a proof of claim in the bankruptcy (Claim No. 252), which, among other things, asserts a priority claim in the estimated amount of $4,759,175.17, based on the tax returns prepared in conjunction with the transaction and the accounting methods used therein.

---

[32] *See* Exhibit 5, *supra* n. 13.

[33] *Id.* at 2.

[34] A true and correct copy of the Conversion to LLC Net Cash Benefits Summary, an attachment to a February 24, 2018 email to Shareholders, is attached as Exhibit 12.

[35] *Id.* at 3.

102.    In addition, in connection with the ULXP transaction then-under negotiation, the LCR Board voted to terminate the firm's Deferred Compensation and Supplemental Retirement plans effective as of December 29, 2017.

103.    The effect of this termination was that the plan balances, totaling an amount not less than $12 million, became eligible to be transferred to shareholders beginning on or about December 29, 2018.

104.    Although these payments would have ordinarily been taxable to the shareholders receiving payments from the terminated plans, the tax savings realized from LeClairRyan's conversion from a PC to PLLC were passed through to the individual shareholders, who were able to use those net operating losses to offset the taxes that would have been owed on the distributions.

105.    LeClairRyan recognized this benefit in a January 13, 2018 draft summary of the Conversion prepared for its shareholders, which noted that "[t]hose distributions ordinarily would be taxable to the Partners, but it is anticipated that the approximately $3 million in projected PLLC-related tax savings to Partners will effectively offset much of the tax."[36]

106.    The termination and subsequent payments from the Deferred Compensation and Supplemental Retirement plans diverted funds from the Debtor's creditors.

107.    At or around the time of the transaction, the LCR Board and the LCR Officers and Directors breached their fiduciary duties of care and loyalty by, among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients

---

[36] A true and correct copy of the January 13, 2018 Project 100 Summary is attached as Exhibit 13.

19

for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

108.    The ULX Entities aided and abetted the LCR Board's breach of its fiduciary duties of care and loyalty and conspired with the LCR Officers and Directors to breach the duties owed to the Debtor and its shareholders, clients, and creditors

109.    As a result of their breaches of fiduciary duties of care and loyalty, including their decision to enter into the ULXP transaction, instead of winding down the insolvent law firm, the LCR Officers and Directors caused significant damages to the Estate in an amount not less than $42,759,900.

## H.    ULXP Controls LeClairRyan Through the Joint Venture.

110.    Following the execution of the MSA and JV Agreements, the ULX Entities worked as managing agents for the Debtor.

111.    The ULX Entities were in charge of key functions, such as accounting, marketing, conflict management, and business development.

112.    The ULX Entities accessed the Debtor's financial and other confidential information essential to the operation of the Debtor.

113.    Upon information and belief, the ULX Entities also incurred expenses on the Debtor's behalf.

114.    The ULX Entities also made personnel decisions regarding the Debtor's personnel.

115.    ULXP Employees were the directors of the following key operations at LeClairRyan: Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development.

4850-3004-5648.2

116.    ULXP Employees regularly held themselves out to the public to be employees and decision-makers of LeClairRyan.

117.    For instance, in February 2019, Josh Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as the "Chief Operating Officer" of LeClairRyan, as well as an employee authorized to enter into business transactions on behalf of UnitedLex and ULXP.[37]

118.    In an August 8, 2018 email to Reed and UnitedLex CFO Nicholas Hinton ("Hinton"), along with certain ULXP directors, Peter Krakaur, then the UnitedLex Vice President, Legal Business Solutions ("Krakaur"), illustrated the operation of ULXP and UnitedLex.[38]   A PowerPoint attached to the email illustrated the service arrangement employed at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and LeClairRyan fully into UnitedLex's systems and processes.

119.    The diagram, reproduced below, shows a slow movement to full integration and dominance by UnitedLex – despite noted "potential issues" that would result from such a course of action.[39]



---

[37] A true and correct copy of the February 18, 2019 email from Rosenfeld to Proxios is attached as Exhibit 14.

[38] A true and correct copy of the August 8, 2018 email from Krakaur to Reed and Hinton is attached as Exhibit 15.

[39] A true and correct copy of the PowerPoint, which was attached to the August 8, 2018 email from Krakaur to Reed and Hinton, is attached as Exhibit 16.

4850-3004-5648.2

120.    In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan]. We are slowly and necessarily integrating UXP (*sic*) operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm. Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes. The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.[40]

121.    As Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now **the owner of the business of law**."[41] (emphasis added).

122.    Explaining further, Krakaur wrote, "[w]e all know law firms do not operate as a business. ULXP is designed to change that. Given the nature of the relationship, the agreements, **and the practical aspects of us running the law firm**, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."[42]

123.    The Debtor's financial condition forced the ULX Entities to reluctantly accept an arrangement where the Debtor would ultimately receive between $10 to $12 million in cash flow float, through the ULX Entities' provision of services as well as by taking over payment of vendor fees, while receiving limited to no payments from LeClairRyan (the "Cash Flow Float").

**I.      The ULX Entities and CVC Grow Concerned Over LeClairRyan's Ability to Repay ULXP.**

124.    ULX Entities and CVC were concerned about LeClairRyan's ability to repay the investments and the Cash Flow Float being provided to the firm.

---

[40] *Id.* at 2-3.

[41] A true and correct copy of the August 10, 2018 email from Krakaur is attached as Exhibit 17.

[42] *Id.*

125.    One reason that the ULX Entities and CVC were concerned was because CVC would be drawing its funding lines to extend the credit to LeClairRyan.

126.    On or about July 2018, CVC contemplated capping the Cash Flow Float at $8.5 million and thought about seeking a commitment from LeClairRyan that any incremental amounts would be subject to different payment terms.[43]

127.    CVC, in particular, had been concerned about LeClairRyan's finances and, during the negotiations had been focused on the growth of the float amounts and sought to include terms in the agreements to protect their investment, including proposing a term saying that payments to ULXP would have priority over distributions to LeClairRyan's members.  However, these terms were ultimately not included.

128.    The Cash Flow Float, however, was premised on (1) increased profitability by LeClairRyan and (2) the ULX Entities systems further optimizing that profitability by allowing attorneys to focus on the practice of law.

129.    Yet, because of LeClairRyan's continued and sustained financial problems, the ULX Entities knew or should have known that LeClairRyan did not have sufficient funds to pay its obligations as they came due – including making payments on the Cash Flow Float provided by the ULX Entities.

**J.      The ULX Entities Sought to Elevate ULXP's Priority Over Other Unsecured Creditors through an $8 Million Dollar Promissory Note.**

130.    By the end of 2018, the Debtor was continuing to experience shareholder defections and declining revenue.

---

[43] A true and correct copy of the July 2, 2018 email from Mohit Goyal is attached as Exhibit 18.

131.    By the end of 2018, the Debtor owed the ULX Entities fees totaling more than $12 million.

132.    In April 2019, a year after entering in the joint venture and five months before the Debtor would file for bankruptcy protection, ULXP and the Debtor entered into an Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "ULXP Note")[44] and an accompanying Security Agreement (the "ULXP Security Agreement").[45]

133.    Both documents were signed on April 4, 2019 but backdated to December 20, 2018.

134.    Under the terms of the ULXP Note, the Debtor agreed to pay ULXP the principal amount of $8 million for alleged fees owed by the Debtor to ULXP under the MSA.

135.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.[46]

136.    The debt that formed the center of the purported loan consisted entirely of *prior advances* made by the ULX Entities to the Debtor.

137.    The result of the ULXP Note was to elevate ULXP's priority over other unsecured creditors.

138.    The Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

139.    That the ULXP Note was, in reality, an equity infusion is evidenced in part by the fact that the Debtor was undercapitalized at the time the ULXP Note and Security Agreement were executed.

---

[44] A true and correct copy of the ULXP Note is attached as Exhibit 19.

[45] A true and correct copy of the ULXP Security Agreement is attached as Exhibit 20.

[46] *See* ULXP Note, *supra* n. 44 at §§ 1, 3.

140.    Despite the premise of a loan, on January 22, 2019, Christopher Lange ("Lange"), a LeClairRyan attorney and the former Corporate Secretary, sent revisions to the ULXP Note to the ULX Entities' outside counsel, and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender [VCF] …would see as being equity like in that it is being paid from the return on our equity investment in [ULXP]."[47]

141.    This effort proved successful.  On January 31, VCF informed the Debtor that it approved the leverage ratio calculation so that the $8 million would be treated as equity, saying "[t]he [UnitedLex] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in."[48]

142.    United Lex knew or should have known that the ULXP Note was treated as equity by VCF.

143.    ULXP knew or should have known that the ULXP Note was treated as equity by VCF.

144.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the ULX Entities were providing equity and investing into the Debtor.

145.    At all times, from April 2018 to September 2019, the Defendants knew or should have known that the Debtor was not sufficiently capitalized to pay back the ULXP Note.

146.    LeClairRyan never made a single payment under the ULXP Note.

---

[47] A true and correct copy of the January 22, 2019 email from Lange is attached as Exhibit 21.

[48] A true and correct copy of the January 31, 2019 email from VCF attached as Exhibit 22.

4850-3004-5648.2

**K.    The Defendants Take Further Control of the Debtor, Prioritizing Payments to ULXP Over All Others and Encouraging the Debtor to Misappropriate Funds Tendered by the Debtor's Clients for Specific Expenses.**

147.    In or around January 2019, the ULX Entities began to convene regular meetings with LeClairRyan's CFO, Dwight Jones ("Jones"), and other LCR Board members to discuss cash flow.

148.    Upon information and belief, in these meetings, Jones would meet with Hinton and the UnitedLex Controller to discuss 13-week cash flow forecasts and to address the payment installments for the ULX Entities.

149.    Hinton insisted that Jones prepare these 13-week cash flow forecasts, which showed weekly cash receipts and potential cash disbursements.   This type of cash flow forecast is most often used in situations where a company enters financial distress in order to provide visibility into the company's short-term options

150.    In connection with these meetings and discussions, Hinton also decided which of the firm's key vendors needed to be paid.

151.    These regular meetings became avenues for the ULX Entities to exert their control and ensure that their invoices were paid ahead of other creditors.

4850-3004-5648.2

152.    As demonstrated by the chart below, between November 2018 and the Petition Date, payables due and owing from the Debtor to ULXP decreased by approximately 30.7%, while the Debtor's payables due and owing to all other creditors increased by approximately 181%:



**Comparison of Payable to ULXP to Other Accounts Payable**
*($ in millions)*

[1]  Excludes interest on $8,000,000 debt recharacterization.
[2]  Includes the following balance sheet line items: Accounts Payable, Credit Card and Accrued Expenses.

153.    The ULX Entities continued to demand weekly payments, with the Debtor's stated payment amounts needing to be at least $2 million a month.

154.    The ULX Entities would demand these payments, regardless of what other higher priority vendor payments were outstanding.

155.    Through these meetings, it was clear that the ULX Entities made the decisions about who was to be paid and when.

4850-3004-5648.2

156.    For example, in an email dated February 21, 2019, Jones explained that the Debtor would not be issuing a weekly payment to ULXP due to the need to handle outstanding payables for client reimbursements.[49]

157.    In response, Hinton sent an email to Gustafson asking him if this was LeClairRyan's position and noting that "[UnitedLex] is not the lowest priority vendor.  We are not LCR's bank."[50]

158.    Based on pressure exerted by the ULX Entities, the Debtor improperly prioritized payments to ULXP, to the detriment of other creditors and clients.

159.    Upon information and belief, there were also instances in which the Debtor did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Entities.

160.    Upon information and belief, in certain of these instances, individual attorneys had to pay for client fees out of pocket to avoid missing client deadlines.

161.    Upon information and belief, in other instances, the Debtor would not pay vendors who were handling aspects of clients' cases, even though the client had tendered funds to LeClairRyan for the purpose of paying those vendors.

162.    The ULX Entities encouraged LeClairRyan to commingle funds tendered by clients for specific expenses with operational funds that were used for other payments.

163.    The ULX Entities pushed back against efforts by the Debtor to cease, or limit, the practice of commingling client and operational funds as the firm approached bankruptcy.

164.    Indeed, Bruce Matson ("Matson"), the Debtor's former Chief Legal Officer, had previously raised this issue to the Debtor's senior leadership by 2016. Matson explained that funds

---

[49] A true and correct copy of the February 21, 2019 email from Jones is attached as Exhibit 23.

[50] *Id*.

tendered by clients, even those related directly to a client disbursement, were not being used for their earmarked purpose and were being intermingled and used to fund the Debtor's operations.

165.    Matson even expressed that the mismanagement of funds tendered by clients was "tantamount to misusing (intentionally) client trust funds."[51]

166.    Hinton was told by LCR Officers and Directors that these funds should not be used for any other purpose other than the purpose that the client intended.

167.    Despite this warning, in an April 10, 2019 email discussing this issue, Hinton told Jones, the then-Chief Financial Officer, to use the funds given to LeClairRyan by clients for expenses for its creditors,  instead of "restrict[ing] the liquidity of the firm by creating artificial restricted cash pools."[52]

168.    This mishandling of these funds, related mismanagement of client affairs, and neglect of other important financial obligations in order to prioritize payments to ULXP was a further violation of fiduciary duties owed by the LCR Officers and Directors, including to its clients and creditors.

**L.    The Novellus Law Group, the Ultimate Demise of ULXP, and the Final Act Pushing LeClair Ryan into Bankruptcy.**

169.    On or about early 2019, the Debtor's financial condition worsened.

170.    At that time, the Debtor and the ULX Entities embarked on an initiative known as "Project Modern."

171.    Project Modern was a last-ditch effort to keep the Debtor from filing bankruptcy whereby the ULX Entities sought to take even greater control of the Debtor.

---

[51] A true and correct copy of the May 2, 2016 email from Matson to Gustafson is attached as Exhibit 24.

[52] A true and correct copy of the April 10, 2019 email from Hinton is attached as Exhibit 25.

4850-3004-5648.2

172.     Project Modern morphed into the idea of creating a new law firm called the Novellus Law Group ("NLG").

173.     Presented to the Debtor's members on or around May 2019, the NLG concept involved forming a new partnership with UnitedLex in which certain of the Debtor's members would move back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.  UnitedLex would be compensated by utilizing a legal and management fee structure and retaining an $8 million dollar investment.

174.     NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that retained LeClairRyan's profitable members while leaving certain debt and other liabilities, including but not limited to real estate leases and technology costs, with LeClairRyan, which would have been wound down.

175.     Under the proposal, the debts owed by LeClairRyan to UnitedLex would be assumed by the newly-formed NLG.

176.     Other debt, including but not limited to debt to former shareholders and landlords, would not have been assumed by NLG.

177.     To incentivize them to join NLG, certain of the Debtor's members were promised equity in UnitedLex, which still hoped to grow by duplicating the failed ULXP business model with other law firms.

178.     In NLG offer letters, a select, group of the Debtor's members were offered base compensation, bonus potential, long term incentive compensation, benefits and payroll taxes –a package allegedly superior to that of the traditional law firm model.

179.    Yet, any new entity formed from the Debtor would still have to still grapple with the Debtor's liquidity issues.

180.    Upon information and belief, these liquidity concerns were assuaged by the fact UnitedLex and CVC would provide financial backing to NLG.

181.    By exploring this proposed transaction, which would have improperly prioritized certain creditors at the expense of others, the LCR Officers and Directors breached the fiduciary duty of care and loyalty.

182.    Exploring this proposed transaction damaged the Estate by further deepening the insolvency of the Debtor.

183.    On or about June 20, 2019, in connection with efforts to enact the NLG plan, Hinton and Reed began negotiating directly with the Debtor's lender, VCF, to provide more financing for NLG.

184.    Upon information and belief, Hinton and Reed sought financial backing from VCF because both CVC and the UnitedLex Entities did not want to invest further money in LeClairRyan.

185.    VCF eventually refused to provide the level of funding Hinton and Reed were seeking.

186.    At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of ULXP.  This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

187.    The Debtor's members voted on July 29, 2019 to formally wind-down LeClairRyan.

188.     On September 3, 2019, the Debtor commenced the Chapter 11 case by filing a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**M.     Payments Made to ULXP by the Debtor.**

189.     Upon information and belief, during the relationship between the ULX Entities and

LeClairRyan, LeClairRyan transferred not less than $19,357,282.51 to ULXP between August 1,

2018 and the Petition Date (the "Avoidable Transfers").  The Avoidable Transfers are listed on the

attached Exhibit 26.

190.     Upon information and belief, of that amount, not less than $17,425,405.50 of the

transfers occurred within one year of the petition date (the "Preferential Transfers").  The

Preferential Transfers are listed on the attached Exhibit 27.

## COUNT I

**(Avoidance of Fraudulent Transfers Under Section 548(a)(1)(A) of the Bankruptcy Code
Against ULXP and UnitedLex)**

191.     The allegations in the preceding paragraphs are re-alleged and incorporated herein

by references as if set forth in their entirety.

192.     The Avoidable Transfers, as detailed on Exhibit 26, were transfers of interests in

the Debtor's property.

193.     The Avoidable Transfers were made with actual intent of the Debtor to hinder,

delay, or defraud any entity to which the Debtor was or became, on or after the date that such

transfers were made or such obligation was incurred, indebted.

194.     The Defendants were not good faith transferees, and therefore are not entitled to

offset rights under section 548(c) and applicable non-bankruptcy law.

195.     Each Avoidable Transfer was accompanied by at least three badges of fraud

indicating the fraudulent nature of such transfer, including but not limited to the following: (i) the

4850-3004-5648.2

transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the Avoidable Transfers.

196.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

197.    As a result of the Avoidable Transfers, creditors of the Debtor sustained significant damages.

198.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

199.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

200.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not less than $19,357,282.51, plus her reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

201.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

## COUNT II

**(Avoidance of Fraudulent Transfers Under Section 548(A)(1)(B) of the Bankruptcy Code Against ULXP And UnitedLex)**

202.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by references as if set forth in their entirety.

203.    The Avoidable Transfers were transfers of interest in the Debtor's property.

204.    The Debtor did not receive reasonably equivalent value in exchange for the Avoidable Transfers.

205.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

206.    The Avoidable Transfers were made while the Debtor were insolvent, or became insolvent as a result of the Avoidable Transfers.

207.    At the time of the Avoidable Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

208.    At the time of, or as a result of the Avoidable Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

209.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of 11 U.S.C. § 502.

210.    The Avoidable Transfers are avoidable transfers pursuant to Bankruptcy Code Section 548(a)(1)(B).

211.    The Debtor received less than a reasonably equivalent value in exchange for the Avoidable Transfers.

212.    The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

213.    The Avoidable Transfers are avoidable as fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

214.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

215.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

216.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

34

## COUNT III

### (Avoidance of Fraudulent Transfers Under Section 544(b) and Section 550 of the Bankruptcy Code and Applicable State Law Against ULXP and UnitedLex)

217.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

218.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

219.    The Avoidable Transfers were transfers of interest in the Debtor's property to the Defendants.  The Trustee reserves the right to seek the avoidance and recovery of any and all additional transfers that she later discovers.

220.    At all relevant times, the Debtor had at least one creditor with claims that arose before or within a reasonable time after the Petition was filed.

221.    The Defendants entered into each Avoidable Transfer with the actual intent to delay, hinder, or defraud the creditors of LeClairRyan.

222.    The primary purpose of the Avoidable Transfers was to take cash from LeClairRyan for the benefit of the Defendants without those assets being made available to LeClairRyan's other creditors.

223.    Each Avoidable Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the Avoidable Transfers.

224.    The Avoidable Transfers were made to or for the benefit of the Defendants.

225.    The Avoidable Transfers were made within the six (6) years before the Petition

Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy

Code.

226.    The Trustee reserves the right to seek the avoidance and recovery of any and all

additional avoidable transfers that she later discovers.

227.    The Avoidable Transfers are recoverable from United Lex as an alter ego of ULXP.

228.    The Trustee is entitled to the full amount of the Avoidable Transfers, totaling not

less than $19,425,405.51, plus her reasonable attorneys' fees and costs, and all other relief the

Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT IV

## (Avoidance of Preferences Under Section 547(b) of the Bankruptcy Code Against ULXP and UnitedLex)

229.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

230.    Between the Petition Date and one year before the Petition Date, the Debtor made

transfers (the "Preferential Transfers") to or for the benefit of the Defendants, as set forth on

Exhibit 27.

231.    The Preferential Transfers were for or on account of an antecedent debt owed by

the Debtor before the Preferential Transfers were made.

232.    The Defendants are statutory insiders for the Debtor, within the meaning of Section

101(31)(F) of the Bankruptcy Code.

233.    The Defendants are also non-statutory insiders of the Debtor.

234.    The Defendants were managing agents of the Debtor, as they accessed the Debtor's

financial and other information essential to the operation of the Debtor, incurred expenses on the

Debtor's behalf, made personnel decisions, and were in charge of key functions, such as accounting, marketing, conflict management, and business development.

235.    The Debtor was insolvent at all times within one year of the Petition Date.

236.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544 or 548 of the Bankruptcy Code, such portion is plead here, in the alternative, as a Preferential Transfer.

237.    The Preferential Transfers enabled the Defendants, as creditors, to receive more than they would have received had the transfer not been made and the creditor received payment of such debt under Chapter 7.

238.    The Preferential Transfers are avoidable as preferences under Section 547 of the Bankruptcy Code.

239.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

240.    The Preferential Transfers are recoverable from United Lex as an alter ego of ULXP.

241.    The Trustee is entitled to the full amount of the Preferential Transfers, totaling not less than $17,425,405.50, plus her reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

## COUNT V

**(Avoidance of Lien and Recovery of Avoided Transactions Under Sections 550(a) of the Bankruptcy Code Against ULXP)**

242.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

243.     To the extent that any transaction is avoided under Bankruptcy Sections 544, 547, and/or 548, pursuant to section 544(b) of the Bankruptcy Code, ULXP's claims and liens against the Debtor are avoidable.

244.     Pursuant to section 551 of the Bankruptcy Code, ULXP's claims and liens that are avoidable herein shall be preserved for the benefit of the Debtor's Estate.

245.     The Claims consist of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

246.     In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.

247.     Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.

248.     ULXP was granted liens securing the commitments pursuant to the ULXP Note.

249.     During all relevant times, ULXP was both a statutory and non-statutory insider.

250.     The grant of the security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to the benefit of insider ULXP (the "ULXP Note Transfer").

251.     The Debtor made such a transfer for or on account of an antecedent debt owed by the Debtor to ULXP before the ULXP Note Transfer was made.

252.     At the time the Debtor made the ULXP Note Transfer, the liabilities of LeClairRyan exceeded the fair value of its assets and it was insolvent.

253.     LeClairRyan made the ULXP Note Transfer within the one-year period before the Petition Date.

254.    The ULXP Note Transfer enabled ULXP to receive more than they would receive if the transfer had not been made.

255.    Based on the foregoing, the ULXP Note Transfer is avoidable pursuant to 11 U.S.C. § 547.

## COUNT VI

### (Avoidance of Fraudulent Transfer Under Section 544(b) and Section 550 of the Bankruptcy Code and Applicable State Law Against ULXP)

256.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

257.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

258.    The ULXP Note Transfer was a transfer of interest in the Debtor's property to ULXP.

259.    At all relevant times, the Debtor had at least one creditor with claims that arose before or within a reasonable time after the Petition was filed.

260.    The Debtor entered into the ULXP Note Transfer with the actual intent to delay, hinder, or defraud the creditors of LeClairRyan.

261.    The ULXP Note Transfer was made to or for the benefit of ULXP.

262.    The ULXP Note Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the ULXP Note Transfer was made to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the ULXP Note Transfer was made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) LeClairRyan was or became insolvent at the time of the ULXP Note Transfer.

263.    The ULXP Note Transfer was made within the six (6) years before the Petition Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

264.    The ULXP Note Transfer should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548(a)(1)(A) or (B), and 550 and applicable state fraudulent transfer law.

## COUNT VII

**(Disallowance of Claims under 11 U.S.C. § 502(d)) Against ULXP and UnitedLex)**

265.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

266.    As alleged above, the Defendants were the recipients of the Avoidable Transfers and the Preferential Transfers which are avoidable pursuant to Section 547 of the Bankruptcy Code, and which are recoverable pursuant to Section 550 of the Bankruptcy Code.

267.    Despite a demand, ULXP has not returned the Avoidable Transfers to the Trustee.[53]

268.    Pursuant to Section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property is recoverable under Section 550(a) of the Bankruptcy Code.

269.    Because the Defendants have not paid or returned the Avoidable Transfers to the Trustee, ULXP's Claims or any claims which ULXP or UnitedLex purport to assert must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

270.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the Defendants' claims against the Debtor's Estate are disallowed.

---

[53] A true and correct copy of the demand letter sent June 8, 2020 is attached as Exhibit 28.

## COUNT VIII

### (Re-Characterization of Debt as Equity Against ULXP)

271.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

272.    ULXP has filed a claim that asserts a right to payments allegedly owed by the Debtor (Proof of Claim Nos. 174) (the "Secured Claim").

273.    The Secured Claim consists of the $8 million-dollar ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

274.    The Secured Claims were equitable contributions to the Debtor where the Debtor was undercapitalized, and the Defendants' $8 million dollar loan consisted of prior advances made by the Defendants to the Debtor.

275.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.

276.    The Debtor made no payments on the $8 million-dollar ULXP Note.

277.    As a result of the Defendants' equitable contribution, the Court should recharacterize as equity ULXP's Proof of Claim No. 174 in its entirety pursuant to this Court's equitable powers.

## COUNT IX

### (Aiding and Abetting Breach of Fiduciary Duty Against UnitedLex, ULXP)

278.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

279.    From at least until or around 2017 and until or around 2019, the Defendants aided and abetted the breaches of fiduciary duty of due care and loyalty by one or more of the LCR

4850-3004-5648.2

Board and the LCR Officers, who owed such fiduciary duties to the Debtor and/or its shareholders, clients, and creditors at all relevant times.

280.    The Defendants did so knowingly, or having reason to know, the nature of the injury to the Debtor and Debtor's creditors brought about by such assistance.

281.    The Defendants substantially assisted one or more of the LCR Officers and Directors knowingly, or having reason to know, the nature of the injury to the Debtor and the Debtor's creditors brought about by such assistance.

282.    The Defendants directly benefited from aiding and abetting such breaches of fiduciary duty and self-dealing by reaping financial rewards to which they were not entitled.

283.    As a direct and proximate result of aiding and abetting breaches of fiduciary duty and self-dealing, the Debtor and its creditors sustained significant damages, including but not limited to damages resulting in the deepening insolvency of the Debtor.

284.    As a result of the Defendants' aiding and abetting of the aforementioned breaches by one or more of the LCR Officers and Directors, the Trustee is entitled to recover the damages suffered by the Debtor in an amount to be proved at trial, in an amount totaling not less than $42,759,900.

## COUNT X

**(Statutory Conspiracy Against UnitedLex, ULXP pursuant to
Virginia Code § 18.2-499, et seq.)**

285.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

286.    From at least until in or around 2017 to until or around 2019, the Defendants and one or more of the LCR Officers and Directors acted in concert, agreed, associated, mutually

undertook, or combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused injury and damage to the Debtor and creditors of the Debtor.

287.    The Defendants violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to the LCR Officers and Directors for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

288.    The Defendants conspired to breach the fiduciary duties the LCR Officers and Directors owed to the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

289.    The unlawful acts include, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

290.    The Defendants wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

291.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one of more of the LCR Officers and Directors, the Debtor and its creditors suffered significant damages, including but not limited to damages related to the Debtor's deepening insolvency.

292.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act (the "VBCA").

293.    The Debtor suffered injury from extending the life of the Debtor, life dissipation of assets, and increased insolvency.  As such, the Debtor's creditors lost assets that would have otherwise been available to satisfy their claims.

294.    As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

295.    The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code.

## COUNT XI

### (Common Law Conspiracy against UnitedLex, ULXP)

296.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

297.    From at least until on or around 2017 to until or around August 2019, the Defendants and one or more of the LCR Director and Officers acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

298.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties the LCR Board and the LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, authorizing and directing LeClairRyan to enter into the Conversion, terminating the firm's Deferred Compensation and Supplemental Retirement plans, misappropriating funds tendered to the Debtor by its clients for

44

specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

299.    The Defendants and one or more of the LCR Officers and Directors intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

300.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one or more of the LCR Officers and Directors, the Debtor and their creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

301.    As a result of the conspiracy, the Trustee is entitled to recover from the Defendants the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $42,759,900.

## COUNT XII

### (Conversion Against UnitedLex, ULXP)

302.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

303.    Rather than utilizing monies that had been tendered by the Debtor's clients for specific expense (the "Expense Transfers"), the Debtors instead turned said monies over to the Defendants.

304.    The Expense Transfers were wrongfully paid to the Defendants.

305.    The Trustee is entitled to immediate possession of the Expense Transfers.

306.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $1,069,510.00.

## COUNT XIII

### (Unjust Enrichment Against UnitedLex, ULXP)

307.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

308.    By accepting funds that were taken inappropriately, at least in part, from funds tendered by the Debtor's clients for specific expenses, UnitedLex and ULXP were conferred a benefit by LeClairRyan's clients.

309.    The ULX Entities knew, or should have known, that the funds received by ULXP were tendered to the Debtor by clients of LeClairRyan to be used for specific expenses.

310.    UnitedLex and ULXP accepted and retained this benefit in circumstances that render it inequitable for them to retain the benefit without paying for its value.

311.    The Trustee is entitled to damages as a result of this unjust enrichment in an amount to be proven at trial, but in an amount not less than $1,069,510.00.

## COUNT XIV

### (Alter Ego Liability Against UnitedLex)

312.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

313.    ULXP was an alter ego of UnitedLex.

314.    There existed a unity of interest and ownership between the Defendants that created no separate personalities for each entity.  ULXP is the adjunct, creature, instrumentality, device, stooge, or dummy of UnitedLex.

315.    The CEO of UnitedLex, was the sole managing member of UnitedLex Manager.

316.    The Defendants shared staff and assets through the Shared Personnel Agreement entered into between the two entities.

46

317.    ULXP was used to justify wrongs, protect fraudulent transfers, and to conspire with the LCR Board to breach the fiduciary duties the LCR Board and LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors; or at a minimum, aided and abetted this breach.

318.    As such, UnitedLex formed and operated ULXP as a device or sham used to disguise this wrongful conduct.

319.    Consequently, all monies that ULXP is required to return to the Estate should be enforced against UnitedLex.

320.    The Trustee is entitled to recover all damages asserted in the Complaint, jointly and severally from UnitedLex and ULXP, which operated as UnitedLex's alter ego.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)     On Counts I and II, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the Avoidable Transfers, and directing the Defendants to pay the Trustee an amount to be determined at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

(b)     On Count III, awarding judgment to the Trustee, pursuant to Sections 544 and 550 of the Bankruptcy Code, Va. Code Sections 55-80 and 55-81, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount to be proven at trial, totaling not less than $19,425,405.51, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(c)     On Count IV, awarding judgment to the Trustee, pursuant to Section 547 of the Bankruptcy Code, in an amount to be proven at trial that is not less than $17,425,405.50, pursuant to Section 550(a) of the Bankruptcy Code;

(d)     On Counts V and VI, avoiding all of ULXP's liens asserted against the Debtor's Estate;

47

(e)     On Count VII, disallowing any claim of the Defendants pursuant to section 502(d) of the Bankruptcy Code;

(f)     On Count VIII, recharacterizing ULXP's Proof of Claim No. 174 as a claim of equity;

(g)     On Count IX, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the Defendants' aiding and abetting breaches of fiduciary duties and self-dealing in an amount to be proven at trial, but totaling not less than $42,759,900;

(h)     On Count X, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of violation of the VBCA, for three times the damages caused to the Debtor as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, in an amount to be proven at trial, but totaling not less than $128,279,700;

(i)     On Count XI, awarding judgment to the Trustee for damages caused to the Debtor and its creditors, as a result of the civil conspiracy in an amount to be proven at trial, but totaling not less than $42,759,900;

(j)     On Count XII, awarding judgment to the Trustee for damages caused to the Debtor and its creditors and clients, as a result of the Defendants acts of conversion in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(k)     On Count XIII, awarding judgment to the Trustee for turnover of money or the value thereof, which does not belong to the Defendants, in an amount to be proven at trial, but totaling not less than $1,069,510.00;

(l)     On Count XIV, finding that ULXP was the alter ego of UnitedLex and that ULXP and United Lex are jointly and severally liable for all damages resulting from this Adversary Proceeding;

(m)     Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(n)     Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(o)     Directing the Defendants to pay forthwith all amounts awarded; and

(p)      Granting such other relief as the Bankruptcy Court deems just and proper.


Dated:    October 26, 2020                    Respectfully submitted,


                                              /s/ Erika L. Morabito
                                              Erika L. Morabito (VSB No. 44369)
                                              Brittany J. Nelson (VSB No. 81734)
                                              FOLEY & LARDNER LLP
                                              3000 K Street, NW, Suite 600
                                              Washington, DC 20007-5109
                                              (202) 672-5300 (telephone)
                                              (202) 672-5399 (facsimile)
                                              emorabito@foley.com
                                              bnelson@foley.com

                                              *Special Counsel to Lynn L. Tavenner, Chapter 7
                                              Trustee*

4850-3004-5648.2