**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | |
|---|---|
| In re:<br><br>LeClairRyan PLLC,<br><br>    Debtor. | Chapter 7<br><br>Case No. 19-34574 (KRH) |
| Lynn L. Tavenner, as Chapter 7 Trustee,<br><br>    Plaintiff,<br><br>v.<br><br>ULX Partners, LLC, ULX Manager LLC, UnitedLex Corporation, and Gary LeClair,<br><br>    Defendants. | Adv. Proc. No. 20-03142 (KRH) |

## FIRST AMENDED COMPLAINT

Plaintiff, Lynn L. Tavenner, Trustee, not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "Chapter 7 Trustee" or the "Trustee") of the bankruptcy estate (the "Estate") of LeClairRyan, PLLC ("LeClairRyan" or the "Debtor" and/or "LCR"), by her undersigned counsel, states the following in support of this adversary complaint against Defendants ULX Partners, LLC ("ULXP"), ULX Manager LLC ("ULX Manager"), UnitedLex Corporation ("UnitedLex," and together with ULXP and ULX Manager, the "ULX Entities") and Gary LeClair (together with the ULX Entities, "Defendants"):

## NATURE OF THE CASE

1.     This case is the aftermath of one deceitful law firm "entrepreneur" conspiring with an opportunistic "global enterprise legal services provider," an actively complicit investment bank, and a group of scheming lawyers to manipulate a law firm for their own gain and benefit.

2.      The principal architects were Gary LeClair, former CEO, Chairman, and co-founder of LeClairRyan, and Daniel Reed, CEO and co-founder of UnitedLex.  Both Messrs. LeClair and Reed had delusional visions of transforming the legal industry into a hugely profitable and scalable (albeit legally unethical) enterprise.  They did not succeed, and the ill-fated experiment ended with the bankruptcy of LeClairRyan, a national law firm.  UnitedLex, the legal services provider, continues to prosper.

3.      In June 2018, Messrs. LeClair and Reed announced the creation of ULXP, a strategic "business platform" designed to provide a "constellation" of law firms with streamlined operations.  The transaction rebadged more than 300 LeClairRyan employees as ULXP employees, and promised to provide LeClairRyan a "pathway to funding" from CVC Capital Partners ("CVC"), a "world leader" in private equity investments.  In exchange, LeClairRyan gave ULXP a license to LeClairRyan's intellectual property and a "turn-key" back office operation that the ULX Entities could then "sell to other law firms."  In the end, the transaction did not provide LeClairRyan the promised funding; instead it resulted in the ULX Entities extracting value from LeClairRyan while LeClairRyan's debts increased.  Ultimately, the law firm had no choice but to liquidate.

4.      The transaction purported to sidestep prohibitions against non-lawyers practicing law by handing UnitedLex keys to the "business" of law, not the "practice."  However, for all intents and purposes UnitedLex owned and directed the firm.  UnitedLex installed its own management team (together with LeClairRyan email addresses and unfettered access to the firm's internal files and systems), effectively relegating Erik Gustafson, then-CEO of LeClairRyan, to a subordinated position.  By August 2018, Mr. Gustafson needed consent from UnitedLex for the most basic of tasks necessary to run a law firm, including approving payments to vendors.  Moreover, even though the transaction had supposedly been blessed by the former General

2

Counsel of the defunct law firm Dewey LeBoeuf ("Dewey"), then a partner at Hinshaw & Culbertson ("Hinshaw"), the opinion analyzed the wrong transaction. No opinion approving the joint venture's final and actual structure had ever been obtained.

5.      Unbeknownst to most of LeClairRyan's shareholders, including some officers and directors, Mr. LeClair had been negotiating the formation of ULXP directly with Mr. Reed and CVC since August of 2017. With closing scheduled for March 2018, the transaction gave Mr. LeClair the temporary relief he needed to prevent LeClairRyan from defaulting on looming bank debt, which would have immobilized the entire plan. However, as of March 2018, CVC had also not received the regulatory approvals it needed to invest in the ULXP structure. So CVC, along with Mr. Reed and Mr. LeClair, pushed the deal forward without providing LeClairRyan any capital infusions, thereby preserving for themselves the valuable opportunity of launching a new business using LeClairRyan's assets.

6.      On March 22, 2018, UnitedLex supposedly learned for the first time that there were "serious concerns" with LeClairRyan "as a going concern," even though due diligence had been going on for more than six months. With this 'new' information, CVC pulled its capital commitment of $33 million. In its place, UnitedLex offered to provide LeClairRyan $8 million in capital 'advances' that it tried to disguise as 'debt' and then later recast as 'secured debt.' The revised terms of the transaction also obligated LeClairRyan to make monthly payments to ULXP in the amount of $3.6 million, a shocking $1.5 million more per year (representing a handsome 12% return on capital) than LeClairRyan's cost in funding the back-office services directly.

7.      The $8 million 'advance' from UnitedLex gave LeClairRyan just enough oxygen to complete its transfer of assets to ULXP in the months that followed. Further, even though CVC had purportedly dropped out of the transaction in March 2018, it continued to participate in the

venture by advising UnitedLex on "revenue share percentages" in June 2018 after the joint venture agreements had been signed.

8.      By August 2018, UnitedLex had built a "restructuring framework" for LeClairRyan, with plans to support the law firm until after its planned "September close" with CVC, expressly acknowledging a potential need to "shrink" the law firm starting in October.  The ULX Entities and Mr. LeClair carefully concealed their plans from certain shareholders of LeClairRyan, baiting them with "carrots" and promises of new client relationships—for LeClairRyan—in addition to more than $80 million in estimated returns arising from the joint venture.  Immediately after CVC took a majority interest in UnitedLex on September 20, 2018, all of the "carrots" disappeared.

9.      Meanwhile, UnitedLex was selling the ULXP deal to media outlets, which captured the attention of potential clients for itself, such as Latham & Watkins, Ford, and Credit Suisse. The ULX Entities, along with CVC, profited (and, upon information and belief, continue to profit) from these relationships in the wake of LeClairRyan's collapse.  As LeClairRyan continued its downward spiral, the ULX Entities made it increasingly harder for LeClairRyan to meet their demands.  In July 2019, LeClairRyan closed its doors with hundreds of millions of dollars of debt that the firm could not repay.

10.     This is not just a case of unforeseeable risks in business.  LeClairRyan had been operating in "the red zone" for years, a fact that UnitedLex knew as early as 2012 when Mr. Reed first partnered with Mr. LeClair.  The economic meltdown of 2008 left LeClairRyan with "the exact same root cause risk that [Dewey] had," including declining revenues, guaranteed compensation packages for top management, and underfunded retirement plans.  LeClairRyan shared another similarity with Dewey:  certain insiders at LeClairRyan had been manipulating the firm's financial information, including by orchestrating the creation of "dummy" invoices, to make

the firm appear healthy.   Indeed, LeClairRyan's operations had aspects of a Ponzi scheme. LeClairRyan funded payments to legacy shareholders with capital contributions from new lateral hires, even though the firm was insolvent at the time and slowly falling to its death.  For those left unpaid when the music stopped, it was no different than a 'money in, money out' con game.

11.     When Dewey filed for bankruptcy and with the public disclosures that followed, Mr. LeClair found himself desperately needing a strategic partner to help sustain the law firm for as long as it took to extract additional value from the firm and/or to further insulate himself from personal exposure.   Around this same time, UnitedLex was suffering from its own financial shortcomings, and Mr. Reed easily bought what Mr. LeClair was selling:  an e-discovery platform, which UnitedLex took over from LeClairRyan in October of 2013, along with a list of grand ideas designed to "disrupt" the legal profession.

12.     Over the years, Mr. LeClair continued to study Dewey in intense detail, tracking claims asserted against shareholders of the firm and indictments handed down against members of Dewey's senior management, implementing steps along the way to protect his own interests and finances.  Despite his own law firm being insolvent, Mr. LeClair purchased in 2014 a vineyard in France in an all cash transaction.

13.     As LeClairRyan's financial state continued to deteriorate, Mr. LeClair and other members of LeClairRyan's long-standing management stepped down to distance themselves from LeClairRyan's projected failure.  According to one UnitedLex employee (former LeClairRyan shareholder), by March 2017 "it [was] like Weekend at Bernie's with Bernie as a metaphor for LeClairRyan," an apt depiction of a dead man propped up to deceive others.

14.     Through this years-long scheme, Mr. LeClair was able to prefer himself and certain legacy shareholders over others, and profit along with UnitedLex, Mr. Reed, and CVC, while

leaving creditors with nothing.  The Trustee brings this action to ensure that Defendants are held accountable for their substantial misappropriation and receipt of value, which rightly belongs to LeClairRyan and its stakeholders.

## JURISDICTION AND VENUE

15.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and (8) to, among other things, determine the validity, priority, or extent of a lien or other interest in property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential and fraudulent obligations and transfers.

16.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's chapter 7 case (under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code")).

17.     This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference from the United States District Court for the Eastern District of Virginia, dated August 15, 1984.

18.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

19.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and 1409.

20.     On November 11, 2021, the ULX Entities filed a Motion to Withdraw the Reference and Memorandum in Support Thereof [ECF No. 13] (the "Motion to Withdraw"), which was denied by the District Court on May 28, 2021.  *See* Mem. Op., *ULX Partners, LLC v. Tavenner*, Civil No. 3:21-cv-77 (DJN) (May 28, 2021).  No facts stated herein raise issues not previously considered by the District Court in connection with the Motion to Withdraw.

## PARTIES

21.    On September 3, 2019 (the "Petition Date"), LeClairRyan commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On October 4, 2019, Lynn Tavenner was appointed as the Chapter 7 Trustee for LeClairRyan.  As Trustee, Ms. Tavenner has the sole authority to bring the claims sought herein on behalf of the Estate.

22.    LeClairRyan was a law firm organized under the laws of the Commonwealth of Virginia run, at different times, by a board of directors and/or managers.

23.    Defendant Gary LeClair formed LeClairRyan in 1988.  He served as LeClairRyan's CEO from inception until April 30, 2011.  In November 2012, Mr. LeClair resumed leadership to manage the Debtor's finances.  Mr. LeClair also served as Chairman through 2015.  Mr. LeClair submitted his resignation from the Debtor on or around July 26, 2019, approximately one month before the Debtor's bankruptcy filing.  Mr. LeClair now practices law as a partner at Williams Mullen in Richmond, VA.

24.    On December 11, 2019, Mr. LeClair filed a proof of claim against the Debtor in a total amount of $2,448,789.00 (Claim No. 134).

25.    Defendant UnitedLex is a Delaware corporation with its principal place of business in Overland Park, Kansas.  In September 2018, UnitedLex became a portfolio investment of CVC, a private equity and investment advisory firm.

26.    Defendant ULX Manager is a Delaware corporation indirectly owned by UnitedLex, with its registered agent, Corporate Creations Network Inc., at 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

27.    Defendant ULXP is a Delaware limited liability company.  ULXP was created in 2018 as a joint venture between LeClairRyan and UnitedLex, and was 99% owned by UnitedLex.

Today, ULXP is fully controlled and managed by ULX Manager, which is wholly owned and controlled by UnitedLex.

## **RELEVANT NON-PARTIES**

28.     Non-party Bruce Matson joined LeClairRyan in 1994 and served as LeClairRyan's Chief Legal Officer ("CLO") from 2012 through 2016.  After stepping down as CLO, Mr. Matson transitioned toward retirement and took on a "Senior Counsel" role in 2018.  On or around August 20, 2019, Mr. Matson became an independent contractor to LeClairRyan.  Shortly thereafter, Mr. Matson fully separated from the firm.  Mr. Matson's law license was revoked by the Virginia State Bar in 2020 after he admitted to inappropriately handling funds in a bankruptcy trust account.

29.     Non-party David Freinberg joined LeClairRyan in 2007, as head of the firm's Newark, NJ office.  Mr. Freinberg served as the firm's CEO from 2011 until 2016.  Mr. Freinberg left the firm in April 2019, and now practices law at Greenberg Traurig.

30.     Non-party Micheal Hern served as LeClairRyan's Chief Operating Officer until 2015.  Mr. Hern also served as President and Vice Chairman of the board until 2016.  Thereafter Mr. Hern served as President Emeritus and Vice President of LeClairRyan.  Mr. Hern left the firm in July 2019.

31.     Non-party Christopher Lange joined LeClairRyan in 2000.  During his tenure, Mr. Lange held various roles at the firm, including Corporate Secretary, Assistant General Counsel and Corporate Department Leader.  Prior to the Debtor's bankruptcy filing, Mr. Lange also served as a member of the Debtor's Dissolution Committee.  Mr. Lange left the firm in 2019.

32.     Non-party George Whitley joined LeClairRyan in 1994 and served as a member of the board from 2014 through 2016.  Mr. Whitley left the firm in 2016.

33.     Non-party Jeffery Brown joined LeClairRyan in 2008.  Mr. Brown headed LeClairRyan's discovery solutions practice ("DSP") and was on the firm's executive committee.

In October 2013, Mr. Brown, along with "400 lawyers and other personnel" moved to UnitedLex to "create a new Richmond-based managed services facility." Mr. Brown continues to work at UnitedLex today as Executive Managing Director.

## STATEMENT OF FACTS

I. **Factual Background**

    A. **LeClairRyan's Rapid Expansion**

34.     Gary LeClair and Dennis Ryan formed LeClairRyan in 1988. The firm initially operated as a regional law firm, focusing on "venture capital clients" and operating on "credit card advances." Throughout the nineties the firm grew slowly, with offices in Virginia and Washington, D.C. After the dot-com bust at the turn of the century, things began to change.

35.     Starting in 2006, Mr. LeClair implemented a strategy of rapid expansion. LeClairRyan entered the New York market on October 12, 2006. In December 2007, LeClairRyan merged with Seiden Wayne in Newark, New Jersey, then led by Mr. Freinberg.

36.     In February 2008, LeClairRyan acquired the law firm Wright, Robinson, Osthimer & Tatum ("Wright Robinson"), which had an "international e-discovery and litigation management practice" located in, among other places, Richmond and on the sixteenth floor of the Lipstick Building in New York.

37.     Upon information and belief, the discovery center became known within LeClairRyan as DSP. DSP had a record-breaking year in 2013, with revenues of $31.7 million. Johnson & Johnson and Ford were among the center's biggest clients.

38.     At its peak, LeClairRyan had twenty-five offices across the country, and employed about 385 employees.

39.     With the firm's expansion, Mr. LeClair negotiated soft-landing contracts for himself and other legacy shareholders. These contracts provided guaranteed compensation for

certain individuals 'serving' in leadership roles.  Payments under these contracts were not tied to actual market conditions, services, or performance.  Moreover, while LeClairRyan's other shareholders generally knew about the existence of these guarantee contracts, the specific compensation terms were not disclosed.

40.     Following the financial crisis of 2008, Mr. LeClair, then-CEO of LeClairRyan, found himself on the "post-golden age battle field," struggling to compete in the "new legal era." Gone were the days of "hockey stick trajectories."

41.     In 2009, Mr. LeClair determined to become a "first mover" in attracting funding from "outside capital investors."  Around this time, Mr. LeClair issued the firm's "Partnership 2020 Report" detailing Mr. LeClair's entrepreneurial visions for the firm over the next decade.

42.     At the time, laws in the United States did not allow non-lawyers to hold economic interests in law firms.  But Mr. LeClair was convinced that he could succeed in forming a billion dollar legal enterprise "either because the law changes or because we will figure out a way." Certain other shareholders at the firm were not "on board with Mr. LeClair's vision and strategy."

43.     By 2013, LeClairRyan, through the ongoing efforts of Mr. LeClair, had "invested heavily (both time and hundreds of thousands of dollars) in innovating, negotiating and preparing to execute" a strategy to attract outside capital.

**B.     UnitedLex Struggles To Meet The Needs Of Clients**

44.     While Gary LeClair was dreaming of mass expansion with outside investors, Daniel Reed was formulating a strategy to take over in-house legal departments.

45.     Mr. Reed formed UnitedLex on October 11, 2006, with co-founder Ajay Agrawal. Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments.  These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support.  These non-legal services also

include legal support services, like patent mining, document management, and electronic discovery.

46.    UnitedLex did not have pre-existing technology, but instead sought to build a platform from the ground up to accommodate the specific needs of each client. The business was "predominantly annuity driven," heavily reliant on long-term relationships and income generated by steady invoice streams.

47.    In early 2009, UnitedLex landed a contract with Computer Sciences Corporation ("CSC" now DXC Technology, "DXC"). Mr. Agrawal attributed much of that success to Bill Deckelman, then in-house counsel at CSC. However, according to Mr. Agrawal, 2010 was a year of "massive dissappointment" for UnitedLex. While the CSC deal was going "swimmingly," companies such as IBM and Hewlett Packard ("HP") were not as impressed with UnitedLex's technology, which had been built specifically to meet CSC's needs. Feeling "disillusioned," Mr. Agrawal sold out of his UnitedLex position in June 2011.

48.    It was around this same time that Mr. Reed met Mr. LeClair.

## II.    Mr. LeClair Seeks To Shield Losses

### A.    The Dewey Collapse Shakes the Legal Industry

49.    On May 28, 2012, Dewey & LeBoeuf filed for bankruptcy. Many observers blamed the collapse on "unfettered growth, often through mergers," outsized pay packages for senior lawyers, and fraudulent accounting practices that made the firm appear solvent, when it was not.

50.    Mr. LeClair acknowledged that LeClairRyan had "the exact same root cause risk that [Dewey] had," prompting Messrs. LeClair and Freinberg to co-author a report titled "Lessons From the Demise of Dewey" dated July 27, 2012 (the "Dewey Report"). The report closely scrutinized Dewey's collapse in an effort to ensure that LeClairRyan (and Mr. LeClair) did not meet the same fate.

51.    Among other things, the Dewey Report:

- promised to fully fund LeClairRyan's retirement plans, while placing "guardrails" and "handcuffs" on lateral compensation packages.  For example, LeClairRyan committed to materially enhance retirement funding to "mitigate the risk of Shareholders being unable to retire."  LeClairRyan also changed its policy so that retirement benefits would not vest for a period of ten years, creating a pool of free cash upon partnership departures.  At the time, one shareholder observed "the cumulative effect of all the 'handcuffs'" were more like "chains"; shareholders should not have to "forfeit hard earned money."

- included a "capital raising map" that increased mandatory capital contributions to 30% of each shareholder's salary.  These contributions were raised through the issuance of two series of notes, class A (for officers and board members) and class B (for other shareholders).  The class B notes had additional mandatory buy in requirements.

- highlighted the need for shareholders "to be good stewards" so that there would always be "new partners" to provide capital contributions needed to replace a departed partner's capital."  Upon information and belief, Mr. LeClair did not expect LeClairRyan to be operating with positive cash flows as a law firm in the years that followed.

52.    In addition to the foregoing, LeClairRyan's 2012 partnership report also recommended that DSP (the firm's discovery center) become a separate unit in 2013.  The separation of DSP would not only allow Mr. LeClair to market the group to outside investors and organizations, it minimized the risk that assets in the DSP group would come into LeClairRyan's estate if LeClairRyan filed for bankruptcy.

**B.    UnitedLex Forms The LeClairRyan Knowledge Center**

53.    In 2013, DSP became a "a separate unit."

54.    On October 18, 2012, LeClairRyan and UnitedLex officially began discussing a joint partnership through a series of telephone calls.  On November 21, 2012, LeClairRyan entered into a confidentiality agreement with UnitedLex, which gave Mr. Reed "open kimono" access to LeClairRyan's most sensitive documents, including the Dewey Report and LeClairRyan's

"Partnership 2020 Report," which detailed Mr. LeClair's aspirations to grow the law firm into a massive legal enterprise by the year 2020.

55.    In the spring of 2013, Messrs. LeClair and Reed decided to move forward with the creation of a joint "pilot" program. Under the joint model, UnitedLex would provide hosting, processing, and related services to LeClairRyan, while LeClairRyan would continue to provide all legal and related services to clients.

56.    A few months later, on October 1, 2013, four partners of LeClairRyan, led by Jeffrey Brown, announced their decision to move to UnitedLex. In response to the announcement, LeClairRyan formed a litigation committee and threatened a lawsuit. That committee, led by then-CLO, Mr. Matson, was granted the exclusive athority to pursue or settle any claims against UnitedLex, without further approval from LeClairRyan's board.

57.    Around this same time, Mr. LeClair met one-on-one with Mr. Brown (aka the "best partner ever") on several occasions. Mr. LeClair also met with Mr. Reed multiple times "stay[ing] off front lines of the litigation [to] be positioned for any business deals." Less than two weeks later, a deal was indeed struck, and the LeClairRyan Knowledge Center was formed.

58.    Shortly after their transition, certain of LeClairRyan's former partners (now UnitedLex employees) were let go or replaced by UnitedLex (in consultation with Mr. LeClair). Today, Jeffrey Brown is still employed at UnitedLex.

59.    Creation of the Knowledge Center raised concerns with some senior individuals within LeClairRyan. For example, on October 16, 2013, Mr. Gustafson (then Litigation Department Leader) told Chris Lange (then Corporate Secretary): "[A] subtle change is that our attorneys will not be able to write off what were formerly DSP services that could be adjusted

internally before billing. [LeClairRyan] will theoretically owe 100% of the effort! unless [UnitedLex] is willing to write it down, and regardless of whether or when the client pays."

60.     Despite these concerns, LeClairRyan and UnitedLex issued a joint press release on October 31, 2013 announcing the creation of the center.  That same day, Mr. LeClair received a Google alert to a blog questioning the ethics of the arrangement.  Forwarding the blog to Messrs. Hern, Lange, Freinberg and Matson, Mr. LeClair cautioned "We should be alert to a potential ethical challenge."  At this point in time, an ethics opinion from UnitedLex had not been delivered, even though it was a required condition for finalizing the transaction.

61.     On November 1, 2013, LeClairRyan and UnitedLex consummated the settlement of LeClairRyan's threatened lawsuit, giving LeClairRyan guaranteed access to the e-discovery center for a period of at least five years through the creation of the LeClairRyan Knowledge Center. In exchange, UnitedLex paid LeClairRyan $3.4 million and took over all of the "DSP technology."

### C.     UnitedLex Promotes The Center; Stops When Ethical Concerns Are Raised

62.     In early November 2013, countless articles about the LeClairRyan Knowledge Center were written and promoted by Mr. LeClair and Mr. Reed.  For example, on November 7, 2013, Messrs. Reed, LeClair, and Freinberg joined a podcast to promote the new partnership. During the interview, Mr. LeClair explained:

> In 2008, the firm acquired a sizable document review center in its merger with Wright Robinson. Shortly after the merger closed, the economy crashed. Clients wanted 'cheaper, better, and faster' service. … We elected to collaborate with UnitedLex.

63.     During the interview, Mr. Reed added:

> More and bigger news is coming. … [W]e have to change the way we think about legal services, to stratify and systematize delivery the way Accenture does. ... That requires a big balance sheet, which we have….

64.     From there, Messrs. Reed and LeClair started trading business contacts and corporate opportunities, consistently meeting and speaking on a weekly basis.  Eventually, the parties reached "an impasse over the form of the [ethics] opinion letter," and, upon information and belief, a master services agreement was never formally signed.

65.     Upon information and belief, UnitedLex and LeClairRyan nonetheless continued their relationship as envisioned by Messrs. LeClair and Reed, but on informal terms.

**D.     Messrs. LeClair and Reed Continue Their Deep Relationship**

66.     After creation of the LeClairRyan Knowledge Center, Messrs. LeClair and Reed continued to routinely discuss the "math" behind their thinking and the "actionable next steps in 'liberating the profession.'"

67.     UnitedLex also seized on LeClairRyan's business contacts and expertise to build new relationships.  For example, on September 23, 2014, Mr. LeClair wrote to Mr. Reed:  "Good conversation with Kaye [Scholer.] They are high on Lauren Leonard [Project Manager at UnitedLex]."  On October 14, 2014, Mr. Reed thanked Mr. LeClair, confirming "your words carry weight. … [W]e found out today that Kaye Scholer selected ULX to be their eDiscovery/technology and managed review fulfillment partner … your influence was obviously impactful."

68.     Similarly, on July 5, 2017, Joe Deering at UnitedLex asked Mr. Reed about preparing a "[Marshall Denning] Chart Deck" for Cooley LLP, including slides that detail "How it works" and "Ethics Opinions."  Mr. Reed replied to Mr. Deering that he was "consolidating [his] notes with [Mr. LeClair] - who was quite emphatic on the winning approach."

III.    **LeClairRyan Spirals Into Insolvency**

A.    **LeClairRyan Repeatedly Misses Projections But Continues Paying Shareholders, Including Mr. LeClair**

69.    On August 21, 2012, mere months after Dewey's bankruptcy filing, Mr. LeClair revealed to shareholders that "for the first time, [LeClairRyan] did not achieve [its] year end collection target" and could not pay "projected 2012 Shareholder Salaries."

70.    In the years that followed, LeClairRyan's operating and financial metrics moved against one another, with debts climbing while revenues declined.

71.    To make up for the shortfall, LeClairRyan adopted a policy of Mandatory Preferred Stock Offerings to raise capital.  This resulted in approximately $2.5 million in preferred stock proceeds in 2013 and 2014.

72.    Even with this new 'equity,' LeClairRyan consistently missed its budget and its revenue fell short of financial projections.

73.    By the end of 2014 (if not earlier), LeClairRyan was insolvent, failing to generate sufficient revenue to pay its debts as they became due.

74.    During this period, shareholder and member compensation was determined in accordance with applicable shareholder agreements, resolutions by the Debtor's board of directors, and annual compensation policies (collectively, the "Compensation Policies").

75.    The Compensation Policies in place for 2014 prevented LeClairRyan from making certain categories of payments (collectively, the "Contingent Retention Incentive") unless LeClairRyan met certain financial metrics.

76.    In 2014, LeClairRyan did not satisfy the necessary conditions precedent for payment of the Contingent Retention Incentive.

77.    Despite failing to meet the metrics, the management of LeClairRyan, including Mr. LeClair, proposed payment of $7.8 million of At-Risk Salary, including deferring $2.6 million of payments to certain leaders of the firm to 2015 in order to remain in compliance with its cash flow debt covenant with its lender at the time, Wells Fargo, as of December 31, 2014.  Shareholders, including Mr. LeClair, approved these At-Risk Salary payments despite not achieving the required profitability.

78.    At the same time, the management of LeClairRyan, including Mr. LeClair, also proposed "rebranding" the "unearned" Contingent Retention Incentive as the "2015 Retention Incentive" and paying in installments from May to September 2015 a total amount of $3.1 million. Shareholders, including Mr. LeClair, approved the new payments they did not earn based on their 2014 Compensation Policies as 2015 Contingent Retention Incentives.

79.    Egregiously, these payments were made at a time when LeClairRyan was facing severe liquidity issues, with a majority of its accounts payable past due.

80.    As a result of these actions, Mr. LeClair personally received $242,868 in 2014 of At-Risk Salary and $121,433 as a 2015 Contingent Retention Incentive.  He also received an additional $24,430 Firm Match of the portion of the At-Risk Salary that Mr. LeClair had designated as a Supplemental Retirement Plan contribution.  The board, including Mr. LeClair, approved this match in December 2014, at a time LeClairRyan had severe liquidity issues.

81.    Due to their financial straits, LeClairRyan also deferred the release of $1.6 million of At-Risk Salary payments to 2015, but recorded the same in 2014 for tax reporting purposes. Delaying payment ensured that LeClairRyan did not breach the cash covenant with Wells Fargo.

82.    In December 2015, Matson summarized the handling of year-end payroll in 2014: "I understand we treated year end payroll that was debited to employees' accounts after 12/31 as

an expense as of 12/31 for accrual purposes but as a post-12/31 item for cash accounting (bank compliance purposes)."

83.     The following year, LeClairRyan again dated certain payments to shareholders, including a payment to Mr. LeClair, as being paid on December 31, 2015, but did not distribute the payments to shareholders until January 4, 2016 ("collectively, the "Cash Covenant Payments"). The Cash Covenant Payments were delayed with the express purpose to avoid reporting cash outflow to Wells Fargo.  If LeClairRyan had made the Cash Covenant Payments on December 31, 2015, LeClairRyan would have violated the cash covenant at the end of the calendar year.

84.     Mr. LeClair personally received Cash Covenant Payments totaling $101,214.

85.     Compensation Policies in 2015 also provided that certain payments to shareholders (the Shareholder Equalization Payment and the targeted Shareholder Performance Payment, (collectively, the "2015 Contingent Payments")) were subject to, among other things, the Debtor's financial performance.

86.     Once again, at the end of the calendar year of 2015, LeClairRyan did not satisfy the necessary financial performance requirements to pay the 2015 Contingent Payments.  Despite the fact that the 2015 Contingent Payments were not earned, management, including Mr. LeClair, approved the payment of the unearned 2015 Contingent Payments to all shareholders in a total amount of $7.1 million.   LeClairRyan also had a then-client, the liquidating trustee of LandAmerica, *i.e.*, Mr. Matson, issue a check payable to the firm in January 2016, which was back dated to December 2015.  Backdating the payment further manipulated the financial state of the firm for year end reporting.

87.     Mr. LeClair personally received $64,505 as a 2015 Contingent Payment in violation of the Board Resolutions and the 2015 Compensation Policy.  He also received an additional

$6,451 Firm Match of the portion of the 2015 Contingent Payment Mr. LeClair designated as a Supplemental Retirement Plan contribution.  The board of directors, including Mr. LeClair, approved this match in December 2015, at a time when LeClairRyan had severe liquidity issues.

88.     As a result of insufficient capital, LeClairRyan had stopped paying its vendors on a timely basis using them as "a source of unsecured credit."  In April 2015, LeClairRyan did not have liquidity to pay its critical vendors.  During this "cash crunch," LeClairRyan requested "dummy" invoices from vendors to draw down on a construction loan to fund operational expenses.

89.     In February 2016, Peter Mares, then-CFO of LeClairRyan raised concerns with Mr. Matson stating that he believed that in prior years, "there were transactions and/or adjustments recorded in the Firm's accounting records that were done to 'manufacture' a certain result."  Mr. Mares left the firm later that year.

90.     In 2016, LeClairRyan faced continued financial pressure.  Management concluded that LeClairRyan's balance sheet did not accurately reflect the value of LeClairRyan's accounts receivable.  The Budget Oversight Committee concluded that the firm's work in progress and accounts receivable were "cluttered with uncollectable accounts and worthless numbers."

91.     The Committee also observed that for "2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned" and that the firm had "borrowed to pay ourselves, contrary to Partnership 2020 fundamentals"—*i.e.*, contrary to the agenda formed by Mr. LeClair in 2009 to achieve "greatness" by year 2020.

92.     In total, LeClairRyan transferred $459,687 in contingent payments for the 2014, 2015, and 2016 years to Mr. LeClair (the "Contingent Income Payments").

93.     Mr. LeClair knew or should have known that LeClairRyan's financial performance did not justify the payment of the Contingent Income Payments.

94.     During this time, LeClairRyan also routinely misused client funds designated for specific purposes, including misappropriating funds earmarked to pay client expenses as a source of financing.  Indeed, Mr. Matson, had previously raised this issue with senior leadership in 2016. Mr. Matson explained in a self-serving email that funds tendered by clients, even those related directly to a client disbursement, were not being used for their earmarked purpose and were being intermingled and used to fund LeClairRyan's operations.

95.     Mr. Matson even expressed that the mismanagement of funds tendered by clients was "tantamount to misusing (intentionally) client trust funds."

**B.      The LeClairRyan Knowledge Center Struggles**

96.     In 2015, Peter Mares replaced Mr. Hern as COO.  In 2016, LeClairRyan appointed Erik Gustafson to serve as CEO to replace Mr. Freinberg.  At the same time, Gary LeClair stepped down as Chairman and Mr. Hern stepped down as Vice Chairman of the board.  Board member Mr. Whitley also left the firm in 2016.

97.     Exiting management was purposeful for these individuals, seeking to divert central focus off their actions and insulate from Dewey related issues/liability that one of more of these individuals had created.  In March 2014, Messrs. LeClair, Freinberg, Matson, and Hern circulated an article on Dewey, noting "it relates to [indictments and] misleading other lawyers as well as the lenders about the financial health of the firm."  On March 6, 2014, Mr. LeClair replied:  "I believe we should have a discussion about the implications of this and our proactive response, both in terms of continuing to improve our risk management processes and a review of our insurance coverage for government investigations. I am not comfortable that we are doing all that we can and should be doing."  Mr. Matson acknowledged this was "scary stuff" and scheduled a call with Mr. LeClair.

98.     Even with these management changes, LeClairRyan's financials continued to decline and UnitedLex took notice.  In 2017, searching for a lifeline, LeClairRyan turned to a potential joint venture with UnitedLex, as a way to address LeClairRyan's financial difficulties.

99.     Around 2017, UnitedLex sought to move beyond merely being a vendor providing legal services to become more of a partner to a "constellation" of law firms.

100.    The joint venture between UnitedLex and LeClairRyan was intended to be the foundation of this proposed "constellation" structure in the United States.

101.    Yet on June 15, 2017, Mr. Brown emailed Mr. Reed about "Connecting Next Week" stating:  "It would be good to de-brief in advance.  I've been wanting to talk with you about the [LeClairRyan Knowledge Center] MSA."  Mr. Reed replied "Will call you in about 30 minutes or so if that works - really quick, was not planning on discussing the [LeClairRyan Knowledge Center] with Gary - rather DXC/Marshall Denning and potential implications etc....."[1]

102.    Mr. Reed then summed up:  "Meant to add dealing with Eric and the LR team re: [the LeClairRyan Knowledge Center] reminds me of Jack Lemon in Glengarry Glen Ross."  Opting for an alternative deadbeat reference, Mr. Brown replied:  "I never saw GGR.  I think it is like Weekend at Bernie's with Bernie as a metaphor for LeClairRyan."[2]

103.    In August 2017, Messrs. LeClair and Reed decided to push forward with their relationship, which required getting Erik Gustafson on board.  On August 3, 2017, Mr. Reed wrote to Mr. LeClair:  "really enjoyed connecting today. … Much to think about."  The next day, Mr.

---

[1]      Marshall Denning is a UK law firm that previously partnered with UnitedLex.

[2]      Both analogies show that as of June 2017 UnitedLex did not view LeClairRyan as a viable business partner. In the film *Glengarry Glen Ross*, Jack Lemmon played a real estate salesman who failed to close on a parcel of real estate capping off his failed career at the end of his failed life.  In the film *Weekend at Bernie's*, two employees went to extreme lengths to maintain the illusion that an otherwise dead Bernie was still alive.

Reed wrote to Mr. Brown: "Jeff, Gary called me earlier today. Said he had spoken with Eric twice in 12 hours on our meeting yesterday [and] Erik is more stoked than even Gary."

104.    Messrs. Reed and Gustafson spoke on August 5, 2017.  In connection with that discussion, Mr. Reed told Mr. Gustafson that Bill Deckelman, the Executive Vice President and General Counsel at DXC wanted to meet with him.  DXC is an information technology service founded in April 2017 through the merger of HP's services department and CSC.  Upon information and belief, Mr. Reed did not disclose the prior relationship that UnitedLex had with Mr. Deckelman and/or his prior company, CSC, to Mr. Gustafson.

105.    On August 23, 2017, Mr. Gustafson met with Messrs. Reed and Brown in person. Mr. Reed followed up two days later, stating:  "I connected with Bill [at DXC] yesterday. . . . We have a partner in Bill, and he could be a good collaborator with us going forward . . . ."  On September 15, 2017, UnitedLex started performing due diligence on the law firm.  Mr. Reed told Mr. Gustafson, "feel free to tell your finance team that the data needed per the request did not have to be in the perfect format - as long as it is intelligible we can put into the right analytical format and proceed from there."

106.    On September 15, 2017, Mr. Gustafson asked Mr. Reed:  "Also, at some point sooner, rather than later, it would be helpful to see the ethical groundwork you have already laid that confirms this can be done."  Mr. Reed replied:  "you will have the opinion from Anthony Davis, David Keyco and Professor Bruce Green; the tax structure document will come from Greenberg Traurig and will be provided subsequently."

107.    Upon information and belief, none of the aforementioned opinions were written on behalf of LeClairRyan and/or addressed the arrangement between LeClairRyan and UnitedLex under U.S. law.

108.    In December 2017, UnitedLex consummated "The DXC Deal," which was a "headline among in-house lawyers," resulting in "150 DXC lawyers and professional staff bec[oming] UnitedLex employees."

### C.    Mr. LeClair Personally Steps In To Push The Deal Forward

109.    Gary LeClair tried to make it appear that he had not been participating in discussions between UnitedLex and LeClairRyan (even though he had been having numerous back-room conversations with UnitedLex through Mr. Reed).

110.    On October 3, 2017, Mr. Brown asked Mr. Gustafson if he would be "comfortable" inviting Mr. LeClair to a meeting, noting that some "of the concepts in the draft Term Sheet are ones Dan and Gary have discussed over the last few years." Mr. Reed then emailed Mr. Brown directly, asking the obvious: "Is your expectation that with Gary in the room it will be difficult for Erik or anyone else to slow walk the process?"

111.    From there, Mr. LeClair formally took the lead for LeClairRyan (having set the stage all along). On October 10, 2017, Mr. Reed circulated a Draft - UnitedLex-Marshall Denning-LeClairRyan Term Sheet 10.10.17.[3] Mr. Reed noted that "[Mr. Brown] mentioned Gary may be joining us. Feel free to forward the attached to him." On October 25, 2017, Mr. LeClair then met with attorneys from Greenberg Traurig and Mr. Reed. Mr. Gustafson did not attend that meeting.

112.    On November 2, 2017, Mr. Reed wrote to Greenberg Traurig and Mr. LeClair (without copying Mr. Gustafson): "I really appreciate the dynamic we are creating - in terms of

---

[3]    In a memo dated September 4, 2017 to employees about the announcement of the firm, UnitedLex explained "for those of you who are employees of UnitedLex but who work closely with Marshall Denning members on commercial transactions, please be advised that due to regulatory issues, you cannot be listed as a member of Marshall Denning. … The website has been designed to provide the right balance of detail and impressions of what Marshall Denning does and how we do it…."

both model development and quality of interaction. I am highly energized about what we are creating. Already looking forward to Monday."

### D.    CVC Actively Participates In Forming The Joint Venture

113.    Even though CVC's investment in UnitedLex was not formalized until September 2018, CVC actively negotiated the joint venture between LeClairRyan and UnitedLex from start to finish.

114.    For instance, on November 23, 2017, Mr. Reed invited Mr. LeClair to a meeting in New York City with CVC bankers.  Mr. Reed noted that Jennifer Weiss from Greenberg Traurig would be in attendance "to go into more detail on the tax structuring of our solution."  Mr. Gustafson was not present at that meeting.

115.    When the ULXP deal was announced to the public on June 13, 2018, CVC's role in negotiating the joint venture was entirely omitted.  To the contrary, Mr. Reed stated that UnitedLex was "venture-backed by JP Morgan."

### E.    UnitedLex Proposes Terms, Then Changes The Deal After Completion Of Due Diligence

116.    On December 29, 2017, UnitedLex sent its original proposal to LeClairRyan (the "December 29 Proposal").  Under the initial terms of the deal, UnitedLex would control ULXP, but members of the LeClairRyan leadership team would hold senior leadership positions at ULXP.

117.    The December 29 Proposal had the following general terms:

- LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the Debtor to provide an array of services to the firm.

- LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.

- LeClairRyan would receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.

- LeClairRyan would receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."

118.    Upon information and belief, at the time of the December 29 Proposal, the parties were also considering an additional $13 million infusion to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

119.    The December 29 Proposal also included terms creating other financial incentives for LeClairRyan's individual shareholders, including an immediate full redemption of their shares in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving equity interests in UnitedLex through either annual or performance-based interests options.

120.    During the winter of 2018, UnitedLex and CVC engaged in additional due diligence of LeClairRyan.  Upon information and belief, LeClairRyan did not perform similar diligence on UnitedLex or CVC.

121.    On or about January 2018, UnitedLex hired an independent third-party, Doug Benson of SB2 Consultants ("SB2"), to assist its due diligence and assess LeClairRyan's finances.

122.    Mr. Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report").

123.    The Benson Report provided UnitedLex explicit details about the poor and troubling condition of LeClairRyan's finances.

124.    During this time, Messrs. LeClair, Reed, and Siddharth Patel (of CVC) continued to have discussions regarding "Law Firm Finance & Accounting."  Once again, it does not appear that Mr. Gustafson was included in those discussions.

125.    On March 10, 2018, Mr. Reed emailed Amit Soni (of CVC) and Mr. LeClair noting: "[Greenberg Traurig] recently emailed that [it had] a sudden issue to address in the morning." A call was set for the following afternoon. Upon information and belief, the "issue" was CVC's failure to have received regulatory approval from authorities in India and the United States to enter into the ULXP transaction.

126.    Shortly after, on March 21, 2018 Mr. Reed wrote to Mr. Gustafson describing the findings contained in the Benson Report, alarmed by it: "[I]t is concerning and creates challenges for me in its current form. … Doug's findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity. Doug goes as far as to raise a question of going concern given current obligations and being at the limit of its credit line and partner stability."

127.    Mr. Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path…we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."

128.    In response to this email, Mr. Gustafson responded to the issues identified in the draft Benson Report and the concerns noted by Mr. Reed. Mr. Gustafson argued that LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."

129.    No later than March 22, 2018 (and, upon information and belief, much sooner), UnitedLex knew that LeClairRyan was unable to pay debts as they come due. For instance, in response to Mr. Gustafson's email Mr. Reed stated:

> [t]he real challenge is liquidity for [LeClairRyan]. I was not expecting that [UnitedLex] would make the capital return, takeover the debt (which does not help

[LeClairRyan] in terms of new liquidity) AND then have to infuse material cash to ensure the firm can survive.  Doug's take away from [Dwight Jones] is that every day begins with a review of cash and serious concerns over the current situation. Doug [Benson] has not come across a firm that is in [LeClairRyan]'s current cash position, and has expressed serious concern with its status as a going concern…I also did not fully realize until seeing [the Benson Report] that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs. Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our 'deal infusion,' how much is needed to operate the firm without being in the perpetual red zone.

130.    Responding to Mr. Reed's email, Mr. Gustafson wrote that unless LeClairRyan can address the payment of debt and the return of partner capital, "we do not see how we could transfer our back office" to ULXP without signing an agreement by March 30.

F.    **LeClairRyan Converts To A PLCC**

131.    As a condition precedent to entering into the ULXP transaction, UnitedLex required LeClairRyan to convert its corporate form from a PC to a PLLC.

132.    LeClairRyan complied with that requirement and converted from a PC to a PLLC on March 31, 2018 (the "Conversion").

133.    The PLLC flow-through structure allowed for a single level of taxation on any capital gains that would have resulted from the shareholders' equity in ULXP.

134.    The effects of the Conversion were described in a March 22, 2018 email from Mr. Gustafson to Mr. Reed, which explained that one consequence of the Conversion was that the firm was able to "materially reduce [its] monthly cash burn [in 2018] by another $450k per month."

135.    Mr. Gustafson also explained that the Conversion allowed the firm to "pay about $30 million in partner draws on a tax deferred basis" which "create[d] a significant retention incentive through 2023, especially for [LeClairRyan's] biggest producers, because early departure can trigger a recapture tax event."

136.    As the firm had previously explained to its shareholders in materials provided in advance of a February 24, 2018 meeting to approve the Conversion, "[r]etention of Partners via the equity incentive [was] a key requirement for ULX."  The "conversion to an LLC to avoid double tax" was seen as "evidence [of] the value [LeClairRyan] place[d] in that incentive."

137.    The Conversion was not the only action taken to pave the way for the joint venture. Indeed, LeClairRyan terminated the firm's Deferred Compensation and Supplemental Retirement plans effective as of December 29, 2017 notwithstanding that the firm's Retirement Plan Committee had recommended that the same not be terminated until at least a year later.  The effects of this termination included but were not limited to (a) the plan balances, totaling an amount not less than $12 million, became eligible to be transferred to shareholders beginning on or about December 29, 2018, (b) funds were diverted from general unsecured creditors, and (c) LeClairRyan had to utilize scare resources to supplement an otherwise underfunded plan.

138.    Although the payments to shareholders upon termination and distribution would have ordinarily been taxable to the shareholders receiving payments from the terminated plans, the tax savings realized from LeClairRyan's conversion from a PC to PLLC were passed through to the individual shareholders, who were able to use those net operating losses to offset the taxes that would have been owed on the deferred compensation distributions.

139.    Certain accounting-related aspects of the Conversion were the subject of an IRS audit.  The IRS initially filed a proof of claim in the bankruptcy (Claim No. 252), which, among other things, asserted a priority claim in the estimated amount of $120,576.71.  However, the IRS thereafter claimed that additional amounts were due and owing based on the tax returns prepared in conjunction with the transaction and the accounting methods used therein.  In connection with the IRS audit, the Trustee, after notice, hearing, and Court authorization (Doc. Nos. 914 and 947),

agreed to a proposed adjustment to conclude the audit, which will result in an increase in priority claims in excess of $2.7 million.

### G.    LeClairRyan Receives Ethics Opinions From Conflicted Counsel

140.    LeClairRyan sought and obtained legal advice with respect to the planned joint venture with UnitedLex from Hinshaw.  UnitedLex also received legal advice with respect to the planned joint venture from Hinshaw.

141.    Hinshaw's role advising both parties was described in a March 19, 2018 executive summary of the contemplated transaction prepared for LeClairRyan's members (the "ULX Executive Summary").

142.    The ULX Executive Summary states that LeClairRyan "individually engaged" Hinshaw to provide "an ethics opinion for the benefit of [LeClairRyan] confirming that the overall proposed transaction and deal structure are legal and ethical."

143.    The ULX Executive Summary also states that UnitedLex "separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion."

144.    UnitedLex had previously received a legal opinion from Hinshaw dated July 25, 2017 (the "July 2017 ULX Opinion"), regarding a similar joint venture transaction with another law firm.

145.    The July 2017 ULX Opinion cautioned that UnitedLex could not "under any circumstances have an ownership interest in [the law firm], or exercise any management or control over [the law firm], or over the provision of legal services by [the law firm]."

146.    The July 2017 ULX Opinion was referenced in term sheets prepared on or about October 2017, which began to sketch out the proposed transaction between UnitedLex and LeClairRyan.  These early term sheets relied on the July 2017 ULX Opinion, among others, to

claim that the deal under discussion was "[f]ully compliant with [the] Rules of Professional Conduct."

147.    In January 2018, Mr. Reed wrote to Mr. LeClair "in speaking with Hinshaw earlier today, they indicated they now are leaning towards being able to permit [LeClairRyan] to rely on the opinion prepared to ULX … [but flagged] language/terms that have the net effect limiting partner movement among firms."  Mr. LeClair replied:  "We know how to skin the cat on vesting. We had 10 year cliff vesting on our nonqualified retirement plan."  Mr. LeClair also indicated that he had found a "significant tax related benefit that will disincentivize leaving for 5 years," which they could potentially use "with other firms in the constellation as well."

148.    Following further discussions between Hinshaw, Lori Thompson, LeClairRyan's then-General Counsel, and others, Hinshaw provided LeClairRyan with an initial opinion letter on March 27, 2018.  A revised version of the opinion letter was provided to Ms. Thompson the following day (the "March 28, 2018 Opinion Letter").

149.    The March 28, 2018 Opinion Letter was provided to the LeClairRyan board in advance of its vote to approve entering into the ULXP transaction.  However, the March 28, 2018 Opinion Letter was premised upon facts relevant to earlier versions of the deal and not the terms actually under negotiation at the time it was issued.

150.    For example, the March 28, 2018 Opinion Letter included references to "ULFS" – United Law Firm Solutions – which was the name the parties had used for the joint venture during negotiations in or around the Fall of 2017.

151.    Notably, the March 28, 2018 Opinion Letter did not include any discussion affirmatively stating that UnitedLex would not have an "ownership interest in" LeClairRyan or that UnitedLex would not "exercise any management or control" over LeClairRyan.

152.    The March 28, 2018 Opinion Letter was never updated, even though the structure and operation of the joint venture had been revised prior to the effective date of the agreements creating ULXP, and almost amended again in or around the end of 2018 and the beginning of 2019.

## IV.    UnitedLex Knows LeClairRyan Is Insolvent, Continues With The Deal (Albeit A Substantially Different Deal)

### A.    UnitedLex Restructures The Deal

153.    Despite expressing serious reservations once they learned the true extent of LeClairRyan's insolvency, CVC and UnitedLex pushed forward with the ULXP venture.  This ensured that the law firm would remain "operating" for the foreseeable future with enough time to lock in the other law firms and companies that had been solicited using LeClairRyan's back-office platform and intellectual property.

154.    Ultimately, the proposed transaction was restructured between ULXP and LeClairRyan to reduce the financial benefits to LeClairRyan and to bestow more control over LeClairRyan's operations to ULXP, to the detriment of LeClairRyan's creditors.  Among other things, CVC and UnitedLex immediately took the infusion of capital of up to $33 million off the table.  Also, in light of the risk of being in a "perpetual red zone," UnitedLex gave no new money to LeClairRyan as a part of the transaction.

155.    Mr. LeClair hid this fact from LeClairRyan's principal lender, telling VCF at a meeting on April 4, 2018 that UnitedLex "completely removed the loan piece due to tax implications."

### B.    LeClairRyan Transfers Intellectual Property

156.    The deal required that LeClairRyan contribute a back-office operation "sufficient to service a large, national law firm," along with intellectual property to ULXP.  LeClairRyan was also required to pay ULXP $3.6 million per month for use of its administrative staff (now

employed by ULXP), which was $1.5 million more per year than the same services costs when done in-house by LeClairRyan.

157.    The intellectual property assets consisted of administrative resources for (i) lateral attorneys; (ii) training; (iii) personnel; (iv) marketing & business development; (v) pricing; (vi) program management; (vii) information technology and tools; (viii) legal industry collaboration & insight; (ix) industry research & analysis (x) risk management in operations and templets; (xi) library and research services; (xii) operations; and (xiii) attorney development.

158.    The property contributed to ULXP also included certain lease obligations and other physical assets associated with the office facilities in Glen Allen, Virginia that housed a substantial portion of LeClairRyan's administrative staff and operations.

159.    LeClairRyan's equity stake was also reduced to a 1% interest in ULXP, entitling LeClairRyan to receive two redemption payments: the first to occur five years after the transaction based on a multiple of EBITDA for years three through five (estimated to be $60-80 million), and the second to occur ten years after the transaction based on a multiple of EBITDA for years six through ten (estimated to be $20-30 million).

160.    UnitedLex indirectly owned the remaining 99% of the joint venture. LeClairRyan received the right to redeem a percentage of EBITDA, the first at the end of the fifth year of operations and the second at the end of the tenth year of operations.

### C.    LeClairRyan Also Agrees To Pay Off-Market Prices For Services

161.    LeClairRyan and ULXP also entered into an expansive Master Services Agreement (the "MSA") on or about April 4, 2018. Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of LeClairRyan. The breadth of these responsibilities is best illustrated by a section of the MSA entitled "Provider & Law Firm Responsibilities," which listed the contemplated responsibilities of ULXP in regards to several essential functions, including

"Legal Operations & Administration," "Client Relations & Business Development," "Marketing & Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project Management," "Human Resources," "Talent Development," and "Technology, Data & Security."

162.    The level of control assumed by ULXP over the core law firm functions is apparent from the descriptions of ULXP's responsibilities under the MSA, which stated that ULXP would, among other things:

a. Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients.

b. Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the successful implementation of the Services, and (c) accomplish the goals of this Agreement.

c. Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities.

d. Manage all market-facing communications and marketing collateral, including Law Firm's website.

e. Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients.

f. Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level.

g. Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives.

h. Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work.

i. Manage employee relations issues and performance management issues at Law Firm and the Provider.

j. Identify, develop and propose compensation for Law Firm non-Members based on market data.

k. Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees.

l. Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm.

m. Manage and ensure the efficient functioning of Law Firm and Provider offices.

n. Track and manage efficient Law Firm time entry compliance.

o. Track and manage [work-in-progress], write downs and write-offs.

p. Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables.

163.   Once the ULXP transaction was consummated, LeClairRyan was no longer able to function on its own without the support of the ULX Entities.

164.   The MSA also provided for fees to ULXP to be calculated under a combination of factors, including what the MSA described as "Invoice Fees" related to "Operations Services" and "Production Services."   In relation to these fees, ULXP provided LeClairRyan an $8 million "advance" on payments to be made under the MSA.  This "float" was in essence an infusion of equity into LeClairRyan, artificially designed to avoid restrictions established by U.S. law around the ownership of a law firm, while allowing LeClairRyan to remain covenant compliant under its loan facilities with VCF.

165.   Yet, because of LeClairRyan's continued and sustained financial problems, the ULX Entities knew or should have known that LeClairRyan did not have sufficient funds to pay its obligations as they came due—including making payments on the accounts payable float provided by the ULX Entities.

166.   Operations Services Fees under the MSA related to ULXP's provision of back office and other non-legal services that LeClairRyan transitioned to it.  Production Services Fees were established through "a calculation that is based on member distributable income and accrued revenue," which were fees generated from the Debtor's provision of legal services.  Put simply, pursuant to the Production Services Fees, ULXP was to be compensated based on net profits of the law firm from its provision of legal services.

167.    The agreement to pay Production Services Fees resulted in the sharing in fees from LeClairRyan's legal practice.[4]

168.    The MSA included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of LeClairRyan."

169.    Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"):  (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018); (2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of Class B Common Interest (effective April 4, 2018 and including the Operating Agreement as Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4, 2018) (as may have thereafter been amended, the "Contribution Agreement"); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement") between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

170.    Together, the JV Agreements granted the ULX Entities unprecedented control over the operation of the Debtor law firm.  Although various attempts were made to amend these agreements in winter 2018 through spring 2019, final agreements were never signed.

171.    The ULX Entities used the JV Agreements to influence and control LeClairRyan's decision-making authority, including requiring LeClairRyan to inappropriately misuse funds tendered by clients for specific costs and expenses.

---

[4]    Other professionals recognized the apparent conflict in this arrangement.  For example, on August 11, 2019, Mr. Reed tried to fill a UnitedLex board seat in the "Compliance and Ethics function."  However, the candidate responded:  "[My attorneys] saw reference to the LeClair Ryan JV from 2018. They are concerned that if I steered business to a law firm that has a material business relationship or JV with UnitedLex, it could appear that I was doing so to juice the value of my equity. They are not concerned about normal, ordinary course engagements that UL might perform for law firms. Rather, they are focused on large, strategic arrangements."

172.    At the time the JV Agreements were executed, the LCR Board knew that LeClairRyan was insolvent.

**D.    UnitedLex Uses The Joint Venture To Promote And Build Its Business**

173.    UnitedLex advertised when the joint venture was announced, through ULXP, that UnitedLex and LeClairRyan sought to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."

174.    Under this model, ULXP would provide its "constellation" of law firms with "market, leading technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics."

175.    UnitedLex also advertised that the joint venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength."

176.    On April 12, 2018, Cortney Nathanson (UnitedLex) wrote to Mr. Reed:  "I had a call with our PR firm today and they think this story will be a huge win for us! … We are submitting a nomination for UnitedLex to American Lawyer Media's 'Alternative Legal Service Provider of the Year' Awards.  While the draft submission focuses largely on what we did with DXC, we can submit a confidential write-up about the ULX Partners deal to support our nomination. This would really push us up a notch or ten from the competition!"

177.    As of May 2018, Latham & Watkins was also interested in the ULXP model and Mr. Reed sought to use materials created by LeClairRyan to consummate a similar relationship. For example, Mr. Reed wrote to Messrs. LeClair and Gustafson:  "Guys, I was recently in

conversation with Peter Lebonski… There is an interest in closely evaluating our constellation model and joining in…."

178.    On June 8, 2018, Mr. Reed then sent the ULXP press release to Mr. Labonski at Latham & Watkins ahead of its publication, noting: "The attached release (please treat as highly confidential) will be released next Tuesday or Wednesday. The content of the release relates to the platform I briefly discussed with you a few weeks back. The platform is highly modular, and can be fully adopted or adopted in part. … [CVC] has been a big part of the economic design."

### E.    UnitedLex Strings LeClairRyan Along With Promised Business Deals, But Never Delivers

179.    To get shareholders in LeCairRyan on board, Mr. Reed had promised them business deals and opportunities, but never delivered.  For example, on December 17, 2017, Mr. Reed wrote to Mr. Gustafson:  "Confidentially and based on some things we are working on with DXC and GE, there will be a good opportunity to enable LeClairRyan to reach into GE….let's discuss on Wednesday or Thursday."  However, that opportunity never materially transpired.

180.    On August 18, 2018, "DXC agreed to move forward" with LeClairRyan.  On August 28, 2018, Mr. Gustafson noted that "[LeClairRyan] could receive $24 million in annual billings from DXC."  However, by October 2, 2018, the LeClairRyan / DXC relationship had ended in what Mr. Reed admitted was "a carnival gone bad," only two weeks after UnitedLex closed its deal with CVC.

181.    On September 1, 2018, another LeClairRyan partner wrote to Mr. Gustafson:

Almost 2 months ago Dan Reed told me in our meeting in Newark that the UnitedLex people were finally going to get me into the loop ASAP on Ford. That was a lie. I've heard nothing from them other than Hendy's email about a meeting he set up on Sept 6 with not me, but others. Erik- you know I think the world of you but these folks are not for me. I don't want to pursue the co-lead Director as I think I should look into other firms where my Ford relationship is respected.

182.    Unbeknownst to other LeClairRyan members, CVC continued to pursue its investment in UnitedLex. CVC continued to advise UnitedLex on the "fee sharing" aspects of the ULXP arrangement in June 2018, after the transaction had been signed.

183.    On or about July 2018, CVC also contemplated capping the amount of "float" available to LeClairRyan at $8.5 million and thought about seeking a commitment from LeClairRyan that any incremental amounts would be subject to different payment terms.

184.    CVC also sought to include terms in the agreements to protect its planned investment in UnitedLex, including proposing a term saying that payments to ULXP would have priority over distributions to LeClairRyan's members. However, these terms were ultimately not included.

185.    On September 11, 2018, Mr. Reed also asked Mr. LeClair to comment on a draft of the UnitedLex / CVC press release announcing CVC's investment in UnitedLex "along the lines we discussed."

### F.    Appraisers Question Asset Valuations After The Deal Is Completed

186.    LeClairRyan and UnitedLex jointly hired an accounting firm, Cornerstone Valuation LLC ("Cornerstone"), to perform a valuation of the ULXP transaction. By the time Cornerstone began its review of the transaction, the parties had already entered into the Contribution Agreement.

187.    Based on valuations and other information provided by Mr. LeClair, Cornerstone valued the assets contributed to the joint venture in the amount of $18.5 million. Cornerstone also valued LeClairRyan's equity interest in the joint venture (without redemption) at $642,000. With redemption LeClairRyan's interest was valued at $13.8 million. The net loss to LeClairRyan was therefore calculated to be $4.7 million.

188.     Moreover, when Cornerstone expressly indicated in its report that Mr. LeClair had supplied the information on which its findings were based, Mr. LeClair made sure to have Cornerstone remove this disclosure from the final report.  Instead, because of Mr. LeClair's manipulations, the report falsely suggests that multiple individuals at LeClairRyan provided Cornerstone with information about the valuation of LeClairRyan's assets.

189.     In connection with the Cornerstone valuation, Mr. LeClair acknowledged that the "trust-me elements of the arrangement are substantial," including (i) the venture could "be terminated at any time with or without cause by [ULXP]"; (ii) "[r]egulatory challenges could lead to a termination or negative change in structure"; (iii) there were no contractual formulas in place governing how the redemption payments to LeClairRyan would be calculated; and (iv) LeClairRyan did not know "if the JV or [ULXP] will have the ability to pay the redemptions."

190.     Cornerstone internally raised concerns over the economics of the transaction.  On April 26, 2018, Jim Edge, founding partner of Cornerstone, wrote to Greg Waller, Cornerstone's managing partner, the transaction "results in an additional cost to [LeClairRyan] of $129,092 per month, or $1,549,104 per year…. In addition, the JV gets [LeClairRyan's] intellectual property and workforce in place."  Mr. Edge also concluded that based on information he had received from Mr. LeClair, "the likelihood of a payout [to LeClairRyan] is slim at best."

191.     Cornerstone's valuation report was never officially finalized even though it was a condition to closing the transaction.  On June 19, 2018, Mr. Reed wrote to Mr. Lange:  "Chris, before [the Cornerstone valuation] is finalized, you/me/gary need to connect.  I have been out of the country the last few weeks and did not connect with Gary.  There are some serious issues for [LeClairRyan] with the opinion."  Mr. Lange then forwarded that message to Mr. LeClair, Mr.

Gustafson and Ms. Thompson, asking "Have either of you ever heard of an issue on the valuation from Dan before?"

192.    Mr. LeClair replied:  "News to me" and suggested sharing the opinion with Keiter (LeClairRyan's go-to accounting firm), noting Carol Hurst should be part of the conversation.  In accordance with Mr. LeClair's instruction, Mr. Lange emailed Keiter for an opinion, asking Keiter "to keep the initial reaction/report verbal."   On June 29, 2018, Keiter emailed Mr. Lange, disclosing that an issue with the valuation is it is based on an assumption that "the business will fail."

193.    A few months later, Mr. Reed instructed employees of the ULX Entities to discuss "the issue of the ~$100M valuation that [LeClairRyan] secured in support of this deal, including discussing how capital was booked within [ULXP] given this valuation and the risk associated with that valuation."

194.    On December 30, 2018, Mr. Lange wrote to Mr. LeClair regarding the Contribution Agreement, noting:

> This issue is more of a headscratcher for me... In short, they want to change the way we are contributing certain IP into ULXP at inception from granting of a perpetual license to an outright assignment/transfer … we need to be careful about how we draft provisions around how we get that IP back if the deal was ever terminated …

195.    Upon information and belief, the IP assets were transferred to ULXP, and UnitedLex through its ownership interests in ULXP, without any compensation to LeClairRyan.

196.    By January 2019, UnitedLex reported that it had "inked deals worth an eventual $1.5 billion in revenue" in the last 18-month period, including with DXC, GE and Ford.

197.    On January 8, 2019, Elizabeth Acee wrote to Mr. Gustafson, "Interesting article. A bit disappointing that in the extensive piece, there is nothing about the JV or LeClairRyan."  Mr. Wolf replied to Mr. Gustafson directly noting:  "Latham is identified as their 'strategic partner."

198.    To address the article internally, Mr. Gustafson wrote to the LCR board and directors on January 8, 2010, noting:  "I don't think we were mentioned because I think the only reason Latham was mentioned was that the meeting happened to be there where I expect that ULX is trying to finalize the Credit Suisse deal moving into execution phase."

199.    Lauren Hopwood at LeClairRyan, on January 10, 2019 wrote insightfully:  "Instead they are just using our firm and our reputation to benefit themselves in trying to win millions of dollars of work that they will keep all of."

## V.    UnitedLex Takes Control; Pulls Plug

### A.    UnitedLex Controls LeClairRyan

200.    Following the execution of the MSA and JV Agreements, the ULX Entities worked as managing agents for LeClairRyan.

201.    The ULX Entities were in charge of key functions, such as accounting, marketing, conflict management, and business development.

202.    The ULX Entities accessed the Debtor's financial and other confidential information essential to the operation of the Debtor.  In November 2018, a LeClairRyan employee noted that "ULXP is now co-staffing people to help ULXP from UnitedLex, so UnitedLex people (who are not fully devoted to LR) have access to LR's systems (including document management)."

203.    Upon information and belief, the ULX Entities also incurred expenses on the Debtor's behalf.

204.    The ULX Entities also made personnel decisions regarding the Debtor's personnel.

205.    The ULXP employees were the directors of the following key operations at LeClairRyan:  Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development. While an employee of ULXP and then at

41

UnitedLex, another individual served as the Plan Administrator of LeClairRyan's 401(k) profit sharing plan.

206.    ULXP Employees regularly held themselves out to the public to be employees and decision-makers of LeClairRyan.

207.    For instance, in February 2019, Josh Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as the "Chief Operating Officer" of LeClairRyan, as well as an employee authorized to enter into business transactions on behalf of UnitedLex and ULXP.

208.    In an August 8, 2018 email to Reed and UnitedLex CFO Nicholas Hinton, along with certain ULXP directors, Peter Krakaur, then the UnitedLex Vice President, Legal Business Solutions, illustrated the operation of ULXP and UnitedLex.

209.    A PowerPoint attached to the email illustrated the service arrangement employed at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and LeClairRyan fully into UnitedLex's systems and processes.

210.    The diagram, reproduced below, shows a slow movement to full integration and dominance by UnitedLex—despite noted "potential issues" that would result from such a course of action.



211.    In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan].  We are slowly and necessarily integrating UXP (sic) operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm. Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes.  The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.

212.    As Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now the owner of the business of law."

213.    Explaining further, Krakaur wrote, "[w]e all know law firms do not operate as a business. ULXP is designed to change that. Given the nature of the relationship, the agreements, and the practical aspects of us running the law firm, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."

**B.    UnitedLex Closes Deal With CVC**

214.    In August 2018, Mr. LeClair and Mr. Reed hired Nicholas Hinton to oversee the management of ULXP.  On September 17, 2018, Mr. Reed cautioned Mr. Hinton on how to exercise power over LeClairRyan:  "Nick … you make the final call … with Erik / LR attorneys. Please set the tone … incorporating Gary's comments. We cannot be a bull in the china shop, even though we have the power to do so. …"

215.    On October 5, 2018 Mr. Reed told Mr. Hinton:  "I want to be as aggressive as possible in reforming LR and ULX Partners and 'feel' the impact in November. Given our first responsibility is ensuring the go forward viability of the organization, we need to be Gordon Gecko

like on cuts, no or highly limited severance, etc."[5]  At the same time, Mr. Reed continued to rely

on Mr. LeClair's guidance, noting in an October 7, 2018 email:  "Very interested in Doug's

thoughts – AND Gary LeClair's. Gary's views and guidance are critical…."

C.     **The ULX Entities Take Further Control of the Debtor, Prioritizing Payments to ULXP Over All Others**

216.    By the end of 2018, LeClairRyan was continuing to experience member defections

and declining revenue.

217.    At the end of November 2018, LeClairRyan owed the ULX Entities approximately

$16.4 million.  Loading the firm with even more debt, on December 1, ULXP transferred

responsibility of the payment of its operational expenses to LeClairRyan, including an outstanding

balance of $1.8 million.

218.    In or around January 2019, the ULX Entities began to convene regular meetings

with LeClairRyan's CFO, Dwight Jones, and other LeClairRyan Board members and/or staff

members to discuss cash flow.  In certain of these meetings, Mr. Jones would meet with Mr. Hinton

and the UnitedLex Controller to discuss 13-week cash flow forecasts and to address the payment

installments for the ULX Entities.

219.    Mr. Hinton insisted that Mr. Jones prepare these 13-week cash flow forecasts,

which showed weekly cash receipts and potential cash disbursements.  This type of cash flow

forecast is most often used in situations where a company enters financial distress in order to

provide visibility into the company's short-term options.

220.    In connection with these meetings and discussions, Mr. Hinton also decided which

of the firm's key vendors needed to be paid.  These regular meetings became avenues for the ULX

---

[5]      In the film *Wall Street*, Gordon Gekko borrowed huge sums of money to take over existing firms, then extracted value by force.  This form of financial piracy in the name of "greed" achieved iconic status thanks to *Wall Street*.  Despite his destructive nature, Mr. Gekko called himself a "liberator" of companies.

Entities to further exert their control and ensure that their invoices were paid ahead of other creditors.

221.    As demonstrated by the chart below, between November 2018 and the Petition Date, payables due and owing from the Debtor to ULXP decreased by approximately 30.7%, while LeClairRyan's payables due and owing to all other creditors increased by approximately 181%:



[1]  Excludes interest on $8,000,000 debt recharacterization.
[2]  Includes the following balance sheet line items: Accounts Payable, Credit Card and Accrued Expenses.

222.    The ULX Entities continued to demand weekly payments, with LeClairRyan's stated payment amounts needing to be at least $2 million a month.  The ULX Entities would demand these payments, regardless of what other higher priority vendor payments were outstanding.  Through these meetings, it was clear that the ULX Entities made the decisions about who was to be paid and when.

223.    As an example, in an email dated February 21, 2019, Mr. Jones explained that LeClairRyan would not be issuing a weekly payment to ULXP due to the need to handle outstanding payables for client reimbursements.  In response, Mr. Hinton sent an email to Mr.

Gustafson asking if this was LeClairRyan's position and noting that "[UnitedLex] is not the lowest priority vendor. We are not LCR's bank."

224.    Based on pressure exerted by the ULX Entities, insolvent LeClairRyan improperly prioritized payments to ULXP, to the detriment of other creditors and clients.

225.    Upon information and belief, there were also instances in which LeClairRyan did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Entities.

226.    Upon information and belief, in certain of these instances, individual attorneys had to pay for client fees out of pocket to avoid missing client deadlines.

227.    Upon information and belief, in other instances, LeClairRyan would not pay vendors who were handling aspects of clients' cases, even though the client had tendered funds to LeClairRyan for the purpose of paying those vendors.

228.    The ULX Entities encouraged LeClairRyan to commingle funds tendered by clients for specific expenses with operational funds that were used for other payments.

229.    The ULX Entities pushed back against efforts by LeClairRyan to cease, or limit, the practice of commingling client and operational funds as the firm approached bankruptcy.

230.    Multiple officers and directors of LeClairRyan told Mr. Hinton that client funds should not be used for any purpose other than the purpose that the client intended.  Despite this warning, on April 10, 2019, a year after entering in the joint venture and five months before LeClairRyan would file for bankruptcy protection, Mr. Hinton told Mr. Jones, the then-Chief Financial Officer, to use the funds given to LeClairRyan by clients for expenses for its creditors, instead of "restrict[ing] the liquidity of the firm by creating artificial restricted cash pools."

231.   This mishandling of these funds, related mismanagement of client affairs, and neglect of other important financial obligations in order to prioritize payments to ULXP was a further violation of fiduciary duties owed by the ULX Entities, including to its clients and creditors.

## VI.   The Joint Venture Purportedly Falls Apart

### A.   UnitedLex Demands More Protections

232.   In April 2019, a year after entering in the joint venture and only three months before LeClairRyan would resolve to dissolve the firm, ULXP and LeClairRyan entered into an Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "ULXP Note") and an accompanying Security Agreement (the "ULXP Security Agreement").

233.   Both documents were signed on April 4, 2019, but were backdated and made effective as of December 20, 2018.

234.   Under the terms of the ULXP Note, LeClairRyan agreed to pay ULXP the principal amount of $8 million for alleged fees owed by LeClairRyan to ULXP under the MSA.   No payments were to be made under the ULXP Note until its maturity date on June 30, 2023.

235.   ULXP did not account to LeClairRyan for the services it was providing.   For example, on April 16, 2019 Brian DeFazio Controller at UnitedLex wrote to Brian Haynes and Dwight Jones:   "So I checked again today and I see that the emails I'm on ONLY have LeClairRyan employees, no ULXP … we really don't have an independent way to tie out between payroll and what we're invoiced for payroll."

236.   The debt that formed the center of the purported loan consisted entirely of prior investments made by the ULX Entities to LeClairRyan.

237.   LeClairRyan was insolvent or undercapitalized at the time the ULXP Note and ULXP Security Agreement were executed.

238.    The result of the ULXP Note was to elevate ULXP's priority over unsecured creditors.

239.    In fact, the ULXP Note was, in reality, an adjustment of equity interests.  Despite being documented as a "loan," on January 22, 2019 Mr. Lange sent revisions to the ULXP Note to counsel for the ULX Entities and to the UnitedLex team, explaining that, via his changes, "we wanted to present a note that our lender [VCF] …would see as being equity like in that it is being paid from the return on our equity investment in [ULXP]."  LeClairRyan then arranged with its senior secured lender to treat the ULXP Note as equity for purposes of performing its leverage ratio calculation.

240.    Upon information and belief, the ULX Entities knew about this arrangement with the senior secured lender.

241.    This effort proved successful.  On January 31, 2019, VCF informed LeClairRyan that it approved the leverage ratio calculation so that the $8 million would be treated as equity, saying "[t]he [UnitedLex] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in."

242.    ULX Entities knew or should have known that the ULXP Note was treated as equity by VCF.

243.    At all times, from April 2018 to September 2019, Defendants knew or should have known that the ULX Entities were providing equity and investing in LeClairRyan.

244.    At all times, from April 2018 to September 2019, Defendants knew or should have known that LeClairRyan was not sufficiently capitalized to pay back the ULXP Note.

245.    LeClairRyan never made a single payment under the ULXP Note.

### B.     Defendants Attempt To Form The Novellus Law Group; Final Act Pushes LeClairRyan into Bankruptcy

246.    On or about early 2019, LeClairRyan's financial condition worsened precipitously.

247.    In a desperate attempt to save the dwindling value of LeClairRyan for the benefit of certain LeClairRyan members and UnitedLex, LeClairRyan and the ULX Entities embarked on an initiative known as "Project Modern." Project Modern was a last-ditch attempt to take the remaining valuable pieces of LeClairRyan, giving the ULX Entities even greater control.

248.    Project Modern morphed into the concept of a new law firm called the Novellus Law Group ("NLG"), which involved forming a new partnership with UnitedLex in which certain of LeClairRyan's members would flip back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.

249.    NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that attempted to strip LeClairRyan of its assets and profitable members while leaving debt and other liabilities, including but not limited to certain real estate leases and technology costs, with LeClairRyan, which would have collapsed under its own weight and inevitably been wound down. To help facilitate this transaction, LeClairRyan made cash payments to ULXP and entered into the ULXP Security Agreement (which among other things authorized related UCC filings).

250.    Under the proposal, the "debts" owed by LeClairRyan to ULXP would be assumed by the newly-formed NLG, and the equity investments that UnitedLex purportedly made in connection with the prior joint venture with LeClairRyan would be incorporated into the new entity's debt and/or equity structure. UnitedLex would also be entitled to various fees and other streams of income including but not limited to profits generated by the new law firm.

251.    Other debt, including, but not limited to, debt to former shareholders and certain landlords, would not have been assumed by NLG—that debt would be restructured (or liquidated in bankruptcy).

252.    To incentivize them to join NLG, certain of LeClairRyan's members were promised equity in UnitedLex, which still hoped to grow by working with other law firms (which, upon information and belief, UnitedLex succeeded at doing with LeClairRyan's business model).

253.    In NLG offer letters, a select group of the Debtor's members were offered base compensation, bonus potential, long term incentive compensation, benefits and payroll taxes—a package allegedly superior to that of the traditional law firm model.

254.    While the NLG model seemed promising, any new entity formed from LeClairRyan would still need operating capital.  Accordingly, on or about June 20, 2019, in connection with efforts to enact the NLG plan, Messrs. Hinton and Reed began negotiating directly with LeClairRyan's lender, VCF, to provide more financing for NLG.

255.    Upon information and belief, Messrs. Hinton and Reed sought financial backing from VCF because neither CVC nor UnitedLex wanted to invest further money in this new law firm.  After a period of discussions and initial diligence, on or about July 18, 2019, VCF refused to provide the level of funding demanded by Messrs. Hinton and Reed.

256.    At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of UnitedLex.  This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

## C.    The Captain Abandons Ship; Members Vote To Dissolve

257.    During the first half of 2019 and as late as July 14, 2019 (if not later), Mr. LeClair and Mr. Reed continued to devise additional ways to strip value from LeClairRyan, this time in

connection with the formation and implementation of NLG, particularly focusing on persuading others of this new entity, including, but not limited, to the "precise messaging" to VCF.

258.    While assisting Mr. Reed with NLG, Mr. LeClair continued to extract value from LeClairRyan in other ways as well.  For example, on March 22, 2019 Mr. LeClair demanded from LeClairRyan (i) interest on an outstanding loan against his Life Insurance Policy, (ii) representation that policy premiums had been paid in full through March 2019, (iii) distribution of the Life Insurance Policy on or before April 10, 2019, subject to the $309,000 outstanding loan, and (iv) payoff of the loan in monthly installments of $40,051.81 each month by November 2019. Otherwise Mr. LeClair threatened to terminate employment for "Good Reason," which he maintained would trigger additional payments under his soft-landing contract.

259.    With VCF refusing, on or about July 15, 2019, to provide the level of NLG funding demanded by Messrs. Hinton and Reed, Mr. LeClair announced (on or about July 25, 2019) his plans to leave LeClairRyan.  Four days after Mr. LeClair's announcement, LeClairRyan's members voted to formally wind-down the firm.

260.    On September 3, 2019 (the "Petition Date"), LeClairRyan commenced a chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

## VII.    Transfers Made To Defendants

### A.    Transfers Made To Mr. LeClair

261.    The Debtor transferred not less than $1,379,158 to Mr. LeClair between September 3, 2017 and the Petition Date (the "Two-Year LeClair Transfers").[6]

---

[6]    The Two-Year LeClair Transfers are listed on the attached Exhibit 1.

262.   Of the $1,379,158 transferred to Mr. LeClair, not less than $515,224 was made on account of antecedent debt and occurred within one year of the Petition Date (the "LeClair Preferential Transfers").[7]

263.   The Debtor transferred not less than $2,363,965 to Mr. LeClair between September 3, 2014 and the Petition Date (the "LeClair Transfers").[8]

264.   In addition, pursuant to various documents, including but not limited to the Fourth Amended and Restated Shareholders Agreement of LeClairRyan, A Professional Corporation, which the Debtor adopted through the Operating Agreement of LeClairRyan PLLC dated as of February 27, 2018 and the Fifth Amendment to December 31, 2007 GDL-SLC dated December 27, 2016 and agreed to on December 28, 2016, Mr. LeClair (as well as his successors, heirs, estate, administrators, representatives, trustees and assigns) purportedly received certain release, indemnification and exculpatory rights (the "Release and Exculpation Rights") from LeClairRyan.

## B.   Transfers Made To The ULX Entities

265.   Upon information and belief, during the relationship between the ULX Entities and the Debtor, the Debtor transferred not less than $19,357,282 to ULXP between October 2013 and the Petition Date (the "ULX Transfers").[9]

266.   Upon information and belief, of that amount, not less than $17,425,405.10 of the transfers occurred within one year of the petition date (the "ULX Preferential Transfers").[10]

---

[7]   The LeClair Preferential Transfers are listed on the attached Exhibit 2.

[8]   The LeClair Transfers are listed on the attached Exhibit 3.

[9]   The ULX Transfers are listed on the attached Exhibit 4.

[10]   The ULX Preferences are listed on the attached Exhibit 5.

267.    In addition, at least $18.5 million in assets were transferred to the ULX Entities under the Contribution Agreement and/or pursuant to other transaction documents, for which LeClairRyan received no consideration or value.

## COUNT I
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550
### (Against ULXP and UnitedLex)

268.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

269.    The ULX Transfers are transfers of interests in the Debtor's property.

270.    The ULX Transfers were made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

271.    The ULX Entities were not good faith transferees, and therefore are not entitled to offset rights under section 548(c) and applicable non-bankruptcy law.

272.    Each ULX Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including, but not limited to:  (i) the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the ULX Transfers.

273.    The ULX Transfers were made within two (2) years prior to the Petition Date.

274.    The ULX Transfers are avoidable and recoverable against ULXP as fraudulent transfers under section 548(a)(1)(A) and 550 of the Bankruptcy Code.

275.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

276.    The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP, and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

277.    The Trustee is entitled to the full amount of the ULX Transfers, totaling not less than $19,357,282.51, plus interest, the Trustee's reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

**COUNT II**
**Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550**
**(Against ULXP And UnitedLex)**

278.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

279.    The ULX Transfers were transfers of interest in the Debtor's property.

280.    The Debtor received less than a reasonably equivalent value in exchange for the ULX Transfers.

281.    The ULX Transfers were made within two (2) years prior to the Petition Date.

282.    The ULX Transfers were made while the Debtor was insolvent, or became insolvent as a result of the ULX Transfers.

283.    At the time of, or as a result of the ULX Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

284.    At the time of the ULX Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

285.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of 11 U.S.C. § 502.

286.    The ULX Transfers are avoidable transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

287.    The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

288.    The ULX Transfers are avoidable and recoverable as fraudulent transfers against ULXP under sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

289.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

290.    The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

291.    The Trustee is entitled to the full amount of the ULX Transfers, totaling not less than $19,357,282.51, plus interest, the Trustee's reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT III
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550, and Applicable State Law
### (Against ULXP And UnitedLex)

292.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

293.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

294.    The ULX Transfers were transfers of interest in the Debtor's property to the ULX Entities.

295.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

296.    The ULX Transfers were made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

297.    Each ULX Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following:  (i) the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the ULX Transfers.

298.    The ULX Transfers were made to or for the benefit of the ULX Entities.

299.    The ULX Transfers were made within the five (5) years before the Petition Date and should be avoided and recovered pursuant to sections 544(b) and 550 of the Bankruptcy Code.

300.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

301.    The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

302.    The Trustee is entitled to the full amount of the ULX Transfers, totaling not less than $19,357,282.51, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

303.     The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

## COUNT IV
### Avoidance of Preferences Under 11 U.S.C. §§ 547(b) and 550
### (Against ULXP and UnitedLex)

304.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

305.     Between the Petition Date and one year before the Petition Date, the Debtor made the ULX Preferential Transfers to or for the benefit of the ULX Entities.

306.     The ULX Preferential Transfers were for or on account of an antecedent debt owed by the Debtor before the ULX Preferential Transfers were made.

307.     The ULX Entities are statutory insiders for the Debtor, within the meaning of Section 101(31)(F) of the Bankruptcy Code.

308.     The ULX Entities are also non-statutory insiders of the Debtor.

309.     The ULX Entities were managing agents of the Debtor, as they accessed the Debtor's financial and other information essential to the operation of the Debtor, incurred expenses on the Debtor's behalf, made personnel decisions, and were in charge of key functions, such as accounting, marketing, conflict management, and business development.

310.     The Debtor was insolvent at all times within one year of the Petition Date.

311.     To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544, 548 or 550 of the Bankruptcy Code, such portion is plead here, in the alternative, as ULX Preferential Transfers.

312.     The ULX Preferential Transfers are avoidable under section 547 of the Bankruptcy Code.

313.     The ULX Preferential Transfers enabled the ULX Entities, as creditors, to receive more than they would have received had the transfer not been made and the creditor received payment of such debt under chapter 7.

314.     The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

315.     The ULX Preferential Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

316.     The Trustee is entitled to the full amount of the ULX Preferential Transfers, totaling not less than $17,425,405.51, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

## COUNT V
### Avoidance of Lien and Recovery of Avoided Transactions
### Under 11 U.S.C. §§ 544, 548, 550, and 551
### (Against ULXP)

317.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

318.     In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

319.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to or for the benefit of insider ULXP (the "ULXP Note Transfers").

320.    As described above, ULXP received ULX Transfers in an amount not less than $19,357,282.51.

321.    To the extent that any transaction is avoided under sections 544 and/or 548 of the Bankruptcy Code, pursuant to section 550 of the Bankruptcy Code, ULXP's claims and liens against the Debtor are avoidable.

322.    Moreover, pursuant to section 551 of the Bankruptcy Code, ULXP's claims and liens that are avoidable herein shall be preserved for the benefit of the Estate.

323.    Based on the foregoing, the ULXP Note Transfers are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and recoverable and/or preserved pursuant to sections 550 and 551 of the Bankruptcy Code for the benefit of the Debtor and its Estate.

## COUNT VI
### Avoidance of Lien and Recovery of Avoided Transactions
### Under 11 U.S.C. §§ 547, 550, and 551
### (Against ULXP)

324.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

325.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

326.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were ULXP Note Transfers.

327.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

328.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to or for the benefit of insider ULXP.

329.    As described above, ULXP received ULX Preferential Transfers in an amount not less than $17,425,405.51.

330.    Based on the foregoing, the ULXP Note Transfers are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and recoverable and/or preserved pursuant to sections 550 and 551 of the Bankruptcy Code for the benefit of the Debtor and its Estate.

## COUNT VII
**Avoidance of Fraudulent Transfer Under §§ 544(b) and 550 and Applicable State Law
(Against ULXP)**

331.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

332.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

333.    The ULXP Note Transfer was a transfer of interest in the Debtor's property to ULXP.

334.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

335.    The Debtor entered into the ULXP Note Transfer with the actual intent to delay, hinder, or defraud the creditors of the Debtor.

336.    The ULXP Note Transfer was made to or for the benefit of ULXP.

337.    The ULXP Note Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including, but not limited to:  (i) the ULXP Note Transfer was made to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the ULXP Note Transfer was made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the ULXP Note Transfer.

338.    The ULXP Note Transfer was made within the five (5) years before the Petition Date and should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 550 and applicable state fraudulent transfer law.

### COUNT VIII
### Disallowance of Claims under 11 U.S.C. § 502(d)
### (Against ULXP and UnitedLex)

339.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

340.    As alleged above, the ULX Entities were the recipients of the ULX Transfers and the ULX Preferential Transfers, which are avoidable pursuant to sections 544, 547, and 548 of the Bankruptcy Code, and which are recoverable pursuant to section 550 of the Bankruptcy Code.

341.    Despite a demand, ULXP has not returned the ULX Transfers to the Trustee.

342.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property avoidable under section 544, 547, or 548 of the Bankruptcy Code, or that is recoverable under section 550(a) of the Bankruptcy Code.

343.    Because the ULX Entities have not paid or returned the ULX Transfers to the Trustee, ULXP's claims or any claims which ULXP or UnitedLex purport to assert must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

344.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the claims asserted by the ULX Entities against the Estate are disallowed.

<u>**COUNT IX**</u>
**Re-Characterization of Debt as Equity**
**(Against ULXP)**

345.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

346.    ULXP has filed a claim that asserts a right to payments allegedly owed by the Debtor (Proof of Claim No. 174) (the "<u>Secured Claim</u>").

347.    The Secured Claim consists of the $8 million ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

348.    The Secured Claim was in substance an equity contribution to the Debtor made when the Debtor was undercapitalized, and the ULX Entities' $8 million loan was not for new value, but on account of a prior $8 million "float" authorized by the ULX Entities to the Debtor under the Master Services Agreement.

349.    Individuals at UnitedLex and LeClairRyan repeatedly referred to the ULXP Note as an equity investment, designed to avoid certain take implications.

350.    LeClairRyan did not have access to third-party funding sources.  Those lines of credit had already been used.

351.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.

352.    The Debtor made no payments on the $8 million ULXP Note.

353.    As a result of the ULXP Entities' equity contributions, the Court should recharacterize as equity ULXP's Proof of Claim No. 174 in its entirety pursuant to this Court's equitable powers.

<u>**COUNT X**</u>
**Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550**
**(Against Mr. LeClair)**

354.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

355.    The Two-Year LeClair Transfers are transfers of interests in the Debtor's property.

356.    The Two-Year LeClair Transfers were made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

357.    Mr. LeClair was not a good faith transferee, and therefore is not entitled to offset rights under section 548(c) of the Bankruptcy Code and applicable non-bankruptcy law.

358.    Each Two-Year LeClair Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including, but not limited to, the following:  (i) the transfers were to Mr. LeClair, who was an insider of the Debtor; (ii) the transfers were made at the same time substantial new debts and liabilities were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the Two-Year LeClair Transfers.

359.    The Two-Year LeClair Transfers were made within two (2) years prior to the Petition Date and are avoidable and recoverable as fraudulent transfers under sections 548(a)(1)(A) and 550 of the Bankruptcy Code.

360.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

361.    The Trustee is entitled to the full amount of the Two-Year LeClair Transfers, totaling not less than $1,379,158, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XI
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550
### (Against Mr. LeClair)

362.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

363.    The Two-Year LeClair Transfers were transfers of interest in the Debtor's property.

364.    The Debtor did not receive reasonably equivalent value in exchange for the Two-Year LeClair Transfers.

365.    The Two-Year LeClair Transfers were made while the Debtor was insolvent, or became insolvent as a result of the Two-Year LeClair Transfers.

366.    At the time of the Two-Year LeClair Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.  At the time of, or as a result of the Two-Year LeClair Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

367.   At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

368.   The Debtor received less than a reasonably equivalent value in exchange for the Two-Year LeClair Transfers.

369.   The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

370.   The Two-Year LeClair Transfers were made within two (2) years prior to the Petition Date and are avoidable and recoverable transfers pursuant to sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

371.   The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

372.   The Trustee is entitled to the full amount of the Two-Year LeClair Transfers, totaling not less than $1,379,158, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XII
**Avoidance and Recovery of the LeClair Transfers as Actual Fraudulent Transfers Under
11 U.S.C. §§ 544(b), 550, and Va. Code § 55.1-400
(Against Mr. LeClair)**

373.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

374.     Under section 544(b) of the Bankruptcy Code, the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under section 502 of the Bankruptcy Code .

375.     The LeClair Transfers were transfers of interest in the Debtor's property to Mr. LeClair.

376.     At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

377.     The Debtor entered into each LeClair Transfer with the actual intent to delay, hinder, or defraud the creditors of the Debtor.

378.     Each transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the transfers were to Mr. LeClair, an insider of the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the LeClair Transfers.

379.     The LeClair Transfers were made to or for the benefit of Mr. LeClair.

380.     The LeClair Transfers were made within the five (5) years before the Petition Date, and are avoidable and recoverable pursuant to applicable state law, and the applicable provisions sections 544(b) and 550 of the Bankruptcy Code.

381.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

382.    Pursuant to Virginia Code Section 55.1-400, the Trustee is entitled to the full amount of the LeClair Transfers, totaling not less than $2,363,965, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XIII
### Avoidance of LeClair Preferential Transfers Under 11 U.S.C. § 547(b)
### (Against Mr. LeClair)

383.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

384.    Between the Petition Date and one year before the Petition Date, the Debtor made the LeClair Preferential Transfers to or for the benefit of Mr. LeClair, as set forth in Exhibit 2.

385.    The LeClair Preferential Transfers were for or on account of an antecedent debt owed by the Debtor before the LeClair Preferential Transfers were made.

386.    Mr. LeClair was a statutory insider of the Debtor, within the meaning of Section 101(31)(F) of the Bankruptcy Code.

387.    Mr. LeClair was also a non-statutory insider of the Debtor.

388.    Mr. LeClair was a managing agent of the Debtor, as, among other things, he had access to the Debtor's financial and other information essential to the operation of the Debtor, directed the Debtor's decision-making process, and controlled the Debtors relationships with other parties, including the ULX Entities.

389.    The Debtor was insolvent at all times within one year of the Petition Date.

390.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544 or 548 of the Bankruptcy Code, such portion is plead here, in the alternative, as LeClair Preferential Transfers.

391.    The LeClair Preferential Transfers enabled Mr. LeClair, as a creditor, to receive more than he would have received had the transfers not been made and the creditor received payment of such debt under chapter 7.

392.    The LeClair Preferential Transfers are avoidable and recoverable as preferences under sections 547 and 550 of the Bankruptcy Code.

393.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

394.    The Trustee is entitled to the full amount of the LeClair Preferential Transfers, totaling not less than $515,224, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

## COUNT XIV
**Avoidance of Releases and Exculpation Rights Under 11 U.S.C. §§ 548 and 550
(Against Mr. LeClair)**

395.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

396.    The Debtor provided the Releases and Exculpation Rights to Mr. LeClair.

397.    The Debtor received no tangible or concrete value in exchange for granting Mr. LeClair the Releases and Exculpation Rights.

398.    The Releases and Exculpation Rights were transfers of interest in the Debtor's property under section 548 of the Bankruptcy Code.

399.    Certain of the Releases and Exculpation Rights were granted while the Debtor was insolvent, or became insolvent as a result of the transfer of Releases and Exculpation Rights to Mr. LeClair.

400.    When the Releases and Exculpation Rights were granted, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

401.    At the time of, or as a result of the Releases and Exculpation Rights, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

402.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

403.    The Debtor received less than a reasonably equivalent value in exchange for the Releases and Exculpation Rights.

404.    The Releases and Exculpation Rights were made within two (2) years prior to the Petition Date and are avoidable transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

405.    Pursuant to section 550 of the Bankruptcy Code the transfer of the Debtor's rights are voidable by the Trustee.

406.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

407.    The Trustee is entitled to avoid the transfer of the Releases and Exculpation Rights to and for the benefit of Mr. LeClair, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

<u>COUNT XV</u>
**Avoidance of Releases and Exculpation Rights Under 11 U.S.C. §§ 544 and 550
and Applicable State Law
(Against Mr. LeClair)**

408.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

409.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

410.    The Releases and Exculpation Rights granted to Mr. LeClair were transfers in the Debtor's property.

411.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

412.    The Debtor received no tangible or concrete value in exchange for the Releases and Exculpation Rights.

413.    The Releases and Exculpation Rights were transfers of interest in the Debtor's property.

414.    The Releases and Exculpation Rights were granted while the Debtor was insolvent, or became insolvent as a result of the Releases and Exculpation Rights to Mr. LeClair.

415.    When the Releases and Exculpation Rights were granted, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

416.    At the time of, or as a result of the Releases and Exculpation Rights, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

417.     At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

418.     The Debtor received less than a reasonably equivalent value in exchange for the Releases and Exculpation Rights.

419.     The Releases and Exculpation Rights were granted to or for the benefit of Mr. LeClair.

420.     The Releases and Exculpation Rights were granted within the five (5) years before the Petition Date should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

421.     The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

422.     The Trustee is entitled to avoid the transfer of the Releases and Exculpation Rights to and for the benefit of Mr. LeClair, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

<u>COUNT XVI</u>
**Avoidance and Recovery of Distributions of Contingent Income Made in Violation of Board Resolutions and Compensation Policies as Actual Fraudulent Transfers Pursuant to 11 U.S.C. §§ 544, 550, and Va. Code § 55.1-400**
**(Against Mr. LeClair)**

423.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

424.     LeClairRyan transferred $459,687 in Contingent Income to Mr. LeClair between September 3, 2014 and the Petition Date.

425.     The Contingent Income payments constitute multiple transfers of property of the Debtor's Estate to Mr. LeClair.

426.    The Contingent Income payments were distributed to Mr. LeClair while the Debtor was insolvent and unable to pay its debts as they became due.

427.    The Debtor distributed the Contingent Income with the actual intent to hinder, delay, and/or defraud one or more of the entities the Debtor was indebted or became indebted to on or after the date of each of the Contingent Income payments.

428.    The Contingent Income payments to Mr. LeClair were accompanied by several badges of fraud, including, but not limited to the following:  (a) the Debtor was insolvent and unable to pay its debts as they became due when it made the Contingent Income payments; (b) the Contingent Income payments were distributed to Mr. LeClair, a director, officer, and shareholder of the Debtor; (c) the Contingent Income payments were distributed to Mr. LeClair in violation of the Board Resolutions, the Compensation Policies, and applicable Virginia law; and (d) the Contingent Income payments were distributed to Mr. LeClair in secrecy or concealment—particularly as it relates to the Cash Covenant Payments.

429.    The Contingent Income Payments were distributed to or for the benefit of Mr. LeClair.

430.    Pursuant to Virginia Code Section 55.1-400, the Trustee is entitled to judgment against Mr. LeClair:  (a) avoiding the Contingent Income payments, (b) directing the Contingent Income payments be set aside, and (c) requiring the Defendant Mr. LeClair, as the recipient of the Contingent Income payments and/or the person for whose benefit the Contingent Income payments were given, to return the Contingent Income payments in the amount of $459,687, or the value thereof, to the Trustee.

## COUNT XVII
### Conversion for Contingent Income Payments
### (Against Mr. LeClair)

431.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

432.    The Debtor did not satisfy the necessary conditions precedent for Mr. LeClair to receive the Contingent Income Payments.

433.    Accordingly, the Contingent Income Payments were wrongfully paid to Mr. LeClair.

434.    The Debtor is entitled to immediate possession of the Contingent Income Payments.

435.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $459,687.

## COUNT XVIII
### Unjust Enrichment for Contingent Income Payments
### (Against Mr. LeClair)

436.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

437.    The Debtor did not satisfy the necessary conditions precedent for Mr. LeClair to receive the Contingent Income Payments.

438.    The Debtor conferred a benefit on Mr. LeClair through the conveyance of the Contingent Income payments.

439.    Mr. LeClair accepted and retained the benefit of the Contingent Income Payments without the Debtor satisfying the conditions precedent necessary to pay the Defendant the Contingent Income.

440.    Mr. LeClair knew or should have known the Debtor did not satisfy the conditions precedent necessary for the Defendant to receive the Contingent Income.

441.    Allowing Mr. LeClair to retain the benefits he received would be unjust.

442.    As a direct and proximate result of the foregoing wrongful acts and Mr. LeClair's

unjust enrichment, the Debtor sustained damages in an amount to be proven at trial, but in no event

less than $459,687.

**COUNT XIX**
**Disallowance of Claims under 11 U.S.C. § 502(d)**
**(Against Mr. LeClair)**

443.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

444.    As set forth in Exhibit 1, Mr. LeClair was the recipient of the LeClair Transfers,

which are avoidable pursuant to sections 544, 547 and 548 of the Bankruptcy Code, and which are

recoverable pursuant to section 550 of the Bankruptcy Code.

445.    Despite demands, the Mr. LeClair has not returned the LeClair Transfers to the

Trustee.

446.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any

claims of any entity (i) from which property is recoverable under section 550(a) of the Bankruptcy

Code or (ii) that is a transferee of a transfer avoidable under sections 544, 547, or 548 of the

Bankruptcy Code.

447.    Because Mr. LeClair has not paid or returned the LeClair Transfers to the Trustee,

these claims or any claims which Mr. LeClair purports to assert must be disallowed unless and

until Mr. LeClair returns to the Trustee an amount equal to each such transfer that is avoided.

448.    Until then, the Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d)

that all of Mr. LeClair's claims against the Estate are disallowed.

## COUNT XX
**Avoidance of Transfers Made In Connection with the Contribution Agreement
Under 11 U.S.C. §§ 548(A)(1)(A) and 550
(Against the ULX Entities)**

449.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

450.    The Contribution Agreement entered in connection with the ULXP joint venture transferred intellectual property interests of the Debtor's property to ULXP (the "Intellectual Property Transfer"), in which UnitedLex had majority interest.

451.    The Contribution Agreement was entered into and the Intellectual Property Transfer was made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

452.    The ULX Entities were not good faith transferees, and therefore they are not entitled to offset rights under section 548(c) and applicable non-bankruptcy law.

453.    The Intellectual Property Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including, but not limited to, the following: (i) the transaction resulted in an immediate realized loss for the Debtor of more than $4 million; (ii) the transfer was made at the same time substantial new debts and liabilities were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the Contribution Agreement.

454.    The Contribution Agreement was entered into within two (2) years prior to the Petition Date. The Intellectual Property Transfer was made within two (2) years prior to the Petition Date and is avoidable as fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.

455.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

456.    The Trustee is entitled to the full amount of assets transferred under the Contribution Agreement including but not limited to the Intellectual Property Transfers, totaling not less than 18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XXI
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(A)(1)(B) and 550
### (Against the ULX Entities)

457.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

458.    The Contribution Agreement transferred interests in the Debtor's property to ULXP.

459.    The Debtor did not receive reasonably equivalent value in exchange for the assets transferred under the Contribution Agreement.

460.    The Debtor was insolvent on the dates that such transfers were made, or became insolvent as a result of such transfers.

461.    At the time of the Contribution Agreement, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts as they matured.

462.    At the time of, or as a result of the Contribution Agreement, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

463.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

464. The Contribution Agreement was entered into within two (2) years prior to the Petition Date and the transfers made thereunder are avoidable transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

465. The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

466. The Trustee is entitled to the full amount of the value of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

### COUNT XXII
### Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and Applicable State Law
### (Against the ULX Entities)

467. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

468. Under section 544(b) of the Bankruptcy Code, the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

469. The Contribution Agreement transferred interests in the Debtor's property to ULXP.

470. At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

471. The Debtor entered into the Contribution Agreement with the actual intent to delay, hinder, or defraud the creditors of the Debtor.

472. The primary purpose of the Contribution Agreement was to take assets from the Debtor for the benefit of the ULX Entities to the detriment of creditors.

473.    Each transfer made in connection with the Contribution Agreement was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following:  (i) the transfer resulted in an immediate realized loss for the Debtor of more than $4 million; (ii) the transfer was made at the same time substantial new debts and liabilities were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the Contribution.

474.    The Contribution Agreement was entered within the five (5) years before the Petition Date.  The transfers made thereunder, including, but not limited to the Intellectual Property Transfers, were made within the five (5) years before the Petition Date and should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

475.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

476.    The Trustee is entitled to the full amount of the value  of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XXIII
**Misappropriation of Trade Secrets Under The Virginia Uniform Trade Secrets Act,
Va. Code §§ 59.1-336 *et seq.*
(Against the ULX Entities and Mr. LeClair)**

477.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

478.    The ULX Entities had access to valuable trade secrets and confidential information belonging to the Debtor as the term "Trade Secrets" is defined under the Virginia Uniform Trade

Secrets Act, Va. Code §§ 59.1-336 *et seq.* through its access to LeClairRyan's documents and systems following the transfer of LeClairRyan's back-office group to ULXP.

479.    These trade secrets are information from which the Debtor derived actual or potential independent economic value, from their not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.    These trade secrets are the subject of efforts that are reasonable under circumstances to maintain secrecy.

480.    Through the ULXP transaction, Mr. LeClair caused the Debtor's trade secrets to be disclosed, and otherwise misappropriated, for the benefit of UnitedLex, without the Debtor's full knowledge and consent.

481.    The ULX Entities knew or had reason to know that the Debtor's trade secrets had been acquired by improper means.

482.    As a result of this misappropriation, the Debtor has been damaged in an amount to be determined at trial.

483.    Upon information and belief, this misappropriation has been willful and malicious, warranting punitive damages under Va. Code §§ 59.1-338, and entitling the Debtor, and now the Trustee, to attorneys' fees under Va. Code §§ 59.1-338.1.

## COUNT XXIV
### Breach of Fiduciary Duty
### (Against the ULX Entities)

484.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

485.    As members of a joint venture, the ULX Entities owed the Debtor a fiduciary duty of loyalty and care to, among other things, (i) preserve, maximize, and equitably distribute profits

generated with respect to the ULXP joint venture; (ii) refrain from dealing with a party adverse to or competing with the ULXP joint venture; and (iii) refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

486.    The UnitedLex Entities breached their duties of loyalty to the Debtor by, among other things, (i) mismanaging the joint venture; (ii) usurping the Debtor's business opportunities and relationships, (iii) pursuing and securing other business deals using the Debtor's assets and intellectual property, (iv) exerting undue control over the Debtor, and (v) engaging in the unauthorized practice of law.

487.    Any economic benefit that the ULX Entities derived and/or continues to derive from the ULXP joint venture and/or it related "constellation" with other entities is a direct and proximate cause of their breach.

488.    The Trustee is entitled to damages from the ULX Entities as a result of their breaches in an amount to be proved at trial, including in the amount of any profits that the ULX Entities received in connection with the ULXP joint venture and any gains the ULX Entities received and/or continue to receive in connection with the "constellation" formed directly and/or indirectly by UnitedLex.

**COUNT XXV**
**Accounting**
**(Against the ULX Entities)**

489.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

490.    As a member of ULXP, the Debtor, and now the Trustee, is entitled to access the joint venture's books, records, and any documents related to its operational structure pursuant to Va. Code § 50–73.102(B)(1).

491.    The ULX Entities violated fiduciary duties owed to the Debtor.

492.    The Trustee is therefore entitled to a full accounting of the books and records of the

ULX Entities as it relates to the "constellation" formed directly and/or indirectly by UnitedLex.

## COUNT XXVI
### Breach Of Fiduciary Duty
### (Against Mr. LeClair)

493.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

494.    As Chairman, a Shareholder and a Member of the firm, Mr. LeClair owed fiduciary

duties, including a duty of loyalty and a duty of care, to the Debtor and its creditors.

495.    Mr. LeClair abused his position as an insider to arrange special and unusual deals

for his own personal benefit and for the benefit of others , including but not limited to:  (i)

payments under the Debtor's supplemental retirement and deferred compensation plans; (ii)

discretionary bonuses and other payments to certain LeClairRyan shareholders, members and/or

attorneys, including himself; (iii) contracts and/or other agreements   benefiting certain

LeClairRyan shareholders, members and/or attorneys, including himself, (iv) negotiation,

formation, and execution/implementation of transactions related to   ULXP; (v) conversion of

LeClairRyan from a PC to a PLLC; and (vi) pursuit of NLG, (vii) incurrence of liabilities,

including but not limited to taxes,  related to certain of these transactions.

496.    In making these arrangements, Mr. LeClair was acting for his own personal benefit

and outside the scope of his agency relationship with LeClairRyan.

497.    As a result of these breaches, the Trustee is entitled to recover the damages suffered

by the Debtor in an amount to be proven at trial, in an amount totaling not less than $72 million.

## COUNT XXVII
### Statutory Conspiracy, Va. Code § 18.2-499, *et seq.*
### (Against the ULX Entities)

498.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

499.    From at least until in or around 2017 to until or around 2019, the ULX Entities and one or more of the LCR Officers and Directors acted in concert, agreed, associated, mutually or combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused injury and damage to the Debtor and creditors of the Debtor.

500.    The ULX Entities violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to the LCR Officers and Directors for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

501.    The ULX Entities conspired to breach the fiduciary duties the LCR Officers and Directors owed to the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

502.    The unlawful acts, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

503.    The ULX Entities' wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

504.    As a direct and proximate result of the conspiracy and agreement among the ULX Entities and one of more of the LCR Officers and Directors, the Debtor and its creditors suffered significant damages, including but not limited to the decline in enterprise value.

505.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act (the "VBCA").

506.    The Debtor suffered injury from its extended existence and the further  dissipation of its assets. As such, the Debtor's creditors lost assets that would have otherwise been available to satisfy their claims.

507.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

508.    The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code.

## COUNT XXVIII
### Common Law Conspiracy
### (Against the ULX Entities)

509.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

510.    From at least until on or around 2017 to until or around August 2019, the ULX Entities and one or more of the LCR Director and Officers acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

511.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties the LCR Board and the LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

512.    The Defendants and one or more of the LCR Officers and Directors intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

513.    As a direct and proximate result of the conspiracy and agreement among the Defendants and one or more of the LCR Officers and Directors, the Debtor and their creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

514.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

## COUNT XXIX
### Statutory Conspiracy, Va. Code § 18.2-499, *et seq.*
### (Against the ULX Entities and Mr. LeClair)

515.    From at least in or around 2015 until in or around 2019, the ULX Entities and Mr. LeClair entered into a scheme to create a billion-dollar legal enterprise that could later be marketed to outside investors.

516.    Through their principal, Mr. Reed, the UnitedLex Entities and Mr. LeClair acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action,

unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

517.    The ULX Entities and Mr. LeClair violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to Mr. LeClair for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

518.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, misappropriation of the Debtor's assets and back-office work force; misusing confidential information for their own personal gains and benefits; misappropriating trade secrets and client relationships that belonged to LeClairRyan; misrepresenting to one or more of the LCR Officer and Directors the potential benefits of the ULXP joint venture; and/or making misleading or false statements to professional consultants.

519.    These unlawful acts, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

520.    The ULX Entities and Mr. LeClair's wrongful conduct was aimed directly at damaging the Debtor and the Debtor's creditors.

521.    As a direct and proximate result of the conspiracy and agreement among the ULX Entities and Mr. LeClair, the Debtor and its creditors suffered significant damages, including but not limited to damages related to the Debtor's loss of business opportunities.

522.    The Debtor did not receive any consideration for the transfer of its assets to the ULX Entities.  Moreover, the transfer was made at a time when the Debtor was insolvent, or the Debtor was left insolvent as a result of the transfers being made.

523.    As a result of the aforesaid actions, the Debtor was unable to continue as a law firm and was thereby damaged.  Further, Defendants took valuable assets with which the Trustee could have administered the Estate and provided some payments to the creditors.

524.    The Defendants' wrongful conduct constitutes a violation of the VBCA.

525.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

526.    The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to section 18.2-500 of the Virginia Code.

## COUNT XXX
### Common Law Conspiracy
### (Against the ULX Entities and Mr. LeClair)

527.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

528.    From at least until on or around 2015 to until or around August 2019, the ULX Entities and Mr. LeClair acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

529.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, misappropriation of the Debtor's assets and back-office work force; misusing confidential information for their own personal gains and benefits; misappropriating trade secrets and client relationships that belonged to LeClairRyan; misrepresenting to one or more of the LCR Officer

and Directors the potential benefits of the ULXP joint venture; and/or making misleading or false statements to professional consultants.

530.    The Defendants and Mr. LeClair intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

531.    As a direct and proximate result of the conspiracy and agreement among the ULX Entities and Mr. LeClair, the Debtor and its creditors sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

532.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities and Mr. LeClair the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

**COUNT XXXI**
**Equitable Subordination Under 11 USC § 510(c)**
**(Against All Defendants)**

533.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

534.    As set forth above, Defendants engaged in a pattern of misconduct at the expense of the Debtor and its Estate and stakeholders, including creditors.

535.    Defendants' misconduct was inequitable and resulted in injury to the Debtor and its stakeholders, including creditors.

536.    Under the principles of equitable subordination, each of the Defendants' claims is subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

537.    Equitable subordination of the Defendants' claims is consistent with the provisions and purposes of the Bankruptcy Code.

538.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 510(c) equitably subordinating all claims filed by Defendants.

## COUNT XXXII
### Conversion
### (Against UnitedLex and ULXP)

539.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

540.    Rather than utilizing monies that had been tendered by the Debtor's clients for specific expense (the "Expense Transfers"), the Debtors instead turned said monies over to the ULX Entities.

541.    The Expense Transfers were wrongfully paid to the ULX Entities.

542.    The Trustee is entitled to immediate possession of the Expense Transfers.

543.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $1,069,510.00.

## COUNT XXXIII
### Unjust Enrichment And Disgorgement Of Expense Transfers
### (Against the ULX Entities)

544.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

545.    By accepting funds that were taken inappropriately, at least in part, from funds tendered by the Debtor's clients for specific expenses, UnitedLex and ULXP were conferred a benefit by LeClairRyan's clients.

546.    The ULX Entities knew, or should have known, that the funds received by ULXP were tendered to the Debtor by clients of LeClairRyan to be used for specific expenses.

547.     UnitedLex and ULXP accepted and retained this benefit in circumstances that render it inequitable for them to retain the benefit without paying for its value.

548.     The Trustee is entitled to damages as a result of this unjust enrichment in an amount to be proven at trial, but in an amount not less than $1,069,510.00.

## COUNT XXXIV
### Alter Ego Liability
### (Against UnitedLex and ULX Manager)

549.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

550.     ULXP and ULX Manager were alter egos of UnitedLex.

551.     There existed a unity of interest and ownership between the ULX Entities that created no separate personalities for each entity.  ULXP and ULX Manager are the adjuncts, creatures, instrumentalities, devices, stooges, or dummies of UnitedLex.

552.     Upon information and belief, UnitedLex is the sole managing member of ULX Manager.  ULX Manager owns 99% of ULXP.

553.     The ULX Entities shared staff and assets through the Shared Personnel Agreement entered into between the two entities.

554.     ULXP and ULX Manager were used to justify wrongs, protect fraudulent transfers, and to conspire with certain board members, officers, managers, and/or shareholders of the Debtor to breach their fiduciary duties owed to the Debtor and its shareholders, clients, and creditors.

555.     As such, UnitedLex formed and operated ULXP and ULX Manager as devices or shams used to disguise this wrongful conduct.

556.     Consequently, all monies that ULXP and/or ULX Manager are required to return to the Estate should be enforced against UnitedLex.

557. The Trustee reserves the right to assert claims against any other entity not named in this complaint with a direct and/or indirect beneficial interest in the ULXP enterprise.

558. The Trustee is entitled to recover all damages asserted in the Complaint, jointly and severally from UnitedLex, ULX Manager, and ULXP, which operated as UnitedLex's alter egos.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)    On Counts I and II, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the Avoidable Transfers, and directing the Defendants to pay the Trustee an amount to be determined at trial, totaling not less than $19,357,282.51, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

(b)    On Count III, awarding judgment to the Trustee, pursuant to Sections 544 and 550 of the Bankruptcy Code, Va. Code Sections 55.1-400 and 55.1-401, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount to be proven at trial, totaling not less than $19,357,282.51, plus interest, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(c)    On Count IV, awarding judgment to the Trustee, pursuant to Section 547 of the Bankruptcy Code, in an amount to be proven at trial that is not less than $17,425,405.51, plus interest, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(d)      On Counts V and VI, avoiding all of ULXP's liens asserted against the Debtor's
Estate;

(e)      On Count VII, avoiding the ULXP Note Transfer;

(f)      On Count VIII, disallowing any claim of the Defendants pursuant to section 502(d)
of the Bankruptcy Code;

(g)      On Count IX, recharacterizing ULXP's Proof of Claim No. 174 as a claim of equity;

(h)      On Counts X and XI, awarding the Trustee the full amount of the Two-Year LeClair
Transfers, totaling not less than $1,379,158, plus interest, plus the Trustee's
reasonable attorneys' fees and costs;

(i)      On Count XII, awarding the Trustee the full amount of the LeClair Transfers,
totaling not less than $2,363,965, plus interest, plus the Trustee's reasonable
attorneys' fees and costs;

(j)      On Count XIII, awarding the Trustee the full amount of the LeClair Preferential
Transfers, totaling not less than $515,224, plus interest, plus the Trustee's
reasonable attorneys' fees and costs;

(k)      On Counts XIV and XV, avoiding the transfer of the Releases and Exculpation
Rights to and for the benefit of Mr. LeClair;

(l)      On Count XVI, awarding the Trustee judgment against Mr. LeClair, pursuant to
Virginia Code Section 55.1-400, (a) avoiding the Contingent Income payments,
(b) directing the Contingent Income payments be set aside, and (c) requiring the
Defendant Mr. LeClair, as the recipient of the Contingent Income payments and/or
the person for whose benefit the Contingent Income payments were given, to return
the Contingent Income payments, or the value thereof, to the Trustee;

(m)    On Counts XVII and XVIII, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $459,687;

(n)    On Count XIX, disallowing all of Mr. LeClair's claims against the Estate;

(o)    On Count XX, awarding the Trustee the full amount of assets transferred under the Contribution Agreement including but not limited to the Intellectual Property Transfers, totaling not less than 18.5 million, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(p)    On Counts XXI and XXII, awarding the Trustee the full amount of the value of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(q)    On Count XXIII, awarding the Trustee an amount to be determined at trial, as well as punitive damages under Va. Code §§ 59.1-338 and attorneys' fees under Va. Code §§ 59.1-338.1;

(r)    On Count XXIV, awarding the Trustee damages from the ULX Entities as a result of their breaches in an amount to be proved at trial, including in the amount of any profits that the ULX Entities received in connection with the ULXP joint venture and any gains the ULX Entities received and/or continue to receive in connection with the "constellation" formed directly and/or indirectly by UnitedLex;

(s)    On Count XXV, awarding the Trustee a full accounting of the books and records of the ULX Entities as it relates to the "constellation" formed directly and/or indirectly by UnitedLex;

(t)    On Count XXVI, awarding the Trustee damages in an amount to be proven at trial, in an amount totaling not less than $72 million;

(u)     On Count XXVII, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million, as well as three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code;

(v)     On Count XXVIII, awarding the Trustee damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million;

(w)     On count XXIX, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million, as well as three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to section 18.2-500 of the Virginia Code;

(x)     On Count XXX, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million;

(y)     On Count XXXI, entering an order and judgment under 11 U.S.C. § 510(c) equitably subordinating all claims filed by Defendants;

(z)     On Count XXXII and XXXIII, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $1,069,510.00;

(aa)    On Count XXXIV, finding that ULXP was the alter ego of UnitedLex and ULX Manager and that ULXP, UnitedLex, and ULX Manager are jointly and severally liable for all damages resulting from this Adversary Proceeding;

(bb)    Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(cc)    Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(dd)     Directing the Defendants to pay forthwith all amounts awarded; and

(ee)     Granting such other relief as the Bankruptcy Court deems just and proper.

Dated:  August 25, 2021                          Respectfully submitted,


By: */s/ Erika L. Morabito*
     Erika L. Morabito (VSB No. 44369)
     Brittany J. Nelson (VSB No. 81734)
     QUINN EMANUEL URQUHART &
     SULLIVAN LLP
     1300 I Street, N.W., Suite 900
     Washington, DC 20005
     (202) 538-8334 (telephone)
     Email:  erikamorabito@quinnemanuel.com
                  brittanynelson@quinnemanuel.com

     *Special Counsel to Lynn L. Tavenner, Chapter
     7 Trustee*