**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

In re:   LECLAIRRYAN PLLC,

               Debtor.

Case No. 19-34574-KRH
Chapter 7

---

LYNN L. TAVENNER,
as Chapter 7 Trustee,

               Plaintiff,

v.

ULX PARTNERS, LLC, et al.,

               Defendants.

Adv. Pro. No. 20-03142-KRH

---

LYNN L. TAVENNER,
as Chapter 7 Trustee,

               Plaintiff,

v.

CVC Capital Partners, et al.,

               Defendants.

Adv. Pro. No. 21-03095-KRH

---

## ORDER TO SEAL OMNIBUS SETTLEMENT AGREEMENT AND RELATED DOCUMENTS, INFORMATION, AND HEARINGS

This matter is before the Court on *ULX Partners, LLC's, UnitedLex Corporation's, and ULX Manager, LLC's Motion to Seal Settlement Agreement and Related Documents, Information, and Hearings* [Adv. Docket No. 207][1] ("Sealing Motion")[2] filed by ULX Partners,

---

[1]    References to "Adv. Docket No. " shall mean docket numbers in Adversary Proceeding No. 20-03142-KRH.

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Sealing Motion.

LLC ("ULXP"), UnitedLex Corporation ("UnitedLex"), and ULX Manager, LLC's ("ULXM") (collectively, the "Defendants").  Upon consideration of the Sealing Motion on an interim basis subject to further consideration at the hearing on the 9019 Motion, the objection to the Sealing Moton filed by the United States Trustee [Adv. Docket No. 215] (the "UST Objection"), and the arguments of the parties in Court on May 25, 2022, and May 26, 2022, and finding that this Court, pursuant to 28 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018, has the authority to grant the relief requested in the Sealing Motion, and that cause exists to support the requested relief and that such relief is appropriate, it is hereby **ORDERED** as follows:

1.      Notwithstanding the applicability of the *Order Approving Procedures and Permitting Trustee to Prosecute and Compromise FAO Actions* [Case No. 19-34574-KRH, 533] as modified by the *Order Modifying Settlement Procedures for FAO Actions* [Case No. 19-34574, Docket No. 929], the Sealing Motion is hereby **GRANTED** as expressly provided herein on an interim basis, pending final hearing to be held on June 8, 2022 (the "Final Hearing").  The parties' rights and defenses with respect to the applicability of the *Order Approving Procedures and Permitting Trustee to Prosecute and Compromise FAO Actions* [Case No. 19-34574-KRH, 533] as modified by the *Order Modifying Settlement Procedures for FAO Actions* [Case No. 19-34574, Docket No. 929] as to the 9019 Motion [Adv. Docket No. 211], Adv. Proceeding No. 20-03142-KRH, and Adv. Proceeding No. 21-03095-KRH are hereby reserved pending the Final Hearing.

2.      The 9019 Motion [Adv. Docket No. 211] shall be, and hereby is, redacted on an interim basis as provided for in Attachment 1 to this Order pending further Order of this Court.

3.      All exhibits to the 9019 Motion, including without limitation the Omnibus

Settlement Agreement, shall be, and hereby are, sealed on an interim basis pending further Order

of this Court.

4.      All declarations and other evidence that the Trustee may choose to file with the

Court or offer at any hearing in connection with the 9019 Motion (collectively, the

"Declarations") shall be filed and/or offered under seal and remain under seal on an interim basis

pending further Order of this Court.

5.      To the extent any objection/response to the 9019 Motion is filed, such objection

shall be filed with the Court under seal and remain under seal on an interim basis pending further

Order of this Court.

6.      The April 19th Transcript located at Adv. Docket No. 200 in the UnitedLex Case

shall be redacted as provided for in Attachment 2 to this Order on an interim basis pending

further Order of this Court.

7.      The Mooted Motions [Adv. Docket Nos. 137, 147, 149, 150, 152, 153, 156, 168,

169, 172, 173, 174, and 175], which have been mooted by the Omnibus Settlement Agreement,

shall remain redacted and under seal, absent further Order of this Court.  The Trustee's proposed

Second Amended Complaint shall be redacted as provided for in Attachment 3, and remain

redacted, absent further Order of this Court.

8.      The transcripts of the hearings held by this Court in this matter on May 25, 2022,

and May 26, 2022 (collectively, the "May Transcripts") shall be, and hereby are, sealed, and

public viewing or disclosure of such transcripts at the Court prohibited on an interim basis

pending further Order of this Court.  Defendants may provide the May Transcripts to the parties

of the Omnibus Settlement Agreement (including their counsel), subject to a commitment of any such party to keep the May Transcripts confidential.

9.      Notwithstanding anything to the contrary herein, and except for (i) the Mooted Motions that have been sealed by this Order and (ii) the Declarations, a copy of the Omnibus Settlement Agreement, the 9019 Motion, and all other documents used to support the same, and any objection/response to the 9019 Motion (collectively, the "Settlement Pleadings") may be provided to any Person (as defined by Section 101(41) of the Bankruptcy Code) holding a claim against the Estate evidenced by (i) a proof of claim, which claim is not otherwise subject to dispute pursuant to the Bankruptcy Code and/or the Bankruptcy Rules and/or (ii) an order of the Bankruptcy Court, only upon written receipt by Paula S. Beran, Esquire at pberan@tb-lawfirm.com of a commitment of any Persons to keep such Settlement Pleadings confidential (collectively, an "Authorized Creditor").  In addition, Defendants may provide the Settlement Pleadings to an insurer of a Defendant, subject to Defendants' discretion and subject to a commitment of any such insurer to keep such Settlement Pleading confidential. Defendants may also provide the Settlement Pleadings and the Declarations to the parties to the Omnibus Settlement Agreement (and their counsel), subject to a commitment of any such party to keep the Settlement Pleadings and the Declarations confidential. The seal/limited access provided for herein, with the exception of the Mooted Motions, shall remain in full force and effect through the earlier of the date (a) upon which the Trustee submits to this Court her Chapter 7 Trustee's Final Report or (b) of further Order of this Court.

10.      To the extent an Authorized Creditor timely filed with the Court an objection to the 9019 Motion on or before June 1, 2022, and upon a written request of such objecting Authorized Creditor, the Trustee may provide such Authorized Creditor with a copy of the

Declarations upon written receipt by Paula S. Beran, Esquire at pberan@tb-lawfirm.com of a commitment to keep such Declarations confidential.

11.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.     This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

13.     This Order shall govern, and the Clerk of the Court shall therefore docket this Order, in Case No. 19-34574-KRH, Adv. Proceeding No. 20-03142-KRH, and Adv. Proceeding No. 21-03095-KRH, and this Order shall have full force and effect in each such case to the extent any of the pleadings, documents, and transcripts referenced herein have been, or will be, filed in such any such case and have been sealed or will be sealed by this Order.

14.     Within seven (7) days of the entry of this Order, the original filing party shall each redocket, as applicable, Attachment 1, Attachment 2, and Attachment 3.

Dated:     June 6, 2022                          /s/  Kevin R. Huennekens
                                        UNITED STATES BANKRUPTCY JUDGE

                                        Entered on Docket:   June 6, 2022

5

# Attachment 1

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | |
|---|---|
| In re: <br><br>      LeClairRyan, PLLC,[1] <br><br>          Debtor. | Case No. 19-34574-KRG <br><br> Chapter 7 |
| Lynn L. Tavenner, as Chapter 7 Trustee, <br><br>          Plaintiff, <br><br> v. <br><br> ULX Partners, LLC, UnitedLex Corporation, and ULX Manager LLC, <br><br>          Defendants. | Adv. Proc. No. 20-03142 (KRH) |

**TRUSTEE'S MOTION AND MEMORANDUM OF LAW FOR ENTRY OF AN ORDER
(I) APPROVING (A) JUDICIALLY MEDIATED SETTLEMENT AND (B)
COMPENSATION TO COUNSEL INCLUDING AN IMPROVIDENT PAYMENT
UNDER SECTION 328(A); AND (II) GRANTING RELATED RELIEF**

        Lynn L. Tavenner, Trustee, not individually, but solely in her capacity as the Chapter 7

trustee (in such capacity, the "**Trustee**") of the bankruptcy estate (the "**Estate**") of LeClairRyan

---

[1] The principal address of the Debtor as of the Petition Date was 4405 Cox Road, Glen Allen, Virginia 23060, and the last four digits of the Debtor's federal tax identification number are 2451.

---

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
Email:  erikamorabito@quinnemanuel.com
        brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, Chapter 7 Trustee*

PLLC ("**LeClairRyan**" and/or the "**Debtor**" and/or "**LCR**")), in the above-referenced Chapter 7 case, by counsel, respectfully states as follows in support of this motion (the "**Motion**"):

## PRELIMINARY STATEMENT

1.      After months of intense, hard fought arm's-length negotiations, and with the significant assistance and critical involvement of a judicial mediator, the Trustee, all of the defendants in two separate adversary proceedings, and certain insurers, have reached a global, comprehensive agreement that is a fair and reasonable compromise of the claims and causes of action asserted by the Trustee in those two separate adversary proceedings.  Among other things, this settlement agreement avoids the lengthy, complex, and expensive litigation of myriad disputed issues among these parties, and it is undoubtedly in the best interest of the Estate.

2.      More specifically, this Motion seeks the entry of an order (1) approving the Settlement (as hereafter defined) by and among the Trustee, on the one hand and ULX Partners, LLC, ULX Manager LLC, and UnitedLex Corporation (collectively, the "**ULX Defendants**"), CVC Advisers (India) Private Limited and/or CVC Capital Partners ("**CVC**"), Daniel Reed, Nicholas Hinton, Josh Rosenfeld, and P. Douglas Benson (collectively, with the ULX Defendants, the "**Defendants**"), Travelers Casualty and Surety Company of America ("**Travelers**"), Continental Casualty Company ("**Continental**"), and Columbia Casualty Company ("**Columbia**") (collectively, Continental and Columbia are referred to as "**CNA**" and Travelers and CNA are referred to as the "**Insurers**");[2] (2) authorizing the effectiveness of the Settlement Agreement (as hereafter defined and attached hereto as **Exhibit A**) on behalf of the Estate; (3) approving a Contingency Payment (as hereafter defined) and authorizing the Trustee to pay the same; and (4)

---

[2]  The Trustee, the Defendants, and the Insurers may be referred to hereinafter collectively as the "**Parties**."

approving the Improvident Payment (as hereafter defined) in an amount to be determined by the Court and authorizing the Trustee to pay the same.

3.      Thus, for the reasons set forth herein, the Trustee respectfully submits that the Settlement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 and grant other relief requested in this Motion.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Eastern District of Virginia has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested herein are sections 105(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule 9019, and Rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia.

## BACKGROUND

### A.  The Bankruptcy Proceeding and Prosecution of Certain Claims

8.      On September 3, 2019 (the "**Petition Date**"), the Debtor filed for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101-1532 (as thereafter amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**").  Pursuant to §§ 1007 and 1108 of the Bankruptcy Code, the Debtor operated as a debtor-in-possession.

3

9.      Per agreement between the Debtor, the United States Trustee, and ABL Alliance, LLP, the Debtor's Chapter 11 case was converted to a case under Chapter 7 of the Bankruptcy Code on October 4, 2019.  Upon conversion, Lynn L. Tavenner was appointed interim trustee, and no trustee having been elected at the meeting of creditors, she continues to serve as the Trustee.

10.      Consistent with her duties, the Trustee began investigating potential causes of action on behalf of the Estate.  Initially, the Trustee, with the assistance of her counsel, filed a *Motion for an Order Establishing Procedures Regarding the Prosecution of Actions Involving Former Attorneys and Certain Others and Memorandum in Support Thereof* (the "**FAO Procedures Motion**") (Main Dkt No. 457).[3]  The FAO Procedures Motion was approved by Order of this Court (Main Dkt No, 533), as amended/supplemented by additional Orders of this Court (Main Dkt No. 929 and 982) (collectively, the "**FAO Order**").

11.      On October 26, 2020, the Trustee filed an adversary proceeding against ULX Partners, LLC and UnitedLex Corporation, Adversary Proceeding No. 20-03142 (as amended, the "**UnitedLex Adversary Proceeding**").[4]

12.      Thereafter, the Trustee also issued demand letters to more than 200 other potential defendants, including defendants Hinton, Reed, Rosenfeld, Benson, and CVC.  The FAO Order established procedures that, among other things, allowed for a potential defendant to elect mediation prior to the Trustee filing a lawsuit.

---

[3]  "Main Dkt" refers to the docket in the main Bankruptcy Case.  "Dkt." refers to the docket in the United Lex Adversary Proceeding, while "Reed Dkt" refers to the docket in the Reed Adversary Proceeding (as hereafter defined).

[4]  On December 12, 2019 ULX Partners, LLC filed Proof of Claim No. 174 in the amount of $8,563,288 and Proof of Claim No. 175 in the amount of $3,952,025 (collectively, the "**ULX Partners Proofs of Claim**").

13.     On September 2, 2021, the Trustee filed a separate adversary proceeding (No. 21-03095-KRH) (the "**Reed Adversary Proceeding**")[5] against CVC as well as UnitedLex's Chief Executive Officer Daniel Reed and its Chief Financial Officer Nicholas Hinton. In the Reed Adversary Proceeding, the Trustee also asserted claims against Josh Rosenfeld and P. Douglas Benson.  In the Reed Adversary Proceeding, the Trustee asserted claims for, among other things, breach of fiduciary duty, statutory and common law conspiracy, and constructive fraud (the "**Reed Adversary Claims**").[6]

### B.  The UnitedLex Adversary Proceeding

14.     Since the filing of the UnitedLex Adversary Proceeding, the Trustee and the ULX Defendants have been engaged in complex and substantial litigation, including a very active motions practice, as well as extensive discovery consisting of written discovery, the exchange of hundreds of thousands of pages of documents, depositions of more than a dozen witnesses, and the retention of various experts.  In addition, throughout this case, the Court entered several pre-trial orders governing the litigation between the Trustee and the ULX Defendants.

15.



---

[5]  The Reed Adversary Proceeding and the UnitedLex Adversary Proceeding are collectively referred to herein as the "**Two Adversary Proceedings**."

[6]  The Trustee has actively pursued the Reed Adversary Proceeding since its inception.  While discovery has not yet begun, there has been an active motions practice. For example, CVC filed a Motion to Withdraw the Reference [Reed Dkt No. 19].  In addition, CVC, Reed, Hinton, Rosenfeld, and Benson have filed separate Motions to Dismiss [Reed Dkt Nos. 8, 9, 23, and 39].  These motions have been stayed while, among other things, the Motion to Withdraw the Reference was being decided by the District Court.

[7]  At the time, the only defendants in the case were United Lex and ULXP.  ULX Manager LLC was subsequently added as a defendant on August 25, 2021, with the filing of the Amended Complaint.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███   █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

17.     On August 6, 2021, the Trustee filed a Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order [Dkt No. 70] (the "**First Motion to Amend**") and on August 16, 2021, the Defendants filed an Objection to the Trustee's Motion for Leave to Amend Complaint and to Modify Pretrial Scheduling Order [Dkt No. 75] (the "**Opposition to First Motion to Amend**").

18.     On August 24, 2021, the Bankruptcy Court granted the Trustee's Motion to Amend the Complaint [Dkt No. 85] resulting in the Trustee filing a First Amended Complaint in the UnitedLex Adversary Proceeding on August 25, 2021 [Dkt No. 86] (the "**Amended Complaint**"), which added ULX Manager LLC and Gary LeClair as defendants.[8]   The First Motion to Amend,

---

[8]   The claims against Gary LeClair have since been resolved (the "**D&O Settlement**") pursuant to an Order [Dkt No. 121] entered on December 3, 2021, granting a separate Motion for Approval of Compromise and Settlement and Memorandum of Law [Dkt No. 119].

the Opposition to First Motion to Amend, and the Amended Complaint are incorporated as if fully

set forth herein.

19.    The First Amended Complaint asserted, among other things, the following causes

of action against ULX Partners, LLC, ULX Manager LLC, and/or UnitedLex Corporation:

(1)  avoidance of preferential and/or fraudulent transfers under sections 544, 547,
548 and 550 of the Bankruptcy Code;

(2) disallowance of claims under Section 502(d) of the Bankruptcy Code;

(3) lack of consideration for intellectual property under the contribution agreement;

(4) re-characterization of debt as equity;

(5) misappropriation of trade secrets;

(6) breach of fiduciary duty;

(7) statutory and common law conspiracy;

(8) an accounting;

(9) conversion;

(10) unjust enrichment; and

(11) alter ego liability.[9]

20.    After the granting of the Motion to Amend, a two-week trial in the UnitedLex

Adversary Proceeding was scheduled to begin on April 14, 2022.  [Dkt No. 144].

21.    On January 28, 2022, the ULX Defendants filed a Motion for Summary Judgment

[Dkt No. 133] (the "**Motion for Summary Judgement**") and associated documents, seeking to

dismiss certain of the UnitedLex Claims. The Trustee opposed the Motion for Summary Judgment

[Dkt No. 152] (the "**Opposition to Summary Judgment**") and the Bankruptcy Court has not yet

ruled on the Motion for Summary Judgment. The Motion for Summary Judgment, the Opposition

to Summary Judgment, and associated pleadings are incorporated as if fully set forth herein.

---

[9]  The claims asserted in the First Amended Complaint as set forth therein against the ULX Defendants are referred
to herein as the "**UnitedLex Claims**."   The Reed Adversary Claims and the UnitedLex Claims are collectively
referred to herein as the "**Claims**."

22.     On February 11, 2022, the Trustee filed a Motion for Leave to Amend the First

Amended Complaint [Dkt No. 147] (the "**Second Motion to Amend**") and associated documents

under seal, which sought to add an additional count against UnitedLex Corporation and ULX

Manager LLC.  The United Lex Defendants opposed the Motion to Amend [Dkt No. 168] (the

"**Opposition to Second Motion to Amend**") and the Bankruptcy Court has not yet ruled on the

Second Motion to Amend. The Second Motion to Amend and the Opposition to the Second Motion

to Amend are incorporated as if fully set forth herein.[10]

### C.  Judicial Mediation

23.     On February 4, 2022, at the joint request of the Trustee and the ULX Defendants,

the Court entered an Order in the United Lex Adversary Proceeding (the "**Mediation Order**")

[Dkt No. 142] appointing the Honorable Frank J. Santoro, the Chief Judge of the United States

Bankruptcy Court for the Eastern District of Virginia, as the judicial mediator (the "**Mediator**"),

to conduct a mediation (the "**Mediation**") among the Trustee, the ULX Defendants, Mr. Reed and

Mr. Hinton in their individual capacities, and Travelers, "[u]nless otherwise ordered by the

Mediator in the Mediator's sole discretion."

24.  ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

---

■   At the request of the Mediator, the Bankruptcy Court continued the hearings on both the Motion for Summary
Judgment and the Second Motion to Amend to allow the Parties sufficient time to continue negotiations in an
attempt to fully resolve the pending disputes between them.

25. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

26.     On March 5 and March 6, 2022, certain of the Parties, their respective counsel, and the Mediator participated in a two-day in-person mediation in Richmond, Virginia.  This initial mediation session lasted approximately a day and a half but was ultimately terminated by the Mediator with specific instructions given to the participating mediation parties.

27.     On March 8, 2022, the Mediator entered the "Order Directing Defendants to Produce Insurance-Related Information" [Dkt No. 177] (the "**March 8 Insurance Order**").  The March 8 Insurance Order directed the ULX Defendants, Hinton and Reed to provide the Trustee with, among other things, (1) a "full and complete copy of any and all insurance policies (including but not limited to insurance policies of Defendants' subsidiaries, parent companies, or affiliated companies) that may provide any coverage (in full or in party) for any judgments awarded against the [ULX Defendants] in this case, and/or against Mr. Hinton and/or Mr. Reed in the [Reed Adversary Proceeding] and/or settlement amounts paid by any Defendants and/or by Mr. Hinton and/or Mr. Reed in this case and/or the [Reed Adversary Proceeding]; or any fees, costs, and expenses paid or incurred in this case by any Defendant, Mr. Hinton, and/or Mr. Reed in this case and/or the [Reed Adversary Proceeding].  Such policies should also include any policies to which

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

any [ULX Defendant], Mr. Hinton, and/or Mr. Reed tendered coverage for the claims at issue herein or the [Reed Adversary Proceeding], including all excess policies regardless of the coverage position taken by the relevant insurance company"; and (2) "all coverage letters and/or denial of coverage letters from any insurance company regarding coverage under any of the policies provided [pursuant to the March 8 Insurance Order], including but not limited to coverage positions taken by the insurance company, and any non-privileged or otherwise protected response to such insurance company by the [ULX Defendants], Mr. Hinton, and/or Mr. Reed thereto."

28.     Also on March 8, 2022, the Mediator entered an "Order Directing the Exchange of Information Between the Defendants, Nicholas Hinton, Daniel Reed, the Insurance Companies and the Chapter 7 Trustee" [Dkt No. 178] (the "**Information Exchange Order**").  The Information Exchange Order required, among other things, the Trustee to provide "the identity of the Trustee's anticipated trial expert with respect to the damages the Trustee alleges were proximately caused by the [ULX Defendants, Reed and Hinton], as well as a summary of the expert's opinions to date as to the amount of such alleged damages and the basis therefore (the "**Trustee's Damages Report**").   Additionally, the Information Exchange Order required the ULX Defendants, Reed, and Hinton to identify the ULX Defendants' "anticipated expert as to damages, along with a summary of that expert's opinions to date rebutting the Trustee's Damage Report."  Finally, the Information Exchange Order also directed that the ULX Defendants provide the Mediator for his "*en camera review*, their year-end financial statements for the last two years, as well as financial statements indicating their current financial condition."

29.     On March 9, the Bankruptcy Court entered an order that the trial in this matter be continued until May 17 and also continued other pending motions in the case.  *See* Dkt No. 184.

30.





35.      On April 13, 2022, after continued hard fought and arm's-lengths negotiations, a global and comprehensive proposal was made by the Mediator to fully and finally resolve all of the pending Claims in the Two Adversary Proceedings (the "**Mediator's Proposal**").  At the direction of the Mediator, the Defendants and the Insurers had until no later than 12 p.m. on April 19, 2022, to (a) accept or reject the Mediator's Proposal in total and (b) if accepted, provide specifics as to the manner, timing, and related security for payments and/or promises to pay (collectively, the "**Settlement Payment Nuances**").

36.      The hearing on the Second Motion to Amend was to be heard by the Bankruptcy Court at 11:00 a.m. on April 19, 2022.  Approximately thirty minutes before that hearing, however, the Defendants and the Insurers agreed to the Mediator's Proposal and provided the Settlement Payment Nuances. The Trustee was asked to immediately accept or reject the Mediator's Proposal that had been accepted by the Defendants and the Insurers.  In the exercise of her business judgement, the Trustee determined that the Mediator's Proposal was in the best interest of the Estate and as such accepted the same (the "**Settlement**").  Subsequently, the Mediator directed the

Trustee, through counsel, to inform the Court at the impending hearing of the material terms of the

Settlement reached between the Parties.  As such, the material terms of the Settlement were set

forth on the record at the April 19, 2022, hearing with the participation of counsel for the ULX

Defendants, Mr. Hinton, and Mr. Reed. Thereafter, the Second Motion to Amend was continued

to allow the Parties to document the Settlement.

### D.  The Global Settlement Agreement

37.    In addition to the terms being articulated on the record at the April 18, 2022,

hearing, the Settlement is further memorialized in a certain settlement agreement (the **"Settlement**

**Agreement"**) (attached hereto as **Exhibit A**) and is incorporated as if fully set forth herein. The

key terms of the Settlement Agreement between the Parties, subject to the Bankruptcy Court's

approval, are as follows:[12]

a.    **Continental Payment:**  In consideration of the mutual releases, covenants,
representations, and undertakings of the Trustee, the Defendants, and the Insurers,
Continental shall pay the Trustee a sum of five million dollars ($5,000,000) on or
before the Closing Date.[13]

b.    **Columbia Payment:**  In consideration of the mutual releases, covenants,
representations, and undertakings of the Trustee, the Defendants, and the Insurers,
Columbia shall pay the Trustee a sum of seven million two hundred and fifty
thousand dollars ($7,250,000) on or before the Closing Date.

c.    **Travelers Payment**:  In consideration of the mutual releases, covenants,

---

[12]   The summary set forth in this section is qualified by the specific provisions of the Settlement Agreement.  To the extent there is any inconsistency between this summary and the Settlement Agreement, the Settlement Agreement governs.

[13]   All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement Agreement.

representations, and undertakings of the Trustee, the Defendants, and the Insurers, Travelers shall pay the Trustee a sum of five hundred thousand dollars ($500,000) on or before the Closing Date.

d. **<u>Defendants' Payment and Pledge of Security</u>:**  In consideration of the mutual releases, covenants, representations, and undertakings of the Trustee and the Defendants, the Defendants shall pay to the Trustee a total sum of eight million two hundred and fifty thousand dollars ($8,250,000).  This sum is scheduled to be paid in three installments.  The first installment of at least two million dollars ($2,000,000) will be paid on or before the Closing Date.  The second installment of three million dollars ($3,000,000) will be paid on or before the first anniversary of the Closing Date, and the third installment of three million two hundred and fifty thousand dollars ($3,250,000) will be paid on or before the second anniversary of the Closing Date. Both the Second Defendants' Payment and the Third Defendants' Payment are fully secured by Notes and Irrevocable Letters of Credit.

e. **<u>Starr Policy Proceeds</u>:** As part of the Settlement Agreement, neither the Defendants nor the Trustee release Starr from any obligations under the Starr Policy.  If any of the Defendants receive any proceeds from Starr under the Starr Policy related to this matter, the proceeds (net any costs of reasonable attorneys' fees incurred in pursuit of the collection of the proceeds) must be turned over and paid to the Trustee.

f. **<u>Waiver of Proofs of Claim</u>:**  ULX Partners, LLC agrees to waive the ULX Partners Proofs of Claim, the present value of which is estimated by the ULX Defendants (and not the Trustee) to be $2.4 million.

g. **Consensual Releases**:   The Settlement Agreement includes certain consensual releases of Claims amongst the Parties.

h. **Compensation of Counsel:** Consistent with the Order entered by the Bankruptcy Court on June 28, 2021 [Main Dkt. No. 937], Quinn Emanuel shall be entitled to receive 35% of the Total Settlement Payment as provided in the Quinn Retention Order (the "**Contingency Payment**").   In addition, the Settlement Agreement contemplates an Improvident Payment of an aggregate amount not to exceed $3,150,000 (the "**Improvident Payment**") to Quinn Emanuel.  By this Motion, the Trustee seeks approval of this Improvident Payment on account of the fact that, among other things, the terms of the Quinn Retention Order have proven to be improvident in view of circumstances in this matter that were not capable of being anticipated at the time of entry of the Quinn Retention Order.  The Improvident Payment is subject to the Estate receiving the Total Settlement Payment and the Defendants do not object to the Improvident Payment.  Furthermore, the Trustee maintains that Quinn Emanuel provided necessary additional non-contingent services (the "**Additional Services**") that arose from the Two Adversary Proceedings that otherwise would have been compensated on an hourly basis had the Trustee and Quinn Emanuel known all of the facts and circumstances regarding this matter.  Notwithstanding the fact that Quinn Emanuel asserts that the value of the Additional Services exceeds the amount of the Improvident Payment, the Settlement Agreement provides that Quinn Emanuel agrees to limit the amount of the Improvident Payment to $3,150,000 or such other amount otherwise approved by the Bankruptcy Court.

15

    i.    **No Admission of Liability By Any of the Parties**

    j.    **Dismissal**:  The Two Adversary Proceedings will be dismissed with prejudice.

38.    The Settlement, as documented in the Settlement Agreement, was the product of an arms-length negotiation, and globally resolves, on terms beneficial to the Estate, complicated litigation in the Two Adversary Proceedings, the continued pursuit of which would be costly and time consuming and pose the risk of an unfavorable result.

## MEMORANDUM OF LAW

39.    The Trustee believes, in her business judgment and after substantial analysis, that entering into the Settlement Agreement is reasonable under these circumstances and respectfully requests that the Court approve the Settlement (and related Settlement Agreement), including the Improvident Payment, and all other relief requested in this Motion.  The Settlement (as documented in the Settlement Agreement) will allow the Estate and all interested parties to avoid the uncertainty and costs of extensive litigation to determine the recovery on the Claims and eliminates the uncertainty of litigation and the risks of collectability of any judgment that may be obtained.  Most importantly, the Settlement will allow the Estate to proceed towards a meaningful distribution to creditors on a more expedited timeline.  Accordingly, for the following reasons, the Trustee believes that entry into the Settlement Agreement is in the best interests of the Estate, its creditors, and other parties in interest and that the Settlement (and related Settlement Agreement) should be approved by the Bankruptcy Court.

    **A. Entry into the Settlement Agreement Is Fair and Equitable and in the Best Interest of the Estate**

40.    Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  The United States Supreme Court has noted that "[c]ompromises are a 'normal part

of the process of reorganization.'" *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (citing *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).  In *TMT Trailer*, the Supreme Court stated that compromises and settlements must be "fair and equitable." 390 U.S. at 424; *see also In re Loudoun Heights, LLC*, No. 13-15588, 2014 WL 2928110, at *8 (Bankr. E.D. Va. June 27, 2014) (same); *Shaia v. Three Rivers Wood, Inc. (In re Three Rivers Wood, Inc.*), No. 98-38685, 2001 WL 720620, at *6 (Bankr. E.D. Va. Mar. 20, 2001) (same); *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (same); *In re Austin*, 186 B.R. 397, 400 (Bankr. E.D. Va. 1995) (same).

41.     Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. *See In re Bond*, 16 F.3d 408 at *3 (4th Cir. 1994) (unpublished table decision) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy") (citations omitted).  The Trustee, in her business judgment, believes that the Settlement Agreement represents a fair and reasonable compromise of the disputed issues regarding the Claims, as set forth in greater detail herein.

42.     The decision whether to approve a compromise under Rule 9019 is committed to the discretion of the Court, which must determine if the compromise or settlement is "fair and equitable".  *In re Health Diagnostic Lab., Inc*., 2016 Bankr. LEXIS 3724 (Bankr. E.D. Va. Oct. 14, 2016); *In re Alpha Nat. Res. Inc.*, 544 B.R. 848, 856 (Bankr. E.D. Va. 2016); *In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997).  The Court is not required to conduct a "mini-trial" of the underlying case, but instead must only decide whether the settlement proposed falls "below the lowest point in the range of reasonableness." *In re Austin*, 186 B.R. at 400 (citations omitted); *accord In re Alpha Nat. Res. Inc.*, 544 B.R. at 857.

43.     Factors that the Court should consider when evaluating a settlement under Bankruptcy Rule 9019 include: (a) "the probability of success in litigation;" (b) "potential collection struggles;" (c) "the complexity, time and expense involved in litigating the matter;" and (d) whether the proposed compromise is fair and equitable to the debtor, its creditors, and other parties in interests. *Loudoun Heights*, 2014 WL 2928110, at *9 (citations omitted); *see also TMT*, 390 U.S. at 424; *Three Rivers Wood*, 2001 WL 720620, at *6 (same); *In re Alpha Nat. Res. Inc.*, 544 B.R. at 857; *In re Frye*, 216 B.R. at 174.

44.     Additionally, the Court must determine whether the proposed settlement is in the best interests of the Estate. *Three Rivers Wood*, 2001 WL 720620, at *6 ("a compromise or settlement will most likely gain approval if it is both 'fair and equitable,' as well as representative of the best interests of the estate as a whole") (citations omitted); *Frye*, 216 B.R. at 174 ("In order to approve a compromise, this court must look at various factors and determine whether the compromise is in the best interest of the estate and whether it is fair and equitable."); *In re Energy Coop. Inc.*, 886 F.2d 921, 927 (7th Cir. 1989) ("The benchmark for determining the propriety of a bankruptcy settlement is whether the settlement is in the best interests of the estate.").

45.     The factors that courts consider in determining whether a settlement is in the best interests of a bankruptcy estate are similar to the factors examined to determine whether the settlement is fair and equitable. *See Parker v. Bullis* (*In re Bullis*), 515 B.R. 284, 288 (Bankr. E.D. Va. 2014) ("The best interests of the estate are met by considering the same factors a court considers in reviewing any proposed settlement: (1) the probability of success on the merits in the litigation; (2) possible difficulties of collecting any judgment which might be obtained; (3) the complexity, expense, and likely duration of any ensuing litigation; and (4) the interests of the creditors, giving proper deference to their reasonable views.") (citations omitted).

46.     Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT*, 390 U.S. at 425. However, "the settlement may be approved even if the court finds it likely that the trustee would ultimately succeed in the litigation." *In re Austin*, 186 B.R. at 400.

47.     When reviewing a proposed settlement, the Court may consider the Trustee's business judgment and the opinions of the other parties to such settlement, and the Court should not substitute its judgment for that of the Trustee. Instead, the Court must determine "whether the settlement falls below the lowest point in the range of reasonableness." *Three Rivers Wood*, 2001 WL 720620, at *6 (citing *Austin*, 186 B.R. at 400). Where a proposed settlement is not below the lowest point of what is fair and reasonable and represents the best interests of the estate as a whole, the court should approve it pursuant to Bankruptcy Rule 9019. *Id*.

48.     In this case, the Trustee believes that the Settlement is fair, equitable, in the best interests of the Estate, appropriate in the Trustee's business judgment, and easily falls within the reasonable range of outcomes. As set forth above, the Settlement (as documented in the Settlement Agreement) is the culmination of more than several months of negotiations among the parties, with the Mediator's assistance and direction, and represents a global resolution of the Claims. The Trustee, in the exercise of her business judgment and in consultation with her professionals and the Mediator, believes that the Settlement (as documented in the Settlement Agreement) is a fair, reasonable, and responsible compromise and resulted in maximum value to the Estate for the reasons that follow.

49.     First, the Settlement (as documented in the Settlement Agreement) is the result of extensive good faith and arms-length negotiations among the Trustee, the Defendants, and the Insurers. It was aided and directed by the substantial participation and input of the Mediator and

represents a result well above the lowest bound of the range of reasonableness.  It in fact is the

Mediator's Proposal. This Settlement is not collusive and represents a fair compromise of the

disputes.

50.    Assuming this Court approves this Motion and authorizes the Trustee to enter into

the Settlement, the Trustee will receive (i) fourteen million seven hundred fifty thousand dollars

($14,750,000) on or before the Closing Date; and (ii) an additional six million two hundred fifty

thousand dollars ($6,250,000) after the Closing Date (collectively, the "**Settlement Payment**

**Cash Funds**").  These amounts, which are a sum certain, are potentially greater than any recovery

the Estate would ultimately receive even if the Two Adversary Proceedings proceeded to

judgement and is well above the lowest bound of the range of reasonableness.

51.    Second, both before and during the Mediation, the Trustee conducted due diligence

on the enforcement and ultimate collectability of potential judgments against the Defendants.

With the assistance of the Mediator and her counsel, the Trustee determined, among other things,

that proceeds from the Insurance Policies for a settlement and the payments received from the

Defendants were the best source of payment to compensate the Estate for damages associated with

the Claims.  Significantly, the majority of the Settlement Payment Funds are available to the

Trustee on the Closing Date, allowing the Trustee and her professionals to focus time and effort

on other important matters in this Bankruptcy case, including but not limited to the review, analysis

and resolution of alleged administrative expenses and pre-petition claims.

52.    Third, the consideration in the Settlement Agreement represents a fair and

reasonable compensation to the Estate for the Claims in light of the uncertainty and risk associated

with time-consuming and expensive litigation that could result in an unfavorable outcome.

Specifically, the Trustee preserves additional Estate resources that would have been spent on,

among other things, a two-week trial in the United Lex Adversary Proceeding, prosecuting the

Reed Adversary Proceeding, and any associated appeals.   Given the scope and complexity of the

United Lex Adversary Proceeding, the Trustee and her counsel had anticipated that the Reed

Adversary Proceeding could have been equally time-consuming and complicated. Moreover, in

agreeing to the releases provided for in the Settlement Agreement, the Trustee and all Parties

contemplated the value of the Claims being released.

53.    Fourth, the Settlement as directed by the Mediator and memorialized in the

Settlement Agreement is fair and equitable to the Estate, its creditors, and other parties in interest.

The value of the Settlement, which includes the Settlement Payment Cash Funds and the waiver

of the ULX Partners Proof of Claims, represents a result well above the lowest bound of the range

of reasonableness and does not prejudice other creditors or parties in interest.   To the contrary,

the Settlement should allow the Trustee to make a meaningful distribution to creditors.   Most

importantly, the Settlement will allow the Estate to proceed towards a more expeditious resolution,

rather than prolonged litigation (and potential appeals) in the Two Adversary Cases.

54.    Finally, the Improvident Payment was unilaterally directed by the Mediator as part

of the Mediator's Proposal as a material and integral term of the Settlement and as such is in the

best interest of the Estate.  Absent approval of the Settlement Agreement, Quinn Emanuel would

otherwise seek compensation on an hourly basis by the Estate in an amount that would exceed

$3,150,000.  Furthermore, Quinn Emanuel has agreed to limit the amount of the Improvident

Payment to the lesser of $3,150,000 or an amount otherwise approved by the Bankruptcy Court

As such, the Settlement provides a sum certain to be recovered by the Estate and defers to this

Court as to the ultimate allowance of the Improvident Payment to Quinn Emanuel in an amount as

determined by this Court but in no instance greater than $3,150,000.

21

55.    Therefore, for the foregoing reasons, the Trustee respectfully submits that the Settlement satisfies the standards for approval under applicable law and that the Court should therefore approve the Settlement Agreement pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019.

**B. The Improvident Payment is Permissible Under the Bankruptcy Code**

56.    In addition to the Improvident Payment being directed by the Mediator and being a material and integral part of the Settlement, the Trustee further maintains that Quinn is entitled to the Improvident Payment pursuant to section 328(a) of the Bankruptcy Code.   The Improvident Payment meets the standards of section 328(a) ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ More specifically, neither Quinn Emanuel nor the Trustee could have anticipated certain developments in this case that required Quinn Emanuel to invest significantly more hours and expenses without any assurance of compensation.   Further, the Improvident Payment was part of the Mediator's Proposal and the Mediator, a sitting bankruptcy judge, would not have proposed anything that was contrary to the provisions of the Bankruptcy Code.

57.    These circumstances satisfy the requirements of Bankruptcy Code Section 328. Courts have recognized that their "power to modify a compensation agreement under § 328 includes the power to increase as well as decrease the agreed-upon compensation." *In re Colorado Mountain Cellars, Inc.*, 139 F.3d 911 (10th Cir. 1998) (citations omitted).   Historically, courts have done so "where the parties did not foresee 'the time, the pressures, or the complexity of [the] case or the phenomenal results achieved.'" *In re Omegas Grp., Inc.*, 195 B.R. 875, 880 (Bankr. W.D. Ky. 1996) (citing *In re Warrior Drilling & Eng'g Co.*, 9 B.R. 841, 847 (Bankr.N.D.Ala.),

modified on other grounds, 18 B.R. 684 (Bankr. D.C. Ala.1981)). While case law is not abundant, the legislative history of section 328 specifically confirms that fees may be increased under the statute. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 328-29 ("The Court's power includes the power to increase as well as decrease the agreed upon compensation.").

58.    Here, there were unique and unpredictable circumstances justifying the Improvident Payment. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ *See, e.g., In re Home Exp. Inc.*, 213 B.R. 162, 167 (Bankr. N.D. Cal. 1997) (increasing professionals' fees because Debtor's "managerial vacuum" was not capable of being anticipated); *In re Western Monetary Consultants, Inc.*, 143 B.R. 780, 782 (Bankr. D. Colo. 1992) (awarding additional fees to accountant under Section 328 where certain necessary documentation was not provided in the correct form).

59.    In awarding an increase in attorney fees' pursuant to section 328(a), courts also consider several other factors, including but not limited to, whether (1) the results obtained went beyond reasonable expectations, (2) the attorney assumed great risk in taking on representation of the case, (3) the attorney persevered where others would have curtailed their efforts, (4) the attorney's efforts resulted in significant infusion of funds into the debtor's estate, and/or (5) the

litigation was voluminous and complex.  *See, e.g., In re Malcon Developers,* 138 B.R. 677, 680-81 (Bankr. N.D. NY 1992); *In re Warrior,* 9 B.R. at 847; *In re Land,* 138 B.R. 66,71 (D. Neb. 1992).  Several of these additional factors were met in this case as well, and therefore weigh in favor of the Bankruptcy Court approving the Improvident Payment set forth in the Settlement Agreement.  The Trustee, in the exercise of her business judgment, believes, among other things, that Quinn persevered where others would have curtailed their efforts. ████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████ Notwithstanding the foregoing, should the Bankruptcy Court approve this Motion, Quinn's substantial efforts will cause significant infusion of funds into the Estate.

60.    Finally, although not a requirement of section 328(a) and not in any way to detract from the authority of this Court, the Trustee, in the exercise of her business judgment, believes the amount of the Improvident Payment to be reasonable given her understanding of the time expended to persevere where others would have not, especially in consideration of the amount to now be recovered by the Estate.[14]

61.    Thus, the Trustee respectfully requests that the Court authorize (a) the Improvident Payment to Quinn Emanuel in an amount of $3.15 million or an amount otherwise determined by this Bankruptcy Court and (b) the Trustee to pay the same as provided for in the Settlement Agreement.

---

[14]  The Trustee anticipates filing declaration(s) at the appropriate time to sufficiently enable the Bankruptcy Court to, among other things, perform its own gatekeeping role in connection with determining the reasonableness of the Improvident Payment.

62.   Judge Phillips' reasoning in approving a global settlement agreement in *In re Toys "R" US, Inc*., et. al., No. 17-34665 ("**TRU**") is instructive here as to certain threshold issues. Specifically, the settlement agreement in TRU included a provision that awarded a substantial contribution payment to counsel of an ad hoc group of creditors.  *See* TRU Dkt No. 4803 ("**TRU Order**"), attached as **Exhibit C**.[15]  In approving the substantial contribution, Judge Phillips found that it was a "material and integral portion" of the TRU settlement agreement and that the settlement was "fair and reasonable and adequately supported by the declarations and exhibits submitted by members of the group which have sufficiently enabled the Court to perform any gatekeeping role it may have in connection with determining the reasonableness" of the substantial contribution payment.  *See* TRU August 7, 2018 Transcript at p. 221, attached as **Exhibit D**. Alternatively, Judge Phillips also held that the payment was authorized pursuant to section 503(b) of the Bankruptcy Code.  *See* TRU August 7, 2018 Transcript at p. 221; TRU Order at 6-7.

63.   Likewise, in this case, payment of the Improvident Payment is a material and integral part of the Settlement Agreement.  As described above, the Improvident Payment was part of the Mediator's Proposal; it is a critical component of the Settlement Agreement.[16]  Further, just like in TRU, the Bankruptcy Court here may exercise its own gatekeeper role of determining whether the Improvident Payment is warranted and reasonable.  Thus, pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, the Bankruptcy Court should approve the Settlement Agreement, regardless of whether the Improvident Payment separately qualifies as a

---

[15]   While the Trustee recognizes that a substantial contribution claim is brought under section 503(b) and Quinn is seeking to be paid through the Settlement Agreement under section 328(a), the analysis of approving these extraordinary payments as a material and integral part of a settlement agreement is similar in both cases.

[16]   The Settlement Agreement makes clear that, while the Improvident Payment is a critical component of the Settlement, both the allowance and the amount of the Improvident Payment is left to the discretion of the Bankruptcy Court.  Settlement Agreement at ¶ 3(h).

payment under section 328(a) of the Bankruptcy Code.  But, even if the Bankruptcy Court rejects this contention, as set forth above, the Improvident Payment should be approved because the payment also meets the standards set forth in section 328(a).

## **CONCLUSION**

64.     All Defendants support the approval of the Settlement, and the Trustee, in the exercise of her business judgment, supports all of the relief sought herein.


**WHEREFORE**, the Trustee respectfully requests that the Court grant the Motion and thereby (a) approve the Settlement; (b) authorize the effectiveness of the Settlement Agreement on behalf of the Estate; (c) approve the Contingency Payment and authorize the Trustee to pay the same; (d) approve the Improvident Payment in an amount to be determined by the Court and authorize the Trustee to pay the same; and (e) provide such other relief as is just and proper.


DATED:        May 18, 2022              Respectfully submitted,


                                        _/s/ Erika L. Morabito_____
                                        Erika L. Morabito (VSB No. 44369)
                                        Brittany J. Nelson (VSB No. 81734)
                                        QUINN EMANUEL URQUHART & SULLIVAN
                                        1300 I Street, N.W., Suite 900
                                        Washington, DC 20005
                                        (202) 538-8334 (telephone)
                                        Email:        erikamorabito@quinnemanuel.com
                                                      brittanynelson@quinnemanuel.com

                                        *Special Counsel to Lynn L. Tavenner, Chapter 7
                                        Trustee*

26

## **CERTIFICATE OF SERVICE**

I certify that on this 18th day of May 2022, a true copy of the foregoing Motion was filed under seal pending this Court's ruling on the request by the United Lex Defendants to seal aspects of the 9019 Motion.  Thereafter, the foregoing Motion will be served as provided in said ruling.

*/s/ Erika L. Morabito*
Erika L. Morabito

# Attachment 2

<pre>
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF VIRGINIA (RICHMOND)
 2
    In Re:                             )   Case No. 19-34574-KRH
 3                                     )   Richmond, Virginia
    LECLAIRRYAN PLLC,                  )
 4                                     )
             Debtor.                   )   April 19, 2022
 5                                     )   11:21 a.m.
    ------------------------------- )
 6                                     )
    LYNN L. TAVENNER, AS CHAPTER 7     )   Adv. Proc. Case No.
 7   TRUSTEE,                          )   20-03142-KRH
                                       )
 8             Plaintiff,              )
                                       )
 9   v.                                )
                                       )
10   ULX PARTNERS, LLC, ET AL.,        )
                                       )
11             Defendants.             )
    ------------------------------- )
12
                          TRANSCRIPT OF HEARING ON
13              MOTION TO AMEND FIRST AMENDED COMPLAINT
                 BEFORE THE HONORABLE KEVIN R. HUENNEKENS
14                   UNITED STATES BANKRUPTCY JUDGE

15   APPEARANCES:
    For the Chapter 7 Trustee:      PAULA BERAN, ESQ.
16                                   TAVENNER & BERAN, PLC
                                     20 North 8th Street
17                                   Richmond, VA 23219

18   Special Counsel for the Chapter ERIKA L. MORABITO, ESQ.
    7 Trustee:                      BRITTANY J. NELSON, ESQ.
19                                   QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
20                                   1300 I Street NW
                                     Suite 900
21                                   Washington, DC 20005

22                                   DAVID M. GRABLE, ESQ.
                                     MATTHEW R. SCHECK, ESQ.
23                                   QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
24                                   865 South Figueroa Street
                                     10th Floor
25                                   Los Angeles, CA 90017
</pre>

```
 1  For ULX Partners, LLC:          J. GREGORY MILMOE, ESQ.
                                     GREENBERG TRAURIG, LLP
 2                                   One Vanderbilt Avenue
                                     New York, NY 10017
 3
                                    DAVID G. BARGER, ESQ.
 4                                   THOMAS J. MCKEE, JR., ESQ.
                                     GREENBERG TAURIG, LLP
 5                                   1750 Tysons Boulevard
                                     Suite 1000
 6                                   McLean, VA 22102

 7  Special Insurance Counsel for  STEPHEN R. MYSLIWIEC, ESQ.
    ULX Partners:                    MILLER FRIEL, PLLC
 8                                   2445 M Street NW
                                     Suite 910
 9                                   Washington, DC 20037

10  For the U.S. Trustee:           SHANNON F. PECORARO, ESQ.
                                     U.S. DEPARTMENT OF JUSTICE
11                                   OFFICE OF THE UNITED STATES
                                     TRUSTEE
12                                   701 East Broad Street
                                     Suite 4304
13                                   Richmond, VA 23219

14

15

16

17

18

19

20

21  Transcription Services:         eScribers, LLC
                                     7227 North 16th Street
22                                   Suite #207
                                     Phoenix, AZ 85020
23                                   (973) 406-2250

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

                            Colloquy                                    3

     1              THE COURT OFFICER:  The United States Bankruptcy Court
     2     for the Eastern District of Virginia is now in session.  The
     3     Honorable Kevin R. Huennekens presiding.  Please come to order.
     4              THE CLERK:  Item number 1, Tavenner v. ULX Partners
     5     LLC, motion to amend first amended complaint.
     6              THE COURT:  Good morning.
     7              MS. MORABITO:  Good morning, Your Honor.
     8              MR. BARGER:  Morning, Your Honor.
     9              MS. MORABITO:  Good morning, Your Honor; Erika
    10     Morabito, Quinn Emanuel, special counsel to the Chapter 7
    11     trustee.  With me this morning, I have my colleagues, Ms.
    12     Brittany Nelson, Mr. Dave Grable, Mr. Matt Scheck.  Can you
    13     hear me okay, Your Honor?
    14              THE COURT:  I can, thank you.
    15              MS. MORABITO:  Thank you, Your Honor.  And I also have
    16     Ms. Tavenner and Ms. Beran together, and hopefully you can see
    17     them on your screen.
    18              First, the parties want to thank the Court for
    19     accommodating us.  I know you have a crazy busy docket this
    20     morning.  The good news is, is that we do believe the parties
    21     have reached a settlement.  So while we were up preparing for
    22     the contested hearing today, we did get a call from Chief Judge
    23     Santoro, the Court appointed mediator in this case.  I received
    24     a call roughly about thirty-five or forty minutes ago.  And so
    25     we are ready to -- not asking for the Court for approval, but

Colloquy                                                                4

1  Judge Santoro did ask that I put the terms of the settlement on

2  the record for Your Honor to hear, if that's okay with you,

3  because obviously we can dispel with the motion to amend and

4  the motion to seal.

5          THE COURT:  You may.  Please proceed.

6          MS. MORABITO:  Thank you, Your Honor.  And I apologize

7  if it's a little disjointed.  I have chicken scratch from my

8  call with Judge Santoro, so hopefully I'm going to get all the

9  terms in.  But I know that I have Greenberg Traurig on here to

10 catch me if I miss something.

11         Your Honor, this is what the deal is comprised of.  It

12 is a twenty-one-million-dollar cash settlement to the estate.

13 Those dollars would come as follows:  there would be 12.25

14 million contributed by CNA, which is the primary insurance

15 carrier in this case.  There will be another 500,000 --  and

16 that's an estimate, and I'll get to that in a minute -- which

17 will be contributed by Travelers Insurance Company.  The reason

18 that's an estimate is that policy is almost exhausted.  The

19 estimate that's left by Travelers is roughly 500,000.  We can

20 count on the 500,000 coming into the estate, however, because

21 whatever shortfall there is from Travelers, UnitedLex has

22 agreed to make up that difference.  So we can count on the

23 500,000.

24         The third component of the 21 million is 8.25 million

25 dollars coming in from a combination of UnitedLex and CVC.

1   That would be the total of twenty-one million dollars coming

2   into the estate by way of cash.

3          The way that will be broken down, Your Honor -- and

4   this is all the mediator's proposal.  The way that that would

5   be broken down would be at closing -- and we'll talk about when

6   closing is in a minute, but at closing, the insurance companies

7   would be required to provide their full contribution.  So what

8   we know would come in at closing would be 12.25 from CNA and

9   500,000 dollars from Travelers, and 2 million dollars from

10  UnitedLex and CVC.  And to the extent Travelers is short,

11  UnitedLex and CVC will make up that additional shortfall of the

12  500,000.  So at closing, the estate would receive 14.75

13  million.

14         Subsequent to closing twelve months from settlement,

15  the estate would receive another three million dollars from

16  UnitedLex and CVC.  We are told by Chief Judge Santoro, that

17  that three million dollars will be fully secured by an

18  irrevocable letter of credit.  The last installment would be

19  3.25 million dollars from UnitedLex and CVC, and that would be

20  required to be paid twenty-four months from the date of

21  settlement.  And that, too, would be fully secured by an

22  irrevocable letter of credit.

23         Our understanding is there would be no risk, then, to

24  the estate or to the trustee that those remaining payments of

25  6.25, would come in.



Colloquy                                                                 7

1           The other component to this is UnitedLex Partners

2    filed a claim, claim number 174, in the amount of 8,563,288

3    dollars.  And they also filed claim number 175, again, ULX

4    Partners, and that claim is in the amount of 3,952,025 dollars.

5    The total of those two claims, Your Honor, is 12,515,308

6    dollars.  Currently, those claims are purported as secured

7    claims.  Part of the litigation against UnitedLex was a

8    recharacterization of those claims to unsecured.

9           As part of this deal, and in addition to the 21-

10   million-dollar cash settlement, ULX Partners has agreed to

11   waive the full amount of the 12,515,308 claim.  It will not be

12   a secured, nor will it be an unsecured, or any other claim.

13   They will not be entitled to a 502(h) claim, and none of the

14   defendants will have any claims against the estate.

15          Another component of the agreement -- and the mediator

16   wanted me to state on the record, this was a unilateral

17   mediator's proposal; it was not suggested, nor requested by the

18   Chapter 7 trustee, or by myself or anybody at Quinn Emanuel.

19   For reasons that the mediator said he would be happy to answer

20   any questions from Your Honor, the United States Trustee, or

21   anybody else, the recommendation is that Quinn Emanuel would

22   receive 10.5 million dollars from the settlement proceeds into

23   the estate.  And that would be in lieu of the current

24   agreement, which is the thirty-five percent under the

25   contingency arrangement.

Colloquy                                                            8

1         In terms of timing of the settlement, the mediator is

2    requiring the parties, absent an extension by the mediator

3    only, to have documents executed.  So that would be the full

4    settlement agreement and the 9019, which trustee's counsel will

5    draft.  Those need to be executed by Friday of next week, which

6    is April 29th.  Our anticipation and hope is that we would be

7    in a position to file those with the Court on or before that

8    Monday, which is May 2nd.

9         We currently don't have an omnibus hearing scheduled

10   in this case; we have one on May 3rd and one on May 31st.  The

11   trustee would ask that since the Court had blocked off for

12   trial May 16 through May 27th, if the Court had a date

13   available that week of May 23rd that was supposed to be trial,

14   it would allow enough time for us to get regular notice out on

15   the 9019 and still be able to have a specially set hearing the

16   week of the 23rd so that we can get this to closing and get

17   money into the estate as soon as possible.

18        I think I have covered everything that Chief Judge

19   Santoro had asked me to cover and to put on the record.  Before

20   I turn it over for affirmation from the defendant's counsel,

21   does Your Honor have any questions?

22        THE COURT:  A couple of questions.  And the first

23   question is, if we proceed with the schedule that you just

24   outlined, when would you anticipate closing occurring?

25        MS. MORABITO:  As soon as the order's entered in

 1  connection with the 9019.

 2          THE COURT:  Okay.  Second question, I assume that

 3  there will be mutual releases exchanged among all of the

 4  parties.  My question --

 5          MS. MORABITO:  That's correct.  That is --

 6          THE COURT:  -- is that on the --

 7          MS. MORABITO:  I'm sorry.

 8          THE COURT:  -- is that on the third anniversary?

 9          MS. MORABITO:  That is correct.

10          THE COURT:  Okay, thank you.  I also assume that in

11  this kind of an arrangement, like most arrangements, that

12  there'd be a provision that no parties admitting any liability

13  and that this is a business decision to resolve the case.

14          MS. MORABITO:  That's correct, Your Honor.

15          THE COURT:  One final question.  Do I have permission

16  to talk with the mediator about the unilateral proposal that he

17  has made regarding the change in the fee structure?

18          MS. MORABITO:  You have permission from Quinn Emanuel,

19  and the mediator has indicated you have permission from him.

20  And I would turn it over to Greenberg Traurig to see if they

21  have any objection to that request for permission.

22          THE COURT:  I will ask them the same question in just

23  a moment.  And my last question is, is the trustee agreeable to

24  the change in the compensation structure?

25          MS. MORABITO:  Ms. Tavenner is on the phone.  If you

1  all want to release your mute button, I would ask Lynn to

2  please speak to that.

3          THE COURT:  Ms. Tavenner?

4          MS. BERAN:  Your Honor for the record, Paula Beran on

5  behalf of the trustee.  The trustee is here and is prepared to

6  answer any questions.  The way the trustee understands is it is

7  technically not a change in compensation under the terms of the

8  engagement letter and court-authorized employment.  Instead,

9  from the mediator's perspective, it is an equalizer for reasons

10 that the mediator articulated to Ms. Tavenner in connection

11 with a potential resolution.  At the point in time when that

12 was articulated to Ms. Tavenner, we didn't know what the

13 ultimate resolution was going to be, but we knew, if there was

14 a resolution, it would include a type of equalizer.  And for

15 those reasons, based on the fact that it is part of the

16 mediator's proposal, Ms. Tavenner has no objection to it.



1   ████████████████████████████.

2          THE COURT:  All right.  Thank you.  Those are all the

3   questions I have.

4          Mr. Barger, are you going to speak on behalf of

5   Greenberg?

6          MR. BARGER:  Your Honor, I think Mr. Milmoe will speak

7   on our behalf.  The only thing I did want to add is I wanted to

8   introduce Stephen Mysliwiec, who is our outside insurance

9   counsel from the firm of Miller Friel, who was instrumental in

10  the show of diplomacy in resolving it.  And he is available,

11  since he was present with Ms. Morabito, should we need

12  additional confirmation.  But I did want to note his and the

13  trustee's efforts to resolve it.  Thank you.

14         THE COURT:  Thank you very much, sir.

15         Mr. Milmoe.

16         MR. MILMOE:  And thank you, Your Honor.  For the

17  record, Gregory Milmoe for Greenberg Traurig on behalf of the

18  defendants.

19         Ms. Morabito's presentation was accurate in every

20  respect, except for one thing at the very end.  And that was

21  the timing of the releases.  It is our understanding, and as

22  Ms. Morabito outlined, we're providing irrevocable letters of

23  credit to back the payments coming due in the future.  And we,

24  therefore, anticipated and would expect to get releases at the

25  closing.

1          Other than that, I thought the presentation was, as

2   usual, succinct and spot on.  And we would also like to express

3   our gratitude to Chief Judge Santoro for his enormous efforts

4   in bridging the fairly significant gaps between the parties.

5          THE COURT:  Well, obviously, I don't know what's been

6   going on with the mediation.  I do know that each of us, as

7   judicial mediators, are required to file time statements with

8   the Fourth Circuit every month as far as our mediation hours

9   are concerned.  I never thought I would have to keep track of

10  my time anymore.  But in any event, I saw his report go in this

11  month, and it looks to me like I'm eternally indebted to him

12  for the time he has spent with regard to this.  So I share your

13  gratitude to him for what he's been able to accomplish.  It's

14  no mean feat.  And I know that it was difficult for the parties

15  to get to a resolution, but I congratulate everyone on doing

16  that.

17         Is there anything further, Mr. Milmoe?

18         MR. MILMOE:  No, Your Honor.  We would concur with

19  your request about permission to speak with the mediator.  And

20  I think that was the only outstanding item.

21         THE COURT:  Okay.  My conversation would be limited to

22  the one issue, by the way; I'm not going to get into any of the

23  confidential discussions that the parties had with the

24  mediator.

25         Is there any other party that wishes to be heard in

 1  connection with this matter?

 2          MS. PECORARO:  Yes, Your Honor.  Shannon Pecoraro for

 3  the United States Trustee's office.  Can --

 4          THE COURT:  Please don't object.

 5          MS. PECORARO:  Your Honor, I can't speak as to whether

 6  we would object or not object.  I'm just finding out about this

 7  deal about twenty minutes ago, and I have not had an

 8  opportunity to discuss it with my superiors.  So I just wanted

 9  to put on the record that we reserve any and all rights until

10  we can actually see the terms of the deal.

11          THE COURT:  I understand.  Thank you very much for

12  that.  I do appreciate it.

13          Does any other party wish to be heard?

14          All right, so Ms. Morabito, I think you quite

15  accurately figured out that my docket is pretty clear for those

16  two weeks that we had previously set aside.  So I'm sure that

17  you can get a date from my courtroom deputy.  I'm loathe to

18  give dates out my own self because I always screw it up.  So if

19  you would, please make arrangements with Ms. Gary, and get a

20  date, and I'll make sure that she understands she can give you

21  whatever date is most convenient for the parties during that

22  time slot that we had otherwise set aside so that we can give

23  the proper notice to all of the creditors in the case.

24          Is there any other business we need to take up in this

25  matter today?

1           MS. MORABITO:  There's not, Your Honor, and I just

2    want to conclude again with thank you.  I know this has not

3    been an easy case.  It's gone on for a long period of time.

4    The Court is certainly, in addition to Judge Santoro, who did

5    an extraordinary job -- sometimes when the judicial branch

6    pushes the parties the way in which you all did, we get to a

7    resolution that I guess nobody's thrilled with, but I guess

8    that means it's a good settlement.  So again, we are very

9    appreciative of the efforts.  Judge Santoro put in weekends and

10   late nights and his law clerk.  Unfortunately, he's gone to

11   another firm, but his law clerk, Jake Lange (ph.), was

12   exceptional as well.  So thank you, Your Honor again.

13          And thank you to the defendants.  I know this has been

14   a difficult case for all of us, but I do appreciate everybody

15   coming together to work at the end, including Mr. Mysliwiec --

16   and I'm sure I said your name incorrectly -- but we do -- the

17   trustee does appreciate everybody's efforts.  So we have

18   nothing further, Your Honor, and thank you.

19          THE COURT:  All right.  Thank you, all.  I do

20   appreciate it.  You know as they say, the devil's in the

21   detail.  So go and get this documented and such.  I'm sure that

22   Chief Judge Santoro is not going to leave you in the wilderness

23   on that front and will give you some guidance with regard to

24   that as well, if you need help.  And he is extremely

25   experienced.

1           It's amazing, you know we were classmates together at

2    William & Mary.  I've known him for a long time.  I've

3    litigated many cases with him, and we've entered into many

4    settlements.  I know how he thinks and how he proceeds, and I

5    think he knows how I think and how I would have proceeded.  I

6    think you've reached a good settlement.

7           MS. MORABITO:  Thank you, Your Honor.

8           MR. BARGER:  Thank you, Judge.

9           THE COURT:  All right.

10          THE CLERK:  Your Honor?

11          THE COURT:  Yes?

12          THE CLERK:  Your Honor.  What about items 2 and 3 on

13   today's docket?

14          THE COURT:  Are we continuing everything, Ms.

15   Morabito?

16          MS. MORABITO:  I mean, it was the motion to amend,

17   yes, and the motion to seal, so I think we should continue

18   those subject to the execution of the settlement just in case.

19          THE COURT:  Okay.

20          MR. BARGER:  That's fine, Your Honor.

21          THE COURT:  Okay.  Everything would just be continued

22   to the date that we select for approval of the settlement, and

23   hopefully we can get this across the finish line completely,

24   but it sounds like we're there.

25          MS. MORABITO:  Thank you, Ms. Gary.  Thank you, Your

1    Honor.

2              THE COURT:  Thank you, all.  We will be in recess.

3              THE COURT OFFICER:  The Court is now in recess.

4         (Whereupon these proceedings were concluded at 11:43 AM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3          I, Ashley Bennett, the court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9                                          April 22, 2022

10   _____     _____

11   ASHLEY BENNETT                      DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Attachment 3

`

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | |
|---|---|
| In re: | Chapter 7 |
| LeClairRyan PLLC, | Case No. 19-34574 (KRH) |
| Debtor. | |
| Lynn L. Tavenner, as Chapter 7 Trustee, | |
| Plaintiff, | |
| v. | Adv.  Proc.  No. 20-03142 (KRH) |
| ULX Partners, LLC, ULX Manager LLC, and UnitedLex Corporation, | |
| Defendants. | |

<u>**SECOND AMENDED COMPLAINT**</u>

Plaintiff, Lynn L. Tavenner, Trustee, not individually but solely in her capacity as the Chapter 7 Trustee (in such capacity, the "<u>Chapter 7 Trustee</u>" or the "<u>Trustee</u>") of the bankruptcy estate (the "<u>Estate</u>") of LeClairRyan, PLLC ("<u>LeClairRyan</u>" or the "<u>Debtor</u>" and/or "<u>LCR</u>"), by her undersigned counsel, states the following in support of this adversary complaint against Defendants ULX Partners, LLC ("<u>ULXP</u>"), ULX Manager LLC ("<u>ULX Manager</u>"), and UnitedLex Corporation ("<u>UnitedLex</u>," and together with ULXP and ULX Manager, the "<u>ULX Entities</u>" or "<u>Defendants</u>"):

`

## NATURE OF THE CASE

1.      This case is the aftermath of one deceitful law firm "entrepreneur" conspiring with an opportunistic "global enterprise legal services provider," an actively complicit investment bank, and a group of scheming lawyers to manipulate a law firm for their own gain and benefit.

2.      The principal architects were Gary LeClair, former CEO, Chairman, and co-founder of LeClairRyan, and Daniel Reed, CEO and co-founder of UnitedLex.  Both Messrs. LeClair and Reed had delusional visions of transforming the legal industry into a hugely profitable and scalable (albeit legally unethical) enterprise.  They did not succeed, and the ill-fated experiment ended with the bankruptcy of LeClairRyan, a national law firm.  UnitedLex, the legal services provider, continues to prosper.

3.      In June 2018, Messrs. LeClair and Reed announced the creation of ULXP, a strategic "business platform" designed to provide a "constellation" of law firms with streamlined operations.  The transaction rebadged more than 300 LeClairRyan employees as ULXP employees, and promised to provide LeClairRyan a "pathway to funding" from CVC Capital Partners ("CVC"), a "world leader" in private equity investments. ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████   In exchange, LeClairRyan gave ULXP a license to LeClairRyan's intellectual property and a "turn-key" back office operation that the ULX Entities could then "sell to other law firms."  In the end, the transaction did not provide LeClairRyan the promised funding ███████████████████████████████████████████████████████; instead it resulted in the ULX Entities extracting value from LeClairRyan while LeClairRyan's debts increased. Ultimately, the law firm had no choice but to liquidate.

`

4.      The transaction purported to sidestep prohibitions against non-lawyers practicing law by handing UnitedLex keys to the "business" of law, not the "practice."  However, for all intents and purposes UnitedLex owned and directed the firm.   UnitedLex installed its own management team (together with LeClairRyan email addresses and unfettered access to the firm's internal files and systems), effectively relegating Erik Gustafson, then-CEO of LeClairRyan, to a subordinated position.  By August 2018, Mr. Gustafson needed consent from UnitedLex for the most basic of tasks necessary to run a law firm, including approving payments to vendors.  Moreover, even though the transaction had supposedly been blessed by the former General Counsel of the defunct law firm Dewey LeBoeuf ("Dewey"), then a partner at Hinshaw & Culbertson ("Hinshaw"), the opinion analyzed the wrong transaction.  No opinion approving the joint venture's final and actual structure had ever been obtained.

5.      Unbeknownst to most of LeClairRyan's shareholders, including some officers and directors, Mr. LeClair had been negotiating the formation of ULXP directly with Mr. Reed and CVC since August of 2017.  With closing scheduled for March 2018, the transaction gave Mr. LeClair the temporary relief he needed to prevent LeClairRyan from defaulting on looming bank debt, which would have immobilized the entire plan.  However, as of March 2018, CVC had also not received the regulatory approvals it needed to invest in the ULXP structure. ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████  So CVC, along with Mr. Reed and Mr. LeClair, pushed the deal forward without providing LeClairRyan any capital infusions, thereby preserving for themselves the valuable opportunity of launching a new business using LeClairRyan's assets.

`

6.      On March 22, 2018, UnitedLex supposedly learned for the first time that there were "serious concerns" with LeClairRyan "as a going concern," even though due diligence had been going on for more than six months.  With this 'new' information, CVC pulled its capital commitment of $33 million.  In its place, UnitedLex offered to provide LeClairRyan $8 million in capital 'advances' that it tried to disguise as 'debt' and then later recast as 'secured debt.'  The revised terms of the transaction also obligated LeClairRyan to make monthly payments to ULXP in the amount of $3.6 million, a shocking $1.5 million more per year (representing a handsome 12% return on capital) than LeClairRyan's cost in funding the back-office services directly.

7.      The $8 million 'advance' from UnitedLex gave LeClairRyan just enough oxygen to complete its transfer of assets to ULXP in the months that followed.  Further, even though CVC had purportedly dropped out of the transaction in March 2018, it continued to participate in the venture by advising UnitedLex on "revenue share percentages" in June 2018 after the joint venture agreements had been signed.

8.      By August 2018, UnitedLex had built a "restructuring framework" for LeClairRyan, with plans to support the law firm until after its planned "September close" with CVC, expressly acknowledging a potential need to "shrink" the law firm starting in October.  The ULX Entities carefully concealed their plans from certain shareholders of LeClairRyan, baiting them with "carrots" and ▮▮▮▮▮▮▮ promises of new client relationships—for LeClairRyan—in addition to more than $80 million in estimated returns arising from the joint venture.  ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

`

9.    ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████    CVC took a majority interest in UnitedLex on September 20, 2018, all of the "carrots"

disappeared.

10.    Meanwhile, UnitedLex was selling the ULXP deal to media outlets, which captured

the attention of potential clients for itself, such as Latham & Watkins, Ford, and Credit Suisse.

The ULX Entities, along with CVC, profited (and, upon information and belief, continue to profit)

from these relationships in the wake of LeClairRyan's collapse.  As LeClairRyan continued its

downward spiral, the ULX Entities made it increasingly harder for LeClairRyan to meet their

demands.  In July 2019, LeClairRyan closed its doors with hundreds of millions of dollars of debt

that the firm could not repay.

11.    This is not just a case of unforeseeable risks in business.  LeClairRyan had been

operating in "the red zone" for years, a fact that UnitedLex knew as early as 2012 when Mr. Reed

first partnered with Mr. LeClair.  The economic meltdown of 2008 left LeClairRyan with "the

exact same root cause risk that [Dewey] had," including declining revenues, guaranteed

compensation packages for top management, and underfunded retirement plans.  LeClairRyan

shared another similarity with Dewey:  certain insiders at LeClairRyan had been manipulating the

firm's financial information, including by orchestrating the creation of "dummy" invoices, to make

the firm appear healthy.  Indeed, LeClairRyan's operations had aspects of a Ponzi scheme.

`

LeClairRyan funded payments to legacy shareholders with capital contributions from new lateral

hires, even though the firm was insolvent at the time and slowly falling to its death. For those left

unpaid when the music stopped, it was no different than a 'money in, money out' con game.

12.     When Dewey filed for bankruptcy and with the public disclosures that followed,

Mr. LeClair found himself desperately needing a strategic partner to help sustain the law firm for

as long as it took to extract additional value from the firm and/or to further insulate himself from

personal exposure. Around this same time, UnitedLex was suffering from its own financial

shortcomings, and Mr. Reed easily bought what Mr. LeClair was selling: an e-discovery platform,

which UnitedLex took over from LeClairRyan in October of 2013, along with a list of grand ideas

designed to "disrupt" the legal profession.

13.     Over the years, Mr. LeClair continued to study Dewey in intense detail, tracking

claims asserted against shareholders of the firm and indictments handed down against members of

Dewey's senior management, implementing steps along the way to protect his own interests and

finances. Despite his own law firm being insolvent, Mr. LeClair purchased in 2014 a vineyard in

France in an all cash transaction.

14.     As LeClairRyan's financial state continued to deteriorate, Mr. LeClair and other

members of LeClairRyan's long-standing management stepped down to distance themselves from

LeClairRyan's projected failure. According to one UnitedLex employee (former LeClairRyan

shareholder), by March 2017 "it [was] like Weekend at Bernie's with Bernie as a metaphor for

LeClairRyan," an apt depiction of a dead man propped up to deceive others.

15.     Through this years-long scheme, Mr. LeClair was able to prefer himself and certain

legacy shareholders over others, and profit along with UnitedLex, Mr. Reed, and CVC, while

leaving creditors with nothing. The Trustee brings this action to ensure that Defendants are held

`

accountable for their substantial misappropriation and receipt of value, which rightly belongs to

LeClairRyan and its stakeholders.

## JURISDICTION AND VENUE

16.     This is an adversary proceeding pursuant to Fed. R. Bankr. P. 7001(1), (2) and

(8) to, among other things, determine the validity, priority, or extent of a lien or other interest in

property, to disallow, recharacterize or subordinate claims, and to avoid and recover preferential

and fraudulent obligations and transfers.

17.     This Court has jurisdiction over the subject matter of this adversary proceeding

pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtor's

chapter 7 case (under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code")).

18.     This adversary proceeding has been referred to this Court pursuant to 28 U.S.C. §

157(a) and the Standing Order of Reference from the United States District Court for the Eastern

District of Virginia, dated August 15, 1984.

19.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

20.     Venue is proper in this District and this Division pursuant to 28 U.S.C. §§ 1408 and

1409.

21.     On November 11, 2021, the ULX Entities filed a Motion to Withdraw the Reference

and Memorandum in Support Thereof [ECF No. 13] (the "Motion to Withdraw"), which was

denied by the District Court on May 28, 2021. *See* Mem. Op., *ULX Partners, LLC v. Tavenner*,

Civil No. 3:21-cv-77 (DJN) (May 28, 2021). No facts stated herein raise issues not previously

considered by the District Court in connection with the Motion to Withdraw.

## PARTIES

22.     On September 3, 2019 (the "Petition Date"), LeClairRyan commenced a chapter 11

case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On October

`

4, 2019, Lynn Tavenner was appointed as the Chapter 7 Trustee for LeClairRyan. As Trustee, Ms. Tavenner has the sole authority to bring the claims sought herein on behalf of the Estate.

23.     LeClairRyan was a law firm organized under the laws of the Commonwealth of Virginia run, at different times, by a board of directors and/or managers.

24.     Defendant UnitedLex is a Delaware corporation with its principal place of business in Overland Park, Kansas. In September 2018, UnitedLex became a portfolio investment of CVC, a private equity and investment advisory firm.

25.     Defendant ULX Manager is a Delaware corporation indirectly owned by UnitedLex, with its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, DE 19810.

26.     Defendant ULXP is a Delaware limited liability company. ULXP was created in 2018 as a joint venture between LeClairRyan and UnitedLex, and was 99% owned by UnitedLex. Today, ULXP is fully controlled and managed by ULX Manager, which is wholly owned and controlled by UnitedLex.

## **RELEVANT NON-PARTIES**

27.     Non-party Gary LeClair formed LeClairRyan in 1988. He served as LeClairRyan's CEO from inception until April 30, 2011. In November 2012, Mr. LeClair resumed leadership to manage the Debtor's finances. Mr. LeClair also served as Chairman through 2015. Mr. LeClair submitted his resignation from the Debtor on or around July 26, 2019, approximately one month before the Debtor's bankruptcy filing. Mr. LeClair now practices law as a partner at Williams Mullen in Richmond, VA.

28.     Non-party Bruce Matson joined LeClairRyan in 1994 and served as LeClairRyan's Chief Legal Officer ("CLO") from 2012 through 2016. After stepping down as CLO, Mr. Matson transitioned toward retirement and took on a "Senior Counsel" role in 2018. On or around August

8

`

20, 2019, Mr. Matson became an independent contractor to LeClairRyan.  Shortly thereafter, Mr. Matson fully separated from the firm.  Mr. Matson's law license was revoked by the Virginia State Bar in 2020 after he admitted to inappropriately handling funds in a bankruptcy trust account.

29.    Non-party David Freinberg joined LeClairRyan in 2007, as head of the firm's Newark, NJ office.  Mr. Freinberg served as the firm's CEO from 2011 until 2016.  Mr. Freinberg left the firm in April 2019, and now practices law at Greenberg Traurig.

30.    Non-party Micheal Hern served as LeClairRyan's Chief Operating Officer until 2015.  Mr. Hern also served as President and Vice Chairman of the board until 2016.  Thereafter Mr. Hern served as President Emeritus and Vice President of LeClairRyan.  Mr. Hern left the firm in July 2019.

31.    Non-party Christopher Lange joined LeClairRyan in 2000.  During his tenure, Mr. Lange held various roles at the firm, including Corporate Secretary, Assistant General Counsel and Corporate Department Leader.  Prior to the Debtor's bankruptcy filing, Mr. Lange also served as a member of the Debtor's Dissolution Committee.  Mr. Lange left the firm in 2019.

32.    Non-party George Whitley joined LeClairRyan in 1994 and served as a member of the board from 2014 through 2016.  Mr. Whitley left the firm in 2016.

33.    Non-party Jeffery Brown joined LeClairRyan in 2008.  Mr. Brown headed LeClairRyan's discovery solutions practice ("DSP") and was on the firm's executive committee.  In October 2013, Mr. Brown, along with "400 lawyers and other personnel" moved to UnitedLex to "create a new Richmond-based managed services facility."

`

## STATEMENT OF FACTS

I.   **Factual Background**

A.   **LeClairRyan's Rapid Expansion**

34.   Gary LeClair and Dennis Ryan formed LeClairRyan in 1988.  The firm initially

operated as a regional law firm, focusing on "venture capital clients" and operating on "credit card

advances."  Throughout the nineties the firm grew slowly, with offices in Virginia and Washington,

D.C.  After the dot-com bust at the turn of the century, things began to change.

35.   Starting in 2006, Mr. LeClair implemented a strategy of rapid expansion.

LeClairRyan entered the New York market on October 12, 2006.  In December 2007, LeClairRyan

merged with Seiden Wayne in Newark, New Jersey, then led by Mr. Freinberg.

36.   In February 2008, LeClairRyan acquired the law firm Wright, Robinson, Osthimer

& Tatum ("Wright Robinson"), which had an "international e-discovery and litigation

management practice" located in, among other places, Richmond and on the sixteenth floor of the

Lipstick Building in New York.

37.   Upon information and belief, the discovery center became known within

LeClairRyan as DSP.  DSP had a record-breaking year in 2013, with revenues of $31.7 million.

Johnson & Johnson and Ford were among the center's biggest clients.

38.   At its peak, LeClairRyan had twenty-five offices across the country, and employed

about 385 employees.

39.   With the firm's expansion, Mr. LeClair negotiated soft-landing contracts for

himself and other legacy shareholders.  These contracts provided guaranteed compensation for

certain individuals 'serving' in leadership roles.  Payments under these contracts were not tied to

actual market conditions, services, or performance.   Moreover, while LeClairRyan's other

`

shareholders generally knew about the existence of these guarantee contracts, the specific compensation terms were not disclosed.

40.    Following the financial crisis of 2008, Mr. LeClair, then-CEO of LeClairRyan, found himself on the "post-golden age battle field," struggling to compete in the "new legal era." Gone were the days of "hockey stick trajectories."

41.    In 2009, Mr. LeClair determined to become a "first mover" in attracting funding from "outside capital investors." Around this time, Mr. LeClair issued the firm's "Partnership 2020 Report" detailing Mr. LeClair's entrepreneurial visions for the firm over the next decade.

42.    At the time, laws in the United States did not allow non-lawyers to hold economic interests in law firms. But Mr. LeClair was convinced that he could succeed in forming a billion dollar legal enterprise "either because the law changes or because we will figure out a way." Certain other shareholders at the firm were not "on board with Mr. LeClair's vision and strategy."

43.    By 2013, LeClairRyan, through the ongoing efforts of Mr. LeClair, had "invested heavily (both time and hundreds of thousands of dollars) in innovating, negotiating and preparing to execute" a strategy to attract outside capital.

**B.    UnitedLex Struggles To Meet The Needs Of Clients**

44.    While Gary LeClair was dreaming of mass expansion with outside investors, Daniel Reed was formulating a strategy to take over in-house legal departments.

45.    Mr. Reed formed UnitedLex on October 11, 2006, with co-founder Ajay Agrawal. Upon information and belief, UnitedLex specializes in providing a number of non-legal services for law firms and legal departments. These non-legal services include "back-office" services, such as accounting, marketing, technology, and human resources support. These non-legal services also include legal support services, like patent mining, document management, and electronic discovery.

11

`

46.     UnitedLex did not have pre-existing technology, but instead sought to build a platform from the ground up to accommodate the specific needs of each client.  The business was "predominantly annuity driven," heavily reliant on long-term relationships and income generated by steady invoice streams.

47.     In early 2009, UnitedLex landed a contract with Computer Sciences Corporation ("CSC" now DXC Technology, "DXC").  Mr. Agrawal attributed much of that success to Bill Deckelman, then in-house counsel at CSC.  However, according to Mr. Agrawal, 2010 was a year of "massive dissappointment" for UnitedLex.  While the CSC deal was going "swimmingly," companies such as IBM and Hewlett Packard ("HP") were not as impressed with UnitedLex's technology, which had been built specifically to meet CSC's needs.  Feeling "disillusioned," Mr. Agrawal sold out of his UnitedLex position in June 2011.

48.     It was around this same time that Mr. Reed met Mr. LeClair.

## II.     Mr. LeClair Seeks To Shield Losses

### A.     The Dewey Collapse Shakes the Legal Industry

49.     On May 28, 2012, Dewey & LeBoeuf filed for bankruptcy.  Many observers blamed the collapse on "unfettered growth, often through mergers," outsized pay packages for senior lawyers, and fraudulent accounting practices that made the firm appear solvent, when it was not.

50.     Mr. LeClair acknowledged that LeClairRyan had "the exact same root cause risk that [Dewey] had," prompting Messrs. LeClair and Freinberg to co-author a report titled "Lessons From the Demise of Dewey" dated July 27, 2012 (the "Dewey Report").  The report closely scrutinized Dewey's collapse in an effort to ensure that LeClairRyan (and Mr. LeClair) did not meet the same fate.

51.     Among other things, the Dewey Report:

`

- promised to fully fund LeClairRyan's retirement plans, while placing "guardrails" and "handcuffs" on lateral compensation packages. For example, LeClairRyan committed to materially enhance retirement funding to "mitigate the risk of Shareholders being unable to retire." LeClairRyan also changed its policy so that retirement benefits would not vest for a period of ten years, creating a pool of free cash upon partnership departures. At the time, one shareholder observed "the cumulative effect of all the 'handcuffs'" were more like "chains"; shareholders should not have to "forfeit hard earned money."

- included a "capital raising map" that increased mandatory capital contributions to 30% of each shareholder's salary. These contributions were raised through the issuance of two series of notes, class A (for officers and board members) and class B (for other shareholders). The class B notes had additional mandatory buy in requirements.

- highlighted the need for shareholders "to be good stewards" so that there would always be "new partners" to provide capital contributions needed to replace a departed partner's capital." Upon information and belief, Mr. LeClair did not expect LeClairRyan to be operating with positive cash flows as a law firm in the years that followed.

52.    In addition to the foregoing, LeClairRyan's 2012 partnership report also recommended that DSP (the firm's discovery center) become a separate unit in 2013. The separation of DSP would not only allow Mr. LeClair to market the group to outside investors and organizations, it minimized the risk that assets in the DSP group would come into LeClairRyan's estate if LeClairRyan filed for bankruptcy.

**B.    UnitedLex Forms The LeClairRyan Knowledge Center**

53.    In 2013, DSP became a "a separate unit."

54.    On October 18, 2012, LeClairRyan and UnitedLex officially began discussing a joint partnership through a series of telephone calls. On November 21, 2012, LeClairRyan entered into a confidentiality agreement with UnitedLex, which gave Mr. Reed "open kimono" access to LeClairRyan's most sensitive documents, including the Dewey Report and LeClairRyan's "Partnership 2020 Report," which detailed Mr. LeClair's aspirations to grow the law firm into a massive legal enterprise by the year 2020.

55.    In the spring of 2013, Messrs. LeClair and Reed decided to move forward with the creation of a joint "pilot" program.  Under the joint model, UnitedLex would provide hosting, processing, and related services to LeClairRyan, while LeClairRyan would continue to provide all legal and related services to clients.

56.    A few months later, on October 1, 2013, four partners of LeClairRyan, led by Jeffrey Brown, announced their decision to move to UnitedLex.  In response to the announcement, LeClairRyan formed a litigation committee and threatened a lawsuit.  That committee, led by then-CLO, Mr. Matson, was granted the exclusive athority to pursue or settle any claims against UnitedLex, without further approval from LeClairRyan's board.

57.    Around this same time, Mr. LeClair met one-on-one with Mr. Brown (aka the "best partner ever") on several occasions.  Mr. LeClair also met with Mr. Reed multiple times "stay[ing] off front lines of the litigation [to] be positioned for any business deals."  Less than two weeks later, a deal was indeed struck, and the LeClairRyan Knowledge Center was formed.

58.    Shortly after their transition, certain of LeClairRyan's former partners (now UnitedLex employees) were let go or replaced by UnitedLex (in consultation with Mr. LeClair).  Today, Jeffrey Brown is still employed at UnitedLex.

59.    Creation of the Knowledge Center raised concerns with some senior individuals within LeClairRyan.  For example, on October 16, 2013, Mr. Gustafson (then Litigation Department Leader) told Chris Lange (then Corporate Secretary): "[A] subtle change is that our attorneys will not be able to write off what were formerly DSP services that could be adjusted internally before billing.  [LeClairRyan] will theoretically owe 100% of the effort! unless [UnitedLex] is willing to write it down, and regardless of whether or when the client pays."

`

60.     Despite these concerns, LeClairRyan and UnitedLex issued a joint press release on October 31, 2013 announcing the creation of the center.  That same day, Mr. LeClair received a Google alert to a blog questioning the ethics of the arrangement.  Forwarding the blog to Messrs. Hern, Lange, Freinberg and Matson, Mr. LeClair cautioned "We should be alert to a potential ethical challenge."  At this point in time, an ethics opinion from UnitedLex had not been delivered, even though it was a required condition for finalizing the transaction.

61.     On November 1, 2013, LeClairRyan and UnitedLex consummated the settlement of LeClairRyan's threatened lawsuit, giving LeClairRyan guaranteed access to the e-discovery center for a period of at least five years through the creation of the LeClairRyan Knowledge Center. In exchange, UnitedLex paid LeClairRyan $3.4 million and took over all of the "DSP technology."

### C.     UnitedLex Promotes The Center; Stops When Ethical Concerns Are Raised

62.     In early November 2013, countless articles about the LeClairRyan Knowledge Center were written and promoted by Mr. LeClair and Mr. Reed.  For example, on November 7, 2013, Messrs. Reed, LeClair, and Freinberg joined a podcast to promote the new partnership. During the interview, Mr. LeClair explained:

> In 2008, the firm acquired a sizable document review center in its merger with Wright Robinson.  Shortly after the merger closed, the economy crashed.  Clients wanted 'cheaper, better, and faster' service. . . .  We elected to collaborate with UnitedLex.

63.     During the interview, Mr. Reed added:

> More and bigger news is coming. . . .  [W]e have to change the way we think about legal services, to stratify and systematize delivery the way Accenture does. . . .  That requires a big balance sheet, which we have . . . .

64.     From there, Messrs. Reed and LeClair started trading business contacts and corporate opportunities, consistently meeting and speaking on a weekly basis.  Eventually, the

`

parties reached "an impasse over the form of the [ethics] opinion letter," and, upon information and belief, a master services agreement was never formally signed.

65.    Upon information and belief, UnitedLex and LeClairRyan nonetheless continued their relationship as envisioned by Messrs. LeClair and Reed, but on informal terms.

**D.    Messrs. LeClair and Reed Continue Their Deep Relationship**

66.    After creation of the LeClairRyan Knowledge Center, Messrs. LeClair and Reed continued to routinely discuss the "math" behind their thinking and the "actionable next steps in 'liberating the profession.'"

67.    UnitedLex also seized on LeClairRyan's business contacts and expertise to build new relationships.  For example, on September 23, 2014, Mr. LeClair wrote to Mr. Reed: "Good conversation with Kaye [Scholer.] They are high on Lauren Leonard [Project Manager at UnitedLex]."  On October 14, 2014, Mr. Reed thanked Mr. LeClair, confirming "your words carry weight.   .   .   [W]e found out today that Kaye Scholer selected ULX to be their eDiscovery/technology and managed review fulfillment partner . . .  your influence was obviously impactful."

68.    Similarly, on July 5, 2017, Joe Deering at UnitedLex asked Mr. Reed about preparing a "[Marshall Denning] Chart Deck" for Cooley LLP, including slides that detail "How it works" and "Ethics Opinions."  Mr. Reed replied to Mr. Deering that he was "consolidating [his] notes with [Mr. LeClair] - who was quite emphatic on the winning approach."

`

## III.  LeClairRyan Spirals Into Insolvency

### A.  LeClairRyan Repeatedly Misses Projections But Continues Paying Shareholders, Including Mr. LeClair

69.     On August 21, 2012, mere months after Dewey's bankruptcy filing, Mr. LeClair revealed to shareholders that "for the first time, [LeClairRyan] did not achieve [its] year end collection target" and could not pay "projected 2012 Shareholder Salaries."

70.     In the years that followed, LeClairRyan's operating and financial metrics moved against one another, with debts climbing while revenues declined.

71.     To make up for the shortfall, LeClairRyan adopted a policy of Mandatory Preferred Stock Offerings to raise capital.  This resulted in approximately $2.5 million in preferred stock proceeds in 2013 and 2014.

72.     Even with this new 'equity,' LeClairRyan consistently missed its budget and its revenue fell short of financial projections.

73.     By the end of 2014 (if not earlier), LeClairRyan was insolvent, failing to generate sufficient revenue to pay its debts as they became due.

74.     During this period, shareholder and member compensation was determined in accordance with applicable shareholder agreements, resolutions by the Debtor's board of directors, and annual compensation policies (collectively, the "Compensation Policies").

75.     The Compensation Policies in place for 2014 prevented LeClairRyan from making certain categories of payments (collectively, the "Contingent Retention Incentive") unless LeClairRyan met certain financial metrics.

76.     In 2014, LeClairRyan did not satisfy the necessary conditions precedent for payment of the Contingent Retention Incentive.

`

77.     Despite failing to meet the metrics, the management of LeClairRyan, including Mr. LeClair, proposed payment of $7.8 million of At-Risk Salary, including deferring $2.6 million of payments to certain leaders of the firm to 2015 in order to remain in compliance with its cash flow debt covenant with its lender at the time, Wells Fargo, as of December 31, 2014.  Shareholders, including Mr. LeClair, approved these At-Risk Salary payments despite not achieving the required profitability.

78.     At the same time, the management of LeClairRyan, including Mr. LeClair, also proposed "rebranding" the "unearned" Contingent Retention Incentive as the "2015 Retention Incentive" and paying in installments from May to September 2015 a total amount of $3.1 million. Shareholders, including Mr. LeClair, approved the new payments they did not earn based on their 2014 Compensation Policies as 2015 Contingent Retention Incentives.

79.     Egregiously, these payments were made at a time when LeClairRyan was facing severe liquidity issues, with a majority of its accounts payable past due.

80.     As a result of these actions, Mr. LeClair personally received $242,868 in 2014 of At-Risk Salary and $121,433 as a 2015 Contingent Retention Incentive.  He also received an additional $24,430 Firm Match of the portion of the At-Risk Salary that Mr. LeClair had designated as a Supplemental Retirement Plan contribution.  The board, including Mr. LeClair, approved this match in December 2014, at a time LeClairRyan had severe liquidity issues.

81.     Due to their financial straits, LeClairRyan also deferred the release of $1.6 million of At-Risk Salary payments to 2015, but recorded the same in 2014 for tax reporting purposes. Delaying payment ensured that LeClairRyan did not breach the cash covenant with Wells Fargo.

82.     In December 2015, Matson summarized the handling of year-end payroll in 2014: "I understand we treated year end payroll that was debited to employees' accounts after 12/31 as

`

an expense as of 12/31 for accrual purposes but as a post-12/31 item for cash accounting (bank compliance purposes)."

83.     The following year, LeClairRyan again dated certain payments to shareholders, including a payment to Mr. LeClair, as being paid on December 31, 2015, but did not distribute the payments to shareholders until January 4, 2016 ("collectively, the "Cash Covenant Payments"). The Cash Covenant Payments were delayed with the express purpose to avoid reporting cash outflow to Wells Fargo.  If LeClairRyan had made the Cash Covenant Payments on December 31, 2015, LeClairRyan would have violated the cash covenant at the end of the calendar year.

84.     Mr. LeClair personally received Cash Covenant Payments totaling $101,214.

85.     Compensation Policies in 2015 also provided that certain payments to shareholders (the Shareholder Equalization Payment and the targeted Shareholder Performance Payment, (collectively, the "2015 Contingent Payments")) were subject to, among other things, the Debtor's financial performance.

86.     Once again, at the end of the calendar year of 2015, LeClairRyan did not satisfy the necessary financial performance requirements to pay the 2015 Contingent Payments.  Despite the fact that the 2015 Contingent Payments were not earned, management, including Mr. LeClair, approved the payment of the unearned 2015 Contingent Payments to all shareholders in a total amount of $7.1 million.   LeClairRyan also had a then-client, the liquidating trustee of LandAmerica, *i.e.*, Mr. Matson, issue a check payable to the firm in January 2016, which was back dated to December 2015.  Backdating the payment further manipulated the financial state of the firm for year end reporting.

87.     Mr. LeClair personally received $64,505 as a 2015 Contingent Payment in violation of the Board Resolutions and the 2015 Compensation Policy. He also received an additional $6,451

`

Firm Match of the portion of the 2015 Contingent Payment Mr. LeClair designated as a Supplemental Retirement Plan contribution. The board of directors, including Mr. LeClair, approved this match in December 2015, at a time when LeClairRyan had severe liquidity issues.

88.     As a result of insufficient capital, LeClairRyan had stopped paying its vendors on a timely basis using them as "a source of unsecured credit."  In April 2015, LeClairRyan did not have liquidity to pay its critical vendors.  During this "cash crunch," LeClairRyan requested "dummy" invoices from vendors to draw down on a construction loan to fund operational expenses.

89.     In February 2016, Peter Mares, then-CFO of LeClairRyan raised concerns with Mr. Matson stating that he believed that in prior years, "there were transactions and/or adjustments recorded in the Firm's accounting records that were done to 'manufacture' a certain result."  Mr. Mares left the firm later that year.

90.     In 2016, LeClairRyan faced continued financial pressure.  Management concluded that LeClairRyan's balance sheet did not accurately reflect the value of LeClairRyan's accounts receivable.  The Budget Oversight Committee concluded that the firm's work in progress and accounts receivable were "cluttered with uncollectable accounts and worthless numbers."

91.     The Committee also observed that for "2014 and 2015, we Shareholders paid ourselves, collectively, more than we earned" and that the firm had "borrowed to pay ourselves, contrary to Partnership 2020 fundamentals"—*i.e.*, contrary to the agenda formed by Mr. LeClair in 2009 to achieve "greatness" by year 2020.

92.     In total, LeClairRyan transferred $459,687 in contingent payments for the 2014, 2015, and 2016 years to Mr. LeClair (the "Contingent Income Payments").

93.     Mr. LeClair knew or should have known that LeClairRyan's financial performance did not justify the payment of the Contingent Income Payments.

`

94.      During this time, LeClairRyan also routinely misused client funds designated for specific purposes, including misappropriating funds earmarked to pay client expenses as a source of financing.  Indeed, Mr. Matson, had previously raised this issue with senior leadership in 2016.  Mr. Matson explained in a self-serving email that funds tendered by clients, even those related directly to a client disbursement, were not being used for their earmarked purpose and were being intermingled and used to fund LeClairRyan's operations.

95.      Mr. Matson even expressed that the mismanagement of funds tendered by clients was "tantamount to misusing (intentionally) client trust funds."

### B.      The LeClairRyan Knowledge Center Struggles

96.      In 2015, Peter Mares replaced Mr. Hern as COO.  In 2016, LeClairRyan appointed Erik Gustafson to serve as CEO to replace Mr. Freinberg.  At the same time, Gary LeClair stepped down as Chairman and Mr. Hern stepped down as Vice Chairman of the board.  Board member Mr. Whitley also left the firm in 2016.

97.      Exiting management was purposeful for these individuals, seeking to divert central focus off their actions and insulate from Dewey related issues/liability that one of more of these individuals had created.  In March 2014, Messrs. LeClair, Freinberg, Matson, and Hern circulated an article on Dewey, noting "it relates to [indictments and] misleading other lawyers as well as the lenders about the financial health of the firm."  On March 6, 2014, Mr. LeClair replied: "I believe we should have a discussion about the implications of this and our proactive response, both in terms of continuing to improve our risk management processes and a review of our insurance coverage for government investigations.  I am not comfortable that we are doing all that we can and should be doing."  Mr. Matson acknowledged this was "scary stuff" and scheduled a call with Mr. LeClair.

`

98.    Even with these management changes, LeClairRyan's financials continued to decline and UnitedLex took notice.  In 2017, searching for a lifeline, LeClairRyan turned to a potential joint venture with UnitedLex, as a way to address LeClairRyan's financial difficulties.

99.    Around 2017, UnitedLex sought to move beyond merely being a vendor providing legal services to become more of a partner to a "constellation" of law firms.

100.    The joint venture between UnitedLex and LeClairRyan was intended to be the foundation of this proposed "constellation" structure in the United States.

101.    Yet on June 15, 2017, Mr. Brown emailed Mr. Reed about "Connecting Next Week" stating:  "It would be good to de-brief in advance.  I've been wanting to talk with you about the [LeClairRyan Knowledge Center] MSA."  Mr. Reed replied "Will call you in about 30 minutes or so if that works - really quick, was not planning on discussing the [LeClairRyan Knowledge Center] with Gary - rather DXC/Marshall Denning and potential implications etc.…"[1]

102.    Mr. Reed then summed up:  "Meant to add dealing with Eric and the LR team re: [the LeClairRyan Knowledge Center] reminds me of Jack Lemon in Glengarry Glen Ross." Opting for an alternative deadbeat reference, Mr. Brown replied: "I never saw GGR.  I think it is like Weekend at Bernie's with Bernie as a metaphor for LeClairRyan."[2]

103.    In August 2017, Messrs. LeClair and Reed decided to push forward with their relationship, which required getting Erik Gustafson on board.  On August 3, 2017, Mr. Reed wrote to Mr. LeClair: "really enjoyed connecting today . . . .  Much to think about."  The next day, Mr.

---

[1]    Marshall Denning is a UK law firm that previously partnered with UnitedLex.

[2]    Both analogies show that as of June 2017 UnitedLex did not view LeClairRyan as a viable business partner. In the film *Glengarry Glen Ross*, Jack Lemmon played a real estate salesman who failed to close on a parcel of real estate capping off his failed career at the end of his failed life.  In the film *Weekend at Bernie's*, two employees went to extreme lengths to maintain the illusion that an otherwise dead Bernie was still alive.

`

Reed wrote to Mr. Brown: "Jeff, Gary called me earlier today. Said he had spoken with Eric twice in 12 hours on our meeting yesterday [and] Erik is more stoked than even Gary."

104.    Messrs. Reed and Gustafson spoke on August 5, 2017. In connection with that discussion, Mr. Reed told Mr. Gustafson that Bill Deckelman, the Executive Vice President and General Counsel at DXC wanted to meet with him. DXC is an information technology service founded in April 2017 through the merger of HP's services department and CSC. Upon information and belief, Mr. Reed did not disclose the prior relationship that UnitedLex had with Mr. Deckelman and/or his prior company, CSC, to Mr. Gustafson.

105.    On August 23, 2017, Mr. Gustafson met with Messrs. Reed and Brown in person. Mr. Reed followed up two days later, stating: "I connected with Bill [at DXC] yesterday. . . . We have a partner in Bill, and he could be a good collaborator with us going forward . . . ." On September 15, 2017, UnitedLex started performing due diligence on the law firm. Mr. Reed told Mr. Gustafson, "feel free to tell your finance team that the data needed per the request did not have to be in the perfect format - as long as it is intelligible we can put into the right analytical format and proceed from there."

106.    On September 15, 2017, Mr. Gustafson asked Mr. Reed: "Also, at some point sooner, rather than later, it would be helpful to see the ethical groundwork you have already laid that confirms this can be done." Mr. Reed replied: "you will have the opinion from Anthony Davis, David Keyco and Professor Bruce Green; the tax structure document will come from Greenberg Traurig and will be provided subsequently."

107.    Upon information and belief, none of the aforementioned opinions were written on behalf of LeClairRyan and/or addressed the arrangement between LeClairRyan and UnitedLex under U.S. law.

`

### C.      Mr. LeClair Personally Steps In To Push The Deal Forward

108.     Gary LeClair tried to make it appear that he had not been participating in discussions between UnitedLex and LeClairRyan (even though he had been having numerous back-room conversations with UnitedLex through Mr. Reed).

109.     On October 3, 2017, Mr. Brown asked Mr. Gustafson if he would be "comfortable" inviting Mr. LeClair to a meeting, noting that some "of the concepts in the draft Term Sheet are ones Dan and Gary have discussed over the last few years."  Mr. Reed then emailed Mr. Brown directly, asking the obvious: "Is your expectation that with Gary in the room it will be difficult for Erik or anyone else to slow walk the process?"

110.     From there, Mr. LeClair formally took the lead for LeClairRyan (having set the stage all along).  On October 10, 2017, Mr. Reed circulated a Draft - UnitedLex-Marshall Denning-LeClairRyan Term Sheet 10.10.17.[3]  Mr. Reed noted that "[Mr. Brown] mentioned Gary may be joining us.  Feel free to forward the attached to him."  On October 25, 2017, Mr. LeClair then met with attorneys from Greenberg Traurig and Mr. Reed.  Mr. Gustafson did not attend that meeting.

111.     On November 2, 2017, Mr. Reed wrote to Greenberg Traurig and Mr. LeClair (without copying Mr. Gustafson): "I really appreciate the dynamic we are creating - in terms of both model development and quality of interaction.  I am highly energized about what we are creating.  Already looking forward to Monday."

---

[3]      In a memo dated September 4, 2017 to employees about the announcement of the firm, UnitedLex explained "for those of you who are employees of UnitedLex but who work closely with Marshall Denning members on commercial transactions, please be advised that due to regulatory issues, you cannot be listed as a member of Marshall Denning. . . .  The website has been designed to provide the right balance of detail and impressions of what Marshall Denning does and how we do it . . . ."

`

112.    In December 2017, UnitedLex consummated "The DXC Deal," which was a "headline among in-house lawyers," resulting in "150 DXC lawyers and professional staff bec[oming] UnitedLex employees."

### D.    CVC Actively Participates In Forming The Joint Venture

113.    Even though CVC's investment in UnitedLex was not formalized until September 2018, CVC actively negotiated the joint venture between LeClairRyan and UnitedLex from start to finish.

114.    For instance, on November 23, 2017, Mr. Reed invited Mr. LeClair to a meeting in New York City with CVC bankers.  Mr. Reed noted that Jennifer Weiss from Greenberg Traurig would be in attendance "to go into more detail on the tax structuring of our solution."   Mr. Gustafson was not present at that meeting.

115.    When the ULXP deal was announced to the public on June 13, 2018, CVC's role in negotiating the joint venture was entirely omitted.   To the contrary, Mr. Reed stated that UnitedLex was "venture-backed by JP Morgan."

### E.    UnitedLex Proposes Terms, Then Changes The Deal After Completion Of Due Diligence

116.    On December 29, 2017, UnitedLex sent its original proposal to LeClairRyan (the "December 29 Proposal").  Under the initial terms of the deal, UnitedLex would control ULXP, but members of the LeClairRyan leadership team would hold senior leadership positions at ULXP.

117.    The December 29 Proposal had the following general terms:

- LeClairRyan would contribute all of its non-legal intellectual property as well as back office and certain other non-legal staff to ULXP, which would then contract with the Debtor to provide an array of services to the firm.

- LeClairRyan would pay a monthly Client Practice Management Services ("CPMS") fee in return for these services.

`

- LeClairRyan would receive an equity interest in ULXP that would be 5 times the average annual CPMS fees paid to ULXP within the first five years of the ten-year agreement.

- LeClairRyan would receive a $20 million loan from ULXP, which would mature in ten years with LeClairRyan "potentially making annual pre-payments of 10% of the loan amount provided [LeClairRyan] hits profitability benchmarks."

118.    Upon information and belief, at the time of the December 29 Proposal, the parties were also considering an additional $13 million infusion to replace LeClairRyan's then loan facilities with its lender, ABL Alliance LLLP, affiliated with and commonly referred to as Virginia Commercial Finance ("VCF").

119.    The December 29 Proposal also included terms creating other financial incentives for LeClairRyan's individual shareholders, including an immediate full redemption of their shares in LeClairRyan, the elimination of shareholder capital contribution requirements, and the possibility of receiving equity interests in UnitedLex through either annual or performance-based interests options.

120.    During the winter of 2018, UnitedLex and CVC engaged in additional due diligence of LeClairRyan. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

121.    On or about January 2018, UnitedLex hired an independent third-party, Doug Benson of SB2 Consultants ("SB2"), to assist its due diligence and assess LeClairRyan's finances.

`

122.    Mr. Benson provided his initial consulting report to UnitedLex on March 21, 2018 (the "Benson Report").

123.    The Benson Report provided UnitedLex explicit details about the poor and troubling condition of LeClairRyan's finances.

124.    During this time, Messrs. LeClair, Reed, and Siddharth Patel (of CVC) continued to have discussions regarding "Law Firm Finance & Accounting."  Once again, it does not appear that Mr. Gustafson was included in those discussions.

125.    On March 10, 2018, Mr. Reed emailed Amit Soni (of CVC) and Mr. LeClair noting: "[Greenberg Traurig] recently emailed that [it had] a sudden issue to address in the morning."  A call was set for the following afternoon.  Upon information and belief, the "issue" was CVC's failure to have received regulatory approval from authorities in India and the United States to enter into the ULXP transaction.

126.    Shortly after, on March 21, 2018 Mr. Reed wrote to Mr. Gustafson describing the findings contained in the Benson Report, alarmed by it: "[I]t is concerning and creates challenges for me in its current form.  … Doug's findings and conclusions paint a picture different than I expected re: LeClairRyan's current liquidity.  Doug goes as far as to raise a question of going concern given current obligations and being at the limit of its credit line and partner stability."

127.    Mr. Reed further noted that "CVC and my board will question why we would provide funds for any purpose other than to ensure sufficient liquidity to prove that the firm is in fact on the right path…we also need to discuss the potential of a tiered structure of cash infusion to ensure LeClairRyan has the fuel to expand…."

128.    In response to this email, Mr. Gustafson responded to the issues identified in the draft Benson Report and the concerns noted by Mr. Reed.   Mr. Gustafson argued that

`

LeClairRyan's "future is more secure with more upside if we proceed with the JV;" specifically noting the need for the cash infusion to "immediately eliminate[] our bank debt and accelerate[] our cash generation."

129.   No later than March 22, 2018 (and, upon information and belief, much sooner), UnitedLex knew that LeClairRyan was unable to pay debts as they come due.  For instance, in response to Mr. Gustafson's email Mr. Reed stated:

> [t]he real challenge is liquidity for [LeClairRyan].  I was not expecting that [UnitedLex] would make the capital return, takeover the debt (which does not help [LeClairRyan] in terms of new liquidity) AND **then have to infuse material cash to ensure the firm can survive**.  Doug's take away from [Dwight Jones] is that every day begins with a review of cash and serious concerns over the current situation.  **Doug [Benson] has not come across a firm that is in [LeClairRyan]'s current cash position, and has expressed serious concern with its status as a going concern**…I also did not fully realize until seeing [the Benson Report] that so many partners have left in just the last few months – and the corresponding impact on growth/recruitment related cash needs.  Again, a pro forma cash analysis needs to be done asap so I can fully understand beyond our 'deal infusion,' how much is needed to operate the firm **without being in the perpetual red zone**.

130.   Responding to Mr. Reed's email, Mr. Gustafson wrote that unless LeClairRyan can address the payment of debt and the return of partner capital, "we do not see how we could transfer our back office" to ULXP without signing an agreement by March 30.

**F.    LeClairRyan Converts To A PLCC**

131.   As a condition precedent to entering into the ULXP transaction, UnitedLex required LeClairRyan to convert its corporate form from a PC to a PLLC.

132.   LeClairRyan complied with that requirement and converted from a PC to a PLLC on March 31, 2018 (the "Conversion").

133.   The PLLC flow-through structure allowed for a single level of taxation on any capital gains that would have resulted from the shareholders' equity in ULXP.

`

134.   The effects of the Conversion were described in a March 22, 2018 email from Mr. Gustafson to Mr. Reed, which explained that one consequence of the Conversion was that the firm was able to "materially reduce [its] monthly cash burn [in 2018] by another $450k per month."

135.   Mr. Gustafson also explained that the Conversion allowed the firm to "pay about $30 million in partner draws on a tax deferred basis" which "create[d] a significant retention incentive through 2023, especially for [LeClairRyan's] biggest producers, because early departure can trigger a recapture tax event."

136.   As the firm had previously explained to its shareholders in materials provided in advance of a February 24, 2018 meeting to approve the Conversion, "[r]etention of Partners via the equity incentive [was] a key requirement for ULX."  The "conversion to an LLC to avoid double tax" was seen as "evidence [of] the value [LeClairRyan] place[d] in that incentive."

137.   The Conversion was not the only action taken to pave the way for the joint venture. Indeed, LeClairRyan terminated the firm's Deferred Compensation and Supplemental Retirement plans effective as of December 29, 2017 notwithstanding that the firm's Retirement Plan Committee had recommended that the same not be terminated until at least a year later.  The effects of this termination included but were not limited to (a) the plan balances, totaling an amount not less than $12 million, became eligible to be transferred to shareholders beginning on or about December 29, 2018, (b) funds were diverted from general unsecured creditors, and (c) LeClairRyan had to utilize scare resources to supplement an otherwise underfunded plan.

138.   Although the payments to shareholders upon termination and distribution would have ordinarily been taxable to the shareholders receiving payments from the terminated plans, the tax savings realized from LeClairRyan's conversion from a PC to PLLC were passed through to

`

the individual shareholders, who were able to use those net operating losses to offset the taxes that would have been owed on the deferred compensation distributions.

139.    Certain accounting-related aspects of the Conversion were the subject of an IRS audit.  The IRS initially filed a proof of claim in the bankruptcy (Claim No. 252), which, among other things, asserted a priority claim in the estimated amount of $120,576.71.  However, the IRS thereafter claimed that additional amounts were due and owing based on the tax returns prepared in conjunction with the transaction and the accounting methods used therein.  In connection with the IRS audit, the Trustee, after notice, hearing, and Court authorization (Doc. Nos. 914 and 947), agreed to a proposed adjustment to conclude the audit, which will result in an increase in priority claims in excess of $2.7 million.

### G.    LeClairRyan Receives Ethics Opinions From Conflicted Counsel

140.    LeClairRyan sought and obtained legal advice with respect to the planned joint venture with UnitedLex from Hinshaw.  UnitedLex also received legal advice with respect to the planned joint venture from Hinshaw.

141.    Hinshaw's role advising both parties was described in a March 19, 2018 executive summary of the contemplated transaction prepared for LeClairRyan's members (the "ULX Executive Summary").

142.    The ULX Executive Summary states that LeClairRyan "individually engaged" Hinshaw to provide "an ethics opinion for the benefit of [LeClairRyan] confirming that the overall proposed transaction and deal structure are legal and ethical."

143.    The ULX Executive Summary also states that UnitedLex "separately engaged Hinshaw, as well as other counsel, for its own benefit and opinion."

`

144.    UnitedLex had previously received a legal opinion from Hinshaw dated July 25, 2017 (the "July 2017 ULX Opinion"), regarding a similar joint venture transaction with another law firm.

145.    The July 2017 ULX Opinion cautioned that UnitedLex could not "under any circumstances have an ownership interest in [the law firm], or exercise any management or control over [the law firm], or over the provision of legal services by [the law firm]."

146.    The July 2017 ULX Opinion was referenced in term sheets prepared on or about October 2017, which began to sketch out the proposed transaction between UnitedLex and LeClairRyan.  These early term sheets relied on the July 2017 ULX Opinion, among others, to claim that the deal under discussion was "[f]ully compliant with [the] Rules of Professional Conduct."

147.    In January 2018, Mr. Reed wrote to Mr. LeClair "in speaking with Hinshaw earlier today, they indicated they now are leaning towards being able to permit [LeClairRyan] to rely on the opinion prepared to ULX … [but flagged] language/terms that have the net effect limiting partner movement among firms."  Mr. LeClair replied: "We know how to skin the cat on vesting. We had 10 year cliff vesting on our nonqualified retirement plan."  Mr. LeClair also indicated that he had found a "significant tax related benefit that will disincentivize leaving for 5 years," which they could potentially use "with other firms in the constellation as well."

148.    Following further discussions between Hinshaw, Lori Thompson, LeClairRyan's then-General Counsel, and others, Hinshaw provided LeClairRyan with an initial opinion letter on March 27, 2018.  A revised version of the opinion letter was provided to Ms.  Thompson the following day (the "March 28, 2018 Opinion Letter").

`

149.    The March 28, 2018 Opinion Letter was provided to the LeClairRyan board in advance of its vote to approve entering into the ULXP transaction.  However, the March 28, 2018 Opinion Letter was premised upon facts relevant to earlier versions of the deal and not the terms actually under negotiation at the time it was issued.

150.    For example, the March 28, 2018 Opinion Letter included references to "ULFS" – United Law Firm Solutions – which was the name the parties had used for the joint venture during negotiations in or around the Fall of 2017.

151.    Notably, the March 28, 2018 Opinion Letter did not include any discussion affirmatively stating that UnitedLex would not have an "ownership interest in" LeClairRyan or that UnitedLex would not "exercise any management or control" over LeClairRyan.

152.    The March 28, 2018 Opinion Letter was never updated, even though the structure and operation of the joint venture had been revised prior to the effective date of the agreements creating ULXP, and almost amended again in or around the end of 2018 and the beginning of 2019.

**IV.    UnitedLex Knows LeClairRyan Is Insolvent, Continues With The Deal (Albeit A Substantially Different Deal)**

**A.    UnitedLex Restructures The Deal**

153.    Despite expressing serious reservations once they learned the true extent of LeClairRyan's insolvency, CVC and UnitedLex pushed forward with the ULXP venture.  This ensured that the law firm would remain "operating" for the foreseeable future with enough time to lock in the other law firms and companies that had been solicited using LeClairRyan's back-office platform and intellectual property.

154.    Ultimately, the proposed transaction was restructured between ULXP and LeClairRyan to reduce the financial benefits to LeClairRyan and to bestow more control over LeClairRyan's operations to ULXP, to the detriment of LeClairRyan's creditors.  Among other

things, CVC and UnitedLex immediately took the infusion of capital of up to $33 million off the table.  Also, in light of the risk of being in a "perpetual red zone," UnitedLex gave no new money to LeClairRyan as a part of the transaction.

155.    Mr. LeClair hid this fact from LeClairRyan's principal lender, telling VCF at a meeting on April 4, 2018 that UnitedLex "completely removed the loan piece due to tax implications."

**B.**



**C.    LeClairRyan Transfers Intellectual Property**

158.    The deal required that LeClairRyan contribute a back-office operation "sufficient to service a large, national law firm," along with intellectual property to ULXP.  LeClairRyan was also required to pay ULXP $3.6 million per month for use of its administrative staff (now employed by ULXP), which was $1.5 million more per year than the same services costs when done in-house by LeClairRyan.

`

159.    The intellectual property assets consisted of administrative resources for (i) lateral attorneys; (ii) training; (iii) personnel; (iv) marketing & business development; (v) pricing; (vi) program management; (vii) information technology and tools; (viii) legal industry collaboration & insight; (ix) industry research & analysis (x) risk management in operations and templets; (xi) library and research services; (xii) operations; and (xiii) attorney development.

160.    The property contributed to ULXP also included certain lease obligations and other physical assets associated with the office facilities in Glen Allen, Virginia that housed a substantial portion of LeClairRyan's administrative staff and operations.

161.    LeClairRyan's equity stake was also reduced to a 1% interest in ULXP, entitling LeClairRyan to receive two redemption payments:  the first to occur five years after the transaction based on a multiple of EBITDA for years three through five (estimated to be $60-80 million), and the second to occur ten years after the transaction based on a multiple of EBITDA for years six through ten (estimated to be $20-30 million).

162.    UnitedLex indirectly owned the remaining 99% of the joint venture.  LeClairRyan received the right to redeem a percentage of EBITDA, the first at the end of the fifth year of operations and the second at the end of the tenth year of operations.

**D.    LeClairRyan Also Agrees To Pay Off-Market Prices For Services**

163.    LeClairRyan and ULXP also entered into an expansive Master Services Agreement (the "MSA") on or about April 4, 2018.  Pursuant to the MSA, ULXP took control of certain delineated "responsibilities" of LeClairRyan.  The breadth of these responsibilities is best illustrated by a section of the MSA entitled "Provider & Law Firm Responsibilities," which listed the contemplated responsibilities of ULXP in regards to several essential functions, including "Legal Operations & Administration," "Client Relations & Business Development," "Marketing

`

& Communications," "Conflicts & Engagement Management," "Value Pricing & Legal Project

Management," "Human Resources," "Talent Development," and "Technology, Data & Security."

164.    The level of control assumed by ULXP over the core law firm functions is apparent

from the descriptions of ULXP's responsibilities under the MSA, which stated that ULXP would,

among other things:

a. Provide coordinated professional legal business operations services to Law Firm in support of Law Firm's delivery of legal services to its clients.

b. Propose ongoing business operations efficiencies and enhancements to Law Firm in support of (a) Law Firm's service delivery to its clients, (b) the successful implementation of the Services, and (c) accomplish the goals of this Agreement.

c. Conduct and share client acquisition and expansion financial planning and profitability analysis in conjunction with identifying and securing new or expanded business opportunities.

d. Manage all market-facing communications and marketing collateral, including Law Firm's website.

e. Propose, enhance and drive legal project management and value pricing strategies for Law Firm in support of Law Firm's service delivery to its clients.

f. Conduct and share client and matter financial planning and profitability analysis with Law Firm on a client, matter and practice group level.

g. Propose, negotiate and drive alternative fee arrangements and other pricing strategies supported by matter and portfolio budgets that align with client business objectives and Law Firm financial objectives.

h. Communicate directly with Law Firm and clients regarding the progress and status of budgets and scope of work.

i. Manage employee relations issues and performance management issues at Law Firm and the Provider.

j. Identify, develop and propose compensation for Law Firm non-Members based on market data.

k. Set compensation for the Provider employees based on market data and periodically evaluate and adjust based on the performance and contribution of the employees.

l. Identify, recruit and hire timekeepers and professional staff at the Provider and identify, recruit and facilitate the hiring of timekeepers (including lateral partners) and professional staff at the Law Firm.

m. Manage and ensure the efficient functioning of Law Firm and Provider offices.

n. Track and manage efficient Law Firm time entry compliance.

`

o. Track and manage [work-in-progress], write downs and write-offs.

p. Drive timely billing and collections, including communicating directly with clients on behalf of Law Firm regarding the transmission of bills and collection of receivables.

165.   Once the ULXP transaction was consummated, LeClairRyan was no longer able to function on its own without the support of the ULX Entities.

166.   The MSA also provided for fees to ULXP to be calculated under a combination of factors, including what the MSA described as "Invoice Fees" related to "Operations Services" and "Production Services."  In relation to these fees, ULXP provided LeClairRyan an $8 million "advance" on payments to be made under the MSA.  This "float" was in essence an infusion of equity into LeClairRyan, artificially designed to avoid restrictions established by U.S.  law around the ownership of a law firm, while allowing LeClairRyan to remain covenant compliant under its loan facilities with VCF.

167.   Yet, because of LeClairRyan's continued and sustained financial problems, the ULX Entities knew or should have known that LeClairRyan did not have sufficient funds to pay its obligations as they came due—including making payments on the accounts payable float provided by the ULX Entities.

168.   Operations Services Fees under the MSA related to ULXP's provision of back office and other non-legal services that LeClairRyan transitioned to it.  Production Services Fees were established through "a calculation that is based on member distributable income and accrued revenue," which were fees generated from the Debtor's provision of legal services.  Put simply, pursuant to the Production Services Fees, ULXP was to be compensated based on net profits of the law firm from its provision of legal services.

`

169.    The agreement to pay Production Services Fees resulted in the sharing in fees from LeClairRyan's legal practice.[4]

170.    The MSA included a caveat that "the payment of the Invoiced Fees shall be adjusted from time to time in order to account for the cash flow needs of LeClairRyan."

171.    Along with the MSA, the parties entered in the following additional agreements governing the arrangement (collectively, with the MSA, the "JV Agreements"): (1) Amended and Restated Limited Liability Company Agreement among ULXP, UnitedLex as the Class A Member and Managing Member, and LeClairRyan as the Class B Member (effective April 4, 2018); (2) Subscription Agreement between LeClairRyan and UnitedLex for LeClairRyan's purchase of Class B Common Interest (effective April 4, 2018 and including the Operating Agreement as Exhibit B); (3) Contribution Agreement between ULXP and LeClairRyan (effective April 4, 2018) (as may have thereafter been amended, the "Contribution Agreement"); and (4) Shared Personnel and Services Agreement ("Shared Personnel Agreement") between UnitedLex and ULXP (made as of April 4, 2018 and effective as of April 29, 2018).

172.    Together, the JV Agreements granted the ULX Entities unprecedented control over the operation of the Debtor law firm.  Although various attempts were made to amend these agreements in winter 2018 through spring 2019, final agreements were never signed.

173.    The ULX Entities used the JV Agreements to influence and control LeClairRyan's decision-making authority, including requiring LeClairRyan to inappropriately misuse funds tendered by clients for specific costs and expenses.

---

[4]    Other professionals recognized the apparent conflict in this arrangement.  For example, on August 11, 2019, Mr. Reed tried to fill a UnitedLex board seat in the "Compliance and Ethics function."  However, the candidate responded:  "[My attorneys] saw reference to the LeClair Ryan JV from 2018.  They are concerned that if I steered business to a law firm that has a material business relationship or JV with UnitedLex, it could appear that I was doing so to juice the value of my equity.  They are not concerned about normal, ordinary course engagements that UL might perform for law firms.  Rather, they are focused on large, strategic arrangements."

`

174.    At the time the JV Agreements were executed, the LCR Board knew that LeClairRyan was insolvent.

**E.    UnitedLex Uses The Joint Venture To Promote And Build Its Business**

175.    UnitedLex advertised when the joint venture was announced, through ULXP, that UnitedLex and LeClairRyan sought to "disrupt[] the traditional law firm model with a new 'constellation' platform that fuses the business and the practice of law."

176.    Under this model, ULXP would provide its "constellation" of law firms with "market, leading technology, new sources of capital, project and knowledge management, process innovation, and resource management to deliver maximum value to clients and improve law firm economics."

177.    UnitedLex also advertised that the joint venture with LeClairRyan would be "revealed as the most disruptive change to the practice and business of law since lawyers began billing their time," and would give law firms the "ability to provide greater value to their clients while operating with significantly improved financial strength."

178.    On April 12, 2018, Cortney Nathanson (UnitedLex) wrote to Mr. Reed:  "I had a call with our PR firm today and they think this story will be a huge win for us! … We are submitting a nomination for UnitedLex to American Lawyer Media's 'Alternative Legal Service Provider of the Year' Awards.  While the draft submission focuses largely on what we did with DXC, we can submit a confidential write-up about the ULX Partners deal to support our nomination.  This would really push us up a notch or ten from the competition!"

179.    As of May 2018, Latham & Watkins was also interested in the ULXP model and Mr. Reed sought to use materials created by LeClairRyan to consummate a similar relationship. For example, Mr. Reed wrote to Messrs. LeClair and Gustafson:  "Guys, I was recently in

`

conversation with Peter Lebonski… There is an interest in closely evaluating our constellation model and joining in…."

180.    On June 8, 2018, Mr. Reed then sent the ULXP press release to Mr. Labonski at Latham & Watkins ahead of its publication, noting: "The attached release (please treat as highly confidential) will be released next Tuesday or Wednesday.  The content of the release relates to the platform I briefly discussed with you a few weeks back.  The platform is highly modular, and can be fully adopted or adopted in part. … [CVC] has been a big part of the economic design."

**F.    UnitedLex Strings LeClairRyan Along With Promised Business Deals, But Never Delivers**

181.    To get shareholders in LeCairRyan on board, Mr. Reed had promised them business deals and opportunities, but never ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ on December 17, 2017, Mr. Reed wrote to Mr. Gustafson:  "Confidentially and based on some things we are working on with DXC and GE, there will be a good opportunity to enable LeClairRyan to reach into GE….let's discuss on Wednesday or Thursday."  However, that opportunity never materially transpired ████████████████████████

███████████████████████████████████████

███ █████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



`



187. █████████████████████████████████████████████████████

█████████████████ On August 18, 2018, "DXC agreed to move forward" with LeClairRyan.

On August 28, 2018, Mr. Gustafson noted that, ███████████████████████████

"[LeClairRyan] could receive $24 million in annual billings from DXC." ████████████

████████████████████████████████████████████████████████████████████████

████████████

`

188. 

G.

190.    Unbeknownst to ███ LeClairRyan members, CVC continued to pursue its investment in UnitedLex.  CVC continued to advise UnitedLex on the "fee sharing" aspects of the ULXP arrangement in June 2018, after the transaction had been signed.

191.    On or about July 2018, CVC also contemplated capping the amount of "float" available to LeClairRyan at $8.5 million and thought about seeking a commitment from LeClairRyan that any incremental amounts would be subject to different payment terms.

192.    CVC also sought to include terms in the agreements to protect its planned investment in UnitedLex, including proposing a term saying that payments to ULXP would have

`

priority over distributions to LeClairRyan's members.  However, these terms were ultimately not included.

193.    On September 11, 2018, Mr. Reed also asked Mr. LeClair to comment on a draft of the UnitedLex / CVC press release announcing CVC's investment in UnitedLex "along the lines we discussed."

194.



**H.    Appraisers Question Asset Valuations After The Deal Is Completed**

196.    LeClairRyan and UnitedLex jointly hired an accounting firm, Cornerstone Valuation LLC ("Cornerstone"), to perform a valuation of the ULXP transaction.  By the time

`

Cornerstone began its review of the transaction, the parties had already entered into the Contribution Agreement.

197.    Based on valuations and other information provided by Mr. LeClair, Cornerstone valued the assets contributed to the joint venture in the amount of $18.5 million.  Cornerstone also valued LeClairRyan's equity interest in the joint venture (without redemption) at $642,000.  With redemption LeClairRyan's interest was valued at $13.8 million.  The net loss to LeClairRyan was therefore calculated to be $4.7 million.

198.    Moreover, when Cornerstone expressly indicated in its report that Mr. LeClair had supplied the information on which its findings were based, Mr. LeClair made sure to have Cornerstone remove this disclosure from the final report.  Instead, because of Mr. LeClair's manipulations, the report falsely suggests that multiple individuals at LeClairRyan provided Cornerstone with information about the valuation of LeClairRyan's assets.

199.    In connection with the Cornerstone valuation, Mr. LeClair acknowledged that the "trust-me elements of the arrangement are substantial," including (i) the venture could "be terminated at any time with or without cause by [ULXP]"; (ii) "[r]egulatory challenges could lead to a termination or negative change in structure"; (iii) there were no contractual formulas in place governing how the redemption payments to LeClairRyan would be calculated; and (iv) LeClairRyan did not know "if the JV or [ULXP] will have the ability to pay the redemptions."

200.    Cornerstone internally raised concerns over the economics of the transaction.  On April 26, 2018, Jim Edge, founding partner of Cornerstone, wrote to Greg Waller, Cornerstone's managing partner, the transaction "results in an additional cost to [LeClairRyan] of $129,092 per month, or $1,549,104 per year.… In addition, the JV gets [LeClairRyan's] intellectual property

`

and workforce in place." Mr. Edge also concluded that based on information he had received from
Mr. LeClair, "the likelihood of a payout [to LeClairRyan] is slim at best."

201.    Cornerstone's valuation report was never officially finalized even though it was a
condition to closing the transaction.  On June 19, 2018, Mr. Reed wrote to Mr. Lange: "Chris,
before [the Cornerstone valuation] is finalized, you/me/gary need to connect.  I have been out of
the country the last few weeks and did not connect with Gary.  There are some serious issues for
[LeClairRyan] with the opinion."  Mr. Lange then forwarded that message to Mr. LeClair, Mr.
Gustafson and Ms.  Thompson, asking "Have either of you ever heard of an issue on the valuation
from Dan before?"

202.    Mr. LeClair replied: "News to me" and suggested sharing the opinion with Keiter
(LeClairRyan's go-to accounting firm), noting Carol Hurst should be part of the conversation.  In
accordance with Mr. LeClair's instruction, Mr. Lange emailed Keiter for an opinion, asking Keiter
"to keep the initial reaction/report verbal."  On June 29, 2018, Keiter emailed Mr. Lange,
disclosing that an issue with the valuation is it is based on an assumption that "the business will
fail."

203.    A few months later, Mr. Reed instructed employees of the ULX Entities to discuss
"the issue of the ~$100M valuation that [LeClairRyan] secured in support of this deal, including
discussing how capital was booked within [ULXP] given this valuation and the risk associated
with that valuation."

204.    On December 30, 2018, Mr. Lange wrote to Mr. LeClair regarding the Contribution
Agreement, noting:

> This issue is more of a headscratcher for me...  In short, they want to change the
> way we are contributing certain IP into ULXP at inception from granting of a
> perpetual license to an outright assignment/transfer … we need to be careful about

`

how we draft provisions around how we get that IP back if the deal was ever terminated …

205.     Upon information and belief, the IP assets were transferred to ULXP, and UnitedLex through its ownership interests in ULXP, without any compensation to LeClairRyan.

206.     By January 2019, UnitedLex reported that it had "inked deals worth an eventual $1.5 billion in revenue" in the last 18-month period, including with DXC, GE and Ford.

207.     On January 8, 2019, Elizabeth Acee wrote to Mr. Gustafson, "Interesting article.  A bit disappointing that in the extensive piece, there is nothing about the JV or LeClairRyan."  Mr. Wolf replied to Mr. Gustafson directly noting: "Latham is identified as their 'strategic partner."

208.     To address the article internally, Mr. Gustafson wrote to the LeClairRyan board and directors on January 8, 2010, noting: "I don't think we were mentioned because I think the only reason Latham was mentioned was that the meeting happened to be there where I expect that ULX is trying to finalize the Credit Suisse deal moving into execution phase."

209.     Lauren Hopwood at LeClairRyan, on January 10, 2019 wrote insightfully: "Instead they are just using our firm and our reputation to benefit themselves in trying to win millions of dollars of work that they will keep all of."

**V.     UnitedLex Takes Control; Pulls Plug**

**A.     UnitedLex Controls LeClairRyan**

210.     Following the execution of the MSA and JV Agreements, the ULX Entities worked as managing agents for LeClairRyan.

211.     The ULX Entities were in charge of key functions, such as accounting, marketing, conflict management, and business development.

212.     The ULX Entities accessed the Debtor's financial and other confidential information essential to the operation of the Debtor.  In November 2018, a LeClairRyan employee

`

noted that "ULXP is now co-staffing people to help ULXP from UnitedLex, so UnitedLex people (who are not fully devoted to LR) have access to LR's systems (including document management)."

213.     Upon information and belief, the ULX Entities also incurred expenses on the Debtor's behalf.

214.     The ULX Entities also made personnel decisions regarding the Debtor's personnel.

215.     The ULXP employees were the directors of the following key operations at LeClairRyan: Chief Operating Officers/Chief Client Services Officers, SVP Human Resources, Director – Engagement Management, Director – Practice Management & Attorney Integration, and Director – Marketing and Business Development.  While an employee of ULXP and then at UnitedLex, another individual served as the Plan Administrator of LeClairRyan's 401(k) profit sharing plan.

216.     ULXP Employees regularly held themselves out to the public to be employees and decision-makers of LeClairRyan.

217.     For instance, in February 2019, Josh Rosenfeld held himself out to a key vendor of LeClairRyan, Proxios, as the "Chief Operating Officer" of LeClairRyan, as well as an employee authorized to enter into business transactions on behalf of UnitedLex and ULXP.

218.     In an August 8, 2018 email to Reed and UnitedLex CFO Nicholas Hinton, along with certain ULXP directors, Peter Krakaur, then the UnitedLex Vice President, Legal Business Solutions, illustrated the operation of ULXP and UnitedLex.

219.     A PowerPoint attached to the email illustrated the service arrangement employed at that time alongside UnitedLex's ideal arrangement, which was to integrate ULXP and LeClairRyan fully into UnitedLex's systems and processes.

`

220.    The diagram, reproduced below, shows a slow movement to full integration and dominance by UnitedLex—despite noted "potential issues" that would result from such a course of action.



221.    In explaining the illustration in the PowerPoint, Krakaur explicitly described the ULX Entities' plan:

> Slides 3+4 convey the concept of how ULXP is practically operating as it did pre April 29 when operations was part of [LeClairRyan].   We are slowly and necessarily integrating UXP (sic) operations (including finance) with [UnitedLex]. That said, we still need to service [LeClairRyan] as a law firm.  Over time, we will shift ULXP (and [LeClairRyan]) towards [UnitedLex] systems and processes.  The art is doing it in a way that pulls [LeClairRyan] partners along with us given cultural and other limitations we discussed earlier regarding law firm partners and their business acumen.

222.    As Krakaur stated in a subsequent August 10, 2018 email, "ULXP is now the owner of the business of law."

223.    Explaining further, Krakaur wrote, "[w]e all know law firms do not operate as a business.  ULXP is designed to change that.  Given the nature of the relationship, the agreements, and the practical aspects of us running the law firm, we need to consider carefully on how we communicate these specific actions and where and how we push partners to achieve our plan."

`

**B.**

224.    In August 2018, Mr. LeClair and Mr. Reed hired Nicholas Hinton to oversee the management of ULXP.   On September 17, 2018, Mr. Reed cautioned Mr. Hinton on how to exercise power over LeClairRyan:  "Nick … you make the final call … with Erik / LR attorneys. Please set the tone … incorporating Gary's comments.  We cannot be a bull in the china shop, even though we have the power to do so.  …"

225.    On October 5, 2018 Mr. Reed told Mr. Hinton:  "I want to be as aggressive as possible in reforming LR and ULX Partners and 'feel' the impact in November.  Given our first responsibility is ensuring the go forward viability of the organization, we need to be Gordon Gecko like on cuts, no or highly limited severance, etc."[5]  At the same time, Mr. Reed continued to rely on Mr. LeClair's guidance, noting in an October 7, 2018 email: "Very interested in Doug's thoughts – AND Gary LeClair's.  Gary's views and guidance are critical . . . ."

**C.     The ULX Entities Take Further Control of the Debtor, Prioritizing Payments to ULXP Over All Others**

226.    By the end of 2018, LeClairRyan was continuing to experience member defections and declining revenue.

227.    At the end of November 2018, LeClairRyan owed the ULX Entities approximately $16.4 million.   Loading the firm with even more debt, on December 1, ULXP transferred responsibility of the payment of its operational expenses to LeClairRyan, including an outstanding balance of $1.8 million.

228.    In or around January 2019, the ULX Entities began to convene regular meetings with LeClairRyan's CFO, Dwight Jones, and other LeClairRyan Board members and/or staff

---

[5]      In the film *Wall Street*, Gordon Gekko borrowed huge sums of money to take over existing firms, then extracted value by force.  This form of financial piracy in the name of "greed" achieved iconic status thanks to *Wall Street*.  Despite his destructive nature, Mr. Gekko called himself a "liberator" of companies.

`

members to discuss cash flow.  In certain of these meetings, Mr. Jones would meet with Mr. Hinton and the UnitedLex Controller to discuss 13-week cash flow forecasts and to address the payment installments for the ULX Entities.

229.    Mr. Hinton insisted that Mr. Jones prepare these 13-week cash flow forecasts, which showed weekly cash receipts and potential cash disbursements.  This type of cash flow forecast is most often used in situations where a company enters financial distress in order to provide visibility into the company's short-term options.

230.    In connection with these meetings and discussions, Mr. Hinton also decided which of the firm's key vendors needed to be paid.  These regular meetings became avenues for the ULX Entities to further exert their control and ensure that their invoices were paid ahead of other creditors.

231.    As demonstrated by the chart below, between November 2018 and the Petition Date, payables due and owing from the Debtor to ULXP decreased by approximately 30.7%, while LeClairRyan's payables due and owing to all other creditors increased by approximately 181%:



**Comparison of Payable to ULXP to Other Accounts Payable**
*($ in millions)*

[1] Excludes interest on $8,000,000 debt recharacterization.
[2] Includes the following balance sheet line items: Accounts Payable, Credit Card and Accrued Expenses.

232.    The ULX Entities continued to demand weekly payments, with LeClairRyan's stated payment amounts needing to be at least $2 million a month.  The ULX Entities would demand these payments, regardless of what other higher priority vendor payments were outstanding.  Through these meetings, it was clear that the ULX Entities made the decisions about who was to be paid and when.

233.    As an example, in an email dated February 21, 2019, Mr. Jones explained that LeClairRyan would not be issuing a weekly payment to ULXP due to the need to handle outstanding payables for client reimbursements.  In response, Mr. Hinton sent an email to Mr. Gustafson asking if this was LeClairRyan's position and noting that "[UnitedLex] is not the lowest priority vendor.  We are not LCR's bank."

234.    Based on pressure exerted by the ULX Entities, insolvent LeClairRyan improperly prioritized payments to ULXP, to the detriment of other creditors and clients.

`

235.     Upon information and belief, there were also instances in which LeClairRyan did not pay expenses, such as client court fees or lease payments, at the direction of the ULX Entities.

236.     Upon information and belief, in certain of these instances, individual attorneys had to pay for client fees out of pocket to avoid missing client deadlines.

237.     Upon information and belief, in other instances, LeClairRyan would not pay vendors who were handling aspects of clients' cases, even though the client had tendered funds to LeClairRyan for the purpose of paying those vendors.

238.     The ULX Entities encouraged LeClairRyan to commingle funds tendered by clients for specific expenses with operational funds that were used for other payments.

239.     The ULX Entities pushed back against efforts by LeClairRyan to cease, or limit, the practice of commingling client and operational funds as the firm approached bankruptcy.

240.     Multiple officers and directors of LeClairRyan told Mr. Hinton that client funds should not be used for any purpose other than the purpose that the client intended.  Despite this warning, on April 10, 2019, a year after entering in the joint venture and five months before LeClairRyan would file for bankruptcy protection, Mr. Hinton told Mr. Jones, the then-Chief Financial Officer, to use the funds given to LeClairRyan by clients for expenses for its creditors, instead of "restrict[ing] the liquidity of the firm by creating artificial restricted cash pools."

241.     This mishandling of these funds, related mismanagement of client affairs, and neglect of other important financial obligations in order to prioritize payments to ULXP was a further violation of fiduciary duties owed by the ULX Entities, including to its clients and creditors.

## VI.     The Joint Venture Purportedly Falls Apart

### A.     UnitedLex Demands More Protections

242.     In April 2019, a year after entering in the joint venture and only three months before LeClairRyan would resolve to dissolve the firm, ULXP and LeClairRyan entered into an

`

Outstanding Deferred Loan Promissory Note in the principal amount of $8 million (the "ULXP

Note") and an accompanying Security Agreement (the "ULXP Security Agreement").

243.    Both documents were signed on April 4, 2019, but were backdated and made

effective as of December 20, 2018.

244.    Under the terms of the ULXP Note, LeClairRyan agreed to pay ULXP the principal

amount of $8 million for alleged fees owed by LeClairRyan to ULXP under the MSA.   No

payments were to be made under the ULXP Note until its maturity date on June 30, 2023.

245.    ULXP did not account to LeClairRyan for the services it was providing.   For

example, on April 16, 2019 Brian DeFazio Controller at UnitedLex wrote to Brian Haynes and

Dwight Jones: "So I checked again today and I see that the emails I'm on ONLY have LeClairRyan

employees, no ULXP … we really don't have an independent way to tie out between payroll and

what we're invoiced for payroll."

246.    The debt that formed the center of the purported loan consisted entirely of prior

investments made by the ULX Entities to LeClairRyan.

247.    LeClairRyan was insolvent or undercapitalized at the time the ULXP Note and

ULXP Security Agreement were executed.

248.    The result of the ULXP Note was to elevate ULXP's priority over unsecured

creditors.

249.    In fact, the ULXP Note was, in reality, an adjustment of equity interests.   Despite

being documented as a "loan," on January 22, 2019 Mr. Lange sent revisions to the ULXP Note

to counsel for the ULX Entities and to the UnitedLex team, explaining that, via his changes, "we

wanted to present a note that our lender [VCF] …would see as being equity like in that it is being

paid from the return on our equity investment in [ULXP]."   LeClairRyan then arranged with its

`

senior secured lender to treat the ULXP Note as equity for purposes of performing its leverage ratio calculation.

250.    Upon information and belief, the ULX Entities knew about this arrangement with the senior secured lender.

251.    This effort proved successful.  On January 31, 2019, VCF informed LeClairRyan that it approved the leverage ratio calculation so that the $8 million would be treated as equity, saying "[t]he [UnitedLex] Deferred Loan Promissory Note is to be added to Net Equity and subtracted from Total Liabilities as you have presented here in."

252.    ULX Entities knew or should have known that the ULXP Note was treated as equity by VCF.

253.    At all times, from April 2018 to September 2019, Defendants knew or should have known that the ULX Entities were providing equity and investing in LeClairRyan.

254.    At all times, from April 2018 to September 2019, Defendants knew or should have known that LeClairRyan was not sufficiently capitalized to pay back the ULXP Note.

255.    LeClairRyan never made a single payment under the ULXP Note.

**B.    Defendants Attempt To Form The Novellus Law Group; Final Act Pushes LeClairRyan into Bankruptcy**

256.    On or about early 2019, LeClairRyan's financial condition worsened precipitously.

257.    In a desperate attempt to save the dwindling value of LeClairRyan for the benefit of certain LeClairRyan members and UnitedLex, LeClairRyan and the ULX Entities embarked on an initiative known as "Project Modern."  Project Modern was a last-ditch attempt to take the remaining valuable pieces of LeClairRyan, giving the ULX Entities even greater control.

258.    Project Modern morphed into the concept of a new law firm called the Novellus Law Group ("NLG"), which involved forming a new partnership with UnitedLex in which certain

`

of LeClairRyan's members would flip back to a W-2 compensation model, with only modest personal capital requirements and bonuses based on specific and personalized management objectives.

259.    NLG was not intended to simply be a continuation of LeClairRyan, but rather a new entity that attempted to strip LeClairRyan of its assets and profitable members while leaving debt and other liabilities, including but not limited to certain real estate leases and technology costs, with LeClairRyan, which would have collapsed under its own weight and inevitably been wound down.  To help facilitate this transaction, LeClairRyan made cash payments to ULXP and entered into the ULXP Security Agreement (which among other things authorized related UCC filings).

260.    Under the proposal, the "debts" owed by LeClairRyan to ULXP would be assumed by the newly-formed NLG, and the equity investments that UnitedLex purportedly made in connection with the prior joint venture with LeClairRyan would be incorporated into the new entity's debt and/or equity structure.  UnitedLex would also be entitled to various fees and other streams of income including but not limited to profits generated by the new law firm.

261.    Other debt, including, but not limited to, debt to former shareholders and certain landlords, would not have been assumed by NLG—that debt would be restructured (or liquidated in bankruptcy).

262.    To incentivize them to join NLG, certain of LeClairRyan's members were promised equity in UnitedLex, which still hoped to grow by working with other law firms (which, upon information and belief, UnitedLex succeeded at doing with LeClairRyan's business model).

263.    In NLG offer letters, a select group of the Debtor's members were offered base compensation, bonus potential, long term incentive compensation, benefits and payroll taxes—a package allegedly superior to that of the traditional law firm model.

`

264.    While the NLG model seemed promising, any new entity formed from LeClairRyan would still need operating capital.  Accordingly, on or about June 20, 2019, in connection with efforts to enact the NLG plan, Messrs. Hinton and Reed began negotiating directly with LeClairRyan's lender, VCF, to provide more financing for NLG.

265.    Upon information and belief, Messrs. Hinton and Reed sought financial backing from VCF because neither CVC nor UnitedLex wanted to invest further money in this new law firm.  After a period of discussions and initial diligence, on or about July 18, 2019, VCF refused to provide the level of funding demanded by Messrs. Hinton and Reed.

266.    At the same time, LeClairRyan's members were leery of the new compensation model given the unfulfilled promises of UnitedLex.  This, in conjunction with the impasse between UnitedLex and VCF on how to handle the Debtor's debt with this new law firm structure, meant that NLG would not come to fruition.

### C.    The Captain Abandons Ship; Members Vote To Dissolve

267.    During the first half of 2019 and as late as July 14, 2019 (if not later), Mr. LeClair and Mr. Reed continued to devise additional ways to strip value from LeClairRyan, this time in connection with the formation and implementation of NLG, particularly focusing on persuading others of this new entity, including, but not limited, to the "precise messaging" to VCF.

268.    While assisting Mr. Reed with NLG, Mr. LeClair continued to extract value from LeClairRyan in other ways as well.  For example, on March 22, 2019 Mr. LeClair demanded from LeClairRyan (i) interest on an outstanding loan against his Life Insurance Policy, (ii) representation that policy premiums had been paid in full through March 2019, (iii) distribution of the Life Insurance Policy on or before April 10, 2019, subject to the $309,000 outstanding loan, and (iv) payoff of the loan in monthly installments of $40,051.81 each month by November 2019.

`

Otherwise Mr. LeClair threatened to terminate employment for "Good Reason," which he maintained would trigger additional payments under his soft-landing contract.

269.    With VCF refusing, on or about July 15, 2019, to provide the level of NLG funding demanded by Messrs. Hinton and Reed, Mr. LeClair announced (on or about July 25, 2019) his plans to leave LeClairRyan.   Four days after Mr. LeClair's announcement, LeClairRyan's members voted to formally wind-down the firm.

270.    On September 3, 2019 (the "Petition Date"), LeClairRyan commenced a chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

## VII.    Transfers Made To Defendants

### A.    Transfers Made To Mr. LeClair

271.    The Debtor transferred not less than $1,379,158 to Mr. LeClair between September 3, 2017 and the Petition Date (the "Two-Year LeClair Transfers").

272.    Of the $1,379,158 transferred to Mr. LeClair, not less than $515,224 was made on account of antecedent debt and occurred within one year of the Petition Date (the "LeClair Preferential Transfers").

273.    The Debtor transferred not less than $2,363,965 to Mr. LeClair between September 3, 2014 and the Petition Date (the "LeClair Transfers").

274.    In addition, pursuant to various documents, including but not limited to the Fourth Amended and Restated Shareholders Agreement of LeClairRyan, A Professional Corporation, which the Debtor adopted through the Operating Agreement of LeClairRyan PLLC dated as of February 27, 2018 and the Fifth Amendment to December 31, 2007 GDL-SLC dated December 27, 2016 and agreed to on December 28, 2016, Mr. LeClair (as well as his successors, heirs, estate, administrators, representatives, trustees and assigns) purportedly received certain release, indemnification and exculpatory rights (the "Release and Exculpation Rights") fromLeClairRyan.

`

**B.**      **Transfers Made to the ULX Entities**

275.    Upon information and belief, during the relationship between the ULX Entities and the Debtor, the Debtor transferred not less than $19,912,972.66 to ULXP between October 2013 and the Petition Date (the "ULX Transfers").[6]

276.    Upon information and belief, of that amount, not less than $17,981,095.66 of the transfers occurred within one year of the petition date (the "ULX Preferential Transfers").[7]

277.    In addition, at least $18.5 million in assets were transferred to the ULX Entities under the Contribution Agreement and/or pursuant to other transaction documents, for which LeClairRyan received no consideration or value.

<u>**COUNT I**</u>
**Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(A) and 550**
**(Against ULXP and UnitedLex)**

278.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

279.    The ULX Transfers are transfers of interests in the Debtor's property.

280.    The ULX Transfers were made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

281.    The ULX Entities were not good faith transferees, and therefore are not entitled to offset rights under section 548(c) and applicable non-bankruptcy law.

282.    Each ULX Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including, but not limited to:  (i) the transfers were to ULXP,

---

[6]      The ULX Transfers are listed on the attached Exhibit 1.

[7]      The ULX Preferences are listed on the attached Exhibit 2.

`

an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers

were made at the same time substantial new liabilities and debts were being incurred by the Debtor;

and (iii) the Debtor was or became insolvent at the time of the ULX Transfers.

283.   The ULX Transfers were made within two (2) years prior to the Petition Date.

284.   The ULX Transfers are avoidable and recoverable against ULXP as fraudulent

transfers under section 548(a)(1)(A) and 550 of the Bankruptcy Code.

285.   The Trustee reserves the right to seek the avoidance and recovery of any and all

additional avoidable transfers that she later discovers.

286.   The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP,

and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the

Bankruptcy Code.

287.   The Trustee is entitled to the full amount of the ULX Transfers, totaling not less

than $19,912,972.66, plus interest, the Trustee's reasonable attorneys' fees, and costs, and all other

relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT II
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(a)(1)(B) and 550
### (Against ULXP And UnitedLex)

288.   The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

289.   The ULX Transfers were transfers of interest in the Debtor's property.

290.   The Debtor received less than a reasonably equivalent value in exchange for the

ULX Transfers.

291.   The ULX Transfers were made within two (2) years prior to the Petition Date.

`

292.    The ULX Transfers were made while the Debtor was insolvent, or became insolvent as a result of the ULX Transfers.

293.    At the time of, or as a result of the ULX Transfers, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

294.    At the time of the ULX Transfers, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

295.    At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of 11 U.S.C. § 502.

296.    The ULX Transfers are avoidable transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

297.    The Debtor was insolvent on the dates that such transfers were made or such obligations were incurred, or became insolvent as a result of such transfers or obligations.

298.    The ULX Transfers are avoidable and recoverable as fraudulent transfers against ULXP under sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

299.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

300.    The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

301.    The Trustee is entitled to the full amount of the ULX Transfers, totaling not less than $19,912,972.66, plus interest, the Trustee's reasonable attorneys' fees, and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

`

## COUNT III
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 544(b), 550,
### and Applicable State Law
### (Against ULXP And UnitedLex)

302. The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

303. Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

304. The ULX Transfers were transfers of interest in the Debtor's property to the ULX Entities.

305. At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

306. The ULX Transfers were made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

307. Each ULX Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following: (i) the transfers were to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the transfers were made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the ULX Transfers.

308. The ULX Transfers were made to or for the benefit of the ULX Entities.

309. The ULX Transfers were made within the five (5) years before the Petition Date and should be avoided and recovered pursuant to sections 544(b) and 550 of the Bankruptcy Code.

`

310.     The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

311.     The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

312.     The Trustee is entitled to the full amount of the ULX Transfers, totaling not less than $19,912,972.66, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

313.     The ULX Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

**COUNT IV**
**Avoidance of Preferences Under 11 U.S.C. §§ 547(b) and 550**
**(Against ULXP and UnitedLex)**

314.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

315.     Between the Petition Date and one year before the Petition Date, the Debtor made the ULX Preferential Transfers to or for the benefit of the ULX Entities.

316.     The ULX Preferential Transfers were for or on account of an antecedent debt owed by the Debtor before the ULX Preferential Transfers were made.

317.     The ULX Entities are statutory insiders for the Debtor, within the meaning of Section 101(31)(F) of the Bankruptcy Code.

318.     The ULX Entities are also non-statutory insiders of the Debtor.

`

319.    The ULX Entities were managing agents of the Debtor, as they accessed the Debtor's financial and other information essential to the operation of the Debtor, incurred expenses on the Debtor's behalf, made personnel decisions, and were in charge of key functions, such as accounting, marketing, conflict management, and business development.

320.    The Debtor was insolvent at all times within one year of the Petition Date.

321.    To the extent any portion of any transaction is deemed not recoverable pursuant to sections 544, 548 or 550 of the Bankruptcy Code, such portion is plead here, in the alternative, as ULX Preferential Transfers.

322.    The ULX Preferential Transfers are avoidable under section 547 of the Bankruptcy Code.

323.    The ULX Preferential Transfers enabled the ULX Entities, as creditors, to receive more than they would have received had the transfer not been made and the creditor received payment of such debt under chapter 7.

324.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional preferential transfer that she later discovers.

325.    The ULX Preferential Transfers are recoverable from UnitedLex as an alter ego of ULXP and/or, upon information and belief, as a subsequent transferee pursuant to section 550 of the Bankruptcy Code.

326.    The Trustee is entitled to the full amount of the ULX Preferential Transfers, totaling not less than $17,981,095.66, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these amounts.

**COUNT V**
**Avoidance of Lien and Recovery of Avoided Transactions**
**Under 11 U.S.C. §§ 544, 548, 550, and 551**
**(Against ULXP)**

`

327.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

328.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

329.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to or for the benefit of insider ULXP (the "ULXP Note Transfers").

330.    As described above, ULXP received ULX Transfers in an amount not less than $19,912,972.66.

331.    To the extent that any transaction is avoided under sections 544 and/or 548 of the Bankruptcy Code, pursuant to section 550 of the Bankruptcy Code, ULXP's claims and liens against the Debtor are avoidable.

332.    Moreover, pursuant to section 551 of the Bankruptcy Code, ULXP's claims and liens that are avoidable herein shall be preserved for the benefit of the Estate.

333.    Based on the foregoing, the ULXP Note Transfers are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and recoverable and/or preserved pursuant to sections 550 and 551 of the Bankruptcy Code for the benefit of the Debtor and its Estate.

**COUNT VI**
**Avoidance of Lien and Recovery of Avoided Transactions**
**Under 11 U.S.C. §§ 547, 550, and 551**
**(Against ULXP)**

334.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

335.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

336.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were ULXP Note Transfers.

337.    In or around April 4, 2019, ULXP and the Debtor entered into the ULXP Note and the ULXP Security Agreement in the amount of $8 million.  Both documents were signed on April 4, 2019 but were backdated to December 20, 2018.  ULXP was granted liens securing the commitments pursuant to the ULXP Note.

338.    The grant of a security interest in connection with the ULXP Note and the filing of the UCC-1 financing statement on April 22, 2019 were transfers to or for the benefit of insider ULXP.

339.    As described above, ULXP received ULX Preferential Transfers in an amount not less than $17,981,095.66.

340.    Based on the foregoing, the ULXP Note Transfers are avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, and recoverable and/or preserved pursuant to sections 550 and 551 of the Bankruptcy Code for the benefit of the Debtor and its Estate.

## COUNT VII
**Avoidance of Fraudulent Transfer Under §§ 544(b) and 550 and Applicable State Law
(Against ULXP)**

`

341.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

342.    Under Bankruptcy Code section 544(b), the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

343.    The ULXP Note Transfer was a transfer of interest in the Debtor's property to ULXP.

344.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

345.    The Debtor entered into the ULXP Note Transfer with the actual intent to delay, hinder, or defraud the creditors of the Debtor.

346.    The ULXP Note Transfer was made to or for the benefit of ULXP.

347.    The ULXP Note Transfer was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including, but not limited to:  (i) the ULXP Note Transfer was made to ULXP, an insider of the Debtor, who exercised dominion and control over the Debtor; (ii) the ULXP Note Transfer was made at the same time substantial new liabilities and debts were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the ULXP Note Transfer.

348.    The ULXP Note Transfer was made within the five (5) years before the Petition Date and should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 550 and applicable state fraudulent transfer law.

**<u>COUNT VIII</u>**
**Disallowance of Claims under 11 U.S.C. § 502(d)**
**(Against ULXP and UnitedLex)**

`

349.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

350.    As alleged above, the ULX Entities were the recipients of the ULX Transfers and the ULX Preferential Transfers, which are avoidable pursuant to sections 544, 547, and 548 of the Bankruptcy Code, and which are recoverable pursuant to section 550 of the Bankruptcy Code.

351.    Despite a demand, ULXP has not returned the ULX Transfers to the Trustee.

352.    Pursuant to section 502(d) of the Bankruptcy Code, the Court shall disallow any claims of any entity from which property avoidable under section 544, 547, or 548 of the Bankruptcy Code, or that is recoverable under section 550(a) of the Bankruptcy Code.

353.    Because the ULX Entities have not paid or returned the ULX Transfers to the Trustee, ULXP's claims or any claims which ULXP or UnitedLex purport to assert must be disallowed unless and until the Defendants return to the Trustee an amount equal to each such transfer that is avoided.

354.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 502(d) that all of the claims asserted by the ULX Entities against the Estate are disallowed.

## COUNT IX
### Re-Characterization of Debt as Equity
### (Against ULXP)

355.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

356.    ULXP has filed a claim that asserts a right to payments allegedly owed by the Debtor (Proof of Claim No. 174) (the "Secured Claim").

357.    The Secured Claim consists of the $8 million ULXP Note entered into between ULXP and the Debtor on April 4, 2019 and back dated to December 20, 2018.

`

358.    The Secured Claim was in substance an equity contribution to the Debtor made when the Debtor was undercapitalized, and the ULX Entities' $8 million loan was not for new value, but on account of a prior $8 million "float" authorized by the ULX Entities to the Debtor under the Master Services Agreement.

359.    Individuals at UnitedLex and LeClairRyan repeatedly referred to the ULXP Note as an equity investment, designed to avoid certain take implications.

360.    LeClairRyan did not have access to third-party funding sources.  Those lines of credit had already been used.

361.    Under the terms of the ULXP Note, no payments were to be made until its maturity date on June 30, 2023.

362.    The Debtor made no payments on the $8 million ULXP Note.

363.    As a result of the ULXP Entities' equity contributions, the Court should recharacterize as equity ULXP's Proof of Claim No. 174 in its entirety pursuant to this Court's equitable powers.

`

## COUNT XX
**Avoidance of Transfers Made In Connection with the Contribution Agreement
Under 11 U.S.C. §§ 548(A)(1)(A) and 550
(Against the ULX Entities)**

364.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

365.    The Contribution Agreement entered in connection with the ULXP joint venture transferred intellectual property interests of the Debtor's property to ULXP (the "Intellectual Property Transfer"), in which UnitedLex had majority interest.

366.    The Contribution Agreement was entered into and the Intellectual Property Transfer was made with actual intent of the Debtor to hinder, delay, or defraud any entity to which the Debtor was or became, on or after the date that such transfers were made or such obligation was incurred, indebted.

367.    The ULX Entities were not good faith transferees, and therefore they are not entitled to offset rights under section 548(c) and applicable non-bankruptcy law.

368.    The Intellectual Property Transfer was accompanied by at least three badges of fraud indicating the fraudulent nature of such transfer, including, but not limited to, the following: (i) the transaction resulted in an immediate realized loss for the Debtor of more than $4 million; (ii) the transfer was made at the same time substantial new debts and liabilities were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the Contribution Agreement.

369.    The Contribution Agreement was entered into within two (2) years prior to the Petition Date.  The Intellectual Property Transfer was made within two (2) years prior to the Petition Date and is avoidable as fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.

`

370.     The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

371.     The Trustee is entitled to the full amount of assets transferred under the Contribution Agreement including but not limited to the Intellectual Property Transfers, totaling not less than 18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XXI
### Avoidance of Fraudulent Transfers Under 11 U.S.C. §§ 548(A)(1)(B) and 550
### (Against the ULX Entities)

372.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

373.     The Contribution Agreement transferred interests in the Debtor's property to ULXP.

374.     The Debtor did not receive reasonably equivalent value in exchange for the assets transferred under the Contribution Agreement.

375.     The Debtor was insolvent on the dates that such transfers were made, or became insolvent as a result of such transfers.

376.     At the time of the Contribution Agreement, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts as they matured.

377.     At the time of, or as a result of the Contribution Agreement, the Debtor was engaged in a business or a transaction for which any property remaining with such Debtor was unreasonably small in relation to its business.

378.     At all relevant times, the Debtor had at least one creditor holding unsecured claims allowable within the meaning of section 502 of the Bankruptcy Code.

`

379.    The Contribution Agreement was entered into within two (2) years prior to the Petition Date and the transfers made thereunder are avoidable transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

380.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

381.    The Trustee is entitled to the full amount of the value of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## <u>COUNT XXII</u>
### Avoidance of Fraudulent Transfers Under 11 U.S.C. § 544(b) and Applicable State Law
### (Against the ULX Entities)

382.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

383.    Under section 544(b) of the Bankruptcy Code, the Trustee has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code section 502.

384.    The Contribution Agreement transferred interests in the Debtor's property to ULXP.

385.    At all relevant times, the Debtor had at least one creditor holding an unsecured claim that is allowable under section 502 of Bankruptcy Code that arose before or within a reasonable time after the transfer was made.

386.    The Debtor entered into the Contribution Agreement with the actual intent to delay, hinder, or defraud the creditors of the Debtor.

387.    The primary purpose of the Contribution Agreement was to take assets from the Debtor for the benefit of the ULX Entities to the detriment of creditors.

`

388.    Each transfer made in connection with the Contribution Agreement was accompanied by at least three badges of fraud indicating the true fraudulent nature of such transfer, including but not limited to the following:  (i) the transfer resulted in an immediate realized loss for the Debtor of more than $4 million; (ii) the transfer was made at the same time substantial new debts and liabilities were being incurred by the Debtor; and (iii) the Debtor was or became insolvent at the time of the Contribution.

389.    The Contribution Agreement was entered within the five (5) years before the Petition Date.  The transfers made thereunder, including, but not limited to the Intellectual Property Transfers, were made within the five (5) years before the Petition Date and should be avoided pursuant to applicable provisions section 544(b) and 550 of the Bankruptcy Code.

390.    The Trustee reserves the right to seek the avoidance and recovery of any and all additional avoidable transfers that she later discovers.

391.    The Trustee is entitled to the full amount of the value  of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, the Trustee's reasonable attorneys' fees and costs, and all other relief the Court deems just and proper for her efforts to avoid and recover these fraudulent transfers.

## COUNT XXIII
### Misappropriation of Trade Secrets Under The Virginia Uniform Trade Secrets Act, Va.  Code §§ 59.1-336 *et seq.* (Against the ULX Entities and Mr. LeClair)

392.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

393.    The ULX Entities had access to valuable trade secrets and confidential information belonging to the Debtor as the term "Trade Secrets" is defined under the Virginia Uniform Trade

`

Secrets Act, Va. Code §§ 59.1-336 *et seq.* through its access to LeClairRyan's documents and systems following the transfer of LeClairRyan's back-office group to ULXP.

394.    These trade secrets are information from which the Debtor derived actual or potential independent economic value, from their not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure or use.  These trade secrets are the subject of efforts that are reasonable under circumstances to maintain secrecy.

395.    Through the ULXP transaction, Mr. LeClair caused the Debtor's trade secrets to be disclosed, and otherwise misappropriated, for the benefit of UnitedLex, without the Debtor's full knowledge and consent.

396.    The ULX Entities knew or had reason to know that the Debtor's trade secrets had been acquired by improper means.

397.    As a result of this misappropriation, the Debtor has been damaged in an amount to be determined at trial.

398.    Upon information and belief, this misappropriation has been willful and malicious, warranting punitive damages under Va. Code §§ 59.1-338, and entitling the Debtor, and now the Trustee, to attorneys' fees under Va. Code §§ 59.1-338.1.

## COUNT XXIV
### Breach of Fiduciary Duty
### (Against the ULX Entities)

399.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

400.    As members of a joint venture, the ULX Entities owed the Debtor a fiduciary duty of loyalty and care to, among other things, (i) preserve, maximize, and equitably distribute profits

73

`

generated with respect to the ULXP joint venture; (ii) refrain from dealing with a party adverse to or competing with the ULXP joint venture; and (iii) refrain from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

401.    The UnitedLex Entities breached their duties of loyalty to the Debtor by, among other things, (i) mismanaging the joint venture; (ii) usurping the Debtor's business opportunities and relationships, (iii) pursuing and securing other business deals using the Debtor's assets and intellectual property, (iv) exerting undue control over the Debtor, and (v) engaging in the unauthorized practice of law.

402.    Any economic benefit that the ULX Entities derived and/or continues to derive from the ULXP joint venture and/or it related "constellation" with other entities is a direct and proximate cause of their breach.

403.    The Trustee is entitled to damages from the ULX Entities as a result of their breaches in an amount to be proved at trial, including in the amount of any profits that the ULX Entities received in connection with the ULXP joint venture and any gains the ULX Entities received and/or continue to receive in connection with the "constellation" formed directly and/or indirectly by UnitedLex.

### COUNT XXV
**Accounting**
**(Against the ULX Entities)**

404.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

405.    As a member of ULXP, the Debtor, and now the Trustee, is entitled to access the joint venture's books, records, and any documents related to its operational structure pursuant to Va. Code § 50–73.102(B)(1).

74

`

406.    The ULX Entities violated fiduciary duties owed to the Debtor.

407.    The Trustee is therefore entitled to a full accounting of the books and records of the

ULX Entities as it relates to the "constellation" formed directly and/or indirectly by UnitedLex.

## COUNT XXVII
### Statutory Conspiracy, Va.  Code § 18.2-499, *et seq.*
### (Against the ULX Entities)

408.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

409.    From at least until in or around 2017 to until or around 2019, the ULX Entities and

one or more of the LCR Officers and Directors acted in concert, agreed, associated, mutually or

combined to accomplish, by concerted action, unlawful, illegal and oppressive acts that caused

injury and damage to the Debtor and creditors of the Debtor.

410.    The ULX Entities violated Virginia Code § 18.2-499 by combining, associating,

agreeing, mutually undertaking or concerting together, and with others, including but not limited

to the LCR Officers and Directors for the purpose of willfully and maliciously injuring the Debtor

in its reputation, trade, business or profession.

411.    The ULX Entities conspired to breach the fiduciary duties the LCR Officers and

Directors owed to the Debtor and its shareholders, clients, and creditors, by among other things,

entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer,

misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating

fraudulent and preferential transfers, and/or making misleading or false statements to professional

consultants.

412.    The unlawful acts, undertaken willfully, intentionally, purposefully, and without

lawful justification, have injured the Debtor and its creditors.

`

413.    The ULX Entities' wrongful conduct was aimed directly at damaging the Debtor and the Debtor's other creditors.

414.    As a direct and proximate result of the conspiracy and agreement among the ULX Entities and one of more of the LCR Officers and Directors, the Debtor and its creditors suffered significant damages, including but not limited to the decline in enterprise value.

415.    The Defendants' wrongful conduct constitutes a violation of the Virginia Business Conspiracy Act (the "VBCA").

416.    The Debtor suffered injury from its extended existence and the further  dissipation of its assets.  As such, the Debtor's creditors lost assets that would have otherwise been available to satisfy their claims.

417.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

418.    The Trustee is also entitled to (and seeks to) recover three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code.

**COUNT XXVIII**
**Common Law Conspiracy**
**(Against the ULX Entities)**

419.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

420.    From at least until on or around 2017 to until or around August 2019, the ULX Entities and one or more of the LCR Director and Officers acted in concert, agreed, associated,

`

mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

421.   The unlawful, illegal, and/or oppressive acts include, but are not limited to, conspiring to breach the fiduciary duties the LCR Board and the LCR Officers and Directors owed the Debtor and its shareholders, clients, and creditors, by among other things, entering into the ULXP joint venture which gave control of LeClairRyan to a non-lawyer, misappropriating funds tendered to the Debtor by its clients for specific expenses, facilitating fraudulent and preferential transfers, and/or making misleading or false statements to professional consultants.

422.   The Defendants and one or more of the LCR Officers and Directors intentionally combined to accomplish these unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal and unlawful means.

423.   As a direct and proximate result of the conspiracy and agreement among the Defendants and one or more of the LCR Officers and Directors, the Debtor and their creditors, sustained significant damages, including but not limited to millions of dollars of unpaid obligations.

424.   As a result of the conspiracy, the Trustee is entitled to recover from the ULX Entities the damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million.

## COUNT XXIX
### Statutory Conspiracy, Va.  Code § 18.2-499, *et seq.*
### (Against the ULX Entities and Mr. LeClair)

425.   From at least in or around 2015 until in or around 2019, the ULX Entities and Mr. LeClair entered into a scheme to create a billion-dollar legal enterprise that could later be marketed to outside investors.

`

426.    Through their principal, Mr. Reed, the UnitedLex Entities and Mr. LeClair acted in concert, agreed, associated, mutually undertook, or combined to accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to the Debtor and the creditors of the Debtor.

427.    The ULX Entities and Mr. LeClair violated Virginia Code § 18.2-499 by combining, associating, agreeing, mutually undertaking or concerting together, and with others, including but not limited to Mr. LeClair for the purpose of willfully and maliciously injuring the Debtor in its reputation, trade, business or profession.

428.    The unlawful, illegal, and/or oppressive acts include, but are not limited to, misappropriation of the Debtor's assets and back-office work force; misusing confidential information for their own personal gains and benefits; misappropriating trade secrets and client relationships that belonged to LeClairRyan; misrepresenting to one or more of the LCR Officer and Directors the potential benefits of the ULXP joint venture; and/or making misleading or false statements to professional consultants.

429.    These unlawful acts, undertaken willfully, intentionally, purposefully, and without lawful justification, have injured the Debtor and its creditors.

430.    The ULX Entities and Mr. LeClair's wrongful conduct was aimed directly at damaging the Debtor and the Debtor's creditors.

431.    As a direct and proximate result of the conspiracy and agreement among the ULX Entities and Mr. LeClair, the Debtor and its creditors suffered significant damages, including but not limited to damages related to the Debtor's loss of business opportunities.

`

432.    The Debtor did not receive any consideration for the transfer of its assets to the

ULX Entities.  Moreover, the transfer was made at a time when the Debtor was insolvent, or the

Debtor was left insolvent as a result of the transfers being made.

433.    As a result of the aforesaid actions, the Debtor was unable to continue as a law firm

and was thereby damaged.  Further, Defendants took valuable assets with which the Trustee could

have administered the Estate and provided some payments to the creditors.

434.    The Defendants' wrongful conduct constitutes a violation of the VBCA.

435.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX

Entities damages suffered by the Debtor and its creditors in an amount to be proven at trial, but

totaling not less than $35 million.

436.    The Trustee is also entitled to (and seeks to) recover three times the damage the

Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs,

pursuant to section 18.2-500 of the Virginia Code.

## COUNT XXX
### Common Law Conspiracy
### (Against the ULX Entities and Mr. LeClair)

437.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

438.    From at least until on or around 2015 to until or around August 2019, the ULX

Entities and Mr. LeClair acted in concert, agreed, associated, mutually undertook, or combined to

accomplish, by concerted action, unlawful, illegal, and/or oppressive acts that caused damage to

the Debtor and the creditors of the Debtor.

439.    The unlawful, illegal, and/or oppressive acts include, but are not limited to,

misappropriation of the Debtor's assets and back-office work force; misusing confidential

`

information for their own personal gains and benefits; misappropriating trade secrets and client

relationships that belonged to LeClairRyan; misrepresenting to one or more of the LCR Officer

and Directors the potential benefits of the ULXP joint venture; and/or making misleading or false

statements to professional consultants.

440.    The Defendants and Mr. LeClair intentionally combined to accomplish these

unlawful purposes, or even if determined to be lawful purposes, accomplish them through illegal

and unlawful means.

441.    As a direct and proximate result of the conspiracy and agreement among the ULX

Entities and Mr. LeClair, the Debtor and its creditors sustained significant damages, including but

not limited to millions of dollars of unpaid obligations.

442.    As a result of the conspiracy, the Trustee is entitled to recover from the ULX

Entities and Mr. LeClair the damages suffered by the Debtor and its creditors in an amount to be

proven at trial, but totaling not less than $35 million.

## COUNT XXXI
### Equitable Subordination Under 11 USC § 510(c)
### (Against All Defendants)

443.    The allegations in the preceding paragraphs are re-alleged and incorporated herein

by reference as if set forth in their entirety.

444.    As set forth above, Defendants engaged in a pattern of misconduct at the expense

of the Debtor and its Estate and stakeholders, including creditors.

445.    Defendants' misconduct was inequitable and resulted in injury to the Debtor and

its stakeholders, including creditors.

446.    Under the principles of equitable subordination, each of the Defendants' claims is

subject to subordination pursuant to section 510(c) of the Bankruptcy Code.

`

447.    Equitable subordination of the Defendants' claims is consistent with the provisions and purposes of the Bankruptcy Code.

448.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 510(c) equitably subordinating all claims filed by Defendants.

## COUNT XXXII
### Conversion
### (Against UnitedLex and ULXP)

449.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

450.    Rather than utilizing monies that had been tendered by the Debtor's clients for specific expense (the "Expense Transfers"), the Debtors instead turned said monies over to the ULX Entities.

451.    The Expense Transfers were wrongfully paid to the ULX Entities.

452.    The Trustee is entitled to immediate possession of the Expense Transfers.

453.    The Trustee is entitled to damages as a result of this conversion in an amount to be proven at trial, but in no event less than $1,069,510.00.

## COUNT XXXIII
### Unjust Enrichment And Disgorgement Of Expense Transfers
### (Against the ULX Entities)

454.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

455.    By accepting funds that were taken inappropriately, at least in part, from funds tendered by the Debtor's clients for specific expenses, UnitedLex and ULXP were conferred a benefit by LeClairRyan's clients.

`

456.     The ULX Entities knew, or should have known, that the funds received by ULXP were tendered to the Debtor by clients of LeClairRyan to be used for specific expenses.

457.     UnitedLex and ULXP accepted and retained this benefit in circumstances that render it inequitable for them to retain the benefit without paying for its value.

458.     The Trustee is entitled to damages as a result of this unjust enrichment in an amount to be proven at trial, but in an amount not less than $1,069,510.00.

### COUNT XXXIV
**Alter Ego Liability**
**(Against UnitedLex and ULX Manager)**

459.     The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference as if set forth in their entirety.

460.     ULXP and ULX Manager were alter egos of UnitedLex.

461.     There existed a unity of interest and ownership between the ULX Entities that created no separate personalities for each entity.  ULXP and ULX Manager are the adjuncts, creatures, instrumentalities, devices, stooges, or dummies of UnitedLex.

462.     Upon information and belief, UnitedLex is the sole managing member of ULX Manager. ULX Manager owns 99% of ULXP.

463.     The ULX Entities shared staff and assets through the Shared Personnel Agreement entered into between the two entities.

464.     ULXP and ULX Manager were used to justify wrongs, protect fraudulent transfers, and to conspire with certain board members, officers, managers, and/or shareholders of the Debtor to breach their fiduciary duties owed to the Debtor and its shareholders, clients, and creditors.

465.     As such, UnitedLex formed and operated ULXP and ULX Manager as devices or shams used to disguise this wrongful conduct.

466.    Consequently, all monies that ULXP and/or ULX Manager are required to return to the Estate should be enforced against UnitedLex.

467.    The Trustee reserves the right to assert claims against any other entity not named in this complaint with a direct and/or indirect beneficial interest in the ULXP enterprise.

468.    The Trustee is entitled to recover all damages asserted in the Complaint, jointly and severally from UnitedLex, ULX Manager,  and ULXP, which operated as UnitedLex's alter egos.



`



## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court enter an Order and Judgment as follows:

(a)     On Counts I and II, awarding judgment to the Trustee, pursuant to Section 548 of the Bankruptcy Code, in an amount of the Avoidable Transfers, and directing the Defendants to pay the Trustee an amount to be determined at trial, totaling not less than $19,912,972.66, plus interest, plus her reasonable attorneys' fees and costs, pursuant to section 550(a) of the Bankruptcy Code;

(b)     On Count III, awarding judgment to the Trustee, pursuant to Sections 544 and 550 of the Bankruptcy Code, Va.  Code Sections 55.1-400 and 55.1-401, or pursuant to other applicable state fraudulent conveyance or fraudulent transfer law, in an amount to be proven at trial, totaling not less than $19,912,972.66, plus interest,

`

plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(c)     On Count IV, awarding judgment to the Trustee, pursuant to Section 547 of the Bankruptcy Code, in an amount to be proven at trial that is not less than $17,981,095.66, plus interest, plus her reasonable attorneys' fees and costs, pursuant to Section 550(a) of the Bankruptcy Code;

(d)     On Counts V and VI, avoiding all of ULXP's liens asserted against the Debtor's Estate;

(e)     On Count VII, avoiding the ULXP Note Transfer;

(f)     On Count VIII, disallowing any claim of the Defendants pursuant to section 502(d) of the Bankruptcy Code;

(g)     On Count IX, recharacterizing ULXP's Proof of Claim No. 174 as a claim of equity;

(h)     On Counts X and XI, awarding the Trustee the full amount of the Two-Year LeClair Transfers, totaling not less than $1,379,158, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(i)     On Count XII, awarding the Trustee the full amount of the LeClair Transfers, totaling not less than $2,363,965, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(j)     On Count XIII, awarding the Trustee the full amount of the LeClair Preferential Transfers, totaling not less than $515,224, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(k)     On Counts XIV and XV, avoiding the transfer of the Releases and Exculpation Rights to and for the benefit of Mr. LeClair;

` 

(l)    On Count XVI, awarding the Trustee judgment against Mr. LeClair, pursuant to Virginia Code Section 55.1-400, (a) avoiding the Contingent Income payments, (b) directing the Contingent Income payments be set aside, and (c) requiring the Defendant Mr. LeClair, as the recipient of the Contingent Income payments and/or the person for whose benefit the Contingent Income payments were given, to return the Contingent Income payments, or the value thereof, to the Trustee;

(m)    On Counts XVII and XVIII, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $459,687;

(n)    On Count XIX, disallowing all of Mr. LeClair's claims against the Estate;

(o)    On Count XX, awarding the Trustee the full amount of assets transferred under the Contribution Agreement including but not limited to the Intellectual Property Transfers, totaling not less than 18.5 million, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(p)    On Counts XXI and XXII, awarding the Trustee the full amount of the value of the transfers made pursuant to the Contribution Agreement, totaling not less than $18.5 million, plus interest, plus the Trustee's reasonable attorneys' fees and costs;

(q)    On Count XXIII, awarding the Trustee an amount to be determined at trial, as well as  punitive damages under Va.  Code §§ 59.1-338 and attorneys' fees under Va. Code §§ 59.1-338.1;

(r)    On Count XXIV, awarding the Trustee damages from the ULX Entities as a result of their breaches in an amount to be proved at trial, including in the amount of any profits that the ULX Entities received in connection with the ULXP joint venture

`

and any gains the ULX Entities received and/or continue to receive in connection with the "constellation" formed directly and/or indirectly by UnitedLex;

(s)    On Count XXV, awarding the Trustee a full accounting of the books and records of the ULX Entities as it relates to the "constellation" formed directly and/or indirectly by UnitedLex;

(t)    On Count XXVI, awarding the Trustee damages in an amount to be proven at trial, in an amount totaling not less than $72 million;

(u)    On Count XXVII, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million, as well as three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to Section 18.2-500 of the Virginia Code;

(v)    On Count XXVIII, awarding the Trustee damages suffered by the Debtor and its creditors in an amount to be proven at trial, but totaling not less than $35 million;

(w)    On count XXIX, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million, as well as three times the damage the Estate sustained as a result of the conspiracy, in addition to reasonable attorneys' fees and costs, pursuant to section 18.2-500 of the Virginia Code;

(x)    On Count XXX, awarding the Trustee damages in an amount to be proven at trial, but totaling not less than $35 million;

(y)    On Count XXXI, entering an order and judgment under 11 U.S.C. § 510(c) equitably subordinating all claims filed by Defendants;

(z)    On Count XXXII and XXXIII, awarding the Trustee damages in an amount to be proven at trial, but in no event less than $1,069,510.00;

`

(aa)    On Count XXXIV, finding that ULXP was the alter ego of UnitedLex and ULX Manager and that ULXP, UnitedLex, and ULX Manager are jointly and severally liable for all damages resulting from this Adversary Proceeding;

(bb)    ████████████████████████████████████████████ ████████████████████;

(cc)    Awarding the Trustee her costs incurred in connection with this Adversary Proceeding, including but not limited to her reasonable attorneys' fees and costs;

(dd)    Awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

(ee)    Directing the Defendants to pay forthwith all amounts awarded; and

(ff)    Granting such other relief as the Bankruptcy Court deems just and proper.

Dated:                                              Respectfully submitted,


By:_____

Erika L. Morabito (VSB No. 44369)
Brittany J. Nelson (VSB No. 81734)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1300 I Street, N.W., Suite 900
Washington, DC 20005
(202) 538-8334 (telephone)
Email:  erikamorabito@quinnemanuel.com
            brittanynelson@quinnemanuel.com

*Special Counsel to Lynn L. Tavenner, Chapter 7 Trustee*

EXHIBIT 1

## ULX TRANSFERS

| Identifying # | Payment Type | Wire / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 305749 | Wire | 7/30/2018 | 8/1/2018 | $   250,000.00 |
| 306336 | Wire | 8/23/2018 | 8/23/2018 | 500,000.00 |
| 306494 | Wire | 8/30/2018 | 8/30/2018 | 500,000.00 |
| 838849 | AR-AP Swap | 6/27/2018 | 8/31/2018 | 147,637.99 |
| 843694 | AR-AP Swap | 7/27/2018 | 8/31/2018 | (27,632.01) |
| 843701 | AR-AP Swap | 7/27/2018 | 8/31/2018 | 318,651.67 |
| 848326 | AR-AP Swap | 8/30/2018 | 8/31/2018 | 243,219.35 |
| 9142018 | Wire | 9/14/2018 | 9/14/2018 | 500,000.00 |
| 307052 | Wire | 9/24/2018 | 9/24/2018 | 500,000.00 |
| 307193 | Wire | 9/27/2018 | 9/27/2018 | 1,000,000.00 |
| 849579 | AR-AP Swap | 9/6/2018 | 9/28/2018 | 97,840.21 |
| 852644 | AR-AP Swap | 9/25/2018 | 9/28/2018 | 84,773.59 |
| 852865 | AR-AP Swap | 9/28/2018 | 9/28/2018 | 19,383.19 |
| 844450 | AR-AP Swap | 8/6/2018 | 9/28/2018 | 9,372.50 |
| 848478 | AR-AP Swap | 9/4/2018 | 9/28/2018 | 1,220.00 |
| 850140 | AR-AP Swap | 9/7/2018 | 9/28/2018 | 7,392.50 |
| 307424 | Wire | 10/5/2018 | 10/4/2018 | 500,000.00 |
| 307633 | Wire | 10/12/2018 | 10/12/2018 | 500,000.00 |
| 307960 | Wire | 10/22/2018 | 10/17/2018 | 500,000.00 |
| 308103 | Wire | 10/26/2018 | 10/25/2018 | 500,000.00 |
| 857251 | AR-AP Swap | 10/31/2018 | 10/30/2018 | 35,085.76 |
| 857167 | AR-AP Swap | 10/26/2018 | 10/30/2018 | 263,323.59 |
| 853411 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 1,363.00 |
| 855168 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 9,834.50 |
| 308243 | Wire | 11/2/2018 | 11/2/2018 | 500,000.00 |
| 308413 | Wire | 11/12/2018 | 11/9/2018 | 500,000.00 |
| 308615 | Wire | 11/20/2018 | 11/20/2018 | 500,000.00 |
| 861158 | AR-AP Swap | 11/27/2018 | 11/30/2018 | 168,271.74 |
| 861439 | AR-AP Swap | 11/29/2018 | 11/30/2018 | 30,069.35 |
| 858669 | AR-AP Swap | 11/13/2018 | 11/30/2018 | 3,315.54 |
| 859089 | AR-AP Swap | 11/8/2018 | 11/30/2018 | 3,360.00 |
| 309622 | Wire | 12/18/2018 | 12/18/2018 | 1,000,000.00 |
| 309716 | Wire | 12/28/2018 | 12/28/2018 | 250,000.00 |
| 309742 | Wire | 12/31/2018 | 12/31/2018 | 750,000.00 |
| 865375 | AR-AP Swap | 12/19/2018 | 12/31/2018 | 30,929.11 |
| 865520 | AR-AP Swap | 12/28/2018 | 12/31/2018 | 5,129.35 |
| 866298 | AR-AP Swap | 12/31/2018 | 12/31/2018 | 5,509.55 |
| 862884 | AR-AP Swap | 12/5/2018 | 12/31/2018 | 2,187.50 |
| 863910 | AR-AP Swap | 12/7/2018 | 12/31/2018 | 434.50 |
| 309916 | Wire | 1/8/2019 | 1/8/2019 | 250,000.00 |
| 310051 | Wire | 1/14/2019 | 1/11/2019 | 750,000.00 |
| 310493 | Wire | 1/30/2019 | 1/30/2019 | 658,154.00 |
| 869687 | AR-AP Swap | 1/28/2019 | 1/31/2019 | 34,506.35 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 3,273.37 |
| 867677 | AR-AP Swap | 1/9/2019 | 1/31/2019 | 4,590.00 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 2,100.00 |

| Identifying # | Payment Type | Wire / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 1656 | Wire | 2/8/2019 | 2/8/2019 | 329,077.55 |
| 1757 | Wire | 2/13/2019 | 2/13/2019 | 164,539.00 |
| 2571 | Wire | 2/27/2019 | 2/27/2019 | 500,000.00 |
| 873497 | AR-AP Swap | 2/22/2019 | 2/28/2019 | 27,434.08 |
| 871186 | AR-AP Swap | 2/8/2019 | 2/28/2019 | 10,577.13 |
| 2916 | Wire | 3/8/2019 | 3/8/2019 | 250,000.00 |
| 3053 | Wire | 3/15/2019 | 3/15/2019 | 250,000.00 |
| 3370 | Wire | 3/20/2019 | 3/20/2019 | 500,000.00 |
| 3222019 | Wire | 3/22/2019 | 3/22/2019 | 500,000.00 |
| 876425 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 18,243.73 |
| 875655 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 1,235.40 |
| 876743 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 32,879.42 |
| 3636 | Wire | 3/31/2019 | 4/1/2019 | 400,000.00 |
| 4009 | Wire | 4/5/2019 | 4/5/2019 | 400,000.00 |
| 4115 | Wire | 4/11/2019 | 4/11/2019 | 500,000.00 |
| 4230 | Wire | 4/17/2019 | 4/17/2019 | 350,000.00 |
| 42519A | Wire | 4/25/2019 | 4/25/2019 | 400,000.00 |
| 4948 | Wire | 5/2/2019 | 5/2/2019 | 200,000.00 |
| 4999 | Wire | 5/3/2019 | 5/3/2019 | 200,000.00 |
| 5210 | Wire | 5/10/2019 | 5/10/2019 | 100,000.00 |
| 5450 | Wire | 5/21/2019 | 5/21/2019 | 400,000.00 |
| 5937 | Wire | 5/30/2019 | 5/30/2019 | 300,000.00 |
| 5965 | Wire | 5/31/2019 | 5/31/2019 | 150,000.00 |
| 6006 | Wire | 6/4/2019 | 6/4/2019 | 200,000.00 |
| 6081 | Wire | 6/7/2019 | 6/7/2019 | 200,000.00 |
| 6313 | Wire | 6/18/2019 | 6/19/2019 | 200,000.00 |
| 6314 | Wire | 6/19/2019 | 6/19/2019 | 50,000.00 |
| 6682 | Wire | 6/28/2019 | 6/28/2019 | 320,000.00 |
| 7404 | Wire | 7/25/2019 | 7/25/2019 | 170,000.00 |
| 7332 | Wire | 7/25/2019 | 7/25/2019 | 150,000.00 |
| 7791 | Wire | 7/31/2019 | 7/31/2019 | 170,000.00 |
| N/A | Wire | 8/7/2019 | 8/7/2019 | 190,639.43 |
| N/A | Wire | 8/19/2019 | 8/19/2019 | 59,560.39 |
| N/A | Wire | 8/20/2019 | 8/20/2019 | 59,560.39 |
| N/A | Wire | 8/21/2019 | 8/21/2019 | 59,560.39 |
| N/A | Wire | 8/22/2019 | 8/22/2019 | 59,560.39 |
| N/A | Wire | 8/23/2019 | 8/23/2019 | 59,560.39 |
| N/A | Wire | 8/26/2019 | 8/26/2019 | 16,190.02 |
| N/A | Wire | 8/27/2019 | 8/27/2019 | 10,709.37 |
| N/A | Wire | 8/28/2019 | 8/28/2019 | 13,449.69 |
| N/A | Wire | 8/29/2019 | 8/29/2019 | 13,449.69 |
| N/A | Wire | 8/30/2019 | 8/30/2019 | 13,450.00 |

$ 19,912,972.66

EXHIBIT 2

## ULX PREFERENTIAL TRANSFERS

| Identifying # | Payment Type | Wire / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 9142018 | Wire | 9/14/2018 | 9/14/2018 | $   500,000.00 |
| 307052 | Wire | 9/24/2018 | 9/24/2018 | 500,000.00 |
| 307193 | Wire | 9/27/2018 | 9/27/2018 | 1,000,000.00 |
| 849579 | AR-AP Swap | 9/6/2018 | 9/28/2018 | 97,840.21 |
| 852644 | AR-AP Swap | 9/25/2018 | 9/28/2018 | 84,773.59 |
| 852865 | AR-AP Swap | 9/28/2018 | 9/28/2018 | 19,383.19 |
| 844450 | AR-AP Swap | 8/6/2018 | 9/28/2018 | 9,372.50 |
| 848478 | AR-AP Swap | 9/4/2018 | 9/28/2018 | 1,220.00 |
| 850140 | AR-AP Swap | 9/7/2018 | 9/28/2018 | 7,392.50 |
| 307424 | Wire | 10/5/2018 | 10/4/2018 | 500,000.00 |
| 307633 | Wire | 10/12/2018 | 10/12/2018 | 500,000.00 |
| 307960 | Wire | 10/22/2018 | 10/17/2018 | 500,000.00 |
| 308103 | Wire | 10/26/2018 | 10/25/2018 | 500,000.00 |
| 857251 | AR-AP Swap | 10/31/2018 | 10/30/2018 | 35,085.76 |
| 857167 | AR-AP Swap | 10/26/2018 | 10/30/2018 | 263,323.59 |
| 853411 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 1,363.00 |
| 855168 | AR-AP Swap | 10/3/2018 | 10/30/2018 | 9,834.50 |
| 308243 | Wire | 11/2/2018 | 11/2/2018 | 500,000.00 |
| 308413 | Wire | 11/12/2018 | 11/9/2018 | 500,000.00 |
| 308615 | Wire | 11/20/2018 | 11/20/2018 | 500,000.00 |
| 861158 | AR-AP Swap | 11/27/2018 | 11/30/2018 | 168,271.74 |
| 861439 | AR-AP Swap | 11/29/2018 | 11/30/2018 | 30,069.35 |
| 858669 | AR-AP Swap | 11/13/2018 | 11/30/2018 | 3,315.54 |
| 859089 | AR-AP Swap | 11/8/2018 | 11/30/2018 | 3,360.00 |
| 309622 | Wire | 12/18/2018 | 12/18/2018 | 1,000,000.00 |
| 309716 | Wire | 12/28/2018 | 12/28/2018 | 250,000.00 |
| 309742 | Wire | 12/31/2018 | 12/31/2018 | 750,000.00 |
| 865375 | AR-AP Swap | 12/19/2018 | 12/31/2018 | 30,929.11 |
| 865520 | AR-AP Swap | 12/28/2018 | 12/31/2018 | 5,129.35 |
| 866298 | AR-AP Swap | 12/31/2018 | 12/31/2018 | 5,509.55 |
| 862884 | AR-AP Swap | 12/5/2018 | 12/31/2018 | 2,187.50 |
| 863910 | AR-AP Swap | 12/7/2018 | 12/31/2018 | 434.50 |
| 309916 | Wire | 1/8/2019 | 1/8/2019 | 250,000.00 |
| 310051 | Wire | 1/14/2019 | 1/11/2019 | 750,000.00 |
| 310493 | Wire | 1/30/2019 | 1/30/2019 | 658,154.00 |
| 869687 | AR-AP Swap | 1/28/2019 | 1/31/2019 | 34,506.35 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 3,273.37 |
| 867677 | AR-AP Swap | 1/9/2019 | 1/31/2019 | 4,590.00 |
| 869334 | AR-AP Swap | 1/16/2019 | 1/31/2019 | 2,100.00 |
| 1656 | Wire | 2/8/2019 | 2/8/2019 | 329,077.55 |
| 1757 | Wire | 2/13/2019 | 2/13/2019 | 164,539.00 |
| 2571 | Wire | 2/27/2019 | 2/27/2019 | 500,000.00 |
| 873497 | AR-AP Swap | 2/22/2019 | 2/28/2019 | 27,434.08 |
| 871186 | AR-AP Swap | 2/8/2019 | 2/28/2019 | 10,577.13 |
| 2916 | Wire | 3/8/2019 | 3/8/2019 | 250,000.00 |

| Identifying # | Payment Type | Wire / Swap Invoice Date | Bank Clear Date / Swap Application Date | Payment Amount |
|---|---|---|---|---|
| 3053 | Wire | 3/15/2019 | 3/15/2019 | 250,000.00 |
| 3370 | Wire | 3/20/2019 | 3/20/2019 | 500,000.00 |
| 3222019 | Wire | 3/22/2019 | 3/22/2019 | 500,000.00 |
| 876425 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 18,243.73 |
| 875655 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 1,235.40 |
| 876743 | AR-AP Swap | 3/22/2019 | 3/22/2019 | 32,879.42 |
| 3636 | Wire | 3/31/2019 | 4/1/2019 | 400,000.00 |
| 4009 | Wire | 4/5/2019 | 4/5/2019 | 400,000.00 |
| 4115 | Wire | 4/11/2019 | 4/11/2019 | 500,000.00 |
| 4230 | Wire | 4/17/2019 | 4/17/2019 | 350,000.00 |
| 42519A | Wire | 4/25/2019 | 4/25/2019 | 400,000.00 |
| 4948 | Wire | 5/2/2019 | 5/2/2019 | 200,000.00 |
| 4999 | Wire | 5/3/2019 | 5/3/2019 | 200,000.00 |
| 5210 | Wire | 5/10/2019 | 5/10/2019 | 100,000.00 |
| 5450 | Wire | 5/21/2019 | 5/21/2019 | 400,000.00 |
| 5937 | Wire | 5/30/2019 | 5/30/2019 | 300,000.00 |
| 5965 | Wire | 5/31/2019 | 5/31/2019 | 150,000.00 |
| 6006 | Wire | 6/4/2019 | 6/4/2019 | 200,000.00 |
| 6081 | Wire | 6/7/2019 | 6/7/2019 | 200,000.00 |
| 6313 | Wire | 6/18/2019 | 6/19/2019 | 200,000.00 |
| 6314 | Wire | 6/19/2019 | 6/19/2019 | 50,000.00 |
| 6682 | Wire | 6/28/2019 | 6/28/2019 | 320,000.00 |
| 7404 | Wire | 7/25/2019 | 7/25/2019 | 170,000.00 |
| 7332 | Wire | 7/25/2019 | 7/25/2019 | 150,000.00 |
| 7791 | Wire | 7/31/2019 | 7/31/2019 | 170,000.00 |
| N/A | Wire | 8/7/2019 | 8/7/2019 | 190,639.43 |
| N/A | Wire | 8/19/2019 | 8/19/2019 | 59,560.39 |
| N/A | Wire | 8/20/2019 | 8/20/2019 | 59,560.39 |
| N/A | Wire | 8/21/2019 | 8/21/2019 | 59,560.39 |
| N/A | Wire | 8/22/2019 | 8/22/2019 | 59,560.39 |
| N/A | Wire | 8/23/2019 | 8/23/2019 | 59,560.39 |
| N/A | Wire | 8/26/2019 | 8/26/2019 | 16,190.02 |
| N/A | Wire | 8/27/2019 | 8/27/2019 | 10,709.37 |
| N/A | Wire | 8/28/2019 | 8/28/2019 | 13,449.69 |
| N/A | Wire | 8/29/2019 | 8/29/2019 | 13,449.69 |
| N/A | Wire | 8/30/2019 | 8/30/2019 | 13,450.00 |
| | | | | $ 17,981,095.66 |